G623ZARC                        Bail

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              15 CR 867 (RMB)

5    REZA ZARRAB,

6              Defendant.

7    ------------------------------x

8                                             New York, N.Y.
                                              June 2, 2016
9                                             1:00 p.m.

10

     Before:
11
                        HON. RICHARD M. BERMAN,
12
                                              District Judge
13

14                            APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     MICHAEL LOCKARD
17   SIDHARDHA KAMARAJU
          Assistant United States Attorneys
18
     BRAFMAN & ASSOCIATES P.C.
19        Attorneys for Defendant
     BENJAMIN BRAFMAN
20   MARC AGNIFILO
     JOSHUA KIRSHNER
21

22   ALSO PRESENT:  Scott Geissler and Jennifer McReynolds, FBI

23   Ecegul Elterman, Turkish language interpreter

24

25

G623ZARC

1              THE COURT:  Good afternoon.  So, I have a few remarks

2     at the outset.  And my plan is to then defer to counsel, if

3     they wish to be heard, in support of the defense motion and in

4     opposition by the government.

5              You think you will want to be heard, Mr. Brafman?

6              MR. BRAFMAN:  Yes, your Honor.

7              THE COURT:  And counsel for the government as well?

8              MR. LOCKARD:  Yes, your Honor.

9              THE COURT:  So, we should note that there is a Turkish

10    language interpreter and who is interpreting and sitting next

11    to Mr. Zarrab.  Is that correct, Mr. Brafman?

12             MR. BRAFMAN:  Yes, your Honor.

13             THE COURT:  Is that simultaneous or intermittent?

14             THE INTERPRETER:  Simultaneous while the attorneys are

15    speaking and your Honor speaking, otherwise if you have

16    questions, it is an allocution, it has to be consecutive.

17             THE COURT:  Okay.  Let me just make a few remarks at

18    the beginning and they are as follows:

19             First, I want to say preliminarily and very

20    emphatically that we are not -- underscore not -- resolving or

21    even considering the issue of Mr. Zarrab's guilt or innocence

22    in this proceeding today.  Mr. Zarrab is presumed to be

23    innocent under our legal system, and that presumption carries

24    right up until the time, if it comes, that he may be determined

25    to be guilty or not following a trial.  The presumption of

innocence is a very important concept in our judicial system.

So today we are only talking about bail, including the proposed conditions of bail as opposed to remand pending trial. The relevant statute is 18, United States Code, Section 3142(b), and under that statute, the Court shall order the pretrial release of a person, unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required, or will endanger the safety of any person, any other person, or the community.

Under 18, United States Code, Section 3142(g), the Court considers four factors to determine if there are conditions of release that will reasonably assure the appearance of the person and the safety of the community. And I just want to take a minute and read those four factors to you so everybody is on the same page.

The first is the nature and the circumstances of the offense or crime charged, including whether the offense is a crime of violence or involves a narcotic drug.

Number two is the weight of the evidence against the person.

Number three is the history and characteristics of the person, including (A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history,

G623ZARC

1    and record concerning appearance at court proceedings.

2            And (B) this is still under factor number three, (B)

3    whether at the time of the current offense or arrest, he was on

4    probation, on parole, or on other release pending trial,

5    sentencing, appeal, or completion of sentence for an offense

6    under federal, state or local law.

7            And then the fourth bail remand criteria or factor is

8    the nature and the seriousness of the danger to any person or

9    the community that would be posed by the person's release.

10           As I just noted, by way of clarification, one of the

11   factors I just mentioned, one of the four factors, is called

12   weight of evidence.  And here, again, I want to caution that

13   that factor, and the others that I mentioned, are going to be

14   analyzed at this time only in connection with the question of

15   bail or remand.  Not with regard to guilt or innocence.

16           The Court has received a very professional and

17   extensive set of legal papers and submissions from the defense,

18   who are proposing bail conditions in an effort to demonstrate

19   that Mr. Zarrab will make all his court appearances, in other

20   words, to guarantee that he is not a flight risk.  And that

21   proposal, that package, that bail package, includes the

22   following conditions:

23           One is a $50 million personal recognizance bond

24   secured by $10 million in cash; two is travel restricted to the

25   Southern District of New York; three is surrender of all travel

G623ZARC

documents; four is strict pretrial supervision; and fifth is

home detention with GPS monitoring at Mr. Zarrab's proposed

residence in Manhattan; and lastly, private armed security

guards who will monitor and guard Mr. Zarrab 24/7, in other

words, around the clock, in order to ensure that he makes all

his court appearances and that he is not a flight risk.

The Court has received a similarly professional and

extensive set of papers and submissions from the government who

oppose bail for Mr. Zarrab.  The government is opposed to the

private security guard and home confinement arrangement offered

by the defense in this case.  The government argues that a

private security firm "simply cannot replicate the controlled

environment of a federal correctional facility."  And goes on

to argue that there are no bail conditions which can be imposed

here in this case, which will ensure that Mr. Zarrab, who is a

Turkish and Iranian national, is not a risk of flight.

So just so you are aware, and this is by way of heads

up, I'm going to hear, as I said at the outset, from counsel

orally today.  I am unlikely to decide the issue here today

with you all present, and will more likely decide it over the

next week or so, upon further review of the papers.

A few more things and then I'm going to turn to

counsel.  The first is that on several occasions, journalists

have called the Court's office or chambers and spoken to one or

another of my law clerks seeking my comment on some aspect of

6

G623ZARC

1    this case.  Such calls are unwelcome and improper in our

2    system.  The Court may not give interviews while a case is

3    pending.  The Court's position is only what is stated on the

4    record when all of the parties and their counsel are present

5    here in court.  Consequently, news articles which appear based

6    on information obtained out of court may very well be

7    inaccurate and incorrect.  I have not given journalists any

8    interviews or comments in response to such calls, and I will

9    not do so going forward.

10         Second, the bail issue that we are considering today,

11   however it is decided, the best way that I know of to resolve

12   the issues presented in this case is to conduct a speedy and

13   public trial by jury.  And to that end, the Court, that is to

14   say I, will make myself available to conduct the trial as soon

15   as counsel for both sides are ready.  I would like counsel to

16   meet and confer following today's conference, and to select two

17   or three mutually agreeable trial dates, and ask them to send

18   me a letter indicating those dates if they can on or before

19   June 7, if that is possible.  And we can fix an actual trial

20   date at the conference which is currently scheduled for

21   June 16, 2016, at 11 a.m.

22         So with that, I think I'll turn to Mr. Brafman who has

23   submitted the bail package.

24         MR. BRAFMAN:  Yes, and your Honor, thank you.

25         Your Honor, to be candid, sir, I appreciate as always

7

G623ZARC

that the Court has taken a lot of unnecessary argument out of

the picture by some of the preliminary comments that your Honor

has made.  So, I do not intend to try the case at this bail

hearing, and I would hope that since I decide not to try it,

that the government will likewise decide not to try it.

    We may be commenting briefly on certain of the

statements made by the government, but clearly, I agree with

you, sir, that some of the complex issues in this case not only

would require a trial to be resolved, but may even require

experts on both sides, clearly, with respect to the sanctions

part.

    THE COURT:  I appreciate that and I will certainly

give you leeway if that's appropriate in making your comments.

    MR. BRAFMAN:  Thank you.

    Judge, I must tell you, having appeared in this

courtroom and probably every other courtroom in this building

for the last 37 years, I'm somewhat awed by the responsibility

today, because I recognize that depending on my ability to

properly focus your Honor's attention on certain key issues,

may well impact on the quality of life that Mr. Zarrab will be

able to enjoy in the many months ahead, to the extent that you

decide whether he is remanded or is released on bail subject to

the conditions we propose.

    I also respectfully note that conceptually trying to

prepare a case of this complexity while the defendant is

8

G623ZARC

1  remanded is almost impossible to conceptualize, and would

2  welcome questions if your Honor gets to that point at some

3  point.  But I don't expect that you will grant bail simply for

4  that reason.

5          I expect that, and hope that you, sir, will grant bail

6  because he's legally entitled to it, and that the government

7  has a dual burden, as the Court in *Sabhnani* makes very clear

8  and as your Honor well knows better than anyone else in this

9  courtroom.

10         And I respectfully note that we can take danger to the

11  community out of the equation, because the government does not

12  argue that he poses a danger to the community, and none of the

13  crimes Mr. Zarrab is charged with are crimes of violence.

14         I will also respectfully note that there are two

15  burdens they must first meet under the law and under the cases

16  that your Honor is familiar with.  One is that they first must

17  prove that the defendant represents a risk of flight, and

18  perhaps because of his lack of ties to the community, they make

19  that argument.

20         And your Honor, it is somewhat disingenuous to pluck

21  someone from a foreign country whose only contact to the United

22  States was coming here to go to Disneyland, and whose crime

23  involved passing through a Federal Reserve bank, and then

24  saying you shouldn't get bail because you have no ties to the

25  community.  And it is impossible for someone under those

G623ZARC

circumstances to have ties to the community.

I have a great respect for this Court, which is why we didn't propose a bail package without any sharp teeth in it. We proposed what I think is a very important sets of conditions that take the risk of flight out of the consideration.

And then even if they meet the first burden of suggesting that the defendant is a risk of flight, the Court and all of the judges in this building and in the Second Circuit who have interpreted the law, said they next must meet a dual burden, and the second burden is they must prove by a preponderance of the evidence that there are no conditions that will ensure that the defendant will come to court when he is required.

And I submit with great respect that they have failed miserably in that part of the equation. So that even if they have suggested that he poses a risk of flight, we respectfully submit that the second burden which they must overcome under the statute your Honor cited and under *Sabhnani*, they have failed. Because if you impose the conditions we suggest, then the defendant will be here, and he will be here whenever required, and he will not be able to leave the jurisdiction.

I am going to try to move through this. I know you've read everything we've submitted. I've been before you before, so I know that. But I need to address certain things for a couple of reasons, and I ask for your Honor's patience.

G623ZARC

1          First of all, as is obvious to everyone and as your

2     Honor well knows, this case is being followed.  And fortunately

3     or unfortunately, I think the public record that we're making

4     now is digitally available to anyone instantly.  And I think it

5     is important that some of the statements made about Mr. Zarrab

6     are taken and put in their proper context.  So I want to start,

7     your Honor --

8          THE COURT:  You should know, I have nothing else on

9     the calendar today.  And so feel free to say what you want to

10    say and need to say, and the same is true for the government.

11         MR. BRAFMAN:  Thank you, Judge.  I think I want to

12    start with the government's suggestion that this defendant was

13    not honest with the pretrial services interview in Miami.  And

14    I say to you, sir, that under the circumstances here, I think

15    that statement is somewhat offensive.  And I think what you

16    only need to do is actually look at the first section of the

17    pretrial services report, where the author of the report says

18    "Although the interview was conducted in English, the defendant

19    is in need of a Turkish interpreter and none was provided."

20    This was conducted by a pretrial services person without an

21    interpreter.

