# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

UNITED STATES OF AMERICA,

                  Government,

-v-

REZA ZARRAB,

                  Defendant.

-----------------------------------------------------------X

**DECISION & ORDER**

15 Cr 867 (RMB)

## I. Background

Having reviewed the record herein, including, without limitation, (i) the defense bail application, including submissions dated May 18, 2016, May 31, 2016, June 1, 2016, and June 7, 2016 (collectively, "Defense Motion")[1]; (ii) the Government's opposition to bail, including submissions dated May 25, 2016, June 1, 2016, and June 3, 2016 (collectively, "Government Opposition"); (iii) the Pretrial Services Report (Florida), dated March 21, 2016; (iv) the transcript of the bail hearing conducted on June 2, 2016, and (v) Defendant Reza Zarrab's Turkish, Iranian, and Macedonian passports, **the Court respectfully denies Mr. Zarrab's application for bail after finding both that Defendant is a flight risk and that there are no conditions or combination of conditions of release that will reasonably assure the appearance of the Defendant.**

In a four count Superseding Indictment, filed on March 30, 2016, the Government charges Mr. Zarrab with the following crimes: **1)** conspiracy to defraud the United States and to impede the lawful functions of the United States Department of Treasury, Office of

---

[1] The Defense Motion includes the Affirmation of Joseph Jaffe, dated May 26, 2016 ("Jaffe Aff."), which is attached hereto as Exhibit A.

1

Foreign Assets Control ("OFAC"), under 18 U.S.C. § 371; **2)** conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. §§ 560.202-205; **3)** conspiracy to commit bank fraud, under 18 U.S.C. § 1349; and **4)** conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956-1957. (See Superseding Indictment ¶¶ 13, 15, 16, 17, 19, 20, 22, 23.) As summarized by the Government at the June 2, 2016 bail hearing: "What the Defendant is charged with is orchestrating and conducting a scheme to allow sanctioned entities, and the government of Iran, to access the international financial networks, and especially the United States financial networks . . . specifically for the purpose of evading sanctions." (See Transcript, dated June 2, 2016 ("Tr."), at 44:17-21.)

Mr. Zarrab is, at 33 years of age, a wealthy and successful international businessman and an experienced international traveler. He is a dual national of Turkey and Iran, and has no ties to New York or to the United States. Mr. Zarrab, who travels on (separate) Turkish, Iranian, and Macedonian passports, has been detained since his arrest in Miami, Florida on March 21, 2016 while enroute with his wife and five year old daughter to Disneyworld.[2]

The Defense Motion proposes the following bail conditions: **1)** a $50 million personal recognizance bond secured by $10 million in cash; **2)** travel restricted to the Southern District of New York; **3)** surrender of all travel documents with no new applications; **4)** strict Pretrial Services supervision; **5)** home detention with GPS monitoring at Mr. Zarrab's recently leased apartment in Manhattan. Mr. Zarrab proposes to leave this apartment only for medical treatment, legal counsel meetings, religious services, and court appearances, all

---

[2] At the time of his arrest, Mr. Zarrab declared to Customs that he was carrying approximately $100,000 in cash. (See Gov.'s Opp'n at 7.)

with prior notification to Pretrial Services; and **6)** Mr. Zarrab's presence at his apartment is to be secured by Guidepost Solutions LLC ("Guidepost"), a security company, with these additional restrictions: i) two or more armed (former or off duty) law enforcement officers at all times; ii) one supervisory security professional overseeing and scheduling Mr. Zarrab's security detail; iii) security at both the apartment and whenever (and to wherever) Mr. Zarrab leaves the apartment building; iv) a security vehicle with driver when Mr. Zarrab travels to counsel's office, court, religious services, or medical treatment; and v) regular Guidepost communication with the Court, Pretrial Services, and the U.S. Attorney's Office. (See Def.'s Mot. at 3-4.)

In support of its bail application, the defense argues: "Because Mr. Zarrab is not charged with a violent crime, is not facing any mandatory minimum prison sentence and is otherwise eligible for bail, we urge this Court not to detain him simply because he is wealthy and lacks ties to the United States. Our bail proposal removes any possible concern of flight." (Id. at 22.)[3]

The Government opposes Mr. Zarrab's bail proposal, arguing that "[t]here are no conditions that can reasonably assure the defendant's appearance." (See Gov.'s Opp'n at 1.) The Government contends that the proposed bail conditions "do not mitigate the risk of flight created by the nature of the charges, weight of evidence, Mr. Zarrab's personal background, and his duplicity to date." (Id. at 2.)

---

[3] Defense counsel has also argued: "And when they [the Government] say to us or to you [the Court] . . . 'look at the conditions [we] proposed to you [the Court] from the start, which suggests implicitly they're saying that we [the defense] proposed Guidepost because [Mr. Zarrab] couldn't be trusted.' We proposed Guidepost so that we don't waste your Honor's time coming back again and again . . . because of his lack of ties to the community." (Tr. at 65:5-11.)

3

The U.S. Pretrial Services Department (Southern District of Miami) issued a Pretrial Services Report, dated March 21, 2016, in which it concluded that there are no conditions or combination of conditions to reasonably assure the Defendant's appearance in court. (See Pretrial Services Report, dated March 21, 2016, at 3.) This conclusion was based upon Mr. Zarrab's: 1) offenses charged; 2) extensive foreign travel; 3) no family ties to the United States; 4) Turkish citizenship; and 5) unknown immigration status. The Pretrial Services Report also concluded that "the defendant may pose a financial danger to the community based on . . . the offense charged." (Id.)

## II. Legal Standard

Under 18 U.S.C. § 3142(b) the court shall order the pretrial release of the person unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community. The government bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk and/or by clear and convincing evidence that the defendant poses a danger to the community. See U.S. v. Ferranti, 66 F.3d 540, 542 (2d Cir 1995); U.S. v. Gebro, 948 F.2d 1118 (9th Cir. 1991). "[T]he government carries a dual burden in seeking pre-trial detention. First, it must establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight . . . Assuming it satisfies this burden, the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007).

4

"The court evaluating risk of flight is to consider the nature of the offense, the weight of the evidence against the suspect, the history and character of the person charged, and the nature and seriousness of the risk to the community." See United States v. Dreier, 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009); see also 18 U.S.C. § 3142(g).

In United States v. Banki, a panel of the Second Circuit Court of Appeals determined that it is "not legal error for a district court to decline to accept . . . as a substitute for detention" hiring private security guards to monitor the defendant while he is on home confinement. 369 F. App'x 152, 153 (2d Cir. 2010) (summary order). "Indeed, such conditions might be best seen not as specific conditions of release, but simply as a less onerous form of detention available only to the wealthy." Id. The Court in Banki was "troubled" by the idea that wealthy defendants may be allowed to buy their way out of prison by constructing their own private jail. Id. at 153. The Court noted that "because the only issue actually decided in [United States v. Sabhnani, 493 F.3d 63 (2d Cir. 2007)] was the adequacy of the particular terms of the proposed monitoring arrangement, we did not there hold that district courts routinely must consider the retention of self-paid private security guards as an acceptable condition of release before ordering detention." Id. at 153-154.

