**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7243**

WRITER'S EMAIL ADDRESS
**christinechung@quinnemanuel.com**

September 27, 2016

<u>VIA ECF AND HAND DELIVERY</u>

Honorable Judge Richard M. Berman
United States District Judge
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 12D
New York, NY 10007

Re:     <u>United States v. Reza Zarrab, *et al.*</u>,
        S1 15 Cr. 867 (RMB)

Dear Judge Berman:

        We are writing to advise the Court of recent developments relevant both to Mr. Zarrab's Motion to Recuse and his Motion to Dismiss.  As set forth below, comments this week by President Recep Tayyip Erdogan of Turkey confirm a central premise of each motion – first, that this Court's participation in 2014 in a Turkish Symposium sponsored by Yüksel Karkin Küçük ("YKK") has given rise to an appearance of partiality, including in light of recent and ongoing events; and, second, that the Department of Justice, by interpreting the jurisdictional provision under International Emergency Economic Powers Act ("IEEPA") to reach a foreign national who acted from abroad, has improperly inserted itself into delicate matters of international relations in a manner that courts have repeatedly cautioned would only be appropriate with the sort of explicit Congressional authorization that is absent from that statute.

        Mr. Zarrab respectfully requests that the Court take these developments, detailed below, into consideration as added basis for recusal, and, in the event recusal is denied, as further support for Mr. Zarrab's Motion to Dismiss.

**I.      *Recusal Is Needed To Avoid The Appearance Of Partiality***

        In his Motion for Recusal, Mr. Zarrab demonstrated that this Court's participation in the Symposium in Istanbul in 2014, where it commented on a scandal in which Turkish government officials purportedly freed Mr. Zarrab and his Turkish co-defendants by firing Turkish prosecutors and judges, gives rise to an unacceptable risk that the Court's partiality could be questioned in

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

these proceedings. (*See generally* Dkt. No. 80). As detailed in Mr. Zarrab's Motion, the Court visited Turkey, as the guest of attorneys from the YKK law firm, in order to "speak out" about the way in which the "rule of law" was then under "attack" by the Turkish government based on its dismissal and reassignment of judges and prosecutors. (Dkt. No. 81-2, at 168). The name partners of the YKK firm were charged in Turkey, after the recent coup attempt, as "terrorist" followers of the Gülenist movement. (Dkt. No. 81-16). A disinterested observer reasonably would perceive from these facts that the Court is sympathetic to the YKK sponsors and the view advanced at the Symposium funded by YKK, and by the government here, that Mr. Zarrab and his co-defendants corruptly escaped prosecution in Turkey. (*See* Dkt. Nos. 80, 83)

The concerns of the appearance of partiality in favor of YKK and against the Turkish government (and its putative ally—Mr. Zarrab) continue to play out in real time. Just two days ago, Reuters reported that President Erdogan, during his visit to the United States for the 71st Session of the United Nations General Assembly, raised Mr. Zarrab's arrest in a meeting with U.S. Vice President Joseph Biden, expressing concern that federal prosecutors have demonstrated their "ulterior motives" by repeatedly referencing Erdogan's government during this prosecution, and that U.S. officials were "wined and dined" by Gülenists in Turkey prior to the case.[1] There were similar reports in the Turkish press, with Hürriyet Daily News quoting Erdogan, on his return trip to Turkey following his U.N. visit, as saying that he had complained to Vice President Biden that "both prosecutor [Preet] Bharara and Judge Richard Berman" had been hosted by members of the Gülenist movement in Turkey, and thus courted by opponents of his government.[2]

These extraordinary developments heighten the risk, which already existed, that an objective observer could reasonably question the Court's ability to remain impartial in these proceedings. *See United States v. Bayless*, 201 F.3d 116, 126 (2d Cir. 2000). The government in this action has placed events in Turkey related to Mr. Zarrab's prosecution in 2013 squarely at issue in this case, including in opposing bail (*see generally* Dkt. No. 18), and has reserved the right to introduce evidence that Mr. Zarrab, in tandem with President Erdogan and officials of his government, corrupted the Turkish justice system in order to avoid jail. (Dkt. No. 83, at 15 n.5). Now, President Erdogan himself has directly denounced this case, the Court, and the U.S. Attorney, including on the basis of this Court's prior association with the sponsors of the Symposium (*see* Exs. A, B), whom the Turkish government has deemed Gülenists and "terrorists" (*see* Dkt. No. 81-16). Regardless of the fact that the Court's conduct at the time of the Symposium was entirely appropriate, the appearance is unavoidable that the Court has ended up on the side of critics of the Erdogan government who are now being targeted and prosecuted by that government, and at odds with the same Turkish leaders who the government here portrays as Mr. Zarrab's

---

[1] Ayla Jean Yackley, *Erdogan Sees "Ulterior Motives" in U.S. Case Against Gold Trader*, Reuters, Sept. 25, 2016, http://www.reuters.com/article/us-turkey-us-prosecution-idUSKCN11V0FR?il=0 (attached hereto as Exhibit A).

