USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: **9/25/16**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA,

                    Government,

     -v-

REZA ZARRAB,

                    Defendant.
-----------------------------------------------------------X

**DECISION & ORDER**

15 Cr 867 (RMB)

## I.    Introduction

Defendant Reza Zarrab's ("Defendant's" or "Zarrab's") motion, dated August 30, 2016, to recuse the Court from participation in this case is without merit. See, e.g., Silver v. Kuehbeck, 217 F. App'x 18, 23 (2d Cir. 2007); CODE OF CONDUCT FOR UNITED STATES JUDGES CANON 4.

Among other reasons, recusal was waived by the Defense at the arraignment on April 27, 2016. See Donato v. Rhode Island Hosp. Trust Nat. Bank, 52 F. Supp. 2d 317, 320 (D.R.I. 1999). The recusal motion is also untimely, having been filed four months after the arraignment and following discovery, extensive motion practice, and the selection of an early trial date. [1] See Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 2003 WL 282187, at *2 (S.D.N.Y. Feb. 7, 2003).

---

[1] The trial was set for January 23, 2017 after Defense counsel made the following suggestion: "[I]n view of the Defendant's current remand status . . . we should try our best to expedite the proceedings." (See Transcript, dated June 20, 2016, at 2:25-3:2.) The Court is fully committed to an early trial date.

Where, as here, the standards governing disqualification have not been met, "disqualification is not optional; rather, it is prohibited." In re Aguinda, 241 F.3d 194, 201 (2d Cir. 2001).

The Defense motion to recuse is centered upon a two-day international legal symposium entitled "International Symposium on the Rule of Law and Justice" in which the Court participated in Istanbul in May of 2014 ("Symposium" or "International Symposium"). [2]

At the time of the 2014 Symposium, the Court had never heard of Defendant Reza Zarrab. The Court first learned of Zarrab two years after the Symposium, on March 21, 2016, when Zarrab was arrested by U.S. officials in Miami, Florida and his criminal case alleging, among other things, conspiracy to violate U.S. sanctions against Iran, was randomly assigned. [3]

On April 27, 2016, at the outset of Zarrab's arraignment, the Court disclosed to the parties that it had been to Istanbul in 2014 and had moderated a panel discussion entitled "Independent and Effective Judiciary" on the second day of the Symposium. Immediately following the Court's comments, Defense counsel Benjamin Brafman stated that he was already aware of the Court's participation and remarks at the Symposium. (See Transcript, dated April 27, 2016 ("Tr."), at 4:17-19.) He said the following: "I was familiar with your Honor's remarks and appearance in Istanbul because, in our thoroughness, we try and follow

---

[2] The other U.S. participants at the Symposium were Professor Heather Gerken, Yale Law School; Professor Richard Pildes, New York University School of Law; Professor Richard Fallon, Harvard Law School; and William Sorrell, Attorney General of Vermont. (See also n.5 for a complete list of Symposium participants.)

[3] At the time of the 2014 Symposium, the Court was also unaware of the criminal charges which had been brought against Zarrab by Turkish prosecutors in 2013.

everything that everyone does . . . My experience here has allowed me to conclude that you are indeed a fair and impartial judge . . . . **We have seen nothing to date which would suggest that you could not participate in any way**." (Tr. at 4:17-5:3) (emphasis added.) [4]

The Defense recusal motion includes incorrect allegations and out of context quotes to support the Defense claim that the Symposium was "largely focused" upon Mr. Zarrab and the criminal charges filed against him by Turkish prosecutors in 2013, and that the Court and other Symposium speakers discussed Mr. Zarrab and his Turkish criminal charges at length. See Metropolitan Opera Association v. Local 100, 332 F. Supp. 2d 667, 671 (S.D.N.Y. 2004) (where, as here, movant impermissibly "isolated words or phrases" while "ignoring the substance and context."). Defendant contends that the Court's comments could be understood to suggest that the Court is biased against Zarrab. (See, e.g., Defendant's Motion to Recuse the Court, dated Aug. 30, 2016 ("Def.'s Mot."), at 3 ("The Court attended a conference that was largely focused on the Turkish prosecution of Mr. Zarrab and others, and made public comments on that prosecution that can be understood as sympathetic to the view that Mr. Zarrab avoided conviction through purportedly corrupt ties to Turkish officials.").)

---

[4] **Astonishingly, Defense counsel (Christine H. Chung appears principally to have drafted the recusal motion) fails to mention Mr. Brafman's comments at the arraignment either in the Defense recusal memorandum or in the accompanying Declaration, dated August 30, 2016.** (See Declaration of Christine H. Chung, dated Aug. 30, 2016 ("Chung Decl.").) Mr. Brafman's comments were discussed in the Government's Opposition Brief, dated September 14, 2016. (See Government's Memorandum in Opposition, dated Sept. 14, 2016 ("Mem. in Opp."), at 7 ("After the Court raised the issue at the defendant's first appearance before it, Zarrab's counsel indicated that he was 'familiar with [the Court's] remarks and appearance in Istanbul,' and he had concluded that the Court was a 'fair and impartial judge,' and that there was 'nothing to date which would suggest that [the Court] could not participate in any way.'").) Mr. Brafman's comments are first mentioned by the Defense in their Reply Brief, dated September 21, 2016.

