GA5SZARC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          15 CR 867 (RMB)

5   REZA ZARRAB,

6               Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        October 5, 2016
9                                       10:45 a.m.

10

    Before:
11
                    HON. RICHARD M. BERMAN,
12
                                        District Judge
13

14                         APPEARANCES

15  PREET BHARARA
        United States Attorney for the
16      Southern District of New York
    MICHAEL LOCKARD
17  SIDHARDHA KAMARAJU
    DAVID DENTON
18  DEAN SOVOLOS
        Assistant United States Attorneys
19
    BRAFMAN & ASSOCIATES, PC
20      Attorneys for Defendant Zarrab
    BY:  BENJAMIN BRAFMAN
21       JOSHUA KIRSHNER

22  QUINN EMMANUEL URQUHART & SULLIVAN LLP
        Attorneys for Defendant Zarrab
23  BY:  CHRISTINE CHUNG
         PAUL D. CLEMENT
24       EDMUND G. LACOUR

25  ALSO PRESENT:
    GEORGE ESAYAN, Certified Turkish Interpreter

GA5SZARC

```
 1              (Case called)
 2              THE COURT:  We have a slight delay having to do with
 3    getting a Turkish language interpreter.  We have just been
 4    advised that we will have one by noon.  I'm going to, I'm ah
 5    phrase, have to recess this until noon, then we can resume at
 6    that time.
 7              Is that OK with everybody?
 8              MR. LOCKARD:  Yes, your Honor.
 9              MR. BRAFMAN:  Your Honor, may we have a moment to
10    confer?
11              Your Honor, we are trying to see if we can figure
12    something out that would assist the court.  There are lawyers
13    in the courtroom who do speak Turkish.  We are trying to
14    determine if that would be acceptable to Mr. Reza and the
15    court.  Just give me one more minute.
16              THE COURT:  Sure.  I just wonder, though, isn't the
17    wisest course to wait until we have an official Turkish
18    interpreter?  We had that issue come up in the case earlier on.
19              MR. BRAFMAN:  I agree, your Honor.  That's my concern,
20    but I've asked for one moment.
21              THE COURT:  Sure.  Whatever you need.
22              (Pause)
23              MR. BRAFMAN:  Your Honor, I think the court is
24    correct.  Since the issue has been raised, we should do this
25    with an official court interpreter.
```

GA5SZARC

1          THE COURT:  They said an hour.  I'm saying 12, at the

2    outside.  It could be, I guess, quarter to 12, if that is not

3    too imprecise for all of you.

4          Anyway, I'll be here.  I'll be down on the bench at

5    11:45.  We will see.

6          MR. BRAFMAN:  We will come back.

7          THE COURT:  If you're not mere, we will find you and

8    tell you.

9          MR. BRAFMAN:  We will be sure to come back, sir.

10          THE COURT:  Great.  See you then.

11          (Recess)

12          THE COURT:  An update.

13          The interpreter's office just called and said it is

14    still a half hour before the interpreter will be here.  That's

15    a revised ETA.  Sorry.

16          ALL PRESENT:  Thank you, your Honor.

17          (Recess)

18          THE COURT:  Sorry for the inconvenience caused by our

19    delay, which was unforeseen.  All is well that ends well, I

20    guess.

21          I do want to say, at the outset, so that it's clear,

22    that my participation in that symposium back in 2014 in

23    Istanbul and the defense motion, recent motion, for recusal,

24    neither of those facts would impact my ability to preside over

25    this case fairly and impartially, and to ensure that

GA5SZARC

1    Mr. Zarrab, who is presumed innocent, receives a fair and

2    impartial hearing.

3         I am most delighted to see Mr. Clement here.  I almost

4    wish, Mr. Clement, you had appeared in the district court in

5    the Tom Brady case instead of just in the Court of Appeals.  I

6    would have enjoyed -- I hope you don't think I am

7    presumptuous -- I would have enjoyed the opportunity to try to

8    convince you that Tom Brady should have started the season game

9    one instead of game five.  That's water under the bridge, as

10   they say.

11        We have set aside time in this conference for oral

12   argument on the two pending motions.  Obviously, there is some

13   interrelation.  If the motion to dismiss were granted, we

14   certainly wouldn't need to get to the motion for suppression.

15        I thought, in the interest of efficiency, we should

16   hear argument on both motions at the same time.  That is the

17   schedule I had laid out also back in August, August 23, when we

18   were anticipating an oral argument date.

19        If you would, each side, I have allotted 45 minutes

20   for covering both motions.  If the defense wishes to reserve

21   some time for rebuttal, let me know, and we'll do that.  We

22   will try to give you a heads up 10 or 15 minutes before the end

23   of your first segment is approaching.

24        The motion to dismiss the indictment in its entirety

25   is dated July 19, and the defense motion to suppress evidence

GA5SZARC

1    and statements made by Mr. Zarrab at or about the time of his

2    arrest in Florida is also dated July 19.

3          I should say, right off the bat, that briefs in both

4    instances and from both sides are excellent.  They could easily

5    support a decision one way or another just on the writing.

6    But, I'm happy to give you time and opportunity to press

7    particular points that you have.

8          With that, and with respect to suppression, I know

9    you'll remember, there was an order, the same order, August 23,

10   2016, which indicated a couple of areas I would like to hear

11   from you about.  That is to say, one is whether a hearing is

12   helpful or required.  Also, the issue of inevitable discovery.

13   And also, I asked you to look into the question of whether the

14   government's search warrant would have covered or did cover a

15   password that might have been utilized with respect to the

16   phone and/or the iPad.

17          With that, the defense has the floor.

18          Who might that be, Mr. Clement?

19          MR. CLEMENT:   your Honor, I will begin and address

20   the motion to dismiss the indictment.  And then my colleague,

21   Mr. Brafman, will address the motion to suppress.

22          THE COURT:  OK.

23          MR. CLEMENT:  What we would like to do is to reserve,

24   essentially, 10 minutes for both rebuttals.  So we will try to

25   take 35 minutes of your time to address the motion to dismiss

GA5SZARC

1    the indictment and the motion to suppress.

2             THE COURT:  We will give you a heads up roughly in

3    35 minutes.  Is that fair?

4             MR. CLEMENT:  That is fair, your Honor.

5             THE COURT:  OK.

6             MR. CLEMENT:  Let me say, at the outset, that I am

7    happy to be here in the district court to avoid anything like

8    that the next time around here.

9             Your Honor, we are here on the motion to dismiss the

10   indictment in its entirety.  The reason the motion is directed

11   to dismissing the indictment in its entirety is that each of

12   the counts in the indictment suffers from fundamental legal

13   defects.

14            I'll start with the sanctions count, because I do

15   think that, at its heart, this is a case about the sanctions.

16            THE COURT:  Count Two in the indictment?

17            MR. CLEMENT:  Yes.

18            THE COURT:  Excuse me.

19            Just for the record, that's the way your brief was

20   also organized, starting with that.

21            MR. CLEMENT:  Exactly, your Honor.

22            It does seem, as I say, this is fundamentally a

23   sanctions case.  But there is a fundamental problem with the

24   government's sanctions theory, which is the sanctions laws are

25   designed to operate on U.S. citizens and transactions that are

GA5SZARC

1   from the United States.  That's obvious from the jurisdictional

2   provision 1702, but it is also obvious from the basic nature of

3   the sanctions regime.  The government's sanctions theory would

4   effectively convert a sanctions regime into a boycott that

5   raises all sorts of issues under international law that

6   congress didn't contemplate.

7          So, the basic nature of a sanctions regime, your

8   Honor, is to say that there are transactions that are otherwise

9   lawful to the rest of the world, that U.S. persons -- persons

10  subject to the jurisdiction of the United States, to use the

11  statutory phrase, or entities in the United States -- cannot

12  conduct those transactions that are lawful to the rest of the

13  world.  But to take that regime and apply it to a citizen of

14  Turkey or a citizen of Iran and say that, just because they

15  started a process that led to a Turkish bank or a bank in the

16  UAE to make a wire transfer request, that that somehow

17  implicates the sanctions statute, I think, would be a radical

18  expansion of the statute.

19         I say "radical" because not only would it be beyond

20  anything that the statute or the regulations authorize, but it

21  would be radical in the sense that it would change the whole

22  nature of the sanctions regime.  Instead of being in position,

23  on United States persons, persons subject to the jurisdiction

24  of the United States, it then starts to tell others outside the

25  United States that they can't engage in any transaction with

Iran.  And that starts to take the form of a boycott and not a

sanctions regime, with very different implications for

international law and the rest.

        So I think that that really gets to the fundamental

problem with this count of the indictment.  I do think it does

go directly to the statutory language.  I think that the terms

that the statute uses, subject to the jurisdiction of the

United States, is a term that has a well-established meaning in

this area.  I think you could look at that both from looking at

the Trading with the Enemy Act and the long history of that

language being restricted to U.S. persons or transactions that

are directly in the United States.

        But, also, I think the history of another statute

that has very similar language, AEDPA, is also very, very

instructive, because when congress decided that it wanted to

extend Ed part to foreign nationals, it took language very

similar to what exists in IEEPA, and then it changed it to make

clear that it applied to foreign nationals operating abroad.

        Of course, congress made no comparable change to

IEEPA.  And I think that was entirely conscious, because in the

context of something like AEDPA, it is understandable why

congress would want to go after foreign nationals, at least

once they're brought into the jurisdiction, and in doing so,

doesn't raise any particularly serious issues of international

law and commodity.

GA5SZARC

1          But doing the same thing with the sanctions regime, I

2   think, would be a step -- I am not saying congress couldn't

3   take that step.  I mean, it would be an interesting question of

4   sort of legislative jurisdiction and the like.  But I just

5   don't think that that is a step you would lightly attribute to

6   congress.  I think that is why this is such an unprecedented

7   and expansive prosecution.

8          We think, we see this, in our argument, in some sense,

9   could be based simply on the statute, but we also think the

10  regulations are fully supported of this argument since they

11  focus on exports from the United States, and they focus on U.S.

12  persons.  And you would expect the regulations to be consistent

13  with the statute.  Of course, in the few places where the

14  regulatory regime tries to address a foreign national outside

15  of the United States, specifically in Section 205 of the

16  regulations, which are not charged in this case -- the few

17  places where the regs do that, they do it expressly, and use

18  the kind of language -- putting aside for a second whether you

19  can do with the regulation something that is not supported by

20  the statute -- they use the kind of language you would expect

21  either the executive branch or congress to use if it was going

22  to take the step of applying the sanctions regime to foreign

23  nationals in a very extraterritorial way.

24          So I think that gets to, I think, the nub of our

25  argument there, which is just that you cannot take a provision

GA5SZARC

that makes it a crime for a U.S. bank to export services, and

suggest that any foreign national that requests a transaction

that might be a violation for the bank, if they were fully

informed, that requesting foreign national does not become

either a primary violator or a subject to a conspiracy count or

some kind of secondary liability count.

I think, as to that second point, I do think the D.C.

Circuit decision, the <u>Yakou</u> decision, is informative on that.

