**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

UNITED STATES OF AMERICA,

                            Government,

            -v-

REZA ZARRAB,

                            Defendant.

-------------------------------------------------------------X

**DECISION & ORDER**

15 Cr 867 (RMB)

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 10/17/16

## I.    Background

On March 19, 2016, Reza Zarrab ("Defendant" or "Zarrab"), a Turkish/Iranian

businessman, was arrested upon arriving in Florida, from Istanbul. Zarrab was enroute to

Disney World with his wife and five-year-old daughter. He had been under criminal

investigation by the United States Attorney's Office for the Southern District of New York.

On March 30, 2016, Zarrab was charged in a four-count Superseding Indictment

("Indictment") with the following crimes: conspiracy to defraud the United States and to

impede the lawful functions of the United States Department of Treasury, Office of Foreign

Assets Control ("OFAC") in violation of 18 U.S.C. § 371; conspiracy to violate the

International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, and the

Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. §§ 560.202-205;

conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344, 1349; and conspiracy to

commit money laundering in violation of 18 U.S.C. §§ 1956-1957. (See Superseding

Indictment ¶¶ 13, 15, 16, 17, 19, 20, 22, 23.)

The Government alleges that Zarrab owns and operates a multi-billion dollar network of

companies located in Turkey and the United Arab Emirates, including a group of companies

held by Royal Holding A.S., such as Royal Emerald Investments; Durak Doviz Exchange, a

"money services" business in Turkey; and Al Nafees Exchange LLC, a "money services"

business in the United Arab Emirates.[1]  (Id. at ¶ 9.)  According to the Indictment, Zarrab, his

employees, Camelia Jamshidy ("Jamshidy") and Hossein Najafzadheh ("Najafzadheh"), and

others, conspired (in addition to the three other conspiracies described above) to evade the

U.S. economic sanctions imposed against Iran by the IEEPA and ITSR.  (Id. at ¶ 12.)  The

Defendant is accused of "conducting international financial transactions using Turkish and

Emirati companies on behalf of and for the benefit of [] Iranian individuals and entities in

order to conceal from U.S. banks and others that services were being provided to Iran, the

Government of Iran, and to agents or affiliates of the Islamic Revolutionary Guard Corp."[2]

(Id.)

On July 18, 2016, Zarrab filed a motion to dismiss the Indictment in its entirety.[3]  (Def.'s

Motion to Dismiss, dated July 18, 2016 ("Mot. to Dismiss").)  Zarrab argues, among other

things, that as a foreign [non-U.S.] national, "he is free to engage in transactions with Iranian

---

[1] A "money services" business is defined as "any person doing business, whether or not on a
regular basis or as an organized business concern, in one or more of the following capacities:
(1) currency dealer or exchanger; (2) check casher; (3) issuer of traveler's checks, money
orders or stored value; (4) seller or redeemer of traveler's checks, money order or stored
value; (5) money transmitter . . ."  See "Definitions: Money Services Business," U.S. DEPT.
OF TREASURY FINCEN
(https://www.fincen.gov/financial_institutions/msb/definitions/msb.html).

[2] "In order to convict a defendant of the crime of conspiracy, the government must show that
two or more persons entered into a joint enterprise for an unlawful purpose[.]" United States
v. Torres, 604 F.3d 58, 65 (2d Cir. 2010).

[3] A principal focus of Zarrab's motion to dismiss brief is on Count II of the Indictment, i.e.,
conspiracy to violate the IEEPA and the ITSR.  (See Mot. to Dismiss at 9 ("The heart of the
government's case against Zarrab is an IEEPA conspiracy charge (Count Two) that is as
unprecedented as it is wrong.").)

businesses without running afoul of U.S. laws that criminalize U.S. sanctions against Iran . . . So long as he does not engage in such transactions in or from the U.S., he is unencumbered by restrictions placed on U.S. citizens as a function of U.S. foreign policy." (Mot. to Dismiss at 1.) Zarrab also contends that, despite what he argues are "obvious" limitations on U.S. sanctions law, "not to mention the presumptions against extraterritoriality," he, nevertheless, "stands accused of violating U.S. law for agreeing with *foreign* persons in *foreign* countries to direct *foreign* banks to send funds transfers from *foreign* companies to other *foreign* banks for *foreign* companies. This is prosecutorial overreach of the first order." (Id.) (emphasis in original.) Zarrab argues that the Government has "manufactured" "unprecedented" charges against him "out of the incidental involvement of a U.S. bank at some mid-point in the payment chain of a transaction that originated *from a foreign country and occurred between two foreign entities*." (Id. at 2-3) (emphasis in original.)

On August 8, 2016, the Government filed its opposition to Zarrab's motion to dismiss. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss, dated Aug. 8, 2016 ("Opp.").) The Government contends, among other things, that "what certainly is unprecedented is Zarrab's novel proposition that the United States is not entitled to prosecute those who willfully seek to exploit the American financial system to help a nation that, through its sponsorship of terrorism and fomenting of global unrest, presents a significant threat to this country's national security." (Opp. at 3-4.) The Government argues that "Zarrab is not charged with offenses arising out of incidental use of the United States banking system in connection with legitimate foreign business, as his motion wrongfully contends. To the contrary, Zarrab's and his co-conspirators' use of the U.S. financial system to process U.S.-dollar transactions for Iranian banks and entities, including companies and entities owned by the Government of

Iran and listed on the U.S. OFAC list of Specially Designated Nationals ('SDNs'), was knowing and intentional." (Opp. at 2.) According to the Government, Zarrab surreptitiously concealed the identity of his Iranian clients because he "was aware that U.S. banks would not knowingly and voluntarily process his U.S.-dollar financial transfers if they learned that the transactions were for the benefit of blocked Iranian entities." (Id. at 2.)

According to the Government, "[p]ut simply, without Zarrab and his network of exchange houses and front companies to secretly conduct sanctions-evading international financial transfers, Zarrab's Iranian co-conspirators would have been excluded from access to the U.S. financial system and the ability to engage in U.S. dollar transactions through U.S. correspondent banks. Zarrab's charged conduct goes to the heart of what U.S. sanctions laws are intended to prohibit." (Id.)

On August 22, 2016, Zarrab filed a reply. (Def.'s Reply, dated Aug. 22, 2016 ("Reply").)[4] Helpful oral argument was held on October 5, 2016. (See Tr. of Proceedings, dated October 5, 2016 ("Tr.").)

**For the reasons set forth below, the defense motion to dismiss the superseding Indictment is denied.[5]**

---

[4] On September 27, 2016, Defense counsel sent an unsolicited letter to the Court in further support of Defendant's motion to recuse (and this motion to dismiss), despite the fact that briefing had concluded. (See Letter to the Court, dated Sept. 27, 2016.) Such filings are improper absent prior Court approval. See Vaughn v. Air Line Pilots Ass'n, Int'l, 395 B.R. 520, 534 (E.D.N.Y. 2008), aff'd, 604 F.3d 703 (2d Cir. 2010), and aff'd sub nom. Vaughn v. Air Line Pilots Ass'n, 377 F. App'x 88 (2d Cir. 2010); see also Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 170 F.R.D. 361, 369-70 (S.D.N.Y. 1997).

[5] **The Court is not here ruling upon the ultimate merits of either parties' claims. Any issues raised by the parties not specifically addressed herein were considered by the Court on the merits and rejected.**

## II.     Legal Standard

The dismissal of an indictment is an "extraordinary remedy" reserved only for extremely limited circumstances implicating fundamental rights. United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001).

