UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

REZA ZARRAB, *et al.*,

Defendant.

S1 15 Cr. 867 (RMB)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT REZA ZARRAB'S
MOTION TO SUPPRESS EMAILS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

BACKGROUND ................................................................................................................ 3

      A.      Erdogan, Gulen, and the Discredited 2013 Corruption Investigation of
              Zarrab .......................................................................................................... 3

      B.      The U.S. Government Reuses the Discredited "Report" to Launch Its
              Own Investigation of Zarrab ...................................................................... 7

ARGUMENT .................................................................................................................. 10

I.      The Government Knowingly Or Recklessly Omitted Critical Information
      Necessary To Determine Whether Probable Cause Existed To Search Zarrab's
      Emails. ................................................................................................................ 10

      A.      The FBI Recklessly Omitted Information About the Discredited Nature
              of the Purported Police Report.............................................................. 13

      B.      Had The FBI Not Recklessly Omitted Information About the
              Discredited "Report," There Would Have Been No Probable Cause to
              Search Zarrab's Hotmail Account. ........................................................ 16

II.     The Contents Of Zarrab's Hotmail Account Should Be Suppressed Under
      Federal Rule of Criminal Procedure 41. .......................................................... 18

CONCLUSION................................................................................................................ 23

# TABLE OF AUTHORITIES

**Cases**

*DeLoach v. Bevers,*
    922 F.2d 618 (10th Cir. 1990) ................................................................. 12

*Donovan v. Fed. Clearing Die Casting Co.,*
    655 F.2d 793 (7th Cir. 1981) ................................................................. 17

*Florida v. Jardines,*
    133 S. Ct. 1409 (2013) ................................................................. 10

*Franks v. Delaware,*
    438 U.S. 154 (1978) ................................................................. 11

*Illinois v. Gates,*
    462 U.S. 213 (1983) ................................................................. 11

*In re Terrorist Bombings of U.S. Embassies in E. Africa,*
    552 F.3d 157 (2d Cir. 2008) ................................................................. 13, 21

*Matter of Warrant to Search a Certain E-Mail Account Controlled*
    *& Maintained by Microsoft Corp.,*
    829 F.3d 197 (2d Cir. 2016) ................................................................. 7, 19, 21

*Murray v. United States,*
    487 U.S. 533 (1988) ................................................................. 12, 20

*Nardone v. United States,*
    308 U.S. 338 (1939) ................................................................. 12

*Rivera v. United States,*
    928 F.2d 592 (2d Cir. 1991) ................................................................. 11, 14

*United States v. Awadallah,*
    349 F.3d 42 (2d Cir. 2003) ................................................................. 12

*United States v. Burke,*
    517 F.2d 377 (2d Cir. 1975) ................................................................. 2, 19, 21

*United States v. Canfield,*
    212 F.3d 713 (2d Cir. 2000) ................................................................. 11

*United States v. Croghan,*
    No. 1:15-CR-48, 2016 WL 4992105 (S.D. Iowa Sept. 19, 2016) ................................................................. 21

*United States v. DeLeon,*
    979 F.2d 761 (9th Cir. 1992) ................................................................. 16

*United States v. DiTomasso,*
   56 F. Supp. 3d 584 (S.D.N.Y. 2014) ................................................ 10

*United States v. Falso,*
   544 F.3d 110 (2d Cir. 2008) ............................................................11

*United States v. Forrester,*
   512 F.3d 500 (9th Cir. 2008) .......................................................... 10

*United States v. Glover,*
   755 F.3d 811 (7th Cir. 2014) ..................................................... 16, 23

*United States v. Hall,*
   113 F.3d 157 (9th Cir. 1997) .......................................................... 16

*United States v. Jacobs,*
   986 F.2d 1231 (8th Cir. 1993) ........................................................ 12

*United States v. Levin,*
   No. CR 15-10271-WGY, 2016 WL 2596010
   (D. Mass. May 5, 2016) ...................................................... 20, 21, 23

*United States v. McMurtrey,*
   704 F.3d 502 (7th Cir. 2013) .......................................................... 14

*United States v. Perea,*
   986 F.2d 633 (2d Cir. 1993) ........................................................... 10

*United States v. Perez,*
   247 F. Supp. 2d 459 (S.D.N.Y. 2003) ..........................................11, 12

*United States v. Rajaratnam,*
   719 F.3d 139 (2d Cir. 2013) ............................................ 12, 14, 15, 16

*United States v. Reilly,*
   76 F.3d 1271 (2d Cir. 1996) ...................................................... 12, 22

*United States v. Simmons,*
   771 F. Supp. 2d 908 (N.D. Ill. 2011).............................................13, 16

*United States v. Turner,*
   558 F.2d 46 (2d Cir. 1977) ........................................................ 19, 20

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990).................................................................... 13

*United States v. Warshak,*
   631 F.3d 266 (6th Cir. 2010) .......................................................... 10

*Warshak v. United States*,
490 F.3d 455 (6th Cir. 2007) ...................................................... 10

*Wilson v. Russo*,
212 F.3d 781 (3d Cir. 2000) ......................................................11

**Constitutional Provision**

U.S. Const. amend. IV ..................................................................10, 11

**Rule**

Fed. R. Crim. P. 41 .............................................................. 2, 9, 18, 19

**Statute**

Stored Communications Act, 18 U.S.C. §2703 ................................. 9, 18, 19

**Other Authorities**

Ahmet Sait Akçay, *Turkey Indicts 3 Ex-Prosecutors Linked to 2013 Probe*,
Anadolu Agency, Aug. 11, 2016, http://aa.com.tr/en/turkey/turkey-indicts-3-
ex-prosecutors-linked-to-2013-probe/626989# ........................................ 6

Tim Arango, *Turkish Leader Disowns Trials That Helped Him Tame Military*,
N.Y. Times, Feb. 24, 2014,
http://www.nytimes.com/2014/02/27/world/europe/turkish-leader-disowns-
trials-that-helped-him-tame-military.html ........................................ 5, 15

Tim Arango & Sebnem Arsu, *Graft Inquiry Intensifies Turkish Political Rivalry*,
New York Times, Dec. 17, 2013,
http://www.nytimes.com/2013/12/18/world/europe/graft-inquiry-intensifies-
turkish-political-rivalry.html?_r=0................................................ 3, 4, 14

