```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          15 Cr. 867 (RMB)

 5   REZA ZARRAB,

 6                  Defendant.

 7   ------------------------------x

 8                                        New York, N.Y.
                                          November 30, 2016
 9                                        10:15 a.m.

10   Before:

11                   HON. RICHARD M. BERMAN,

12                                        District Judge

13                        APPEARANCES

14   PREET BHARARA
          United States Attorney for the
15        Southern District of New York
     MICHAEL LOCKARD
16   DAVID W. DENTON, JR.
     DEAN SOVOLOS
17        Assistant United States Attorney

18   BRAFMAN & ASSOCIATES, P.C.
          Attorneys for Defendant
19   BENJAMIN BRAFMAN
     JOSHUA KIRSHNER
20
     LEWIS BAACH KAUFMANN MIDDLEMISS
21        Attorneys for Defendant
     AARON T. WOLFSON
22
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
23        Attorneys for Defendant
     CHRISTINE CHUNG
24

25
```

                            APPEARANCES CONTINUED


KIRKLAND & ELLIS
     Attorneys for Defendant
EDMUND G. LACOUR
VIET D. DINH

HARRY RIMM
     CJA counsel for the Defendant


Also Present:   Agent Jennifer McReynolds, FBI

                Agent Scott Geissler, FBI

                Asiye Kay, Turkish Interpreter

                George Esayan, Turkish Interpreter

```
1              (Case called)
2              THE COURT:  We have a fair amount of ground to cover
3    today.  First, I should mention that we have a Turkish language
4    interpreter, as we have had throughout these proceedings.  And
5    just to confirm with Mr. Zarrab that he is able to understand
6    these proceedings with the represent of the interpreter?
7              THE DEFENDANT:  Yes.
8              THE COURT:  As I was saying.  So there are a few
9    things that I want to cover today.  Of course, the principal
10   one is a so-called Curcio hearing to discuss any actual or
11   potential conflicts of interest.  Particularly, we are focused
12   on any that may result from the fact that the law firm of
13   Kirkland & Ellis represents both Mr. Zarrab in this case, on
14   the one hand, and two banks which have participated in some of
15   the transactions referred to and described in the indictment in
16   this case, namely Bank of America and Deutsche Bank, on the
17   other hand.  That is one principal focus of the proceeding, and
18   I'm going to have some preliminary questions for you all with
19   respect to that.
20             I'm going to incidentally hear from the government
21   briefly, and then from the defense briefly, also from Mr. Rimm
22   briefly on those subjects.
23             It's also been raised -- this is particularly, I
24   guess, for you Mr. Brafman.  As you were aware by the
25   government when it raised this issue of the Curcio hearing, the
```

1   question of compartmentalization arose.  And we haven't really

2   discussed that at any length, but are you and Mr. Zarrab

3   prepared to talk about that, as well?  It was raised at the

4   same time, and I don't think we've given you an opportunity to

5   comment on that

6        MR. BRAFMAN:  Your Honor, I'd be prepared to comment

7   on that at the Court's convenience, and I think it will not be

8   an issue once I've made my position clear.  Mr. Zarrab and I

9   have had an opportunity to discuss it as well, and I think you

10   could briefly question him through the interpreter, and I think

11   he understands the issue.

12        THE COURT:  Those would be the questions that were

13   originally suggested by the government?

14        MR. BRAFMAN:  In substance, your Honor, yes.

15        THE COURT:  In substance.  Fine.  So we'll probably

16   cover that, also.

17        MR. BRAFMAN:  I think if you would permit me at the

18   time before you actually get to the questions maybe a very

19   brief statement, I think it will shorten the process.

20        THE COURT:  Okay.  There's going to be a whole other

21   section relating to the timetable in this case.  In that

22   regard, it's my understanding that counsel does not want to

23   have a suppression hearing on Monday and has asked for a later

24   date.  We're going to have to talk about some dates.  I'm happy

25   to do that, but we're going to have to talk about some date or

 1    dates appropriate for that purpose.

 2             MR. BRAFMAN:  Excuse me, Judge.  At that time, we also

 3    want to address the issue of the two open issues; that is, the

 4    Franks hearing that the government objects to, which I thought

 5    the Court had already ordered, and also the testimony that we

 6    have requested of Agent Geissler.

 7             THE COURT:  I'll be prepared to do that.  I know you

 8    mentioned in your most recent letter that I had ordered the

 9    Franks hearing.  My understanding was, as a result of my order

10    of November 11, that that's still an open legal issue.  I said

11    something in there subject to determining whether there should

12    be that hearing or should not be one, so that is something that

13    I'm still looking at the briefs or the submissions on.

14    Actually, what I said on November 11, on endorsing your letter,

15    it said, "Subject to ruling that a hearing is unnecessary."  So

16    that's somewhat of an open question still in my mind.  But what

17    I'm going to do today, there are some supplemental briefing

18    that I would like on that subject.

19             MR. BRAFMAN:  I understand, Judge, and I would just

20    like to be briefly heard at the end.

21             There's also going to be an issue with respect to

22    scheduling with respect to the trial, whether you want to hear

23    that today, as well.

24             THE COURT:  I do.  I'm prepared to deal with that, as

25    well.

1            MR. BRAFMAN:  Thank you, Judge.

2            THE COURT:  Back to the question of whether there's

3     actual potential conflict the interest.

4            Preliminarily, I wanted to ask the former Bancroft

5     attorneys, of whom there are four, when they became either

6     partners at or affiliates, however the legal relationship

7     between them and Kirkland & Ellis actually took place.

8            MR. DINH:  Thank you, your Honor.  Viet Dinh from

9     Kirkland & Ellis.  I was formerly a partner at Bancroft PLLC,

10    and as of October 22nd, I became a parter at Kirkland & Ellis.

11    Likewise, all my colleagues who have entered an appearance

12    here, Paul Clement, Jeff Harris, Eddie Lacour, all became

13    Kirkland & Ellis lawyers as of October 22nd.

14           THE COURT:  So that's the operative date.  I know you

15    objected to the government saying it was a merger, but however

16    that that took place, you became partners, the four of you, of

17    Kirkland & Ellis on October 22, 2016.

18           MR. DINH:  October 22nd.  As a technical matter, it

19    was not a merger.  Bancroft is still an operating LLC and was

20    winding down.  All of us, including all of our administrative

21    staff, just simply left Bancroft in order to join Kirkland &

22    Ellis as new employees.

23           THE COURT:  Okay.  Briefly, as I understand the

24    issue -- and I'll hear from the government in a moment and then

25    from the defense -- the government is contending, and did so

1    first in a letter to me dated November 18, 2016 requesting this

2    hearing, because they said that the new relationship between

3    Mr. Dinh and other defense counsel, three other defense counsel

4    with Kirkland & Ellis either posed an actual or potential

5    conflict of interest because Kirkland & Ellis, prior to that

6    time and currently represents Bank of America and Deutsche

7    Bank, which are two of the banks that have been implicated in

8    transactions alleged by the government to be unlawful

9    transactions involving Mr. Zarrab.

10         In its letter dated November 29, 2016, the government

11    provides some detail about those transactions.  We'll hear from

12    them in a moment.  I was not aware, but the cumulative value of

13    those transactions is in the billions of dollars; is that

14    right?

15         MR. LOCKARD:  That's correct, your Honor.

16         THE COURT:  For example, there's one with Deutsche

17    Bank via the Al Nafees Exchange, approximately 6,548 transfers

18    referred to total 1 billion -- is that $13,898?  No, that's not

19    right.  It's a billion 13.  $1.13 billion.  Those transactions,

20    approximately, right?

21         MR. LOCKARD:  That's correct, your Honor.

22         THE COURT:  So you'll mention that, no doubt, in your

23    discussion.

24         MR. LOCKARD:  Correct.

25         THE COURT:  I'm going want to hear from you as to

1   whether you think there is an actual conflict or is it a

2   potential conflict as a result now of the back and forth of

3   submissions by both the government and the defense.

4           MR. LOCKARD:  Yes, your Honor.  I'll clarify something

5   that I think we were careful in how we described the

6   transactions in our letters, and I do want to clarify.  It is

7   not the government's contention that each one of those

8   transfers is an elicit transfer, but it is our contention that

9   each of those entities were involved in elicit transfers and

10  that --

11          THE COURT:  Hold on a second.  Because of the

12  translation, I think it would be best if counsel speak from the

13  podium.

14          MR. LOCKARD:  Yes, your Honor.  I'll start with, just

15  to clarify, it is not the government's contention that each of

16  the transfers identified in our November 29th letter is an

17  elicit transfer, but it is our contention, and we expect that

18  the proof at trial would show, that each of the identified

19  entities were involved in elicit transactions in the overall

20  scheme charged in the indictment, and that the transfers and

21  dollar figures represent the amount of activity by that entity

22  that passed through each of the two banks.

23          I think the government views the issue as one of an

24  actual conflict, not in the sense that the firm's

25  representation of Mr. Zarrab necessarily is directly adverse to

1    any other matter in which the firm represents the banks,

2    because we don't know the details of those representations, but

3    certainly positions that Mr. Zarrab has taken even so far in

4    this case have been positions that the government views as

5    being adverse to the interests of the banks, and in particular,

6    arguments that Mr. Zarrab has made in support of his motion to

7    dismiss, which we think are likely to be echoed as trial

8    defenses to the effect that --

9         THE COURT:  Before you get to that.  You're saying

10   that you think that the relationship poses actual conflicts

11   based on this matter alone, that is to say this criminal

12   proceeding against Mr. Zarrab, in which the two banks, Bank of

13   America and Deutsche Bank, are implicated.

14        MR. LOCKARD:  Correct.  That's because Mr. Zarrab has

15   taken the position in this matter that the banks were not

16   victims of the charged bank fraud defense.

17        The government believes that they were, and so

18   Mr. Zarrab's position that they are not victims of the charged

19   bank fraud offense is a position that we think is adverse to

20   the interests of the bank as a victim.  We would expect at

21   trial, because it is a bank fraud charge, a very common

22   defense, or attempted defense, in a bank fraud charge is that

23   either of the banks were aware of the activity and, therefore,

24   were not misled or did not care and, therefore, the information

25   was not material.

