**EXHIBIT A**

H5B3ZARC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4            v.                          15 CR 867 (RMB)

5    REZA ZARRAB,

6               Defendant.
     ------------------------------x

7
                                     New York, N.Y.
8                                    May 11, 2017
                                     2:00 p.m.
9
     Before:
10
                      HON. RICHARD M. BERMAN,
11
                                       District Judge
12

13                        APPEARANCES

14   JOON H. KIM
          Acting United States Attorney for the
15        Southern District of New York
     SIDHARDHA KAMARAJU
16   DAVID DENTON
     DEAN C. SOVOLOS
17        Assistant United States Attorneys

18   BRAFMAN & ASSOCIATES P.C.
          Attorneys for Defendant Zarrab
19   BENJAMIN BRAFMAN
          -and-
20   DOAR RIECK DeVITA KALEY & MACK
        Attorneys for Defendant Zarrab
21   JAMES R. DeVITA
          -and-
22   FERRARI & ASSOCIATES, P.C.
        Attorneys for Defendant Zarrab
23   ERICH C. FERRARI

24

25   ALSO PRESENT:  Seyhan Sirtalan and Asiye Kay, Turkish language
     interpreters

H5B3ZARC

1

2          THE COURT:  As you know, this is the resumption of the

3    Curcio hearing that we had started last session, May 2.

4          I have a preliminary matter that goes to the heart of

5    the Curcio concern, and I think it needs to be further resolved

6    before we can go much further.  And you all may have some

7    questions of your own that you want to raise, but let me raise

8    this one at the outset because it's of concern to me.

9          You will remember that as it relates to that order of

10   May 1st that I handed out which I want to come back to -- first

11   let me make sure that Mr. Zarrab is able to understand with the

12   help of the Turkish interpreter.

13         MR. BRAFMAN:  He tells me his headset is not

14   operating.

15         THE COURT:  Oh.

16         MR. BRAFMAN:  Thank you, sir.

17         THE COURT:  Is it working now, Mr. Zarrab?

18         THE DEFENDANT:  Yes.

19         THE COURT:  If you recall in the May 1 order, I posed

20   a series of additional Curcio and Curcio-related topics or

21   questions.  They are in the form of questions.  And in

22   particular, I want to refer now to questions three, four, and

23   five, which we did discuss, but I still think we need to have

24   more discussion.

25         So, three asks whether Greenberg Traurig's

1  representation of both Mr. Zarrab and the Republic of Turkey is

2  an actual conflict.  And I further asked in that order is it

3  waivable and cite relevant case authorities and rules.  We

4  never got to that and we didn't get any followup authorities,

5  cases, etc.  But that's a legal question.

6       Four is related to three, and it asks who is Greenberg

7  Traurig's client when Mr. Giuliani meets with Turkish or United

8  States officials to discuss Mr. Zarrab's case, Turkey or

9  Mr. Zarrab.  Then I ask can such discussions ever be

10  privileged, or is any privilege waived.

11       And then five asks may Messrs. Giuliani or Mukasey

12  participate in or take positions adverse to Mr. Zarrab in

13  negotiations between United States and Turkey.

14       So it's around these questions that I'm personally not

15  satisfied that I yet understand these matters fully in terms of

16  conflicts, waivable, not waivable, etc., what the implications

17  are, and notwithstanding that we had some oral presentations at

18  the last session on May 2, 2017, I asked at the beginning did

19  people want to respond in writing.  I think the preference was

20  to do it orally, but it still leaves some gaps in my opinion.

21       So I reviewed the transcript, and I'm going to go over

22  some of it with you now.  And I believe that there are still

23  some divergent or conflicting responses in the record.

24       So, number one, at page 10, this is a small point but

25  that's where I had asked for case authorities to respond to

4

H5B3ZARC

1   that question, and we haven't done that yet.  But on page 12, I

2   ask the following.  So I ask the question, this is the question

3   I just mentioned a minute ago, whether Messrs. Giuliani or

4   Mukasey may participate or take positions adverse to Mr. Zarrab

5   in negotiations between the United States and Turkey.  Any

6   negotiations.  Okay.