22         Now, if you recall, sir, and I have the transcript if

23    we need to refer to it, I represented to your Honor and say so

24    as an officer of the court, who I hope the Court recognizes

25    that I when I say that, that I'm being honest, that I told your

G623ZARC

Honor that I can have some conversation with the defendant in

English.  And nevertheless, at the arraignment before your

Honor, you provided an interpreter.

          We don't even have to go to that, Judge, because what

I got, to be honest with you, your Honor, which I think

resolves the issue, is the transcript of this defendant in

Florida when he was arraigned in Florida where he waived his

detention hearing.  And in Florida, it is the prosecutor who

indicates that there is a language problem between defendant

and his attorney, and therefore, they are adjourning the

detention hearing.

          And at that point, your Honor, there is an interesting

question that I raise.  The question that I raise is the

government has essentially spent almost 50 percent of its

initial submission suggesting that the defendant was less than

candid with pretrial during his interview in Florida.  And I

think they did that, your Honor, because they wanted to back in

to the facts in the *Cilins* case which is quoted by them, where

Judge Pauley denied bail with armed guards, ostensibly in part

because it wasn't until the third detention hearing where the

defendant in that case disclosed that he had a million dollar

secret bank account, and Judge Pauley mentioned that fact that

he had been dishonest with pretrial.

          But the charges in *Cilins*, where the defendant was

charged with obstruction of justice, with attempting to suborn

G623ZARC

perjury in this district, with attempting to tamper with

witnesses.  And Judge Pauley, who I know we all respect and

know quite well, said candidly that the nature of the charges

and the fact that the defendant was dishonest, having been

given three chances, determined in Judge Pauley's opinion that

he couldn't be trusted.

       Now, if we remove from this argument that which the

government has spent so much time on, that this man has

purposely tried to deceive pretrial services, it takes the wind

out of the biggest sail in the government's boat to keep this

defendant remanded.  And it does so, your Honor, because they

relied on it extensively, again and again and again.

       And to be candid with you, Judge, I kept shaking my

head in somewhat disbelief because if you look at -- and I have

a copy here of the transcript of March 21, 2016, in the

Southern District of Florida.  Mr. Hayes who is the government,

Assistant United States Attorney James Hayes, alerts the Court

to the following:  "Your Honor, we're requesting pretrial

detention hearing.  I have been in conversations with counsel,

because she's just met her client recently, and there is a bit

of a language problem and he's not ready to go forward today,

obviously," and then they go on and they schedule it and she

waives the hearing.

       So I say that for two reasons.  First of all, there

was no point, this pretrial services interview, if there was no

G623ZARC

1    interpreter available, because the defendant was not going to

2    have a detention hearing.  The pretrial services report is

3    basically done, as we all know in this district, to give the

4    Court some guidance as to what you know about this person, and

5    we hope that the report is thorough and that the report is

6    accurate.

7           Now, your Honor, yesterday, I'm grateful that the

8    government sent you what was marked as Exhibit A, which is a CD

9    which shows about a 15-minute interview of Mr. Zarrab after his

10   arrest in Florida.  The interview, it's very brief, takes place

11   on a Saturday night, after 10 p.m.  And they had the ability to

12   get a Turkish interpreter on a Saturday night after 10 p.m.,

13   and the Turkish interpreter is present in that room with

14   Mr. Zarrab throughout that interview.  And by my count, your

15   Honor, there are at least 15 separate occasions when Mr. Zarrab

16   looks at the interpreter and asks the interpreter by his facial

17   expression to interpret, and has conversation with the

18   interpreter, and the interpreter responds and the interpreter

19   explains.

20          And what's interesting, Judge, is it is usually in

21   connection with something that deals with assets, that deals

22   with entities, words that are not common to someone who speaks

23   English conversationally.  And in one particular exchange,

24   which we cite in the letter we sent to the Court yesterday,

25   where the agent who is trying to pressure Mr. Zarrab into

G623ZARC

cooperating, says to him "Your illicit activities in financing

Iranian entities in violation of U.S. law," and Mr. Zarrab

responds "I don't understand."  And then the interpreter goes

on to explain.  And when he tells him repeatedly how much time

he is going to be spending in prison, maybe using the term

"decades in prison" several times during the interview, to

frighten Mr. Zarrab, who appears bewildered during this

interview, because several times he even asks "Am I under

arrest?"  And the interpreter on 15 occasions, and it may be

16, it may be 14, so don't hold me to it, but the interpreter's

off to the left.  You can hear him.  But you can see

Mr. Zarrab, he keeps looking at him, and almost every time he

looks at the interpreter for guidance, it is because of a

question that relates to the case, to the charges, to the issue

of sanctions.

        And to suggest, as the government has, that this man

speaks English well enough so that you should decide his fate

based on a report by pretrial, where one of the things we don't

have are the questions that were posed to Mr. Zarrab by the

pretrial services officer.  We have her notes.

        What we have represented to your Honor, and what we

think is true, this was done in the 15-minute interview when

Mr. Zarrab was essentially in a cage speaking through a screen.

Pretrial services interview required the report before the

defendant was brought to the arraignment.  The arraignment is

G623ZARC

1   on October 21, Judge.  It is three days after his arrest.  They

2   had 72 hours to round up an interpreter.  And when they needed

3   an interpreter, they had one on a Saturday night at 10 o'clock

4   when they wanted him to cooperate.  But for a pretrial services

5   interview, there isn't a defendant in any country, besides

6   maybe a career criminal, who can grasp the significance of a

7   pretrial services interview.

8           And there is no lie in the interview.  There is no lie

9   in the interview.  There is no intentional withholding of

10  information in the interview.

11          And the perfect irony in this case, which still has me

12  scratching my head, is we're the ones who came to the Court and

13  told the government and told you all about his assets, all

14  about his charity, all about his wealth, all about his

15  businesses.  Before there was a claim that the pretrial

16  services interview was false.  We did that.  Before your Honor

17  had to even think about bail, the defendant authorized us to

18  tell the Court everything.  Not because he lied to pretrial.

19  But because we wanted your Honor to understand that this was a

20  man of substance, with a family, with businesses, with

21  legitimacy, with employees, who was considered one of the top

22  taxpayers in Turkey during the period in question.  Number 56

23  on the list that we provided to your Honor of all the people in

24  Turkey.

25          So the government latches on to the following:  When

G623ZARC

asked his monthly income, she writes $60,000.  Now, was that a

salary from one of the many companies he ran, is that his total

salary?  Because on the next page she says he told her he had

an $8 million home and that it was paid in full.  There is no

followup questions, where did you get $8 million on a $60,000 a

month salary.  He has a million dollar business.  There is no

followup, where do you get a million dollars on a $60,000

salary.

              And then she says the defendant possessed a Turkish

passport which he advised was seized by arresting officers.

That's true.  He came into the United States on a Turkish

passport.  And then she writes, and in the past 10 years the

defendant has traveled to London, Europe, China, Singapore,

Thailand and Dubai for vacation.  How do we know what that

question was?  And the government says, well, you also went to

other countries and he didn't list them all, because obviously

he didn't want pretrial services to know.

              Judge, if the defendant had known that this report

would be used by the United States attorney's office to detain

him, he had a right to counsel at that hearing, she wasn't

there.  He had the right to an interpreter as noted by the

pretrial services officer, they didn't provide him with an

interpreter.

              And they take the position that because this is not a

complete document, therefore, he lied and therefore you should

G623ZARC

not release him on the conditions that are imposed because
under *Cilins* the Court used a lie to pretrial services as a
basis upon which to detain the defendants.

THE COURT:  Is the point or the central point that if
you take out that allegation that he was not being forthright
with pretrial services, you remove the *Cilins* precedent of
Judge Pauley?  Is that what you're arguing?

MR. BRAFMAN:  It's that argument, yes.  Because the
case -- I will tell you, sir, in a moment that every single
case that the government cited to your Honor is completely
distinguishable.  We're in the Southern District.  They are in
the Hula Bowl with some of the cases they cited, the facts are
so different.

But in the *Cilins* case, and we all have respect for
Judge Pauley, in that case he denied 24-hour armed guards.  In
that case he made a finding that Cilins were not trustworthy.
They had three detention hearings before he first admitted to a
million dollar bank account.

*It is more than that, Judge, and I appreciate the*
*question.  What the government has said is that forget Cilins*
*for a minute.  They have said in half of their initial*
submission and continuously in their sur-reply, they have said
that the defendant's failure to fully disclose his assets to
pretrial services is a reason why you can't trust him.  Because
it shows that he is deceptive, it shows he is dishonest.  How

G623ZARC

1    can you trust someone who has been dishonest?

2                And what's interesting is Judge Rakoff in the *Dreier*

3    case, which is, you know, a decision in this district, approved

4    24-hour armed guards, and Dreier had a dual personality.

5    Dreier had a completely false identity that he had set up to

6    use to bilk people, and Judge Rakoff says, I got to give him

7    bail because the law says that if the conditions that are

8    proposed will ensure his appearance, the law requires me to

9    give him bail.

10                And he also addressed something else, which is sort of

11   the elephant in the room and perhaps in the country.  He

12   addressed the issue of do we allow wealthy defendants to do

13   this when not wealthy defendants can't do it.

14                Your Honor has a history of family court; I was an

15   assistant district attorney.  The inequities in the criminal

16   justice system on the state and federal level between people of

17   means and people of not means is not something that is

18   Mr. Zarrab's fault, and it is nothing we are going to remedy in

19   this case.  It is sad, but it's true.  Poor people don't get

20   the same quality sometimes of representation, maybe the same

21   quality of sentencing advocacy.  It's sad, but true.

22                But that does not mean that you claim someone is very

23   rich and, therefore, he can use his wealth, and then say but

24   you can't use your wealth to create a prison.  That's an

25   anomaly that Judge Rakoff dealt with in the *Dreier* case, Judge

G623ZARC

1    Broderick dealt with in the *Ng* case, and we'll get to the *Ng*

2    case in a minute, because I was struck by what the government

3    said.  And I know the *Ng* case because I argued that bail

4    package, and I'll move onto that in a moment.

5              But what your Honor's question was, first of all, in

6    *Cilins*, the charges were reprehensible.  Our client is charged

7    with what we believe to be an unprecedented violation of the

8    Iran sanctions law applied to a non-U.S. citizen who has not

9    done anything on U.S. soil, has not come to the United States

10   to commit a crime, and the only connection to the United States

11   is that some of the bank transfers in dollars the government

12   alleged passed through a United States bank.  Not the

13   defendant's bank account.  A United States bank.  One bank

14   cleared apparently through the Federal Reserve, but they don't

15   have any jurisdiction whatsoever.

16             In *Cilins*, you were dealing with someone who was

17   intending to corrupt this courthouse, corrupt this case,

18   corrupt his case, and Judge Pauley I think dealt with him

19   appropriately.

20             So when you take out the lack of an interpreter, and

21   then understand that the defendant was not being deceptive, and

22   it is unfair to think he is deceptive, it is more than getting

23   beyond *Cilins*.  It gets me to where I hopefully want your Honor

24   to be, and that is that the defendant is not dishonest with the

25   Court, has not attempted to be deceptive with the Court.  And

G623ZARC

1     if your Honor set bail conditions, he would comply with them.