## III. Analysis

In the Court's view, the four bail factors support continued detention rather than release of Mr. Zarrab by a preponderance of the evidence.

### 1) The nature and circumstances of the offenses charged

The defense concedes that the Indictment sets forth "serious felony charges" but also points out that Mr. Zarrab "has not been charged with any crime involving violence, sex trafficking, terrorism, minor children, narcotics or weapons." (See Def.'s Mot. at 5, 12.)

5

According to the defense, "there is nothing about the nature and circumstance of the charged offenses to suggest that pretrial detention is necessary to achieve the purposes of the Bail Reform Act." Id.

The Government, on the other hand, emphasizes the national security nature of the crimes charged. (See, e.g., Gov.'s Opp'n at 16-20.) "The IEEPA authorizes the President to deal with 'unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States' by declaring a national emergency with respect to such threats . . . The President has repeatedly declared such a national emergency with respect to the Government of Iran." (Id. at 3.) The Government also points out that as recently as March 9, 2016, the President stated that, notwithstanding the Joint Comprehensive Plan of Action ("JCPOA") entered into between the United States, Iran, and other nations concerning Iran's nuclear program, "certain actions and policies of the Government of Iran [including those charged in this case] continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." (Id. at 4.)

The Government contends that "Zarrab facilitated millions of dollars worth of transactions on behalf of Iran and sanctioned entities that were designed to evade the U.S. sanctions." (Id. at 5.) "The entities aided by Zarrab include entities that, at the time, were arms of the IRGC [Iran's Islamic Revolutionary Guard], which is notorious for its facilitation of terrorism . . . Zarrab's conduct . . . was not limited to any specific banned set of products, but rather, enabled Iran to engage in the full course of conduct that threatens the United States." (Id. at 16, n.7.)

6

The Government states the four felonies with which Defendant is charged "carry a statutory maximum term of imprisonment of 75 years and a likely sentencing range under the United States Sentencing Guidelines of decades." (Id. at 1.)

The Court concludes that the charges against the Defendant are indeed serious and that the Defendant, if he were to be convicted, may well face a substantial term of imprisonment.[4]   The United States has imposed economic sanctions and regulations to help ensure that the Government of Iran and Iranian companies do no harm the United States. "Every President since President Clinton has continued the national emergency with respect to Iran and Executive Orders 13059, 12959, and 12957, given that the actions and policies of Iran continue to threaten the national security, foreign policy, and economy of the United States." (Id. at 4.) This factor weighs in favor of continued detention.

## 2) The weight of evidence against the person

The defense argues that the "charges are ill-founded and that the Government will not prevail at trial." (See Def.'s Mot. at 12.) According to defense counsel, this case "hang[s] by a jurisdictional thread," and "the only basis upon which the alleged conduct in this case could be subject to the jurisdiction of the United States is that the non-U.S. banks that Mr. Zarrab used to send the U.S. dollar payments to the non-U.S. recipients elected to do so by involving U.S. banks in the payment chain." (See Def.'s Reply at 11, 17.)

During the June 2, 2016 bail hearing, defense counsel also argued that the Defendant "didn't intend to defraud the bank, because he had no idea that those transactions were going

---

[4] At the same time, the Court has emphasized throughout this bail proceeding – and most recently on June 2, 2016 – that "Mr. Zarrab is presumed to be innocent in our legal system, and that presumption carries right up until the time, if it comes, that he may be determined to be guilty (or not) following a trial." (Tr. at 2:22-25.)

to pass through a United States Federal Reserve, because they were sent by non-U.S. banks to other non-U.S. banks." (Tr. at 38:14-18.) Defense counsel also commented that Adam Szubin, the U.S. Acting Under Secretary of Treasury and former Director of OFAC made statements which suggest that the "assertion of jurisdiction in this matter is entirely inappropriate." (See Def.'s Reply at 11; see also discussion at pp. 8-9.) The Defense asserts: "There is no incentive to flee a case that is defensible and Mr. Zarrab is intent on remaining in the Southern District of New York to fight these charges and clear his name." (Id. at 17.)

The Government counters that "the evidence of Zarrab's participation in the charged offenses is overwhelming: his culpability is captured in voluminous and unimpeachable email communications among Zarrab and his subordinates and coconspirators, business records, and financial evidence that document his orchestration of the charged schemes." (See Gov.'s Opp'n at 1.) There is, according to the Government, a clear "paper trail that shows Zarrab engaging in millions of dollars worth of sanctioned financial transactions." (Id. at 19.) The Indictment alleges, as an example, that on or about June 1, 2011 an email was sent to Zarrab from an individual with Iran's Mellat Exchange which had "very urgent" written in Farsi in the subject line and which attached several additional documents, including letters and messages that certain payments had been "blocked" by United States banks pursuant to the sanctions imposed by OFAC. (See Superseding Indictment at 9-10.) "Zarrab was warned explicitly that financial transactions in which he engaged were banned by U.S. banks because they ran afoul of OFAC regulations." (See Gov.'s Opp'n at 19.) "Zarrab himself direct[ed] transactions that were not for the benefit of the company in whose

8

name they were executed, but rather, for NIOC [National Iranian Oil Company], which was at the time, designated as an arm of the IRGC [Islamic Revolutionary Guard]." (Id.)

The Government asserts that jurisdiction in the U.S. courts is entirely proper. (See Gov.'s Surreply at 4.) The charged offenses "apply to foreign nationals operating in foreign countries when they conspire to evade or avoid the IEEPA and the ITSR or to cause a violation of those provisions," and Congress has the authority to enforce its laws beyond the territorial boundaries of the United States. (Id.) The Government also contends that the IEEPA and ITSR prohibit "any transaction . . . that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions in the ITSR and any conspiracy formed to violate any of the prohibitions in the ITSR – without regard to the nationality or location of the individuals involved in the prohibited transaction or conspiracy". (Id. at 5.) "[T]he evidence is overwhelming that Zarrab and his co-conspirators knew about the existence of U.S. and international sanctions against Iran; that Zarrab and his co-conspirators knew that these U.S. dollar transactions on behalf of and for the benefit of Iranian entities and the Government of Iran would be processed by U.S. financial institutions; and that Zarrab and his coconspirators knew that the transactions would be blocked whenever the connection to Iran was apparent." (Id. at 8.)[5]

---

[5] The Government offers several examples, including the following:

1) "[T]he [Defendant's] Al Nafees Exchange was the subject of OFAC regulatory compliance proceedings in approximately 2012 and 2013, which ultimately resulted in a multi-million dollar civil penalty . . . 'due to [Al Nafees's] processing of funds transfers through the United States where the benefits of such financial services were received in Iran, in apparent violation of the [ITSR].'" (Gov.'s Surreply at 9.);
2) "As early as January 2011, Zarrab's Dubai-based exchange company, Al Nafees Exchange, was removing Iran-identifying information from wire transfer requests that

9

Jurisdictional and evidentiary (and other) issues may well be the subject of pretrial

motion practice. And, the ultimate merit or strength of the Government's case will be tested

at or before trial. These matters are not being determined conclusively at this time. See

United States v. Bellomo, 944 F. Supp. 1160, 1163 (S.D.N.Y. 1996) ("The issue now before

the Court is whether there is a risk that [Defendant] will flee the jurisdiction or endanger

others before the trial can be held, not whether he is guilty or innocent of the charges in the

indictment."); United States v. Fama, 2013 WL 2467985, at *3 (S.D.N.Y. June 7, 2013)

("The Court recognizes the difficulty inherent in assessing the Government's case before

trial, and is mindful not to reach any conclusions about [Defendant's] guilt or innocence.").