[2] Fikret Bila & Abdulkadir Selvi, *Erdogan Says He Asked US VP Biden About Arrest of Iranian-Turkish Businessman Zarrab*, Hürriyet Daily News, Sept. 25, 2016, http://www.hurriyetdailynews.com/erdogan-says-he-asked-us-vp-biden-about-arrest-of-iranian-turkish-businessman-zarrab.aspx?pageID=517&nID=104232&NewsCatID=338 (attached hereto as Exhibit B).

partners in a purported pattern of corruption.  The situation now is even more untenable than before.

## II.  *Dismissal Is Warranted Because Prosecutors Have Inserted Themselves Into Foreign Relations Without Clear Authorization From Congress To Apply IEEPA Extraterritorially*

The comments by President Erdogan last week during his meeting with Vice President Biden also bear on Mr. Zarrab's argument, in his Motion to Dismiss, that the "longstanding principle" of the presumption against extraterritoriality weighs strongly against exercising jurisdiction where, as here, the statute is devoid of any "clear indication of extraterritorial application." (Dkt. No. 67, at 19-20 (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)).  President Erdogan's comments demonstrate the exact risk that the presumption against the extraterritorial application of criminal statutes is meant to avoid. (*See id.* at 19-22.)  As set out in the Motion to Dismiss, that presumption applies, in part, to ensure that courts do not become embroiled in sensitive areas of foreign relations without authorization from Congress in the form of explicit statutory text. (*See id.* at 19-20 (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (noting that the presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord"))). The reason for this doctrine is to ensure that prosecutors do not insert themselves into matters of foreign relations that are the unique province of the President and Congress. (*Id.*)

The fact that the President of Turkey has now complained about Mr. Zarrab's prosecution to the Vice President of the United States is confirmation that those concerns are real, and that prosecutors, by their decision to charge and arrest a foreign national for actions taken abroad, have contributed to tensions at the highest levels of government.  In his comments over the weekend, President Erdogan invoked principles of "sovereign immunity" when he contended that repeated references to him and his government by prosecutors in this case demonstrates their "malicious intent." (Ex. B).  He also emphasized that Mr. Zarrab, a Turkish citizen, had not committed any crime under Turkish law.  (*Id.*)  President Erdogan urged that Turkey "cannot remain insensitive to the arrest of any of [its] citizens in another country, just as how the U.S. cannot remain insensitive to the arrest of its citizens in Turkey. Moreover, [Mr. Zarrab] has not committed any crime according to works by our justice and economy ministries."  (*Id.*)  These comments demonstrate both the risks that prosecutors can trigger "international discord" through extraterritorial prosecutions, *Kiobel*, 133 S. Ct. at 1664, and the principles of sovereignty that have prompted courts to insist on clear Congressional authorization before permitting such actions.

Far from providing a "clear indication" of extraterritorial application, the sanctions statute, which is the basis for the charges against Mr. Zarrab, expressly limits prosecution to persons "subject to the jurisdiction of the United States."  50 U.S.C.A. § 1702(a).  As described in the Motion to Dismiss, Congress enacted IEEPA in 1977, knowing that the phrase "persons subject to the jurisdiction of the United States" had been defined for decades in sanctions law to be limited to:  (1) U.S. citizens, (2) persons "actually within the United States," (3) corporations organized under U.S. law, and (4) organizations owned by any of the foregoing.  (Dkt. No. 76, at 3-4 ("MTD

Reply")).[3]  Because it is undisputed that Mr. Zarrab does not fall within any of those four categories, he is not a "person[] subject to the jurisdiction of the United States," and is not subject to jurisdiction under IEEPA.[4]

In addition to the authorities cited by Mr. Zarrab in his Motion to Dismiss, the 2004 amendment to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) that criminalize material support for foreign terrorist organizations are highly instructive.[5]