3

The Defendant's allegations are untrue and are debunked by the verbatim transcript of the Symposium.[5] The transcript shows that neither Mr. Zarrab nor the criminal charges brought against him by Turkish prosecutors in 2013 were discussed by the Court at the Symposium. (The Symposium transcript is included as Ex. 2 to the Chung Decl.) Rather, Symposium speakers devoted their remarks to universal principles of the "Rule of Law and Justice."[6]

Dr. Yilmaz Argüden, Chairman of the United Nations Global Compact for Turkey, gave the opening (welcoming) remarks at the Symposium:

---

[5] The Symposium was transcribed in both Turkish and English. (See Chung Decl., Ex. 2.)

[6] The 28 Symposium speakers included law professors, judges, and public officials from many countries. In order of appearance at the Symposium, they were: Dr. Yilmaz Argüden, Chairman of the United Nations Global Compact for Turkey; Professor Emin Artuk, Dean and Faculty of Law at Marmara University; Charles Hunter, U.S. Consul General in Istanbul; Marietje Schaake, member of the European Parliament; Stefano Manservisi, the European Union's Ambassador to Turkey; Professor Richard Pildes, Professor of Constitutional Law at New York University; Professor Richard Fallon, Professor of Constitutional Law at Harvard University; Professor Heather Gerken, Professor of Constitutional Law at Yale University; Professor Ergun Özbudun, Professor of Constitutional Law at Istanbul Sehir University and Turkey's Representative in the Venice Commission; Sir Edward Garnier, member of the UK Parliament and former Solicitor General of England & Wales; William Sorrell, Attorney General of Vermont; Helena Lišuchová, Head of the International Cooperation Department at the Ministry of Justice for the Czech Republic; Professor Sami Selçuk, Professor of Criminal Law at Bilkent University and Honorary President of the Court of Cassation of Turkey; Hanes Swoboda, member of the European Parliament; Berl Bernhard, Chairman of the Middle East Investment Initiative; Marina Wes, Lead Economist with the World Bank; Professor Juergen Tasck, State Judge on the Hessian Administrative Court of Justice; Christina Koulias, representative of the United Nations Global Compact; Lord Harry Woolf, Former Lord Chief Justice of England & Wales; Judge Richard M. Berman, Southern District of New York; Gabriela Knaul, United Nations Special Rapporteur on the Independence of Judges and Lawyers; Professor Işil Karakaş, Judge on the European Court of Human Rights in Turkey; Professor Lucian Mihai, Former President of the Constitutional Court of Romania and Member of the Venice Commission for the Council of Europe; Judge Thomas Guddat, Vice-President of the European Association of Judges and Prosecutors; Baroness Patricia Scotland, member of the House of Lords and Former Attorney General for England & Wales; Professor Paul Lemmens, Judge for the European Court of Human Rights; Professor Osman Doğru, Professor of Human Rights and Faculty of Law at Marmara University; and Róisín Pillay, Director of the Europe Regional Programme at the International Commission of Jurists.

4

On behalf of the board of directors of Global Compact Turkey, I would like to thank you all for your participation in this important event . . . . As you may know, the UN Global Compact is an initiative started by the United Nations 10 years ago . . . . [W]e attach utmost importance to this Symposium. Development takes its basis from trust, which is created by uninterrupted governance and a legal system that functions in a fair, impartial, and rapid manner . . . . Our benchmark for this purpose is the EU and EU Council that hosts advanced practices in the field of universal legal norms and democracy, rights, law and freedoms. We have to absolutely complete our structural deficiencies in this area. However, completing these norms on paper is not sufficient. At the same time, we have to ensure the judiciary which implements these norms is independent and impartial.

(See Chung Decl., Ex. 2 at 16.)

The Symposium compendium sets forth the purpose of the Symposium as follows:

The purpose of the Symposium was to collect information about successful practices across the world in these areas and finally create an intellectual accumulation of knowledge . . . . As part of the Symposium, discussions focused on the protection of justice and the rule of law, establishment of separation of powers and effects of an ideal rule of law on economy and development . . .

(Id. at 8.)[7]

---

[7] In his keynote address to the Symposium, Lord Harry Woolf, Former Lord Chief Justice of England and Wales, stated:

The rule of law is international. It may not be precisely the same in all jurisdictions but it is international . . . . It needs to be emphasized there is nothing western or eastern or northern or southern about the underlying principle of rule of law. It has a global reach and dimension. Rule of law symbolizes the quest of civilized democratic societies, be they eastern or western, to combine that degree of liberty without which law is tyranny, with that degree of law without which liberty becomes license . . . The rule of law is the heritage of all mankind because it is the underlying rationale, which is belief in the human rights and human dignity of all individuals everywhere in the world.

(Chung Decl., Ex. 2 at 76.)

The Defense recusal motion aggressively disparages the Istanbul law firm,

YükselKarkinKüçük ("YKK"). The Court understands that YKK helped to organize the

Symposium, invited the Court and other Symposium participants, and paid participants'

travel and lodging expenses. Defense counsel incorporates into their recusal motion, and

specifically into Ms. Chung's Declaration, accusations that YKK attorneys are "criminals

and terrorists," and "members of an Armed Terrorist Organization." (See Def.'s Mot. at 13,

18; see also Chung Decl., Exs. 16-19.) As far as the Court knew in 2014 when it accepted an

invitation to participate in the Symposium, YKK was an affiliate of DLA Piper and was

regarded as one of the preeminent (and largest) law firms in Istanbul.[8] (See Firm Profile,

"YükselKarkinKüçük Attorney Partnership," THE LEGAL 500.)