I think Judge Chin's decision in the <u>Chalmers</u> case, which

dismissed an indictment and followed from the D.C. Circuit

decision, applied the D.C. Circuit decision, I think they are

both correctly decided. But they also reenforce this basic

notion that, when a sanctions regime makes a very different and

understandable judgment in treating a U.S. exporter differently

from a would-be importer, if you will, that you can't get

around that expressed sort of judgment simply by saying, well,

there is a conspiracy count.

To be clear, it might be a different case if you had

an allegation that my client engaged in an active conspiracy

with a U.S. bank, where they were agreeing with the U.S. bank

as to how the U.S. bank was going to violate the export

regulations. But that is not what we have here. And the

government, in their papers, I think, correctly and fairly

alleges that the nub of the dispute here is that there was

an effort to get the U.S. banks to unwittingly process a

GA5SZARC

1    transaction that they wouldn't otherwise process.  But that's,

2    I think, a very different situation from a situation where

3    there was a conspiracy that actively involved the U.S. banks as

4    a coconspirator, and that is not what we have here.

5         So, if the court has any questions on the sanctions

6    count, I would love the opportunity to address them.  I also

7    want to have time to talk about the bank fraud count.

8         THE COURT:  What then do we make of the government's

9    position in opposition?

10        MR. CLEMENT:  Well, I think, the government's position

11   in opposition, as I understand it, depends on an idea that I

12   just don't think that the statute supports.  It depends, I

13   suppose --and you may have a better sense of what you think the

14   government's position than I do is -- I think to the extent

15   that they have an argument in response to this, it is that

16   maybe 203, in the clause to export language, could extend this

17   far.

18        I think that's wrong for two reasons.  One is, I don't

19   think even in 203, as amended, there is anything in there that

20   is sufficiently clear that it would overcome a presumption

21   against extraterritoriality.  But I also think the language

22   that's probably the critical language, the idea that somebody

23   outside the United States could potentially cause somebody in

24   the United States to export a service, I think there is two

25   ways to think about that language, one of which is perfectly

GA5SZARC

1    consistent with both our argument, but also congressional

2    intent and principles of the, you don't lightly assume,

3    congress violates international law.  And that is the idea

4    that, look, if you're somebody who is in a position to direct

5    and control a US-based company to export something to Iran, and

6    you direct them to do it and you cause an export in that sense,

7    that's something that you could imagine congress would want to

8    address, and you could imagine that the regulations were

9    designed to address it.

10           So, theoretically, if you had like a foreign parent

11   that was directing a US-based subsidiary to export to Iran, you

12   could, under that provision, get both the foreign parent and

13   the U.S. subsidiary.  But what the government wants to do is

14   say, as I understand their position, it would really extend to

15   anybody who requests the import of a service from a U.S.

16   entity.  I don't think cause to export logically means that, in

17   the context of this statute -- and I think it would be such a

18   radical expansion of the statute, because I don't think, just

19   going from the U.S. bank is liable for U.S. criminal law

20   violations to any Iranian or other foreign national who makes a

21   request for a transaction -- that would be a problem for the

22   US-based company to say that every one of those is now a

23   violator of U.S. criminal law.  It is just a radical expansion

24   of the statute and really does get you, essentially, to a

25   boycott situation.

GA5SZARC

1          I just don't think that the government's response to

2     our argument is sufficient to overcome the presumption against

3     extraterritoriality.  And the government responds to that to

4     say, oh, well, we have every indication that this is an

5     international statute.  You don't have to get beyond the I in

6     IEEPA to understand that --

7          THE COURT:  Can I interrupt you just for a second for

8     the court reporter?

9          You mentioned IEEPA.  You did that before.  Can you

10    identify that act for the court reporter?  And also AEDPA, you

11    mentioned before.  So we have that clear in the record.

12         MR. CLEMENT:  Sure.

13         The IEEPA is the International Emergency Economic

14    Powers Act.  And the particular provision that I'm referring to

15    is 50 U.S.C. 1702.

16         As to AEDPA -- I am going to try to get that for you

17    in one second -- it's the Anti-terrorism and Effective Death

18    Penalty Act.  If it is helpful, we can get the specific cite.

19         THE COURT:  That's fine.  I'm a little bit unclear.

20    Is the defense arguing, as a matter of fact, that the use of

21    the American bank was inadvertent or incidental or intentional?

22         The government is saying that it wasn't just a mere

23    use, it was a way to dollarize these transactions, I suppose.

24    Well, I don't know if there is another way, an alternate way,

25    to get dollars to Iran, if that were the purpose.

GA5SZARC

1          What is the defense position with respect to the U.S.

2    banks?  Was that intended or what?

3          MR. CLEMENT:  Well, I guess what I would say, your

4    Honor, is our position is that it was not intended as a factual

5    matter.  But our position is that, as a legal matter, it does

6    not matter, which is to say even if it was intentional -- now,

7    the government in their brief, actually, specifically makes the

8    observation -- which I think is unassailably correct, and I

9    don't think there is a disagreement between the parties on

10   this -- which is it is perfectly possible to get a dollarized

11   transaction from the UAE to China, for example, without going

12   through the United States.

13          All sorts of banks outside the United States have

14   dollar-denominated accounts, and I suppose if it were crystal

15   clear that the United States regime actually prohibited foreign

16   nationals from doing anything that went through a U.S. bank, I

17   suppose you probably would have people being very careful to

18   make sure that a dollarized transaction didn't touch the

19   United States.

20          THE COURT:  All right.

21          MR. CLEMENT:  But in a regime where it's never been

22   clear to a foreign national that there was a problem with going

23   through the United States, I think that a foreign national

24   would rationally be -- and I think the facts would show, our

25   argument doesn't depend on it one way or the other -- I think

GA5SZARC

1      the facts would show that both my client, the banks, the

2      foreign banks that actually initiated the wire transfer

3      directly, they were essentially indifferent.

4            At some point, a bank in the UAE or the bank in Turkey

5      decided, yeah, they had dollars in an account in a U.S. bank

6      and a correspondent relationship.  At some point, somebody

7      intentionally decided to go through a U.S. bank.  But as far

8      as my client's concerned, he was essentially indifferent.

9            But, in all events, even if he was under the delusion

10     that the absolute only way to get this done was through a U.S.

11     bank, I think our legal position would still be, as a foreign

12     national sitting in Turkey, if he makes that request, he hasn't

13     violated United States criminal law.

14            If I can move then to the bank fraud count, I do think

15     there is a different problem with the bank fraud count.

16            I think, at the outset, I think that there is

17     something problematic about sort of repackaging what is, at

18     bottom, a sanctions issue as a bank fraud problem, given the

19     radically different penalties under the bank fraud statute.

20            But, in all events, I think there are, again, serious

21     legal defects with the bank fraud theory, starting with the

22     idea that the indictment, essentially, fails to allege the two

23     most fundamental aspects of a bank fraud, which is a

24     misrepresentation that is going to essentially make the bank a

25     victim of the bank fraud.  I think on both of those fundamental

1    aspects of bank fraud, the indictment is defective.

2              I think, in some ways, your Honor, it sounds dangerous

3    to try to use an analogy, but I think there is an analogy here

4    that, in some ways, makes it fairly clear why there is a

5    fundamental problem with the bank fraud theory.  I would ask

6    you to imagine a regime where a U.S. bank simply cannot have a

7    deposit from an Iranian national.  If you had somebody come in,

8    and it turns out they're actually a Turkish and Iranian dual

9    citizen, they want to make a deposit with the bank.  They give

10   the $100 and say, I would like to open up an account with you.

11   There is a form that they have to use to open up the account.

12             Let's say the account form doesn't ask them their

13   nationality, doesn't require them to certify, I am not a

14   national of Iran.  They go ahead and they put that money in.

15   Say they put $100 in.  Maybe, in a couple weeks, they withdraw

16   90.  I would submit to your Honor that, in that scenario, there

17   is absolutely no bank fraud, even though, if the bank were

18   fully informed, the bank would have said, no, we decline to

19   take your deposit because you're an Iranian national.

20             I think there would be no bank fraud in that situation

21   for essentially two fundamental reasons.  One is that there

22   would be no misrepresentation at all.  The would-be depositor

23   came in, gave the bank the information that they required, and

24   certainly absent some allegation that there was a duty to fully

25   disclose your citizenship status, there is just no

GA5SZARC

1    misrepresentation at all.  Here is my money, I would like to

2    open up an account.

3           The second fundamental reason that there is no bank

4    fraud in that situation is that the bank is not out anything.

5    On the contrary, the bank now has deposits -- you know, the

6    would-be defendant, under the government's theory, I suppose,

7    has come in and said, here is $100, please take it from me.  So

8    the bank is not worse off, and the bank is, in fact, better off

9    because they now have an extra $100 in their deposits.

10          So, I do believe that what we have here is actually

11   entirely parallel to that analogy because, with respect to

12   these wire transfers, there is nothing alleged in the

13   indictment that rises to the level of a misrepresentation in

14   the wire transfer requests.  The information that's required in

15   the wire transfers was provided not even by my client, but by

16   another foreign bank, and there weren't misrepresentations on

17   it.  Certainly, none have been alleged.

18          I think it is worth understanding that there is a

19   little bit of an oddity of this whole regime, because you would

20   think, in a regime where it was really problematic for a U.S.

21   bank to process a wire transfer to the ultimate benefit of an

22   Iranian entity, that in order to do any wire transfer

23   internationally, there would be some box you would have to

24   check or some information that would tip the U.S. bank off to

25   that, that there is a problem.  But there isn't.

GA5SZARC

1          So, in this case, it is perfectly appropriate for the

2     foreign national banks to make this wire transfer request, and

3     they don't have to make a misrepresentation to get the

4     U.S. bank to essentially make the wire transfer.  So, from that

5     sense, as in the depositing situation, there is no

6     misrepresentation at all.  There isn't any duty -- I don't

7     think the government either in the indictment or its brief

8     points to any duty -- that would turn an omission into a

9     misrepresentation or a fraudulent scheme.

10         And it's worth noting that the omission theory would

11    only work on prong one of the bank fraud statute, not prong

12    two.  But, in all events, they don't point to any duty, and I

13    think that's both important for understanding that they haven't

14    made adequate allegations of bank fraud or what they alleged as

15    to constitute bank fraud.  I think it also helps understand, a

16    little bit, our extraterritoriality argument.  Because the

17    government's response to our extraterritoriality argument as

18    bank fraud is, what you are talking about, you're trying to

19    defraud U.S. bank institutions.  So that is enough of a

20    U.S. effect.

21         But I think the real problem that shows up, the

22    extraterritoriality problem, is this idea that since there

23    isn't a misrepresentation, they haven't alleged it.  But they

24    must think there is a duty somewhere, and they would think that

25    is a duty that somehow operates on my client sitting in Turkey.

GA5SZARC

1    And that would be a pretty radical extraterritorial projection

2    of the United States law, that I don't think there is any

3    indication in the bank fraud statute or anywhere else that

4    gives rise to that duty.