In reviewing a motion to dismiss an indictment, the Court must take the allegations of the indictment as true. United States v. Hashmi, 2009 WL 4042841, at *1 (S.D.N.Y. Nov. 18, 2009) (citing Boyce Motor Lines v. United States, 342 U.S. 337, 343 n.16 (1952)).  An indictment is sufficient if it contains the elements of the offense(s) charged and fairly informs a defendant of the charge(s) against which he must defend. United States v. Solomonyan, 451 F. Supp. 2d 626, 640 (S.D.N.Y. 2006) (citing Hamling v. United States, 418 U.S. 87, 117 (1974)). It is said that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (citing United States v. Tramunti 513 F.2d 1087, 1113 (2d Cir. 1975)).

"[T]he presumption against extraterritoriality does apply to criminal statutes, except in situations where the law at issue is aimed at protecting the right of the government to defend itself." United States v. Vilar, 729 F.3d 62, 73 (2d Cir. 2013).  The presumption against extraterritoriality does not apply where the failure to extend the scope of the statute to a foreign setting will result in adverse effects within the United States or where the conduct regulated by the government occurs within the United States. Torrico v. Int'l Bus. Machines Corp., 213 F. Supp. 2d 390, 397 (S.D.N.Y. 2002) (citing Environmental Defense Fund, Inc. v. Massey, 986 F.2d 528, 531 (D.C. Cir. 1993)).

## III.    Analysis

**(1) Count I: Conspiracy to Defraud the United States in Violation of 18 U.S.C. § 371 ("Section 371")**

Zarrab argues, among other things, that "Count One [] fails under the text of Section 371 . . . [which] reaches schemes which deprive the government of money or property or attack the integrity of the United States and its agencies," principally because "the alleged conspiracy to defraud OFAC occurred entirely abroad, with Zarrab and his co-conspirators acting overseas to arrange transactions between foreign banks on behalf of foreign entities." (Mot. to Dismiss at 34-35.) Zarrab acknowledges that "some courts have applied Section 371 to include actions that merely conceal information that obstructs an agency's attempts to enforce its regulations," but argues that "the government goes even further here, contending that nearly any violation of an agency regulation is an attempt to 'defraud' that agency." (Id. at 35.)

The Government counters that the Indictment clearly includes "the elements of this type of Section 371 offense – commonly called a 'Klein conspiracy.'" (Opp. at 42) (citing United States v. Klein, 247 F.2d 908 (2d Cir. 1957).) It "makes clear that the defendant is alleged to have deceitfully obstructed OFAC's administration of the sanctions regulations [against Iran] . . . by concealing payments involving Iran behind a network of exchanges and companies, preventing both U.S. banks and the United States government from identifying the fact that he was transmitting prohibited payments on behalf of Iran through U.S. banks." (Id. at 43.) According to the Government, "it is now well established that § 371 . . . reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." (Id. at 42.)

The Court finds that the Indictment clearly sets forth each of the elements of a <u>Klein</u> conspiracy.[6]  The Indictment states that, "from at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, Reza Zarrab, Camelia Jamshidy, and Hossein Najafzadeh . . . knowingly and willfully did combine, conspire, confederate, and agree together and with each other to defraud the United States and an agency therefore, to wit, to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of OFAC in the enforcement of economic sanctions laws and regulations administered by that agency."  (Indictment at ¶ 13.) The Government asserts that "the defendant willfully concealed information knowing that screening functions implemented by [U.S.] banks seeking to comply with OFAC regulations would block the transactions in which he was engaging, and thereby explicitly obstructed the lawful function of OFAC regulations by deceitfully processing transactions with incomplete information."  (Opp. at 43-44); see <u>Coluccio v. United States</u>, 313 F. Supp. 2d 150, 153 (E.D.N.Y. 2004) ("[T]he indictment was sufficient as a matter of law [in] that it fully informed the Petitioner of the 'deceitful/dishonest means' element of the crime . . . even without the ritualistic recitations of the words 'deceitful and dishonest.'").

The Indictment includes a series of overt acts alleged to have been taken in furtherance of the conspiracy, including, among other things, that in January 2011, Royal Emerald Investments, owned and operated by Zarrab, "caused an international wire transfer from the

---

[6] To establish a <u>Klein</u> conspiracy, the government must show "(1) that the defendant entered into an agreement (2) to obstruct a lawful function of the Government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy."  <u>United States v. Ballistrea</u>, 101 F.3d 827, 832 (2d Cir. 1996).

U.A.E. to [a] Canadian company in the amount of approximately $953,289, which was processed by a United States bank . . . [where] the wire transfer information provided to [the] U.S. Bank purported that the payment was related to fire equipment" but made no mention of the fact that the transfer was requested by and for MAPNA, an Iranian construction and power plant company.  (See Indictment at ¶ 14(b).)

The Indictment alleges a violation of § 371 against Zarrab and his co-conspirators also because, among other things, "all that is necessary is that the scheme had the object of making it more difficult for the [government agency, i.e., OFAC] to carry out its lawful functions and that the scheme depend on 'dishonest or deceitful means.'"  United States v. Shellef, 507 F.3d 82, 104 (2d Cir. 2007).  The Indictment provides detailed allegations that Zarrab and his co-conspirators willfully "us[ed] intermediary shell companies in third countries and stripp[ed] Iran-revealing information from payment instructions to U.S. banks." (See Opp. at 14; Indictment at ¶ 14.)  Defendant "explicitly obstructed the lawful function of OFAC regulations by deceitfully processing transactions with incomplete information." (See Opp. at 44; Indictment at ¶ 14); see also United States v. Bilzerian, 926 F.2d 1285, 1302 (2d Cir. 1991) (where evidence of defendants' "mere failure to comply with a regulatory requirement to provide information" was sufficient to sustain conviction).

Zarrab's argument that "Count One must also be dismissed because Section 371 does not apply to foreign conduct . . . [and] the conspiracy only touched the U.S. twice, when foreign banks directed funds transfers through U.S. banks en route to other foreign banks . . . [and therefore] the alleged conduct is overwhelmingly (if not entirely) foreign, with effects felt almost entirely abroad" is unpersuasive.  (Mot. to Dismiss at 35.)  Case law points in a different direction.  In United States v. Budovsky, the defendant, an owner and operator of an

online currency exchange incorporated in Costa Rica, was indicted for violating Section 371 by "intentionally creat[ing], structur[ing], and operat[ing] [a currency exchange] as a business venture designed to help criminals conduct illegal transactions and launder the proceeds of their crimes" and allowing clients to "hide their account numbers when transferring funds . . . [and] exchange real currency [] through third-party exchangers . . . [The latter] were often foreign unregulated and unlicensed money transmitting businesses." 2015 WL 5602853, at *1 (S.D.N.Y. Sept. 23, 2015). The defendant argued in Budosvky that the indictment should have been dismissed "due to a lack of nexus between [his] alleged conduct and the United States." Id. at *4. In rejecting the defendant's argument, District Judge Denise Cote recognized that "'Congress has the authority to enforce its laws beyond the territorial boundaries of the United States.'" Id. (quoting United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003)). Judge Cote held that "[a]ssuming that the Government is required to state the nexus of the alleged crimes to the United States in an indictment, the Indictment includes several allegations that establish a sufficient nexus with the United States . . . [including that the defendant] moved $13.5 million from a Costa Rican bank account held by [the exchange company] through a correspondent bank account in the Southern District of New York." Id. at 5.