BBC News, *Turkey Frees Cabinet Ministers' Sons*, February 28, 2014,
http://www.bbc.com/news/world-europe-26387522................................ 5

Dan Bilefsky and Sebnem Arsu, *Turkey Feels Sway of Reclusive Cleric in the
U.S.*, New York Times, Apr. 24, 2012,
http://www.nytimes.com/2012/04/25/world/middleeast/turkey-feels-sway-of-
fethullah-gulen-a-reclusive-cleric.html................................................ 3

Daren Butler and Robin Pomeroy, *Turkey Drops Corruption Case That Dogged
Government*, Reuters News, Oct. 17, 2014.............................................. 6

Daren Butler and Nick Tattersall, *Turkish Judicial Purge Brings Corruption Investigation to a Halt, Reuters*, Jan. 22, 2014, http://www.reuters.com/article/us-turkey-corruption-idUSBREA0L1G220140122 ....................................................... 4

Daniel Dombey, *Turkish Prosecutor Drops High-Level Corruption Probe*, Financial Times, Oct. 18, 2014, http://www.ft.com/cms/s/0/63cf5042-56cb-11e4-a0b2-00144feab7de.html?siteedition=intl#axzz4IenMG1Ly .......................................... 6

DOJ Office of Legal Education, Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations 84, https://www.justice.gov/sites/default/files/criminal-ccips/legacy/2015/01/14/ssmanual2009.pdf ......................................................... 22

The Economist, *A Challenge to Erdogan's Rule*, Dec. 17, 2013, http://www.economist.com/blogs/charlemagne/2013/12/turkish-politics ........................... 3, 4

*Gülen, Suspected Associates on Trial for Coup Plot Charges*, Daily Sabah, Jan. 6, 2016, http://www.dailysabah.com/investigations/2016/01/06/gulen-suspected-associates-on-trial-for-coup-plot-charges ................................................................. 6

Humeyra Pamuk and Nick Tattersall, *Leaked Documents Purport to Reveal Turkish Graft Allegations*, Reuters, Mar. 14, 2014, http://www.reuters.com/article/us-turkey-corruption-idUSBREA2D1F420140314........................................................................ 5

Timothy Phelps, *From His Pa. Compound, Fethullah Gülen Shakes Up Turkey*, Los Angeles Times, Jan. 20, 2014, http://www.latimes.com/world/la-fg-turkey-Gulen-20140120-story.html .............................................................. 4, 14, 15

Emre Peker, *Erdogan Scores Big Win in Overcoming Graft Scandal*, Wall Street Journal, Jan. 20, 2015, http://www.wsj.com/articles/erdogan-set-for-big-win-in-overcoming-graft-scandal-1421788481 ............................................................... 6

Mehul Srivastava, *Turkey Crisis Put Jailed Millionaire at Heart of Gold Trail*, Bloomberg, Jan. 29, 2014, http://www.bloomberg.com/news/articles/2014-01-29/turkey-scandal-places-jailed-millionaire-at-center-of-gold-trail .................................. 4

Giris Tarihi, *Here Is the Brief of Treason*, Sabah, Jan. 16, 2015, http://www.sabah.com.tr/gundem/2015/01/16/iste-ihanet-fezlekesi ....................................... 5

Turkish Grand Assembly, Parliament Investigation Commission Report No. 681 (Jan. 5, 2015).................................................................................................. 6

## INTRODUCTION AND SUMMARY OF ARGUMENT

Reza Zarrab was arrested in Turkey in December 2013 as part of a broad corruption probe that also targeted senior officials in then-Prime Minister Recep Erdogan's government. Shortly after Zarrab's arrest, an unsigned 299-page document purporting to be a police report was anonymously posted on the internet. The "report" ostensibly detailed misconduct by Zarrab and others related to bribery and trade with Iran that would justify his arrest. But numerous sources in Turkey, Europe, and the United States immediately recognized that Zarrab's prosecution was part of a high-stakes political fight between Erdogan and his chief political rival, the influential Turkish imam Fethullah Gulen. It was already well-known that Gulen's supporters had, at his urging, filled numerous law enforcement positions throughout Turkey. And in the months that followed Zarrab's arrest, evidence mounted that the Turkish prosecutors behind Zarrab's prosecution were in league with Gulen, had used fabricated evidence and false charges in the past to imprison political enemies, and were possibly doing the same again to target Zarrab and others close to Erdogan.

Against this backdrop, the U.S. government began its own investigation into Zarrab. To obtain a warrant to search Zarrab's email account, the U.S. government told the magistrate judge a misleadingly one-sided story about Zarrab and the December 2013 charges, treating the politically motivated Turkish prosecution and discredited "police report" as sure proof that Zarrab had violated U.S. law. But by the time the government sought its warrant, the legality of the prosecution against Zarrab and the reliability of the "police report" were already in question. Even so, the government never mentioned to the magistrate judge any of the widely publicized accounts that cast doubt on the propriety of the investigation or accuracy of the document. Instead, the government's application for the warrant presented the unsigned "police report" as solid evidence that Zarrab had broken U.S. laws. The rest of the warrant application shows why

the government omitted this critical information—the government lacked any other sufficient

basis upon which to establish probable cause.  When the "police report" is viewed alongside this

critical omitted information, it is clear that there was no probable cause to grant the warrant and

that the evidence the government obtained pursuant to its unlawful search must be suppressed.

The government's search of Zarrab's Hotmail account did not only violate the Fourth

Amendment; it contravened crucial territorial restrictions Federal Rule of Criminal Procedure 41

places on warrants.  Rule 41(b) sets the outer territorial limit on a magistrate judge's authority to

issue a warrant, providing that no warrant may be issued to search premises outside the

jurisdiction of the United States.  And the Second Circuit recently confirmed that neither the

Stored Communications Act, nor Rule 41, which the Act incorporates, do not allow warrants to

reach electronic data that is stored outside U.S. jurisdiction.  Zarrab's email account is

maintained by Microsoft and is associated with Turkey, and based on Microsoft's policies for

international data storage, it is a virtual certainty that Zarrab's email data was stored outside U.S.

jurisdiction when the government obtained a warrant to search the account.  The magistrate

judge, therefore, had no power to issue the warrant.  Had Rule 41 been followed, Zarrab's emails

would not have been seized, which is the only showing required to obtain suppression for a

violation of the Rule.  Moreover, based on her years of experience conducting international

investigations and searching email accounts, the FBI agent who signed the affidavit in support of

the application for the warrant surely knew that Zarrab's data was stored outside U.S.

jurisdiction, yet she did not inform the magistrate judge.  This "intentional and deliberate

disregard of a provision in the Rule" also demands suppression.  *United States v. Burke*, 517 F.2d

377, 386-87 (2d Cir. 1975) (Friendly, J.).