1        Obviously, Mr. Zarrab doesn't have to tell us what his

2   defenses are, but those are extremely common defenses in a

3   fraud charge and something that we would expect to see in some

4   variation at trial, again, which is a position that we think is

5   adverse to the banks in this case.  We think it is an issue of

6   an actual conflict for those reasons.

7        THE COURT:  Let me ask you this.  Of course, you don't

8   know what the evidence at trial would show, but suppose it came

9   about that the banks, rather than Mr. Zarrab, were actually

10  encouraging these transactions, and one could envision

11  theoretically a defense by Mr. Zarrab said, 'Well, I'm just a

12  businessman.  You know.  I engage in commercial transactions

13  all the time.  And endeavoring to solicit my business, Bank of

14  America and Deutsche Bank said, oh, do your commercial

15  transactions through our banks.'  There's nothing wrong with

16  that, and in fact, encouraged him to do it.  What if that

17  defense were raised?

18        MR. LOCKARD:  I think that's perhaps an even stronger

19  variation on the potential argument that the banks didn't care

20  would be the argument that the banks were actively encouraging

21  the conduct?  I don't think so far in this litigation

22  Mr. Zarrab has really contested that he was engaged in business

23  with either the government of Iran or Iranian entities.  The

24  defense that has been advanced has been either that that's

25  perfectly lawful for him to do because he's outside the United

1    States or that no one was deceived or defrauded in a legal

2    sense as a result of his conduct.  And so if the defense is

3    that the banks were aware of the nature of the activity and

4    either did not care or actively were encouraging it in order to

5    generate business and fees, he would be implicating the banks

6    in criminal conduct.

7         THE COURT:  And exculpating himself to some extent, or

8    endeavoring to.

9         MR. LOCKARD:  Potentially.  I think we would view that

10   as not particularly exculpatory but as a way to shift

11   responsibility elsewhere, certainly.

12        THE COURT:  Fair enough.  Thank you.

13        Mr. Brafman, did you want to address this issue?

14        MR. BRAFMAN:  Your Honor, I think this is an issue

15   that representatives of Kirkland & Ellis should address.

16        THE COURT:  Okay.

17        MR. DINH:  Thank you, Mr. Brafman.  Your Honor, may it

18   please the Court.  We appreciate the government's position that

19   we are not directly adverse to the banks in this case, but only

20   with respect to the potential theories of liability as well as

21   defenses.  Therefore, our position --

22        THE COURT:  Excuse me.  I'm not sure that is his

23   position.  I thought he said that he's of the view that there

24   is adverse -- a relationship between Mr. Zarrab and the banks,

25   not --

```
 1              MR. DINH:  I think, again, your Honor --
 2              THE COURT:  Maybe I'm wrong.
 3              MR. DINH:  -- I'll leave whatever -- I think what I
 4    mean to say is, I hear the government saying that we are not
 5    directly adverse in the sense that we're representing the banks
 6    in this proceeding as well as concurrently representing
 7    Mr. Zarrab in this proceeding.  I think that's certainly not
 8    clear, and it is relevant to our position on the ethical
 9    conflicts.  I think here the government is saying that there is
10    a potentially springing in direct conflict as to their status
11    as victims, because should the Court agree with the government
12    and should the government prove that there was actual harm,
13    then the banks would have some sort of claim that arises out of
14    the activities as alleged and to be proved at trial, some cost
15    with respect to the enhanced investigation, and some risk of
16    governmental action of the like.  I would consider that to be
17    analogous to the well-commented and more common case that is
18    well-discussed in the literature with respect to the common
19    concurrent representation of an insured party that is also
20    represented by the insurance company.  I had it a little bit
21    different.  A lawyer may represent a plaintiff to sue a party
22    that is insured and also represents the insurance company.  I
23    think the commentary in the case law is clear that that does
24    not pose a conflict, even though in some ways the insurance
25    company's economic interest if liability is sought would be
```

 1    directly adverse to the plaintiff, the client.  I think this is

 2    analogous to that situation, which is, it is an indirect

 3    springing potential conflict that arises out of that indirect

 4    relationship.  So that's why our position is that there is no

 5    conflict -- actual conflict with respect to Rule 1.7 under the

 6    New York Rules of Professional Responsibility.

 7              But in all event, I think that the critical issue for

 8    the Court today is obviously that which we have conceded to,

 9    which is the Curcio issues and the defendant's right, Sixth

10    Amendment right to counsel of his choice, as well as to

11    conflict-free trial.  I think all of those issues can be

12    addressed by the Court's procedures that the Court has ordered,

13    including appointment of Mr. Rimm, including our commonly

14    submitted script for the Court to assure itself that Mr. Zarrab

15    has made a knowing and intelligent waiver of any potential

16    springing actual of the conflicts that is waivable.

17              As you know, out of abundance of caution, and as

18    suggested by the Court, we have obtained the banks' statements

19    as to their position in this regard.  We went a step further

20    while we were making the frantic appeals to the banks then and

21    obtained their waiver after fully disclosing the facts of this

22    case to our representation of those banks.

23              THE COURT:  Could you tell us, summarize what those

24    waivers -- so Bank of America has submitted a waiver and

25    Deutsche Bank has submitted a waiver.  What are those

 1    waivers -- could you tell us who wrote them, or rather who

 2    signed them and what they purport to waive?

 3         MR. DINH:  Yes.  Your Honor, I think that all of the

 4    waivers were executed by associate general counsels, which are

 5    the equivalent of senior vice president within the bank.  I

 6    believe one was executed by the Head of Regulatory Affairs of

 7    the Americas for the banks, a clearly authorized person, and

 8    after fully disclosing the information here, they waived any

 9    conflicts that may present itself and allows Kirkland & Ellis

10    to represent Mr. Zarrab at the same time that we represent

11    those banks.

12         Likewise, with Deutsche Bank, we had a waiver --

13    actually, that was the waiver from the Head of Regulatory

14    Affairs for the Americas, and that was signed by the associate

15    general counsel for regulatory affairs for the Americas.

16         The Bank of America was executed by an associate

17    general counsel and senior vice president that is in charge of

18    supervising all outside legal counsel and, therefore, clearly

19    had an authority to waive such conflicts, or potential

20    conflicts, on behalf of the bank, and likewise, consents to

21    the -- for representing both Mr. Zarrab and the bank in various

22    matters.

23         THE COURT:  So one of those two waivers, I think it

24    was the Deutsche Bank waiver, that's on behalf of the New York

25    branch, do I understand that correctly, of Deutsche Bank, but

1    not beyond the New York branch?  Could you explain that?

2            MR. DINH:  Yes, your Honor.  There is a bit of

3    indeterminacy, if you will, because banks are locally chartered

4    within each state, nation, and the like.  So you can imagine

5    that each bank entity is separately chartered and incorporated

6    with an overall parent; in this case, in Germany.  So when the

7    government identified one portion of the Deutsche Bank, I think

8    it was the Deutsche Bank Deposit & Trust Company that the firm

9    represented in some proceedings in SDNY.  We went to the bank

10   and told them the facts and the like, and the bank and its

11   counsel determined that this is most likely the affected entity

12   through which any alleged transfers would be made because it is

13   the money center bank through which wire transfers through

14   corresponding accounts would be transferred.  So that's why it

15   was the New York branch, because it is the money center of the

16   location, and that is the affiliate or subsidiary or corporate

17   entity that most closely matches the allegations.  That is our

18   and the bank's good faith effort in order to identify the right

19   entity with which to waive so as to give the Court comfort.

20           Again, as I said, given our position that there is no

21   actual conflict under Rule 1.7, such waiver is not necessary,

22   but it is done out of an abundance of caution and in order to

23   give the Court more comfort.

24           THE COURT:  You also mentioned in correspondence that,

25   I guess also in an abundance of caution, Kirkland & Ellis has

1    agreed to establish this ethical wall, I think it's called,

2    somehow separating off representation of Mr. Zarrab and

3    representation of Bank of America and Deutsche Bank.  Could you

4    tell us what that ethical wall means and what it is?

5            MR. DINH:  Yes, your Honor.  Out of abundance of

6    caution, what we've done is we have put in a wall that

7    encapsulates all the personnel who have worked on Mr. Zarrab's

8    representation.  So that includes the four lawyers, as well as

9    all of our support staff in this representation.  And

10   basically, no information about Mr. Zarrab's case can be

11   accessed except for those individuals.  If somebody else wants

12   to enter the representation within the firm, so the rest of

13   the members of the firm would have to get specific permission

14   from general counsel in order to access that information.  I

15   think that's the tightest wall we can give in order to protect

16   all the confidentiality of this particular case.

17           If I may, there are some further refinements that, out

18   of candor, I would like to apprise the Court.

19           The government, in addition to Deutsche Bank and Bank

20   of America, which is the primary institutions that have been

21   identified in their motion, has previously given us a list in

22   total of 11 banks that may be affected by this matter.  In

23   addition to actions that we have taken and submitted with the

24   Court with respect to Deutsche Bank and Bank of America, we

25   have determined that six other banks also represented by

1    Kirkland & Ellis.  We have sought from them -- we have apprised

2    them of the government's position and given the full

3    information and disclosure, as we've given Deutsche Bank and

4    Bank of America, and sought from those banks the same type of

5    waivers that we have obtained from Deutsche Bank and Bank of

6    America.

7           We have not heard back from all of those institutions

8    because our efforts have been focused on the Court's orders

9    with respect to Deutsche Bank and Bank of America, but I wanted

10   to let you know that we have taken the preemptive steps, even

11   though it's not been briefed, in order to take care of those

12   issues.

13          One further refinement, if you will.  One of the banks

14   that is in the list of six that the firm also represents is

15   HSBC.  With respect to HSBC, the ethical wall does not exclude

16   two lawyers who works on one HSBC matter; that is, Mr. Clement

17   and myself.

18          THE COURT:  All right.

19          MR. DINH:  So Mr. Clement and myself are handling an

20   appeal for HSBC -- ironically, on the same side as the

21   government -- to the Second Circuit where all of us are trying

22   to appeal from an order from Former Judge Gleason.

23          With respect to that, I have also conversed with

24   Mr. Zarrab and explained to him that Mr. Clement and I

25   represent HSBC in that matter so we can't metaphysically wall

1   off ourselves, and Mr. Zarrab understands that metaphysical

2   issue.  I've likewise explained that to the responsible counsel

3   for HSBC, and they understand it, and they have indicated their

4   consent and waiver, although they have not executed the

5   language that we've sent to them.  But both sides understood

6   that one particular wrinkle with respect to HSBC.