7           And the government responded as follows right after

8   that:  "Certainly the government believes that they cannot do

9   that, that is to say Messrs. Giuliani and Mukasey cannot take

10   positions adverse to Mr. Zarrab."  And the government goes on

11   to say "They have ethical obligations that would preclude them

12   from negotiating to Mr. Zarrab's detriment, whether with the

13   United States or with Turkey."

14           And then I turn to Mr. Brafman, I said "Mr. Brafman,

15   do you agree with that?"  And he said, "Your Honor, far be it

16   for me to teach either former Chief Judge Mukasey or former

17   United States Attorney Rudy Giuliani what their ethical

18   obligations are."

19           And we get that.  These are people who are quite

20   sophisticated in these matters, but nevertheless, we went on in

21   the Curcio question-and-answer period, and at page 44 and 45 of

22   the transcript, this is a question proposed jointly by the

23   government and by the defense, the question to Mr. Zarrab is,

24   "Do you understand that your attorneys from Greenberg Traurig,

25   including Mr. Giuliani, cannot negotiate on your behalf in a

H5B3ZARC

1    manner that would be adverse to the interests of the government

2    of Turkey?"  And Mr. Zarrab answered "Yes."

3              But therein, I think, lies the dilemma.  There seems

4    to be a conflict between the questions on page 12 and the one I

5    just read to you, 44 and 45.  And the issue is who is,

6    colloquially, I might say, 100 percent looking out for

7    Mr. Zarrab's interests at these negotiations?  That's the

8    conflict that I perceive.

9              I don't think, at least to my knowledge, Mr. Brafman,

10   you're not present at those negotiations historically or in the

11   future.  And so that is my question.  And that is not resolved,

12   in my opinion.  I mean, I need to be better educated to get

13   over that hurdle.  Who is looking out for Mr. Zarrab at any

14   negotiations that Mr. Giuliani and Mr. Mukasey might be engaged

15   in with Turkey or the United States, which will, of course, one

16   way or the other, affect Mr. Zarrab.

17             MR. BRAFMAN:  Your Honor, it is my understanding, both

18   from what was said publicly and from the affidavits that were

19   submitted under seal, that neither Mr. Mukasey -- certainly not

20   him, has any responsibility or relationship with the government

21   of Turkey and does not serve as an agent of Turkey and never

22   has.

23             THE COURT:  Right.

24             MR. BRAFMAN:  With respect to Mr. Mukasey, it is easy.

25             With respect to Mr. Giuliani, it is my understanding

H5B3ZARC

1    that while the firm Greenberg Traurig has been engaged on

2    behalf of the government of Turkey, Mr. Giuliani himself has

3    never represented the government of Turkey personally in any

4    matter, anywhere.  At least that's the representation that's

5    been made to me.

6           It is also my understanding that the exclusive reason

7    for both of these gentlemen being retained, and on this

8    discussion I was present, was to assist Mr. Zarrab in, as we

9    have said publicly, attempting to determine whether there is a

10   resolution through diplomatic channels, if you will, that could

11   help resolve the matter.  Then we could come to the Southern

12   District and Court.

13          THE COURT:  To help resolve this matter.

14          MR. BRAFMAN:  This matter, yes, sir.

15          THE COURT:  But the way it was I think described in

16   the affidavits that were submitted was to help to come to some

17   arrangement or some deal that was beneficial to the United

18   States and Turkey.

19          MR. BRAFMAN:  That's correct.

20          THE COURT:  And would, by the way, work to

21   Mr. Zarrab's benefit.

22          MR. BRAFMAN:  Yes.

23          THE COURT:  That's the question I have.

24          MR. BRAFMAN:  Your Honor, what I understand to be the

25   case is that the reason there is no conflict is that in the

1   event that they could come to an understanding that was

2   beneficial to the government of Turkey and the government of

3   the United States, it would be for the purpose also of helping

4   resolve Mr. Zarrab's case.  Not simply to benefit the national

5   security interests of both countries.