2             Your Honor, I also note that, unlike *Cilins* where the

3     defendant's information was relied on by a Court and it turned

4     out to be false, we are the ones who came to you, sir, in our

5     bail application, and told you where all of his assets are and

6     all of the different businesses that he has.

7             And I just want you for a moment, sir, and forgive me,

8     I'm not trying to be dramatic, he comes to the United States

9     not to commit a crime, he comes to the United States to take a

10    five-year-old to Disneyland.  At the airport, he declares

11    $100,000 in cash before he is under arrest, not because he

12    thinks he is going to be arrested, because if he thought he was

13    going to be arrested, why come to the United States?  He

14    declared it because it was the legal thing to do.  And the

15    government ignores that.  The government suggests that if he

16    comes to the United States with $100,000, that's a bad thing.

17            Well, to be honest with you, Judge, it's very hard to

18    come to the United States from a foreign country where the

19    local currency may or may not be fluctuating, may or may not be

20    acceptable here.  But he declares it.  He does what the law

21    requires, and Customs has no quarrel with it.

22            He's then arrested, but then I want to ask your Honor

23    just for a moment to consider the following.  You're going to

24    Disneyland, and suddenly you're not.  Suddenly you are in

25    handcuffs and suddenly you are in a maximum security jail, and

G623ZARC

1    on a Saturday night you are confronted by two FBI agents and an

2    interpreter and you are told you are going to be spending the

3    rest of your life in jail, and you keep saying "I don't

4    understand.  I don't know what I did wrong."  And the only

5    statement which he does make in English  "I did not violate the

6    law."

7             So there is nothing in that tape which the government

8    could use.  If we tried to offer it at trial to show

9    consciousness of innocence, they would say it is not admissible

10   because it's not an admission.

11            The purpose of that tape is to show the difficulty of

12   the defendant with the English language.  It is clear as a bell

13   on that tape, so I am glad they taped it.  It is also clear as

14   a bell when they want to get an interpreter to help, they can

15   get a interpreter even on a Saturday night.

16            Your Honor, I want to talk for a moment, what's

17   interesting in this case is that there are parts of this

18   indictment that trouble me.  And I don't mean "trouble me"

19   because I am going to have trouble defending them.  They

20   trouble me because, your Honor, this just kind of stuff doesn't

21   happen in the cases that I'm generally in.

22            The indictment, which I know your Honor has, has two

23   e-mails that the government cites to as evidence that the

24   defendant is a bad guy.  There is no other reason to put that

25   e-mail into the indictment.  One of the e-mails which is on

G623ZARC

1    page 11 -- starts at the bottom of page 10, goes on to page 11

2    of the indictment, it is an e-mail from someone to Mr. Zarrab,

3    which suggests that he should support the supreme leader and he

4    should violate the sanctions, and it is almost like too good to

5    be true for the government to have an e-mail like that, which

6    is obviously of interest to me, who is this.

7            But what the government doesn't say, what the

8    government actually does say, is that this e-mail was sent to

9    Mr. Zarrab and was supposed to be signed by him.  It was

10   presented for his signature.  And the government concedes in

11   the memo that he didn't sign it.  He didn't sign it.  It was

12   found in his e-mail box.

13           I want to suggest, and I don't mean to be facetious,

14   but if I was to send an e-mail to your Honor and say, Judge, I

15   think you should really vote for Bernie Sanders, and we found

16   it in your e-mail, that should not be used to suggest that

17   Judge Berman supports Bernie Sanders because you would have to

18   respond to the e-mail, and you didn't, or you would have to

19   sign for the e-mail so we at least know that you have it.

20           This e-mail was in Farsi.  As we indicate in our

21   papers, the defendant does not read Farsi.  He speaks Farsi.

22   He left Iran when he was one years old.  He was not educated in

23   Iran.  There is no proof anywhere that the defendant speaks

24   Farsi.  To the contrary.  There is evidence in the discovery

25   where he is telling people that he doesn't speak Farsi.

1          So, this e-mail, which we submit would not get to a

2     jury, we would in the motion in limine under 403 seek to strike

3     this because all it does is inflame -- he cannot write Farsi.

4     So he can't respond to this.  He can speak Farsi.  But he

5     cannot respond to this.  And he didn't respond to it.

6          What's even more troubling, because we're playing fast

7     and loose with translations, we have an e-mail that is signed,

8     that appears on page 10.  And that e-mail is important, and

9     your Honor has a copy of the indictment.  I would like to be

10    able to hand something up and also give a copy of this to the

11    government.

12          THE COURT:  You're on page 10?

13          MR. BRAFMAN:  Yes, your Honor.  There is an e-mail on

14    page 10 which we have officially translated by a certified

15    interpreter.  And I understand that the government will say,

16    well, how do we know this person knows how to interpret.  I

17    represent to you that this is a certified interpreter who has

18    interpreted this e-mail.  This e-mail was interpreted, again,

19    from Farsi into English, and the government's translation is so

20    off, is so different, than the official interpreter typed for

21    us, and gave to us, I ask to be able to hand up and give a copy

22    to the government.  I've highlighted one particular section.

23    I'd ask your Honor if you could, sir, take a moment, please --

24          THE COURT:  So, you want me to compare this to which

25    line on page 10?  Starting on which line of page 10?

G623ZARC

1          MR. BRAFMAN:  If you look at the highlight of the

2     indented portion, which is the e-mail, this e-mail is supposed

3     to refer to two transactions of $9,225 and 35,000, according to

4     that page of the indictment when you read up.  And then what

5     they say is signed by Najafzadeh, a co-defendant, concerning

6     the two payments through the Nafis Exchange Office which stated

7     in part, in Farsi, then you have in the indictment a English

8     translation.

9          And for the record, do you mind, sir, if I read it?

10         THE COURT:  Not at all.

11         MR. BRAFMAN:  This is the quote:  "The above amounts

12    were blocked by OFAC, and despite repeated follow ups to

13    execute these transfers by providing all necessary documents,

14    unfortunately, the transfers have not been executed and

15    deposited in the beneficiary's account.  Therefore, despite the

16    lack of communication with you regarding the covered topic, and

17    only with regard to your excellent achievements regarding

18    similar prior cases, it is requested regarding the passage of

19    more than two months and lack of any results from the follow up

20    of Nafis Exchange, please arrange with your guidance this case

21    can be closed."

22         Now, that is supposed to suggest that the defendant

23    had notice that these transactions were blocked by OFAC.  What

24    is not in this translation, and that which is highlighted in

25    the typed translation where the certification is behind it, by

G623ZARC

1    a certified interpreter Beth Morgan, the highlighted section

2    says, I quote:  "Thus, though the above-mentioned issue does

3    not concern you."  That's not in the government's translation.

4    Nor is this a literal translation by the government, because

5    the literal translation, if you want me to read it, sir, reads

6    completely differently.

7         What I've learned in the short time I've been in this

8    case is that Farsi is like -- there are cultural disconnects

9    between who is interpreting and how they're interpreting.  And

10   in some languages that happens.  It happens in Mandarin, I

11   learned recently in the other case.

12        But what happened in this case is the government

13   relied on interpretations that were in our opinion inaccurate.

14        So when they say this is a slam dunk case, and the

15   evidence against the defendant is overwhelming, there are two

16   issues that they're going to have to deal with.  First, the

17   e-mail from the supreme leader -- to the supreme leader or

18   about the supreme leader, that is perhaps the most prejudicial

19   document in the case.  I suggest under 403 will never be

20   admitted into evidence.  It will never be authenticated as

21   having been read by the defendant, and it will never be

22   authenticated as having been understood by the defendant, and

23   there is no theory of admissibility as to how that comes in.

24   Because if you are to send something to me, and I get it, you

25   could say well, maybe it shows you knowledge.  Maybe it does,

G623ZARC

1  maybe it doesn't.  But it doesn't mean that I adopt what you've

2  said.  It doesn't mean that I share your concerns.

3          Now, maybe the government's going to suggest, well, it

4  shows the state of mind of the person who wrote the e-mail.

5  Good.  That's not my client.  It doesn't show the state of mind

6  of the person who got the e-mail, because we don't know that he

7  got it.  They found it in his e-mail box.  Right now my e-mail

8  is off because I'm in court and out of respect I turn it off.

9  There may be 50 on there that are junk.  There may be 50 on

10  there that are people trying to solicit investment in some town

11  in Nigeria.  It doesn't mean that I am agreeing with this

12  preposterous project.

13          So I suggest most respectfully, Judge, that this case,

14  which the government suggests is overwhelming, has issues that

15  criminal defense lawyers, to be candid with you, generally

16  don't have in a case.

17          We have conferred with sanctions experts throughout

18  the country, and we have not found one identical case charging

19  a non-U.S. citizen who is not importing or exporting goods into

20  the United States, who is not smuggling goods, who is not

21  working through his bank account in the United States, where

22  it's bank to bank, we have found nothing, no precedent

23  whatsoever.

24          The bank cases that the government cites, they're

25  against banks.  Most of the banks either pled guilty or worked

G623ZARC

1    out deferred prosecution agreements, because the cost to the

2    bank of fighting it is the same as paying it, and banks can pay

3    it.

4            But the point is in those cases, the sanctions

5    violations were to a United States bank, owned by the bank or

6    sent by a United States, bank to a bank.  That's not the case

7    here.  We have found no case, and they have not found a single

8    case, Judge, in which a non-U.S. citizen from Turkey sending

9    something to a different country outside the United States, and

10   some of the dollar transactions by the bank end up passing

11   through the Federal Reserve for one reason or another, has

12   nothing to do with willfulness on the part of Mr. Zarrab.

13           And most incredibly, Judge, because this whole world

14   of sanctions, I must be honest to you, is new to me, although I

15   think I am a quick study, just last week, the undersecretary of

16   the Treasury, who used to be the head of OFAC, testified before

17   Congress.  And when you read his testimony, one would think

18   that now that we have a treaty with Iran, the sanctions are

19   being eased.  Yes, they are, and maybe by the time we have

20   motion practice in this case, there won't be any more

21   sanctions.  It will be an interesting question to see if

22   someone who has committed a crime, allegedly, that is now no

23   longer a crime, what that person's status is for purposes of

24   guideline analysis variance or whether the case can go forward.

25           What is interesting about the Szubin testimony that we

G623ZARC

1    cite to your Honor is he goes back.  He doesn't just go

2    forward.  He goes back before the sanctions are eased, and he

3    says very clearly that these sanctions were never intended to

4    apply to a non-U.S. citizen.  Because if you think about it for

5    a minute, if it is a non-U.S. citizen outside the United States

6    dealing with a bank outside the United States, and it is a

7    transfer to a bank outside the United States, we would be

8    controlling the entire world.  We could be prosecuting people

9    in every country in the world, and that's not what we're

10    supposed to do.