But, the Court is persuaded for purposes of setting bail that the evidence against the

Defendant appears strong, including, without limitation, the exhibits attached to the

Government's Opposition, as well as the emails and allegations described in the Superseding

Indictment (at pp. 6-12). This factor weighs in favor of continued detention.

### 3) The history and characteristics of the defendant

It is conceded by the defense that Mr. Zarrab has no ties to the United States. (Tr. at

8:17-22.) As noted, he is a 33 year old successful international businessman who was born

in Iran and lives in Turkey. He is a dual national of Turkey and Iran. Mr. Zarrab is,

---

were processed by U.S. financial institutions for the benefit of the Mellat Exchange, an
Iranian exchange house owned by the state-owned Bank Mellat." (Id. at 8); and
3) "Payments that Zarrab and his coconspirators caused on behalf of Mellat Exchange
were, in fact, blocked by the U.S. financial institutions pursuant to OFAC regulations
when the Iranian nexus was insufficiently concealed." (Id.)

notwithstanding his relatively young age, an experienced world traveler. He holds Iranian, Turkish and Macedonian passports.[6] Mr. Zarrab is married and has a young daughter.

Among Defendant's business enterprises are the following: a Turkish gold brokerage and currency exchange; a shipbuilding company in Istanbul named Royal Shipping; a real estate construction company; a furniture manufacturing operation in Istanbul named Royal Mobilya; and a tea brokerage business trading Sri Lankan tea destined for Turkey. (See Def.'s Mot. at 13, 14, 18.) According to defense counsel, Mr. Zarrab was listed as "the 56[th] largest taxpayer in Turkey" in 2015. (Id. at 17.)

Defense counsel also states that Mr. Zarrab suffers from a "series of medical issues," including intestinal polyps, a stomach ulcer, and tumor located near his kidney. Defendant "requires a special diet and medical supervision properly to maintain his health . . ." (Id. at 21.) The Pretrial Services Report states: "The Defendant suffers from Irritable Bowel Syndrome (IBS), tumor on his kidney, kidney issues, and stomach problems."[7] (Pretrial Services Report at 2.)

Defense counsel presents charts and other documentation showing that Mr. Zarrab has made numerous charitable contributions to worthy causes in Turkey, including medical care for the needy, assistance to mentally disadvantaged children, and access to quality schooling for residents of low income Turkish communities. (Def.'s Mot. at 15.)

---

[6] Between 2007 (when Defendant was 24 years old) and 2016, Mr. Zarrab traveled to the United Arab Emirates, Russia, Azerbaijan, Greece, Spain, Italy, the Netherlands, Saudi Arabia, Thailand, Turkey, Maldives, France, Mauritius, South Africa, Austria, Switzerland, China, Macedonia, Turkmenistan, Germany, England, Lebanon, Singapore, the United Kingdom, Egypt, and Sweden. Many of these countries were visited more than once.

[7] Pretrial Services also stated that "ten years ago, the defendant was diagnosed with depression and panic attacks by a doctor in Turkey." (Pretrial Services Report at 2.)

The Government contends that Mr. Zarrab is an "extraordinary flight risk" and bases this assertion principally upon the absence of any ties of the Defendant to the United States, Defendant's significant wealth and resources, and Defendant's relationships to several foreign countries, including countries that seemingly would not extradite him (back) to the United States to face the pending charges. (See Gov.'s Opp'n at 21.) The Government also contends that Mr. Zarrab was not truthful (forthcoming) to Pretrial Services. (Id.) "When asked to truthfully quantify his wealth, Zarrab minimized his business income from several billion dollars to less than a million dollars, and omitted millions of dollars worth of assets. Similarly, when asked about his travel over the past decade, Zarrab chose to mention a few countries that he visited purportedly for vacation, but failed to disclose his travel to countries like Lebanon, Russia, and Saudi Arabia." (Id.) "[T]here are no bail conditions that will assure his presence in Court." (Id. at 1.)[8]

According to the Government, the Defendant's "commercial ventures generate a tremendous amount of revenue – more than $11 billion annually – in foreign countries." (Id. at 22.). An exhibit to the Government's Opposition appears to quote the Defendant as saying that for some time in 2014 he was exporting a ton of gold a day and was responsible for "approximately 25 billion Turkish lira in exports, or more than $11 billion." (Id. at 8 and Exhibit B.). The Government describes one of Defendant's businesses as a money exchange house that "sold and bought $3,452,919,870 and $3.452,928,229, respectively, in 2011." (Id. at 8.) The Government also lists assets of the Defendant, including a private airplane;

---

[8] The Government also states that the Defendant "is alleged by Turkish authorities to have used his wealth and influence to secure his recent release from Turkish prison." (Gov.'s Opp'n at 1.) It refers to a Turkish Prosecutor's Report, dated December 18, 2013, which allegedly contains details of bribe payments from Mr. Zarrab to several high-ranking Turkish officials. (Id. at 12.)

"approximately 20 properties"; "approximately 24 firearms"; horses; luxury automobiles; and "artwork valued at more than $10 million." (Id. at 10.) The Government also emphasizes the facts that Defendant holds Iranian and Macedonian passports (in addition to his Turkish passport) and that those two countries do not have extradition treaties with the United States.

The Government also contends that the Defendant regularly travels to other countries that do not have extradition treaties with the United States, including Russia, Lebanon, and Saudi Arabia. (Id. at 21.) It states that while Turkey does have an extradition treaty with the United States, Turkey does not extradite its citizens.[9] (Id.)

### Defendant's Forthrightness and His English and Farsi Language Skills

In making its case for continued detention rather than release on bail, the Government argues that Defendant was untruthful with Pretrial Services and did not, for example, fully disclose the extent of his wealth or the extent of his prior foreign travel. (See Gov.'s Opp'n at 7.) This is contested by the defense, which explains that there was an English language problem or barrier which affected Mr. Zarrab's interview with Pretrial Services. According to the defense, what may appear as misinformation or partial disclosure by Mr. Zarrab is explained by the fact there was no Turkish interpreter present at the Pretrial Services interview in Miami on March 21, 2016. Defense counsel asks that the Court "view the Miami Pretrial Services Report in two ways: first, as a minimally probative document given the language barrier, and second, as a minor part of what has been a [subsequent] full,

---

[9] Defense counsel also states that Turkey has an extradition treaty with the United States but adds that Turkey has recently complied with a United States request for extradition of a high profile hacking suspect. (See Def.'s Mot. at 9, 13.)

thorough examination and disclosure of defendant's assets and overall wealth" by counsel. (See Def.'s Reply at 8-9.)