AEDPA is, like IEEPA, a sanctions statute.  *See, e.g.*, U.S. Dep't of Treasury, OFAC Regulations for Exporters and Importers, at 2 (Jan. 24, 2012), *available at* https://www.treasury.gov/resource-center/sanctions/Documents/facei.pdf (identifying AEDPA, and 18 U.S.C. § 2339B in particular, as relevant OFAC laws); *see also* 81 Fed. Reg. 43070-01 (July 1, 2016) (noting that AEDPA is one of five statutes pursuant to which OFAC may impose sanctions).  As originally formulated, 18 U.S.C. § 2339B included the identical jurisdictional language as appears in IEEPA—namely, it authorized the prosecution of persons "subject to the jurisdiction of the United States."  Pub. L. 104-132, Title III, § 303(a) (Apr. 24, 1996), 18 U.S.C. 2339B(a)(1) (1996).  Congress amended that provision to expand its jurisdictional reach, through enactment of the Intelligence Reform and Terrorism Prevention Act of 2004.  Pub. L. 108-458, Title VI, § 6603(c) (Dec. 17, 2004).  It did so by deleting the phrase "subject to the jurisdiction of the United States," and replacing it with a provision, under the heading "EXTRATERRITORIAL JURISDICTION," that, among other things, expressly authorizes prosecution of "an offender [] brought into or found in the United States" for conduct that "occurs outside the United States."[6] Thus, where Congress intended to authorize prosecutors to charge foreign persons for their conduct abroad, it made that intent crystal clear, as is required as a predicate for such a prosecution.  *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016).  Congress has made no similar amendment to IEEPA.

---

[3]  The territorial boundary drawn by IEEPA is entirely consistent with the principle that barring U.S. citizens and those acting in the U.S. from engaging in transactions with a designated "enemy" is consistent with constitutional and international law, but purporting to assert the ability to prosecute non-U.S. persons acting abroad for violating a U.S. sanctions prohibition is nothing short of a blockade, which is an act of war.  (*See* Dkt. No. 67, at 4-5).

[4]  Further, because of the statutory limit on persons subject to jurisdiction, the government's effort to re-characterize a funds transfer from one foreign country to another as an "export" of services "from the United States" prohibited by OFAC regulations—based solely on a U.S. clearing transaction that Mr. Zarrab had no power to command—is as irrelevant as it is unconvincing.

[5]  It is well settled that a litigant may challenge jurisdiction at any time.  *See* Fed. R. Crim. P. 12(b)(2) ("A motion that the court lacks jurisdiction may be made at any time while the case is pending."); *United States v. Capoccia*, 578 F. App'x 47 (2d Cir. 2014).  Mr. Zarrab presents this additional authority in support of that challenge.

[6]  Attached hereto as Exhibit C is a comparison of the amended version of the material-support statute that shows the changes to the original version.

The fact that Congress deemed it necessary to amend the material-support statute to reach foreign defendants who commit their acts abroad demonstrates that Congress did not believe that the prior statutory language—the identical "subject to the jurisdiction of the United States" language still operative in IEEPA—was broad enough to have that reach. *See Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."). And notably, that is the understanding the Department of Justice itself expressed when it commented on that amendment. In a statement to Senate Subcommittee on Terrorism, Technology and Homeland Security, the then-Chief of the DOJ's Counter-terrorism section, Barry Sabin, explained that the amendment effectuated by the Intelligence Reform and Terrorism Prevention Act replaced "the old jurisdictional provision" under AEDPA specifically to "expan[d]" the material-support provisions to reach "conduct by an alien offender outside the United States who is later brought to the country or found here."[7] In other words, Congress expanded the material support statute to permit jurisdiction over persons situated identically to Mr. Zarrab, and that expansion was necessary specifically because the prior statutory language—the same "subject to the jurisdiction of the United States" that remains in place in IEEPA—was not broad enough to cover such defendants.[8]

The 2004 amendments to AEDPA are important for a second reason as well. As explained in the Motion to Dismiss, the government cannot rely on Section 1705 of IEEPA, which was amended in 2007 to authorize prosecution for conspiring to violate the Iran sanctions, or aiding and abetting such violations, to reach foreign defendants who would not be subject to prosecution as primary violators. (MTD Reply, at 5-6 (citing, *inter alia*, *United States v. Yakou*, 428 F.3d 241, 252 (D.C. Cir. 2004)).[9] Here again, Congress's amendments in AEDPA to the material-support statute demonstrate its ability to speak clearly, as the presumption against extraterritoriality

___

[7]   Statement of Daniel Meron, Principal Deputy Assistant Attorney General, Civil Division, & Barry Sabin, Chief, Counterterrorism Section, Criminal Division, before the Subcomm. on Terrorism, Technology, and Homeland Security of the Senate Judiciary Comm., at 7 (Apr. 20, 2005), *available at* https://www.justice.gov/archive/ll/subs/testimony/042005-civ-meroncrm-sabin.pdf (attached hereto as Exhibit D).