## II.  Background

The Court, as noted supra p. 2, disclosed to the parties at the April 27, 2016 arraignment

that it was among the participants at the International Legal Symposium.[9] The Court stated

that its "participation in this [2014 Symposium] does not impact my ability to preside over

this case fairly and impartially, and to ensure that Mr. Zarrab, who is presumed to be

innocent . . . receives a fair and impartial hearing and eventual trial." (Tr. at 3:24-4:3.) The

Court provided the parties with an outline of its panel presentation which was also made a

court exhibit at the arraignment (and is attached hereto as Exhibit A).

---

[8] YKK, to the Court's knowledge, was also the only law firm in Turkey to be awarded the "Chambers Europe Award for Excellence – Law Firm of the Year" for two consecutive years in 2012 and 2013. (See Firm Profile, "YükselKarkin Attorney Partnership," CHAMBERS AND PARTNERS.)

[9] The Symposium audience appears to have consisted primarily of lawyers, academics, business people, and law students. (See Tr. at 3:1-18; see also supra n.6.)

The panel discussion which the Court moderated, as noted, was entitled "Independent and Effective Judiciary." The panelists included Gabriela Knaul, United Nations Special Rapporteur on the Independence of Judges and Lawyers, who discussed "the principle of the independence of the judiciary [as] enshrined in the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the Basic Principles on the Independence of the Judiciary"; Professor Işil Karakaş, Judge on the European Court of Human Rights in Turkey, who spoke about "the rule of law and independence of [the] judiciary, which originated from the European Court of Human Rights' case law"; Professor Lucian Mihai, Former President of the Constitutional Court of Romania and Member of the Venice Commission for the Council of Europe, who discussed "the role of the Venice Commission [which is] to provide legal advice to its member states and in particular to help states wishing to bring their legal and institutional structures in line with European standards"; and Judge Thomas Guddat, Vice-President of the European Association of Judges and Prosecutors, who reviewed an "important opinion on councils of the judiciary . . . [wherein the] Consultative Council of European judges set out 42 . . . tasks which must be carried out in an independent manner." (Chung Decl., Ex. 2 at 85-91.) None of the panelists mentioned Mr. Zarrab or the charges brought against him by Turkish prosecutors in 2013.

In response to the Court's disclosure, also as noted supra pp. 2-3, Defense counsel Brafman advised the Court at the arraignment that he had already investigated the 2014 Symposium, including the Court's role and remarks, and had concluded that he saw no basis for recusal.

> I was familiar with your Honor's remarks and appearance in Istanbul because, in our thoroughness, we try and follow everything that everyone does . . . my experience here has allowed me to conclude that you are indeed a fair and

7

> impartial judge . . . . We have seen nothing to date which would suggest that
> you could not participate in any way.

(Id. at 4:17-5:5.)

Defense counsel's remarks at the arraignment constitute a waiver and are sufficient to

deny the motion to recuse. See United States v. Sampson, 12 F. Supp. 3d 203, 207 (D. Mass.

2014) ("[A] waiver of grounds for recusal generally cannot be withdrawn at a later date

[where] the defendant approved of the district judge's continued service after the pertinent

facts were disclosed.") (quoting United States v. Rogers, 119 F.3d 1377, 1382 (9th Cir.

1997)).

There is (also) another reason to deny the recusal motion, which is that it is untimely.[10]

After stating on April 27, 2016 that there was nothing to prevent the Court "in any way"

from presiding in this case, the Defense waited more than four months to file a recusal

motion. And, during that four month period, the Defense fully engaged in litigating the

case, i.e., by filing three (separate) motions, by participating in discovery, and by agreeing to

January 23, 2017 as the trial date. See Silver, 217 F. App'x at 23 ("We need not reach the

merits of [movant's] argument that the district court below abused its discretion in not

granting his motion for recusal because [movant] did not bring such motion at the earliest

possible moment after obtaining knowledge of facts demonstrating the basis for such a

claim.").

---

[10] See Mem. in Opp. at 1 ("The defendant's motion is untimely . . . [as] the facts underlying the defendant's motion – the Court's participation at a conference in Istanbul two years ago – were known to the defendant more than four months ago, before this defendant began to vigorously litigate this case in the Court . . . . The defendant has delayed too long to now seek a new judge."); see also Apple v. Jewish Hospital and Medical Ctr., 829 F.2d 326, 333 (2d Cir. 1987).

8

The first of the three above mentioned motions brought by Defendant was an application

for bail, which was premised upon privately funded round-the-clock armed security. (See

Bail Application, dated May 18, 2016.) On June 16, 2016, the Court denied Defendant's bail

application. [11] United States v. Zarrab, 2016 WL 3681423, at *1 (S.D.N.Y. June 16, 2016).

Second, on July 19, 2016, the Defense filed a motion to suppress evidence seized from

Mr. Zarrab's iPhone and iPod and certain statements made by Mr. Zarrab following his

arrest. (See Defendant's Motion to Suppress, dated July 19, 2016.) This motion is fully

briefed and is *sub judice*.

Third, the Defense filed a motion to dismiss the Superseding Indictment. (See

Defendant's Motion to Dismiss, dated July 19, 2016.) This motion was fully briefed on

August 22, 2016 and is *sub judice*.