5              Before I lose the thread, the second aspect of this,

6    which I think provides an appropriate analogy to my simple

7    depositor situation, is this is not a situation where my

8    clients are trying to principally get money out of a U.S. bank

9    that is in the U.S. bank.  They are trying to get money through

10   a U.S. bank in a sense, but they are there, they are showing up

11   in the first instance with, we would like this money,

12   essentially, to go through the U.S. bank, but ultimately go to,

13   let's say, a Canadian company.  They are there.  Here is

14   $100,000.  So it is like the depositor situation in the sense

15   that they are not trying to milk the bank out of some money

16   that the bank starts with.

17             They are simply trying -- at most, you can say they

18   are trying to get a service out of the bank, and simply, even

19   if you use some deceit -- and I don't think they really -- they

20   haven't alleged misrepresentation or a duty, I'm not sure they

21   have that -- even if you were to use some deceit to get a U.S.

22   bank to provide a service that the U.S. bank is going to be

23   compensated for and doesn't create any problem for the U.S.

24   bank, as long as it is unwitting, and that is what they allege,

25   then you have an alleged bank fraud.

1          I think what makes this bank different from every

2      other case of bank fraud of which I am aware is that, if this

3      scheme were to succeed here, the U.S. bank is better off.  They

4      process to wire transfer.  They have gotten some compensation

5      for that.  If the scheme works, the bank is better off.  Every

6      other bank fraud case I have ever seen, if the scheme works,

7      the bank is worse off.  And that is kind of the *sine qua non* of

8      bank fraud.  I do think that is a fundamental defect in their

9      bank fraud theory.

10          I think, to anticipate your Honor's question, what do

11      we say about what they say in their brief.  I think what they

12      say in their brief is, well, there could be regulatory costs

13      that the bank incurs.  There could be some threat.  There are

14      a lot of these transactions that go through a bank.  Maybe some

15      bank regulator is going to take a closer look at them.  That,

16      your Honor, is a theory that, I think, they have absolutely no

17      support for.  I mean, if you look at the bank fraud cases,

18      there are cases where either the bank is going to be out money

19      or the bank's customer is going to be out money.  And even

20      though the bank might have a holder, in due course, defense

21      against their own customer.  The Circuit's cases suggest that

22      still might be enough of an injury to the bank.

23          But nobody says, Well, you're making them do a

24      transaction.  By making them do the transaction, even if it

25      is unwitting, there is some greater chance that they'll be

GA5SZARC

1   audited, some greater chance that they're going to incur some

2   costs.  No court accepted that, that I'm aware of, and I think

3   for good reason.

4           In that situation, there is a complete disconnect

5   between any added sort of disadvantage to the bank and what my

6   client is trying to get.  Prong two of the bank fraud statute

7   talks about obtaining funds.  I mean, my client obtained no

8   funds from these banks.  My client indirectly paid for a

9   service of making these wire transfers to go through a

10  U.S. bank.  The U.S. bank was better off, if the U.S. bank was

11  suspicious, they would stop it, in which case the U.S. bank is

12  not worse off.  And if the transaction goes through and they're

13  unwitting, then they're not out anything and my client doesn't

14  obtain anything unlawful.

15          I think that there is this fundamental problem with

16  the bank fraud statute as well.  Very briefly, before I turn

17  things over to Mr. Brafman, I would like to mention the other

18  two counts in the complaint.

19          If we are right on sanctions and we are right on the

20  bank fraud, I think the money laundering count and the client

21  conspiracy count fall at their own weight.  I also think there

22  are independent problems with those two counts.  I do think

23  there is a merger problem with the money laundering theory

24  here.  And the government's response that you don't have the

25  proceeds language in the particular subsection at issue here, I

1    don't think is an adequate response.

2         I think that what congress intended in the money

3    laundering statute was clearly to apply money laundering

4    statute in circumstances in which the money laundering activity

5    made the underlying offense more aggregate or was an aggravated

6    idea.  The idea that you can by some kind of underlying

7    specified unlawful activity just automatically, *ipso facto*,

8    violates the money laundering statute and there are

9    substantially higher penalties, I think is a statutory problem.

10   Congress did not intend that.

11        I think one way of thinking about this difference is

12   we wouldn't be making that same argument if the theory here was

13   that what my client was trying to do was procure, say, the

14   unlawful export of military equipment, and then, as adjunct to

15   that, also had to figure out how to get funds into and out of

16   the United States.  That is a situation where there clearly is

17   no merger problem.

18        But in a situation where the underlying specified

19   unlawful activity is a wire transfer, the idea that the money

20   laundering statute is going to come in and say, well, the wire

21   transfer itself is the money laundering.  I just don't think

22   that theory works.

23        The last thing I'll say about the client conspiracy is

24   that, in addition to the problem that if the other counts fall

25   out, I think the client conspiracy falls out.  This would be

GA5SZARC

1    the first case I know of where you have a client conspiracy

2    that is applying extraterritorially.  The idea that you're

3    going to take 18 U.S.C. 371 -- which, I'll say, the government

4    has managed to extend beyond anything that seems like a

5    traditional fraud -- but to take that and then say, look, we

6    are going to impose a duty on the whole world to not frustrate

7    U.S. enforcement efforts of its own sanctions regime, I think

8    there is just no indication that the congress that passed

9    18 U.S.C. 371 had any intention to project it outside of our

10   borders in that kind of way.

11          With that, your Honor, I'll turn it over to my

12   colleague.

13          THE COURT:  Thanks very much.

14          MR. BRAFMAN:  Your Honor, good afternoon, sir.

15          THE COURT:  Good afternoon.

16          MR. BRAFMAN:  Your Honor, I think your Honor knows me

17   as an advocate for quite some time, and I am rarely nervous or

18   intimidated.  But I never have had to follow Paul Clement.  I

19   share your Honor's observations.  For me, this is a particular

20   treat.  I'll try and silence the pounding in my heart as I try

21   and get through the few kernels of argument that have been

22   delegated to me.

23          Judge, I want to briefly indicate that we have moved

24   to suppress, obviously, the statements made by Mr. Zarrab prior

25   to being advised of his Miranda rights, the statements made by

GA5SZARC

1    him in the course of having to give the agents his passcode,

2    and also the evidence obtained from the path from the phone

3    after they obtained a search warrant, as well as the statements

4    made to him after his arrest, which the government argues, out

5    of the presence of counts, which the government argues is part

6    of a routine processing.

7            I want to focus on what your Honor specifically asked

8    us to address in the order of August 23, 2016, that your Honor

9    referenced earlier.  I want to not wander.  I want to go right

10   to that.  This is clear to me that the court has specific

11   inquiries that you wanted us to address.

12           First, whether a suppression hearing is necessary

13   and/or helpful.  I think if your Honor were to grant the

14   suppression that we ask for, then a hearing is neither

15   necessary or helpful, and we obviously would not urge one.  I

16   do think, however, that if your Honor were inclined not to

17   grant our motion, then a hearing is absolutely required,

18   because there are no dispute offered by the government as to

19   the facts alleged in Mr. Zarrab's own affidavit.  And the

20   sequence of events and the chronology of events, that I am

21   going to paint for the court in just a moment, cry out for a

22   hearing, because what happened here, even though I can't prove

23   it without a hearing, are so eloquently outlined in the course

24   of events, that I think doing this without a hearing would

25   deprive the court of very important information.

GA5SZARC

1          I would also address inevitable discovery and also

2     address, in a moment, whether the government's search warrant

3     includes any reference to the passcode and what that means.

4          Your Honor, what we need to just draft or set out as a

5     seam briefly, which is, I think, undisputed, is the following:

6     Mr. Zarrab was on a vacation to Disney World in Orlando,

7     Florida, on March 19 with his family.  He had done nothing

8     wrong with entering the country.  He lawfully declared all the

9     money he was is carrying.  He accurately described the amount

10    and they verified it, and it is perfect.  They go through

11    customs.  That is when everything changes.

12         This is not a routine border inquiry because, at

13    customs, what we do know is that FBI agents are waiting steps

14    away to eventually arrest Mr. Zarrab.  And I think if we had a

15    hearing, I could demonstrate quite easily that everything was

16    orchestrated that day, that everything was orchestrated by, at

17    the very least the FBI, if not also government prosecutors.

18         THE COURT:  You mean they knew he was coming?

19         MR. BRAFMAN:  They absolutely knew he was coming

20    because the agents were at the airport waiting to arrest him.

21         Yes, there is no question that we can establish that

22    they had evidence that he was coming to land, and I think we

23    could establish beyond question that the agents had

24    orchestrated the entire sequence of events in allowing the

25    customs border patrol people to first engage him in and attempt

GA5SZARC

1    to get the passcode to the iPhone, and that this was not by

2    happenstance.  This was not a routine border inquiry.  This was

3    a plan set in place to get the passcode.

4           Because what your Honor also needs to keep in mind,

5    at or about this time, there was great controversy over the

6    government's ability to crack an iPhone.  And, indeed, Judge

7    Johnson, in <u>Djibo</u> cases -- D-j-i-b-o -- the only case directly

8    on point, specifically notes that inability of the government

9    prosecutors and the concession they make to an Eastern District

10   judge, which Judge Johnson sort of scoffs that, because to make

11   a contrary position before him, that absent the passcode, they

12   were trying to force Apple to develop software that would allow

13   them to break into an iPhone without a passcode.  The

14   technology then was front and center in the minds of the FBI

15   when they confronted Mr. Zarrab.

16          I have reason to believe that a hearing would also

17   demonstrate that they knew he was carrying an iPhone.  They

18   were monitoring his activities for some time.  What you have is

19   not a routine border inquiry.  What happens to Mr. Zarrab

20   physically is, after he is in passport control, he is removed

21   from passport control to a secluded area into a private room.

22   I think it is important for your Honor to note that that does

23   not end there.  He is then removed from his wife and family and

24   taken into a second room where it is only him and border

25   patrol.

1          At that point, your Honor, I believe a reasonable

2    person in Mr. Zarrab's position would believe that he was not

3    free to leave, because he was not answering any questions

4    unlawfully, he was not carrying any contraband, and he had no

5    idea why they were taking him into a second inner sanctum, if

6    you will, other than to detain him, and he had no ability to

7    flee.  I think the customs official would testify that he was

8    not free to leave, but obviously it is the perception by

9    Mr. Zarrab at the time.

10         At that point, the customs officer asks him for his

11   passcode.  That has nothing to do with the routine border

12   patrol inquiry.  Judge Johnson clearly said, for the first time

13   in his life, the government suggests that when you come into

14   the United States, and you have done nothing wrong in terms of

15   your entry forms and you have not lied to customs about

16   anything that they could put their finger on, they have a right

17   to all of your passcodes and they have a right to go through

18   your personal electronic devices as part of routine border

19   inquiry.  That is just not the law, and I don't believe it is

20   routine.