And, in Licci v. Lebanese Canadian Bank, SAL, plaintiffs, foreign citizens who were injured or whose family members were killed in a series of Hezbollah rocket attacks in Israel, brought suit under the Alien Tort Statute against Lebanese Canadian Bank ("LCB"), "a Lebanese bank with no branches, offices, or employees in the United States," and alleged that LCB, through a third-party bank account in New York, "effectuate[d] U.S.-dollar-denominated transactions . . . [and] conduct[ed] dozens of international wire transfers on

behalf of Shadid (Martyrs) Foundation . . . an 'integral part' of Hezbollah and 'part of its financial arm.'" 2016 WL 4470977, at *2 (2d Cir. Aug. 24, 2016). Plaintiffs also alleged that "LCB was aware that the U.S. sanction regime 'is and was intended to prevent Hezbollah from conducting banking activities, including wire transfers.'" Id.[7] And, in a parallel forfeiture action against LCB, the Government alleged that "LCB engaged in activity intended to conceal and disguise the true source, nature, ownership, and control of proceeds of illegal activities in a scheme that benefitted Hezbollah." Id. at *12.[8]

The Second Circuit in Licci found that "Plaintiffs' allegations 'touch and concern' the United States with sufficient force to displace the presumption [against extraterritoriality]," and that "Plaintiffs specifically allege that LCB carried out the specific banking services which harmed the plaintiffs and their decedents *in and through the State of New York.* Plaintiffs here have alleged that LCB engaged in numerous New York-based payments and 'financing arrangements' conducted exclusively through a New York bank account . . . . [T]hese allegations [are] both specific and domestic." Id. at *11 (emphasis in original). The Second Circuit held that "the relevant conduct alleged – i.e., LCB's alleged act of carrying out wire transfer services on Hezbollah's behalf through the State of New York – satisfies a

---

[7] Compare Opp. at 2 ("Zarrab was aware that U.S. banks would not knowingly and voluntarily process his U.S.-dollar financial transfers if they learned that the transactions were for the benefit of blocked Iranian entities.").

[8] Compare Opp. at 43 (Zarrab and his co-conspirators "deceitfully obstructed OFAC's administration of the sanctions regulations [against Iran] . . . by concealing payments involving Iran behind a network of exchanges and companies, preventing both U.S. banks and the United States government from identifying the fact that he was transmitting prohibited payments on behalf of Iran through U.S. banks.").

preliminary determination that such conduct provided practical assistance to Hezbollah that substantially affected Hezbollah's perpetration of the underlying violations." Id.

### (2) Count II: Conspiracy to Violate the IEEPA and ITSR

Zarrab states that "the linchpin of this prosecution is the purported conspiracy to violate [31 C.F.R. §560.204], which expressly applies only to exports 'from the United States, or by a United States person, wherever located.' Here, there is no allegation that Zarrab, or the other alleged conspirators, are either U.S. citizens or permanent residents, nor that they were physically located within U.S. territory at the time of the alleged overt acts." (Mot. to Dismiss at 10.)

Zarrab also contends that "none of the[] executed or contemplated transactions trigger criminal liability because Zarrab did not export or conspire to export anything 'from the United States' [in violation of] 31 C.F.R. § 560.204 . . . . [T]he funds Zarrab and his alleged co-conspirators sent to third countries, purportedly for the benefit of Iran, all came 'from' accounts held outside of the U.S. by foreign persons at foreign banks." (Id. at 11.) According to Zarrab, "the mere fact that a U.S. bank cleared a payment originating and terminating at foreign banks without any involvement of Zarrab . . . does not somehow transform the payment into a 'U.S. export' by Zarrab." (Id. at 12.)

Zarrab also argues that the IEEPA and the ITSR do not apply extraterritorially to reach his actions. (Id. at 19.) According to Zarrab, "far from containing a clear indication of an extraterritorial application, both Section 204 and . . . Section 203 make abundantly clear that they do not apply to foreign conduct by foreign persons." (Id. at 20.) "The government's sweeping reading of IEEPA disregards the statute's jurisdictional limits and transforms it from a classic prohibition on U.S. nationals and territory in service of U.S. foreign policy

into a highly controversial effort to prosecute anyone in the world who engages in dollar-denominated transactions with Iran." (Id. at 9-10.)  This point was also emphasized by Defense counsel at oral argument.  "The government's sanctions theory would effectively convert a sanctions regime into a boycott that raises . . . issues under international law that Congress didn't contemplate" and "would be a radical expansion of the statute."  (Tr. at 7:3-6; 17-18.)

The Government counters that "there is no doubt that a financial transaction [as here] in which a U.S. bank sends funds overseas is a 'service' [within the meaning of § 560.204] that is exported or supplied from the United States or by a U.S. person."  (Opp. at 16.)  The Government also contends that "the Indictment is not an extraterritorial application of the IEEPA and the ITSR . . . [because] Zarrab is charged in connection with his scheme to intentionally export and supply financial services from the United States and to cause U.S. banks to export and supply financial services – in other words, with causing conduct and effects in the United States."  (Id. at 18-19.)

The Government further argues that, "even if the Indictment were considered an extraterritorial application of the IEEPA and the ITSR, there is no presumption against extraterritoriality here . . . [because] the IEEPA and the ITSR are an exercise of the government's right to defend itself . . . . [T]he IEEPA and the ITSR are part of Congress' delegation of authority to the President to deal with foreign threats."  (Id. at 19-20.)

**IEEPA & ITSR**

Enacted in 1977, the IEEPA empowers the President of the United States to employ a variety of economic sanctions and other measures in response to situations which the President has declared to be national emergencies.  See 50 U.S.C. § 1701 et seq.  On October

29, 1987, President Reagan declared that "the Government of Iran is actively supporting terrorism as an instrument of state policy" and ordered that "no goods or services of Iranian origin may be imported into the United States." See Exec. Order 12613, 52 Fed Reg. 41940 (Oct. 29, 1987). Pursuant to President Reagan's order, OFAC promulgated the ITSR, 31 C.F.R. § 560 et seq., to implement the Iranian embargo.

On May 6, 1995, President Clinton, after declaring that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," ordered new sanctions to prohibit more broadly transactions involving export to, financing of, and investment in Iran. See Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995); Exec. Order 12959, 60 Fed Reg. 24757 (May 6, 1995). 31 C.F.R. § 560.204 of the ITSR prohibits "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." 31 C.F.R. § 560.204. 31 C.F.R. § 560.203 prohibits "any transaction . . . that evades or avoids, has the purpose of evading or avoiding . . . any of the prohibitions" set forth in § 560, and prohibits "any conspiracy formed to violate any of the prohibitions" set forth in § 560. 31 C.F.R. § 560.203(a)-(b).

The Court finds that the Indictment clearly sets forth the elements of a conspiracy to violate the IEEPA and the ITSR. The Indictment notifies the Defendant that he, with others, violated the IEEPA and the ITSR, stating that "from at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, Reza Zarrab, Camelia Jamshidy, and Hossein Najafzadeh . . . knowingly and willfully did combine, conspire, confederate, and agree together and with

each other to violate, and to cause a violation of, licenses, order, regulations, and prohibitions issued under the IEEPA . . . . [I]t was a part and object of the conspiracy . . . [that] the defendants, and others known and unknown, would and did export, reexport, sell and supply, and cause to be exported, reexported, sold, and supplied, directly and indirectly, from the United States, services, to wit, international financial transactions, to Iran and to the Government of Iran . . . in violation of 50 U.S.C. §§ 1701-1707, and 31 C.F.R. § 560.204." (Indictment at ¶¶ 15-16.)