# BACKGROUND

### A.    Erdogan, Gulen, and the Discredited 2013 Corruption Investigation of Zarrab

The U.S. government's investigation of Zarrab arose out of a fierce political battle in Turkey that simmered for more than a decade before finally boiling over on December 17, 2013. Then-Prime Minister Recep Erdogan had for years been political allies with Fethullah Gulen, "Turkey's most influential cleric, … who commands a global empire of media outlets, schools and charities."[1]  But Gulen left Turkey in 1999 "amid accusations of plotting to overthrow the secular government,"[2] and a rift began to develop between him and Erdogan.[3]  Though outside Turkey, Gulen's influence in the country continued to grow.  Indeed, it is well-documented that Gulen's "supporters have long filled the ranks of the police, judiciary and, to a lesser extent, the military, something Gulen has encouraged in speeches," and James Jeffrey, former U.S. ambassador to Turkey, even described Gulen supporters as having formed "a state within a state" in Turkey.[4]

Before dawn on December 17, 2013, Turkish police conducted a series of raids, arresting the sons of three of Erdogan's cabinet ministers and also detaining several businessmen close to

---

[1]    Ex. 1, The Economist, *A Challenge to Erdogan's Rule*, Dec. 17, 2013, http://www.economist.com/blogs/charlemagne/2013/12/turkish-politics.

[2]    Ex. 2, Dan Bilefsky and Sebnem Arsu, *Turkey Feels Sway of Reclusive Cleric in the U.S.*, New York Times, Apr. 24, 2012, http://www.nytimes.com/2012/04/25/world/middleeast/turkey-feels-sway-of-fethullah-gulen-a-reclusive-cleric.html.

[3]  Ex. 3, Tim Arango & Sebnem Arsu, *Graft Inquiry Intensifies Turkish Political Rivalry*, New York Times, Dec. 17, 2013, http://www.nytimes.com/2013/12/18/world/europe/graft-inquiry-intensifies-turkish-political-rivalry.html?_r=0.

[4] *Id.*

Erdogan, including Zarrab, on charges of bribery and corruption.[5]  The arrests were immediately seen in Turkey, Europe, and the United States "as a further and dramatic escalation in the continuing power struggle between Mr. Erdogan and … Fethullah Gulen."[6]  The Erdogan government swiftly pushed back against what it deemed an illegitimate "judicial coup" perpetrated by a "parallel state" of Gulen supporters in the Turkish police force and judiciary.[7] This interpretation of events was bolstered by the fact that the leading prosecutor on the cases, Zekeriya Oz, was widely reported to be in league with Gulen.[8]  Former Ambassador Jeffrey agreed that Gulen "has a political movement that has infiltrated the police and military" and that the corruption charges against Zarrab and others were "politically motivated and … wrong."[9]

Shortly after the corruption charges were brought, someone anonymously posted on the internet a 299-page document that purported to be a police report detailing the corruption

---

[5] *Id.*

[6] *See* Ex. 1, The Economist, *A Challenge to Erdogan's Rule*, Dec. 17, 2013, http://www.economist.com/blogs/charlemagne/2013/12/turkish-politics; *see also* Ex. 3, Tim Arango & Sebnem Arsu, *Graft Inquiry Intensifies Turkish Political Rivalry*, New York Times, Dec. 17, 2013, http://www.nytimes.com/2013/12/18/world/europe/graft-inquiry-intensifies-turkish-political-rivalry.html?_r=0.

[7] Ex. 4, Daren Butler and Nick Tattersall, *Turkish Judicial Purge Brings Corruption Investigation to a Halt, Reuters*, Jan. 22, 2014, http://www.reuters.com/article/us-turkey-corruption-idUSBREA0L1G220140122; Ex. 5 Mehul Srivastava, *Turkey Crisis Put Jailed Millionaire at Heart of Gold Trail*, Bloomberg, Jan. 29, 2014, http://www.bloomberg.com/news/articles/2014-01-29/turkey-scandal-places-jailed-millionaire-at-center-of-gold-trail.

[8] Ex. 3, Tim Arango & Sebnem Arsu, *Graft Inquiry Intensifies Turkish Political Rivalry*, New York Times, Dec. 17, 2013, http://www.nytimes.com/2013/12/18/world/europe/graft-inquiry-intensifies-turkish-political-rivalry.html?_r=0;

[9] Ex. 6, Timothy Phelps, *From His Pa. Compound, Fethullah Gülen Shakes Up Turkey*, Los Angeles Times, Jan. 20, 2014, http://www.latimes.com/world/la-fg-turkey-Gulen-20140120-story.html.

investigation into Zarrab and others.[10]   The alleged report, however, was not signed by any police officer or prosecutor, nor was it validated by the Turkish police.  Moreover, by early 2014, it was widely reported that many prosecutors and investigators aligned with Gulen had previously used fabricated evidence to bring charges against Turkish military leaders.[11]   The New York Times reported in February 2014 that the "same prosecutors" were responsible for the corruption charges against Zarrab and that "[m]any of the prosecutors and investigators in both cases—the corruption inquiry and the old military trials—are followers of Fethullah Gulen."[12] Other news sources would later claim that much of the information in the purported police report about Zarrab was fabricated, with many details of the alleged crimes having been written before the investigation had even begun.[13]

The charges against Zarrab were ultimately dropped.  He was released from detention on February 28, 2014, and the charges against him were dismissed entirely in October 2014.[14]   In

---

[10] Ex. 7, Humeyra Pamuk and Nick Tattersall, *Leaked Documents Purport to Reveal Turkish Graft Allegations*, Reuters, Mar. 14, 2014, http://www.reuters.com/article/us-turkey-corruption-idUSBREA2D1F420140314; Ex. 8, Sept. 24, 2014 Warrant ¶28.