7               THE COURT:  So that means there's no ethical wall when

8   it comes to HSBC.

9               MR. DINH:  With respect to Mr. Clement and myself,

10  yes.

11              THE COURT:  Well, I mean, the wall as described

12  doesn't exist with respect to HSBC.

13              MR. DINH:  Right.  Or I would say nobody else except

14  for Mr. Clement and myself can access both Mr. Zarrab and --

15              THE COURT:  So you and he have gone over the wall, so

16  to speak.

17              MR. DINH:  Exactly.

18              THE COURT:  I was not aware of these other six banks,

19  and it seems to me that we will need a waiver comparable to the

20  ones that we received from Bank of America and Deutsche Bank.

21  Do you anticipate any problem getting those or --

22              MR. DINH:  I don't.

23              THE COURT:  You don't have to really answer that.

24              MR. DINH:  Exactly.  I got the writing from the last

25  two banks, so I can't make any representations with respect to

1    the future ones, although we have had indications from two of

2    the banks that they would execute.  So --

3              THE COURT:  So those are in the works, as it were.

4              MR. DINH:  Yes, your Honor.

5              THE COURT:  Yes.

6              MR. LOCKARD:  One thing that we would like to note for

7    the record.  As this Curcio inquiry has proceeded, the

8    government obviously also has been in touch with the various

9    banks in connection with obtaining records in furtherance of

10   the investigation and in preparation for trial, as well as

11   identifying potential trial witnesses and trial testimony.

12             In those discussions, we did learn that the parts of

13   the bank at Deutsche Bank and Bank of America with whom the

14   government has been dealing on this case were not aware of the

15   Curcio inquiries with the general counsel's office.  Typically,

16   the part of the bank that responds to government inquiries is

17   not necessarily part of the general counsel's office, so we

18   have encouraged them to --

19             THE COURT:  That, I would say is --

20             MR. LOCKARD:  -- to speak internally.

21             THE COURT:  -- unfortunately overall, let alone with

22   respect to this case.

23             MR. LOCKARD:  I think it likely would be the case --

24             THE COURT:  Just an observation.

25             MR. LOCKARD:  -- at the other banks represented by

 1    Mr. Dinh's firm, as well.  So we have earn couraged the banks

 2    to talk to each other internally to make sure that everybody is

 3    on the same page and there is full information throughout this

 4    process.  If Mr. Dinh could provide us with a list of the other

 5    banks, we can also make sure that the banks are internally

 6    speaking with each other.

 7             THE COURT:  Yes.  So we need to formalize that a

 8    little bit more.  I mean, that the general counsel is not

 9    talking to some other part of the bank gives me less comfort

10    than I had when I came out on the bench today with respect to

11    the two waivers that I've seen, so that has to be addressed.  I

12    mean, it's illusory, unless the person who wrote the waiver

13    really speaks for the bank, and what we don't want to hear is

14    that the general counsel or somebody else was unaware of that.

15    That is a problem, frankly, for me, and so that has to be

16    addressed in a formal way.

17             From what I'm hearing, the six banks are in no

18    different position visa vis this Curcio proceeding than Bank of

19    America or Deutsche Bank.  Do you perceive any difference?  I

20    mean, so to have two waivers and not six doesn't really come to

21    grips with the problem.

22             MR. LOCKARD:  I think it largely is the same.  I think

23    one potential material difference, and we are just hearing

24    about it so I don't have fully formed thoughts about it yet,

25    but it sounds like the HSBC matter may be slightly different

1  because Mr. Dinh and Mr. Clement are personally involved in

2  that representation.  I understand, though I'm not very

3  familiar with the matter, I understand that it is a sanctions

4  related matter, a sanctions compliance matter, so I think

5  that's something that may require a little bit of additional

6  consideration.

7           THE COURT:  Yes.  Okay.  I don't know what it means,

8  either, at this point, but I do know, and as Mr. Dinh

9  suggested, we do need to hear from the other six banks, and we

10  need to hear from everybody that the left hand and the right

11  hand are communicating internally.

12           MR. LOCKARD:  Yes, your Honor.

13           MR. DINH:  Your Honor, may I be heard on one thing I

14  forgot to bring up?

15           THE COURT:  Sure.

16           MR. DINH:  The engagement in Mr. Zarrab's matter, as

17  you will hear further from Mr. Brafman, but from the beginning

18  and to this point has been as appellate and strategic counsel.

19  We are responsible for the motions as well as any potential

20  appeals.  We were not retained nor do we anticipate to be

21  examining witnesses, in preparation of the witnesses, and

22  certainly not on cross examination of any bank witnesses, and

23  so in large part, that takes care of the directly adverse issue

24  under the professional rules.

25           THE COURT:  Oh, no.  You've lost me.  I mean, you're

1      sort of compartmentalizing your representation and saying that

2      because you're doing that, there's less likely to be a conflict

3      and otherwise?  I'm missing the point.

4              MR. DINH:  Yes, your Honor.  I think that under the

5      rules in the commentary, especially under the 1.7B with respect

6      to waivers, it is clearly an actual conflict if a law firm

7      cross examines its own client for another client.  That's not

8      the case here, because any examination of the banks would not

9      be done by Kirkland & Ellis.

10             MR. BRAFMAN:  Your Honor, if I may.  Generally, when

11     the Curcio issue presents itself, normally, one of the ways

12     it's cured is if there is someone on the defense team who has

13     no relationship with any of the banks who is able to conduct

14     the cross examination of a witness in an adverse capacity,

15     perhaps because I think Mr. Dinh is correct that the rule does

16     not permit -- the ethical rules do not permit a lawyer to cross

17     examine his or her own client in an adverse capacity.  And the

18     understanding that we have come to among the defense lawyers,

19     and that Mr. Zarrab has made clear, is that with respect to the

20     actual trial, should these witnesses appear and should they be

21     questioned, they would be questioned either by me or someone

22     else on the defense team, but not by any person connected to

23     Mr. Dinh's prior firm or his current firm.

24             THE COURT:  So just while you're up, Mr. Brafman.  The

25     issue that I raised before, I'm just curious as to what you

1    think about that.  Is the net of all of this Curcio proceeding

2    that, among other things, Mr. Zarrab is knowingly and

3    voluntarily waiving the right to argue or defend himself by

4    saying that the banks are responsible for these transactions,

5    or the banks told me that these transactions were okay, I'm

6    just a businessman, and I'm just doing business?  Is he waiving

7    that right to argue that the banks are the culpable parties, so

8    to speak, if the evidence were to lead in that direction?

9            MR. BRAFMAN:  He is certainly not waiving the right to

10   argue that he is not guilty of these charges because, as a

11   business person, A, the law doesn't apply to him because he's

12   not a citizen.

13           THE COURT:  I get that.

14           MR. BRAFMAN:  Second, with respect to the bank fraud

15   charge, he is certainly not waiving his right to argue that the

16   banks are not victims here, either because they suffered no

17   loss or because they clearly knew that these transactions

18   involved Iran, for example.  But I don't believe that he is

19   required to waive his right to question these witnesses.  I

20   think all he needs to do --

21           THE COURT:  No, but you just said something quite

22   important.  So you're saying that he can argue that the banks

23   knew the nature of these transactions.  Is that what you're

24   saying?

25           MR. BRAFMAN:  He may have the right to argue that if

1    the underlying documentation or the testimony leads us in that

2    direction.  But what I was trying to indicate, your Honor, is

3    that, should it be in this trial that a bank witness is -- a

4    government witness is adverse in his direct testimony, for

5    example as to Mr. Zarrab, he need not waive his right to cross

6    examine them, all he needs to waive at a Curcio hearing is the

7    fact that he does not believe there is a conflict by virtue of

8    the fact that Mr. Dinh or his firm or firms represented the

9    bank in another proceeding.  And so long as the person who is

10   going to be doing the questioning on his behalf are not members

11   of the firm whoever represented the bank, there is a separate

12   ethical conundrum that Mr. Dinh would face if he were required

13   to cross examine a bank official in an adverse capacity.

14          THE COURT:  I get that.  Although when we get to the

15   questions, it's not that clear to me that some of these areas

16   are, in fact, sought from Mr. Zarrab as waivers.  When we get

17   to them, you'll let me know.

18          MR. BRAFMAN:  I think if you allow Mr. Rimm and

19   Mr. Zarrab to address the issue, I think Mr. Zarrab, from what

20   I understand, is prepared this morning to waive any issue that

21   would arise solely as a result of Mr. Dinh's representation of

22   any of the banks who are charged as victims in this case.  Not

23   waiving his right to present any defenses with respect to the

24   banks, because we are obviously -- that's the mix here, and I

25   think Mr. Dinh's letters from the banks recognize that he is

1    part of a team that is defending Mr. Zarrab in this case.

2    　　　　　THE COURT:  I do.  But I don't -- is that okay with

3    Mr. Dinh?  Are your clients, so far Bank of America and

4    Deutsche Bank, they're okay with Mr. Zarrab saying, 'I didn't

5    do anything wrong, I'm just a businessman.  In fact, it was the

6    banks who encouraged me to do these transactions.'  And let's

7    take it one step further, they even said that it was perfectly

8    lawful.  Your clients are okay with that happening?

9    　　　　　MR. DINH:  Your Honor, the waivers speak for

10   themselves.  I would not go much beyond that.

11   　　　　　THE COURT:  No.  But you are esteemed counsel, and I'm

12   trying to figure out what they mean so we don't have the people

13   who wrote them here -- I'm just posing a -- I don't know where

14   the evidence is going to lead, but are your banks okay with

15   Kirkland & Ellis lawyers being part of this proceeding where

16   that defense is raised by Mr. Zarrab?

17   　　　　　MR. DINH:  I believe that that is the import of the

18   waivers, especially given all of the recitation of facts and

19   allegations by the government.  We obviously, as Mr. Lockard

20   points out, we are not obligated nor able at this point in

21   order to identify our trial defenses in that regard, but the

22   waivers do recognize the potential conflict of interest as

23   presented by the indictment and the allegations in the bank's

24   knowing waivers.