6           And that the reason they were engaged is not to act as

7   surrogate State Department officials just going out trying to

8   settle a crisis across the globe, but as a representative of

9   Mr. Zarrab with the hope of convincing both of the governments

10  involved that there might be as a resolution that helps both

11  Turkey and the United States, with the added benefit of helping

12  Mr. Zarrab.  So, I really don't see the conflict.

13          And if your Honor requires further -- it isn't a

14  question of providing with you authority, because this is

15  certainly unique to my experience and I'm not certain I am

16  going to find --

17          THE COURT:  Mine as well.

18          MR. BRAFMAN:  I read the cases, and none of them

19  really address this issue, and many of them are

20  distinguishable.  So, that's why I haven't provided you with

21  authority, for example, from the last conflict Curcio hearing

22  where it was just law firms and banks involved.

23          If your Honor requires further clarification by way of

24  additional sealed affidavits, that's the best I think I can

25  offer.

H5B3ZARC

1          MR. KAMARAJU:  Well, your Honor, first of all, all the

2     information the government has about whatever discussions are

3     going on has come to us from the defense counsel, so we're not

4     aware of who is participating in these discussions.  To the

5     extent Mr. Giuliani --

6          THE COURT:  Do you see an issue here?  Am I the only

7     one?

8          MR. KAMARAJU:  No.  As I understand the point your

9     Honor is making is, is there a question as to whether at the

10    negotiation table between the United States and Turkey, there

11    is conflict-free counsel representing Mr. Zarrab.

12         THE COURT:  That's my point.

13         MR. KAMARAJU:  Right.  Which is an issue that we

14    litigated extensively, for example, with Kirkland & Ellis where

15    Mr. Brafman was the conflict-free counsel before this Court.

16         THE COURT:  Right.

17         MR. KAMARAJU:  So --

18         THE COURT:  And by the way, I think if I remember, not

19    that it's dispositive because it's the Court's duty to resolve

20    the question, but Mr. Gillers, who had submitted a letter,

21    Professor Gillers said that the key of it was that there was

22    conflict counsel available 24/7 so to speak in the form of

23    Mr. Brafman.

24         MR. KAMARAJU:  Correct.

25         THE COURT:  So that's what saved -- I don't know if

H5B3ZARC

1    that's the right way to describe it.  But that is what enabled

2    him to also have conflicted counsel.

3        MR. KAMARAJU:  I believe your Honor is right.  That is

4    one of the sort of basic principles in the Gillers opinion.

5        There was some contrary case law that we had cited to

6    your Honor, U.S. v. Rahman, in which the Court sort of rejected

7    the concept of having sort of a shadow counsel for purposes of

8    just cross-examining one witness, for example.

9        But, at the heart of it I think the presence of

10   conflict-free counsel in the form of Mr. Brafman was a key part

11   to the Court's determination certainly, but also to Professor

12   Gillers' opinion.

13       In terms of what's going on perhaps in these

14   negotiations, the fact that Mr. Giuliani personally has not

15   done any work for the Republic of Turkey, if that's the

16   representation that's been made, I don't believe that actually

17   makes it conflict free because I think the law is pretty clear,

18   certainly the ethical rules are pretty clear, that a conflict

19   for a law firm is imputed to the lawyers in that firm.

20       If Mr. Mukasey is also involved in all of those

21   negotiations, then I suppose he, for purposes of sort of the

22   Turkey conflict, represents conflict-free counsel for

23   Mr. Zarrab.  But that is commissioned on the fact he would be

24   involved in all of those negotiations.  In other words, if

25   Mr. Giuliani is only sitting across the table, you don't have

H5B3ZARC

1    that protection.

2           We don't have any information about how those

3    negotiations are being conducted or who is making phone calls

4    or sitting down, but given the facts we know, that's the way we

5    see it playing out.  We do think your Honor has a point.

6           THE COURT:  Actual or potential?  Or you raise the

7    issue we discussed last time about privilege.  Are those

8    negotiations privileged or are they public or --

9           MR. KAMARAJU:  So, I don't think they've been made

10   public.

11          THE COURT:  No.

12          MR. KAMARAJU:  But I don't think they can be

13   privileged at all.  First of all, Greenberg's relationship with

14   the nation of Turkey is not an attorney-client relationship.

15   In other words, well, let me clarify that.  They are foreign

16   registered agents of the nation of Turkey.

17          But based at least on the materials provided to the

18   Court as part of the affidavits, the services that they appear

19   to be rendering are not legal in nature.  In other words, they

20   are not -- the communications are not seeking legal advice

21   between the two, which is a prerequisite for the privilege.