11          Just like I am not going to ask the Court to become

12    involved in the political underground war in Turkey that the

13    government refers to over and over again without authenticating

14    the source or relying on press reports.  I think that's

15    inappropriate and I'm not going to get into that, unless your

16    Honor asks me to get into it.  I'm not going to get into the

17    allegations against Mr. Zarrab in Turkey, unless your Honor

18    wants me to go into it.  Because under the law of comity, that

19    case has been dismissed, that case has been dismissed by the

20    prosecutor, that case has been dismissed by the Court, and

21    ultimately those charges were also dismissed by the Parliament

22    against the people who are alleged.

23          So there is no criminal record of Mr. Zarrab.  And

24    what the government has tried to do, in my opinion, most

25    respectfully, and I have great with respect for these two

G623ZARC

1    lawyers.  This isn't personal.  But what they have done in

2    their papers is they've tried to dirty up Mr. Zarrab as best

3    they could even if it means recklessness.

4            You want to know one of the things I found amusing?

5    They say he has a submersible.  It is a submarine you rent for

6    a couple of days if you want to go underground to see the

7    ocean.  It is not a submarine that you use for military

8    warfare.

9            The guns that they talk to you about, there was a

10   retired police officer who had a classic gun collection, they

11   were all permitted, and he wanted to try and interest

12   Mr. Zarrab in buying them.

13           You know, I once used this in a summation.  If you

14   take a pizza with a lot of toppings, and you throw it against

15   the wall, the pizza falls down but the wall is dirty.  That's

16   what's happened here, your Honor.  They have taken a classic

17   white collar case that is eminently defensible, that is a case

18   of first impression, and they have essentially taken the

19   position that he is a bad guy, and therefore, you should keep

20   in jail and you should keep in jail for basically forever.  Or

21   at least until there is a trial, which could be many, many

22   months.  And I know your Honor wants us to meet and wants us to

23   confer with the government.

24           One thing that no one could say truthfully is that I

25   shy away from showing up when there is a trial date.  I'll be

G623ZARC

1    here whatever date we pick or your Honor orders.  But there is

2    a substantial difference in the length of time that will be

3    required to defend this case if the defendant is able to be out

4    at a lawyer's office, than if eight lawyers are trying to get

5    in a cubicle at the MCC with the lack of the computers that we

6    need.  Because they're turning over the discovery by the

7    bushel, to their credit, but it's hundreds of thousands of

8    e-mails, many of them are not translated, many of them are in

9    foreign languages that we'll have to have translated.

10           Your Honor, I want to go back to the *Ng* case.  Because

11   what's interesting to me, your Honor, is how when the

12   government needs to, they can sort of flip.  Here's what I

13   mean.  I argued the *Ng* case.  I'm no longer counsel of record

14   in that case for reasons having nothing do with the case or

15   Mr. Ng, but I argued the bail motion before Magistrate Judge

16   Fox and I argued it before Judge Broderick when the government

17   went there.

18           In that case, the government fought to the death to

19   keep Mr. Ng detained.  He was a billionaire, his wealth -- his

20   wealth dwarfs Mr. Zarrab's wealth.  It -- billionaire.  Private

21   planes.  He was heading to a private plane when he was

22   arrested.  And here, we have a defendant who came into the

23   United States with $100,000, gave it, told Customs he had it.

24           In the *Ng* case, what the government hung their hat on

25   was he lied to Customs about suitcases full of cash that he had

G623ZARC

1    brought into the United States again and again and again, a

2    total of several million dollars' worth of United States

3    currency, and he was arrested for a 1001 violation, which was

4    later dismissed when they realized they got it wrong.  But the

5    argument was that he lied about the purpose of the money.

6            And in the *Ng* case we had a foreign national with zero

7    ties to the United States, who, according to the government,

8    and I don't want this to be used in any way to prejudice

9    Mr. Ng, because I'm just telling you what the government said,

10   but in that case, the government charged a foreign national

11   with coming to the United States for the purpose of committing

12   a serious crime on New York soil in the Southern District of

13   New York, by attempting to bribe U.N. officials.  Not a crime

14   in China.  But a crime that was going to be committed here.

15   And they forced the issue.  They first told Magistrate Fox it

16   was illegal for him to consider the bail package.  That

17   language is actually in the record before Judge Fox.  Because

18   if you look at the colloquy between Judge Broderick and the

19   assistant United States attorney in the bail hearing, when we

20   got before Judge Broderick, the first question he asks of

21   Mr. Richenthal is "Are you suggesting, is it the government's

22   position that if I consider approving the bail package that

23   Judge Fox approved, that I would be doing something that

24   violates the law?"  And they backed off, obviously, because

25   half a dozen judges in this district and in other districts

G623ZARC

have approved that, and no one is going to suggest they

violated the law.  They backed off that.  They said, "No, we

just think it's something that is frowned upon, that should be

frowned upon," and they got stuck and mired in this position.

          If you look at the very first couple of pages of the

transcript we submitted to your Honor, that's what they

basically said.

          Let me get to the main, main component of the bail

package.  Your Honor correctly noted the significant conditions

that we provide.  And again, almost in an implicitly offensive

manner, in order to get around what they know to be compelling

precedent of other judges in this building who approved the

24-hour guard as a way to release the defendant from jail, but

nevertheless ensure his appearance, because your Honor's

direction from the court of appeals and from the law is to find

the least restrictive conditions of bail possible.

          So in order to get around that, they use little words

in the submissions that I think they shouldn't use, to be quite

candid.  They use words like "This is a facade."  "These guards

are under the employ of the defendant."  "These guards can't be

trusted."

          I just want to put on the record, I was delighted when

your Honor asked us to unseal the Guidepost affidavit from

Joseph Jaffe who is present in the courtroom, and I think your

Honor was 100 percent correct.  Let the public who will read

G623ZARC

1    about this, should your Honor grant bail, understand what we're

2    proposing.  We're not proposing two old retired cops from the

3    beat who were just going to schlep into the apartment and say

4    watch this guy.

5          Guidepost is run by Bart Schwartz.  Bart Schwartz was

6    the chief of the Criminal Division of the United States

7    Attorney's Office for the Southern District of New York.  He

8    has impeccable credentials.  He has been appointed by federal

9    judges throughout the country as a monitor, as someone who

10   should go in and do compliance, to do due diligence, and

11   Guidepost is his company.

12         And Joseph Jaffe, who is present in the courtroom,

13   gave you an affidavit with his background.  He was the head of

14   official corruption for the United States Attorney's Office for

15   the Southern District of New York.  He was a former district

16   attorney in upstate.  He's been in law enforcement his whole

17   life.  They personally vet these guards.

18         And in the *Ng* case, who has been on bail now for more

19   than six months, it works flawlessly.  And just so the record

20   is clear and so that your Honor understands, I want to just

21   explain to you, sir, how it works.

22         The way it works is Guidepost first of all inspects

23   the apartment.  They have already done that.  I don't want you

24   to feel that we are presumptuous doing it, but time is of the

25   essence.  If you do grant bail, I don't want to be inventing

G623ZARC

1    the wheel while he sits in jail longer than necessary.  So

2    Guidepost has already inspected and approved the apartment.

3    What that means is they take away any security concerns, they

4    have outfitted the apartment with cameras, they have outfitted

5    the windows with censors.  The apartment is on the 15th floor

6    of a building.  The only thing we've redacted was the exact

7    address and the apartment number.  Your Honor has it, but we

8    don't need all of these journalists camping outside that

9    building.  It is not fair to the other tenants.  Even if you

10   grant bail, we'd like him to have some modicum of privacy if

11   possible.

12       THE COURT:  We'll get to that at the end, but I did

13   receive a letter from --

14       MR. BRAFMAN:  I understand, Judge, and I'm not looking

15   for a fight with the New York Times or anyone else.  But, we'll

16   cross that bridge when we come to it.  It only matters if your

17   Honor rules in our favor.  So we could defer the fight with

18   them if that hopefully happens.

19       What we've done is the apartment's been leased, the

20   apartment's been paid for, the apartment's been furnished.  And

21   the way it works is Guidepost picks, not we, Guidepost picks

22   the people who work in that apartment.  And these are the

23   rules.  They all have to be either current or retired law

24   enforcement personnel.  That means FBI, DEA, Customs or Postal

25   Inspectors or New York City Police.  They have to have

G623ZARC

1    impeccable background checks.  They vet these people because

2    their reputation is determined by those people.  At least two

3    officers are in the apartment 24/7.  Sometimes they work in

4    12-hour shifts, sometimes they work in eight-hour shifts.  But

5    there are two people in that apartment with the defendant at

6    all times.

7            He goes no place unless the trip is approved by

8    pretrial services, and unless the trip meets the conditions of

9    bail, and the only conditions that we would ask for, if we get

10   to that point, is that he be permitted, if necessary, to travel

11   with Guidepost to counsel's office.  He would be permitted

12   obviously to come to court as required, if there is a medical

13   emergency --

14           THE INTERPRETER:  You're going too fast.

15           MR. BRAFMAN:  I'll slow down.

16           THE COURT:  Excuse me.  Do you need a break?

17           THE INTERPRETER:  It would be nice.

18           THE COURT:  Why don't we take five minutes.

19           (Recess)

20           THE COURT:  Please be seated everybody.

21           Two things, Mr. Brafman.  I've been advised to advise

22   you to go slower.  And second, I think we want to soon get to

23   the government.

24           MR. BRAFMAN:  Yes, your Honor.  I have been advised to

25   go slower as well, but your advice is much more important and I

will.  Also I'm coming to the end.  Had we not taken the break
I think I needed another five or six minutes, but I hear you,
sir, loud and clear.

          Your Honor, when we left I was just discussing for the
record who Guidepost is and what they do and how they staff it.

          There are two people on the premises at all times.  If
your Honor requires, they will be armed guards.  If your Honor
requires, they will be permitted to use reasonable force if
necessary.  We agreed to that in the *Ng* case where the
defendant actually signs a waiver of liability, to the extent
he tries to escape, which is just not going to happen, but if
he did, they could shoot him just like they are law enforcement
people, and they're not going to risk their professional career
nor their lives in allowing him to do anything wrong.

          They supervise everyone who comes into the premises,
and those people are subject to search.  And you are permitted
to have a list and they clear it, whether it's lawyers or
family or whoever it is.  So it works perfectly.

          If he has to be transported, Guidepost provides a
security vehicle and a driver, so now you have three people, a
driver and two armed security guards, who are transporting him
everywhere, whether it is for medical emergency, religious
service, anything approved by pretrial.