Mr. Zarrab's language skills were fully debated at the June 2, 2016 bail hearing (and in subsequent submissions). AUSA Lockard contended that: "Mr. Zarrab saying he doesn't understand English well enough to participate at a pretrial services interview is . . . flatly contradicted by the evidence." (See Tr. at 50:13-15.) Lockard pointed to "voluminous e-mail and electronic communications in which Mr. Zarrab communicates with others in English. And that is both on his telephone, on his Bureau of Prisons e-mail account, he receives documents, including business documents, in English. He receives texts and e-mails in English and responds in English." (Id. at 51:1-6.) Defense counsel countered that "the government's suggestion that this defendant was not honest with the pretrial services interview in Miami . . . is somewhat offensive. I think that what you only need to do is actually look at the first section of the pretrial services report, where the author of the report says 'Although the interview was conducted in English, the defendant is in need of a Turkish interpreter and none was provided.'" (Id. at 10:12-21.)

During the bail hearing, AUSA Lockard also addressed Mr. Zarrab's Farsi language skills, which he claims are more sophisticated than the defense suggests: "Mr. Zarrab acknowledges that he can speak and hear Farsi. His family members are Iranian. He has business interests in Iran. He has friends in Iran. And the electronic communications on his telephone and in his e-mail account show that he repeatedly receives communications and documents written in Farsi, and that he understands and responds to these communications." (See Tr. at 49:21-25, 50:1-2.)

Following the bail hearing, the Government provided, by letter dated June 3, 2016, examples of Defendant's proficiency in the English language, including emails and images obtained from the Defendant's cellphone. For example, there is an email, dated May 30, 2015, from Mr. Zarrab to "Sama Petrol" to which Mr. Zarrab attaches a written letter in English on the letterhead of one of his companies which discusses a recent business deal: "Although the agreement has been realized between our company and the esteemed company Sama Petrol, all the mutual understandings were obtained through direct negotiations with NICO [Naftiran Intertrade Company] and henceforth any correspondence with our company regarding the subject of this agreement will be realized, only if it is issued by NICO." (Gov.'s Letter, Exhibit J.). In another email, written in English and dated March 20, 2013, Mr. Zarrab appears to respond to certain banking/regulatory questions, including questions regarding economic sanctions and the ability of a company to wire money. (Gov.'s Letter, Exhibit K.) Another illustration of Mr. Zarrab's English language skill appears to be reflected in a lengthy series of recorded chats from in or about November 2015 through March 2016 between the Defendant and a business associate discussing diverse business and personal topics. (Gov.'s Letter, Exhibit I.)

The Government also submitted numerous documents and emails that reflect Defendant's proficiency in communicating in Farsi. These exhibits include Farsi text message screenshots, emails, and typed and handwritten contracts in Farsi. (See Gov.'s Letter, Exhibits O-Q.) The Government asserts that one of the documents is a handwritten Farsi contract signed by the Defendant. (Id., Exhibit Q.)[10]

---

[10] The contract is attached to an email from the Defendant and is dated September 25, 2014.

The Defense, as noted, disputes any deception by Mr. Zarrab. The defense counters by stating that "[i]t is undisputed that Mr. Zarrab can understand and speak basic English but requires an interpreter for complex conversation involving legal or technical terms, phrases or words" and that the Government's submission "sheds no new light on this issue." (See Def.'s Letter at 3-4.)

According to the defense, the Government exhibits do not, for example, show that "Zarrab ever looked at the images . . . [or] understood them"; or that "Mr. Zarrab has English-speaking employees who might assist him in drafting English-language communications." (Id. at 4.) The defense contends, with respect to Mr. Zarrab's prison emails, that "you can have help from other inmates in how you compose your e-mail . . . [and] there is a self-correcting feature on the CorrLinks e-mail [that] fixes any of your grammatical errors, any of your spelling errors." (Tr. at 62:22-25.)

And, with regard to Defendant's proficiency in Farsi, defense counsel argues that although Mr. Zarrab speaks and understands Farsi, he cannot read or write it. (See Tr. at 22:21 (MR. BRAFMAN: "[T]he defendant does not read Farsi . . . he speaks Farsi.").) According to the defense, the Government's exhibits "show nothing of value," and "as a general matter, Mr. Zarrab works with people who do in fact speak Farsi and who can assist him when necessary." (See Def.'s Letter at 5.) And, "the government needs to understand that you will find that there are Farsi e-mails that were sent to him that he forwarded to others. Others forwarded to him. And the problem with an e-mail . . . is once you hit the send button, you have no idea where that e-mail ends up, and you have no control over what e-mail comes to you." (Tr. at 63:10-16.)

The precise extent and level of sophistication of Mr. Zarrab's English or Farsi

language skills or the full extent of his wealth and resources are not conclusive of the bail

issue currently before the Court. These matters may well be discussed again at subsequent

proceedings, including trial. Based upon the record, the Court is convinced that Mr. Zarrab

has a good grasp of English and Farsi – himself and perhaps with the assistance of others –

sufficient to engage in complex international, financial, and business transactions. The Court

also concludes that in these legal proceedings, it is appropriate that Mr. Zarrab continue to

have the benefit of a Turkish interpreter. See Pagan v. Berbary, 2007 WL 2932775, at *2

(N.D.N.Y. Oct. 5, 2007). The Court is also grateful to defense counsel for submitting a fuller

picture of Mr. Zarrab's businesses, wealth, assets, and resources. [11]

For purposes of deciding bail or remand, the Court finds most persuasive the

following: Defendant's lack of ties to the United States; his significant wealth and his

substantial resources; his extensive international travel; and his strong ties to foreign

countries, including countries without extradition. These factors, among others stated,

provide Mr. Zarrab with the incentive and the wherewithal to flee and render him a flight

risk. See, e.g., United States v. Epstein, 155 F. Supp. 2d 323, 326 (E.D. Penn. 2001) ("The

crucial factor, however, is defendant's lack of ties to the United States and his extensive ties

---

[11] THE COURT: "Is the point or central point that if you take out that allegation that he was not being forthright with pretrial services, you remove the Cilins precedent of Judge Pauley? Is that what you're arguing?"

MR. BRAFMAN: "It's that argument, yes . . . in Cilins, you were dealing with someone who was intending to corrupt this courthouse . . . corrupt his case, and Judge Pauley I think dealt with him appropriately. So when you take out the lack of an interpreter, and then understand that the defendant was not being deceptive . . . it is more than getting beyond Cilins."