[8]   Congressional debate at the time the amendment was enacted confirms that the purpose was to expand jurisdiction. 150 Cong. Rec. S10197-01, S10230 (daily ed. Oct. 1, 2004) (statement of Sen. Jon Kyl) (explaining that the effect of the change is to "expand[] federal jurisdiction" of the material support statute) (excerpts attached hereto as Exhibit E); 150 Cong. Rec. S11939-01, S11995 (daily ed. Dec. 8, 2004) (statement of Sen. Jon Kyl) (amendment "broadens the jurisdictional bases of the material-support statute") (excerpts attached hereto as Exhibit F). Of course, if the original statutory language—the same language that remains in place in the IEEPA statute under which Mr. Zarrab is charged—were broad enough to reach foreign defendants who acted abroad, such an "expansion" would have been unnecessary.

[9]   It is axiomatic that causer liability is a form of aiding and abetting. *See* 18 U.S.C. § 2 (making one who "aids, abets, counsels, commands, induces, or procures" an offense punishable as a principal, in subsection (a), and one who "causes an act to be done which if directly performed by another would be an offense" punishable as a principal in subsection (b)).

requires, when it intends to authorize the prosecution of foreign actors as conspirators. *See Yakou*, 428 F.3d at 252. The Intelligence Reform and Terrorism Prevention Act amended Section 2339B to create "extraterritorial jurisdiction" over classes of offenses and persons, including persons who conspire with, or aid and abet, other persons "over whom jurisdiction exists," under the amended statute. Pub. L. 108-458, Title VI, § 6603(c)–(d). In Section 1705 of IEEPA, by contrast, there is no similar language authorizing the extraterritorial prosecution of purported conspirators.[10]

The fact that Congress expanded the jurisdiction of the material-support provisions of AEDPA just three years before Congress amended IEEPA is telling. When it amended IEEPA, Congress understood how to amend a sanctions statute to reach foreign actors for their conduct abroad, but it elected not to. But rather than replace "subject to the jurisdiction of the United States" with a provision that would expand jurisdiction to reach foreign defendants—as it had done just a few years earlier with AEDPA—Congress left the original language intact, thus confirming that it had no intention to broaden IEEPA to reach defendants situated as Mr. Zarrab is here. Further, in its 2007 amendments, Congress added Section 1705 to refer generally to conspiracy and aiding and abetting but without any language—like the language it included in its earlier amendments to AEDPA—that this provision would apply "extraterritorially." Here again, Congress understood how to amend its sanctions laws to authorize prosecution of foreign actors for their overseas conduct, whether as primary violators or co-conspirators, and it chose not to.

The stark contrasts between the language Congress used in IEEPA, and the language Congress added to the material-support provisions for the specific purpose of authorizing the prosecution of foreign defendants, demonstrate, at a very minimum, that the IEEPA terminology did not provide Mr. Zarrab with the clear notice that rule of lenity requires. *See Liparota v. United States*, 471 U.S. 419, 427 (1985) ("[T]he rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability."); *United States v. Banki*, 685 F.3d 99, 109 (2d Cir. 2012) ("[T]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."). A foreign defendant would have no reason to expect that he could be subject to prosecution for his actions abroad under a statute applicable only to "persons subject to the jurisdiction of the United States," particularly where Congress saw the need to amend a different statute, to replace that same language, for the specific purpose of reaching such defendants.

---

[10] In a 2010 Conference Report accompanying the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, which proposed amendments to the Iran Sanctions Act of 1996, the Conference Committee noted that the 2007 amendment to Section 1705 of IEEPA did not alter the jurisdictional limit in Section 1702. That Report stated that: "The [International Emergency Powers Enhancement] Act [of 2007] greatly increased penalties for violators of U.S. sanctions. As a result, **U.S. persons** who illegally trade with Iran now face civil fines up to $250,000 or twice the amount of the transaction. In addition, the Act increased criminal penalties to $1 million with a maximum jail sentence of 20 years." H.R. Rep. No. 111-512, at 46 (2010) (Conf. Rep.) (emphasis added) (excerpts attached hereto as Exhibit G).

For the reasons stated herein as well as the reasons stated in our prior briefing, we respectfully request that the Court recuse itself and, if it does not, that it dismiss the Indictment in its entirety.

Respectfully submitted,

Christine H. Chung

cc:     AUSA Michael D. Lockard
        AUSA Sidhardha Kamaraju
        AUSA David W. Denton
        AUSA Dean C. Sovolos
        All Co-counsel of Record