Oral argument was scheduled to take place on September 6, 2016 but was cancelled by

the Court on August 31, 2016, the day after Defendant's recusal motion was filed. (See

Order, dated Aug. 31, 2016, at 1.)

The recusal motion, in substantial part, relies upon Turkish media (press) accounts. An

example is the following:

> The Turkish press has reported that your Honor, during the Istanbul conference
> and in an interview at the time, commented on prosecutions commenced in
> Turkey, beginning on December 17, 2013, of several persons alleged to be close
> to the Turkish government, which included Mr. Zarrab . . . . These high-profile
> arrests led to a scandal in Turkey, in which government officials were accused of

---

[11] In rejecting Defendant's proposed bail package, the Court referred to the Second Circuit Court
of Appeals summary order in United States v. Banki. "[I]t was 'not legal error for a district court
to decline to accept . . . as a substitute for detention' hiring private security guards to monitor the
defendant while he is on home confinement. 'Indeed, such conditions might be best seen not as
specific conditions of release, but simply as a less onerous form of detention available only to the
wealthy.'" Zarrab, 2016 WL 3681423, at *2 (quoting Banki, 369 Fed. Appx. 152, 153 (2d Cir.
2010)).

9

accepting bribes. The Turkish government, for its part, viewed the prosecutions to be politically motivated and . . . [i]n the next months, it reassigned, replaced, and dismissed thousands of police, prosecutors, and judges, including one of the prosecutors in Mr. Zarrab's case. Mr. Zarrab, who had been arrested on December 17, 2013, was freed in February 2014."

(Def.'s Mot. at 1.)

On September 14, 2016, the Government filed an opposition to Zarrab's motion to recuse the Court. (See Mem. in Opp., dated Sept. 14, 2016.) The Government argues, among other things, that "the defendant's bases for recusal are without merit . . . the defendant's claims rely on a mischaracterization of the Court's remarks at the Istanbul conference, rank speculation, and impermissible consideration of press coverage. The comments about which the defendant complains were no more than noncontroversial opinions about fundamental principles of a fair and effective justice system." (Id. at 1.)

On September 21, 2016, Zarrab filed a reply. [12] (See Defendant's Reply in Support, dated Sept. 21, 2016 ("Reply").)

## III.    Legal Standard

The legal principles upon which the Court resolves Defendant's recusal motion include the following:

"[A] judge 'shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.'" Diamondstone v. Macaluso, 148 F.3d 113, 120 (2d Cir. 1998)

---

[12] On September 27, 2016, Defense counsel also filed an unsolicited 7-page letter, with accompanying exhibits, in further support of Defendant's motion to recuse (and its motion to dismiss). (See Letter to the Court, dated Sept. 27, 2016.) Such supplemental filings (i.e., what amounts to a second reply brief) are improper absent prior Court approval. See Vaughn v. Air Line Pilots Ass'n, Int'l, 395 B.R. 520, 534 (E.D.N.Y. 2008), aff'd, 604 F.3d 703 (2d Cir. 2010), and aff'd sub nom. Vaughn v. Air Line Pilots Ass'n, 377 F. App'x 88 (2d Cir. 2010); see also Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 170 F.R.D. 361, 369-70 (S.D.N.Y. 1997).

(quoting 28 U.S.C. § 455(a)). "Movants must overcome a presumption of impartiality, and the burden for doing so is substantial." Giladi v. Strauch, 1996 WL 18840, at *1 (S.D.N.Y. Jan. 18, 1996). "The decision whether a judge's impartiality can 'reasonably be questioned' is to be made in light of the facts as they existed, and not as they were surmised or reported." Cheney v. U.S. Dist. Court for D.C., 541 U.S. 913, 914 (2004).

"A judge may engage in extrajudicial activities, including law-related pursuits and civic, charitable, educational, religious, social, financial, fiduciary, and governmental activities, and may speak, write, lecture, and teach on both law-related and nonlegal subjects." CODE OF CONDUCT FOR UNITED STATES JUDGES CANON 4.

"If the only basis for recusal is an appearance of partiality . . . the parties may, after full disclosure on the record of the basis for disqualification, waive this ground for recusal. United States v. Salemme, 164 F. Supp. 2d 49, 52 (D. Mass. 1998) (citing 28 U.S.C. § 455(e)).

"[I]t is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." Six W. Retail, 2003 WL 282187, at *2 (quoting Apple, 829 F.2d at 333). "[J]udicial resources should not be wasted; and [] a movant may not hold back and wait, hedging its bets against the eventual outcome." Apple, 829 F.2d at 334.

"Judicial inquiry may not [] be defined by what appears in the press. If such were the case, those litigants fortunate enough to have easy access to the media could make charges against a judge's impartiality that would effectively veto the assignment of judges. Judge-shopping would then become an additional and potent tactical weapon in the skilled

11

practitioner's arsenal." In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1309 (2d Cir. 1988).

"The Court has an affirmative duty not to disqualify itself unnecessarily." Thorpe v. Zimmer, Inc., 590 F. Supp. 2d 492, 494 (S.D.N.Y. 2008) (citing Rosen v. Sugarman, 357 F.2d 794, 797 (2d Cir. 1966)). "[W]here the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited." In re Aguinda, 241 F.3d at 201. "[R]ecusal motions should not be allowed to be used as strategic devices to judge shop." Hoffenberg v. United States, 333 F. Supp. 2d 166, 173 (S.D.N.Y. 2004).