21         And, in this case, it is not routine.  In this case,

22   it is purposeful.  How do we know that?  When they ask him for

23   the passcode, he provides it.  He is not advised of his rights,

24   but yet, in the next room, I think a hearing would demonstrate,

25   are FBI agents just waiting to get the passcode before they

GA5SZARC

1    arrest him and advise him of his rights.  They have

2    orchestrated this in a way that allows them to essentially

3    incriminate himself by not advising him of his right to remain

4    silent and asking him for the passcode.

5         Then what happens?  The agent who gets the passcode

6    leaves the room.  I think a hearing would demonstrate that he

7    goes in, and he confers with the FBI agents, who we now know

8    are in the next room.  The agents apparently can't get it to

9    work, because the customs official comes back, asks him to

10   repeat the passcode, and inputs it in his presence.

11        So what you have is not a routine border inquiry.

12   What you have is a first act, second act, and a third act, and

13   they are all designed to essentially deprive Mr. Zarrab of his

14   constitutional rights not to incriminate himself and allow the

15   government to get that which they could not have otherwise

16   obtained, because once they advise him of his right to remain

17   silent, subsequent to getting the passcode, he exercises his

18   right to an attorney.

19        And what's most telling in this case is, if you will

20   note from our papers, and it is not disputed by the government,

21   after he asks for a lawyer and he asks if he can use his phone

22   to contact the lawyer, the agent, the FBI agent tells him, if

23   you sign this waiver allowing us to search your phone, I'll let

24   you use the phone to call the lawyer.  They knew what they had

25   done was wrong, and I think this was, after the fact, trying to

1      cover their back side.

2              I think, yes, your Honor, a hearing will not only be

3      helpful, it may well be dispositive.  If your Honor is inclined

4      to hear further discussion on this issue, I don't think it is

5      possible to deny our motion without a hearing.

6              In terms of inevitable discovery, your Honor, I think

7      that the Second Circuit is pretty clear that inevitable

8      discovery, first of all, doesn't help them on a Fifth Amendment

9      violation.  If the right to counsel should have been advised of

10     Mr. Zarrab before he incriminated himself by giving a

11     testimonial statement, which is giving the passcode as defined

12     as his testimonial statement, the inevitable discovery doesn't

13     save them.

14             Even inevitable discovery on a Fourth Amendment issue,

15     the Second Circuit has argued that inevitable discovery only

16     saves you if they can point to hard facts that convincing a

17     district court that this would have been inevitably discovered.

18     You know what, Judge?  They can't do that.  That's why, if you

19     look at the affidavit filed by the agent in support of the

20     application of a search warrant ten days later, they keep that

21     from the magistrate.  They do not tell the magistrate judge

22     that they had obtained the passcode, nor do they explain to the

23     magistrate judge how they went about getting the passcode.  It

24     is completely silent.

25             I know in the government's papers, they say, well,

GA5SZARC

1    they got a search warrant.  Since they got a search warrant

2    without using the passcode, therefore, there must have been

3    probable cause and they would have gotten the warrant anyway

4    and, therefore, they haven't fooled anybody.  We take the flip

5    side.  By keeping that material from the magistrate, a

6    magistrate may well have said, Wait a minute.  How did you get

7    the passcode?  And without the passcode, the government has not

8    suggested in any shape or form that they would have been able

9    to get into the phone.  So inevitable discovery does not save

10   them.  It certainly does not save them on the self-

11   incrimination issue, and it certainly does not save them on the

12   search of the iPhone.

13           Your Honor, there is another aspect that I want to

14   briefly touch upon.  The government takes the position -- and

15   what we can show, without controversy, it is not disputed, they

16   gave us the videotape -- Mr. Zarrab is advised of his rights on

17   tape a half hour after he is first detained.  And he is advised

18   of his rights, and he asks the agent who is questioning him,

19   You mean I can have a lawyer?  He says, Yes.  I can have a

20   lawyer now?  The agent says, Yes.  He says, Good.  I would like

21   to have a lawyer.

22           The agent then, very broadly, says, We are going to

23   stop questioning you because that's how American justice works.

24   He has nice things to say, but it didn't happen exactly that

25   way.  What happens after the tape is turned off, we know that,

again, without dispute, Mr. Zarrab is now taken to a third

place.  He is put in a car, he is handcuffed, he is placed

under arrest.  He is away from his family, he is taken by car

to a third place, and then he is asked by the agent to put down

on the list all of his assets, all of his bank accounts, and

all of the property he owns.  And he does that after he has

asked for the right to counsel.

        And in a way to excuse that, the government, I

think -- and I say this with respect for the lawyers -- but the

argument that I think is almost disingenuous, or preposterous

is the right word, that is part of the ordinary arrest

processing.  It is part of the ordinary arrest processing to

take a subject whose entire investigation centers on the

businesses he owns, the bank accounts he has, the places of

business that he operates from, and suggests that when

you're -- they are not processing him.  It is not like this

is pretrial services and they are asking for date of birth,

residence, pedigree questions, and says, What do you do for a

living?

        He is in a car with agents on the way to, eventually,

wherever he is going to get processed.  They get there, and

they ask him to list all those things.  That is a statement

made by the defendant after his right to counsel has been

invoked.  It's not only been invoked, he has been deprived of

his right to contact counsel immediately, because they say to

GA5SZARC

1   him, The only way you can use your phone to call your lawyer is

2   if you sign the consent after the fact.

3           I think the facts here, your Honor, scream out for

4   suppression.  I say that respectfully, but if you don't

5   suppress without a hearing, I think it is impossible to resolve

6   these issues without a hearing.

7           Thank you, Judge.  If you have any questions.

8           THE COURT:  No.  I'm good.

9           MR. BRAFMAN:  Thank you.

10          THE COURT:  Hold on one second.

11          Let me just ask the interpreter, are you OK if we keep

12   going?

13          THE INTERPRETER:  Yes, your Honor.

14          THE COURT:  Let's hear from the government.

15          MR. LOCKARD:  Thank you, your Honor.

16          I will proceed largely in the same order that defense

17   counsel has proceeded, if that is acceptable to the court.

18          THE COURT:  That's fine.

19          MR. LOCKARD:  I'll begin with the argument about Count

20   Two, the IEEPA account.

21          THE DEPUTY CLERK:  Counsel, I'm sorry, you have to use

22   the microphone.  The interpreter is having trouble hearing you.

23          THE COURT:  You're going to start with Count Two,

24   which the defense says is the -- sum and substance is the wrong

25   word -- but really is the core of this dispute in this case?

1          MR. LOCKARD:  It's certainly an important charge in

2     the indictment.  I think it has been the recipient of the

3     lion's share of the dispute, certainly in the briefing.

4          Let me start with Count Two, which charges the

5     defendant with participating in a conspiracy to violate the

6     IEEPA.

7          I am going to start not with the policy provisions

8     that defense counsel assumes congress had in mind when they

9     passed the statute.  I am going to start with the language of

10    the statute, which is, as the court is aware, the first place

11    that any court or advocate goes to determine what it is that

12    congress had in mind when it enacted the statute.  Because the

13    statute, in a very clear and unambiguous way, defines the scope

14    of what it does, and it says a lot about what congress had in

15    mind with respect to extraterritorial issues when it adopted

16    the IEEPA in the 1970s.

17         I'll start with the first section of the statute,

18    which is in Section 1701, which sets out the purpose of the

19    statute.  In 1701, what congress does is, it gives the

20    president the authority to declare national emergencies to

21    address unusual threats to the national security, economy,

22    etc., of the United States, when those unusual and

23    extraordinary threats have their origin, in substantial part or

24    in whole, outside the United States.  So right from the get-go,

25    the IEEPA is thinking about extraterritorial issues and threats

GA5SZARC

1    originating from outside the United States.

2           Section 1702 describes what it is that the president

3    can do in order to respond to those national emergencies.  What

4    Section 1702 does, it gives the authority to the president to

5    investigate, regulate, or prohibit, broadly speaking, two

6    different types or categories of transactions.

7           The first category of transactions are those that

8    involve persons subject to the jurisdiction of the United

9    States, and that is the provision where the defense has focused

10   almost all of their attention, but it also gives the president

11   the authority to investigate, regulate, or prohibit

12   transactions that involve property that are in the jurisdiction

13   of the United States.  And the fact that there is that second

14   category is significant for this extraterritoriality problem

15   because the first category already deals with U.S. persons.

16   I'll use that as a shorthand for persons subject to the

17   jurisdiction of the United States.

18          So the property provision doesn't do anything if it

19   also limited to U.S. persons, but it is not.  It also applies

20   to foreign nationals or persons acting outside the United

21   States, if they are engaging in a transaction that involves

22   property that is subject to the jurisdiction of the United

23   States.  Again, in Section 1702, the statutory scheme is

24   contemplating both U.S. persons and non-U.S. persons when there

25   is U.S. property involved.

1          That carries us over to Section 1705, which is the

2     section that imposes criminal liability.  Section 1705 says who

3     can be criminally liable for violating any executive order or

4     regulation promulgated under the IEEPA.  Section 1705 says

5     something different about the persons that it talks about than

6     what Section 1702 said when it is talking about persons.  And

7     that distinction is important because the law, as you know, is

8     a well worn legal trove, that when congress uses different

9     formulations in the same act, it means different things.

10          Section 1705 says that a person who violates, attempts

11     to violate, conspires to violate, or causes a violation, that

12     is who can be criminally liable.  Section 1705 does not limit

13     those persons to persons subject to the jurisdiction of the

14     United States.  That is not accidental, because congress talked

15     about persons subject to the jurisdiction of the United States

16     in Section 1702.  So we know that, when it intended to limit

17     the scope of the persons its talking about, it knows how to do

18     that, and in 1705, it did not do that, and that was

19     intentional.

20          Now, those two categories of transactions the 1702

21     talks about, that carries forward into the regulations in the

22     particular regime that is issued here, which is the Iranian

23     transactions and sanctions regulations.  Again, Section 204 of

24     those regulations, again, talks about two different types of

25     transactions that are prohibited.  The export, sale, or supply

GA5SZARC

1    of goods, technology, or services by a U.S. person, or the

2    export, sale, or supply of technology, goods, or services,

3    from the United States.  Again, tracking the two categories of

4    transactions that are described in 1702.

5           The statutory language answers the extraterritoriality

6    question that has been brought to the court's attention by the

7    defense argument.  And what the IEEPA says is, yes, foreign

8    nationals who cause a violation, violate, who attempt to

9    violate, or who conspire to violate the IEEPA, can be

10   criminally charged and can be prosecuted for those offenses.

11          The presumption against extraterritoriality, as it has

12   been discussed in the briefs and a little bit here today, I

13   think it doesn't track the way that the Supreme Court has

14   talked about the presumption against extraterritoriality in its

15   recent cases, including cases like Pasquantino and Morrison and

16   their progeny.

17          The defense argument essentially is, Mr. Zarrab is a

18   foreign national, he is alleged to have participated in this

19   conspiracy from outside the United States.  That means this is

20   an extraterritorial application of these statutes.  I am now

21   shifting from the argument that that's perfectly OK under the

22   statutory language, and now we are addressing sort of, in the

23   alternative, even if the court thought that the statute did not

24   have extraterritorial application, why this is not an

25   extraterritorial application of the statute.