The Indictment also alleges that, "in furtherance of the conspiracy and to effect the illegal object thereof," Zarrab, Jamshidy, and Najafzadeh committed a series of "overt acts" which included "design[ing] layered transactions using intermediary shell companies in third countries and stripping Iran-revealing information from payment instructions that would be provided to U.S. banks." (See Opp. at 14) (citing Indictment at ¶¶ 12, 14(a)-(b).) For example, the Indictment alleges that Zarrab "caused an international wire transfer from the UAE to [a] Canadian company in the amount of approximately $953,289.00, which was processed by a United States bank . . . . The wire transfer information provided to the U.S. Bank purported that the payment was related to fire equipment." (See Indictment at ¶ 14(b).) The wire transfer made no mention of the fact that the transfer was performed on behalf of MAPNA, an Iranian construction and power plant company. (Id.; see also supra pp. 7-8.)

The Indictment alleges that Zarrab "knew that U.S. banks would block his transactions if the Iranian nexus were revealed, and, in fact, sometimes did block his transactions."[9] (Opp.

---

[9] For example, on or about June 1, 2011, an employee of Mellat Exchange "sent an email to Zarrab with the subject line, in Farsi, 'very urgent' and attaching (1) a portion of a SWIFT [a financial messaging service] message noting that a payment in the amount of approximately $9,225 had been blocked by a United States bank 'pursuant to sanctions imposed by the U.S.

at 14.) (citing Indictment at ¶ 14(f), (h).)  Nonetheless, "Zarrab continued to engage in similar unlawful transactions after the U.S. banks had blocked others." (Id. at 14-15) (citing Indictment at ¶ 14(j)-(m).)

Zarrab's contention that "the mere fact that a U.S. bank cleared a payment originating and terminating at foreign banks without any involvement of Zarrab . . . does not somehow transform the payment into a 'U.S. export' by Zarrab," is unpersuasive.  (Mot. to Dismiss at 12.)  The Second Circuit Court of Appeals has made clear that "the execution of money transfers on behalf of others from the United States to Iran" may constitute the exportation or supply of a prohibited "service," in violation of the IEEPA and the ITSR.  United States v. Banki, 685 F.3d 99, 106 (2d Cir. 2012), as amended (Feb. 22, 2012).  In Banki, the defendant, an Iranian-born naturalized U.S. citizen, had been convicted of conspiring to violate the ISTR under 31 C.F.R. §§ 560.203-204, by employing an Iranian "hawaladar" or broker to "facilitate the transfer of funds from Iran to the United States" and also "send[ing] approximately the same amount to Iran" from the U.S. in a series of offsetting transfers.  See 685 F.3d at 103.  In rejecting the defendant's argument that "executing money transfers to Iran on behalf of others qualified as 'services' under the ITSR only if undertaken for a fee," the Second Circuit held that "the execution of money transfers from the United States to Iran on behalf of another, whether or not performed for a fee, constitutes the **exportation of a**

---

Gov. Dept. of Treasury OFAC'; (2) a letter from [a] Hong Kong company's bank advising that a payment to [the] Hong Kong Company from Asi Kiymetli Madenler Turizm Otom [a Turkish company] in the amount of approximately $9,200.00 had been blocked by [a] U.S. bank because of OFAC; [and] (3) a portion of a second SWIFT message noting that payment of a second international transfer to [a] Hong Kong company in the amount of approximately $35,000.00 had been blocked by a United States bank as a result of OFAC sanctions." (Indictment at ¶ 14(h).)

service."[10] <u>Banki</u>, 685 F. 3d at 108 (emphasis added). The Second Circuit also recognized that "the Iranian embargo is intended to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States posed by the actions and policies of the Government of Iran . . . [and] by design[,] the embargo is deliberately overinclusive." <u>Id.</u>

Similarly, in <u>United States v. Homa International Trading Corp.</u>, where the defendant was convicted of violating the IEEPA and the ISTR by "planning and implementing the transfer of funds from the United States to bank accounts in Iran via Dubai, U.A.E.," the Second Circuit rejected the defendant's argument that "there was insufficient evidence to demonstrate that [his] money-transfer services were 'services' prohibited by the [] Embargo regulations." 387 F.3d 144, 146 (2d Cir. 2004). "In our view, the execution on behalf of others of money transfers from the United States to Iran is a 'service' under the terms of the Embargo." <u>Id.</u> The Second Circuit also held that "the Embargo's prohibition on the exportation of services applies where the benefit of such services is received in Iran, if such services were performed in the United States." <u>Id.</u>; <u>see also</u> <u>United States v. Saboonchi</u>, 2014 WL 1831149, at *4 (D. Md. May 7, 2014) (the "embargo to include all exportation and reexportation, direct and indirect, with the specific destination of Iran . . . [is a] simple, unambiguous bar . . . of all exportation to Iran.") (quoting <u>United States v. Ehsan</u>, 163 F.3d 855, 858–59 (4th Cir. 1998)).[11]

---

[10] According to the Government, Zarrab is similarly charged with "caus[ing] United States banks [to] unwittingly conduct financial transfers on behalf of and for the benefit of Iranian entities, including Iranian government-owned companies." (Opp. at 1.)

[11] The Government states: "if a foreign bank had its own store of U.S. dollars that it wished to send to [a foreign entity], then it could simply have done so, without involving the U.S. bank. There would be no need for the foreign bank to use (and thus pay for) the services of

Zarrab and his co-conspirators' conduct, as alleged in the Indictment, was also contrary

to OFAC's goal of "precluding transfers designed to dollarize transactions through the U.S.

financial system for the direct or indirect benefit of Iranian banks or other persons in Iran or

the Government of Iran." 73 Fed. Reg. 66541 (Nov. 10, 2008); see also OFAC, *The Use of*

*Exchange Houses and Trading Companies to Evade U.S. Economic Sanctions Against Iran*

(Jan. 10, 2013) ("[T]hird-country exchange houses or trading companies that are acting as

money transmitters to process funds transfers through the United States in support of

business with Iran [are] not exempt or otherwise authorized by OFAC"; "The evasive

practices identified by OFAC involve transactions omitting referencing to Iranian addresses;

omitting the names of Iranian persons or entities in the originator or beneficiary fields; and

transmitting funds from an exchange house or trading company located in a third country to

or through the United States on behalf of an individual or company located in Iran . . .

without referencing the involvement of Iran or the designated persons.").[12]

**Extraterritoriality**

The Court finds that the Indictment alleges a domestic nexus between Zarrab and his co-

conspirators' conduct and the United States, i.e. the exportation of services from the United

States.  See United States v. Banki, 685 F.3d 99, 106 (2d Cir. 2012), as amended (Feb. 22,

---

the U.S. bank.  The entire purpose behind the banking relationship that Zarrab exploited was
to get access to the dollars in the custody of the U.S. bank."  (Opp. at 37); see also
Indictment at ¶ 12 (the purpose of the conspiracy was to "assist[] Iranian individuals and
companies . . . to evade U.S. sanctions by conducting international financial transactions
using Turkish and Emirati companies on behalf of and for the benefit of [] Iranian
individuals and entities in order to conceal from U.S. banks and others that services were
being provided to Iran, the Government of Iran, and to agents or affiliates of the [Islamic
Revolutionary Guard Corp].").
[12] See Indictment at ¶ 14(b); see also discussion supra pp. 7-8, 14.