[11] Ex. 9, Tim Arango, *Turkish Leader Disowns Trials That Helped Him Tame Military*, N.Y. Times, Feb. 24, 2014, http://www.nytimes.com/2014/02/27/world/europe/turkish-leader-disowns-trials-that-helped-him-tame-military.html.  The New York Times reported in February 2014 about "sensational trials that shook the Turkish military in recent years," recounting how "many legal and forensics experts have long said … the trials were a sham," based on "fake evidence."  *Id.*  Moreover, the Times reported that the "same prosecutors" who used this fabricated evidence were going after Erdogan and Zarrab.  *Id.*  The paper also reported that "[m]any of the prosecutors and investigators in both cases—the corruption inquiry and the old military trials—are followers of Fethullah Gulen."  *Id.*

[12] *Id.*

[13] Ex. 10, Giris Tarihi, *Here Is the Brief of Treason*, Sabah, Jan. 16, 2015, http://www.sabah.com.tr/gundem/2015/01/16/iste-ihanet-fezlekesi.

[14] Ex. 11, BBC News, *Turkey Frees Cabinet Ministers' Sons*, February 28, 2014, http://www.bbc.com/news/world-europe-26387522; Ex. 12, Daniel Dombey, *Turkish Prosecutor Drops High-Level Corruption Probe*, Financial Times, Oct. 18, 2014,

December 2014, a Turkish court found that the prosecutor's decision to dismiss those charges was consistent with Turkish law.[15]  Likewise, in January 2015, an investigative commission of the Turkish Parliament issued a report after having delved into the allegations leveled against four of Erdogan's former cabinet ministers.  The commission concluded that there was insufficient evidence to support the charges and thus agreed with the decision of the Istanbul Chief Public Prosecutor to drop the charges.[16]  Later that month, the entire Turkish Parliament also rejected corruption allegations against the former ministers.[17]  Oz and two other prosecutors who brought the discredited case against Zarrab were suspended for their action.  Their conduct formed the basis for later criminal charges alleging that they had plotted with other Gulen loyalists to carry out a terrorist plot to overthrow the Turkish government.[18]

---

http://www.ft.com/cms/s/0/63cf5042-56cb-11e4-a0b2-00144feab7de.html?siteedition=intl#axzz4IenMG1Ly; Ex. 13, Daren Butler and Robin Pomeroy, *Turkey Drops Corruption Case That Dogged Government*, Reuters News, Oct. 17, 2014.

[15] Ex. 14, Turkish Court Order (Dec. 15, 2014).

[16] Ex. 15, Turkish Grand Assembly, Parliament Investigation Commission Report No. 681 (Jan. 5, 2015).

[17] Ex. 16, Emre Peker, *Erdogan Scores Big Win in Overcoming Graft Scandal*, Wall Street Journal, Jan. 20, 2015, http://www.wsj.com/articles/erdogan-set-for-big-win-in-overcoming-graft-scandal-1421788481.

[18] Ex. 17, Ahmet Sait Akçay, *Turkey Indicts 3 Ex-Prosecutors Linked to 2013 Probe*, Anadolu Agency, Aug. 11, 2016, http://aa.com.tr/en/turkey/turkey-indicts-3-ex-prosecutors-linked-to-2013-probe/626989#; Ex. 18, *Gülen, Suspected Associates on Trial for Coup Plot Charges*, Daily Sabah, Jan. 6, 2016, http://www.dailysabah.com/investigations/2016/01/06/gulen-suspected-associates-on-trial-for-coup-plot-charges (reporting on the trial of former prosecutors and police "accused of scheming to topple the government by falsely implicating the close circle of Cabinet members and then-Prime Minister Recep Tayyip Erdoğan of corruption on the grounds of fabricated evidence").

**B.      The U.S. Government Reuses the Discredited "Report" to Launch Its Own Investigation of Zarrab**

After the December 17, 2013 charges were brought against Zarrab in Turkey, the U.S. government began its own investigation into Zarrab.  Though there was evidence that the charges against Zarrab were politically motivated and that the purported police report was deeply flawed, the U.S. government relied on the document as the centerpiece of its first application for a warrant to search Zarrab's emails.   On September 23, 2014, FBI Special Agent Jennifer McReynolds submitted to a U.S. magistrate judge in the Southern District of New York an affidavit in support of an application for search warrants related to Zarrab.  *See* Ex. 8, Sept. 2014 Warrant.  She sought a warrant to obtain the contents of the Riza SF Hotmail Account, which was used and controlled by Zarrab.  *See id.* ¶¶20, 24(c), 28(d).

While McReynolds averred that the contents of the Riza SF Hotmail Account were stored at premises controlled by Microsoft, Inc., *id.* ¶2(c), she never identified where those premises were located.  She noted that Microsoft is headquartered in Redmond, Washington, *id*. ¶2(c), but the only geographic information she provided regarding the specific email account was that it was registered from an IP address that resolves to Turkey, *id.* ¶24(c).

Microsoft provides its Hotmail email service to customers in over 100 countries, and as of 2014, the company stored and managed customers' email data using discrete datacenter facilities spread over 40 countries.  *Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 829 F.3d 197, 202 (2d Cir. 2016).  To improve the speed of its service, "Microsoft generally stores a customer's e-mail information and content at datacenters located near the physical location identified by the user as its own when subscribing to the service."  *Id*.  Thus, it is a virtual certainty that the contents of the Riza SF Hotmail Account were stored outside the United States.

7

To establish probable cause that Zarrab's email account contained evidence of a crime, the warrant application depended almost entirely on the purported December 2013 report. The warrant alleged that Zarrab had violated the International Emergency Economic Powers Act (IEEPA); engaged in money laundering by promoting violations of IEEPA, bank fraud, and bribery of a public official; and violated the federal aiding and abetting statute, 18 U.S.C. §2. *See* Sept. 2014 Warrant ¶¶8-15, 39. But the affidavit focused heavily on alleged Turkish crimes, noting that Zarrab had been arrested in Turkey in December 2013 on charges that he had bribed cabinet officials in Erdogan's government as part of a scheme to facilitate sales of Iranian-produced oil and gas in exchange for gold. *Id.* ¶27. While the application cited to a handful of newspaper articles that had reported about the charges against Zarrab, *see id.* ¶27(a), (b), (c), the core of the evidence that McReynolds submitted to the magistrate judge came from the purported police report. *See id.* ¶28. McReynolds noted that the document was dated December 18, 2013, that it had a case number, and that it referenced investigative steps by law enforcement agencies in Turkey. *Id.* The agent further noted that the document discussed financial records, physical surveillance, wiretapped conversations, and the content of intercepted emails. *Id.* She averred that an unnamed FBI agent in Istanbul had reviewed the "Turkish Investigative Report" and confirmed that it appeared to be consistent in format and content with genuine Turkish law enforcement reports. *Id.* Finally, she attested that "at least some of the information" in the report could be corroborated by other sources. *Id.*