25   　　　　　THE COURT:  But that's just a narrow view.  Because as

1   Mr. Brafman and all of us know, that one never knows what comes

2   out at a trial.  And I'm raising a possibility.  I have no

3   idea, by the way, I'm not suggesting that this is a realty, but

4   I have no idea if it's going to happen.  But we'd be in a

5   terrible position then, if there were evidence of the nature

6   that I'm describing, I don't know what your position would be

7   at that time.

8            MR. DINH:  I think if you --

9            THE COURT:  We can't have a waiver that's just limited

10  to certain hypothetical facts as we're heading to a trial,

11  which as you well know, every trial always has surprises,

12  always has something different than -- so there's no actual

13  roadmap that we can look at now that tells us exactly what's

14  going to be said by whom at the trial.  So the point is, we are

15  going through this proceeding to make sure we don't have a

16  problem down the road, and we can't just say that these waivers

17  are limited to this fact that the government says that the

18  banks are victims and it turns out that they're not victims.

19  That would not be acceptable to me, actually.  We have to be a

20  little more flexible there and understand that the reality of

21  trials is different than what we necessarily can predict today.

22           MR. DINH:  Yes, your Honor.  And I do not mean to say

23  that the bank waivers are limited to one limited set of facts.

24  They are fully apprised of all the facts in this case as we

25  know them today, all the allegations that are made by the

 1    government.  They understand the scope of our representation

 2    and they have knowingly waived and consented to our

 3    representation of Mr. Zarrab in this regard.  I think one --

 4    and each one of those waivers, one of those conditions is that

 5    no Kirkland & Ellis attorney would cross examine the banks'

 6    witnesses that may be presented.  I think that in and of itself

 7    speaks that they have considered the potential ramifications

 8    that your Honor is addressing.

 9            THE COURT:  Okay.  So then briefly, I'm going to turn

10    to Mr. Rimm.  As you know, I appointed him some week or ten

11    days ago.  I don't exactly remember.  As I had indicated, which

12    is common practice, we appointed him as CJA attorney on duty on

13    that particular day to undertake as an independent person who

14    has no relationship to this case otherwise to familiarize

15    himself with the issue of these Curcio conflict issues and to

16    speak with Mr. Zarrab, with the help of a Turkish language

17    interpreter, and just to give comfort actually to the Court,

18    and also to Mr. Zarrab, that there was this independent review

19    of the conflict issues.

20            Mr. Rimm has sent me a letter dated November 29, 2016

21    summarizing that he did that, and perhaps we could call on him

22    to tell us what, in fact, he found.

23            MR. RIMM:  Thank you, your Honor.

24            THE COURT:  Before you start, I guess the new news

25    that I heard today is probably new news to you, as well; that

```
 1    is to say, that there are six other banks.  I don't suppose you

 2    spoke to Mr. Zarrab about any other banks apart from Bank of

 3    America and Deutsche Bank.

 4              MR. RIMM:  That's correct, your Honor.  The focus of

 5    our conversation yesterday was on the Bank of America and

 6    Deutsche Bank.  The names of the other six banks are names with

 7    which I was not familiar until this morning.  But having spent

 8    approximately two hours in a comprehensive conversation with

 9    Mr. Zarrab yesterday, I believe firmly that the answers that

10    your Honor may pose to him in connection with the Court's

11    Curcio inquiry will result in the same answers as to those six

12    additional banks.  Just to repeat quickly what my letter from

13    yesterday says, Judge.

14              THE COURT:  Yes.

15              MR. RIMM:  Mr. Zarrab was fully engaged in our

16    conversation from yesterday.  He asked what I deemed to be

17    appropriate questions.  He provided answers to my questions in

18    a manner that made me believe he understood the questions and

19    all of the issues that we had reviewed and discussed.  We went

20    through in painstaking detail hypotheticals, examples set forth

21    by the government in its two submissions, questions as amended

22    by Kirkland & Ellis' letter from November 21st.  We discussed

23    the ethical wall, among other things.  We also discussed the

24    waivers from the two banks as laid out in Kirkland & Ellis'

25    November 28th letter.
```

1          I did not reach a conclusion whether there is an

2    actual or a potential conflict.  I don't think that my

3    appointment requires me to do so.  But nevertheless, I think

4    whether your Honor concludes it's actual or potential or

5    something else, Mr. Zarrab is fully prepared today to answer

6    your Honor's questions and, if your Honor concludes that there

7    is either an actual or a potential conflict, he is prepared to

8    proceed and to make a knowing and intentional waiver of his

9    right to conflict-free counsel.

10          THE COURT:  So that's the nature of his waiver is

11   that -- Mr. Zarrab's, that is -- that he's prepared knowingly

12   and voluntarily to waive the right to conflict-free

13   representation, right?  That's the sum and substance?

14          MR. RIMM:  Yes, your Honor.

15          THE COURT:  Okay, thank you.

16          By the way, the letters from the banks, Bank of

17   America and Deutsche Bank, are each dated November 29, 2016.

18   One is by a man named Andrew Stemmer, he's with Deutsche Bank,

19   New York branch, and the other is with Mr. C. Paige Bobick, and

20   he's with Bank of America.  Those letters will have to speak

21   for themselves for now, but we do need, as I say, the

22   supplementation, and I'll ask the government and defense

23   counsel to work together to get the supplementation with

24   respect to the six other banks, and also, we'll call it the

25   left-hand-right-hand issue, knowing what one segment of the

 1    bank is doing be it known by the other segment of the bank.

 2         We'll also need to hear further about the HSBC issue

 3    where the ethical wall is not -- I guess -- well, I don't know

 4    how to describe it, but there's no ethical wall it seems with

 5    respect to Mr. Clement and Mr. Dinh with respect to HSBC.

 6         Anybody want to say anything else about the background

 7    before -- no.

 8         MR. LOCKARD:  No, your Honor.

 9         THE COURT:  Mr. Brafman?

10         MR. BRAFMAN:  No, your Honor.

11         THE COURT:  Just give me a moment.  I'm just reviewing

12    again the questions.  I thought, Mr. Brafman, I would use your

13    questions -- or the defense, rather -- maybe it's Kirkland &

14    Ellis' proposed questions which are not uncommon or the ones

15    that one would typically ask during a Curcio hearing.  If you

16    give me a minute, I just want to review one or two of them in

17    light of the facts we've talked about today.

18         (Pause)

19         THE COURT:  Mr. Lockard, here's a question for you.

20    I'm now referring to your November 29 letter to me in which I

21    solicited or elicited from you as a subject of a court order

22    dated November 29, 2016 which I asked the government to provide

23    additional information to the Court in advance of the Curcio

24    hearing, and this is the letter in which you detailed many of

25    these transactions and dollar amounts involving Deutsche Bank

1    and Bank of America.  It seems to me that we're going to need

2    something like that with respect to these six other banks, too,

3    are we not?

4              MR. LOCKARD:  Yes, your Honor.  I think our letter

5    already identifies how the banks are referred to, to the extent

6    that they are referred to in the indictment, in Footnote 2 on

7    page 2.

8              THE COURT:  I've got that in front of me.

9              MR. LOCKARD:  We can also provide similar information

10   with respect to the aggregate transactions involving those

11   identified entities for the other banks, as well.

12             THE COURT:  But I wonder -- I'm really not

13   wondering -- I'm wondering whether we're going to succeed, even

14   theoretically, in proceeding with Curcio questions with respect

15   essentially to two out of eight banks.  It's like a partial

16   Curcio hearing.  It doesn't seem to me to make much sense.

17             MR. LOCKARD:  I think that's right.  I think you could

18   accomplish part of the Curcio today, but I don't think we can

19   accomplish all of the Curcio today.

20             THE COURT:  Well, one would have to do the precise

21   same questions with respect to six other banks at some other --

22   so that -- I'm not sure that's the most efficient use of our

23   time.

24             MR. LOCKARD:  I think that's right, your Honor.

25             MR. DINH:  Your Honor, we had advised Mr. Zarrab of

1    the other six banks and had obtained from him a knowing and

2    written waiver with respect to those six banks.  That was

3    accomplished the day before Thanksgiving, so he's had plenty of

4    time in order to appreciate that.

5         In the interest of judicial expediency, I would submit

6    that the purpose of the Curcio hearing is for the Court to

7    ascertain Mr. Zarrab's knowing and intentional waiver, knowing

8    all the facts available to him.

9         We will, of course, in all good faith and with all

10   delivered speed, obtain the position and consents from the

11   other banks, but with respect to Mr. Zarrab, I'm not sure that

12   that is the relevant inquiry.

13        THE COURT:  I'm not entirely sure I agree with you in

14   this regard.  So in this sort of unusual situation, we have

15   waivers on both sides, right?  We have waivers from Mr. Zarrab

16   and waivers, presumably, from the banks, and we also have, in

17   the context of those waivers, which is, for example with

18   respect to Bank of America and Deutsche Bank, the letter from

19   the government dated November 29 which actually sets forth some

20   of the transactions and the dollars amounts.  So from my view

21   of things, I would rather have context before conclusions

22   rather than conclusions without context.

23        So for example, Mr. Zarrab would not be happy if two

24   or three or four of the banks decided that they weren't going

25   to do -- I'm guessing, I don't want to speak for Mr. Zarrab and

1    Mr. Brafman -- but I think we should have all of the context on

2    the table before we impose on Mr. Zarrab and ask him if, in

3    fact, he's waiving this whole body of transactions and eight

4    banks.  That just seems to me.

5           I hear what you're saying.  I think possibly one could

6    do it today in part and then do it in part again, but to me,

7    it's better to have everything that we need, because that's

8    just the way I view things, that we should have a fuller record

9    and a fuller context before we ask him to make these waivers.

10          MR. DINH:  I understand.  Just one last point, your

11   Honor.

12          MR. BRAFMAN:  May I have one second, your Honor?

13          THE COURT:  Sure.

14          (Discussion off the record)

15          MR. DINH:  I appreciate your Honor's concern and

16   caution.  I'm advised that Mr. Zarrab is well aware of our

17   representation of the other banks, as I've indicated to the

18   Court, and is willing to waive his right with respect to those

19   banks, also.  Most significantly, your Honor, I think that the

20   questions that the government proposed and the defense

21   consented to does not presume a mutual waiver.  That is, the

22   questions as submitted to the Court does not assume that

23   Mr. Zarrab's waiver is conditional upon a reciprocal waiver

24   from the banks.