22          If that's not the case, if there are legal advice

23   being sought, it is conceivable that Greenberg's communications

24   with the Republic of Turkey may be privileged to the extent

25   they are actually seeking legal advice.

H5B3ZARC

1    But their communications with third parties, outside

2    parties, could never be privileged.  So, negotiations across

3    the table with whatever officials in the United States, those

4    can't be privileged because they are outside of whatever

5    privilege relationship would be claimed.

6    As to whether it is an actual or potential conflict,

7    we addressed this a little bit at the last conference.  From

8    the government's perspective, I don't think we have enough

9    information to say conclusively it is an actual conflict or a

10   potential conflict, because for an actual conflict, and we're

11   happy to submit some authorities to your Honor in writing to

12   this effect.  But the Second Circuit has said that an actual

13   conflict requires a divergence in the interests of the client

14   and the attorney that is so significant that there is no way to

15   sort of reconcile those two.

16   There is still another layer I think whether a

17   conflict is waivable.  And the Second Circuit has said even

18   that is a higher standard, because a unwaivable conflict is a

19   conflict that no rational defendant would ever waive.

20   So, I think from the government's perspective it is a

21   thorny conflict issue that may be actual or may be potential.

22   It is certainly potential at this time.  There is no doubt

23   about that.  It may crystalize into being an actual conflict.

24   But ultimately, if Mr. Zarrab is properly allocuted

25   and agrees to waive, a number of the issues is waivable.

H5B3ZARC

1          MR. BRAFMAN:  Your Honor, first I just want to

2     indicate that I'm glad that I was the conflict-free counsel

3     that saved the first go-around.  I'm not involved in these

4     negotiations and prefer not to be.  It's way above my pay

5     grade, to be perfectly candid.

6          To the extent that former Judge Mukasey has never

7     represented Turkey, and if he is involved in these

8     negotiations, as I believe he is, then he certainly would be

9     conflict-free counsel.

10          I also believe that this is waivable, whether it's

11     potential or actual.  And I think if you do the extensive voir

12     dire of Mr. Zarrab that has already been undertaken and will

13     continue today, then I think this issue is removed from the

14     case.

15          We have certainly alerted him over a period of months

16     during the Kirkland Ellis hearing as to the nature of the

17     Curcio inquiry, so I believe he is not completely unfamiliar

18     with the process.

19          I also find it hard to imagine that if he has retained

20     Messrs. Giuliani and Mukasey for the specific purpose of trying

21     to negotiate on his behalf and has now heard from your Honor

22     and through the submissions that Mr. Giuliani's firm also

23     represents Turkey in some matters, knowing all of that, if he

24     makes an intelligent waiver, I think the issue is removed and

25     he would be hard pressed to raise it as an issue if convicted,

1    because he's the one who created the relationships that we're

2    all discussing.

3              THE COURT:  So how do we reconcile the questions and

4    answers, one of which says that Giuliani cannot take a position

5    adverse to Turkey, and the other on page 44, 45, that they

6    cannot -- that's the question to which Mr. Zarrab acceded.  And

7    yet, as his counsel, as the government indicated at page 12 the

8    last time, they must take positions in Mr. Zarrab's best

9    interests.

10             I'm having trouble getting beyond that.

11             MR. BRAFMAN:  I think their obligation to Mr. Zarrab,

12   for want of a better word, trumps their marginal relationship

13   to the Turkey because as the government just indicated, they

14   really are not in an attorney-client relationship with Turkey.

15   The firm has registered as an agent of the Republic of Turkey.

16   And I think if we were to question Mr. Gillers, and I really

17   don't want to further burden the record, I think when you have

18   an actual client who you are representing as an officer of the

19   court, in a pending criminal matter, and your firm has a

20   relationship with a country, and you don't have anything to do

21   with that, I'm not certain that you have a conflict in whose

22   best interests you must always act.  Because you've been

23   personally retained by a defendant in a criminal case to act on

24   his behalf.  And I think that's your ethical obligation.

25   That's as good as I can do.

1          THE COURT:  I understand.  I understand.  I would like

2     you all to commit it to paper.