          Pretrial needs to inspect the apartment.  They can't
do that before they have an order from the Court granting bail,

G623ZARC

```
1    so they haven't been able to inspect the apartment.  But we
2    wanted to get a head start so the apartment is available and
3    it's been outfitted with all of the security measures that
4    pretrial would normally require.  They need to have a dedicated
5    landline for the electronic monitoring, all of that is
6    available.  So pretrial, if your Honor permits, will be able to
7    inspect.
8            And we have other conditions as follows.  I want to
9    get to the money part of the bail package.  You know, if we
10   said 100 million, the government would say, well, he has 200
11   million, so what's 100 million.  So we picked a number, your
12   Honor, that is meaningful to him, but hopefully also meaningful
13   to the Court.  It is not every day that people in this
14   courthouse post $10 million cash secured by a $50 million bond.
15           And I want to tell you, sir, just a couple of things
16   about Mr. Zarrab that I think are important.  He's 33 years
17   old.  He has a five-year-old daughter.  The government suggests
18   that he would want to be a fugitive for the rest of his life.
19   Assuming a normal lifespan, that would mean he would have to
20   live as a fugitive for 50 years.  He would never subject his
21   family to that.  And his wife, Judge, who is an internationally
22   recognized recording star and perhaps the highest paid
23   recording artist in Turkey, would be the wife of a fugitive.
24   And every time she tried to go to a foreign country, and we
25   have lists of her signed contracts where she's already going in
```

G623ZARC

1    months ahead, paid performances, it's just not something he is

2    going to do.

3           And finally, Judge, this case is defensible, I submit.

4    This case is unique.  This case has issues which none of the

5    other cases in this building have.  And whether they are cases

6    of first impression, we anticipate substantial motion practice

7    which will distill whether there is a bank fraud.  The Supreme

8    Court is considering that issue today.  Whether you need to

9    intend to defraud a bank.  And there is a 9-3 split among the

10   circuits, and the Second Circuit is on our side of that fence.

11   And if the Supreme Court rules in our favor, there is no intent

12   to defraud the bank.

13          The bank didn't lose any money.  Banks made money off

14   of these transactions.  And certainly he didn't intend to

15   defraud the bank, because he had no idea that those

16   transactions were going to pass through a United States Federal

17   Reserve, because they were sent by non-U.S. banks to other

18   non-U.S. banks.

19          The cases they cite where people are smuggling plane

20   parts and nuclear warheads and all sorts of commercial

21   equipment, that's not this case.  The statutes they cite have

22   never been applied to a non-U.S. citizen who is not providing

23   goods.  And whether the sanctions remain or not, to suggest as

24   they have that this man is, A, definitely going to be

25   convicted, and definitely going to face decades in prison.  The

G623ZARC

1    way the guidelines are applied in this case, your Honor may

2    have extraordinary discretion on what sentence to impose in the

3    event of a conviction.  And if by then the sanctions are

4    completely gone, as Mr. Szubin suggested it might be, maybe

5    there is an appeal to reason with the U.S. attorney's office as

6    to why this case should not proceed.

7          And I want to close, Judge, by just talking briefly

8    about two of the cases the government cites and relies on to

9    show you how distinguishable they are.  And I want to make

10   certain the record is clear, the bail statute requires that we

11   provide the Court with assurances, reasonable assurances that

12   he will be here.  No one can guarantee, and the statute doesn't

13   require a guarantee, and the Court can't require a guarantee.

14   That's not the language.  Reasonably assures that the defendant

15   will be here is the language.  Because someone can die, someone

16   can, you know, disappear, all things can happen that are beyond

17   our expectations.  So we're taking all of the reasonable

18   measures to provide the kind of conditions that will allow the

19   Court to feel comfortable that the defendant will reasonably

20   appear.

21         Your Honor, the government cites the *Banki* decision,

22   and the *Banki* decision was a case decided by Judge Keenan who

23   all of us I think have great respect for, indeed he was my

24   chief when I was in the district attorney's office.

25         But I have the order of Judge Keenan in the *Banki*

G623ZARC

case.  And what the judge in that case cites in the order as a
principal reason for him not doing the 24-hour security guard
is when the defendant was arrested, he had false identification
cards which are available for people who wish to change or mask
their identity.  These documents explain we can create custom
identification cards in any country.  And Judge Keenan didn't
trust Banki for that reason.  And he didn't rule out the use of
these guards.  At the end of the case, he says "In this case,
I'm not going to allow it."  "In this case."  Because of what
this guy was charged with and what this guy had in his
possession at the time.

        Your Honor, the *Sabhnani* case is an interesting case.
Because the *Sabhnani* case which is the case I think all of us
look to for guidance, is a case that not only had risk of
flight, but there was violence.  They considered these people
dangerous to the community.  These people were employing people
and they were keeping them kidnapped in their house and they
were beating them and hurting them.  And they were considered
risks of flight and dangers to the community.  And Judge Platt
originally denied the bail conditions, and the Second Circuit
said you got to do this.  The armed guards takes out the
concern that they're going to run, and we're not concerned that
they're going to hurt anyone if the armed guards are there, so
we're going to propose armed guards.

        Now, I understand those people were naturalized

G623ZARC

1     citizens and they had ties to the community.  But the fact is,

2     Judge, that even in the case that had danger to the community,

3     as one of the concerns, the *Sabhnani* court, the Second Circuit

4     in *Sabhnani* quotes extensively from the Bail Reform Act on the

5     obligation and the dual burden of proof that the government has

6     in order to secure detention.

7         And your Honor has said at the beginning, you said it

8     at the arraignment, and I know you believe it and I know you

9     mean it when you say it, he's presumed to be innocent.  He has

10    the presumption of innocence.  When your Honor charges a jury,

11    you can tell them and you would tell them that the presumption

12    of innocence alone if not rebutted by proof beyond a reasonable

13    doubt is enough for you to find the defendant not guilty.

14        So at this stage there is no evidence that you have to

15    suggest that he's going to flee, you have ample assurances that

16    the defendant will stay, and you have enormous incentive for

17    this young man who has a young daughter, and a very successful

18    independent wife, he has every incentive to clear his name.  He

19    has every incentive to fight this case.

20        When you look at the charges in this case, and I'll

21    stop then, the bank fraud I submit is defective as a matter of

22    law and will be shown to be dismissed on motion practice.  The

23    money laundering statute is a double count.  You cannot do a

24    sanctions violation as a practical matter without also

25    violating the money laundering statute the way they charge it

G623ZARC

        here.  And no Court could sentence him separately on both and

        have those sentences run consecutively, in my judgment, because

        it is the same activity that is charged as a sanctions

        violation and as a money laundering violation.

                And to the extent that they charge, this is at its

        heart a sanctions case.  This is at its heart an unprecedented

        sanctions case because the government, you have been gracious

        in permitting us to write and then write again and write again.

        And I appreciate that and I know the government does too.

                But you would expect that if they had all of those

        weeks to write, that they would find one case directly on point

        where the facts in this case with a defendant who is a

        non-citizen is charged criminally, criminally, with a violation

        of the sanctions cases, and what Mr. Szubin said in his

        testimony as recently as last week is that even if you found

        someone who did that, maybe they would get blacklisted, maybe

        they get civil sanctions.  There is no suggestion that the

        defendant is going to face decades in prison that they suggest.

                So when we get into the weeds, there is going to be a

        serious due process notice argument that I think the Court will

        also have to struggle with.

                But right now, Judge, we just want bail, we want it on

        the conditions that we submit will reasonably assure the

        defendant will appear when requested.  And I think just like

        Judge Broderick, just like Judge Rakoff, just like other judges

G623ZARC

1    in other districts have trusted Guidepost, they are the people

2    who do this.  The only people who I think you can trust who

3    have impeccable credentials, and they all come out of the

4    Southern District.  To suggest they would compromise their

5    reputation because the defendant is paying the fees is just not

6    an appropriate comment and not a fair consideration.

7              Thank you for your patience, your Honor.

8              THE COURT:  Thank you.

9              MR. BRAFMAN:  Your Honor, just so the record is clear,

10   we have all the passports in the event the Court was to grant

11   bail, there are three passports.  One pretrial already has, it

12   was seized at his arrest.  We have his other two passports in

13   court, and can deposit them with pretrial or deposit them today

14   with the court if the Court requests.

15             THE COURT:  Thank you.

16             MR. LOCKARD:  Should I use the podium your Honor?

17             THE COURT:  I think it would be easiest, yes.

18             MR. LOCKARD:  So, your Honor, I'm going to go in a

19   little bit of reverse order from what Mr. Brafman proceeded in.

20   My comments on Guidepost are going to be very brief, because,

21   your Honor, the government contends that under the

22   circumstances of this case, we don't have to get to the

23   Guidepost question because in light of the nature and the

24   seriousness of the charges that the defendant is charged with,

25   the weight of the evidence against him, and in particular, the

G623ZARC

1   history and characteristics of this defendant, and history of

2   duplicity that he has shown both pretrial services and in court

3   in connection with bail proceedings, preclude any combination

4   of conditions that will reasonably assure his presence.

5           So I'm going to start with the nature and

6   circumstances of the offense charged, and the weight of the

7   evidence and come back.

8           THE COURT:  You are going to do them separately,

9   right?

10          MR. LOCKARD:  We will do them separately.  They're

11  obviously interrelated, but we'll do them separately.

12          I'm going to combat Mr. Brafman's closing argument

13  hopefully right here.  What the defendant is charged with, he

14  is not charged with conducting lawful transactions abroad that

15  by happenstance crossed through the United States financial

16  system.  Those are not the charges against the defendant.

17          What the defendant is charged with is orchestrating

18  and conducting a scheme to allow sanctioned entities, and the

19  government of Iran, to access the international financial

20  networks, and especially the United States financial networks,

21  in order specifically for the purpose of evading sanctions.

22          The fact that these transactions crossed through the

23  United States is not happenstance.  It is a central integral

24  part of the scheme with which the defendant is charged.

25          And there is nothing novel or unique or unprecedented

G623ZARC

about an individual, including a foreign national, being

charged with knowingly and willfully participating in a scheme

to cause violations of the sanctions, and to evade and avoid

those sanctions.

And nothing about Mr. Szubin's comments to Congress,

which I submit have been slightly mischaracterized before the

Court, and we have cited the Court to the website of the

Treasury Department, where Mr. Szubin's remarks have been

memorialized so the Court can see exactly what he said,

Mr. Szubin never suggested that United States criminal law and

sanctions law does not reach past our own borders.  In fact,

Mr. Szubin's testimony was drawing a distinction between

transactions that do not cross through the United States, and

transactions that do cross into the United States.  And what

Mr. Szubin was explaining is if a foreign national has U.S.

dollars and wants to conduct a transaction using those U.S.

dollars in a manner that does not cross through the U.S.

financial system, then no, the sanctions do not preclude that

transaction.

The key distinction is when those dollars do cross

through the U.S. banking system.  And that is what the

defendant has been charged with here.  That is precisely the

conduct that is at issue.

We've also cited in our papers provisions of the

Office of Foreign Assets Controls website, that make explicit

G623ZARC

1    that the sanctions do preclude foreign nationals from

2    conspiring to evade the national security controls by causing

3    U.S. financial institutions to process these transactions.  And

4    we have drawn the Court's and defense counsel's attention to a

5    letter from Mr. Szubin at the time that he was head of OFAC to

6    al Nafis Exchange Company, which is one of the key components

7    of this scheme, a company that was operated in many respects by

8    the defendant, imposing a civil penalty for doing exactly what

9    it is that the indictment also alleges that he did.