(Tr. at 17:4-19:23.)

to Brazil with which no extradition treaty exists. In our view, his forfeiture of $1 million worth of assets in the United States would not deter him from flight when in Brazil he has significant wealth, a lucrative job, the presence of his family, and insulation from ever being forced to stand trial."); United States v. Abdullahu, 488 F. Supp. 2d 433, 445 (D.N.J. 2007) ("After reviewing the totality of the evidence, the Court has reached the inescapable conclusion that the government has proved by a preponderance of the evidence that no condition or combination of conditions exist that will reasonably assure the defendant's appearance at trial. The defendant faces serious criminal charges . . . The defendant faces a potential ten year prison sentence and involuntary deportation. The defendant does not have permanent and longstanding ties to this area, he has the means and incentive to flee and he has family ties and a place to live in an overseas country that will not extradite him to the United States."); United States v. Seif, 2001 WL 1415034, at \*2-3 (D. Arizona Nov. 8, 2001) (Where defendant, a foreign national, had no family ties to United States, and was an experienced international traveler with substantial connections in countries that do not have extradition treaties.)[12] These factors weigh in favor of continued detention.

**4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release**

The Defense argues that "there is very little authority supporting the argument that a court should consider a defendant's propensity to commit further economic crimes as 'danger to the community' contemplated by the Bail Reform Act." (See Def.'s Mot. at 18.)

---

[12] The Court has not made any finding of "terrorism" or "lying" in connection with this bail proceeding. Such finding(s) may have been made in one or more of the cases cited. See, e.g., Abdullahu, 488 F. Supp. 2d at 441.

18

"Furthermore, as a practical matter, Mr. Zarrab could not engage in the conduct alleged in the Indictment if he is under house arrest in the United States." (Id. at 19.)

Although its principal focus is upon risk of flight, the Government points out that the Defendant "has aided sanctioned Iranian financial institutions, such as Bank Mellat, the Mellat Exchange, and Bank Karafarin, by giving them access to the very financial markets that the sanctions scheme was designed to cut them off from. He has helped the IRGC [Islamic Revolutionary Guard] earn millions of dollars that could be used to finance its weapons proliferation and support for terrorism by facilitating shipping and petroleum transactions for IRGC-controlled entities, like NIOC [National Iranian Oil Company]. In doing so, the Defendant eased the pressure on Iran and the IRGC created by the sanctions, and worked to diminish their deterrent effect. Zarrab's actions, in a very real sense, compromised the well-being and security of the United States. " (See Gov.'s Opp'n at 18.)

As noted, the Pretrial Services Report concluded that the Defendant "may pose a financial danger to the community." See supra p. 4.

The Court concludes that undermining U.S. sanctions against Iran may well pose a threat to the United States and that Mr. Zarrab's release may exacerbate that threat by, for example, enabling him to communicate with business associates or others at or from his New York City apartment.[13] The Court also notes that U.S. Under Secretary Szubin has stated the following: "Iran continues to be the world's leading state sponsor of terrorism, and to play a significant role in destabilizing the [Middle East] region. It supplies funding and weapons to

---

[13] The Court is not finding by clear and convincing evidence that Mr. Zarrab poses a danger to the community.

Hizballah, to the Assad regime, and to the Houthis in Yemen. It continues to develop its ballistic missile program, in contravention of UN Security Council provisions. And it continues to violate human rights." (See *Testimony of Acting Under-Secretary for Terrorism and Financial Intelligence Adam J. Szubin before the House Committee on Foreign Affairs* (May 25, 2016); see also United States v. Kuyumcu, No. 16-cr-00308 (E.D.N.Y. June 14, 2016).) This factor also weighs in favor of continued detention.

### Privately Funded Armed Guards: "The Elephant in the Room"

Having determined by a preponderance of the evidence that Mr. Zarrab is a flight risk, the Court next determines whether there are bail conditions which will "reasonably assure the appearance of the person as required." 18 U.S.C. §§ 3142(b)-(f)(2); see also Banki, 369 F. App'x at 153. [14] Bail conditions approved by the court in such circumstances must be "reasonable." See United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) ("The Court must determine whether there are reasonable conditions of release that can be set or whether detention is appropriate.").

The defense argues – in support of the "24/7" privately funded armed guard feature of its bail application – that "the unblemished professional reputation of Guidepost [the proposed

---

[14] The Court focuses in this section of the Opinion upon the privately funded armed guard feature of Defendant's bail application because that is the central point of contention between the parties. The defense describes the private guard issue as "the elephant in the room and perhaps in the country . . . . Do we allow wealthy defendants to do this when not wealthy defendants can't do it?" (Tr. at 18:11-13.) At the same time, the Court's determination as to whether any set of bail conditions would "reasonably assure" Mr. Zarrab's appearance reflects all of the findings and conclusions set out in sections (1)-(4), supra, as well as the Court's analysis of Defendant's privately funded armed guard proposal.

private security agency] . . . will ensure Mr. Zarrab's return to court whenever required."[15] (Def.'s Reply at 29.) The defense also states that "[t]he inequities in the criminal justice system on the state and federal level between people of means and people of not means is not something that is Mr. Zarrab's fault, and it is nothing we are going to remedy in this case. It is sad, but it's true. . . . But that does not mean that you claim someone is very rich and, therefore . . . say [that] you can't use your wealth to create a prison." (Tr. at 18:15-24.)[16]

The Government argues, relying in part upon United States v. Banki, that the Court need not (even) consider the Defendant's private armed guard proposal. (Gov.'s Opp'n at 23). In Banki, the Court stated: "we did not hold [in Sabhnani] that district courts routinely must consider the retention of self-paid private security guards as an acceptable condition of release before ordering detention." Banki, 369 F. App'x at 154; see also Sabhnani, 493 F.3d at 78 n.18 ("The government has not argued and, therefore, we have no occasion to consider whether it would be contrary to principles of detention and release on bail to allow wealthy defendants to buy their way out by constructing a private jail.") The Government also

---

[15] The Court in this Decision is in no way impugning the work or integrity of Guidepost or its officers and employees.

[16] Private security guard bail proposals impact a miniscule number of defendants in the U.S. criminal justice system. See Feuer, Alan, *Bail Sitters,* THE NEW YORK TIMES (Dec. 24, 2009) ("So far [as of 2009], according to interviews with lawyers and the security firms that serve them, there have been a half-dozen cases of home confinement with bail monitoring."); see also United States v. Seng, No. 15-cv-706 (S.D.N.Y. Oct. 23, 2015); United States v. Valerio, 9 F. Supp. 3d 283 (E.D.N.Y. 2014); United States v. Cilins, 2013 WL 3802012 (S.D.N.Y. July 19, 2013); New York v. Strauss-Kahn, No. 307065/2011 (N.Y. Sup. Ct. May 20, 2011); United States v. Douglas, et al., No. 09-cv-01082 (S.D.N.Y. Jan. 29, 2010); United States v. Banki, No. 10-cr-08 (S.D.N.Y. Jan. 21, 2010); United States v. Madoff, No. 08-mag-2735 (S.D.N.Y. Jan. 12, 2009); United States v. Dreier, 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009); United States v. Brooks, et al., No. 06-cr-0550 (E.D.N.Y. 2008); United States v. Sabhnani, 493 F.3d 63 (2d Cir. 2007); Borodin v. Ashcroft, 136 F. Supp. 2d 125 (E.D.N.Y. 2001); United States v. Agnello, 101 F. Supp. 2d 108 (E.D.N.Y. 2000); United States v. Gotti, et al., No. 98-cr-00042 (S.D.N.Y. Feb. 10, 1998).

contends that "Zarrab's proposed private security arrangement does not mitigate the risk of flight" because, among other reasons, Guidepost is "put in a position where they suffer a conflict of interest because they are jailers being paid by the inmate," (Tr. 58 at 12-14), and because "a private security firm simply cannot replicate the controlled environment of a federal correctional facility." (Gov.'s Opp'n at 24.)