## IV. Analysis

### A) A Movant May Not Hold Back and Wait, Hedging its Bets Against the Eventual Outcome

The Defense waived recusal at the arraignment and Defendant's recusal motion is untimely.

The Court's participation in the International Symposium, as noted, was disclosed by the Court at the outset of the arraignment on April 27, 2016. Following the Court's disclosure, Defense counsel stated that "with all modesty, you have proven me correct . . . . I said that the first thing the Judge is going to do is raise the fact that he participated in the panel, so I'm glad that you proved me correct." (See Tr. at 4:16-23.) Defense counsel acknowledged that he had already investigated the Court's involvement in the Symposium and "Your Honor's remarks," and had concluded that the Court was "indeed a fair and impartial judge" and there was no basis for recusal. Defense counsel stated unequivocally that "[w]e have seen nothing to date which would suggest that you could not participate in any way." (See Tr. at 5:1-3.)

12

As a result, Defense counsel waived recusal on the basis of an alleged appearance of partiality. See Salemme, 164 F. Supp. 2d at 52 (citing 28 U.S.C. § 455(e)) ("The parties may, after full disclosure on the record of the basis for disqualification," waive an appearance of partiality.); see also In re Cargill, Inc., 66 F.3d 1256, 1261 (1st Cir. 1995) ("Counsel's unqualified assent, combined with [their] subsequent silence for a substantial period of time, creates a sturdy foundation on which the validity of the waiver might rest."); Rogers, 119 F.3d at 1382 (where defendant "expressly approved of the district judge's continued service . . . [defendant's] election to proceed after th[e] disclosure constitutes an effective waiver under § 455(e).").

Defendant's recusal motion is also untimely. "Recusal motions must be made at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." Apple, 829 F.2d at 333; see also Six W. Retail Acquisition, 2003 WL 282187, at *1, 3. The International Symposium was held on May 8-9, 2014 and it was transcribed and publicly reported. Defense counsel was aware of the Court's participation in the Symposium and of the Court's remarks. Nonetheless, Defense counsel waited over four months from and after the April 27, 2016 arraignment to seek recusal. Defense counsel did so after they had advised the Court on April 27, 2016 that they had independently investigated the Symposium and found "nothing to date which would suggest that you could not participate in any way," and after they had participated fully in extensive motion practice, pretrial discovery, and the setting of an early trial date. Six W. Retail, 2003 WL 282187, at *3; see also discussion at supra pp. 2, 8-9.

Defense counsels' efforts to support its recusal motion by relating it to the attempted coup in Turkey in July of 2016 (and after) are unavailing. "A judge should not recuse

13

himself on unsupported, irrational, or highly tenuous speculation." Lamborn v. Dittmer, 726

F. Supp. 510, 514 (S.D.N.Y. 1989); see also Estate of Ginor v. Landsberg, 1997 WL 414114,

at *2 (S.D.N.Y. July 24, 1997) ("Where the basis for recusal is not direct, but is remote,

contingent, or speculative, recusal is not warranted."); In re Aguinda, 241 F.3d at 201

("Where a case . . . involves remote, contingent, indirect or speculative interests,

disqualification is not required.").

## B) The Symposium Focused Upon Universal Principles Underlying the Rule of Law and Justice: There Was No Mention of Mr. Zarrab or The Charges Filed Against Him By Turkish Prosecutors

There is no need to reach the merits of Defendant's recusal motion because of waiver and

untimeliness. See Silver, 217 F. App'x at 23; In re IBM Corp., 45 F.3d 641, 643 (2d Cir.

1995) (A "prompt application avoids the risk that a party is holding back a recusal

application as a fall-back position in the event of adverse rulings on pending matters."); see

also Universal City Studios, Inc. v. Reimerdes, 104 F. Supp. 2d 334, 349-50 (S.D.N.Y.

2000). Even assuming, arguendo, that there were a need to review the merits of Defendant's

recusal motion (which plainly there is not), an objective and informed observer could not

reasonably question the Court's impartiality. See United States v. Bayless, 201 F.3d 116,

126 (2d Cir. 2000).

First, the International Symposium was focused upon universal principles of the Rule of

Law and Justice. It included, among others, representatives of the European Union and the

Council of Europe, and respected professors, judges, lawyers and scholars. The Symposium

was organized into five panel sessions, entitled "Rule of Law," "Threats to the Rule of Law,"

"Impact of Rule of Law on Business and Economy," "Protection of Fundamental Rights and

Freedoms," and "Independent and Effective Judiciary." (See Chung Decl., Ex. 2.)

14

Second, the Court's remarks at the Symposium focused upon universal principles of the Rule of Law and Justice and, particularly, the importance of an independent and effective judiciary. [13] The Court moderated a discussion of "critical questions for every democracy, not just Turkey." (See Chung Decl., Ex. 2 at 86.) The Court's principal contention was that "without a fearless, strong, well-qualified, fair and independent judiciary, there can be no real democracy. And even that is not enough; there also needs to be . . . constant vigilance by the bar, the judges, the law schools, the media, and, of course, the citizenry to maintain and foster judicial independence." (Id. at 86.) The Court also stated that "the separation of powers [and] the rule of law [are] what prevent the state from unilaterally and arbitrarily relocating or firing judges and prosecutors who are actively pursuing an investigation, removing police officers, crashing [sic] investigations, disrespecting court decisions, closing down the means of communications, and otherwise attempting to dominate the judiciary." (Id.)