1          But the presumption against extraterritoriality is not

2    a substantive limit on who can be charged as a defendant.

3    That's clear from cases like Pasquantino and like Morrison.  I

4    am going to talk about Morrison for a second because it really

5    throws this issue into sharp beliefs.  I know the court is

6    familiar with the facts of the case, so very briefly, that was

7    a civil securities lawsuit in which the plaintiffs had

8    purchased securities listed on a foreign stock exchange.  They

9    brought a Securities Act claim against the issuer and against

10   defendants in the United States alleging the fraudulent scheme,

11   that affected the purchase of securities, happened in the

12   United States.  It happened in Florida.

13          So the Supreme Court goes through this exercise of

14   analyzing whether the Securities Act is extraterritorial,

15   decides that it is not, but at that point the plaintiffs say,

16   but, Court, this isn't extraterritorial because the defendants

17   are in the United States, and that is where the fraud took

18   place.  Now, the court says, that is not as easy as it sounds,

19   because after you say the statute isn't extraterritorial, you

20   have to say, all right, what does that mean for this statute?

21   What is the focus of the statute?  The focus of the Securities

22   Act is on where the securities were purchased or on what

23   exchange are they listed.  So the fact that the fraud happened

24   in the United States, the defendants were in the United States,

25   didn't make it a domestic application.  It was extraterritorial

GA5SZARC

1  because the purchases were overseas and the exchange upon which

2  the securities were listed was overseas.

3         If you take the converse of that, what it shows is

4  where the defendant is located depending on the statute.  It

5  doesn't answer the extraterritorial question at all.  So if

6  there were the purchase or sale of securities in the United

7  States, and there was fraud in connection with that purchase

8  that was perpetrated abroad or by foreign defendants, that

9  would not be an extraterritorial application because the

10  relevant part of the statute is domestic.  The conduct was

11  domestic.

12         If you look to the IEEPA statute, that analogy matches

13  perfectly, because the focus of the IEEPA statute is whether

14  goods or services were exported by U.S. persons or from the

15  United States, directly or indirectly, for the benefit of Iran.

16  So the fact that the defendant was a foreign national,

17  participated in a conspiracy to cause violations of that

18  statute, does not render it an extraterritorial application,

19  for the same reason the Morrison situation was not a domestic

20  application of the Securities Act.

21         I am going to address just a couple other issues very

22  quickly, and then hopefully answer any questions that the court

23  has.

24         So there has also been quite a bit of argument about

25  whether this is a radical expansion, whether this is a novel

application, whether this is unprecedented.  It has been clear
for a long time that foreign nationals are not permitted to use
the U.S. financial system to conduct transactions that are for
the benefit of Iran or for the government of Iran.  Until the
year 2008, there was a general license that OFAC had issued
that allowed certain types of transactions that were for the
benefit of Iran, as long as it met certain requirements,
including not originating from Iran or from an Iranian bank and
some other requirements.  And in 2008, that license was
revoked.  At that point, it was perfectly clear to everyone
that international financial transactions that rely on U.S.
correspondent banks to complete the transactions are prohibited
by the sanctions regime.

          THE COURT:  Can I ask you, what do you make of
Mr. Clement's reliance on the D.C. Circuit decision in, Yakou
and Judge Chin's decision in Chalmers, with respect to
Count Two?

          MR. LOCKARD:  Both of those cases address pretty
similar factual issues.  I'll address them kind of as a group.

          The reason that the Yakou decision, and the Chalmers
decision following it, don't advance Mr. Zarrab's argument is
because it was addressing a different type of prohibition.  In
fact, in Yakou, the Yakou court, as I'll explain in a minute,
distinguished the case that we have from the case that it was
facing.

GA5SZARC

1    What was going on in <u>Yakou</u> is, there was a regulation

2    that required U.S. persons to register as brokers if they were

3    involved in brokering munitions.  That is simplifying it, but

4    that is as close as I can get for today's purposes.  There are

5    two individuals who were charged, a father and a son, one of

6    whom was a U.S. person and one of whom was not, neither of whom

7    had registered as brokers, and both of whom were engaged in the

8    activity of brokering munitions in Iraq, apparently.  So no

9    involvement with the U.S., no export of goods or services from

10   the U.S., just a U.S. person who was required, because of that

11   status, to register as a munitions broker.

12   What the <u>Yakou</u> court said was that definition of

13   requiring only U.S. persons to register sort of defines out a

14   liability anybody who is not a U.S. person, and liability can't

15   be reimposed by charging them as an aider or an abettor or

16   accessory.

17   But the <u>Yakou</u> court distinguished another case where a

18   foreign national had been convicted for exporting munitions out

19   of the United States.  So if you substitute financial services

20   for munitions --

21   THE COURT:  That's us.

22   MR. LOCKARD:  -- that's this case.

23   I'll now address the bank fraud count briefly, unless

24   the court has any further questions about the IEEPA account.

25   THE COURT:  No.

1          Do you want to jump to misrepresentation and loss with

2     respect to the bank fraud?

3          MR. LOCKARD:  Yes, your Honor.  You anticipated

4     exactly where I was headed.

5          So the problem with the motion to dismiss at this

6     point is what it means to have a misrepresentation.  Again, we

7     are here on the motion to dismiss, which tests the legal

8     sufficiency of the indictment, not the sufficiency of the

9     evidence to prove the charge at trial.

10          That's significant because the Supreme Court -- I'm

11     sorry -- the Second Circuit has described what it is to show a

12     misrepresentation for purposes of the bank fraud statute, and

13     it requires looking at all of the facts and circumstances,

14     looking at the defendant's entire course of conduct, to

15     determine if that course of conduct is deceptive or amounts to

16     an affirmative representation, even when any particular

17     specific act by itself may or may not.  That's in both the

18     Barrett case and the Morgenstern case -- cases decided after

19     trial, not at the motion to dismiss stage -- where there was a

20     full trial record to assess those issues.

21          THE COURT:  Are you saying here, that on a motion to

22     dismiss, that we have a misrepresentation or omissions, or does

23     it matter, or both?

24          MR. LOCKARD:  I think we have both.  Just to give sort

25     of a flavor of what we expect the trial to show, to show why

1    this is really a fact issue, why this is an evidentiary issue

2    and not a legal issue to be decided on a motion to dismiss, the

3    indictment charges a scheme going on for a period of five

4    years, right, multiple transactions, each of which was designed

5    in a way to conceal from U.S. banks the fact that the ultimate

6    beneficiary of these transactions was an Iranian entity or the

7    government of Iran.

8             So the length of time, the number of transactions, the

9    number of different entities that were used, the swapping out

10   of entities as time went on, so that suspicion wouldn't fall on

11   any particular entity, the use of wiring transactions, so it

12   would go not from just one foreign entity to another, but

13   through multiple foreign entities, the stripping of Iran

14   related information out of the wire instructions --

15            THE COURT:  Is stripping another phrase for omission?

16            MR. LOCKARD:  It is.  It is a phrase from -- it is a

17   word for omitting that information.

18            But not just omitting, but taking transactional

19   information provided by the conspirators, Iranian clients who

20   were also conspirators, and deleting the Iran related

21   information out of those instructions before passing it on.

22            We expect it will include evidence of false

23   documents --

24            THE COURT:  Are you saying that the bank would have

25   seen that, but for the stripping?

GA5SZARC

1          MR. LOCKARD:  Correct, your Honor.  Correct, your

2     Honor.

3          We expect there will be evidence of the use of false

4     documents to create the appearance of non-Iranian economic

5     activity supporting these transactions, again, all for the

6     purpose of deceiving the banks.

7          So, as a pleading matter, certainly the indictment is

8     sufficiently pleaded.  We think it is an evidentiary matter.

9     There is more than enough evidence to prove the element of

10    misrepresentation beyond a reasonable doubt at trial, but it

11    has to wait until trial.

12         Now, with respect to loss to the bank, or the bank

13    being the victim, I think it is worth noting that whether or

14    not an intent to harm the bank or to victimize the bank,

15    whether or not that remains an element of a bank fraud charge

16    under Section 13441 is an issue that is currently pending

17    before the Supreme Court in a case called Shaw v. United

18    States, that the indictment is sufficiently pled even if that

19    remains an element of the charge.

20         So we can proceed with resolving the motion to

21    dismiss, the government believes, although it may affect the

22    jury instructions that the parties submit prior to trial.

23         THE COURT:  So what is the loss that we should be

24    concerned with on a motion to dismiss?

25         MR. LOCKARD:  The Second Circuit has recognized

GA5SZARC

several types of loss as qualifying as a loss or risk of loss

that satisfies that requirement, including the risk of civil

liability, including reputational harm, including complications

with other commercial relationships, other commercial risks.

There is a pretty broad view about what qualifies as risk of

loss under the Second Circuit precedent.

We expect to be able to show several different kinds

of risk of loss.  One type of risk of loss which is shown

directly in the overt acts alleged in the indictment is the

risk that there will be a transaction that gets blocked, as one

bank or another in the chain of these payments realizes the

Iranian nexus, and in accordance with OFAC regulations, blocks

that payment, one of the banks in the chain is going to be out

the money because they will already have paid it out and they

won't get paid back.  That is a real concrete risk of an actual

financial loss to one of those banks.

There is the risk of civil liability from the Office

of Foreign Assets Control.  It is no secret that almost every

major bank in the United States in the past several years has

had some encounter or another with OFAC, or with other

regulators relating to their compliance procedures, and whether

they have been appropriately followed and appropriately

designed a scheme that passes huge sums of Iranian money

through a U.S. bank substantially increases the risk of that

potential liability and certainly the cost of responding to any

1   inquiries relating to it.

2              THE COURT:  You're saying that risk is enough?

3              MR. LOCKARD:  Risk is enough.  Risk is enough.

4              And this really goes to, also, the arguments that have

5   been advanced that Mr. Zarrab was, in fact, trying to help

6   these banks out by padding their profit margins.  That is

7   really no different than the argument that has been repeatedly

8   rejected.  For example, that an individual who commits mortgage

9   fraud intends to benefit the bank because they intend to repay

10  the fraudulently obtained loan, the bank will make the

11  interest, and so I didn't really intend to harm the bank.  Has

12  that been widely rejected because what the mortgage fraud has

13  done is expose the bank to risk of loss, a risk that, in a lot

14  of cases, is, in fact, materialized, but it is not required to

15  show that it does actually materialize.

16             I am happy to address any other arguments that the

17  court would like to hear on the bank fraud problem.

18             Otherwise, I'll address very briefly the money

19  laundering count and then move into the motion to suppress.

20             THE COURT:  OK.  Are you going to do the motion to

21  suppress also?

22             MR. LOCKARD:  Yes, your Honor.  I am flying solo

23  today.

24             THE COURT:  All right.

25             MR. LOCKARD:  With respect to the money laundering

GA5SZARC

1    count, we concede that if the specified unlawful activities

2    that are alleged in the indictment are dismissed, then we no

3    longer have a predicate for the money laundering to attach to,

4    but for the reasons that we have discussed here today, those

5    counts should not be dismissed, which leads to the merger issue

6    that has been raised.