2012). Therefore, the question of whether the IEEPA and the ITSR apply extraterritorially need not be reached.  See United States v. Mostafa, 965 F. Supp. 2d 451, 469 (S.D.N.Y. 2013) ("[T]here is a sufficient domestic nexus between the allegations . . . to avoid the question of extraterritorial application altogether. Overt acts occurred in the United States.").

Assuming, *arguendo*, that the issue of extraterritoriality were to be reached, Zarrab's argument that IEEPA and ISTR do not apply extraterritorially would likely prove to be unpersuasive.  Several provisions of the IEEPA and the ITSR would (expressly) support the Court's jurisdiction and any presumption against extraterritoriality would be overcome by the United States' interest in defending itself.  The cases support this conclusion.  For example, in United States v. Vilar, which involved Section 10(b) of the Securities Exchange Act of 1934, the Second Circuit Court of Appeals held that the "presumption against extraterritoriality does apply to criminal statutes, except in situations where the law at issue is aimed at protecting the right of the government to defend itself."  729 F.3d at 73.  The Court went on to say that "statutes prohibiting crimes against the United States government may be applied extraterritorially even in the absence of clear evidence that Congress so intended."  Id. (quoting United States v. Gatlin, 216 F.3d 207, 211 at n.5 (2d Cir. 2000). Similarly, in United States v. Siddiqui, where the defendant had challenged the extraterritorial application of 18 U.S.C. § 1114, the Second Circuit reasoned that "the nature of the offense – protecting U.S. personnel from harm when acting in their official capacity – implies an intent that [the statute] apply outside of the United States."  699 F.3d 690, 700 (2d Cir. 2012), as amended (Nov. 15, 2012) (quoting United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011)).

The enactment and promulgation of the IEEPA and the ITSR reflect the United States' interest in protecting and defending itself against, among other things, Iran's sponsorship of international terrorism, Iran's frustration of the Middle East peace process, and Iran's pursuit of weapons of mass destruction, which implicate the national security, foreign policy, and the economy of the United States. See United States v. Ehsan, 163 F.3d 855, 859 (4th Cir. 1998) (citing Message to Congress on Iran, 31 *Weekly Comp. Pres. Doc.* 1584 (Sept. 25, 1995)) (and reversing district court's dismissal of an indictment charging defendant with violating the IEEPA and the ITSR by sending technology to Iran).

50 U.S.C. § 1701(a) of the IEEPA is instructive. It reads: "Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual or extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a); see also Massey, 986 F.2d at 531 (finding that "the presumption [against extraterritoriality] is generally not applied where the failure to extend the scope of the statute to a foreign setting will result in adverse effects within the United States.").

50 U.S.C. § 1702(a)(1)(B) grants the President broad powers, including the power to "investigate, block during the pendency of an investigation, regulate, direct and compel . . . any property in which any foreign country or a national thereof has any interest . . . subject to the jurisdiction of the United States." 50 U.S.C. § 1705(c) establishes criminal penalties for "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act" described in the statute. 50 U.S.C. § 1705(c) is **not** limited to individuals (such as U.S. citizens) who are subject to the

jurisdiction of the United States, indicating that Congress intended the statute to be applied extraterritorially.[13]

31 C.F.R. § 560.204 of the ITSR, relatedly, prohibits the "exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." The prohibition set out in Section 204 is not directed against (only) "a United States person," but also includes certain conduct emanating "from the United States."[14]

Zarrab's reliance upon United States v. Yakou and United States v. Chalmers for the proposition that the IEEPA and the ITSR may not be applied extraterritorially is misplaced.

---

[13] According to the Government, Section 1702 "gives the authority to the President to investigate, regulate, or prohibit, broadly speaking, two different types or categories of transactions. The first category of transactions are those that involve persons subject to the jurisdiction of the United States, and that is the provision where the Defense has focused almost all of their attention, but it also gives the President the authority to investigate, regulate, or prohibit transactions that involve **property** that are in the jurisdiction of the United States. And the fact that there is that second category is significant for this extraterritoriality problem because the first category already deals with U.S. persons . . . . So the property provision doesn't do anything if it [is] also limited to U.S. persons, but it is not. It also applies to foreign nationals or persons acting outside of the United States, if they are engaging in a transaction that involves property that is subject to the jurisdiction of the United States. . . . [I]n Section 1702, the statutory scheme is contemplating both U.S. persons **and non-U.S. persons when there is U.S. property involved**." (See Tr. at 34:2-25 emphasis added.)

[14] The Government contends persuasively that the two categories of transactions that Section 1702 prohibits "carr[y] forward into the regulations in the particular regime that is [at] issue here, which is the Iranian Transactions and Sanctions Regulations [ITSR] . . . Section 204 of those regulations . . . [also] talks about two different types of transactions that are prohibited. The export, sale, or supply of goods, technology, or services by a U.S. person, or the export, sale, or supply of technology, goods, or services, from the United States . . . The statutory language answers the extraterritoriality question that has been brought to the Court's attention by the Defense argument. And what the IEEPA says is, yes, foreign nationals who cause a violation, violate, who attempt to violate, or who conspire to violate the IEEPA, can be criminally charged and can be prosecuted for those offenses." (Id. at 35:20-36:10.)

(<u>See</u> Reply at 5; <u>see also</u> Tr. at 10:7-17.)  These cases are readily distinguishable from the

<u>Zarrab</u> case.  In <u>Yakou</u>, the United States Court of Appeals for the District of Columbia

emphasized that "it was undisputed that the conduct identified in the indictment took place

outside the United States" **and** that "the United States does not argue that Yakou is

'otherwise subject to the jurisdiction of the United States.'"  428 F.3d 241, 245 (D.C. Cir.

2005).  As noted <u>supra</u> pp. 13-14, the Government in the <u>Zarrab</u> case very clearly charges

that Zarrab "conspired to export and supply U.S. dollar-transfer services from the United

States directly and indirectly to Iran."  (<u>See</u> Opp. at 12; <u>see also</u> Tr. at 39:2-4 ([Government]:

"It has been clear for a long time that foreign nationals are not permitted to use the U.S.

financial system to conduct transactions that are for the benefit of Iran or for the government

of Iran.").)

    In addition, the defendant in <u>Yakou</u> was charged under International Traffic in Arms

Regulations, 22 C.F.R. § 129 <u>et. seq.</u>, which "applies only to 'U.S. persons, wherever

located, and any foreign person located in the United States or otherwise subject to the

jurisdiction of the United States.'"  <u>See Yakou</u>, 428 F.3d at 253.  Zarrab, by contrast, is

charged under the ITSR, which prohibits, among other things, "the exportation, re-

exportation, sale, or supply directly or indirectly, from the United States, or by a United

States person, wherever located, of any goods, technology, or services to Iran or the

Government of Iran."  <u>See</u> 31 C.F.R. § 560.204; <u>see also</u> <u>supra</u> pp. 13-14.  Zarrab is also

charged under the IEEPA which encompasses "transactions involving[] any property in

which any foreign country or a national thereof has any interest by any person, or with

respect to any property, subject to the jurisdiction of the United States."  <u>See</u> 50 U.S.C. §

1702(a)(1)(B); <u>see also</u> discussion of Government's argument on Oct. 5, 2016, <u>supra</u> p. 20

n.13 ("[T]he property provision [of 50 U.S.C. § 1702] doesn't do anything if it [is] also limited to U.S. persons . . . It also applies to foreign nationals or persons acting outside of the United States, if they are engaging in a transaction that involves property that is subject to the jurisdiction of the United States.") (emphasis added.)