Agent McReynolds then described the substance of the document, claiming that it "showed that Zarrab was at the center of a scheme" to evade international sanctions against Iran and engage in bribery. *Id.* ¶28(a). The "report" detailed a scheme to fabricate transaction records related to wire transfers and exports from Turkey to Iran and Dubai and alleged that

8

Zarrab had previously engaged in a similar scheme. *Id.* The document further alleged that Zarrab had bribed public officials and that the Riza SF Hotmail Account contained detailed records of those bribes. *Id.* ¶28(b), (e). McReynolds asserted that this claim was corroborated by records from Microsoft showing that the Riza SF Hotmail Account had exchanged emails with another email account listed in the document. *Id.* ¶28(f). McReynolds further averred that the document showed that the Riza SF Hotmail Account belonged to Zarrab, and that this information was corroborated by the fact that the account was registered in the name of "Riza Zarrab" in Istanbul in 2007. *Id.* ¶28(c)-(d).

According to McReynolds, information in the press and "report" was also corroborated by bank records showing that Al Nafees Exchange and Royal Emerald Investments LLC conducted several transactions in which the purpose of the transaction related to gold. *Id.* ¶29. The affidavit also averred that an email account allegedly connected with Mellat Exchange had been used to communicate with sanctioned entities. *Id.* ¶31. But other than referencing two news articles printed shortly after Zarrab's 2013 arrest, *id.* ¶27(a)-(b), the warrant application contained no evidence that Zarrab worked with these entities. Finally, the warrant application alleged that Al Nafees Exchange is Zarrab's company, *see id.* ¶¶17, 20, but offered essentially no support for this claim, other than to note that an email account allegedly associated with Al Nafees Exchange sent emails to Zarrab three times in 2014. *Id.* ¶25(b)-(c).

Accordingly, when the U.S. magistrate judge issued a warrant to search the Riza SF Hotmail Account, his decision was based almost entirely on allegations made in the discredited Turkish "police report." The warrant was sought and issued pursuant to the Stored Communications Act, 18 U.S.C. §2703(b)(1)(A), §2703(c)(l)(A), and Federal Rule of Criminal Procedure 41. *See id.* ¶49.

**ARGUMENT**

**I.      The Government Knowingly Or Recklessly Omitted Critical Information Necessary To Determine Whether Probable Cause Existed To Search Zarrab's Emails.**

The Fourth Amendment protects the rights of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013).

"In the digital age, electronic communication is" a domain in which "people expect information to stay shielded from law enforcement even as they knowingly disclose it to other parties." *United States v. DiTomasso*, 56 F. Supp. 3d 584, 593 (S.D.N.Y. 2014); *see also United States v. Forrester*, 512 F.3d 500, 511 (9th Cir. 2008) ("The privacy interests in" the inside of a letter and contents of an e-mail "are identical."). Those who entrust their electronic communications to electronic communication services companies are akin to tenants who rent from a landlord and "have a legitimate expectation of privacy in their apartments," *United States v. Warshak*, 631 F.3d 266, 287 (6th Cir. 2010), and bank customers who place items "in a safe deposit box." *Warshak v. United States*, 490 F.3d 455, 472 (6th Cir. 2007), reh'g en banc granted, opinion vacated (Oct. 9, 2007). "Accordingly, … a subscriber enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial [Internet service provider]," and "[t]he government may not compel a commercial ISP to turn over the contents of a subscriber's emails without first obtaining a warrant based on probable cause." *Warshak*, 631 F.3d at 288. Indeed, as bailees of their customers' information, electronic service providers "often [have] the duty … to exclude others from possession of the property entrusted to" them. *United States v. Perea*, 986 F.2d 633, 640 (2d Cir. 1993).

Thus, a magistrate judge may not issue a warrant to search the contents of someone's email account except "upon probable cause, supported by Oath."  U.S. Const. amend. IV.  To determine whether probable cause exists, the magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, … there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

For a magistrate judge to accomplish this task, it is vital that the information before him be accurate.  Accordingly, "[a] defendant is permitted to challenge the veracity of a search warrant … where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information."  *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000).  A defendant typically "demonstrates that statements in an affidavit intentionally or recklessly misled" a magistrate judge through a *Franks* hearing.  *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008).  The hearing draws its name from the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978), which held that a defendant is entitled to a hearing upon making a "substantial preliminary showing" that (1) a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and (2) the statement was necessary to the magistrate judge's finding of probable cause.  *Id*. at 155-56, 170-71.  "Intentional or reckless omissions of material information, like false statements, may serve as the basis for a *Franks* challenge."  *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).  Omissions "are made with reckless disregard if an officer withholds a fact in his ken" and "any reasonable person would have known that this was the kind of thing the judge would wish to know."  *United States v. Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003) (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) and *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th

Cir. 1993)). And courts may infer recklessness "where the omitted information was 'clearly critical' to the probable cause determination." *Id.* (quoting *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990). "Subjective intent, after all, is often demonstrated with objective evidence." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013).

A falsehood or omission in a warrant application is "material" if it was "necessary to the issuing judge's probable cause finding." *United States v. Awadallah*, 349 F.3d 42, 64-65 (2d Cir. 2003). In evaluating materiality, the Court should determine whether "putting aide erroneous information … there remains a residue of independent and lawful information sufficient to support probable cause." *Id.* at 65.

If a Court suppresses illegally obtained evidence, the exclusionary rule requires suppression not only of those materials "seized during an unlawful search," but also "derivative evidence … that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting *Nardone v. United States,* 308 U.S. 338, 341 (1939)).