25          THE COURT:  I thought the bank letters, or one of them

 1    indeed, said something to that effect.

 2          MR. DINH:  But the Curcio -- and we have -- with our

 3    conditionality on the banks, that the banks as --

 4          THE COURT:  Am I right or wrong about that?  So for

 5    example, Mr. Stemmer says, "The foregoing consent is also

 6    subject to the firm's receipt of a written consent from Zarrab

 7    to the firm's present representation of the bank and its

 8    subsidiaries and affiliates in connection with any and all

 9    matters in which the firm currently represents the bank or its

10    subsidiaries and affiliates."  By the way, Bank of America said

11    the same thing.  I assume these six other banks are going to

12    say the same thing there, too, right?

13          MR. DINH:  And that conditionality is met because we

14    have that waiver from Mr. Zarrab and have or are in the process

15    of providing it to those banks.  My point is that with respect

16    for the purpose of Curcio and the delicate balance between his

17    right to counsel of choice versus his right to conflict-free

18    counsel, the questions as propounded by the government and as

19    acceded to by the defense, does not presume any such

20    reciprocation; indeed, presumes quite the converse.

21          THE COURT:  I get it.  I get it.  I'm not necessarily

22    disagreeing with you.  From my perspective, I prefer to have

23    the context first and the conclusion, which is the Curcio

24    questioning, after we see it all in front of us, just like we

25    have with respect to these transactions.  So maybe it's

1    excessive caution or maybe it's unnecessary, but we can't

2    finish in any event, right?  I don't think we reach a

3    conclusion on Curcio hearing, I don't, until we get all of

4    these consents from the six other banks or we jump over the

5    ethical wall or whatever we're going to do with respect to

6    HSBC.  That needs all to be in place before I'm ready to make a

7    determination.  I think I'm going to wait.

8              How long would it take to get that context?

9              MR. LOCKARD:  With respect to the financial

10    information, the government can have that available within a

11    day or two, and certainly by the end of this week.

12              THE COURT:  Okay.

13              MR. DINH:  I cannot make any representations because

14    it's an independent third party, your Honor, that I cannot

15    answer to.  But we are making all progress, as you know, even

16    preemptively before asked by the Court.

17              THE COURT:  You know, just as I said in one of the

18    orders, no Curcio, no nothing.  You know what I mean?  No next

19    proceeding.  We've got to get these issues resolved before we

20    can take any next step and have a suppression hearing,

21    et cetera, et cetera.  I'm happy and was happy to come up with

22    dates today, but to me, that hinges on when we can finish this

23    business.

24              MR. BRAFMAN:  Your Honor, we had suggested, and the

25    government, I think, had -- the government indicated to us that

1    the 5th, which is the next scheduled proceeding, was not going

2    to work because of witness unavailability, I believe, on their

3    part.

4              THE COURT:  I'm now prepared not to proceed on the

5    5th.

6              MR. BRAFMAN:  What I'd like to do, if your Honor would

7    permit, I think we agreed on the 15th, subject to the Court's

8    availability, as an alternative date for the hearing, and

9    Mr. Dinh advises me that if we keep that date, that he believes

10   he'll be able to get the additional waivers before that so the

11   Court could conduct the Curcio on that morning.  We could then

12   move to the suppression hearing, and hopefully on the same day

13   a brief Franks hearing, if your Honor agrees that we should

14   have that.

15             THE COURT:  While we're on the topic, how I was going

16   to respond was to ask you about the 14th instead of the 15th,

17   because it would be a better date to start this or do all of

18   that.

19             MR. BRAFMAN:  I believe that question should be

20   addressed to the government.  I think the 14th was a date that

21   I believe was problematic for them, if I'm not mistaken.  Let

22   me just check before I do that.  I believe I could do the

23   morning of 14th.  The 15th is a better day for me, as well.

24             THE COURT:  Well, I'm going to suggest that you save

25   both dates.  The 15th is available.  The 14th is in the morning

 1   for you.  How about the government?

 2             MR. LOCKARD:  We expect the witnesses to be available

 3   both days, the 14th and the 15th.

 4             THE COURT:  Let's say we'll adjourn, hopefully, the

 5   conclusion of the Curcio to the 14th of December at 9:30.  I

 6   hate not to have a date -- can we say that by December 7 we'll

 7   have the information with respect to the other six banks, do

 8   you think?

 9             MR. DINH:  We will certainly try, your Honor.  Again,

10   if we cannot, we will come back to the Court with an

11   explanation.  But your Honor, may I?  One question as to form.

12             THE COURT:  Yes.

13             MR. DINH:  We have viewed, as I think is consistent

14   with the ethical obligations, the representation and consents

15   by our clients is made to prevent Ellis as the law firm, and so

16   we had, prior to your Honor's order of yesterday at noon, we

17   had sent out the forms for consent to Kirkland & Ellis.  I

18   understand the Court -- those are to be addressed to the Court.

19   May we ask for the Court's indulgence so we that don't increase

20   the time in dealing with these complex organization that we

21   will collect all of these consents addressed to Kirkland &

22   Ellis and then put them all in a cover letter to the Court with

23   a representation that they are made to the Court, also?

24             THE COURT:  Yes.  Or if they haven't been done yet, so

25   they can --

1           MR. DINH:  If they have not been done, we will take

2    every effort to make them addressed to the Court.

3           THE COURT:  Or you can CC the Court.  Doesn't sound

4    like any of them have been done, but yeah, that would work as a

5    fallback.  I would prefer it in the same fashion that we got

6    the Bank of America and Deutsche Bank.  I'll work with you on

7    that.

8           MR. DINH:  Thank you, your Honor.

9           MR. BRAFMAN:  There are a number of other, I think,

10   important issues that we would like to address to the Court,

11   but is the Court determined not to proceed until the Curcio

12   issue is resolved?  Because these issues really don't directly

13   impact on Kirkland & Ellis.

14          THE COURT:  I'm happy to hear you on this issue of

15   compartmentalization, for example.  I'm happy to also talk

16   scheduling in terms of the hearings and dates and the trial

17   date.  I don't know if you had other things in mind.  Did you

18   have more in mind than those items?

19          MR. BRAFMAN:  I don't believe I do.  Other counsel may

20   want to ask the Court to address another issue, but let me, if

21   I can, your Honor, since we are here and the Court has made

22   yourself available, if we can, let's address the other issue,

23   which I don't believe is an issue.

24          I think the issue of compartmentalization among

25   defense counsel was created as a result of a comment I made at

an informal meeting with the government several weeks ago.  So

that it's clear, there was and continues at this point to be

several -- there are several different law firms involved in

this case, and because of the breadth of the work to be done,

we have essentially, among ourselves, delegated certain work to

one firm or another.  But since the Court appointed me de facto

lead counsel, I have done everything humanly possible, with the

assistance of Mr. Kirshner and Mr. Agnifilo, to keep abreast of

everything that was happening.  I was aware, and so was

Mr. Zarrab, that one or another of the lawyers involved had met

with the government, or certain government lawyers, in an

effort to see if there was a way to resolve this case in a

manner acceptable to him, because of his status as a noncitizen

and our belief that there were jurisdictional issues, and there

are discussions that I was not present at where other lawyers,

I think, raised one or more of those issues with government

lawyers.

        Shortly after those meetings, I became completely

aware of them.  But in the meeting with the government where we

were really meeting to discuss scheduling and discovery, as an

aside, as I was leaving, in a passing comment I did direct the

question to the line assistants, in addition to the people

here, just asking, and almost in a comical way, "Have there

been any negotiations with your office that I'm not aware of?"

And I think the response was that I should address those

1    questions and words of substance to my colleagues, which I did.

2    I knew that meetings had taken place.  I was not there.

3    Shortly thereafter, I spoke with the lawyers and I was fully up

4    to speed, and I briefed my client on it.

5            I also tell you that these lawyers spoke directly to

6    Zarrab and then to me, and I really don't believe there is any

7    issue whatsoever in terms of Mr. Zarrab ever being able to

8    claim that there's something going on here in the defense team

9    that he doesn't know about.  And I think if you're asking is he

10   prepared to say I have different lawyers, I believe they are

11   communicating, and I waive any possible issue that could arise

12   with respect to a claim of either ineffective assistance of

13   counsel or uninformed counsel, I believe he's prepared to waive

14   that claim today.

15           I submit to you, as an officer of the court, that

16   there is no issue.  I have taken the responsibility in large

17   measure, together with cocounsel, of having full and frank

18   discussions with Mr. Zarrab, have met with him many, many

19   times, despite the hardship involved in having those meetings

20   while he is remanded, and I think he is up to speed on all

21   aspects of any discussions by any lawyers with any government

22   lawyers.

23           THE COURT:  I'm going to ask the government if they

24   have any response to what you've just said, but would you also,

25   while we're hearing from the government, assuming they do want

1    to say anything, would you look over that proposed list and see

2    which, if any, of those questions you and Mr. Zarrab feel

3    comfortable responding to?

4          MR. BRAFMAN:  If I may have just one minute, your

5    Honor?

6          THE COURT:  Yes.

7          MR. BRAFMAN:  Your Honor, this list was between

8    Mr. Rimm and Mr. Zarrab, as well.  I think he did discuss this

9    issue with him, and he is prepared to report to you that

10   Mr. Zarrab also understands it and is willing to waive.  Your

11   Honor, the difficulty with the list is we think some of the

12   questions just aren't appropriate to ask of a defendant.  I

13   want to make sure I'm looking at the same --

14         THE COURT:  The nine questions?

15         MR. BRAFMAN:  Yes.  Your Honor, with respect to the

16   nine questions, I have no objection to your Honor asking

17   Mr. Zarrab questions 1, 2, 3, 4, and 5.  I understand that some

18   lawyers feel that 6, 7, 8, or 9 create questions that I don't

19   think the defendant is required to answer once he's answered

20   questions 1 through 5.

21         THE COURT:  Let me hear from the government if they

22   agree or if they disagree.  Particularly, I'm going ask you

23   again, Mr. Brafman, how about question 8?