3          MR. BRAFMAN:  Excuse me?

4          THE COURT:  I said I would like you all to commit it

5     to paper, because I think it's really the issue.  We've talked

6     about a lot of other things, the banks, we've gotten beyond the

7     banks with Kirkland & Ellis.  We haven't had quite a situation,

8     I've never experienced one like this one.  So I wouldn't mind,

9     and if you agree, that would be terrific.  If you want to meet

10     and confer and find out from Mr. Brafman as much as he's able

11     to tell you, maybe that can inform.  Or if you want to just

12     submit two separate letters, but I do want authorities to

13     resolve those issues.

14          MR. BRAFMAN:  In lieu --

15          THE COURT:  The privilege thing is big.  To me,

16     anyway.

17          MR. BRAFMAN:  Let me address that if I may.

18          THE COURT:  If in fact the nature of those

19     conversations is not privileged, so that's a big right that a

20     defendant normally has, or any client, forget defendant, any

21     client has, is attorney-client privilege.  So, this is sort of

22     a hypothetical.  But, if there are conversations that are going

23     on there that, which I imagine there would be, concern

24     Mr. Zarrab, those are not subject to the attorney-client

25     privilege.

1          MR. BRAFMAN:  But they may be subject to the attorney

2     work product.

3          THE COURT:  Maybe, maybe.

4          MR. BRAFMAN:  If I interview a witness on behalf of my

5     client, and that witness is not my client so that the

6     conversation is not privileged, I think I would be within my

7     rights as a lawyer to reject the government's request, unless

8     it became Jencks material, to request my notes of my

9     conversation because it's work product.

10          MR. KAMARAJU:  That analogy may be correct, but I

11     don't think that's the point that the Court is addressing,

12     which is communications with a government official.

13          THE COURT:  Right.

14          MR. KAMARAJU:  Sitting across the table would not be

15     protected by attorney work product.

16          THE COURT:  Right.  Automatically you're giving up a

17     fundamental client right.

18          MR. KAMARAJU:  I think to the extent privileged

19     attorney-client communications between Mr. Zarrab and either

20     Mr. Giuliani or Mr. Mukasey are being interjected into

21     discussions with anybody outside of the relationship, be it

22     Turkish officials, be it U.S. officials, anyone, I think that

23     does run the risk of waiver of the attorney-client privilege

24     between Mr. Zarrab and Mr. Giuliani or Mr. Mukasey, which is

25     the point your Honor is making.  But that is a significant

1    right held by a criminal defendant, or frankly, any client of

2    an attorney.

3              And so, if that is occurring -- and again, the

4    government has no information one way or the other as to

5    that -- I think that has to be done with Mr. Zarrab's knowledge

6    and his explicit authorization.  Because otherwise, I think as

7    your Honor is rightly pointing, that does present a significant

8    conflict and issue.  And I would imagine a troubling ethical

9    situation for the attorneys involved.

10             MR. BRAFMAN:  Well --

11             MR. KAMARAJU:  So I think there is value in sort of

12   exploring that, and the government is happy to provide it.

13             THE COURT:  I don't mean to make homework, but in the

14   exploration, I do think there need to be additional Curcio

15   questions.  Perhaps that is a way to get through some of these

16   issues.  That assumes that everything is waivable, and I don't

17   know whether that's true.  But if you both conclude that it is,

18   then there probably has to be some further questions to get us

19   through.

20             MR. BRAFMAN:  I think perhaps -- excuse me.  I think

21   perhaps, Judge, I think we should note that if it's work

22   product, it doesn't turn on who you're speaking to, whether

23   it's a witness or the president of the United States or the

24   president of Turkey.  If you're doing it as an attorney doing

25   your work for your client, it still would be work product, even

1   if not technically privileged.

2           And I would say that what I think might resolve this

3   issue better than another memorandum, although I welcome the

4   additional questions so that the record is complete, I think

5   perhaps an additional affidavit submitted under seal in which

6   Mr. Giuliani expressly states, if he can, that in these

7   meetings he is representing Mr. Zarrab and that he does not

8   believe for the following reasons that he has an ethical

9   quandary, and let them try and convince you.  Because that's

10  the people who are having these conversations.