10          So there is no novelty here, there is no uniqueness

11   here, there is nothing unprecedented about this.

12          There is also nothing about the JCPOA, the Joint

13   Comprehensive Plan of Action, which removed secondary sanctions

14   against Iran in exchanges for Iran's agreement to limit its

15   nuclear program.  A very targeted, specific agreement for a

16   specific purpose.  Nothing about that changes the criminality

17   of the conduct here.  It was criminal at the time that it took

18   place, it is still criminal under existing United States law as

19   it stands today.

20          Mr. Szubin's comments before Congress go on to explain

21   why it is that Iran is still subject to sanctions because of

22   their support for terrorism, because of various other

23   activities that the government of Iran has undertaken that

24   threaten the national security of the United States.  These are

25   national security controls that were adopted because of the

G623ZARC

1    extraordinary threat that the government of Iran poses to the

2    national security of the United States, as has been found by

3    president after president after president, including by

4    President Obama, after the adoption of the JCPOA when that

5    national security threat was continued.

6            The evidence in this case is in fact overwhelming.  It

7    is captured in voluminous electronic communications involving

8    the defendant and his co-conspirators.

9            And I will focus, just as Mr. Brafman did, on the

10   draft letter that Mr. Zarrab received from a co-conspirator

11   that was prepared for his signature and addressed to the

12   Central Bank of Iran expressing Mr. Zarrab's willingness,

13   indeed, his patriotic duty, to assist the government of Iran in

14   evading economic sanctions as part of the government of Iran's

15   policy of economic jihad.  That is, the intentional evasion of

16   the United States and international sanctions against Iran.

17           THE COURT:  Before you get to the weight of the

18   evidence, could you go back to the nature of the charges.  And

19   do you have an opinion as to whether or not the charges set

20   forth in your indictment could have taken place without passing

21   through U.S. banking system?

22           MR. LOCKARD:  The charges are based on -- the

23   sanctions charges and the bank fraud charges and the money

24   laundering charges are all based on U.S. financial

25   transactions.

G623ZARC

1           Mr. Zarrab is charged with acting with co-conspirators

2     to use a network of front companies located outside of Iran,

3     specifically for the purpose of allowing Iranian entities,

4     including government-own entities, access to international

5     financial systems.  As part of that scheme, numerous U.S.

6     dollar transactions were processed by United States banks, by

7     Mr. Zarrab's network, for the benefit of and on behalf of these

8     Iranian entities.  And it was designed that way specifically to

9     conceal from the banks the fact that these transactions were

10    for benefit of Iran.

11           And did Mr. Zarrab know they were going to the United

12    States?  Of course he did.  That is the purpose of the system

13    as it was designed.

14           Mr. Zarrab received numerous e-mails containing

15    financial information reflecting the U.S. dollar transactions

16    were going through U.S. correspondent accounts located in New

17    York City, among other places.  Mr. Zarrab was notified when

18    those payments were blocked, because if the scheme did not work

19    the way it was intended and the banks realized the Iranian

20    nexus, the payments were blocked, and we cite to a couple of

21    examples of that happening in the indictment.

22           So I'm going to get back to the Central Bank of Iran

23    letter, which is of course relevant and probative of

24    Mr. Zarrab's knowledge and intent.  It was sent to him by

25    co-conspirators, it was copied to Hossein Najafzadeh, who was

G623ZARC

the main point of contact between the Mellat Exchange, which is

a money services business owned by a state-owned bank in Iran.

This was an important business relationship for Mr. Zarrab and

his network.  Mr. Zarrab and his network did a lot of business

for Mellat Exchange to allow it access to international

financial markets.  And this is a letter about that business.

It is a letter about providing the same kind of access to the

Central Bank of Iran and the Iranian banking system.

          Mr. Zarrab received not just one draft of this letter.

He received two drafts of this letter.  And it is certainly

Mr. Zarrab's right to argue at trial that he didn't read it, he

didn't understand it, he didn't comprehend it, but the

circumstances of the e-mail certainly indicate that he did

receive it, and did understand it, and it is in fact reflective

of his and his co-conspirators' understanding of the nature and

purpose of their conduct.

          I'm going to address the claim that Mr. Zarrab doesn't

read Farsi a little bit more later, but as it pertains to this

e-mail, the claim is just not credible.  It is just not

credible.

          Mr. Zarrab acknowledges that he can speak and hear

Farsi.  His family members are Iranian.  He has business

interests in Iran.  He has friends in Iran.  And the electronic

communications on his telephone and in his e-mail account show

that he repeatedly receives communications and documents

G623ZARC

written in Farsi, and that he understands and responds to these

communications.

          Now, the language of Farsi does not use the Roman

alphabet.  It can be written transliterated using Roman

characters.  It can also be written using Farsi characters.

Mr. Zarrab received electronic communications and documents in

both forms.  And he responds to communications that are written

using the Farsi alphabet.

          And we're happy to provide the Court, if it would like

some examples of that happening.

          But the idea that Mr. Zarrab cannot read the Farsi

language is just ludicrous.

          Similarly, Mr. Zarrab saying he doesn't understand

English well enough to participate at a pretrial services

interview is also flatly contradicted by the evidence.  I know

that the Court had reviewed the recording of his post-arrest

interview.  And what that interview shows is that Mr. Zarrab is

comfortable conversing in the English language.  And that is

shown very strongly, not by the number of times he glances in

the direction of the interpreter, but by the occasions in which

he tells the interpreter he doesn't need an interpretation.  It

is shown by the occasions when Mr. Zarrab speaks in English

without waiting for a Turkish translation of the agent's

statements or questions.  It is shown by the lengthy statements

in English that Mr. Zarrab makes about his business, and his

G623ZARC

1    travel.  It is also shown again in voluminous e-mail and

2    electronic communications in which Mr. Zarrab communicates with

3    others in English.  And that is both on his telephone, on his

4    bureau of prisons e-mail account, he receives documents,

5    including business documents, in English.  He receives texts

6    and e-mails in English and responds in English.

7         Mr. Zarrab's facility with the English language

8    certainly is strong enough to be able to understand and respond

9    to questions about how much money do you make, what properties

10   do you have, where have you traveled.  These are not

11   complicated questions.  These are not technical questions, they

12   are not difficult to understand.  And in fact he understood

13   them enough to make a slight and extremely misleading

14   disclosure to pretrial services.

15        And while it is true that we were not present at that

16   interview, and neither was Mr. Brafman, the argument that

17   pretrial services got a very limited picture of Mr. Zarrab's

18   travel and assets because they don't know how to ask questions

19   about travel and assets is just not a credible argument.  That

20   is the purpose of the pretrial services interview.  That is

21   what pretrial services officers do for a living.  So this is

22   not the result of the failure of followup questions.  This is

23   the result of an intentional effort by the defendant to conceal

24   his foreign assets and his foreign travel.  It is an omission

25   that has continued even into the proceedings before this Court

G623ZARC

1    on bail.

2              It has been repeatedly asserted that the defendant has

3    in fact made a full disclosure of his assets, but that is just

4    not the case.  There is no inventory of assets that has ever

5    been provided by the defense.  There has been a general

6    description that Mr. Zarrab has a shipbuilding company, a real

7    estate company, and a furniture making company.  We don't have

8    any inventories of assets, we don't have any identification of

9    bank accounts, we have no idea what Mr. Zarrab's true income

10   is.

11             Mr. Brafman made the argument that the $50 million

12   bond was a substantial bond that was sufficient under these

13   circumstances.  He said, well, if we made it a $100 million

14   bond, the government would have said, well, he's got $200

15   million.  We have no idea whether the defendant has $200

16   million or $2 billion.

17             What we do know is that the only serious effort to

18   detail the defendant's assets has come from the government when

19   we talked about things that were learned through the

20   investigation.  Not volunteered by the defendant.

21             And we provided the Court with spreadsheet after

22   spreadsheet after spreadsheet of undisclosed assets of the

23   defendant.  Three dozen vehicles, horses, yachts, an airplane,

24   undisclosed real estate holdings, an armory of firearms, a host

25   of private bodyguards.  This is all information provided by the

G623ZARC

1  government as a result of investigation, not volunteered by the

2  defendant as part of an effort to demonstrate his financial

3  resources and credibility.

4       So just like the defendant in *Cilins*, who over a

5  series of proceedings disclosed a little more, disclosed a

6  little more, but never disclosed the whole thing, Mr. Zarrab

7  disclosed a little bit to pretrial, disclosed a little bit more

8  to this Court, but has never really disclosed his actual

9  financial profile.

10       Mr. Zarrab's deception to pretrial services also

11  applies to his travel where he did not talk about his Iranian

12  passport or his Macedonian passport.  And where he describe his

13  travel as London, Europe, China, Singapore, Thailand, Dubai for

14  vacation.  He didn't answer it that way because he didn't

15  understand the question was about all of your travel, not just

16  your vacation travel.  He answered that way to try and minimize

17  the appearance of his international travel and ability to

18  travel outside the United States.

19       He does in fact have two more passports which

20  Mr. Brafman candidly disclosed, because he knew about them.

21  But Mr. Zarrab's travel includes not only the places he

22  identified to pretrial, but also Lebanon, with which the

23  government does not have an extradition treaty; Russia, another

24  place from where the defendant cannot be extradited;

25  Azerbaijan; Egypt; Saudi Arabia; South Africa; the Maldives.

G623ZARC

|      |
| ---- |

1    None of the these places were disclosed by the defendant.  His

2    characterization of his travel as for vacation is an

3    intentional effort to minimize the frequency of his travel.

4    Because his passport, just his Turkish passport, which is the

5    only passport the government has, shows that he engages in

6    international travel on a weekly basis.  His passports are

7    novels.  So Mr. Zarrab was duplicitous --

8            THE INTERPRETER:  Could you repeat that?

9            MR. LOCKARD:  His passports are as thick as novels.

10           THE INTERPRETER:  Which ones?

11           MR. LOCKARD:  The Turkish passport.

12           THE COURT:  Wait.

13           MR. LOCKARD:  We don't know what travel is reflected

14   in the other two passports.

15           So Mr. Zarrab has been duplicitous with pretrial about

16   his travel, he's been duplicitous with pretrial services and

17   with this Court about his finances, he's strategically

18   attempted to invoke a language barrier when it suits him.  He

19   is perfectly conversant in English when speaking with the FBI,

20   but suddenly needs a Turkish interpreter when the shortcomings

21   of his pretrial services interview are revealed.  He can read

22   and speak Farsi when it suits him, but suddenly cannot read

23   Farsi characters when it comes to an incredibly incriminating

24   piece of evidence against him.

25           All these factors show that there is no combination of

G623ZARC

1    conditions that can reasonably assure this defendant's

2    continued appearance, especially when combined with the fact he

3    has no ties to the United States whatsoever, he has extensive

4    ties abroad, extensive travel abroad, access to an unknown set

5    of resources.  But what we do know shows that he is lavishly

6    wealthy.  And not only the ability to travel to places from

7    where he could not be extradited, but a history of traveling to

8    those places repeatedly.