On the facts of this case, and having thoroughly considered Defendant's entire bail application, the Court concludes that Mr. Zarrab's continued detention is warranted. The bail package, including the privately funded armed guard regime proposed by the Defendant, does not reasonably assure the appearance of Mr. Zarrab in future proceedings. The Court's analysis is as follows:

1. **It is reasonable to consider Mr. Zarrab's bail proposal as detailing a form of continued detention, and not "release."** During the bail hearing on June 2, 2016, the Government pointed out that: "There is [] in the case law a debate . . . about whether conditions that put the defendant in confinement in a private apartment under armed security, whether this is any longer a question about conditions of release, or whether it is now about conditions of detention." (See Tr. at 55:21-56:2.) Given the very severe restrictions sought to be imposed upon Mr. Zarrab, the Defendant's proposal does not appear to contemplate "release" so much as it describes a very expensive form of private jail or detention. See 18 U.S.C. § 3142. The Defendant's proposal includes, among its other elements, the following: travel restricted to the Southern District of New York; surrender of all travel documents with no new applications; home detention with GPS-monitoring of Mr. Zarrab's residence; two or

more armed (former or off-duty) law enforcement officers residing with Mr. Zarrab around-the-clock; one additional supervisory security professional continuously overseeing Mr. Zarrab's whereabouts; an enhanced security detail – including car and driver – whenever and wherever Mr. Zarrab travels; meetings with defense counsel limited to Mr. Zarrab's apartment and not counsel's office; and Mr. Zarrab signing a waiver of liability for the use of reasonable force in the event of an attempted escape.[17] See also Banki, 369 F. App'x at 154 ("**Indeed, such conditions might be best seen not as specific conditions of release, but simply as a less onerous form of detention available only to the wealthy**.") (emphasis added); United States v. Valerio, 9 F. Supp. 3d 283, 293-94 (E.D.N.Y. 2014) ("There is nothing in the Bail Reform Act that would suggest that a defendant . . . has a statutory right to replicate or construct a private jail in a home or some other location. The Bail Reform Act address conditions of *release,* not conditions of *detention.* Of course, the Act clearly allows for forms of home detention less restrictive than jail. However, once the home detention becomes so restrictive (including with the use of private security guards) that it simply replicates a jail, it is highly questionable whether the Bail Reform Act contemplates 'release' in that context.").)

2. **The privately funded armed guard regime proposed by the defense is not reasonable because, in too many respects, it substitutes judicial oversight and management for (more appropriate) reliance upon trained, experienced, and qualified professionals from the U.S. Bureau of Prisons and the U.S. Marshals**

---

[17] The latter two provisions – legal counsel meetings in the apartment and waiver of force liability – were proposed at the bail hearing on June 2, 2016. (Tr. at 69:7-21.)

**Service.** The Affirmation, dated May 26, 2016, of Joseph Jaffe, Guidepost's Chief

Compliance Officer and Deputy General Counsel, is instructive as to the Court's

projected role in overseeing Mr. Zarrab's detention. Mr. Jaffe states: "In pretrial

release cases . . . we follow the directions and orders of the Judge ordering pretrial

release, to secure and oversee the individual releasee according to the Judge's orders,

and report to and interface with the Court." (Jaffe Aff. at ¶ 6.) Mr. Jaffe further

states: "Similarly, in all of our monitoring assignments, the order or agreement

establishing and governing our retention, the Court, oversight, regulatory,

enforcement or prosecuting authority sets the parameters of our actions." (Id. at ¶ 6

n.1.)

During the June 2, 2016 bail hearing, the following colloquy about to the Court's role

took place:

THE COURT:     If you'd look at Mr. Jaffe's affirmation . . . it says "In pretrial
               release cases, as in all of our monitoring assignments, we follow
               the directions and orders of the judge, ordering pretrial release
               to secure and oversee the individual release according to the
               judge's orders . . . So, I don't quite understand what that means .
               . . I'm not going to be on the phone to Guidepost to say [] that
               sounds like a dangerous situation, you should act or not act . . .
               What's that about? . . .

MR. BRAFMAN:   [Rhetorically, to be sure, counsel stated:] This is not a situation
               where Guidepost bothers the Court with 'we think we should hit
               him over the head with a hammer because he is being
               obnoxious.' This will not bother the Court at all. To the
               contrary. Once the Court sets the conditions of release . . . then
               the Court isn't bothered.

See Tr. at 66:13-67:17.

But judicial involvement **is** inherent in the proposed privately funded armed guard

regime. Here are some examples:

- The Court may be asked to decide whether the private security guards should be armed or unarmed. (See Jaffe Aff. at 3 ("Guidepost is prepared and has agreed that, should the Court approve the pretrial release of Mr. Zarrab, we will provide an appropriate number of experienced, **armed (if required by the Court)** security professionals (all former, or off-duty, law enforcement officers), 24-hours per day, seven days per week, as oversight of Mr. Zarrab . . .") (emphasis added); see also Tr. at 68:14-20 (THE COURT: "I do think that actually there's some suggestion there that whether or not they have a gun [] is a function of whether the Court determines they should or shouldn't." MR. BRAFMAN: "Yes, but Judge, once you set that in place, they only use arm[ed] guards. And if you say that it doesn't matter, that's up to their discretion.").)

- The Court may be asked to determine the appropriate level of force that may be used to secure Mr. Zarrab. (See Tr. at 68:22-69:15 (THE COURT: "If I say have a gun, that is suggesting that you use the gun." MR BRAFMAN: "No. Judge, these are trained – everyone is a trained law enforcement person." THE COURT: "Just hear me out. There's obviously a distinction between an armed guard and an unarmed guard . . . [and] if the judge says they should be armed, then there is some suggestion at least that if something happens, you use that gun . . ." MR. BRAFMAN: "I understand your Honor's concern. I don't want the issue of whether the officer chooses to use a weapon to be brought back to your direction that it has to be armed.").)