The Court also commented that: "It is no secret that the rule of law as contrasted with the rule of man is under some attack in Turkey"; "the Turkish Constitution [] speaks of the security of [judicial] tenure, it is not life tenure." (Id. at p. 86.)

And, the Court pointed out that "to be sure, this [judicial independence] is a complex, nuanced and multidimensional issue . . . . [C]ourts do not exist in a vacuum. [T]here is therefore an obvious political context in which all of our respective judiciaries operate. And in that connection [] the [word] politics is not used negatively or pejoratively, it is not a dirty word. In

---

[13] The Court made a similar presentation at a weeklong conference for Albanian judges in Tirana, Albania in 2013.

fact, it is a reality and it is unavoidable. And so to understand this debate and to participate in this debate we need to understand the Turkish politics as well." (Id.)

The Court's remarks at the Symposium were entirely proper. They made no mention of Zarrab or the Turkish charges brought against him. And, it would be objectively unreasonable to conclude from these remarks that the Court was biased or partial against Mr. Zarrab. "Engaging in such law-related activities – including speeches that comment on current events and legal developments – is permitted not only because judges are citizens, but because they are particularly knowledgeable on such topics." Da Silva Moore v. Publicis Groupe, 868 F. Supp. 2d 137, 137 (S.D.N.Y. 2012) (quoting In re Judicial Misconduct, 632 F.3d 1289, 1289 (9th Cir. 2011)); see also CODE OF CONDUCT FOR UNITED STATES JUDGES CANON 4.

## Press Articles

Defense counsels' motion for recusal relies upon press articles, including an article entitled "Rule of Law and Freedom of Press Under Attack in Turkey," dated May 9, 2014, from the Turkish newspaper Today's Zaman. (See Chung Decl., Ex. 1.) Defense counsel states: "[t]he Turkish press has reported that your Honor, during the Istanbul conference and in an interview at the time, commented on prosecutions commenced in Turkey, beginning on December 17, 2013, of several persons alleged to be close to the Turkish government, which included Mr. Zarrab as the most prominent defendant." (See Def.'s Mot. at 1.)

The Today's Zaman article attributes several remarks to the Court. (See Chung Decl., Ex. 1.) Two of the remarks, i.e., that "it is inappropriate to change the rules of the game while the game is taking place," and that there should be "complete separation of powers between the executive and the judiciary," appear to have been excerpted from comments made during the

16

Symposium. (See Chung Decl., Ex. 2, at 86.) The un-excerpted remarks were as follows: (i) "[W]hat we should not be doing in the political realm is encouraging politics, or politicians, to diminish the judicial independence or to introduce new rules and/or to change the rules of the game much less change the participants in the game while the very game is in progress. That in my opinion will surely be to substitute the rule of man for the rule of law"; and (ii) "[T]he first principle of the independent judiciary is that there must be a fiercely guarded separation of powers . . . [that] must be among the branches of government." (Id.) There was no mention of Mr. Zarrab or the Turkish charges brought against him. And, it would be objectively unreasonable to conclude from these remarks that the Court was biased or partial against Mr. Zarrab.[14]

The Second Circuit has held: "Judicial inquiry may not [] be defined by what appears in the press. If such were the case, those litigants fortunate enough to have easy access to the media could make charges against a judge's impartiality that would effectively veto the assignment of judges. Judge-shopping would then become an additional and potent tactical weapon in the skilled practitioner's arsenal." In re Drexel Burnham Lambert Inc., 861 F.2d at 1309; see also Bayless, 201 F.3d at 129 (quoting In re United States, 666 F.2d 690, 695 (1st Cir.1981) ("Although public confidence may be as much shaken by publicized inferences of bias that are false as by those that are true, a judge considering whether to

---

[14] Other remarks attributed to the Court, i.e., that the Court found the April 25, 2014 speech of the Turkish Constitutional Court President Haşim Kiliç discussing reversal of a government ban on Twitter to be "very impressive," and, relatedly, that "it sends a bad message to citizens" when government officials disparage decisions of the courts, (see id., Ex. 1.), also do not refer to Mr. Zarrab or the Turkish charges brought against him. It would be objectively unreasonable to conclude from these remarks that the Court was biased or partial against Mr. Zarrab.

17

disqualify himself must ignore rumors, innuendos, and erroneous information published as fact in the newspapers. To find otherwise would allow an irresponsible, vindictive or self-interested press informant . . . to control the choice of judge."); United States v. Cutler, 796 F. Supp. 710, 714 (E.D.N.Y. 1992).

## Remarks of Other Symposium Speakers

Defense counsel have unfairly and inaccurately disparaged other Symposium participants by mischaracterizing and by reshaping their remarks. For example, Defendant contends that Charles Hunter, the U.S. Consul General in Istanbul, singled out Zarrab when Consul General Hunter "criticized the steps taken by the Erdogan government in response to the December cases by . . . observing that the rule of law requires equal treatment for any criminal 'regardless of whether he is an ordinary citizen, a wealthy businessman, a law enforcement official or a high government official.'" (Def.'s Mot. at 8.) In fact, Consul General Hunter discussed basic Rule of Law principles and made no mention of Mr. Zarrab or the Turkish charges against him. Consul General Hunter stated:

> Thank you for inviting me to participate in this impressive gathering of dignitaries and experts from around the world to discuss the topic of profound importance: the rule of law and its role in a successful and democratic modern society. As we have seen in countries transitioning to democracy in this region and around the world, the overall health of any democratic society can be measured by the extent to which it is governed by its own laws. People, citizens, and non-citizens, must know that they have access to public justice when they believe that they have been wronged. Those suspected of crimes must believe that a system of laws is in place which ensures fair treatment and fair trials. Anyone who considers committing a crime must know that he will likely be caught and punished regardless of whether he is an ordinary citizen, a wealthy businessman, a law enforcement official, or a high government official. And businesses must know that they operate in a relatively stable environment, that their legitimate contracts will be honored, and that reasonable regulations will be fairly enforced by administrative bodies. All these expectations relate directly to the rule of law and should be met in modern democratic societies.