7         I think there is a misunderstanding about what the

8    money laundering count alleges.  There was one type of

9    misunderstanding that was laid out in the moving brief on the

10   motion to dismiss.  That misunderstanding was that the proceeds

11   money laundering theory alleged, when, in fact, a promotion

12   money laundering account had been alleged, there is a continued

13   misunderstanding in the reply where the argument now is that

14   there is a merger between the IEEPA violation and promoting the

15   IEEPA violation by transferring money from the United States

16   outside of the United States.

17        What's actually being alleged here is that there is a

18   promotion by moving money from outside of the United States

19   into the United States, and that is the transaction that is

20   promoting the IEEPA.  Because U.S. banks pay money out, they

21   have to get money back in, right?  So it is crossing the border

22   in both directions.

23        Now, with respect to the motion to suppress.  I'll

24   start with the court's question first about whether a hearing

25   is required.

GA5SZARC

1          We don't think any hearing is necessary on the motion
2    to suppress, either to suppress the results of the phone search
3    or to suppress Mr. Zarrab's processing statements, his
4    post-arrest statements about his assets.  That is true for a
5    couple of reasons.  One is, while we certainly don't agree that
6    a hearing would show the facts that Mr. Brafman has described
7    that are set forth in Mr. Zarrab's affidavit, even on those
8    facts, the law is clear that those facts do not rise to a
9    violation either of the Miranda rule -- well, in either
10   circumstance, a violation of the Miranda rule --

11          THE COURT:  You're saying that, assuming Mr. Brafman's
12   scenario is proven, you think that, as a matter of law, there
13   would be no suppression?

14          MR. LOCKARD:  That's correct, because those facts do
15   not support a conclusion that Miranda warnings were necessary
16   at either stage of the questioning that Mr. Brafman has raised.
17   And the law is also clear that, even if there were a Miranda
18   warning required when Mr. Zarrab provided his passcode,
19   exclusion is not an available remedy, exclusion of a Fourth
20   Amendment search is not an available remedy for a Fifth
21   Amendment Miranda violation.

22          Let me start first with whether a Miranda warning was
23   required during the border stop.

24          THE COURT:  He says it wasn't a real border stop, so
25   to speak.  I don't mean real, but, you know.

1            MR. LOCKARD:  I understand.  I understand the

2      argument.  I think that argument is addressed by the Second

3      Circuit's decision in FNU LNU.  FNU LNU says a couple things

4      that are extremely important in evaluating whether the

5      allegations rise to the level of a custodial interview for

6      Miranda purposes.

7            The first part that FNU LNU makes, which has been made

8      many times before and recapitulated in FNU LNU, is that a

9      person not being free to leave does not turn it into a

10     custodial interview for Miranda purposes.  That is true because

11     there are a lot of different types of investigative stops, not

12     all of which amount to an arrest, and not all of which require

13     the issuance of Miranda warnings before questioning.

14            An easy example is a traffic stop.  If you're driving

15     and you see the lights in your review mirror, you know you have

16     to pull over.  When the traffic stop starts, you know you can't

17     drive off in the middle of it.  Everybody in a traffic stop

18     knows they are not free to leave until the traffic stop is

19     over, unless the deprivation of freedom starts to become the

20     equivalent of an arrest.  So you are functionally under the

21     same type of detention as an arrest.  That is when Miranda

22     warnings are required.

23            So, yes --

24            THE COURT:  You think that did not happen to

25     Mr. Zarrab before Miranda warnings were actually administered?

GA5SZARC

```
 1              MR. LOCKARD:  That's correct.  Because when you
 2   evaluate whether a detention has become an arrest-like
 3   situation, you look at what an objective reasonable observer in
 4   that person's position would understand.
 5              So, Mr. Brafman has raised a lot of speculation about
 6   what was going on behind the scenes.
 7              THE COURT:  Yes.
 8              MR. LOCKARD:  But by alleged that it was behind the
 9   scenes, he has made it irrelevant for the determination of
10   whether it was an arrest or functional equivalent to an arrest
11   for an objective reasonable person.
12              THE COURT:  Because it was unknown?
13              MR. LOCKARD:  Because it was unknown to Mr. Zarrab.
14   According to the facts laid out in Mr. Zarrab's affidavit, he
15   knew he went to passport control, he knew he declared a sum of
16   U.S. currency, he knows he was pulled into secondary
17   questioning.  He knows that his telephone was given to the
18   agent, the customs agent.  He knows that his nanny, who he was
19   traveling with, was also pulled into secondary questioning.  He
20   knows that he is asked questions about his currency, and he
21   knows that he is asked for the passcode.  None of that remotely
22   comes close to rising to the level of an arrest detention to an
23   objective reasonable observer.  There is nothing about being
24   asked about the passcode to his iPhone that changes any of
25   that.
```

1          Remember what the context of the stop was.  It is a

2     foreign national traveling from outside of the United States

3     into the United States.  As the Second Circuit and other courts

4     have described it, that is akin to, more or less, a

5     constructive consent to a border search and a border

6     investigative border stop.

7          THE COURT:  There doesn't have to be any bad behavior

8     or drunkenness necessary?

9          MR. LOCKARD:  Just by approaching the border, just by

10    approaching the border, the nation has the right to ensure that

11    contraband isn't being brought in, that inadmissible aliens

12    aren't coming in.  And going specifically to an iPhone, you can

13    imagine circumstances where customs and border patrol may very

14    well want to confirm information on an individual's phone.  For

15    example, if they were to open up an iPhone and find an ISIS

16    flag as wallpaper or find propaganda videos, things of that

17    nature, customs may want to turn that person around and not

18    admit them to the United States.

19         So there is a perfectly legitimate customs and border

20    rationale for the types of baggage searches, personal searches

21    and electronic searches, that it is well settled that the

22    customs agents have the authority to conduct.

23         THE COURT:  Is that a norm, by the way, a manner of

24    practice that people coming in, they ask for your phone and for

25    the passcode?

1          MR. LOCKARD:  It is my understanding that customs

2     agents -- I don't know if it happens always, but it happens on

3     a regular number of situations that people will be asked for

4     the passwords to their electronics in the same way if you're

5     carrying locked luggage, you may be asked for the keys to your

6     luggage.

7          When you look at the facts that have been alleged by

8     Mr. Zarrab, especially when you compare them to the facts in

9     FNU LNU, legally, this doesn't rise to a custodial stop for

10    Miranda purposes.  Mr. Brafman conceded that this was, at most,

11    about a half hour from when he entered passport control until

12    he was formally placed under arrest.  I believe the questions

13    of FNU LNU was something more like 90 minutes or an hour and

14    a half.  The questions in FNU LNU were repeated, they were

15    probing questions about that person's application for passport.

16    They were shown photographs and asked to identify photographs.

17    There was a lot of very suspicious questioning that went on of

18    this person, and still, Second Circuit held, as a matter of

19    law, it did not amount to a custodial interrogation for Miranda

20    purposes.  That's point one.

21          Point two is, even if Miranda were required, and even

22    if his giving up the passcode to his phone were an

23    un-Mirandized statement where Miranda was required, the case

24    law is clear, especially under the Supreme Court decision in

25    Patane, that the exclusion of a Fourth Amendment search that

results from an un-Mirandized statement is not suppressible,

that the remedy for an un-Mirandized statement is the

suppression of a statement itself, not from physical evidence

gained as a result of a search.

There is really no way to distinguish what happened in

Patane from what happened here.  The facts certainly are

different that, all legal aspects, there is no way to

distinguish Patane from this case.  In Patane, the defendant

was placed under arrest.  He was not Mirandized.  I believe

they started to Mirandize him, and then he said, Don't

Mirandize me, and they stopped.  And everybody agreed that

doesn't qualify as Mirandizing the defendant.

So while he is under arrest, while he is restrained,

while there are armed agents in his residence, he is asked

about a firearm.  He says, I don't want to tell you where my

firearm is because you might take it.  He is asked about the

firearm again, and then he identifies the location of the

firearm.  And then he gives consent to search his bedroom in

his house, which is where the firearm was.  It was recovered,

and he moved to suppress it.

The Supreme Court said, again, notwithstanding that

everything about knowing that he had a gun, knowing where the

gun was, and getting consent to search for the gun, all of it

came from statements that he made without being Mirandized.

The Supreme court unambiguously held that you cannot suppress

1   the gun because that is not a remedy for un-Mirandized

2   statements.  The government couldn't put into trial his

3   statements that he had a gun or that he knew where it was, to

4   show that it was his, but certainly they can introduce the gun

5   itself.

6          Mr. Brafman referenced the Eastern District of

7   New York's decision in Djibo.  I won't spend a whole lot of

8   time on that decision, but I will make a couple of observations

9   that I think are important.  The first is that the Djibo

10  decision got the Patane analysis entirely wrong.  But that

11  analysis was also not necessary to the result that that court

12  reached because the Djibo court suppressed the results of a

13  phone search on two grounds.  The first was the court's finding

14  that the defendant had made un-Mirandized statements about the

15  passcode and, as a Fifth Amendment remedy, suppressed the

16  results of the subsequent search.  But the court also

17  suppressed the results of that search as the fruits of a prior

18  warrantless search of the phone, which is a separate Fourth

19  Amendment fruit of the poisonous tree analysis.  The Eastern

20  District's analysis of Patane, while wrong, was also not

21  necessary.

22          I'll end very quickly with the motion with respect to

23  Mr. Zarrab's post-arrest post-Miranda statements about his

24  assets and his bank accounts.  Again, no hearing is necessary

25  because there are no facts that are in dispute that are going

GA5SZARC

1    to affect the court's determination of whether or not this is

2    appropriate pedigree questioning or inappropriate un-Mirandized

3    interrogation.  We think it is clear that it is pedigree

4    questioning from Mr. Zarrab's own declaration.  It's clear

5    that, as a matter of timing, when these questions occurred,

6    right, they did not occur at the time that he was questioned at

7    the airport.  It happens after he has been transported to

8    another facility for fingerprinting and questioning in

9    connection with his processing.

10           It's also clear from the nature of the questions,

11   these are questions that are part of -- they are a part of

12   processing for a very good reason.  First of all, as

13   Mr. Brafman knows, these are questions that are listed on the

14   U.S. Marshal service intake form, which is where they were

15   noted in connection with the processing.  They are not FBI

16   questions.

17           The reasons the marshals do these things is because

18   the marshals are responsible for housing pretrial detainees and

19   tracking down escapees and fugitives, and things that are

20   relative to a person's identity, family members, residences,

21   and bank accounts is all information that is important to the

22   marshal service to be able to locate and apprehend a fugitive.

23   That is why they are processing questions.  That is why they

24   are pedigree questions.