The Chalmers court relied upon Yakou in dismissing criminal charges brought against a Bahamian corporation which had "paid secret and illegal surcharges to the Government of Iraq in exchange for the right to receive allocations of Iraqi oil under the United Nations Office of the Iraq Programme, Oil-for-Food." 474 F. Supp. 2d 555, 558 (S.D.N.Y. 2007). The defendant in Chalmers was charged under 18 U.S.C. § 2332d, which applies (only) to "United States persons," defined as "any United States citizen or national, permanent resident alien, juridical person organized under the laws of the United States, or any person in the United States." Id. at 565. But, as noted above, Zarrab is charged under the ITSR which prohibits conduct not only of a United States person, but also prohibits conduct emanating "from the United States." And, Zarrab is charged under the IEEPA which reaches "transactions involving[] any property [] subject to the jurisdiction of the United States." See 31 C.F.R. § 560.204; 50 U.S.C. § 1702(a)(1)(B). The Government in Zarrab underscores that "Zarrab and his co-conspirators conspired to cause the export or supply of [] financial services *from the United States*, and thus are properly charged under Section 1705(b) with a conspiracy to violate or cause a violation of Section 204." (See Opp. at 17 (emphasis added); see also Indictment at ¶¶ 15-16.)

In sum, while Zarrab may not be a "U.S. person" and would not fall within the ambit of 18 U.S.C. § 2332 (or, as in Yakou, within the ambit of 22 C.F.R. § 129), he may nonetheless

be charged under the IEEPA and the ITSR which encompass conduct emanating "from the United States," and/or involves "property [] subject to the jurisdiction of the United States."

### (3) Count III: Conspiracy to Commit Bank Fraud in Violation of 18 U.S.C. § 1344

Zarrab contends that Count III must be dismissed because "there is no allegation that [he] conspired to make a material misrepresentation to a U.S. bank, harm a U.S. bank, or obtain money or property from a U.S. bank." (Mot. to Dismiss at 25.)  Zarrab argues that "the government is attempting to convert allegations that Zarrab participated in a scheme to structure transactions for the purpose of evading sanctions, by wiring funds to or from non-restricted entities, into a separate conspiracy to mislead financial institutions that happened to have a role in effecting those transactions." (Id. at 27.)

The Government responds that the Indictment makes clear that Zarrab and his co-conspirators made multiple false statements in connection with a scheme to defraud U.S. banks.  (Opp. at 27.)  They did this, according to the Government, over a period of five years by, among other things, "layering [] transactions through multiple front companies and stripping information from wire instructions that revealed connections to sanctioned entities," including Iran.  (Id.)  The Government argues that "the transactions in which Zarrab and his co-conspirators engaged are themselves misrepresentations . . . . [T]hese transactions are designed to deceive the bank that their true participants are sanctioned entities and that, as a result, these transactions are illegal." (Id.)  The Government also contends that the conspiracy, among other things, "exposed U.S. banks to loss . . . [by, among other things,] robb[ing] the U.S. banks of critical information with respect to these funds transfer instructions, and thus . . . deny[ing] the victim banks the right to control their assets by depriving them of information to make necessary discretionary economic

decisions." (Id. at 31.)  The Government further argues that "the potential consequences for the bank from executing barred transactions is tremendous," including potential civil liability and "massive fines and forfeiture." [15]  (Id. at 32.)

18 U.S.C. § 1344 prohibits "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice – (1) to defraud a financial institution; or (2) to obtain any of the money, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344.  "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."  United States v. Martin, 803 F.3d 581, 588 (11th Cir. 2015).  A conviction under

---

[15] During oral argument, the Government also said the following regarding the bank fraud charge:

> We expect to be able to show several different kinds of risk of loss.  One type of risk of loss which is shown directly in the overt acts alleged in the Indictment is the risk that there will be a transaction that gets blocked, as one bank or another in the chain of these payments realizes the Iranian nexus, and in accordance with OFAC regulations, blocks the payment[.]  [O]ne of the banks in the chain is going to be out the money because they will already have paid it out and they won't get paid back. That is a real concrete risk of an actual financial loss to one of those banks.

> There is the risk of civil liability from the Office of Foreign Assets Control.  It is no secret that almost every major bank in the United States in the past several years has had some encounter or another with OFAC, or with other regulators relating to their compliance procedures, and whether they have been appropriately followed and . . . [A] scheme that passes huge sums of Iranian money through a U.S. bank substantially increases the risk of that potential liability and certainly the cost of responding to any inquiries relating to it.

(Tr. at 44:7-45:1.)

the "scheme to defraud" clause of the bank fraud statute requires that the defendant engage in or attempt to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss. Stavroulakis, 952 F.2d at 694.

The Court finds that the Indictment clearly states the elements of a conspiracy to commit bank fraud in violation of 18 U.S.C. § 1344.  The Indictment alleges that, "from at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere . . . it was a part and an object of the conspiracy that Mr. Zarrab [and others] . . . would and did knowingly execute and attempt to execute a scheme or artifice to defraud a [U.S.] financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a [U.S.] financial institution, by means of false and fraudulent pretenses, representations, and promises."  (Indictment at ¶¶ 19-20.)  The Indictment includes details which are sufficient to provide notice to the Defendant of violating the bank fraud statute by tracking the relevant statutory language.  See United States v. Badoolah, 2014 WL 4793787, at *13 (E.D.N.Y. Sept. 25, 2014) (denying defendant's motion to dismiss an indictment for bank fraud which alleged that defendant "prepared and oversaw the preparation of mortgage loan applications that contained numerous material misrepresentations to make [] buyers appear creditworthy").[16]

---

[16] An indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.  See Stavroulakis, 952 F.2d at 693; see also United States v. Harris, 805 F. Supp. 166, 169-71 (S.D.N.Y. 1992) (where defendant "concealed the true financial condition of [their company] from the lending banks.").

**Material Misrepresentation(s) and Concealment**

Zarrab's argument that the Indictment fails to allege material misrepresentations to a U.S. bank is refuted by the Indictment.  (Mot. to Dismiss at 26.)  That is, the Indictment alleges that Zarrab and his co-conspirators, through the use of "layered transactions using intermediary shell companies in third countries and stripping Iran-revealing information from payment instructions that would be provided to U.S. banks," made material misrepresentations (plus concealment and omissions) which deceived the U.S. banks into processing transfers on behalf of sanctioned entities.  (See Opp. at 14.)  The Indictment, as also noted supra pp. 7-8, 14, charges, for example, that in January 2011, Royal Emerald Investments, owned and operated by Zarrab, "caused an international wire transfer from the U.A.E. to [a] Canadian company in the amount of approximately $953,289, which was processed by a United States bank . . . [and] the wire transfer information provided to the U.S. Bank purported that the payment was related to fire equipment."  (See Indictment at ¶ 14(b).)  The wire transfer information failed to disclose to the U.S. bank – i.e., stripped out information – that the transfer was requested by and for MAPNA, an Iranian construction and power plant company.  (Id.)  According to the Government, "these financial institutions would not have processed these transactions had they known of the true beneficiaries."  (Opp. at 27.)