While courts will not suppress information obtained in good faith reliance on a warrant that is valid on its face, "[g]ood faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). Rather, "the good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all the known facts." *Id.* at 1273. Thus, the exception will not apply if the affiant is "not frank with the magistrate in proceedings to obtain the warrant." *Id.*

Finally, while "the Fourth Amendment affords no protection to aliens searched by U.S. officials outside of our borders," *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 168 (2d Cir. 2008), "its purpose [is] to restrict searches and seizures which might be conducted by the United States in domestic matters." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990). Thus, the Fourth Amendment applies to foreign citizens who have formed "significant voluntary connection[s] with the United States." *Id.* at 260. And as Justice Kennedy—who provided the fifth vote in *Verdugo*—put it, for searches executed "within the United States," there is "little doubt that the full protections of the Fourth Amendment would apply." *Id.* at 277-78 (Kennedy, J., concurring).

### A.     The FBI Recklessly Omitted Information About the Discredited Nature of the Purported Police Report.

FBI Agent Jennifer McReynolds either knowingly or recklessly omitted critical information related to the veracity of the purported "Turkish Investigative Report" that formed the core of her warrant application to the U.S. magistrate judge. Nearly every allegation of wrongdoing leveled against Zarrab in the September 2014 application draws its support from this anonymous report. Sept. 2014 Warrant ¶28. Thus, McReynolds "had obvious reasons to omit … adverse facts" that cast doubt on the document, *United States v. Simmons*, 771 F. Supp. 2d 908, 917 (N.D. Ill. 2011), and that is precisely what she did. McReynolds noted that "[a]n FBI agent stationed in Istanbul … reviewed the Turkish Investigative Report and confirmed that it appears to be consistent in format and content with genuine Turkish law enforcement reports," Sept. 2014 Warrant ¶28, and then proceeded to present the document as an unbiased and definitive account of Zarrab's past conduct. But McReynolds omitted numerous well-known and widely-reported facts about the 2013 corruption investigation and the document—information that "provided obvious reasons to doubt the veracity of the allegations" in the "report." *United States v.*

13

*McMurtrey*, 704 F.3d 502, 512 (7th Cir. 2013).  This "omitted information was clearly critical to the probable cause determination."  *Rajaratnam*, 719 F.3d at 154.  Because "[r]ecklessness may be inferred" in these circumstances, Zarrab has plainly made a "substantial preliminary showing" sufficient to justify a *Franks* hearing to determine precisely why McReynolds presented such a one-sided and misleading view of the purported report to the magistrate judge.  *Rivera*, 928 F.2d at 604.

As recounted above, informed observers in Turkey, Europe, and the United States recognized that the December 17, 2013 corruption charges were, at best, politically motivated and, at worst, the product of fabricated evidence.[19]  Indeed, the New York Times reported on December 17, 2013, that "many commentators [in Turkey] saw the influence of the Gulen movement behind the investigation," and explained that "[t]he movement's power within Turkey stems from the positions it controls within the state."[20]  Likewise, the Los Angeles Times reported in January 2014 that "Turkish authorities accuse Gulen and his movement of secretly creating an unaccountable 'state within a state' that is trying to foment a 'judicial coup.'"[21]  This assessment was shared by James Jeffrey, the former U.S. ambassador to Turkey, who stated that Gulen's "political movement … has infiltrated the police and military and is able to use their government powers to political ends," which was demonstrated when they brought the

---

[19] *See supra* pp. 3-6.

[20] Ex. 3, Tim Arango & Sebnem Arsu, *Graft Inquiry Intensifies Turkish Political Rivalry*, New York Times, Dec. 17, 2013, http://www.nytimes.com/2013/12/18/world/europe/graft-inquiry-intensifies-turkish-political-rivalry.html?_r=0.

[21] Ex. 6, Timothy Phelps, *From His Pa. Compound, Fethullah Gülen Shakes Up Turkey*, Los Angeles Times, Jan. 20, 2014, http://www.latimes.com/world/la-fg-turkey-Gulen-20140120-story.html.

"politically motivated" and "wrong" corruption charges against Zarrab and others.[22]   Perhaps most glaring was McReynolds's failure to mention reports that many of the Gulen-aligned prosecutors who brought the corruption case against Zarrab had previously used fabricated documents—"as well as plenty of other dubious evidence"—to target other political enemies with trumped up charges.[23]   These shocking accounts of prosecutorial misconduct were not limited to some distant corner of the internet, but were printed on the front page of the New York Times.[24]

Agent McReynolds's omissions of these and similar facts were plainly "designed to mislead, or" were "made with reckless disregard of whether they would mislead, the magistrate." *Rajaratnam*, 719 F.3d at 154.  The warrant application clearly establishes that McReynolds had researched Zarrab's case by scouring both U.S. and Turkish media.  *See* Sept. 2014 Warrant ¶27 ("The Turkish and international press has reported on details of the investigation …").  But McReynolds used her research to tell a patently one-sided story to the magistrate judge, even asserting that, when prosecutors and investigators had been reassigned from Zarrab's corruption case, "[t]he press … characterized these actions as political interference in the investigation and prosecution."  *Id*. ¶27 n.7.  But while some members of "the press" may have espoused this view, many others reported facts that cast grave doubt on the legitimacy of the corruption allegations and authenticity of the anonymously leaked, unsigned "police report."  McReynolds and the unnamed "FBI agent stationed in Istanbul" with whom she consulted undoubtedly had access to

---

[22] *Id.*

[23] Ex. 9, Tim Arango, *Turkish Leader Disowns Trials That Helped Him Tame Military*, N.Y. Times, Feb. 24, 2014, http://www.nytimes.com/2014/02/27/world/europe/turkish-leader-disowns-trials-that-helped-him-tame-military.html.

[24] *Id.* (noting that the original print version of the article appeared "on Page A1 of the New York edition").

such material information.  *Id.* ¶28.  And this evidence of a politically motivated prosecution gave McReynolds "obvious reasons to doubt the veracity of the allegations" she presented to the magistrate judge.  *Rajaratnam*, 719 F.3d at 154.  Because this information plainly "was the kind of thing the judge would wish to know," *id.*, McReynolds acted in reckless disregard of the truth when she withheld it from the magistrate judge.