24         MR. BRAFMAN:  I think there is one question that your

25   Honor could phrase after question 5, and that is, "Do you

1    understand that by having different lawyers who are involved in

2    different aspects of this case you are waiving any claim of

3    ineffective assistance of counsel in the event you were to

4    concludes that lawyers did not fully communicate with each

5    other?"  I think that's really the main issue of the day, that

6    he's not going to be able to raise an issue of ineffective

7    assistance of counsel by virtue of the fact that he has a

8    number of different lawyers who are handling different parts of

9    this case.  If you get an affirmative response to that

10   question, I really think the issue is settled, Judge.

11         THE COURT:  You still think 8 or 9 are not compatible

12   with what you just said?

13         MR. BRAFMAN:  Because there's no evidence to suggest

14   that any of the lawyers are operating in a way that is not in

15   Mr. Zarrab's best interest and assumes something that's

16   inappropriate.

17         THE COURT:  I see.

18         Mr. Lockard.

19         MR. LOCKARD:  Yes, your Honor.  I'm not appreciating

20   the nuance between the written question 8 and Mr. Brafman's

21   proposal.

22         THE COURT:  I'll tell you what.  Why don't we go off

23   the record for a minute and see if you can't come up with a

24   question that's not.

25         MR. BRAFMAN:  Your Honor, if your Honor wants to go

1    through 1 through 5 and then ask 8, then I don't have a problem

2    with 8 if we stop it at the end of the noneffective assistance

3    of counsel, period, because that's really the issue.  I think

4    the add-on is just inappropriate.

5            MR. LOCKARD:  I don't think the government has any

6    objection to the proposed edit to question 8.  I think we do

7    also think that number 9 is sort of the ultimate Curcio

8    question, and we think number 9 is also appropriate.

9            MR. BRAFMAN:  Your Honor, number 9 is just a

10   repetition of all the other questions.  The fact is, he has

11   different lawyers.  He understands that they are handling

12   different aspects of his case.  He's waiving any claim that he

13   was denied or would be denied the effective assistance of

14   counsel.  If he were to determine that the lawyers were not

15   properly communicating with each other, which I respectfully

16   indicate that they are, in any event, and he's here hearing me

17   say that, and he's discussed this issue with independent

18   counsel.

19           THE COURT:  It may be a little repetitious, but it

20   doesn't look, having heard what I've heard, like a question

21   that we shouldn't ask.  So 8 as edited, and 9 as it exists.

22           MR. BRAFMAN:  Your Honor, just so it's clear, this is

23   not a football team where you have separate players who have

24   separate responsibilities on each play and is supposed to cover

25   a particular issue.  This is a moving defense team.

1          THE COURT:  As I understood.  I think that is the

2     point that the government was making, that this notion of

3     compartmentalization was that different players, if you will,

4     have different assignments, and I think he's concerned, rightly

5     or wrongly, that as a result of that, there may not be

6     communication, or there may be actually a difference of

7     approach by different lawyers.

8          MR. BRAFMAN:  Judge, I'm not going to fight you if you

9     want to ask that question, I just want your Honor to

10    understand --

11         THE COURT:  I'm not suggesting that there is that

12    problem, but it's been put on the table.

13         MR. BRAFMAN:  But I want the Court and the government

14    and Mr. Zarrab to hear at the same time --

15         THE COURT:  Okay.

16         MR. BRAFMAN:  -- the assignments are not set in stone,

17    and sometimes the responsibilities overlap.  For example,

18    although Mr. Dinh's firm may be drafting a response, I

19    ultimately review it, Mr. Kirshner and I submit suggestions,

20    recommendations, sometimes the product is a combination of

21    input by a number of different firms, Ms. Chung, Mr. Wolfson.

22    There are other people who have input into something.  So even

23    though they have the assignment of doing written work, we're

24    all participating in the end product.  Just like today, I'm

25    speaking on behalf of the team, I'm going to be raising issues

1   that we have collectively discussed with Mr. Zarrab, so it's

2   really not fair to pigeonhole.

3           I think the issue of the day is if you have more than

4   one lawyer and you are assuming that they work cooperatively in

5   your best interest, which I represent we are, do you waive any

6   potential conflict of interest issue as to ineffective

7   assistance of counsel by virtue of having more than one lawyer

8   in a case?  I think that's the ultimate question.

9           If your Honor is more comfortable asking question 9,

10  then I'm not going to strongly oppose it.

11          THE COURT:  Mr. Lockard.

12          MR. LOCKARD:  Yes.  I'll take the podium.

13          THE COURT:  Does that work for you?

14          MR. LOCKARD:  That works for the government.  And with

15  the Court's permission, I'll add just a couple of background

16  comments just in the interest of making sure that the record is

17  clear.

18          THE COURT:  Okay.

19          MR. LOCKARD:  Again, I'll be brief.  I think this is

20  an issue that the government thought it appropriate to raise

21  because of a couple of examples where we thought that the

22  concerns had, in fact, played out.

23          We understand that Mr. Zarrab has retained a large

24  team of attorneys and that it may be perfectly efficient and

25  sensible for him to organize that team in different ways and to

```
 1   have them carry out different tasks at different times.  But
 2   there had been, at least on some occasions, discussions between
 3   certain of Mr. Zarrab's attorneys and the government where we
 4   were advised explicitly that only certain attorneys were aware
 5   of either the topic of conversation or the fact of the meeting,
 6   which may be a perfectly rational decision for Mr. Zarrab to
 7   make, but one that we thought warranted making sure that the
 8   record was clear that he had, in fact, made that decision and
 9   was aware of the fact that it can create risks, as in any team
10   that approaches the size of an organization, that one part of
11   the team may have information that would be helpful to another
12   part of the team, there has to be effective communication
13   between them in order to make use of it, or if different parts
14   of the team are pursuing strategies that could be intentioned
15   with each other, then that could undermine the effectiveness of
16   either or both of those, so we thought it warranted making sure
17   that the record was clear that Mr. Zarrab was intentional about
18   that setup.
19           THE COURT:  What I'm going to do is swear in
20   Mr. Zarrab.  I'm going to ask him questions 1, 2, 3, 4, and 5,
21   8 as edited by Mr. Brafman, and question 9 in an effort to
22   respond to everybody's concern on this.
23           MR. BRAFMAN:  Your Honor, they're just switching
24   interpreters.
25           THE COURT:  Sure.
```

1              (Defendant sworn)

2              THE COURT:  Mr. Zarrab, you've heard the conversation

3     this morning, and I'm going to ask you a series of questions

4     relating to this latter discussion that we've been having.

5              First, do you understand that you have hired a large

6     number of attorneys to represent you in this matter?

7              THE DEFENDANT:  Yes.

8              THE COURT:  And by "large", I think we're talking

9     about 14 -- there are some 14, or approximately 14 attorneys

10    representing you.

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  Second, do you understand that if you

13    direct different attorneys who are representing you to pursue

14    different strategies, those strategies might conflict?

15             THE DEFENDANT:  I understand, your Honor.

16             THE COURT:  Third, do you understand that if you

17    instruct that certain aspects of your trial strategy are not to

18    be shared with all of your attorneys, those other attorneys may

19    pursue other avenues that conflict with the aspects of your

20    trial strategy that they do not know about?

21             THE DEFENDANT:  I'm aware, your Honor.

22             THE COURT:  And fourth, do you understand that during

23    the course of preparing your case for trial, it has been

24    necessary and will continue to be necessary for your attorneys

25    to confer with the government and the Court about your case?

```
 1              THE DEFENDANT:  I understand, your Honor.

 2              THE COURT:  Five, do you understand that if different

 3    attorneys who represent you are inconsistent in their

 4    communications with the government and the Court about your

 5    case, it may harm your interests?

 6              THE DEFENDANT:  I understand, your Honor.

 7              THE COURT:  Then the next question is this, do you

 8    understand that by giving instructions to your lawyers about

 9    how to proceed with your case you are waiving, assuming there

10    were a conviction, any post conviction argument on appeal or

11    otherwise that you were denied effective assistance of counsel?

12              THE DEFENDANT:  I understand, your Honor.

13              THE COURT:  The last question I want to ask you is, do

14    you waive any post conviction, assuming there were a

15    conviction, argument on appeal or otherwise that by virtue of

16    assigning different responsibilities to different lawyers on

17    your team, you were denied effective assistance of counsel by

18    them?

19              THE DEFENDANT:  I understand, your Honor.

20              THE COURT:  Thank you very much.  I appreciate that.

21              Mr. Brafman, I would turn next to scheduling.  I don't

22    know if you were suggesting that somebody else wanted to raise

23    some other issue before scheduling?

24              MR. BRAFMAN:  I think Mr. Rimm just wants to verify

25    that he discussed this issue of different counsel with
```

1     Mr. Zarrab independently.

2              MR. RIMM:  May I have a moment, your Honor?

3              THE COURT:  Sure.

4              (Discussion off the record)

5              MR. RIMM:  Your Honor, I just want to note for the

6     record, as my letter from yesterday indicated, that I discussed

7     these issues of compartmentalization with Mr. Zarrab, and he

8     was prepared to go forward today, and actually requested that

9     he go forward today.

10             I do have one question for the Court, while I'm

11    standing up, if I may.

12             THE COURT:  Yes.

13             MR. RIMM:  Does your Honor wish for me to meet with

14    Mr. Zarrab again in connection with the six other banks?

15             THE COURT:  It's really a question for you.  That is

16    to say, so the preparation that you did with him up until now

17    with respect to the Bank of America and Deutsche Bank, do you

18    feel that there is more to discuss with him specifically with

19    respect to these six other banks?  Before you answer, do you

20    want to see what those six other banks submit before you answer

21    that question?

22             MR. RIMM:  I'm happy to defer making a decision until

23    I receive the submission from Kirkland & Ellis, but I do

24    believe that, because of how comprehensive our discussion was

25    yesterday, another meeting will not be necessary.

1          THE COURT:  Perhaps you, at the time that you do get

2     to review and see these other submissions, you could send me a

3     letter that says, if this is the case, that nothing in these

4     submissions detracts from your conversation, or there's no need

5     for further conversations because these issues have been

6     covered before.

7          MR. RIMM:  Very well, your Honor.

8          MR. BRAFMAN:  Judge, if I may.  In order of, I think,

9     scheduling, I think we've set the morning of September 14th and

10    15th for the suppression with respect to the iPhone, and I

11    would also like to briefly address the need for a Franks

12    hearing and ask the Court to consider, if you grant the Franks

13    hearing, to hold it immediately after the suppression hearing.