11          MR. KAMARAJU:  I think there's a couple of points just

12  quickly to address.  I don't mean to belabor the point.  First

13  of all, I think the fundamental issue with the work product

14  doctrine being exercised here, aside from the fact that they

15  were talking to government officials, rather than witnesses, is

16  Mr. Giuliani and Mr. Mukasey have expressly disclaimed that

17  they will participate in this litigation before the Court.

18  They have limited their representation for the Court, and

19  typically work product is in connection.  But we can address

20  that in further detail if it's relevant.

21          THE COURT:  That's what I would like.

22          MR. BRAFMAN:  On that point, I don't think he's right

23  at all.  I think --

24          THE COURT:  I didn't say he was.  I don't know.

25          MR. BRAFMAN:  I just want you, sir, to understand, if

```
1     I am the lawyer who is representing Mr. Zarrab in court, and I
2     confer with another lawyer as co-counsel who has no intention
3     of filing a notice of appearance or coming here and making any
4     argument, my conferring with that person can still be work
5     product.  It could still be joint defense privilege.  We are
6     not talking about it.  We're talking about if I'm talking to a
7     third party who is not a lawyer, but I'm doing it on behalf of
8     my client, I still think it's work product, even though he's
9     not representing him in this matter.  Because you don't have to
10    have representation as to a specific matter to have an
11    attorney-client relationship with someone.
12            Mr. DeVita has been appointed as special counsel, has
13    an attorney-client relationship with Mr. Zarrab on this
14    specific matter.  That doesn't mean he could be subpoenaed to
15    answer any questions that would come up concerning other
16    matters that he discovered during this relationship, because it
17    would be work product by Mr. DeVita.
18            MR. KAMARAJU:  We obviously have a disagreement I
19    think over whether the work product doctrine would cover, and
20    we're happy to supply the Court with authorities on that.
21            THE COURT:  Okay.
22            MR. KAMARAJU:  I do think one of the tricky things
23    here --
24            THE COURT:  By the way, I think it's valuable to have
25    these cleared up for everybody.  For the integrity of the
```

1   proceeding, for defense counsel, for the government counsel, so

2   I think it's only helpful to everybody.

3           MR. KAMARAJU:   And the point I was going to make, your

4   Honor, is actually one of the things that the Gillers opinion

5   also stressed, and the ethical opinions upon which it was based

6   stressed, is that whatever limitations are being placed on a

7   representation by an attorney in order to avoid a conflict or

8   deal with a conflict situation, should be explicitly laid out,

9   usually in writing, and should be made clear to the defendant,

10  so that he is aware of exactly what his attorneys can and

11  cannot do on his behalf.

12          And I think the conflict that your Honor noted between

13  the questions in the Curcio and the question from the May 1st

14  order, may very well mean that Mr. Giuliani, at least, is

15  cabined to a very thin and narrow land in which he can

16  negotiate, one in which the only positions he can take are ones

17  that are not adverse to Mr. Zarrab or not adverse to the nation

18  of Turkey.

19          And if that is the case, then that is something that

20  Mr. Zarrab should know about explicitly and should agree to

21  waive if the Court determines that it is waivable.

22          The government's view at this point with the

23  information we know is these are waivable conflicts.  If that

24  changes from the information we receive, we'll let the Court

25  know.  I think without that knowledge, we are not satisfying

1   some of the basic principles that we elucidated during the

2   Kirkland proceedings.

3           THE COURT:  Yes.  So, where that leaves me on these

4   issues is I would like supplement submission either jointly or

5   each of you.  It doesn't have to be lengthy.  You know the

6   questions that are on my mind.  And now if you want to discuss

7   in there work product versus privilege, I'm happy to get some

8   help on that, too.

9           MR. BRAFMAN:  If I may suggest, your Honor, if the

10  government can put its position in writing, because I am going

11  to need to discuss their position with Messrs. Mukasey and

12  Giuliani.  Having my position in writing in advance doesn't

13  make any sense.

14          THE COURT:  You're right.  I think that's fair.  Is

15  that okay with you?  Except that he's going to probably want to

16  ask you, to the extent you can help him out as to what's

17  happening so to speak, to the extent you can share that with

18  him.