9            So for all of those reasons, that's why the government

10   says you don't have to get to the Guidepost question.  But we

11   will get to the Guidepost question.

12           There is some fundamental flaws with the defendant's

13   proposal to be released on bail under the security of armed

14   private guards that have nothing to do with anyone's assessment

15   of the integrity of the Guidepost company or its employees or

16   directors.  There are inherent features of that arrangement

17   that have been discussed by other courts, including by Judge

18   Bianco in the Eastern District of New York, and a number of

19   cases that he compiled in his *Valerio* decision that make that

20   condition not a reasonable one.

21           There is, first of all, in the case law a debate, a

22   debate the government thinks is a healthy one, about whether

23   conditions that put the defendant in confinement in a private

24   apartment under armed security, whether this is any longer a

25   question about conditions of release, or whether it is now

G623ZARC

1    about conditions of detention.  A question that is not

2    addressed by the Bail Reform Act.  And some very thoughtful

3    judges in this district and others have expressed concern that

4    the Bail Reform Act is in those circumstances being abused by

5    wealthy defendants to create conditions of confinement that are

6    more comfortable and convenient to them, rather than conditions

7    of release that are designed to reasonably assure their

8    presence.

9               THE COURT:  And your view is what in this case?

10              MR. LOCKARD:  In this case, our view is they don't

11   reasonably assure the presence of the defendant.

12              THE COURT:  No, where do you come down on the

13   conditions of confinement versus conditions of release?

14              MR. LOCKARD:  Our position is that you don't have to

15   get to the question of whether it is legally governed by the

16   Bail Reform Act or not.

17              THE COURT:  I see.

18              MR. LOCKARD:  Because it does not address the risk of

19   flight issue.  But it is a healthy question to ask in

20   circumstances like this.

21              The principal shortcoming of this proposal is that, at

22   heart, the defendant's bail proposal hinges on this proposal to

23   use armed private security guards to assure his presence.  That

24   is the lynchpin of the proposal.  And what that proposal is

25   really saying is, we're going to take a defendant who poses an

G623ZARC

extraordinary flight risk, as reflected not only in all the
discussion that we've just gone through, but also in the fact
that this is the condition that the defense thinks could
reasonably assure his presence.  We are going to take somebody
with that kind of flight risk and put them in lightly
controlled circumstances in Manhattan, and surround them with
armed guards.  Putting them in the circumstance where a flight
attempt is most likely.  And then add firearms to the mix,
posing a risk to the health and safety of bystanders, and
property of innocent neighbors.

        Then we cited to the Court to -- I believe it was a
Newsweek article that talks about prison escape attempts.  And
the thing about prison escape attempts is they most often
happen when the defendant or inmate is not in the prison.  An
escape is most likely to be attempted and most likely to
succeed when an inmate is taken out of the prison environment,
for hospital visits or other reasons.  That is the position the
defendant is being asked to be put in 24/7.  It is such a risk
that the U.S. marshals service and bureau of prisons, when it
is necessary to take an inmate out of the prison, they view
that as a high risk, high threat situation.  They take
precautions to try to avoid an escape event.  One of those
precautions is not to let anyone else know that the inmate is
going to be out of prison.  That is information that they keep
carefully guarded as a security threat.

G623ZARC

1          Another fundamental problem with the defendant's

2    private armed guard proposal is that it does put the private

3    armed guards in a situation that is unlike the situation faced

4    by federal officers, federal correctional officers, and federal

5    marshals.  These are private individuals, notwithstanding their

6    law enforcement background, they are still private individuals.

7    Their conduct is not governed or supervised by federal law or

8    federal agencies.  They are neither supervised nor disciplined

9    by federal agencies.  The scope of their ability to use force

10   is different, the potential consequences to them of using

11   force, frankly, I don't know.

12          And they're put in a position where they suffer an

13   inherent conflict of interest because they are jailers being

14   paid by the inmate.  And it is not impugning their integrity to

15   note that that is a conflict of interest.  There are reasons

16   why judges and lawyers have professional rules of conduct.

17   Rules that include prohibitions against conflicts of interest,

18   because they create an inherent impairment on an individual's

19   ability to fulfill their duties.  And that's why they're

20   generally prohibited.  Even if the lawyer or the judge has all

21   the integrity in the world, it still impairs their ability to

22   do their function.  Or at the very least it creates the

23   appearance of that impairment.

24          The same concept applies to the Guidepost proposal.

25   It creates a conflict of interest for a private security guard

G623ZARC

1    who is being paid by the person they're guarding, and if an

2    escape attempt happens, they are now under conflicting impulses

3    about whether to use force, how to use force, under what

4    circumstances, what are going to be the consequences to me if I

5    do this.  These are conflicts that are not faced by bureau of

6    prisons officials or United States marshals.

7             Your Honor, I think I'm done, if I could just have a

8    moment to consult with co-counsel.

9             THE COURT:  Sure.

10            MR. LOCKARD:  So your Honor, for those reasons as well

11   as those set forth in our papers, the government submits there

12   are no conditions or combination of conditions that will

13   reasonably assure the presence of this defendant.

14            And as I said, if the Court would like to see some

15   examples of electronic communications that I referenced showing

16   the defendant's facility with the English language and

17   understanding of Farsi characters, we are happy to provide

18   those to the Court and point them out to defense counsel.

19            THE COURT:  I would like to see those.  If you could

20   submit them send them in a letter with a cover letter with a

21   copy to Mr. Brafman.  I would like to see what you have.

22            I am going to take 10 minutes, Mr. Brafman, and then

23   give you another couple of minutes.

24            MR. BRAFMAN:  I just need a couple minutes.

25            THE COURT:  Yes.

G623ZARC

1          (Recess)

2          THE COURT:  Please be seated.

3          Mr. Brafman.

4          MR. BRAFMAN:  Your Honor, I promise to be brief and I

5  appreciate the opportunity to briefly respond.

6          I want to first indicate for the record that when

7  Mr. Lockard cited the case before Judge Bianco, that is the

8  *Valerio* decision which we reference in our brief at page nine,

9  footnote eight, *Valerio* is a child pornography case where it

10 was a production case that carried a mandatory 15-year minimum

11 sentence.  And while Judge Bianco did reject the armed

12 security, he did so for the following reasons.  Quote:  "The

13 defendant's attempt to replicate a jail in his home is

14 insufficient to adequately address the issues of dangerousness

15 raised by his release."

16         This was not a risk of flight.  This was someone who

17 was producing child pornography, and was facing mandatory

18 minimum 10, 15-year sentence, and the decision by Judge Bianco

19 is completely unrelated to the issues before this Court.

20 Because he was concerned that the defendant could continue to

21 engage in production if he were released.

22         Also, your Honor, the government cites this inherent

23 conflict.

24         THE COURT:  Before you get to that, I want to make a

25 comment about that case or the *Cilin* case or the *Madoff* case.

G623ZARC

1   So, in my opinion, each case is unique in the sense that we

2   have to decide bail or remand based on this case, this case

3   involving Mr. Zarrab.  And we can draw something or not,

4   distinguish or not, other cases, but at the end of the day, my

5   decision is going to be made based on the factors that are set

6   forth as they applied in this case.  And of course we'll look

7   at other cases in the circuit and elsewhere to perhaps get

8   ideas.  But, I do want to underscore that I think every case

9   has to be decided on its individual merits and its individual

10   facts.

11          MR. BRAFMAN:  I agree.  And I don't think it should be

12   any other way, and I appreciate what your Honor has said.  And

13   what we have done in citing other cases is not to say to your

14   Honor because that judge did it, you need to do it.  But just

15   to address the government's suggestion that this is a novel

16   approach, we want the Court to be comfortable in the knowledge

17   that other judges in this district and elsewhere has found in

18   those cases, under circumstances there, that it was

19   appropriate, and that it is not something that should be

20   ignored as a proposition when the issue and the standard is can

21   we provide the Court with reasonable conditions that will

22   reasonably assure the defendant's appearance, which is the

23   standard that the Court needs to make in a case where

24   dangerousness to the community is not in issue.  But I hear

25   what your Honor is saying.

G623ZARC

1           Your Honor, I would also indicate that the suggestion

2     that the defendant was trying to hide his Iranian passport is

3     absurd, because he is indicted under his Persian name.  Reza

4     Zarrab with a Z is his Persian name.  His Turkish name is

5     Sarraf.  The passport he came to the country under is his

6     Turkish name.  For him to be indicted under Zarrab, to be told

7     he is under arrest for violating the laws of this state under

8     his Persian name, it would be ludicrous for him to deny he has

9     an Iranian passport.  He was asked if he had a passport, and

10    the passport he entered the country in was his Turkish

11    passport.  There was no attempt to mislead pretrial.

12          And I again submit most respectfully that I disagree

13    vigorously with the government's assessment of the videotape,

14    which is the best example of what he does understand and what

15    he doesn't understand.  And just like I can confer with him

16    about uncomplicated questions, when you're talking about key

17    words, you have to accept that he needs an interpreter.

18          And I also point out, which the government may or may

19    not know, but when you deal with people in prison for as long

20    as I have, and their e-mails from prison you understand, is the

21    e-mails that someone writes from prison, first of all, you can

22    have help from other inmates in how you compose your e-mail.

23    Second, there is a self-correcting feature on the CorrLinks

24    e-mail.  If you hit a button it fixes any of your grammatical

25    errors, any of your spelling errors.  So to suggest to me

G623ZARC

1    because he writes an e-mail to someone from jail that

2    demonstrates his proficiency in English is just wrong.

3           Third, in the discovery that we've already reviewed,

4    this is just the tip of the iceberg, there are references by

5    Mr. Zarrab well before he is arrested, in 2015, to people who

6    are trying to write to him in Farsi, that I don't read Farsi.

7    It is a text message that the government gave us, so there is a

8    clear indication before he has any reason to fabricate that he

9    can't read Farsi.

10          And the other thing that the government needs to

11   understand is that you will find that there are Farsi e-mails

12   that were sent to him that he forwarded to others.  Others

13   forwarded to him.  And the problem with an e-mail, as I tell

14   law students, is once you hit the send button, you have no idea

15   where that e-mail ends up, and you have no control over what

16   e-mail comes to you.

17          The defendant does not speak -- he speaks Farsi, but

18   he does not read and write Farsi.  If the government has

19   examples, we'll respond when and if we see them.  I suggest

20   they not waste your Honor's time.

21          I also want to end on this note.  They suggest that

22   there is no conflict -- that there is a conflict between

23   employing a private guard, and you know, Judge, no system is

24   perfect.  And people do escape from the bureau of prisons.  And

25   people every day, we read in the tabloids, unfortunately, about

G623ZARC

1    bureau of prisons people who are compromised by cunning

2    inmates, whether they get contraband in or whether they got

3    contraband out and people are being disciplined and fired.  No

4    system is perfect.