The Government raised a related (pertinent) issue during the June 2, 2016 bail hearing regarding the use of force: "Another fundamental problem with the defendant's private armed guard proposal is that it does put the private armed guards in a situation that is unlike the situation faced by federal officers, federal correctional officers, and federal marshals. These are private individuals, notwithstanding their law enforcement background, they are still private individuals. Their conduct is not governed or supervised by federal law or federal agencies. They are neither supervised nor disciplined by federal agencies. [And, in fact, they are paid by the person they are guarding]. The scope of their ability to use force is different, the potential consequences to them of using force, frankly, I don't know." (Tr. at 58:1-11.) E.D.N.Y. District Judge Joseph F. Bianco's observation in United States v. Valerio is relevant here. "The questions about the legal authorization for the private security firm to use force against defendant should he violate the terms of his release, and the questions over whether the guards can or should be armed, underscore the legal and practical uncertainties—indeed, the imperfections—of the private jail-like concept envisioned by defendant, as compared to the more secure option of an actual jail." 9 F. Supp. 3d at 295.[18]

- The Court may also be asked to make attorney/client determinations for Mr. Zarrab, i.e., to decide whether the Defendant may travel to his attorneys'

---

[18] The court in United States v. Dreier, while authorizing the defendant's private security bail package, also recognized that "[t]o be sure, a private security guard could face liability for using excessive force to prevent a defendant's flight . . ." 596 F. Supp. 2d at 834.

offices for consultation or whether, as in <u>Dreier</u>, the attorneys must travel to him. <u>See</u> <u>Dreier</u>, 596 F. Supp. at 833. The Jaffe Affirmation provides in ¶ 10 that: "Additional security and monitoring personnel also shall be provided whenever Mr. Zarrab leaves the premises, if he is permitted to do so pursuant to the bail conditions . . . [w]e will also provide, as needed, a security vehicle with driver, whenever such travel is required and authorized by the court."

And, at the bail hearing, the following colloquy took place:

| THE COURT: | I imagine you are aware [] even . . . in the <u>Dreier</u> case, I don't even think Mr. Dreier was able to go to his lawyer's office, I think the lawyer [] had to come to his apartment." |
|---|---|
| MR. BRAFMAN: | That's correct . . . . We will agree to whatever conditions you deem appropriate, and if it requires us to come to his apartment, we have secured an apartment that is big enough to have a meeting room so the lawyers can work so that's easy . . . . If that's part of the mix, Judge, we won't fight you on any of those conditions." |

Tr. at 70:3-20.

3. **The Defendant's private guard proposal is unreasonable because, as noted, it raises serious issues of liability surrounding the use of force against the Defendant and persons who may interact with him.** In several other cases, courts have required waivers from defendants permitting the "future use of reasonable force" against them. This "unusual" practice was invoked in <u>Dreier</u>, where the defendant was required expressly to "consent in writing to the use, by the armed security guards, of 'temporary preventive detention and the use of reasonable force' to thwart any attempt to flee." <u>Dreier</u>, 596 F. Supp. at 834. Similarly, in <u>United States v. Ng Lap Seng</u>, the court required that "Defendant consents to members of the Guidepost

security detail's use of reasonable, legal force as they deem appropriate to prevent Defendant from fleeing the Southern District of New York or otherwise violating the terms of release." 15-cr-706, at *3 (S.D.N.Y. Oct. 23, 2015).

In this case, the defense has stipulated that Mr. Zarrab "will sign a waiver . . . that agrees they [i.e., the armed guards] are permitted to use reasonable force to detain him if he attempts to flee." (See Tr. at 69:16-18.) But the Court questions whether such waivers are valid and/or enforceable or if they are reasonable. The Court shares the concern expressed in Jaffe v. Pallotta TeamWorks, that "[a]s with the proscription against prospective waiver of tort liability for intentional torts or for strict liability, such [waiver] agreements interfere with the ability of the state to ensure that persons do not put each other at risk of bodily harm, a policy that often serves goals beyond the protection of the immediate contracting party." 374 F.3d 1223, 1226 (D.C. Cir. 2004); see also Am. Auto. Ins. Co. v. Rest Assured Alarm Sys., Inc., 786 F. Supp. 2d 798, 807 (S.D.N.Y. 2011) ("[T]o the extent that such agreements purport to grant exemption for liability for willful or grossly negligent acts, they have been viewed as wholly void."); Restatement (Second) of Contracts § 195 ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable."). The Court appreciates the observation in Valerio, where, quoting United States v. Colorado-Cebado, Judge Bianco stated: "What more compelling case for an order of detention is there than a case in which only an armed guard and the threat of deadly force is sufficient to assure the defendant's appearance? There are some conditions that are simply not appropriate to be contracted out, and detention under armed guard

28

would seem to be one of those." 9 F. Supp. 3d at 295 (quoting 2013 WL 5852621, at *6 (W.D. Tex. Oct. 30, 2013)).

4. **Most importantly, the Defendant's privately funded armed guard proposal is unreasonable because it helps to foster inequity and unequal treatment in favor of a very small cohort of criminal defendants who are extremely wealthy, such as Mr. Zarrab.** As was eloquently stated by then Chief Justice Earl Warren, "[t]he quality of a nation's civilization can be largely measured by the method it uses in the enforcement of its criminal law. When those methods result in arbitrary inequality because of race, indigence or otherwise, the nation as a whole suffers as well as those who are victims of inequality." (See Attorney General Kennedy's National Conference on Bail and Criminal Justice (1964).) And, in a case concerning an indigent defendant's right of access to trial transcripts, the U.S. Supreme Court wisely found that "differences in access to the instruments needed to vindicate legal rights, when based upon the financial situation of the defendant, are repugnant to the Constitution." Roberts v. LaVallee, 389 U.S. 40, 42 (1967).

With respect to a bail package similar to the Defendant's proposal, the court in United States v. Cilins observed that "[f]ederal judges swear an oath . . . to 'administer justice without respect to persons, and do equal right to the poor and to the rich.' That pledge is violated if a defendant, who is a serious risk of flight with every incentive to flee and the means to do so, is permitted to buy his way out of detention." 2013 WL 3802012, at *3 (S.D.N.Y. July 19, 2013).[19] Former E.D.N.Y. District Judge

---

[19] The Court is not finding that the facts of Cilins are the same as the facts of this case.

Eugene H. Nickerson tellingly found in <u>Borodin v. Ashcroft</u>, that "[i]t is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the government, even if carefully selected." 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001).

And, while the court in <u>Banki</u> found that it had "no occasion to consider whether it would be contrary to principles of detention and release on bail to allow wealthy defendants to buy their way out by constructing a private jail," it, nonetheless, explained that "[w]e remain troubled by that possibility." 369 F. App'x at 153-54 (internal citations omitted).

## IV. Conclusion & Order

Based upon the facts presented here, and after having reviewed carefully the parties' submissions and applicable authorities, and for the reasons stated above, the Court concludes that the Government has shown by a preponderance of the evidence that Mr. Zarrab poses a risk of flight and that no condition or combination of conditions, including privately funded armed guards, will reasonably assure his appearance at trial. The Court respectfully denies Mr. Zarrab's application for bail [#16].

Dated: New York, New York
      June 16, 2016

*RMB*

**RICHARD M. BERMAN, U.S.D.J.**

# EXHIBIT A

UNITED STATES DISCTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITES STATES OF AMERICA

     -v-

REZA ZARRAB,

          Defendant.