(Chung Decl., Ex. 2 at 16.)

Similarly, Defense counsel misconstrues the context of the European Union's Ambassador to Turkey, Stefano Manservisi, when they emphasize that Ambassador Manservisi "spoke of 'following developments since the 17th of December with great attention and increasing concern.'" (Def.'s Mot. at 7.) Ambassador Maservisi did not mention Mr. Zarrab or the Turkish charges against him, but, instead, focused upon "shap[ing] and driv[ing] the reforms that have transformed Turkey in the fifteen years since the country became a candidate for accession," to the European Union. (Chung Decl., Ex. 2 at 22.) Ambassador Manservisi summarized the history of judicial reform in Turkey and said:

> It is worth noting that notwithstanding the achievements made since 1999, it nevertheless bears repeating that reform of the system of justice in Turkey and consolidation of the rule of law remains a work-in-progress, unfinished business. And even more important, in terms of legitimate ambitions, in terms of institutional changes. And with the convincing track record of the judiciary's capacity to act independently, efficiently and with impartiality still to become evident. Laws are important; but implementation of laws and the perception of the credibility of the system are equally important. In this context [] we have been following developments since the 17th of December with great attention and increasing concern.

(Id.)

Defense counsel unfairly mischaracterizes Harvard Professor Richard Fallon's remarks by saying that Professor Fallon was referring to Zarrab when he "criticized the steps taken by the Erdogan government in response to the December cases by . . . disapproving of 'tampering with the judicial branch.'" (Def.'s Mot. At 8.) Professor Fallon did not mention Mr. Zarrab or the Turkish charges against him. Speaking on the first day of the Symposium about the "Rule of Law," Professor Fallon stated: "[M]y remarks are going are going to fall

19

into three categories. First, I'm going to talk about the nature of the rule of law as a political ideal. Then, second, I'm going to talk about what I will call the cultural preconditions for the rule of law. And then third and finally, I will talk about some of the challenges in creating the right cultural conditions for a robust version of the rule of law and moving to those right cultural conditions from ones which [are] more fluid and fragile." (Id. at 33.)

> I will finish with a kind of cry from the heart. And the cry from the heart is focused on the paradigm of a situation that appears in many places throughout the world. Where political leaders, under conditions in which atmosphere for the rule of law is fraught or fragile, put the kind of trust that is necessary for the existence of the rule of law at risk either by changing rules of political democracy . . . or using levers of power to initiate faceless prosecutions or tampering with the judicial branch in a way that tends to squander the society's rule of law or to betray the kind of trust that is necessary for the rule of law's flowering. For political leaders to behave that way anywhere in the world is both a political tragedy and a moral crime.

(Id.)

And, Defense counsel criticize Professor Ergun Özbudun of Istanbul Sehir University for "decr[ying] the 'effort of a majoritarian party . . . to take control of the other state institutions.'" (Def.'s Mot. at 8.) Professor Özbudun discussed historical development of the Rule of Law, including "establish[ing] judicial control over the acts of the administration [and] the introduction of the judicial review of constitutionality of laws." (Chung Decl., Ex. 2 at 35.) Professor Özbudun made no mention of Mr. Zarrab or the Turkish charges against him:

> [L]et me go back to the point . . . the danger of a majoritarian drift of a democracy. The effort of a majoritarian party, especially a pre-dominant party, to take control of the other state institutions, to dominate them in a way to eliminate the instruments of, what we called in political science literature, instruments of horizontal accountability.

(Id.)

### C) The 2016 Attempted Coup in Turkey and the Law Firm YKK

As noted supra pp. 13-14, the Defense attempts unpersuasively to support recusal by reference to the attempted coup on July 15, 2016 and by alleging that YKK "plotted to overthrow the Turkish government." (See Def.'s Mot. at 12-13.) Defendant states that "it has recently come to light that the lawyers who hosted the Symposium at which your Honor spoke are now being prosecuted and branded as terrorists by the same Turkish government that, according to prosecutors here, is aligned with Mr. Zarrab." (Def.'s Mot. at 3.) According to Defendant:

> It appears that YKK, the law firm that sponsored the conference and thus the Court's attendance, is in active conflict with the same Turkish authorities . . . within weeks of the coup attempt in Turkey in July, the Chief Public Prosecutor in Istanbul charged four YKK partners . . . with being members of an 'Armed Terrorist Organization' led by Fethullah Gülen and banned them from leaving Turkey. The Hürriyet newspaper also reported in late July that the law firm's office had been subjected to a raid by 'armed police' and the law firm was shut down.

(Id. at 2, 13.)