25           The fact that there were questions about the

GA5SZARC

1    defendant's assets and residences, in a prosecution where his

2    assets are potentially also of evidentiary value, doesn't

3    change the fact that these are pedigree questions any more than

4    questions about a person's identity are suddenly taken out of

5    pedigree questioning if they are charged with identity theft or

6    any more than assets questions are taken out of the pedigree

7    realm if they are charged with any financial fraud or

8    securities fraud or a similar financial offense.

9            THE COURT:  I'm not sure I understand what you just

10   said.

11           MR. LOCKARD:  So pedigree questions are pedigree

12   questions regardless of what the charge is.

13           THE COURT:  You're saying, end of story, these are

14   pedigree questions?

15           MR. LOCKARD:  End of story.

16           THE COURT:  It doesn't matter that some people have --

17           MR. LOCKARD:  That's correct.

18           Even if the answers to those questions might be of

19   evidentiary relevance, depending on what that person is charged

20   with, right.  So that the example about the identity theft,

21   questions about a person's identity theoretically are relevant

22   to an identity theft charge, but that doesn't change the fact

23   that these are pedigree questions that are necessary as part of

24   the process.

25           THE COURT:  All right.

GA5SZARC

1           MR. LOCKARD:  Just one last thing, unless the court

2      has any additional questions.

3           We had a cite to an Eleventh Circuit decision.  This

4      goes to the question of the suppression of the phone search.

5      So there is a 2005 decision -- it is unpublished, but it is in

6      the Federal Appendix -- that addressed where a defendant in a

7      custodial setting gave an un-Mirandized description of the

8      combination to his safe.

9           In that case, although his statement about what the

10     combination was, was suppressed, the contents of the safe,

11     after the search, were not suppressed.  That's <u>United States v.</u>

12     <u>McKreith</u>, which is M-c-K-r-e-i-t-h.  That's at 140 Fed. Appx

13     112 (11th Cir. 2005).

14          One moment, your Honor.  One clarification on

15     <u>McKreith</u>.  The statement wasn't suppressed, it just wasn't

16     offered.  So there was no suppression because the government

17     didn't rely on it, in any event.

18          THE COURT:  Thank you.

19          I am going to take a two-minute pause.

20          Mr. Clement, are you going to split up the rebuttal

21     similarly, or is it one person or the other?

22          MR. CLEMENT:  I think we will split up the rebuttal,

23     if your Honor will allow.

24          THE COURT:  I sure will.  Take two minutes and we will

25     have rebuttal.

GA5SZARC

1        (Recess)

2        THE COURT:  The defense has reserved time for

3   rebuttal.  This is that time.

4        MR. BRAFMAN:  I think the interpreter stepped out to

5   use the men's room.

6        THE COURT:  OK.

7        MR. BRAFMAN:  Just one moment, sir.

8        THE COURT:  Sure.

9        (Pause)

10       THE COURT:  I am going to have one or two questions

11  for the government before you begin the rebuttal.

12       MR. BRAFMAN:  He's back, your Honor.

13       THE COURT:  I have two remaining brief questions or

14  topics for the government.

15       You did not address inevitable discovery or the scope

16  of the warrant, whether it would call for the passcode or not.

17  Could you address those?

18       MR. LOCKARD:  Yes, your honor.  I apologize for that.

19       THE COURT:  That's all right.

20       MR. LOCKARD:  In the event we had to make a case for

21  inevitable discovery, which I think would require a hearing,

22  what we expect we would be able to show is that the biometric

23  unlocking function on the iPhone was enabled, that is, the

24  fingerprint unlocking mechanism was enabled.  And in the

25  absence of having the passcode, we would have been able to

1  obtain an order compelling the defendant to unlock it using his

2  fingerprint.

3          THE COURT:  You would?

4          MR. LOCKARD:  Yes, your Honor.

5          THE COURT:  OK.

6          MR. LOCKARD:  Now, with respect to the scope of the

7  warrant.  The warrant doesn't address the passcode issue at

8  all, principally, because it is not relevant to probable cause

9  to justify the search.  In the same way, an affidavit to search

10 a residence wouldn't necessarily, say that the agents already

11 had the keys for the residence, which is not relevant to

12 probable cause.  That's why it is not in there.  And there is

13 no Fourth Amendment search that would have enabled us to get

14 access to the passcode, and that is why it is not addressed in

15 the warrant.

16          THE COURT:  Thanks.

17          Counsel?

18          MR. CLEMENT:  Thank you, your Honor.  Just a few

19 points in rebuttal.  I'll start with the IEEPA account.

20          We are perfectly happy to talk about the text of the

21 relevant statute and the relevant regulations, because we think

22 they very much support our position.

23          The government starts with 1701 and says that it is

24 about external threats.

25          THE COURT:  Right.

GA5SZARC

1          MR. CLEMENT:  Of course it is, but it doesn't empower

2     the president, for example, blocked transactions between France

3     and Iran or between Iranian citizens.  So where you get the

4     scope of the statute is in 1702.  1702 is a real problem for

5     the government, because this isn't a case where you only have

6     to look to the presumption against extraterritoriality.  Here,

7     the relevant jurisdictional provision is expressly territorial.

8     It talks about U.S. persons and it talks about U.S. property.

9          The government is right, it talks about both.  And in

10    that respect, it does apply to a U.S. person operating outside

11    the United States.  So, in that sense, it applies to the U.S.

12    person everywhere.  But as to property, what that is talking

13    about is either a transaction that comes from the United

14    States, takes property from the United States and repatriates

15    to Iran or something.  But my client isn't accused of having

16    bank accounts here that he is getting back to Iran.  There is

17    no relevant property here in the United States either.

18          I think, therefore, you have a statute -- and I think

19    the property in the United States point is important, because

20    what both the provisions in 1702 indicate is this is not a

21    statute that overcomes the presumption against

22    extraterritoriality, but is expressly extraterritorial.  The

23    only exception being it applies to U.S. persons even if they

24    are abroad.

25          That maps onto the two classic sources of

jurisdiction.  One being jurisdiction over U.S. nationals, the
other being jurisdiction over what happens here.  You can fully
apply 1702 without applying it extraterritorially to somebody
in Turkey, who isn't even conspiring with somebody in the
United States, but is simply trying to make a transaction,
which if the U.S. person is fully aware of all the facts, maybe
they wouldn't process it because of the rules that apply to the
U.S. person.

          That's why 1705 does not help them.  It doesn't help
them on multiple levels.  One is, 1705 is not expressly
extraterritorial.  It has any person language, and it is not
limited to only U.S. persons, but that doesn't make it
extraterritorial.  All that does is make it a normal statute to
a presumption against extraterritoriality applies.

          1702 is like the super easy case.  It is
extraterritorial.  1705 doesn't get you to the as of non-U.S.
persons abroad.  The presumption of extraterritoriality says
you don't go there.  Yakou says you don't go there.  And, of
course, Chalmers says you don't go there.

          I want to talk first about Yakou.  I don't think the
government's effort to point to this export of arms case, that
is talked about incredibly quickly, I don't think you could
posit anything.  What the D.C. Circuit was doing there is, they
were taking some language that the government relied on from a
district court case that says that the arms control statute

there was expressly international.  They said, we don't need to
rely on that principle here because that was a distinguishable
case.  They didn't even dig into that and say that is
definitely different.

          What might arguably be different, but is not alleged
here, is to try to use 1705 to go after a non-U.S. person under
a conspiracy theory that they are conspiring with a U.S.
person.  If there was an allegation that my client was
conspiring, had an insider at some U.S. bank and there was a
conspiracy between them, that would be a harder case.  I think
I would still be up here trying to make an extraterritorial
argument.  That is the kind of thing where maybe 1705 applies.

          But the maneuver of trying to say that 1705 gets them
something that 1702 doesn't, effective the move the government
tried to make in Yakou and was told no, and it is exactly the
move they tried to make in Chalmers and were told no.

          Chalmers is a fortiori every way you look at it, your
Honor.  Because the company there, this bay oil company, was a
Bahamian company incorporated in the Bahamas.  It was actually
owned -- the CEO was a Texas citizen.  You've got a lot more
U.S. connection in that case than you possibly have here.  But,
nonetheless, Judge Chin says no, this is all pretty clear, and
this applies to U.S. persons, not a Bahamian corporation, so it
doesn't apply.

          The other thing that he does -- and that's where I

GA5SZARC

1    think that case couldn't be any more on point -- is he rejects,

2    as his last of the government's arguments that he rejects, says

3    the government says, well, even if it is a Bahamian company,

4    they aided and abetted violations in the United States.  And

5    that is where he says, no, you don't get there under 1705 or

6    some secondary liability theory.

7          I think this case is *a fortiori*.  Again, we are not

8    alleged to have conspired with somebody or aided and abetted

9    anybody.  What we are alleged to have done is, essentially,

10   proffered a transaction that, if the company knew everything,

11   the bank knew everything they could, they probably wouldn't

12   transfer.  But we don't give them information they didn't ask

13   for, we just give them the information, they process it.  There

14   is no violation then.  It was unwitting.  If it gets stopped,

15   then it gets stopped.  Either way, there is no violation by the

16   U.S. person.  I don't think they can get there.

17         Just two other points on the IEEPA point.  One is the

18   government replies, both here today and in their briefs, on the

19   U-turn license and the fact that that was revoked.  I think

20   that just makes our case for us, because who did the U-turn

21   license apply to?  It applied to U.S. banks.  The U-turn

22   license didn't apply to foreign nationals.  Foreign nationals

23   weren't all of a sudden licensed do something, because the

24   sanctions regime never reached the foreign national.

25         The sanctions regime was always directed at U.S.

GA5SZARC

banks.  When the U-turn license was in place, the U.S. banks

had a license to process certain transactions.  When it was

revoked, the U.S. banks no longer had that.  But the foreign

citizens were left out of the regime both before and after the

U-turn license.  It didn't apply to them.

I am a little surprised, the last point on IEEPA, the

government invoked <u>Morrison</u>.  <u>Morrison</u> is typically a case you

use to argue against the extraterritorial application of the

statute.  I think if you were just to look at these statutes in

a normal way, you would say, this involves or this involves an

effort by a citizen of Turkey to try to get a transaction from

either Turkey or the UAE to either Canada or China.  It has got

only the most effervescent connection with the United States at

all.

I think if you looked at it kind of at a global level,

you would say this is an extraterritorial application.  Then if

you dug into the details, then I think it would be even more

obvious that it is extraterritorial, because their theory is

that my client had an obligation, when he was sitting in

Turkey, to do something different vis-a-vis the Turkish bank,

either not make a request at all, because it was obviously

verboten, or provide sort of initial information beyond the

bare outlines of what is necessary in a wire transfer.  All of

those are obligations that would have, of course, applied to

him sitting in Turkey.  He didn't come to the United States,

GA5SZARC

1    and it just seems like it is obviously extraterritorial in a

2    way that is problematic.

3          That does bring me then to the bank fraud counts,

4    which I'll be more brief about, but the best the government can

5    do on misrepresentation is to start talking about stripping out

6    information.  But I think, in order to talk about stripping

7    something out as being problematic, there has to be a duty to

8    include the information.  I mean, if you strip out information

9    that's not required to execute a wire transfer, unless there is

10   some duty to be over-inclusive, then I don't see how you have

11   either a misrepresentation at all or an actionable omission.