Defendant argues that "[t]here is no allegation in the Indictment that Zarrab conspired to make any representation of any kind to a U.S. bank [and] there can be no 'material misrepresentation' to a U.S. bank in the absence of *any* representation to a U.S. bank."  (Mem. at 26) (emphasis in original.)  During oral argument, Defense counsel contended that "there would be no misrepresentation at all . . . . There isn't any duty . . . that would turn an

omission into a misrepresentation or a fraudulent scheme." (See Tr. at 16:21-22; 18:6-9.)

These arguments are unpersuasive under the case law. In United States v. Autuori, the Court recognized that "[u]nder the [bank] fraud statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." 212 F.3d 105, 118 (2d Cir. 2000) (quoting United States v. Townley, 665 F.2d 579, 585 (5th Cir. 1982)). And, in United States v. Colton, the defendant was convicted of bank fraud in violation of § 1344 when, after defaulting on a personal bank loan, the defendant approached the bank posing as an independent third-party trust, and purchased the loan at a substantial discount – but without disclosing to the bank his ownership and control of the trust. 231 F.3d 890 (4th Cir. 2000). Had the bank known of the defendant's ownership of the trust, "the bank 'would not [have sold] the loan at a discount' but rather would [have sought] full payment." Colton, 231 F.3d at 895. The defendant appealed his conviction of bank fraud, arguing, as Zarrab does, that "[because] the government offered no evidence that he made any affirmative misrepresentations or breached any fiduciary, statutory, or other independent legal duty to disclose information, he cannot be held to have violated the federal bank fraud statute." Colton, 231 F.3d at 894.

In affirming the defendant's conviction, the Fourth Circuit Court of Appeals found the defendant's argument to be "a cramped construction of the bank fraud statute." Id. The Court held that "the language of the bank fraud statute [should] be broadly construed so as to reach anyone engaged in a scheme or artifice to defraud, including a scheme to actively conceal material information through deceptive conduct, with the intent to mislead and suppress the truth, even in the absence of an independent legal duty to disclose such

information." Id. at 903; see also United States v. Keplinger, 776 F.2d 678, 697-98 (7th Cir. 1985) ("It requires no extended discussion of authority to demonstrate that omissions or concealment of material information . . . can constitute fraud cognizable under the [bank] fraud statute."); Autuori, 212 F.3d at 119.

The kind of conduct alleged in the Indictment has been found to constitute material misrepresentation by other courts as well.  In United States v. Dupree, the defendant was convicted of a conspiracy to commit bank fraud after obtaining loans from a bank by providing false income statements and by forming shell corporations in order to conceal financial information.  2012 WL 5333946, at *1 (E.D.N.Y. Oct. 26, 2012), aff'd, 620 F. App'x 49 (2d Cir. 2015).  In finding that the defendant "engaged in a course of conduct designed to deceive [the bank] into making or maintaining loans by means of materially false representations," District Judge Kiyo Matsumoto recognized that "a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." Id. at *22 (quoting Neder v. United States, 527 U.S. 1, 16 (1999)).  Similarly, in United States v. Harris, the defendant moved to dismiss a charge of conspiracy to commit bank fraud, under 18 U.S.C. § 1344, after obtaining loans from a bank, by "concealing the true financial condition" of defendant's company and "concealing from the banks [] trading practices prohibited by the loan agreement."  805 F. Supp. at 169.  In denying defendant's motion to dismiss the indictment and finding that "the bank fraud counts are facially sufficient," District Judge Charles Haight recognized there were material misrepresentations where "throughout the entire time embraced by the loan agreement and its extensions, defendant is alleged to have fraudulently

overstated the [company's] assets and understated its liabilities, concealing [] practices prohibited by the loan agreement, and falsified numerous documents." Id. at 172.

Because Zarrab and his co-conspirators are alleged in the Indictment to have provided false and misleading statements through the use of multiple layered entities and by stripping material information from wire transfer instructions which influenced the decision-making of the U.S. banks, at the motion to dismiss stage he made material misrepresentations under both "prongs" of 18 U.S.C. § 1344. [17] See Neder, 527 U.S. at 1; see also United States v. Rigas, 490 F.3d 208, 234 (2d Cir. 2007) ("[M]ost bank fraud is committed when a defendant makes a misrepresentation to a bank in an effort to persuade the bank to make a discretionary decision in a way that benefits him.").

**Loss**

The defense also argues that the Indictment fails to allege that Zarrab conspired to expose the bank to loss. (Mot. to Dismiss at 30.) Defense counsel claims that "there is simply no indication . . . that a bank would face a real threat of loss on account of processing a transaction that, unbeknownst to the bank, was meant to evade OFAC sanctions." (Id. at 28.) The Government counters that by concealing the true beneficiaries of these transactions from the U.S. banks, Zarrab and his co-conspirators, among other things, robbed the U.S. banks of the ability to "properly assess the risk from engaging in these transactions" and exposed the banks to actual or potential loss. (See Opp. at 32; see also Tr. at 44:7-8; 17-25.)

---

[17] See also Tr. at 43:3-5 ([Government]: "We expect there will be evidence of the use of false documents to create the appearance of non-Iranian economic activity supporting these transactions, again, all for the purpose of deceiving the banks.").

The Court finds that the Indictment adequately alleges that Zarrab and his co-conspirators intended to and did victimize the U.S. banks and exposed them to actual or potential losses. See United States v. Ragosta, 970 F.2d 1085, 1089 (2d Cir. 1992). As noted, Zarrab and his co-conspirators are alleged to have deliberately deceived U.S. banks by, among other things, stripping or concealing material information and otherwise providing misleading wire transfer information intended to hide the fact that the transactions were performed on behalf of sanctioned entities. (See also Indictment at ¶¶ 14(a)-(b).) "[T]hese financial institutions would not have processed these transactions had they known of the true beneficiaries." (Opp. at 27.)

In United States v. Schwartz, defendants were convicted of defrauding Litton, a producer of night vision devices, by conspiring to purchase and ship "$7 million worth of night vision devices . . . for the Argentine military forces to use against the British in the then ongoing Falkland Islands War," and failing to disclose that the equipment was destined for Argentina and that their customer was an Argentine businessman. 924 F.2d 410, 414 (2d Cir. 1991). "Rather, they told Litton that their customer was Texas Armaments Advisors – an inactive corporate shell controlled by [defendants]." Id. In affirming defendants' convictions, the Second Circuit held that in order to "adequately convey[] the intent element of the fraud statutes . . . the government must prove defendants contemplated a harm, which need not be pecuniary in nature, but which would be proven if the jury found that defendants intended by their misrepresentations to obtain equipment that Litton would not have sold to them but for the fraudulent representations." Id. at 420-21; see also United States v. Laljie, 184 F.3d 180, 189 (2d Cir. 1999) ("Presentation to a financial institution of a fraudulent document that

exposes the institution itself to a potential loss if the document be honored and funds be released, such as a forged or altered document, is within the scope of § 1344.").