> **B.  Had The FBI Not Recklessly Omitted Information About the Discredited "Report," There Would Have Been No Probable Cause to Search Zarrab's Hotmail Account.**

Agent McReynolds had "obvious reasons for omitting the information" discrediting the 2013 corruption prosecution and related "report"—the information critically undermined the government's ability to establish probable cause to search Zarrab's email account.  *Simmons*, 771 F. Supp. 2d at 917.  The magistrate "depended on the prosecutor and [FBI agent] to present him with the truth, and to bring to his attention problems with their [source]'s credibility.  He was misled."  *United States v. Hall*, 113 F.3d 157, 160 (9th Cir. 1997).  In light of the government's nearly total reliance on the discredited police "report," had the affidavit also included information about the political nature of the corruption investigation and the sordid history of Gulen-aligned prosecutors using fabricated evidence to target political enemies, the affidavit would have failed to establish probable cause.  *See United States v. Glover*, 755 F.3d 811, 818 (7th Cir. 2014) ("[T]he affidavit did not provide the magistrate with even a minimum of information on credibility that might have triggered further inquiry.  We cannot defer to the under-informed finding of probable cause."); *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992) ("[I]f the omitted information had been included in the application for the search warrant, no reasonable person could have found probable cause to issue the warrant.").  Emails from Zarrab's Hotmail account, therefore, should be suppressed.

The September 2014 warrant application's allegations as to Zarrab and his Hotmail account turn almost entirely on the veracity of an unsigned document the government retrieved off the internet." Sept. 2014 Warrant ¶28. While McReynolds stated that "at least some of the information contained in the Report has been corroborated by other sources," *id*., such corroboration was negligible. First, the government noted that the report stated that Zarrab used the Riza SF Hotmail Account, and information from Microsoft and Twitter tended to support that conclusion. *Id*. ¶28(c)-(d). Second, the report states that the Riza SF Hotmail Account sent emails to a certain other email address, which was corroborated by records from Microsoft showing that the accounts exchanged emails. *Id*. ¶28(e)-(f). While the warrant application also cites evidence that Al Nafees Exchange and Royal Emerald Investments LLC engaged in transactions related to gold, *id*. ¶29, the application does not allege any facts tying Zarrab to either company. The application's references to actions by other sanctioned parties likewise fail to justify searching Zarrab's emails, as the only evidence that Zarrab was connected to the sanctioned parties are two newspaper articles released shortly after Zarrab's questionable arrest. *Id*. ¶27(a)-(b). Thus, at bottom, the government relies on only a handful of newspaper articles and an anonymous and discredited "report" it pulled off the internet to justify gaining access to Zarrab's email account. These sources are plainly insufficient to establish probable cause here, *see Donovan v. Fed. Clearing Die Casting Co.*, 655 F.2d 793, 797 (7th Cir. 1981) ("We need not belabor the point that all newspaper reports are not of sufficient reliability to form the basis of Fourth Amendment probable cause determination."), especially in light of the trove of information the government ignored when it presented its one-sided story about Zarrab to the magistrate judge. The Court, therefore, should order a *Franks* hearing to determine whether to

suppress the contents of Zarrab's Hotmail account and derivative evidence the government obtained as a result of searching that account.

## II.   The Contents Of Zarrab's Hotmail Account Should Be Suppressed Under Federal Rule of Criminal Procedure 41.

Rule 41 of the Federal Rules of Criminal Procedure, entitled "Search and Seizure," governs federal warrants.  It directs "the magistrate judge or a judge of a state court of record" to issue the warrant to "an officer authorized to execute it."  Rule 41(e)(1).  Rule 41(b) sets forth the territorial limits on these warrants, making clear that U.S. magistrate judges may issue warrants only with respect to persons or property located within the magistrate judge's particular federal judicial district or—in certain instances—with respect to persons or property in another federal district, "a United States territory, possession, or commonwealth," or various diplomatic or consular missions of the United States or diplomatic residences of the United States located in a foreign state.  Fed. R. Crim. P. 41 (b)(2), (b)(3), (b)(5).

The Stored Communications Act sets forth procedures the government must follow to obtain access to certain electronic information held by providers of electronic communication services.  *See* 18 U.S.C. §2703.  The government needs only an administrative subpoena to obtain basic subscriber and transactional information, and the government can obtain other non-content records by court order.  §2703(c)(2), (d).  But to obtain the actual content that a provider stores for its customer, such as the content of an email, the government generally must first secure a warrant that has been issued "using the procedures described in the Federal Rules of Criminal Procedure," or using State warrant procedures.  §2703(a), (b), (c).  If the electronic communications have been stored by the provider for less than 180 days, the government must obtain a warrant.  §2703(a).  And a warrant is also required for older electronic communications unless the government is willing to provide notice to the provider's subscriber or customer.

§2703(b)(1)(A).  Warrants issued under §2703 must "be 'issued using the procedures described in the Federal Rules of Criminal Procedure.'"  *Microsoft*, 829 F.3d at 208 (quoting 18 U.S.C. §2703(a)).  "And insofar as territorial reach is concerned, Rule 41(b) describes the extent of the power of various authorities (primarily United States magistrate judges) to issue warrants with respect to persons or property located within a particular federal judicial district."  *Id*.

The Second Circuit has repeatedly held that, for certain types of violations of Rule 41, suppression is an appropriate remedy, even if the government has not violated the Fourth Amendment.  As Judge Friendly held, "violations of Rule 41 alone" can "lead to exclusion" where "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule."  *United States v. Burke*, 517 F.2d 377, 386-87 (2d Cir. 1975) (footnotes omitted); *see also United States v. Turner*, 558 F.2d 46, 52 (2d Cir. 1977) (same).  Both instances are satisfied in this case.  The court should suppress the fruit of the government's illegal search of Zarrab's Hotmail account because (1) that data would not have been available to the government if Rule 41 had been followed, and (2) the government's search was an intentional and deliberate violation of the Rule.

First, Microsoft provides its Hotmail email service—the same service Zarrab utilized—to customers in over 100 countries, and as of 2014, the company stored and managed its customers' email data using discrete datacenter facilities in over 40 countries.  *Microsoft*, 829 F.3d at 202.  "Microsoft generally stores a customer's e-mail information and content at datacenters located near the physical location identified by the user as its own when subscribing to the service."  *Id*.  When a user's data is stored at a foreign datacenter, the only way to access it is from that data center.  *Id*.  As the warrant application attests, the Riza SF Hotmail Account was

registered from an IP address that resolved to Turkey.   Sept. 2014 Warrant ¶24(c).   It is, therefore, a virtual certainty that the contents of the Riza SF Hotmail Account were stored outside the United States and thus outside the territorial authority of of a Rule 41 warrant. Accordingly, when the magistrate judge issued a warrant to search Zarrab's email content stored outside U.S. jurisdiction, Rule 41 was violated.