14         The government, with respect to the suppression

15    hearing, has offered several affidavits which are the direct

16    testimony of several agents.  They have essentially taken the

17    position that they cannot identify the customs agent who is

18    alleged to have taken the pass code from Mr. Zarrab on two

19    occasions while he was being interviewed by border patrol.

20         They have also told me that they do not intend to

21    contest the accuracy of Mr. Zarrab's affidavit that he put in

22    in support of the search warrant.

23         The reason I want to ask you to consider allowing me

24    to call Agent Geissler, which the government objects to, is

25    because he is the key agent who I believe helped coordinate all

1    of the matters that occurred on March 19th at the Miami

2    airport.  He is the agent who advised Mr. Zarrab of his rights

3    on the brief videotape that I think we've all seen, and shortly

4    after the videotape is turned on and Mr. Zarrab asks for a

5    lawyer.  It's also, I think, Agent Geissler who is involved at

6    a later point during the processing of asking Mr. Zarrab for

7    the information that we believe to be inappropriately obtained

8    after he invoked his right to counsel with respect to his

9    holdings, his business assets, and his business and banking

10   relationships.

11          The government has taken a position that that all came

12   in as routine processing.  I believe I have a right to question

13   Mr. Geissler on those issues, and I believe, just based on the

14   information we have already been provided by the government, I

15   think brief questioning of Mr. Geissler will, I think, produce

16   information that I think the Court should hear before ruling on

17   the motion to suppress.

18          THE COURT:  Just so you know, I agree with you.  The

19   ruling is that you may, if you wish, call Mr. Geissler.

20          MR. BRAFMAN:  Thank you very much, your Honor.

21          THE COURT:  You're talking about the so-called, the

22   first portion -- the first suppression hearing.

23          MR. BRAFMAN:  Yes, sir.  The suppression hearing, as

24   you already ordered, so I'm permitted to call Mr. Geissler.

25          THE COURT:  Yes.

 1          MR. BRAFMAN:  I would also ask, since we're starting

 2    on the 14th, that the government produce, as soon as possible,

 3    because they were supposed to have the hearing on the 5th and

 4    now it's the 14th, but I believe they are supposed to produce

 5    whatever 3500 material is appropriate for the hearing, and that

 6    is any reports filled out by the customs agent or the FBI

 7    agents who are involved in the processing.

 8          I'm not looking to do a fishing expedition, and if

 9    they want to provide only the three or two of the reports

10    prepared by Agent Geissler with respect to the processing, I'll

11    accept that, but I think I should be entitled to the

12    3500 material prior to the hearing.

13          THE COURT:  Why don't you talk to the government and

14    see if you can't work that out.

15          MR. BRAFMAN:  I will, your Honor.  I think, in

16    substance, they have agreed, and now that your Honor has

17    ordered that I can question Agent Geissler, I think we'll make

18    progress without bothering the Court.

19          Your Honor, I want to briefly be heard.  I know we've

20    written on it, and if the Court needs further written

21    submissions we'll try and expedite it, but the Franks hearing,

22    just so the Court understands, is going to be very brief.  It's

23    one witness.  It's agent McReynolds.  It's her affidavit that

24    is in question.  It's her affidavit that was relied on by the

25    magistrate to issue the warrant that allowed them to search the

1    defendant's emails.  It's, I think, impossible to do this

2    entirely on papers, and I promise the Court that the entire

3    questioning of Agent McReynolds would take between half hour or

4    an hour, at most, and can be done immediately after the

5    suppression hearing starts.

6         THE COURT:  Expediency has really never been a

7    motivating factor for me.  Whether you're entitled to that

8    hearing or not, I have to decide, I will decide that.  Whether

9    it's a half hour or three days, if you're entitled to it,

10   you'll get it.  If you're not, I'll indicate why not.

11        MR. BRAFMAN:  Okay.

12        THE COURT:  I'm not concerned about long or short or

13   anything.

14        MR. BRAFMAN:  Okay.

15        THE COURT:  I was planning to ask you, and the

16   government as well, so the briefing is very helpful.  The

17   government raised, as you know, in court and in its

18   correspondence, the issue of inevitable discovery, and I was

19   going to ask, and will ask you now today, for a supplemental

20   briefing.  Really, I don't think we need more than five pages

21   each side, you know, probably double-spaced, but it would be

22   helpful to have some citations just so I get a feel for what

23   would be argued if we ever reached the issue of inevitable

24   discovery.

25        MR. BRAFMAN:  Yes, your Honor.  We'll try and submit

 1    that as quickly as possible.

 2           Your Honor, I want to talk respectfully about

 3    scheduling.  And if your Honor wants to tell us on the 15th

 4    what your thinking is, I just want to alert you to a problem

 5    that has arisen primarily as a result of the government's

 6    superseding indictment.  I'm not saying this in a critical

 7    fashion, but it was more than eight months after the

 8    defendant's arrest that we became aware of a superceding

 9    indictment.  He was arrested in March, and I think we got the

10    indictment last month.  In my math, it's eight months since

11    March, or close to it.

12           Your Honor, while the government maintains that that

13    indictment doesn't substantially change the playing field, it

14    adds a defendant, who I don't believe they're ever going to

15    produce, and yet we are going to be burdened with defending

16    that part of the case.  It adds an entity called Mahan Air,

17    which we have never searched for in our initial attempt to get

18    a handle on the materials that are voluminous, and I will

19    represent to the Court that I believe, in hiring computer

20    experts who used our search terms, they reviewed hundreds of

21    thousands, if not millions, of emails, wire transfers receipts,

22    and other documentation, and I believe the defendant has spent

23    more than a million dollars on these computer experts, and now

24    they are telling us that there has to be new search terms with

25    respect to Mohammad Zarrab, and also who has been added as a

1    defendant with respect to Mahan Air.  And just so the Court

2    understands, many of these documents are in farsi.  They have

3    to be translated by the computer people who hire farsi experts,

4    and it's a very time-consuming process, and lawyers on our team

5    have spent literally hundreds of hours in actually analyzing

6    these materials.

7              It's impossible to look at just one email, you have to

8    go back and look at a chain, then you have to look at who the

9    other people are who are copied.  So I don't want to burden the

10   Court, but it's a very, very complicated issue.

11             I've spoken to the government about the need to

12   adjourn the trial date.  The government has graciously told us

13   that they would accept a reasonable application, and I think we

14   even discussed as much as a four-month adjournment of the

15   January trial date as something that they would consider

16   reasonable.  But herein lies the problem.  In addition to

17   reviewing the materials, it now becomes apparent that, although

18   two members of the defense team -- one of my associates and

19   Ms. Chung -- actually traveled to Turkey and interviewed

20   certain people, that there are a whole new slew of people who

21   may have to be interviewed.  We may ultimately decide, after

22   interviewing them, that we're going to need Rule 15 depositions

23   whether the government is able to travel to Turkey or not,

24   because several months ago they were under the direction they

25   weren't permitted to travel to Turkey.  So we might be able to

1    do it by Skype or some type of a videoconferencing, but this is

2    a very laborious, cumbersome, time-consuming process.

3         So when I represented to the Court that I would be

4    available for a January 23rd trial date, I did so recognizing

5    that that is an obligation to your Honor that has caused me to

6    turn away other potential trial dates that would conflict,

7    because whatever else someone might say about me, I always show

8    up on the day of trial, and intended to do so on January 23rd.

9    Because we had a January 23rd trial date, which I thought would

10   certainly be over within four, six, eight weeks at the outside,

11   because the government, I think, has estimated their length of

12   the case to be three weeks, depending on stipulations, I think

13   we estimated one week defense case, so I have accepted other

14   trial commitments into the late spring, early summer.  I also

15   have a personal family obligation that's out of the country.

16        What I'm going to ask -- and I know this sounds like a

17   lot -- I'm requesting that your Honor consider adjournment of

18   the trial date until the Fall of 2017 after the holidays that

19   are in late September and early October so we don't have to

20   interrupt the proceedings.

21        Now, I point out, which is obvious, that the defendant

22   is in remand.  So certainly, if anyone is prejudiced by this,

23   it is him.  It's hard for me to understand any substantial

24   prejudice to the government other than their obligation to

25   resolve these matters expeditiously, but the onus here, your

1    Honor, is on their decision to supersede.

2          I will tell you that, while they will claim that it

3    doesn't change the case in any dramatic fashion, I beg to

4    differ.  By injecting the Hezbollah entity into this indictment

5    and tying it to Mr. Mohammed Zarrab, and as a coconspirator

6    ultimately trying to tie it to my client, it changes the

7    dynamics of this trial.  And as an experienced trial lawyer,

8    it's hard for me to conceive of what kind of greater prejudice

9    you can inject into a trial that was a sanctions case and now

10   turning it into what the average potential juror may decide is

11   a case that involves supporting terrorism.

12         While the government in its response says, well, you

13   always had NIOC in this group, and everyone knows that that's

14   an Iran sponsored organization, I don't think if you ask the

15   average person on the streets of Manhattan what NIOC is anybody

16   would know.  But if you ask them what Hezbollah is, certainly

17   most of the people would immediately identify it as a terrorist

18   organization.

19         So if we try this case now, I think, among other

20   things, I would, for the first time since I've been in this

21   case, actually consider whether we would need to use an

22   extended questionnaire in jury selection because of that issue,

23   whether I would need to do polls and we would need to bring in

24   a jury consultant.  This is a very vicious issue that is now in

25   the case.

1           I also think there's going to be additional briefing

2       that we're going to have to do, because we think the case

3       against Mohammed Zarrab should be severed.  He's not going to

4       be here for the trial, unless the government surprises

5       everybody here.  And by injecting him into the case, they've

6       complicated our job dramatically.

7           So we both agree that the January 23rd trial date, by

8       consent, if I were available, could be adjourned for four

9       months.  My unavailability is because we really had a hard

10      trial date of January 23rd that I believe I had a right to rely

11      on, and now I have a hard trial date in June that I cannot

12      avoid, because I promised the Court and the Court directed me

13      not to take anything that conflicts with that case, and I have

14      a personal issues in May.