19          MR. BRAFMAN:  I'm happy to do that.

20          MR. KAMARAJU:  We're happy to sort of put in the first

21  submission on the legal questions.  But I think we are going to

22  need additional facts from Mr. Brafman.  So if you'll allow us

23  a period of time to consult with him, then we can put in a

24  submission that addresses the legal questions.

25          THE COURT:  Thank you.  And also include any

H5B3ZARC

1    additional questions that have to be posed to Mr. Zarrab or

2    perhaps something in advance that Mr. Zarrab should be asked to

3    look at and see if this is going to be acceptable to him.

4             MR. KAMARAJU:  Yes, your Honor.

5             THE COURT:  So I think you should get all the

6    mechanisms that will help everybody out, so to speak.

7             MR. BRAFMAN:  Can I ask your Honor, I submitted a

8    letter on this, filed it on ECF.  I just want the record to

9    reflect that we have withdrawn our request for a suppression

10   hearing previously scheduled for May 18, and I assume that the

11   government doesn't take any opposition to that.  And I'd ask

12   the Court to cancel that hearing.  This was done --

13            THE COURT:  I thought that was understood.  I planned

14   to do that.

15            MR. KAMARAJU:  Yes, that's our understanding, your

16   Honor.

17            THE COURT:  You don't want an ex parte suppression

18   hearing?

19            MR. KAMARAJU:  You know what?  I prefer not to in the

20   end.

21            MR. BRAFMAN:  It's good practice.

22            THE COURT:  So that also, by the way, frees up time on

23   that date if we need it.  So how long would it take you to put

24   something together?

25            MR. KAMARAJU:  I think we can move pretty quickly

1   after receiving information from Mr. Brafman.  So maybe the

2   operative question is how much time does Mr. Brafman need to

3   consult with Mr. Mukasey and Giuliani in the first instance.

4           THE COURT:  He's going to say it becomes a what you

5   need to know.

6           MR. BRAFMAN:  Also, Judge, I don't control these

7   gentlemen's calendars.  I have no idea where they are as we

8   speak.  They could be in Turkey.

9           That was facetious.

10          THE COURT:  I know.

11          MR. KAMARAJU:  So, is it your Honor's plan then to

12   hopefully address these issues on May 18?

13          THE COURT:  Well, I would like to get this in the

14   record with authorities before we go further.  We don't have

15   that much left to do.  But if there is more, there is no point

16   if he agrees to everything and then "oh, by the way."

17          MR. KAMARAJU:  Would a week be sufficient?

18          THE COURT:  Yes.

19          MR. DeVITA:  I'm going to be out of town next week.

20          MR. BRAFMAN:  Judge --

21          THE COURT:  Why don't with go off the record and maybe

22   the three of you could speak and see what works.

23          MR. BRAFMAN:  Your Honor, could we do this?  I need to

24   find out the availability of both Messrs. Giuliani and Mukasey

25   to meet with me.  I could e-mail the government tomorrow and

H5B3ZARC

1    tell them how much time I think I need.  They could then tell

2    me how much time they'd like, and we can check with your very

3    efficient first-rate courtroom deputy who never misses a beat

4    and she could schedule something at your Honor's convenience.

5            THE COURT:  Okay.  You mean schedule for the

6    submissions?

7            MR. BRAFMAN:  Yes.

8            THE COURT:  Or you could propose a schedule.

9            MR. KAMARAJU:  We'll put a letter proposing a date for

10   submissions.

11           MR. BRAFMAN:  We'll put in a letter proposing the date

12   for the submissions, and then at your Honor's convenience also

13   a date for the continuing of the Curcio.

14           THE COURT:  Do you anticipate you might want to

15   respond to whatever he submits?

16           MR. BRAFMAN:  I anticipate that I will.

17           THE COURT:  Okay.  Keep that 18th date in mind because

18   it's available, and maybe we'll use it for that purpose, but it

19   could be another date too if you're ready before then.

20           MR. BRAFMAN:  Yes, sir.

21           THE COURT:  All right.  That's it for me on this.

22   Anybody else have any issues they want to raise?

23           MR. BRAFMAN:  No, your Honor.

24           MR. KAMARAJU:  Nothing from the government, your

25   Honor.