5          But what we have in this system with Guidepost is,

6    first of all, live feed from the facility in which he is going

7    to be housed.  Cameras being monitored by their professionals,

8    they have had hundreds of assignments from federal courts, from

9    state courts, and there hasn't been a single issue of a

10    Guidepost representative being compromised.

11          Is anything possible?  Yes, anything is possible.

12    Could he try to escape and have to be shot?  Sure.  That's

13    something that we addressed in the *Ng* case, and the defendant

14    signed a waiver which allowed the Guidepost people to use

15    reasonable force as if they were a police officer.

16          And to the extent that there is danger to the

17    community, Judge, we are all grownups here.  Every time a

18    police officer, a sworn police officer, a trained police

19    officer, uses a weapon on the streets of New York, the odds are

20    overwhelming that someone other than the person they're

21    shooting at gets hit either a ricochet or by a stray bullet.

22          So to suggest he should be remanded because of the

23    unlikely event that he'll overpower two or more armed guards to

24    escape and they will have to shoot him and they'll end up

25    shooting someone else is just not right.

G623ZARC

1          What the law says is he is entitled to bail.  There is

2    nothing about these charges that suggest that he is not

3    entitled to bail.  And unless and until they overcome the dual

4    burden of proof, which I don't think they can, he is entitled

5    to bail.  And when they say to us or to you, just a moment ago,

6    well, look at the conditions they proposed to you from the

7    start, which suggests implicitly they're saying that we

8    proposed Guideposts because he couldn't be trusted.  We

9    proposed Guideposts so that we don't waste your Honor's time

10   coming back again and again and again and again because of his

11   lack of ties to the community.

12          The only reason we're not talking about easy bail

13   under these charges is because the defendant doesn't have ties

14   to the community.  If he had ties to the community, on these

15   charges, I submit he would be on very reasonable bail, he would

16   have been out for the last 70 days, and we would not be having

17   a detention hearing because he has no criminal record, it is a

18   white collar crime and it is not a crime of violence.  If he

19   was a citizen of the United States, or from the United States,

20   they created this venture by arresting him when he came to

21   Disneyland on the jurisdictional charge that I submit is

22   hanging by a thread.

23          The only reason we came to you, with my experience in

24   this building, with my knowledge of the bail practices in this

25   building, it was I who suggested that the best chance you have

G623ZARC

1     of convincing the Court that we have provided reasonable

2     assurance that he will stay here, is if we propose Guideposts,

3     who is all former people who the government I think gives great

4     credibility to or at least they usually do, and propose that to

5     the Court.  So we don't have to come back and continue to

6     provide additional conditions.  It was out of respect for this

7     Court's time that we offered it in the first instance.  Not

8     because we concluded that it was the only way that could keep

9     him here.

10          Thank you very much for your patience.

11          THE COURT:  I do have one question, one followup

12    question just on that on the Guidepost situation.  And now if

13    you have it handy, if you'd look at Mr. Jaffe's affirmation.

14          MR. BRAFMAN:  Yes, sir.

15          THE COURT:  It comes up in a few places, but on page

16    three, paragraph six, it says, Mr. Jaffe speaking, "In pretrial

17    release cases, as in all of our monitoring assignments, we

18    follow the directions and orders of the judge, ordering

19    pretrial release to secure and oversee the individual releasee

20    according to the judge's orders," etc., etc.

21          So, I don't quite understand what that means.  So,

22    certainly, I'm not going to be on the phone to the Guidepost to

23    say, well, that sounds like a dangerous situation, you should

24    act or not act.  Or you should.

25          What's that about?

G623ZARC

1          MR. BRAFMAN:  I'll explain that and it's a good

2     question and there is a very good answer.  The way it would

3     work, we hope if the Court were to order release with the

4     Guidepost, is your Honor would say these are the following

5     conditions of bail.  He can only leave with pretrial approval

6     and notice to the government.  He can only go to the following

7     places.  Meaning the law firm or medical facility.  And then

8     they don't allow any other release outside those conditions.

9          And the way it works is we notify or they notify

10     pretrial, pretrial understands that this is within the Court's

11     order, and they approve it, and then the person is blacked out

12     of the electronic monitoring while they are in the custody of

13     Guidepost while they travel from one place to the next.

14          This is not a situation where Guidepost bothers the

15     Court with we think we should hit him over the head with a

16     hammer because he is being obnoxious.  This will not bother the

17     Court at all.  To the contrary.  Once the Court sets the

18     conditions of release and the conditions provide, for example,

19     he would remain in the apartment, money gets deposited with the

20     court, the bond is signed, the defendant is outfitted with the

21     bracelet, he is only permitted to leave with pretrial

22     supervision and notice -- pretrial approval, on notice to the

23     government, then the Court isn't bothered.  They are not

24     calling you for guidance on what they have to do, and what they

25     don't have to do.

G623ZARC

1          This is working seamlessly in other cases right as we

2     speak where pretrial supervision gets a request from a law firm

3     saying we need the defendant in our office between 10 and

4     4 p.m., and they black him out, Guidepost brings him to the

5     office, they sit there until he is released, and then they take

6     him back.  And always people remain in the apartment so people

7     can't get in there who aren't supposed to be in there.

8          I can give your Honor the order that Judge Broderick

9     wrote.

10          THE COURT:  I just wanted to get your take on it.

11          MR. BRAFMAN:  Yes, it doesn't require your Honor to

12     weigh in on everyday ministerial functions as to whether we can

13     do this, whether we can do that.

14          THE COURT:  I do think that actually there's some

15     suggestion there that whether or not they have a gun or not is

16     a function of whether the Court determines they should or

17     shouldn't.

18          MR. BRAFMAN:  Yes, but Judge, once you set that in

19     place, they only used arm guards.  And if you say it doesn't

20     matter, that's up to their discretion.

21          THE COURT:  That goes to my question.  I don't know

22     what that means.  If I say have a gun, that is suggesting that

23     you use the gun.

24          MR. BRAFMAN:  No.  Judge, these are trained --

25     everyone is a trained law enforcement person.

G623ZARC

1          THE COURT:  Just hear me out.  There's obviously a

2     distinction between an armed guard and an unarmed guard.  So if

3     the judge -- I'll say it again, I think it is valid -- if the

4     judge says, well, they should be armed, then there is some

5     suggestion at least that if something happens, you use that

6     gun.

7          MR. BRAFMAN:  Well, Judge, we'll take that

8     responsibility off your shoulders.  We will consent to the

9     armed guards, for the guards being armed at all times.  That's

10    easy.  It makes it much easier.  And quite frankly, your Honor,

11    I think that Guidepost prefers it.  It is a higher rate if the

12    person is armed than if they are not armed.

13          I understand your Honor's concern.  I don't want the

14    issue of whether the officer chooses to use a weapon to be

15    brought back to your direction that it has to be armed.  We

16    will consent to the has to be armed.  The defendant will sign a

17    waiver as he did in the *Ng* case that agree they are permitted

18    to use reasonable force to detain him if he attempts to flee.

19    And obviously, law enforcement people are justified even in

20    using deadly physical force if the circumstances arise.  That's

21    all on us.

22          THE COURT:  I'm raising the issue because I have

23    studied these other cases that you all have been referring to,

24    including -- it's interesting to read the transcripts of those

25    proceedings, where there is a sort of a -- not a negotiation,

G623ZARC

1   that's too strong a term, but a back and forth with the judge

2   and the prosecutor and the defense lawyer.  And so, yes, he'll

3   be armed.  No, they won't be armed.  Or I imagine you are aware

4   I think even in Judge Rakoff in the *Dreier* case, I don't even

5   think Mr. Dreier was able to go to his lawyer's office, I think

6   the lawyer Mr. Shargel had to come to his apartment.

7            MR. BRAFMAN:  That's correct.

8            THE COURT:  There are all these permutations involved

9   with the Guidepost type situation that are -- well --

10           MR. BRAFMAN:  Your Honor, to the extent your Honor is

11  considering granting bail, I want to make it as user friendly

12  and as easy for the Court.  We will agree to whatever

13  conditions you deem appropriate, and if it requires us to come

14  to his apartment, we have secured an apartment that is big

15  enough to have a meeting room so the lawyers can work so that's

16  easy.  To be perfectly candid with you, it makes our life

17  easier, it makes Guidepost easier, and it saves the defendant

18  an enormous expense.  Every time they transport him, they use a

19  special vehicle with a special guard.  If that's part of the

20  mix, Judge, we won't fight you on any of those conditions.

21           THE COURT:  I'm not negotiating.  I'm just trying to

22  understand how these arrangements come about.

23           MR. BRAFMAN:  Well, in the *Dreier* case, as I

24  understand it, I was in touch with Mr. Shargel back then, there

25  was a very limited window because they were negotiating a plea.

G623ZARC

1      So there wasn't really any need for Mr. Dreier to go anywhere,

2      other than stay home, because he wanted to be able to take care

3      of personal matters.  And shortly after the armed -- the guards

4      started, he pled guilty and was remanded.

5           So, here, your Honor, this case might be tried in

6      several months, might be tried in a year, depending on the

7      motions and depending on the extent of the discovery.  So, each

8      case as you said is fact specific, and we'll work with whatever

9      conditions your Honor were to impose.

10          THE COURT:  I got you.  Thank you.

11          MR. BRAFMAN:  Thank you, sir.

12          MR. LOCKARD:  Your Honor, I am not seeking a

13     sur-reply.  Just wanted to make one very quick --

14          THE COURT:  Well, there is precedent here for a

15     sur-reply as I can tell everybody, and then some actually.  I

16     think -- what comes after a sur-reply?

17          MR. BRAFMAN:  Sur-sur-reply.

18          THE COURT:  We've gotten those too.  Go ahead.

19          MR. LOCKARD:  Just a very quick correction to the

20     record.  I think Mr. Brafman said that the *Valerio* case was

21     only a danger to the community case and not a risk of flight

22     case.  I wanted --

23          THE INTERPRETER:  The interpreter cannot hear.

24          THE COURT:  It is best if you use the podium.

25          MR. BRAFMAN:  I agree with them.  There were two --

G623ZARC

1           THE COURT:  Wait.

2           MR. LOCKARD:  Just to make a quick correction for

3    Mr. Brafman's benefit.  On pages 297 to 298 of the *Valerio*

4    decision, Judge Bianco also addresses risk of flight and

5    concludes for some of the same reasons that the private guards

6    did not adequately address danger to the community, it also did

7    not adequately address risk of flight issue.

8           MR. BRAFMAN:  It was a 15-year mandatory minimum.

9           THE COURT:  Okay.  Can we have a timeframe, you are

10   going to make a submission to me.  Can you do that say today,

11   tomorrow?  Or tomorrow let's say.

12          MR. LOCKARD:  Yes.

13          THE COURT:  Mr. Brafman, we'll give you an opportunity

14   to respond.  If he submits it Friday, you can respond by

15   Tuesday?

16          MR. BRAFMAN:  Okay.  Yes, sir.

17          THE COURT:  Great.  So very helpful.  I am going to

18   take the matter, as I said at the outset, under advisement and

19   I'll be in touch, as they say.

20          Thanks very much.  We are adjourned.

21                            o0o

22

23

24

25