**S1 15 Cr. 867 (RMB)**

Affirmation

---

JOSEPH JAFFE, under the penalties of perjury affirms and says:

1.     I am the Chief Compliance Officer and Deputy General Counsel of Guidepost Solutions LLC ("Guidepost"). I am an attorney admitted to practice in the State of New York, and among others, the U.S. District Courts for the Southern and Eastern Districts of New York and the U.S. Court of Appeals for the Second Circuit. Prior to my joining Guidepost Solutions, among others, I served as an Assistant United States Attorney for the Southern District of New York (Chief of the Official Corruption Unit, Assistant Chief of the Criminal Division, Administrative Assistant U.S. Attorney); Acting Chief Inspector of the U.S. Drug Enforcement Administration; elected District Attorney of Sullivan County New York. I was in private practice for a decade. I have been engaged as an Investigative Consultant, licensed investigator in multiple states since 1991.

2.     This Affirmation is offered to the Court to describe Guidepost and the services it has provided and would further provide should the Court grant the pending Application for Pretrial Release. We ask that the Court order this Affirmation be sealed and not made available to the public because should the Court grant pretrial release, the location of the premises where Mr. Zarrab will be confined, the full nature of the security installations made at those premises and the schedules and duty operations of those assigned, have not been made known to Mr. Zarrab and release of the information publicly could possibly compromise the operations proposed.

3.     Guidepost is a global organization with a team of experienced investigators, security and technology consultants and compliance and monitoring experts. We provide security, investigative, compliance and monitoring leadership for critical client needs.

4. Members of the Guidepost Solutions team have been performing monitorships involving entities and individuals across a broad spectrum of industries in the corporate, non-profit, construction and private sectors for more than three decades. Members of our executive team include Chairman, Bart M. Schwartz; Chief Executive Officer, Julie Myers Wood; Chief Compliance Officer and Deputy General Counsel, Joseph Jaffe; President of Investigations and Monitoring, Thomas A. McShane and President of Investigations and Private Client Protection Andrew J. O'Connell, who are recognized as integrity monitors with multiple years of experience. They have had numerous court and other appointments to monitor the conduct of organizations and individuals and have received assignments from or with the approval of among others:

a) U.S. District Court for the Southern District of New York
b) U.S. District Court for the Eastern District of New York
c) U.S. District Court Northern District of Illinois
d) U.S. Department of Justice
e) U.S. Securities and Exchange Commission
f) U.S. Department of Commerce, Bureau of Industry and Security
g) U.S. Department of Treasury, Office of Foreign Assets Control
h) U.S. Attorney's Office for the Southern District of New York
i) Occupational Safety and Health Administration
j) Commodity Futures Trading Commission
k) Attorney General of the State of California
l) Attorney General of the State of New York
m) Attorney General of the State of New York Medicaid Fraud Control Unit
n) Office of the District Attorney of New York County
o) New Jersey Department of the Treasury
p) New York City Department of Investigations
q) New York City Economic Development Corporation
r) New York City Transit Authority
s) New York State Department of Environmental Conservation
t) New York State Department of Financial Services
u) New York State Organized Crime Task Force
v) New York City School Construction Authority
w) Port Authority of New York and New Jersey, Office of Inspector General.

5. Guidepost has vast experience assessing security operations, as well as designing and managing the installation of physical security and life safety systems for both new and existing sophisticated facilities and operations under our Security & Technology Consulting ("STC") practice. Our typical services include threat risk and vulnerability assessments, security program evaluations, feasibility studies, peer reviews and constructability studies; security systems design, engineering, cost estimating, inspections, and commissioning. Our STC employees possess many

years of experience, incorporating a broad range of expertise from the security management and technical security disciplines in both the public and private sectors. Guidepost STC has completed hundreds of program assessments and premise security program projects across the globe, across dozens of facility types, including the homes of High Net Worth individuals, large Commercial and Industrial operations and Sports venues for multinational corporations, and critical infrastructure projects.

6.      Guidepost team members have provided pretrial release services in the past to the U.S. District Courts in the Southern and Eastern Districts of New York, and the District of New Jersey. We recently provided such services in the matter of <u>United States v. Jeffrey Webb</u> in the Eastern District of New York and are currently providing such services in the matter of <u>United States v. Ng Lap Seng</u>, in the Southern District of New York. In pretrial release cases, as in all of our monitoring assignments,[1] we follow the directions and orders of the Judge ordering pretrial release, to secure and oversee the individual releasee according to that Judge's orders, and report to and interface with the Court, Pre-Trial Services or other agencies as required and directed, regardless of who may be paying our fees.

7.      In this matter we have been retained by Brafman & Associates, P.C. As part of that assignment Guidepost security specialists assessed the security profile of premises located at ███. Guidepost visited and reviewed the site, designed and oversaw the implementation of what we believe are appropriate electronic and physical surveillance measures to ensure that Mr. Zarrab may reside at the premises, while at the same time be restricted to the premises, except as otherwise ordered by the Court. Appropriate physical restraints and electronic and visual monitoring equipment have been installed and will be monitored on a twenty-four hour/seven day a week basis from within the premises by Guidepost personnel who will be assigned there on a twenty-four (24) hour basis, and online as well. Separate descriptions of the installed equipment and its details are available to the Court and Pre-Trial Services (We ask that the documents be sealed and not be made available to the public). We anticipate that, should release be granted by the Court, Pre-Trial Services will inspect the premises in advance. We will attend to any additional measures required by Pre-Trial Services.

8.      In addition, Guidepost is prepared and has agreed that, should the Court approve the pretrial release of Mr. Zarrab, we will provide an appropriate number of experienced, armed (if required by the Court) security oversight professionals (all former, or off-duty, law enforcement officers), 24-hours per day, seven days per week, as oversight of Mr. Zarrab and any persons who may visit the premises, to ensure that: (a) he remains at the premises as required by the terms of

---

[1] Similarly, in all of our monitoring assignments, the order or agreement establishing and governing our retention, the Court, oversight, regulatory, enforcement or prosecuting authority sets the parameters of our actions and we report to them regardless of what agency or individual pays the fees involved.

the bail order to be secured; (b) he appears as required for his court appearances; and, (c) otherwise does not violate his bail conditions for as long as required by the Court.

9. In these circumstance, we propose to utilize two or three such security professionals on each shift. If more than two or three security professionals are required by the Court, we are prepared to provide as many as are needed. In addition, we will also have one supervisory security professional overseeing and scheduling the security detail. In addition, I will serve as the Project Executive for the duration of the project. The activities we will perform at the premises will be guided by the Court's direction.[2] We will prepare and provide such a description of actions to the Court and Pre-Trial Services once the Court has made its decision.

10. Additional security and monitoring personnel also shall be provided whenever Mr. Zarrab leaves the premises, if he is permitted to do so pursuant to the bail conditions (e.g., court appearances, attorney meetings, religious services, doctor visits). We will also provide, as needed, a security vehicle with driver, whenever such travel is required and authorized by the court. When such travel takes place, Guidepost will maintain a security presence at the residence to ensure the continuing security integrity of the residence.

11. Guidepost will communicate with Pre-Trial Services, other enforcement authorities, the Court, and/or the U.S. Attorney's Office, as required by the Court.

12. We are prepared to answer any inquiries by the Court.

Dated: New York, New York
May 26, 2016

Joseph Jaffe

---

[2] *See, for example*, Order, U.S. v. Ng Lap Seng, 15 Cr. 706 (VSB), filed October 23, 2015