The Defense argument is speculation which does not support their motion. See Landsberg, 1997 WL 414114, at *2 ("Where the basis for recusal is not direct, but is remote, contingent, or speculative, recusal is not warranted."); see also Zavalidroga v. Cote, 395 Fed. Appx. 737, 739 (2d Cir. 2010). In making this tenuous argument, Defense counsel unpersuasively relies upon In re School Asbestos Litigation, 977 F.2d 764 (3d Cir. 1992). (See Def.'s Mot. at 18.) There, a district judge had "approved an *ex parte* request by the plaintiffs for $50,000 from a settlement fund to support a scientific conference on a key merits issue—the hazards of asbestos." 977 F.2d at 770. Thereafter, the judge accepted an invitation to the conference and was "exposed to a Hollywood-style 'pre-screening' of the

21

plaintiffs' case: thirteen of the eighteen expert witnesses the plaintiffs were intending to call gave presentations very similar to what they expected to say at trial." Id. at 770, 782. "[A]t oral argument and in his opinion . . . [the judge] recognized that some people could reasonably suspect a taint." Id. at 783.

There are no substantive similarities between the Zarrab case and In re School Asbestos. The Court in Zarrab was not assigned to preside until March 2016, some two years after the Symposium. It did not authorize any funds to sponsor the Symposium. The Symposium was focused upon the Rule of Law, not on Mr. Zarrab and his 2013 criminal charges. The Court did not address any "key merits issues" at the Symposium, and was not exposed to any "Hollywood-style" prescreening of the Government's case. And, the panelists at the Symposium were all prominent judges, government officials, professors, and attorneys who discussed universal legal principles and, excluding the Court, are not involved in the Zarrab case.

The Zarrab case presents facts which are, if anything, even more benign than the facts of either Da Silva Moore v. Publicis Groupe or In re Aguinda – where recusal was found to be inappropriate. In In re Aguinda, plaintiffs, in a case against Texaco, moved for recusal after the district judge attended a "five-day conference on various environmental law issues . . . [where] one of the numerous speakers at the conference was a private consultant who formerly had been chairman of defendant Texaco, Inc." and the conference was sponsored and funded in part by Texaco. 139 F. Supp. 2d 438, 438-39 (S.D.N.Y. 2000). The district judge denied plaintiffs' motion, finding that "neither [the former chairman] nor any of the other speakers or participants at the conference addressed any aspect of the merits of" the case at bar. Aguinda,

139 F. Supp. 2d at 439. The Second Circuit Court of Appeals held that "a reasonable person would not doubt the judge's impartiality . . ." In re Aguinda, 241 F.3d at 206.

In Moore v. Publicis Groupe SA & MSL Grp., plaintiffs sought to recuse a mag judge who, "while presiding over the parties' dispute on predictive coding," spoke at several e-Discovery panels where "another panelist on two of the panels was . . . e-Discovery counsel [for Defendant]," and the mag judge had made "passing references" to the case. 868 F. Supp. 2d at 140. On appeal, the district court found that "[a] disinterested observer fully informed of the facts in this case would find no basis for recusal." 2012 WL 12528637, at *3 (S.D.N.Y. Nov. 8, 2012).

"A judge may engage in extrajudicial activities, including law-related pursuits and civic, charitable, educational, religious, social, financial, fiduciary, and governmental activities, and may speak, write, lecture, and teach on both law-related and nonlegal subjects." CODE OF CONDUCT FOR UNITED STATES JUDGES CANON 4.

> As a judicial officer and person specially learned in the law, a judge is in a unique position to contribute to the improvement of the law, the legal system, and the administration of justice . . .

In re Charges of Judicial Misconduct, 404 F.3d 688, 693 (2d Cir. 2005) (quoting CODE OF CONDUCT FOR UNITED STATES JUDGES, COMMENTARY TO CANON 4).

## V. Conclusion & Order

For the reasons set forth above, Defendant Reza Zarrab's motion to recuse the Court [#79] is denied.

The Court will hold oral argument on the pending motion to dismiss and will also discuss the pending motion to suppress at a conference with the parties on October 5, 2016 at 10:30 a.m. (See Order, dated Aug. 21, 2016, at 1) ("Among the issues the parties address at oral

23

argument should be: whether a suppression hearing is necessary and/or helpful; inevitable discovery; whether the Government search warrant includes password/access to the contents to Defendant Zarrab's phone.").)

Dated: New York, New York
September 29, 2016

$\mathcal{RMB}$

<u>**RICHARD M. BERMAN, U.S.D.J.**</u>

# EXHIBIT A

# Five "Basics" of an Independent and Effective Judiciary

Richard M. Berman
United States District Judge, Southern District of New York

## 1. Separation of Powers

- Judiciary must be independent of legislature and executive branches
- Cases must be decided fairly, impartially, and based upon the facts and the law: no "telephone justice" or "ex parte" communications
- Mechanisms: Secure tenure for judges and constitutional review power of judiciary

## 2. Transparency

- Court decisions must be written and legally compelling
- Public "dockets" and open court records
- Media must have access to court proceedings

## 3. Judges must be highly qualified and above reproach

- "Vetting" for strong academic and professional credentials
- Good character, integrity, and judicial temperament

## 4. Adherence to High Ethical Standards

- Judicial Codes of Conduct
- Judges must uphold the integrity and independence of the judiciary
- Avoid even the appearance of impropriety

## 5. Deference to the Rule of Law, Not the Rule of Man

- Laws enacted and legal institutions established
- Competent staffing for judicial institutions
- Public respect for the law and its role in society