12         The same idea, one of these wire transfers, there was,

13   at one point, an invoice attached to it, and then they said,

14   well, the invoice talks about Iran.  Let's get the wire

15   transfer sent through without the invoice.  If there is a duty

16   to include the invoice, maybe that's a problem.  But where does

17   that duty come from?  I don't think there is such a duty.  It

18   is not alleged in the indictment.

19         And, of course, if there were a duty, it's now

20   becoming crystal, crystal clear that both IEEPA and the bank

21   fraud statute are being applied over in Turkey to tell my

22   client that, you know, even though you have a wire transfer,

23   you don't need an invoice.  If at some point you had an invoice

24   associated with this, you can't drop the invoice, you have to

25   send the invoice to the United States.  Boy, if that is not

1   extraterritorial, I don't know what is.

2           Then, lastly, on bank fraud, there is this idea that

3   the bank is a victim.  With all due respect to the government,

4   I don't think anything the Supreme Court is going to decide in

5   Shaw is going to get the government where they need to go in

6   this case, because there is no financial risk to the bank in

7   the way that the courts have looked to.  I mean, Shaw is

8   dealing with a situation, maybe the funds are insured, the bank

9   is not really ultimately out here, no funds are coming out of

10  the bank that are going to the criminal defendant at all.

11  What's happening here is, a bank is processing a transaction

12  that it wouldn't process if it were fully informed, but it's a

13  profitable transaction.  And if the conspiracy or the scheme is

14  effectuated, they are better off, not worse off.

15          Just two last points on that.  One, they talk about

16  this possibility that maybe if the transaction is blocked, the

17  bank will be worse off.  With all due respect, they either

18  don't understand the transaction or they are thinking about the

19  wrong bank.  Because if a Turkish bank transfers, let's say,

20  $100,000 to the U.S. bank with the idea that it is ultimately

21  going to be credited over to a Canadian bank, and then

22  transferred it to Canada and that gets stopped midway, well, as

23  a matter of what happens in the real world, it would get

24  reversed.  Nobody would be out any money.  But if somehow it

25  got froze right then, the U.S. bank would have an extra

1    $100,000.  The bank that would be at risk in that situation

2    would be the transfer or bank outside the United States, so

3    that absolutely can't count.

4         Then they want to bring up the analogy of mortgage

5    fraud.  I think that encapsulates what is wrong with their

6    theory on both the misrepresentation and on the injury to the

7    bank.  Because as to the misrepresentation, all those mortgage

8    fraud cases involved cases where they were misrepresenting

9    information that the bank wanted on the form about income or

10   about the rest of that, in an effort, the bank wanted that

11   information in order to assess whether it was a loan that they

12   thought met their standards.

13        There was a misrepresentation about that.  That's

14   completely different than a situation where somebody fills out

15   everything on the form they are supposed to, but they actually

16   end up -- there is a hurricane coming and it might wipe

17   something out, and the bank would like to know that.  But

18   nobody asked him, and he didn't have a free-flowing obligation

19   to say, Well, there might be some bad news coming into this.

20        This is the same thing.  The wire transfer, he gave

21   all the information the bank needed.  It is also different on

22   the risk of loss.  The reason the bank wanted the information

23   on which there was a misrepresentation in those cases was to

24   protect their financial interests.  That is not what is going

25   on here.  The bank doesn't want to know if there is an ultimate

GA5SZARC

1  Iranian beneficiary because those are particularly risky

2  transactions from a financial standpoint.  They want to know

3  that information so they can comply with the regulatory regime.

4  If there is anything going on there, it is a regulatory

5  problem, which is to say there might be a way for the

6  government -- if this is really a problem, there might be a way

7  for the government to solve this by having additional

8  regulatory provisions.  If the government really wants to solve

9  the problem with what my client is doing, there is a way that

10  they can do that, and that is perfectly consistent with the

11  presumption of extraterritoriality and everything else in the

12  sanctions law, which is they can designate him as somebody who

13  is subject to secondary sanctions.  And then, all of a sudden,

14  people can't deal with him.  That is another option for dealing

15  with this.

16          But to prosecute him criminally?  Again, I haven't

17  mentioned it before today, because I think we are actually --

18  we have a clear, unambiguously correct position.  But if we get

19  you anywhere near to a tie on what is correct, the rule of

20  lenity should kick in, and I think it kicks in at this stage of

21  the case, and suggests that the statute doesn't apply.

22          I will say one thing about the money laundering count,

23  which is responsive to the one thing the government said, which

24  is the idea that you can somehow bifurcate the IEEPA violation,

25  such that the IEEPA violation is only the outflow, and the

GA5SZARC

1  money laundering violation is only the inflow.  With all due

2  respect, I just don't think that works.  The IEEPA violation is

3  not just the outflow of money from the U.S. bank to the

4  Canadian bank.

5      I am not even sure, if you try to isolate that

6  transaction, that is not the transaction that really benefits

7  Iran.  What benefits Iran is the ability to get a dollarized

8  transaction to get money from one place to another.  It's got

9  to be the whole transaction that is the IEEPA violation.  It

10  has to be that my client is trying to get a service out of a

11  UAE bank that is somehow impermissible.  I don't think it is an

12  IEEPA violation at all.

13      But, gee whiz, it has to be both sides of the

14  transaction.  The government can't possibly cut it in half and

15  say, here is your IEEPA violation, here is your money

16  laundering violation, no virtue problem.

17      That's all I have, your Honor.  I think a couple

18  minutes for Mr. Brafman.

19      THE COURT:  OK.

20      MR. BRAFMAN:  Thank you.

21      May I proceed, your Honor?

22      THE COURT:  Yes, sure.

23      MR. BRAFMAN:  Your Honor, I am going to be brief.  I

24  think our papers cover these issues and, I think, to be honest,

25  I don't think the government's response adequately addressed

1     the arguments I made in my initial argument.  I also think that

2     they are just flat out wrong in some respects.

3            The analogy of the traffic stop is sort of absurd.

4     Yes, we all know if a police officer stops you because you have

5     a broken taillight or you made a wrong turn, that you are going

6     to stop, and you are going to be there, and you're going to be

7     there until he tells you that you can go.  If a police officer

8     stops, he doesn't have the right, under our rules, to ask you

9     for your cell phone and make you give him your passcode so he

10    can look to see if a member of ISIS.  If he wants to do that,

11    he has got to go through a lot of other steps before he can get

12    to intrude.

13           What is always interesting to me when I listen to

14    Mr. Lockard, it is always sort of cool when they are staring on

15    at a decision on all fours that leaves them for dead, and their

16    response isn't trying to distinguish the case, their response

17    is to tell you, with all due respect, that Judge Johnson got it

18    wrong.

19           I submit that if you read Djibo carefully, you will

20    see it is a very carefully written decision.  And he adequately

21    and accurately analyzes the Patane case -- which is

22    P-a-t-a-n-e -- and addresses the issue raised by Mr. Lockard.

23    But, more importantly, what they ignore is Judge Johnson's

24    reliance, in large measure, on the Riley case, which is

25    Riley v. California, which we cite in our memo.

1            In <u>Riley v. California</u>, the court says the electronic

2     device passwords require the torrents of police misconduct in

3     order to let them go roaming through that.  And in the Judge

4     Johnson's decision, he cites several pages where they talk

5     about how the hold of a person's life can now be found in their

6     mobile phone.  It functions as a computer, as a camera, as a

7     diary.  In order for that intrusion to be viable, you have to

8     go through the constitutional steps that would, for example, be

9     required if you wanted to inspect someone's home.  Just because

10     you want to do it doesn't mean that you can do it.

11            To suggest that, at the border, they have a right to

12     force you to open your phone so that they can tell whether or

13     not there is an ISIS flag as your screensaver, well, if they

14     had looked at the screensaver, they would have seen that it

15     doesn't have an ISIS flag.  And, instead, we don't know what

16     they did with his phone for the ten days between opening it

17     illegally, we submit, and then getting a search warrant.

18            One of the things that the <u>FNU</u> case that they rely on

19     so heavily suggests -- and that is what happened here, almost

20     directly on point -- is that the nature of the question can

21     turn something into custodial interrogation, and it is not just

22     the objective understanding by the defendant that he is,

23     in fact, in custody.  The nature of the questions by the

24     interrogator can make it clear that you're not leaving, that

25     you are in trouble, and that we are going to investigate you

GA5SZARC

1    and, quite possibly, arrest you.  And then they should advise

2    you of your rights, because there is nothing to do with a

3    border search that requires them to open a cell phone.

4         I think Mr. Lockard is dead wrong, when you asked him

5    specifically and he said to you yes, he thinks it is quite

6    common.  It is not quite common, and I would like to see him

7    get someone from customs in here to tell him in how many cases

8    where there is no misrepresentation on the customs form, there

9    is no contraband found, there is no weapon, there is no illegal

10   entry, there is no warrant that's found, they go ahead and they

11   search the cell phones or asked for the passcodes of electronic

12   devices that the individuals are having.  I would suggest to

13   you, Judge, that it is a very, very unique moment in this case

14   which turns their interrogation into a custodial interrogation

15   requiring the Miranda warnings.

16        I ask, most respectfully, I know you have done this

17   already -- you know, it is interesting because I have read

18   Djibo probably five times, I haven't seen the government able

19   to really distinguish it other than try, but they haven't.

20   Judge Sterling Johnson, to his credit, held an extended hearing

21   before he ultimately suppressed and ruled that what they had

22   done was wrong.

23        I think to prevent the suggestion that a hearing is

24   not necessary when the outline of what I have painted jumps off

25   the scenario that we know to be true, because Mr. Zarrab put in

GA5SZARC

1    an affidavit -- I don't see an affidavit from an agent saying,

2    let me tell you what really happened.  He got it wrong, what

3    you normally see in a suppression argument.

4          In their briefs and the response, they stay far away

5    from the facts, Judge.  They don't duel with our chronology of

6    events.  I think that is a concession on their part that, if

7    you got these customs agents here, they would tell you they

8    were instructed on how to do this by the FBI agents in the next

9    room, they were specifically asked to break into that phone

10   because the agents knew that, if they were to do that, they

11   would have to advise him of his rights, and they put a foreign

12   national, who had not come in with contraband or weapons or

13   lied to customs and openly declared a sum of money, into a

14   position without the advice of an attorney.  They asked him a

15   question, and he ultimately incriminated himself.

16         I think you have to suppress, sir, but you certainly

17   have to order a hearing.  Thank you.

18         THE COURT:  That's been very helpful.

19         I am going to take the matter under advisement.

20         We are going to take a look at the transcript of

21   today's proceeding to help in resolving these questions.

22         MR. BRAFMAN:  Thank you very much.

23         THE COURT:  We will be in touch.

24         MR. BRAFMAN:  Thank you, sir.

25         THE COURT:  Yes.

GA5SZARC

1          (Adjourned)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25