At oral argument, Defense counsel contended that "what makes this [case] different from every other case of bank fraud of which I am aware is that, if this scheme were to succeed here, the U.S. bank would be better off. They process the wire transfer [and] have gotten some compensation for that. If the scheme works, the bank is better off. Every other bank fraud case I have ever seen, if the scheme works, the bank is worse off." (Tr. at 20:1-6.) But where, as here, it is alleged that a defendant "intentionally withholds or falsifies material information . . . the defendant will have already exposed the [bank] to 'immediate harm by denying [the bank] the right to control [its] assets by depriving [the bank] of the information necessary to make discretionary economic decisions.'" See United States v. Watts, 934 F. Supp. 2d 451, 471 (E.D.N.Y. 2013) (quoting United States v. Levis, 488 Fed. Appx. 481, 486 (2d Cir. 2012)); see also United States v. Chandler, 98 F.3d 711, 716 (2d Cir. 1996) (where "[t]he [defendant's] pseudonym prevented the bank from acquiring full information, exposing it to [] risk."); see also supra p. 30.

The Government also argues that "the potential consequences for the bank from executing barred transactions is tremendous," including "massive fines and forfeiture." (Opp. at 32.) By way of example, on December 11, 2012, the United States Department of Justice announced that HSBC Bank had agreed to forfeit $1.256 billion and to enter into a deferred prosecution agreement because it had violated the IEEPA. See Press Release 12-1478, "HSBC Holdings Plc. and HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit $1.256 Billion in Deferred Prosecution Agreement," U.S. Dept. of Justice (Dec. 11, 2012). "[B]anks are the first layer of defense against money

launderers and other criminal enterprises who choose to utilize our nation's financial system to further their criminal activity . . . In particular, banks have a special responsibility to use appropriate due diligence in monitoring the cash transactions flowing through their financial system and identifying the sources of that money in order not to assist in criminal activity. By allowing such illicit transactions to occur, HSBC failed in its global responsibility to us all." Id.

### (4) Count IV: Conspiracy to Commit Money Laundering in Violation of § 18 U.S.C. § 1956(a)(2)(A)

Zarrab argues that "the Indictment's duplicative money laundering charge merges with the IEEPA charge and should thus be dismissed." (Mot. to Dismiss at 33.) He contends that "the government simultaneously charges Zarrab with (1) conspiracy to violate [IEEPA] sanctions for arranging international financial transactions, and (2) conspiracy to launder money for arranging *the exact same transactions*." (Id. at 34) (emphasis in original.) According to Zarrab, "it is well settled that the specified unlawful activity must be distinct from the money laundering allegation itself." (Id. at 33.)

The Government counters that "Zarrab's challenge that the money laundering conspiracy . . . merges with the IEEPA and bank fraud conspiracies fails as a matter of law [because] Zarrab relies on case law concerning a different provision of the money laundering statute than is at issue here." (Opp. at 39.) The Government contends that "it is well settled that there is no so-called 'merger' concern with respect to 18 U.S.C. § 1956(a)(2)(A), which is the provision that Zarrab is charged with conspiring to violate." (Id.) According to the Government, Zarrab "rel[ies] exclusively on inapposite case law addressing [a] different statutory provision[], i.e., Section 1956(a)(1)." (Id. at 41.)

To find a violation of 18 U.S.C. § 1956(a)(2)(A), a defendant must have: (1) transmitted or transferred a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, (2) with the intent to promote the carrying on of specified unlawful activity. 18 U.S.C. § 1956(a)(2)(A); see also United States v. Piervinanzi, 23 F.3d 670, 680 (2d Cir. 1994).

The Court finds that the Indictment clearly alleges the elements of a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(2)(A). The Indictment alleges that "from at least in or about 2010, up to at least in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere . . . it was part and an object of the conspiracy [to commit money laundering] that Mr. Zarrab [and others] . . . would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to places in the United States from and through places outside the United States, in amounts exceeding $10,000, with the intent to promote the carrying on of specified unlawful activity, to wit, the illegal export of services to Iran as charged in Count Two . . . and bank fraud as charged in Count Three." (Indictment at ¶¶ 22-23.)

The Indictment describes one overt act of this conspiracy as follows: "On or about January 16, 2013, Zarrab sent an email to a co-conspirator . . . attaching a SWIFT message for a payment in the amount of approximately $1,000,000 from Gunes General Trading LLC, a company located in the U.A.E.," to an energy company located in Turkmenistan. (Id. at 14(k).) According to the Indictment, "on or about January 16, 2013, Gunes General Trading LLC . . . caused an international wire transfer from the U.A.E. to [the] Turkmeni company in the amount of approximately $999,907, which was processed by a United States bank." (Id.

at 14(l).)  The Indictment also alleges that "[i]n or about November 11, 2013, a co-conspirator [of Zarrab] . . . sent an email to Zarrab attaching . . . a letter from [the] Turkmeni company, dated May 30, 2013, addressed to the Deputy Minister of Iran's Oil Ministry, instructing that payment to [the] Turkmeni company be made in U.S. currency."  (Id. at 14(m).)

The Indictment sets forth the elements of § 1956(a)(2)(A) and "identifies the amounts transferred, dates of transfer, and institutions to and from which the money was transferred." 1996 WL 665621, at *3 (S.D.N.Y. Nov. 18, 1996).  In United States v. Bodmer, a case similar in this respect to the Zarrab case, the district court denied the defendant's motion to dismiss the charge of conspiracy to commit money laundering in violation of § 1956(a)(2)(A), where the indictment alleged that the defendant "would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument from a place in the United States to and through a place outside the United States, *with the intent* to promote the carrying on of specified unlawful activity."  342 F. Supp. 2d 176, 192 (S.D.N.Y. 2004) (emphasis in original.)  "Clearly, the Government has adequately alleged . . . that [defendant] had specific intent to violate the money laundering statute."  Id.  The Court in Bodmer also held that the indictment's "allegations sufficiently provide [defendant] with a plain, concise and definite written statement of the essential facts constituting the offense charged."  Id.

Zarrab's argument that the conspiracy to commit money laundering charge "merges" with the IEEPA and bank fraud conspiracies is unpersuasive.  Section 1956(a)(2)(A) "clearly penalizes the transportation of monetary instruments in promotion of unlawful activity, not the underlying unlawful activity; in passing the money laundering statute, Congress

determined that the transportation of monetary instruments in promotion of unlawful activity itself constitutes a crime." Id. at 191.

And, in United States v. Piervinanzai, the defendants raised an argument nearly identical to the merger argument which Zarrab raises here, namely that "the overseas transmission of funds [i.e., money laundering] 'merges' with the underlying bank fraud, precluding independent liability under § 1956(a)(2)." 23 F.3d at 679. The Second Circuit rejected the defendants' argument, holding that "the statute does not 'merge' the underlying criminal activity and promotion through laundering into one." Id. Similarly, in United States v. Nazemzadeh, the defendant argued that "Count 3 of the Indictment, international money laundering [in violation of] 18 U.S.C. § 1956(a)(2)(A) should be dismissed . . . [because it] was not separate and apart from the [IEEPA] offenses alleged . . . and therefore the money laundering charge impermissibly imposes additional liability for the same offense, violating the merger doctrine." 2014 WL 310460, at *11 (S.D. Cal. Jan. 28, 2014). The court rejected the defendant's argument, finding that "the money laundering statute with which Defendant is charged requires only that money be transmitted or transferred to the United States from a place outside the United States with the intention of promoting the carrying on of specified unlawful activity." Id. at *12 (citing Piervinanzi, 23 F.3d at 680). "[T]he specified unlawful activity need not be separate and distinct from the [underlying] transaction." Id.

## IV.    Conclusion & Order

For the foregoing reasons, the Court respectfully denies Defendant's motion to dismiss

the Indictment [#66].


Dated: New York, New York
          October 17, 2016

_RMB_

RICHARD M. BERMAN, U.S.D.J.