This violation of Rule 41 plainly prejudiced Zarrab and thus justifies suppression. "'Prejudice' in this context consists of being subjected to a search that ... might not have occurred or ... if the Rule had been followed." *Turner*, 558 F.2d at 52.   And by the clear terms of Rule 41(b), this extraterritorial "search would not have occurred if Rule 41 had not been violated." *Id.*   The Court thus should suppress the contents of Zarrab's Hotmail account and evidence the government acquired as a "result of the unlawful search."   *Murray*, 487 U.S. at 537.

Multiple district courts have reached just that conclusion in cases materially indistinguishable from this one.   For example, in *United States v. Levin*, the government obtained a warrant from a judge in the Eastern District of Virginia, but the property that was searched— the defendant's computer—was located in Massachusetts.   No. CR 15-10271-WGY, 2016 WL 2596010, at *5 (D. Mass. May 5, 2016).   The government argued that because "it is impossible to identify in advance the location of the property to be searched, Rule 41(b)(1) ought be interpreted to allow a judge in the district with the strongest known connection to the search to issue a warrant," but the court rejected this argument "because it adds words to the Rule."   *Id*. at *6.   Instead, the court held that "because Rule 41(b) did not grant her authority to issue the ... warrant, the magistrate judge was without jurisdiction to do so," and the "warrant ... was void." *Id.* at *8.   The court also held that the defendant was prejudiced because, "had Rule 41(b) been followed, the magistrate judge would not have issued the ... Warrant, and therefore the search

conducted pursuant to that Warrant might not have occurred." *Id*. at *9.  The court ultimately suppressed the evidence against the defendant.  *Id*. at *13.

Another district court recently reached the same conclusion in a similar case, suppressing evidence for a violation of Rule 41(b).  *United States v. Croghan*, No. 1:15-CR-48, 2016 WL 4992105, at *8 (S.D. Iowa Sept. 19, 2016).  The court held that "[s]uppression is an appropriate means to deter law enforcement from seeking warrants from judges lacking jurisdiction to issue them, and this deterrence function outweighs the societal costs associated with suppression." *Id.* This Court should follow the persuasive reasoning of these courts and the clear language of the Stored Communications Act and Rule 41(b) to hold that Zarrab's emails must be suppressed.

Second, the Court should suppress the contents of Zarrab's email account because of the government's "intentional and deliberate disregard of a provision in" Rule 41.  *Burke*, 517 F.2d at 387 (footnote omitted).  Rule 41(b) leaves no uncertainty as to where a magistrate has "authority to issue a warrant," and that authority does not extend beyond the jurisdiction of the United States.  "Indeed, 'if U.S. judicial officers were to issue search warrants intended to have extraterritorial effect, such warrants would have dubious legal significance, if any, in a foreign nation.'"  *Microsoft*, 829 F.3d at 212 (quoting *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 171 (2d Cir. 2008)).  Agent McReynolds, despite years of experience dealing in international investigations and executing search warrants of email accounts, Sept. 2014 Warrant ¶1, never informed the magistrate judge that Zarrab's emails were almost certainly stored outside the jurisdiction of the United States.  Nor was the government oblivious to this possibility.  In a 2009 manual the Department of Justice produced for its attorneys, the government discussed how Rule 41's "territorial limit on searches of computer data poses problems for law enforcement because computer data stored in a computer network can be

21

located anywhere in the world."[25]  The guide advised that whenever "agents can learn prior to the search that some or all of the data described by the warrant is stored in a different location than where the agents will execute the search," and the data is stored in two or more different places in the United States, "agents should obtain separate warrants from the two districts."[26] But "when agents learn before a search that some or all of the data is stored remotely outside of the United States, matters become more complicated," sometimes even requiring formal assistance from the foreign country that holds the data.[27]  Thus, McReynolds had good reason to know that the warrant application she submitted to the magistrate judge would almost certainly lead to an illegal search, and the Court thus should suppress the contents of the search.  At a bare minimum, however, the Court should conduct a hearing to determine whether McReynolds intentionally and deliberately violated Rule 41.

Moreover, because McReynolds was well aware both that the content of Zarrab's email account was likely stored outside U.S. jurisdiction and that Rule 41 could not authorize a warrant to search that content, the good faith exception does not apply to allow this illegally obtained information into evidence.  That "exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all the known facts."  *Reilly*, 76 F.3d at 1273.  It does not provide an excuse in cases where the agent is "not frank with the magistrate in proceedings to obtain the warrant—proceedings that are typically *ex parte.*"  *Id*.  In this case, McReynolds failed to inform the magistrate judge about the location of the contents of

---

[25]  DOJ Office of Legal Education, Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations 84, https://www.justice.gov/sites/default/files/criminal-ccips/legacy/2015/01/14/ssmanual2009.pdf.

[26]  *Id*. at 84-85.

[27]  *Id*. at 85.

Zarrab's email account.  And "it is quite a stretch to label the government's actions in seeking a warrant so clearly in violation of Rule 41 as motivated by 'good faith.'"  *United States v. Glover*, 736 F.3d 509, 516 (D.C. Cir. 2013).  Moreover, the good faith exception should not apply to this warrant, which the magistrate judge never had authority to issue, "[b]ecause a warrant that was void at the outset is akin to no warrant at all."  *Levin*, 2016 WL 2596010 at *12.  The contents of Zarrab's email account, therefore, must be suppressed.

## CONCLUSION

For the reasons set forth above, this Court should grant Zarrab's motion to suppress evidence obtained as the result of the government's search of the Riza SF Hotmail Account.

In the alternative, the Court should order a hearing to determine whether FBI Agent Jennifer McReynolds knowingly and intentionally, or with reckless disregard for the truth, made false statements or intentional or reckless omissions of material information in her affidavits in support of application for a warrant to search the Riza SF Hotmail Account.

Respectfully submitted,

/s/  Viet D. Dinh
Viet D. Dinh
Paul D. Clement
Edmund G. LaCour Jr.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.,
Suite 1200
Washington, D.C. 20005

*Attorneys for Defendant Reza Zarrab*