15          THE COURT:  So you're talking about when?  September,

16      October?

17          MR. BRAFMAN:  I think we're talking about mid-October.

18      I can send you the actual dates.  I think some of the holidays

19      begin in late September, but some of the holidays that I

20      observe continue into the beginning of October.  But I think it

21      would be October.  And I think, given that the defendant is

22      remanded and this is his request, because he only gets one shot

23      at a trial and he wants to have his lawyers fully prepared,

24      he's willing to spend another nine months incarcerated, if it's

25      required, in order to, one, have me be the trial lawyer, or

GBUQZARB1

 1   two, be fully prepared.

 2        Now, the alternative, Judge, and I don't want this,

 3   but I'm suggesting that if we can't come to some accommodation,

 4   I would then have to ask your Honor to relieve me, and I would

 5   then need to confer with Mr. Zarrab about replacing me.  I've

 6   spent an enormous amount of time already in this case, and to

 7   have a new lawyer come in, my guess is any good lawyer is going

 8   to ask you for a six-months' adjournment because he would have

 9   to start from ground zero with respect to all of the materials

10   that I've already reviewed and the issues I've litigated.

11        THE COURT:  Let me hear briefly from the government.

12        MR. LOCKARD:  Thank you, your Honor.

13        Mr. Brafman is correct about several things that he

14   said.  The first is that the government has advised defense

15   counsel that we certainly would consent to a reasonable

16   adjournment of the trial date in order that Mr. Zarrab and his

17   defense team are fully prepared to participate in the trial.

18   We don't think that an adjournment until mid-October is a

19   reasonable adjournment for several reasons.  The first is,

20   Mr. Brafman, again correctly, anticipated our position that we

21   don't think that the superceding indictment is a game-changer,

22   as Mr. Brafman noted.  It added one defendant into the

23   already-existing charges.  It added some overt act allegations

24   relating to a new entity.  And when I say "new", I just mean

25   not previously discussed in the indictment, but still an entity

that, in the government's view, was within the scope of the

offense conduct even before the second superceding indictment

was returned.

       The new entity, Mahan Air, is an Iranian commercial

airline that has been designated by the U.S. Government and

others, because of its role in providing support for the

Islamic Revolutionary Guard Corps, Hezbollah, and other

terrorist organizations, that is not the only time that

terrorism comes into this place.

       This indictment is based on offense conduct that is a

sanctioned violation for the Islamic Republic of Iran, which is

on the sanctions list, among other reasons, because it is the

world's leading state sponsor of terrorism, including

Hezbollah, including Hamas, including the Islamic Revolutionary

Guard Corp. and the Quds force.  So terrorism has always been

an underlying issue in any sanctions case involving Iran.  We

don't think that the addition of yet another entity that is

involved in that conduct and has been designated as a result of

that changes the overall tenor and nature of the charges or of

the evidence.  The indictment already included allegations, for

example, concerning entities that had been designated because

of their support for weapons of mass destruction programs.

       Now, to the extent that the defense team does need to

refocus their preparation efforts, that is certainly related to

an issue that has been the topic of discussion both at prior

1    conferences and between government counsel and defense counsel.

2    We have, since the last time it was discussed on the record, we

3    have met again with defense counsel to talk about ways in which

4    the government can help to facilitate the defense's review of

5    the discovery and to be more efficient and effective in

6    preparing for trial.

7            As a result of that, the government has spent

8    considerable amount of time since then beginning to prepare,

9    essentially, rough draft exhibit lists so that we can be in a

10   position to provide with specificity the body of emails and

11   other documents that we think are going to be particularly

12   relevant for trial preparation, and we hope to be in a position

13   to start providing those to defense counsel in the near future.

14           All of which is to say, while we certainly agree that

15   the defense should have as much time as is reasonably required

16   to prepare for trial, we don't think that a nine-month

17   adjournment of the trial date is a reasonable one.  We think

18   that an adjournment of approximately two to three months or

19   four months, if that's what works for everybody's calendar,

20   would be a reasonable adjournment, and that's something that we

21   would consent to.  But we would ask the Court to take a hard

22   look at everyone's schedule and see if we can find a sufficient

23   trial window within that time period rather than kicking this

24   over until mid to late Fall of 2017.

25           We think it's also important because the public does

1    have an interest in a speedy and public trial of this matter,

2    as in any prosecution.  I think that's especially true in this

3    particular matter, which is a case that involves a somewhat

4    greater level of public interest.  It certainly has drawn more

5    public interest.  We think the public interest in a speedy

6    trial is greater, both because of the nature of the charges and

7    the interest that the public has already expressed, as well as

8    the fact that there have been, among other things, allegations

9    in this case of political motivations or political conduct by

10   branches of the government that are supposed to be impartial

11   and apolitical, and we think that that is an interest that also

12   is worth vindicating in a speedy trial.

13       MR. BRAFMAN:  Your Honor, just very briefly.  First of

14   all, I checked the calendar, and if the Court were to grant the

15   adjournment, I'd be looking at Monday, October 16th, if the

16   Court were to agree.

17       I must say that it is hard for me to accept the

18   government's interest in speedily resolving these matters when

19   they waited nine months or eight months before filing the

20   superseder.  That's what is causing this delay, your Honor.  We

21   were not going to ask for an adjournment of the January 23rd

22   trial date, but then we got the superseder.  I agree we met,

23   they agreed to help us with looking at certain exhibits, but I

24   can't be bound by their exhibit lists as the roadmap through

25   this case, and I do think that it's going to require travel by

 1   at least some members of the defense team to try and figure out

 2   who this new defendant is, other than the fact that he happens

 3   to be the defendant's brother.

 4        One of the things we're trying to work very hard to

 5   establish is that what I think has happened here is the

 6   government has tried to make Mr. Reza Zarrab criminally

 7   responsible for everything that may involve other members of

 8   the Zarrab family, but not him personally, and trying to

 9   extricate him from that is a very time-consuming,

10   detail-oriented process.  The reasonableness of the adjournment

11   request is not because I'm suggesting that we need eight or

12   nine months to fully prepare, what I'm suggesting is that we

13   need at least four months or five months, and then we run up

14   against my other commitments that are now problematic, not

15   because of anything I've done, but because the government has

16   changed the playing field.  This isn't our fault, Judge.

17        THE COURT:  The principal consideration in terms of

18   speedy trial, or a principal consideration, is the defendant,

19   who is obviously, as Mr. Brafman said, incarcerated.  So if he

20   wishes, if he feels that it's appropriate, I'm going to go

21   along with that.  I'm going to say October 16 for trial.

22        Mr. Brafman, we do have to work in in September,

23   October a pretrial conference, at least tentatively scheduled

24   now, and if there's to be more, then I'm sure I'll hear from

25   you.  When, reasonably, would that be?  That would normally be

1   at least two or three weeks before the trial.

2            MR. BRAFMAN:  Your Honor, may I suggest, now that we

3   have this trial date, we confer with the government by email

4   and then submit a joint letter in which to provide --

5            THE COURT:  That's fine.  So you need to provide a

6   date for pretrial conference, also for trial submissions,

7   pretrial submissions.

8            MR. BRAFMAN:  Motions in limine, request for charge.

9            THE COURT:  You'll work that into your letter, as

10  well.  Okay?

11           MR. BRAFMAN:  Yes, sir.

12           THE COURT:  What I would like, going back to our more

13  immediate schedule, is by December 5 to have a letter

14  application or a letter from the government with respect to

15  inevitable discovery.  I don't think you need more than five

16  pages with citations, and then by December 7 to have a response

17  from the defense to that issue of inevitable discovery.  We've

18  said before that December 7 is the target date for information

19  about other banks.  We also said December 14 to conclude,

20  hopefully, this Curcio aspect and to commence the suppression

21  hearing, if we need to, and we may go over to December 15.

22           In between, I will give you a ruling or some sort of

23  heads up with respect to the Franks issue.

24           MR. BRAFMAN:  Thank you.

25           THE COURT:  Speedy trial issue or application that

 1  would take us to October 16, 2017.

 2          MR. BRAFMAN:  Your Honor, just because we've been very

 3  careful on everything else, I would like you to pose a question

 4  directly to Mr. Zarrab on the record that he consents to an

 5  adjournment of the trial date to October 16 and waives his

 6  speedy trial claims between now and that date.

 7          THE COURT:  Do you understand that, first of all,

 8  Mr. Zarrab?

 9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  And is it so that you do wish to adjourn

11  the trial to October 16, 2017?

12          THE DEFENDANT:  Your Honor, I need that time to be

13  prepared for my trial with my strong team.

14          THE COURT:  Okay.  And you waive any issues with

15  respect to speedy trial to and including that date?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  I'm going to find, under 18 United States

18  Code, Section 3161, that the request for adjournment,

19  particularly by the defense, is appropriate and warrants

20  exclusion of the adjourned time from speedy trial calculations.

21  I further find that the exclusion is designed to prevent any

22  possible miscarriage of justice, to facilitate these

23  proceedings, including pretrial preparation, and to guarantee

24  effective representation of and preparation by counsel for the

25  government and the defense, and thus, the need for exclusion.

1    The ends of justice outweigh the interest of the public and the

2    defendant in a speedy trial pursuant to 18 U.S.C., Section

3    3161(h)(7)(A) and (b).

4         I look forward to your submission with respect to

5    interim dates for pretrial conference and submissions.

6         MR. BRAFMAN:  Yes, your Honor.

7         THE COURT:  Anything else anybody wants to raise

8    today?

9         MR. BRAFMAN:  I don't think so, your Honor.

10        THE COURT:  Here's one other thing.  Mr. Rimm, we

11   thank you for helping us.  It would be helpful, I don't know if

12   it'll arise again during the course of these proceedings, but

13   if you could be sort of on standby in case any independent

14   counsel issues come up, you would be familiar with them, and it

15   would be okay to call on you, as it will be, with respect to

16   the letter that you're going to submit after we get the

17   submissions from the six other banks?  If you would remain as

18   our standby independent counsel in this case?

19        MR. RIMM:  I'd be happy to do so, your Honor.

20        THE COURT:  Thanks so much.  Thank you everyone.

21        Mr. Rimm, it would be helpful if you were here for the

22   Curcio hearing on the 14th.

23        MR. RIMM:  Yes, your Honor.

24        (Adjourned)

25