UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

                    :

UNITED STATES OF AMERICA

                    :

     - v. -

                    :

REZA ZARRAB,
   a/k/a "Riza Sarraf,"
MEHMET HAKAN ATILLA,
MEHMET ZAFER CAGLAYAN,
   a/k/a "Abi,"
SULEYMAN ASLAN,
LEVENT BALKAN,
ABDULLAH HAPPANI,
MOHAMMAD ZARRAB,
   a/k/a "Can Sarraf,"
   a/k/a "Kartalmsd,"
CAMELIA JAMSHIDY,
   a/k/a "Kamelia Jamshidy," and
HOSSEIN NAJAFZADEH,

          Defendants.

- - - - - - - - - - - - - - - - - x

**ORIGINAL**

**SUPERSEDING INDICTMENT**

S4 15 Cr. 867 (RMB)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 0 6 2017

## BACKGROUND

     1.    The charges in this indictment arise out of a multi-year scheme to violate and evade U.S. national security controls against the Government of Iran.  In particular, money service businesses and front companies in Iran, Turkey, the United Arab Emirates, and elsewhere were used to violate and evade prohibitions against Iran's access to the U.S. financial system and restrictions on the use of proceeds of Iranian oil and gas sales and on the supply of gold to the Government of Iran and Iranian entities and persons.

2.    High-ranking government officials in Iran and
Turkey participated in and protected this scheme.   Some
officials received bribes worth tens of millions of dollars paid
from the proceeds of the scheme so that they would promote the
scheme, protect the participants, and help to shield the scheme
from the scrutiny of U.S. regulators.

3.    The leaders of a Turkish bank majority-owned by
the Government of Turkey ("Turkish Bank-1") knowingly
facilitated the scheme, participated in the design of fraudulent
transactions intended to deceive U.S. regulators and foreign
banks, and lied to U.S. regulators about Turkish Bank-1's
involvement.

4.    The proceeds of Iran's sale of oil and gas to
Turkey's national oil company and gas company, among others,
were deposited at Turkish Bank-1, in accounts in the names of
the Central Bank of Iran, the National Iranian Oil Company
("NIOC"), and the National Iranian Gas Company.   Because of U.S.
sanctions against Iran and the anti-money laundering policies of
U.S. banks, it was difficult for Iran to access these funds in
order to transfer them back to Iran or to use them for
international financial transfers for the benefit of Iranian
government agencies, banks, and businesses.

2

5.     Turkish Bank-1 participated in several types of transactions for the benefit of Iran that, if discovered, exposed Turkish Bank-1 to sanctions under U.S. law, including: (1) allowing the proceeds of sales of Iranian oil and gas deposited at Turkish Bank-1 to be used to buy Turkish gold that was not exported to Iran, in violation of the so-called "bilateral trade" rule; (2) allowing the proceeds of sales of Iranian oil and gas deposited at Turkish Bank-1 to be used to buy gold for the benefit of the Government of Iran; and (3) facilitating transactions fraudulently designed to appear to be purchases of food and medicine by Iranian customers, in order to appear to fall within the so-called "humanitarian exception" to certain sanctions against the Government of Iran, when in fact no purchases or food or medicine actually occurred. Turkish Bank-1 officials concealed the true nature of these transactions from officials with the U.S. Department of the Treasury so that Turkish Bank-1 could supply billions of dollars' worth of services to the Government of Iran without risking being sanctioned by the U.S. and losing its ability to hold correspondent accounts with U.S. financial institutions.

## The International Emergency Economic Powers Act

6.     The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections

3

1701-1706, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

7. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

### The Iranian Transactions and Sanctions Regulations

8. On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations

4

necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

9. The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC").

10. The ITSR provide that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran. See 31 C.F.R. § 560.427(a).

11. The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a

5

violation of, or attempt to violate the ITSR. 31 C.F.R.
§ 560.203.

## Sanctions Concerning Proceeds of Iranian Oil Sales
## and the Supply of Gold to Iran

12. On December 11, 2011, the National Defense
Authorization Act for Fiscal Year 2012 was enacted (the "2012
NDAA"), requiring the imposition of sanctions on foreign
financial institutions--including banks and money service
business, among others--following a determination by the
President that a foreign financial institution violated certain
prohibitions with respect to the Central Bank of Iran or another
Iranian financial institution designated under the IEEPA. These
prohibitions applied to government-owned foreign financial
institutions with respect to transactions for the sale or
purchase of petroleum or petroleum products to or from Iran
conducted or facilitated on or after 180 days from the enactment
of the 2012 NDAA, unless the foreign country significantly
reduced its volume of petroleum and petroleum products purchased
from Iran. These prohibitions included an exception for
transactions for the sale of food, medicine, or medical devices
to Iran.

13. On July 30, 2012, the President issued Executive
Order 13622 to take additional steps with respect to the
national emergency declared in Executive Order 12957. The

6

President, among other things, imposed additional restrictions
with respect to the sale of Iranian petroleum and petroleum
products, authorizing the Secretary of the Treasury to impose
sanctions on a foreign financial institution that knowingly
conducted or facilitated any significant financial transaction
with NIOC, the Naftiran Intertrade Company Ltd. ("NICO"), or the
Central Bank of Iran, or for the purchase or acquisition of
petroleum or petroleum products from Iran, unless the President
determined the foreign country had significantly reduced its
volume of petroleum and petroleum products purchased from Iran
pursuant to the 2012 NDAA.  Exec. Order 13622, 77 Fed. Reg.
45897 (Jul. 30, 2012).

        14.  Executive Order 13622 also authorized the
Secretary of the Treasury to impose sanctions against any person
who "materially assisted, sponsored, or provided financial,
material, or technological support for, or goods or services in
support of, NIOC, NICO, or the Central Bank of Iran, or the
purchase or acquisition of U.S. bank notes or precious metals by
the Government of Iran."  Exec. Order 13622, 77 Fed. Reg. 45897
(Jul. 30, 2012).  Executive Order 13622 prohibited any
transaction that evaded or avoided, had the purpose of evading
or avoiding, caused a violation of, or attempted to violate any
of the prohibitions set forth in that order.

                            7

15. On August 10, 2012, the Iran Threat Reduction and Syria Human Rights Act of 2012, codified at 22 U.S.C. §§ 8711 et seq. (the "Iran Threat Reduction Act" or "ITRA"), extended the sanctions against Iranian oil sales. The ITRA amended the 2012 NDAA by imposing a "bilateral trade" restriction on Iranian oil proceeds: financial transactions by foreign financial institutions with respect to the sale or purchase of petroleum or petroleum products to or from Iran were permitted only for trade between the foreign country and Iran, with any funds owed to Iran deposited in an account within that foreign country. See 22 U.S.C. § 8513a(d)(4)(D). In other words, the proceeds of Iranian oil sales to Turkey had to be deposited into accounts in Turkey and could only be used for trade between Turkey and Iran; otherwise, any foreign financial institution facilitating these transactions faced U.S. sanctions. These requirements went into effect on or about February 6, 2013.

16. On January 2, 2013, the Iranian Freedom and Counterproliferation Act (the "IFCA"), imposed additional restrictions on supplying gold to Iran. The IFCA broadened the prohibition in Executive Order 13622 on supplying precious metals to the Government of Iran to prohibit the sale, supply, or transfer of precious metals, directly or indirectly, to the country of Iran, including non-Government entities. See 22

8

U.S.C. § 8804(a)(1)(A). The IFCA also extended the ITRA's bilateral trade restriction to the proceeds of Iranian natural gas sales. The IFCA's restrictions went into effect on or about July 1, 2013.

17. On June 3, 2013, the President implemented, among other things, the IFCA's prohibition on dealings in precious · metals on behalf of Iran pursuant to his authorities under the IFCA, the IEEPA, and other statutes. Exec. Order 13645, 78 Fed. Reg. 33945 (June 3, 2013). Executive Order 13645 prohibited any transaction that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate any ' of the prohibitions set forth in that order.

18. The Secretary of the Treasury promulgated the Iranian Financial Sanctions Regulations (the "IFSR") implementing the sanctions imposed by the Executive Orders 13622 and 13645, the 2012 NDA, the IFCA, and the ITRA, among others. See 31 C.F.R. §§ 561.203, 204, 205. The IFSR prohibited, among other things, transactions that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate any of the provisions of the IFSR. See 31 C.F.R. § 561.205.

9

**Designated or Identified Entities and Individuals**

19. Appendix A to the ITSR contained a list of persons determined to be the Government of Iran. At all times relevant to this Indictment, Bank Mellat was an Iranian state-owned bank on the list in Appendix A. At all times relevant to this Indictment, NIOC was an Iranian Oil Company on the list in Appendix A. At all times relevant to this Indictment, NICO and Naftiran Intertrade Company Sarl ("NICO Sarl") were on the list in Appendix A.

20. At all times relevant to this Indictment, Bank Sarmayeh was an Iranian state-owned bank and, beginning on July 12, 2012, was identified as a state-owned bank by OFAC on the Specially Designated Nationals ("SDN") List. At all times relevant to this Indictment, Sarmayeh Exchange was a money services business in Iran owned and controlled by Bank Sarmayeh.

21. Bank Mellat and all of its branches and subsidiaries were designated by OFAC on or about October 25, 2007, as SDNs under the ITSR, the IFSR, and the Weapons of Mass Destruction Proliferators Sanctions Regulations ("WMD Sanctions"), 31 C.F.R. Part 544. Mellat Exchange Company ("Mellat Exchange") was a money services business owned and controlled by Bank Mellat. At all times relevant to this Indictment, Bank Mellat was an SDN.

10

22. On or about July 12, 2012, OFAC designated Hong Kong Intertrade Company ("HKICO") as an SDN pursuant to the ITSR. OFAC further identified NIOC as an agent or affiliate of Iran's Islamic Revolutionary Guard Corp ("IRGC") pursuant to Executive Order 13599 on or about September 24, 2012. On or about May 23, 2013, OFAC designated Seifollah Jashnsaz, chairman of NICO, NICO Sarl, and HKICO; Ahmad Ghalebani, managing director of NIOC and a director of both Petro Suisse Intertrade Company SA and HKICO; Farzad Bazargan, managing director of HKICO; Hashem Pouransari, NICO official and managing director of Asia Energy General Trading LLC; and Mahmoud Nikousokhan, NIOC finance director and a director of Petro Suisse Intertrade Company SA as SDNs under the WMD Sanctions. At all times relevant to this Indictment after on or about July 12, 2012, HKICKO was an SDN. At all times relevant to this Indictment after May 23, 2012, Jashnsaz, Ghalebani, Bazargan, Pouransari, and Nikousokhan were each an SDN. At all times relevant to this Indictment after September 24, 2012, NIOC was identified as an agent or affiliate of the IRGC.

23. On or about October 12, 2011, OFAC designated Mahan Air as an SDN pursuant to Executive Order 13224 for providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF").

11

According to OFAC, Mahan Air, based in Tehran, provided transportation, funds transfers and personnel travel services to the IRGC-QF, including by providing travel services to IRGC-QF personnel flown to and from Iran and Syria for military training, facilitating the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel, facilitated IRGC-QF arms shipments, and received funds for the procurement of controlled goods by the IRGC-QF.  Further according to OFAC, Mahan Air also provided transportation services to Hizballah, a Lebanon-based designated Foreign Terrorist Organization, and has transported personnel, weapons, and goods on behalf of Hizballah and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hizballah.

## The Defendants

24.  At all times relevant to this Indictment, REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, owned and operated a network of companies located in Turkey and in the United Arab Emirates, including a group of companies under Royal Holding A.S. ("Royal Holding"), a holding company in Turkey, and Durak Doviz, a money services business in Turkey later known as Duru Doviz; and did business through the Al Nafees Exchange LLC ("Al

12

Nafees Exchange"), a money services business in the United Arab
Emirates.  The Royal Holding group of entities includes Royal
Denizcilik, Safir Altin Ticaret, Royal Emerald Investments,
among others.

          a.   ZARRAB and his business associates used
high-level contacts in the Turkish and Iranian governments to
secure a role in transferring Iranian funds held in Turkey in
evasion of U.S. sanctions against Iran.  For example, ZARRAB
signed a letter written to then-President of Iran Mahmoud
Ahmadinejad describing the ZARRAB family's experience in
international finance and their willingness and ability to help
the Government of Iran defeat U.S. and international sanctions:

> Respectfully, at this point in time, when
> the world-devouring imperialism has been
> using the weapon of economic blockade and
> negative propaganda to isolate our beloved
> homeland, the Islamic Iran, and tightens the
> grip of sanctions further day-by-day, and
> considering that serving our beloved nation
> is a religious duty for every Iranian, in
> the year of Economic Jihad, under the
> guidance of the almighty God, hereby the
> Zarrab family with a half a century of
> experience in exchange and moving of
> currency and having been able to set up
> branches in the United Emirates, Turkey,
> Russia and Azerbaijan, and doing currency
> transfers (over three billion euros),
> sending paper money to Iran (indirectly) and
> . . . to have a role, however negligible, in
> serving our beloved homeland, we declare our
> readiness for any collaboration in moving
> currency as well as adjusting the rate of
> exchange under the direct supervision of the

13

> honorable economic agents of the government,
> within the framework of the international
> and macroeconomic policies of the blessed
> regime of the Islamic Republic of Iran, and
> by using the lease credit facilities and
> interest.
>
> It is hoped that with the zealous efforts of
> the children of Islamic Iran we can witness
> the ever increasing progress of the Islamic
> homeland and to reach the high summits of
> respect and honor more than before.

b. ZARRAB and co-conspirators exchanged and reviewed drafts of a similar letter addressed to a senior official of the Central Bank of Iran in December 2011.

25. At all times relevant to this Indictment, MEHMET HAKAN ATILLA, the defendant, was the Deputy General Manager of International Banking at Turkish Bank-1.

26. MEHMET ZAFER CAGLAYAN, the defendant, was the Turkish Minister of the Economy from approximately July 2011 until December 2013 and currently serves in the Turkish Parliament. While Minister of the Economy, CAGLAYAN received tens of millions of dollars' worth of bribes in cash and jewelry from the proceeds of the scheme to provide services to the Government of Iran and to conceal those services from U.S. regulators. CAGLAYAN directed other members of the scheme to engage in certain types of deceptive transactions, approved the steps taken by other members to implement the scheme, and protected the scheme from competitors as well as from scrutiny.

14

27. SULEYMAN ASLAN, the defendant, was the General Manager of Turkish Bank-1 until approximately February 2014. While General Manager, ASLAN received tens of millions of dollars' worth of bribes in cash from the proceeds of the scheme to provide services to the Government of Iran and to conceal those services from U.S. regulators. In meetings and communications with officials from the U.S. Department of the Treasury, ASLAN concealed the true nature of these transactions so that Turkish Bank-1 could supply billions of dollars' worth of services to the Government of Iran without being sanctioned by the U.S.

28. LEVENT BALKAN, the defendant, was an Assistant Deputy Manager for International Banking at Turkish Bank-1 until approximately February 2013.

29. At all times relevant to this Indictment, ABDULLAH HAPPANI, the defendant, was an associate of REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, working at Durak Doviz and Duru Doviz.

30. At all times relevant to this Indictment, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," the defendant, owned and operated a network of companies located in Turkey and in the United Arab Emirates, including Flash Doviz ("Flash Doviz"), a money services business in Turkey; Sam

15

Exchange, a money services business in the UAE; and Hanedan General Trading LLC ("Hanedan General Trading"), a company in the UAE, among others.

31. At all times relevant to this Indictment, CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," the defendant, was an employee of REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, at Royal Holding and related entities.

32. At all times relevant to this Indictment, HOSSEIN NAJAFZADEH, the defendant, was a senior officer at Mellat Exchange.

## The Gold Export Scheme

33. As alleged above, in 2012 the United States sanctions relating to the sale of Iranian oil and the supply of currency and precious metals to Iran and the Government of Iran grew more restrictive. In response, REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, the defendants, and others devised a scheme to use exports of Turkish gold to allow Iran access to the proceeds of Iranian oil sales to Turkey, to evade these restrictions, and to deceive foreign banks and U.S. regulators.

34. First, REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN

16

ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, CAMELIA JAMSHIDY, a/k/a
a/k/a "Kamelia Jamshidy," the defendants, and others conspired
to transfer Iranian oil proceeds at Turkish Bank-1 to exchange
houses and front companies controlled by ZARRAB in order for
those exchange houses and front companies to buy gold for export
from Turkey. After being exported from Turkey, the gold could
be converted into cash or currency and remitted to Iran or used
to conduct international financial transfers on behalf of
Iranian persons and entities. Although these gold purchases
were made by or on behalf of the Government of Iran, including
Iranian banks owned or controlled by the Government of Iran, in
violation of Executive Order 13622, ASLAN and ATILLA represented
to U.S. Treasury officials that the gold purchases were by
private Iranian companies and individuals.

35. Second, REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET
HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN
ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, CAMELIA JAMSHIDY, a/k/a
"Kamelia Jamshidy," the defendants, and others conspired to use
false documentation and misrepresentations to make it appear
that, after gold was purchased in Turkey with the proceeds of
Iranian oil sales deposited at Turkish Bank-1, the gold was then
exported to Iran when, in fact, the gold was exported to Dubai
and sold there, in violation of the ITRA, 22 U.S.C.

17

§ 8513a(d)(4)(D), in order to obtain U.S. dollars, Euros, and other currencies that could be used to fund the activities of the Government of Iran and Iranian companies and persons.

36.    Third, after the IFCA broadened the gold prohibitions to include supply to private Iranian companies and individuals, REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, ABDULLAH HAPPANI, CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," the defendants, and others conspired to transfer the proceeds of Iranian oil sales held at Turkish Bank-1 to exchange houses and front companies controlled by ZARRAB in order for those exchange houses and front companies to secretly continue buying gold for export from Turkey on behalf of and for the benefit of Iranian persons and companies.

37.    REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, arranged meetings in Turkey between approximately October 4 and 8, 2012, among MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, MEHMET HAKAN ATILLA, the defendants, and others, and Iranian government banking and oil officials, including the then-Governor of the Central Bank of Iran and Mahmoud Nikousokhan, then the finance director of NIOC and a director of Petro Suisse Intertrade Company SA.  At these meetings the participants discussed, among other things, ZARRAB conducting

18

financial transfers using the proceeds of Iranian sales of natural gas at Turkish Bank-1 and transferring the proceeds of Iranian sales of oil from China to Turkish Bank-1.

38.  On or about October 6, 2012, REZA ZARRAB, a/k/a "Riza Sarraf," and ABDULLAH HAPPANI, the defendants, spoke. During this conversation, ZARRAB told HAPPANI that he just left a meeting with SULEYMAN ASLAN, the defendant, and described an arrangement to pay ASLAN just like ZARRAB already was paying MEHMET ZAFER CAGLAYAN, the defendant. ZARRAB advised, "It's the same arrangement as Abi. You know, it's the same system." HAPPANI asked if CAGLAYAN would be aware of the payments to ASLAN: "If we use the same system, will Abi not know?" ZARRAB informed HAPPANI that CAGLAYAN knew and approved: "I told Abi. He already called me over. He was the one who told me to get it going." "Abi," Turkish for an older brother, was a reference to CAGLAYAN.

39.  REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, arranged meetings in Turkey in early May 2013 among MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, the defendants, and others, and Iranian government banking and oil officials, including the then-Iranian Minister of Oil; Ahmad Ghalebani, then the managing director of NIOC; Nikousokhan; and Seifollah Jashnsaz, then the chairman of NICO. At these meetings the

19

participants discussed, among other things, arranging for the
Turkish national oil company to transfer payments for Iranian
oil to NIOC at an account held at Turkish Bank-1 by Bank
Sarmayeh, an Iranian government-owned bank.  ZARRAB had a
contract with Sarmayeh Exchange to conduct currency exchange and
wire transfers for that entity, giving him preferential access
to these Iranian oil revenues.

40.  On or about May 6, 2013, REZA ZARRAB, a/k/a "Riza
Sarraf," and SULEYMAN ASLAN, the defendants, spoke.  During this
conversation, ASLAN told ZARRAB that MEHMET HAKAN ATILLA, the
defendant, reported that NIOC transferred 70 million (apparently
Turkish lira or Euro) directly to an account controlled by
ZARRAB at Turkish Bank-1.  ZARRAB complained, "No it's not
direct, they did it wrong and it will go bank . . . you stop it
and I will fix it, they are stupid, they are retarded. . . .
Please count that as if it did not happen."  ZARRAB later
explained that, after ASLAN had left the meeting with the
Iranian officials, "we talked and stuff so I would control
[that] they wouldn't say something wrong to this they would not
say something wrong to that."

41.  After IFCA's restrictions on the supply of
precious metals to Iran, REZA ZARRAB, a/k/a "Riza Sarraf,"
continued to use proceeds of Iranian oil and gas sales at

20

Turkish Bank-1 to buy gold for export from Turkey in order to give the Government of Iran and Iranian persons and companies access to these funds. For example, on or about September 16, 2013, ZARRAB and SULEYMAN ASLAN, the defendant, spoke and, during this conversation, ASLAN reported on a meeting that he recently had with Turkish government officials who asked to increase Turkey's gold exports. ASLAN reported, "the request is, well, they exported $11 billion in gold last year." ZARRAB responded, "They are asking for the same to be done again, aren't they?" ASLAN replied, "Well, they are saying, 'do something, whatever the method, but help us out, take care of this job,' you know." ASLAN also stated, "I said, 'Iran -- it would not be through Iran, but we -- um, we will find a way, don't you worry.'" ZARRAB responded in part, "We have a method, we will use that. We need to sit down and talk in person."

42. On or about November 11, 2013, a representative of Turkish Bank-1 emailed employees of REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, spreadsheets of transactions relating to exports of gold from Turkey to the United Arab Emirates and Iran that purported to show tens of millions of Euros' worth of gold being exported by Royal Denizcilik and Safir Altin Ticaret to Iran as recently as September and October 2013, including to entities owned and controlled by the Government of Iran.

21

43.  Often REZA ZARRAB, a/k/a "Riza Sarraf," ABDULLAH HAPPANI, CAMELIA JAMSIDY, a/k/a "Kamelia Jamshidy," the defendants, and others caused gold exported from Turkey to be sold in Dubai rather than reexported to the Iranian buyers and the proceeds transferred back to companies owned and controlled by ZARRAB in Turkey, where the proceeds could be further transferred secretly on behalf of and for the benefit of the Government of Iran and Iranian companies and persons.  On other occasions, ZARRAB, HAPPANI, JAMSHIDY and others would cause the gold to be re-purchased by companies owned and controlled by ZARRAB in Turkey and imported back to Turkey, where it could be sold.  These transactions to sell gold in Dubai or to repurchase and reimport the gold to Turkey on behalf of and for the benefit of the Government of Iran and Iranian companies and persons were often conducted in U.S. dollars.  Between at least approximately December 2012 and October 2013, more than $900 million in such transactions were conducted by U.S. financial institutions through correspondent accounts held in the United States.

### The Fraudulent Food and Medicine Trade Scheme

44.  In response to the broadened prohibition against the supply of gold to include private Iranian companies and individuals, REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN,

22

ABDULLAH HAPPANI, CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy,"
the defendants, and others also conspired to transfer Iranian
oil revenues held at Turkish Bank-1 outside Turkey by falsely
pretending that these transfers were in connection with the sale
of food and medicine to Iran from Dubai.

     45.  SULEYMAN ASLAN, MEHMET HAKAN ATILLA, the
defendants, and others at Turkish Bank-1 designed the fraudulent
food and medicine scheme with REZA ZARRAB, a/k/a "Riza Sarraf,"
ABDULLAH HAPPANI, the defendants, and others.  In addition to
designing the scheme, ASLAN and ATILLA concealed the scheme from
U.S. Treasury officials in order to avoid potential sanctions
against Turkish Bank-1 pursuant to the 2012 NDAA, the ITSR, the
IFCA, and the IFSR.  MEHMET ZAFER CAGLAYAN, a/k/a "Abi," the
defendant, and other Turkish government officials both approved
of and directed that the fraudulent food and medicine scheme be
adopted and implemented.

     46.  On or about October 24, 2012, REZA ZARRAB, a/k/a
"Riza Sarraf," and LEVENT BALKAN, the defendants, spoke.  During
that conversation, ZARRAB and BALKAN discussed a transfer of
U.S. dollars between ZARRAB's account and Safir Altin's account
at Turkish Bank-1.  BALKAN warned ZARRAB about the transfer
because it was conducted by a U.S. financial institution through
its correspondent account in the United States ("U.S. Bank-1").

BALKAN stated, "I mean I'm talking about, one, an American Bank; two, dollars; three, Safir; I mean... many factors are all bundled up here." ZARRAB asked if the transfer would cause an issue, and BALKAN replied, "I just wanted to share it with you. When I mentioned strategic thinking, I meant we should access this together briefly. . . . The balance, the balance is not important. What's more important is security."

47. On or about February 12, 2013, representatives of the U.S. Treasury Department met in Turkey with MEHMET HAKAN ATILLA, the defendant, and other officials of Turkish Bank-1. During this meeting, among other things, the representatives of the U.S. Treasury Department warned Turkish Bank-1 about Iranian attempts to evade sanctions, including through the use of transactions to buy food for import to Iran.

48. On or about March 26, 2013, REZA ZARRAB, a/k/a "Riza Sarraf," and ABDULLAH HAPPANI, the defendants, spoke. During that conversation, ZARRAB and HAPPANI discussed a conversation that ZARRAB just had with SULEYMAN ASLAN, the defendant, about the fact that "they will stop the gold after one-and-a-half months" and that "[h]e [ASLAN] is insisting that we do food and then he will extend it for about two to three months." HAPPANI asked, "How are we going to make it food?", and ZARRAB went on, in part: "He [ASLAN] is saying that we can

24

send it from Dubai to Iran." ZARRAB later said, "He says that wherever you can provide a document from, do it." ZARRAB later went on to explain, in part: "He [ASLAN] says, 'It's not that, provide it, it is not a problem; whichever way you provide it, provide it. Provide it to Cikinova [coded language meaning false documentation, among other things] and Cikinova will send it; it is not a problem.'"

49. REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, arranged meetings in Turkey between approximately April 9 and 10, 2013, among MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, the defendants, and others, and Iranian government banking and oil officials, including Nikousokhan and Jashnsaz. At these meetings the participants discussed, among other things, designing transactions with the proceeds of Iranian oil sales at Turkish Bank-1 that appeared to be for the purpose of importing food into Iran.

50. On or about July 2, 2013, REZA ZARRAB, a/k/a "Riza Sarraf," and MEHMET HAKAN ATILLA, the defendants, spoke. During that conversation, ZARRAB and ATILLA discussed bills of lading requested by Turkish Bank-1 in connection with ZARRAB's purported food transactions using the proceeds of Iranian oil sales at Turkish Bank-1. ZARRAB explained his purported inability to provide bills of lading because he used small,

five-ton wooden ships for transport between Dubai and Iran that would not provide bills of lading. ATILLA expressed his concern about this explanation: "I'm thinking it would be slightly difficult to carry [goods] weighing 140-150 thousand tons in things that carry five thousand tons." ATILLA later noted, "that's not physically possible." ZARRAB explained that, while he could not provide bills of lading, he could provide customs documents: "The document is being prepared by the government. Customs. Dubai Customs is arranging which ship it will go with, how much, and what's being carried. And also there's the Dubai seal on margin." ATILLA agreed: "You can get those documents? Then give us those documents and I will look at the bill of lading issue later." ZARRAB acknowledged that he had made an error by making the transfer too large: "Hakan, we made an error there. We should have sent it in five million." After further discussion, ZARRAB agreed to also send bills of lading, despite having earlier denied being able to obtain them.

51. On or about July 9, 2013, REZA ZARRAB, a/k/a "Riza Sarraf," and MEHMET HAKAN ATILLA, the defendants, spoke again. During that conversation, ZARRAB and ATILLA discussed, among other things, false supporting documents submitted in connection with ZARRAB's transfers of Iranian oil proceeds at Turkish Bank-1. ATILLA reiterated, "Some of these ships are

26

very large.  There are ships that carry 50,000, 80,000, 90,000
tons of goods.  These are not small ships.  I beg you to ask our
colleagues to take a look at the tonnage."  ZARRAB acceded: "Of
course.  Should they only look at the larger ships?"  ATILLA
warned of the even greater risks of documents identifying
smaller ships:

> They should look at the small ones, too.  On
> the larger ships, it's possible to give a
> bill of lading.  On smaller ships, that can
> carry 13,000, 14,000, the goods are 20,000.
> That brings attention to these ships.  You
> need to check that out.  There are larger
> goods on the smaller tonnage ships.

ZARRAB asked: "Should I do anything about them?"  ATILLA
instructed: "They should pay attention that the tonnage should
match."  ATILLA gave these instructions despite having been
earlier informed by Zarrab that the documents he [Zarrab]
provided were prepared by Dubai Customs.

52.  On or about July 9, 2013, after the call
described above in Paragraph 51, REZA ZARRAB, a/k/a "Riza
Sarraf," and ABDULLAH HAPPANI, the defendants, spoke.  During
that conversation, ZARRAB stated, in part, "[T]hese guys loaded
20 thousand tons on a vessel with a capacity of 13 thousand
tons; he says to pay attention to these, that's all.  The man is
just openly saying that don't stick it into our eyes, that's it,
what else could he say?"  HAPPANI responded, "Thank you, God

bless him, what else can I say?"

53. On or about September 16, 2013, REZA ZARRAB, a/k/a "Riza Sarraf," and SULEYMAN ASLAN, the defendants, spoke. During this conversation, ZARRAB and ASLAN discussed, among other things, the fact that Turkish Bank-1 intended to preclude non-Turkish companies, including two specifically identified American companies, from selling food to Iran in exchange for the proceeds of Iranian oil and gas sales held at Turkish Bank-1 so that ZARRAB would have sole access to these funds.

54. REZA ZARRAB, a/k/a "Riza Sarraf," ABDULLAH HAPPANI, the defendants, and others continued to use fraudulent documentation to represent that transfers of proceeds of Iranian oil and gas sales from Turkish Bank-1 were related to sales of food or medicine. For example, on or about October 14, 2014, ZARRAB sent an email to an official with Turkish Bank-1 attaching documents purportedly relating to the sale of food products by a Dubai company to Iran.

55. On or about October 10, 2014, representatives of the U.S. Department of the Treasury met with MEHMET HAKAN ATILLA, the defendant, and other officials of Turkish Bank-1. During this meeting, representatives of the U.S. Department of the Treasury asked about Turkish Bank-1's dealings with REZA ZARRAB, a/k/a "Riza Sarraf," the defendant. ATILLA denied that

Turkish Bank-1 knowingly participated in any transactions with
ZARRAB intended to evade or avoid U.S. sanctions against Iran
and claimed to have conducted due diligence on ZARRAB's
counterparties.

## Scheme To Provide International Wire Transfer Services for the Government of Iran and Iranian Companies and Persons

56.   In addition to providing the Government of Iran
access to the proceeds of Iranian oil and gas sales deposited at
Turkish Bank-1, the defendants also conducted international
financial transfers with these proceeds and other funds held for
the benefit of Iranian companies and individuals while
concealing the true nature of these transfers from banks and
U.S. regulators.  As a result of this scheme, U.S. financial
institutions, among others, were deceived into providing
financial services for the benefit of the Government of Iran and
Iranian companies and persons that they would not otherwise have
provided.

57.   Among the Iranian beneficiaries of this scheme
were NIOC, NICO, HKICO, Mellat Exchange, Sarmayeh Exchange, and
Mahan Air.

### Transfers for NIOC, NICO, and HKICO

58.   On or about January 7, 2013, REZA ZARRAB, a/k/a
"Riza Sarraf," the defendant, sent an email to a co-conspirator
not named as a defendant herein ("CC-1"), an employee of Royal

29

Holding, attaching instructions for an international financial transfer from Turkish company ECB Kuyumculuk Ic Ve Dis Sanayi Ticaret Limited Sirketi in the amount of approximately $600,000 to an energy company located in Turkmenistan ("Turkmeni Company-1").

59.    On or about January 16, 2013, REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, sent an email to a co-conspirator not named as a defendant herein ("CC-2") attaching a SWIFT message for a payment in the amount of approximately $1,000,000 from Gunes General Trading LLC, a company located in the U.A.E., to Turkmeni Company-1.

60.    On or about January 16, 2013, Gunes General Trading LLC, a co-conspirator not named as a defendant herein, caused an international wire transfer from the U.A.E. to Turkmeni Company-1 in the amount of approximately $999,907, which was processed by a United States bank ("U.S. Bank-2").

61.    On or about November 11, 2013, a co-conspirator not named as a defendant herein ("CC-3") sent an email to REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, attaching (1) a letter from HKICO, signed by Seifollah Jashnsaz and stamped "CONFIDENTIAL," addressed to HKICO's bank concerning an approximately €100 million transfer to HKICO's account; (2) a letter from NIOC concerning an international financial transfer;

30

and (3) a letter from Turkmeni Company-1 dated May 30, 2013,
addressed to the Deputy Minister of Iran's Oil Ministry,
instructing that payment to Turkmeni Company-1 be made in U.S.
currency.

## Transfers for Mellat Exchange

62.   On or about January 26, 2011, a co-conspirator
not named as a defendant herein ("CC-4"), an employee of Mellat
Exchange, described in paragraph 21 above, sent an email to a
second co-conspirator not named as a defendant herein ("CC-5"),
an employee of Al Nafees Exchange, described in paragraph 25
above, with instructions for Al Nafees Exchange to make
international financial transfers on behalf of Mellat Exchange.
Included in the instructions was a payment in the amount of
approximately $953,288.85 to a company located in Canada
("Canadian Company-1") described as "transfer by MAPNA."  MAPNA
was a reference to MAPNA Group, an Iranian construction and
power plant company.

63.   On or about January 27, 2011, Royal Emerald
Investments, a co-conspirator not named as a defendant herein,
caused an international wire transfer from the UAE to Canadian
Company-1 in the amount of approximately $953,289, which was
processed by a United States bank ("U.S. Bank-3").  The wire
transfer information provided to U.S. Bank-3 purported that the

payment was related to fire equipment, but made no mention of MAPNA Group.

64.   On or about February 28, 2011, CC-4 of Mellat Exchange sent an email to CC-5 of Al Nafees Exchange with instructions for making several international financial transfers, including four transfers in United States currency, on behalf of Mellat Exchange.   Included in the instructions was a payment in the amount of approximately $76,950 to a company located in China ("Chinese Company-1"), identifying the "Intermediary Bank" for the transaction as a bank located in the United States ("U.S. Bank-4").

65.   On or about March 1, 2011, CC-4 sent an email to REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, and to a co-conspirator not named as a defendant herein ("CC-6"), an employee of Royal Holding, attaching a list of the four U.S.-currency payment instructions for Mellat Exchange described in paragraph 64 above.

66.   On or about March 9, 2011, CC-4 of Mellat Exchange sent an email to CC-5 of Al Nafees Exchange with instructions for making several international financial transfers in United States currency on behalf of Mellat Exchange.   Included in the instructions was a payment in the amount of approximately $9,225 to a company located in Hong Kong

32

("Hong Kong Company-1").

67. On or about May 24, 2011, CC-4 of Mellat Exchange sent an email to REZA ZARRAB, a/k/a "Riza Sarraf," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," the defendants, and CC-6 of Royal Holdings with the subject line, in Farsi, "very very urgent!!!!!!!!!!" Attached to the email were (1) a portion of a SWIFT message addressed to the attention of "OFAC/Compliance Unit" indicating that an international wire transfer in the amount of approximately €3,711,365 had been stopped by U.S. Bank-3 because of global sanctions; (2) a statement that the payment related to services provided in connection with development of a gas field in Iran; and (3) a letter from Mellat Exchange to ZARRAB stating in part, in Farsi:

> Based on the results of the continuous follow-ups regarding the above transfer, and your suggestion regarding communication with the OFAC agency in Turkey regarding facilitating transfers or returns thereof, the information received from the credit applicant is reflected exactly for follow up and appropriate action.

68. On or about May 31, 2011, CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," the defendant, sent an email to CC-5 of Al Nafees Exchange attaching a letter from Mellat Exchange, signed by HOSSEIN NAJAFZADEH, the defendant, to Al Nafees Exchange requesting the delivery of approximately $30 million in U.S. currency to Mellat Exchange in Tehran, Iran.

69.   On or about June 1, 2011, CC-4 of Mellat Exchange sent an email to REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, with the subject line, in Farsi, "very urgent" and attaching, among other things, (1) a portion a SWIFT message noting that a payment in the amount of approximately $9,225 had been blocked by U.S. Bank-1 "pursuant to the sanctions imposed by the U.S. Gov Dept. of Treasury OFAC"; (2) a letter from Hong Kong Company-1's bank advising that a payment to Hong Kong Company-1 from Asi Kiymetli Madenler Turizm Otom in the amount of approximately $9,200 had been blocked by U.S. Bank-1 because of OFAC; (3) a portion of a second SWIFT message noting that payment of a second international transfer to Hong Kong Company-1 in the amount of approximately $35,000 had been blocked by a United States bank ("U.S. Bank-5") as a result of OFAC sanctions; (4) a letter from Mellat Exchange dated May 15, 2011, to a relative of ZARRAB's at Al Nafees Exchange, signed by HOSSEIN NAJAFZADEH, the defendant, concerning the two blocked payments; and (5) a letter from Mellat Exchange dated June 1, 2011, to Durak Doviz, signed by NAJAFZADEH, concerning the two payments "through the Nafees Exchange," which stated in part, in Farsi:

> [T]he above amounts were blocked by OFAC, and despite repeated follow-ups to execute these transfers by providing all necessary documents, unfortunately, the transfers have

34

not been executed and deposited in the
beneficiary's account.  Therefore, despite
the lack of communication with you regarding
the covered topic, and only with regard to
your excellent achievements regarding
similar prior cases, it is requested:
Regarding the passage of more than 2 months,
and the lack of any results from the follow-
ups of Nafiss Exchange, please arrange that
with your guidance this case can be closed.

### Transfers for Mahan Air

70.  On or about October 13, 2011, a co-conspirator
not named as a defendant herein ("CC-7"), an individual
affiliated with Mahan Air's office in Dubai, received an email
from a representative of Mahan Air with the subject "IMPORTANT
!! -- MAHAN AIR has been OFAC listed from US Treasury
Department" and including, among other things, a statement that
a bank had advised that "all transactions to/from Mahan Air will
be rejected as per sanctions policy, following the addition of
Mahan Air to the OFAC list[.]"

71.  On or about December 18, 2013, CC-5 received an
email from an employee of the Al Nafees Exchange with the
subject line: "ASCOT" and attaching electronic copies of
(1) license information for Ascot General Trading, a Dubai
company, showing CC-7 as the licensee and manager, on which was
a handwritten note in Farsi referencing "Mahan" and the name of
an officer in Mahan Air's Dubai office, a co-conspirator not
named as a defendant herein ("CC-8"); (2) pages from the

35

passport of CC-7; (3) an Al Nafees Exchange account signature card for Ascot General Trading showing CC-7 as the account signatory; and (4) a letter dated December 17, 2013, on Ascot General Trading letterhead, signed by CC-7 and addressed to Al Nafees Exchange, directing a transfer from Ascot General Trading's account to a beneficiary with an account at an Iranian bank.

72. On or about January 19, 2015, CC-7 received an email from a money services business advising that a wire transfer had been returned, and including a portion of a SWIFT message stating, among other things, "ORIGINATOR IN OFAC SANCTIONLIST."

73. On or about June 25, 2015, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," the defendant, received an email from an employee of the Al Nafees Exchange attaching an electronic copy of an Al Nafees Exchange Payment Order for Flash Doviz, MOHAMMAD ZARRAB's company, concerning a payment of $1,180,238.00 (U.S. dollars) and a second payment of €129,901.00 from Ascot General Trading to Flash Doviz "FOR MAHAN" and naming CC-8. A handwritten note on the payment order, in Farsi, read in part: "Please deposit the above amounts in the Mahan account and show us the transfer slips."

74. On or about July 6, 2015, CC-5 sent an email to

36

MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," the
defendant, attaching electronic copies of (1) an Al Nafees
Exchange Payment Order for Flash Doviz concerning a payment of
approximately €570,613.00 from Ascot General Trading to Flash
Doviz "FOR MAHAN" and naming CC-8, with a handwritten note in
Farsi that read: "Should be deposited into the Mahan account
with you;" and (2) four Funds Transfer Request Forms concerning
requested payments totaling approximately €560,613 to recipients
in Austria, Greece, Singapore, and Germany, each bearing an
Ascot General Trading stamp.

      75.  On or about July 7 and July 8, 2015, MOHAMMAD
ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," the defendant,
sent CC-5 approximately four emails attaching electronic copies
of wire transfer records concerning payments corresponding to
the Funds Transfer Requests that CC-5 had sent to MOHAMMAD
ZARRAB on or about July 6, 2015.  The originators on the wire
transfers were two Turkish companies ("Turkish Company-1" and
"Turkish Company-2").

      76.  On or about July 9, 2015, CC-5 sent two emails to
an officer with Mahan Air, a co-conspirator not named as a
defendant herein ("CC-9"), attaching the wire transfer records
that CC-5 had received from MOHAMMAD ZARRAB, a/k/a "Can Sarraf,"
a/k/a "Kartalmsd," the defendant, on July 7 and July 8, 2015.

77.   On or about July 13, 2015, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," the defendant, sent CC-5 an email attaching an electronic copy of a SWIFT message concerning a transfer of $324,690 from Turkish Company-1 to a company in Malaysia ("Malaysian Company-1").   The SWIFT message record reflected that the message had been sent from a bank in Turkey to U.S. Bank-4 in "New York, NY, United States of America," indicating that the payment would be transferred through a correspondent account held at U.S. Bank-4.

78.   On or about July 21, 2015, CC-5 sent an email to MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," the defendant, with the subject: "tt's" -- a reference to telegraphic transfers, or wire transfers.   Attached to the email was an Al Nafees Exchange Payment Order concerning four payments from Ascot General Trading to Flash Doviz for Mahan Air in the amounts of $116,385, €363,971, $100,000, and €298,984.   A handwritten note on the payment order read, in Farsi, "Put in the Mahan account."   Also attached to the email were four Fund Transfer Request Forms, bearing an Ascot General Trading stamp, concerning payments (1) to a company in Hong Kong ("Hong Kong Company-2") for $100,000, and (2) an entity purportedly located in Belize (but having an account in Latvia) and entities located in Greece and Belgium in the amounts of €363,971, €75,524, and

€45,208, respectively.

79.   On or about July 22, 2015, an email was sent from an employee of MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," the defendant, a co-conspirator not named as a defendant herein ("CC-10"), to CC-5 attaching an electronic copy of a Wire Transfer Send Money Receipt from a money services business in Dubai reflecting a wire transfer of $100,000 from Hanedan General Trading to Hong Kong Company-2.

80.   On or about July 23, 2015, CC-5 sent an email to MOHAMMAD ZARRAB attaching electronic copies of (1) an Al Nafees Exchange Payment Order concerning transfers (a) from Ascot General Trading to a co-conspirator not named as a defendant herein ("CC-11"), an employee of MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," the defendant, in the amount of €200,000, (b) to Flash Doviz for Mahan Air in the amount of €87,520, and (c) to Flash Doviz for Mahan Air in the amount of $50,000; and (2) Ascot General Trading Funds Transfer Requests concerning payments to Hong Kong Company-2 in the amount of $50,000 and to entities located in France and Germany for €27,520 and €60,000, respectively.

81.   On or about July 23, 2015, CC-7 sent an email to CC-5 with the subject: "Re: 100.000,00 USD MAHAN AIR" and attaching an electronic copy of a wire transfer record

reflecting a transfer in the amount of approximately $99,940.00 from Hanedan General Trading to Hong Kong Company-2 and identifying the intermediary bank for the transfer as U.S. Bank-4 in "New York, NY USA."

82.   Later on July 23, 2015, CC-5 sent an email to CC-9 attaching an electronic copy of the wire transfer record described in paragraph 81 above, with portions of the information blacked out but reflecting, among other things, the originator, beneficiary, and intermediary bank (U.S. Bank-1).

83.   On or about July 27, 2015, CC-7 sent an email to CC-5 attaching an electronic copy of a Wire Transfer Send Money Receipt from a money services business in Dubai reflecting a wire transfer of $50,000 from Hanedan General Trading to Hong Kong Company-2.

84.   On or about July 29, 2015, CC-7 sent an email to CC-5 with the subject: "Re: 50.000,00 USD MAHAN AIR" and attaching an electronic copy of a wire transfer record reflecting a transfer in the amount of approximately $49,950.00 from Hanedan General Trading to Hong Kong Company-2, and identifying the intermediary bank for the transfer as U.S. Bank-1 in "New York, NY USA."

## STATUTORY ALLEGATIONS

### COUNT ONE

#### (Conspiracy to Defraud the United States)

The Grand Jury charges:

85. The allegations contained in paragraphs 1 through 84 of this Indictment are repeated and realleged as if fully set forth herein.

86. From at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to defraud the United States and an agency thereof, to wit, to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of the U.S. Department of the Treasury in the enforcement of economic sanctions laws and regulations administered by that agency.

41

## Overt Acts

87.    In furtherance of the conspiracy and to effect

the illegal object thereof, REZA ZARRAB, a/k/a "Riza Sarraf,"

MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi,"

SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, MOHAMMAD

ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY,

a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the

defendants, and others committed the overt acts set forth in

paragraphs 33 to 84 of this Indictment, among others, which are

fully incorporated by reference herein.

(Title 18, United States Code, Section 371.)

### COUNT TWO

**(Conspiracy to Violate the**

**International Emergency Economic Powers Act)**

The Grand Jury further charges:

88.    The allegations contained in paragraphs 1 through

84 of this Indictment are repeated and realleged as if fully set

forth herein.

89.    From at least in or about 2010, up to and

including in or about 2015, in the Southern District of New

York, Turkey, the United Arab Emirates, and elsewhere, REZA

ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER

CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH

42

HAPPANI, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act.

90. It was a part and an object of the conspiracy that REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, would and did provide and cause others to provide financial services to Iran and to the Government of Iran prohibited by U.S. law, without first obtaining the required approval of OFAC, and to evade and avoid the requirements of U.S. law with respect to the provision of financial services to Iran and to the Government of Iran, in violation of Executive Orders 12959, 13059, 13224, 13599, 13622, and 13645 and 31 C.F.R. §§ 560.203, 560.204, 560.205, 561.203, 561.204, and 561.205.

(Title 50, United States Code, Section 1705;

43

Executive Orders 12959, 13059, 13224, 13599, 13622, and 13645;
Title 31, Code of Federal Regulations, Sections 560.203,
560.204, 560.205, 561.203, 561.204 & 561.205.)

## COUNT THREE

### (Bank Fraud)

The Grand Jury further charges:

91.     The allegations contained in paragraphs 1 through
84 of this Indictment are repeated and realleged as if fully set
forth herein.

92.     From at least in or about 2010, up to and
including in or about 2015, in the Southern District of New
York, Turkey, the United Arab Emirates, and elsewhere, REZA
ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER
CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH
HAPPANI, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd,"
CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN
NAJAFZADEH, the defendants, and others known and unknown, did
knowingly execute and attempt to execute a scheme or artifice to
defraud a financial institution, the deposits of which were then
insured by the Federal Deposit Insurance Corporation ("FDIC"),
and to obtain moneys, funds, credits, assets, securities, and
other property owned by and under the custody and control of
such financial institution, by means of false and fraudulent
pretenses, representations, and promises, and aided and abetted

44

the same, to wit, inducing U.S. financial institutions to conduct financial transactions on behalf of and for the benefit of the Government of Iran and Iranian entities and persons using money and property owned by and under the custody and control of such financial institutions, by deceptive means.

(Title 18, United States Code, Sections 1344 & 2.)

## COUNT FOUR

### (Conspiracy to Commit Bank Fraud)

The Grand Jury further charges:

93.  The allegations contained in paragraphs 1 through 84 of this Indictment are repeated and realleged as if fully set forth herein.

94.  From at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to

commit bank fraud, in violation of Title 18, United States Code, Section 1344.

95. It was a part and an object of the conspiracy that REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, would and did knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, the deposits of which were then insured by the FDIC, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

## COUNT FIVE

### (Money Laundering)

The Grand Jury further charges:

96. The allegations contained in paragraphs 1 through 84 of this Indictment are repeated and realleged as if fully set forth herein.

46

97. From at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, together with others known and unknown, in an offense involving and affecting interstate and foreign commerce, did knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and .funds to places in the United States from and through places outside the United States, in amounts exceeding $10,000, and aided and abetted the same, with the intent to promote.the carrying on of specified unlawful activity, to wit, (i) the illegal export of services to Iran as charged in Count Two of this Indictment, (ii) bank fraud as charged in Counts Three and Four of this Indictment, and (iii) an offense against a foreign nation involving bribery of a public official.

(Title 18, United States Code, Sections 1956(a)(2)(A) & 2.)

## COUNT SIX

### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

98. The allegations contained in paragraphs 1 through 84 of this Indictment are repeated and realleged as if fully set forth herein.

99. From at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(2)(A).

100. It was a part and an object of the conspiracy that REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy,"

48

and HOSSEIN NAJAFZADEH, the defendants, and others known and
unknown, in an offense involving and affecting interstate and
foreign commerce, would and did transport, transmit, and
transfer, and attempt to transport, transmit, and transfer,
monetary instruments and funds to places in the United States
from and through places outside the United States, in amounts
exceeding $10,000, with the intent to promote the carrying on of
specified unlawful activity, to wit, (i) the illegal export of
services to Iran as charged in Count Two of this Indictment,
(ii) bank fraud as charged in Counts Three and Four of this
Indictment, and (iii) an offense against a foreign nation
involving bribery of a public official, in violation of Section
1956(a)(2)(A) of Title 18, United States Code.

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATION

### (Counts Two, Three, and Four)

101. As a result of committing the offenses alleged in
Counts Two, Three, and Four of this Indictment, REZA ZARRAB,
a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN,
a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI,
MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA
JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the
defendants, shall forfeit to the United States, pursuant to

49

Title 18, United States Code, Section 981(a)(1)(C) and Title 28,
United States Code, Section 2461, all property, real and
personal, that constitutes or is derived from proceeds traceable
to the commission of the offenses alleged in Counts Two, Three,
and Four of this Indictment, including but not limited to a sum
of money representing the amount of proceeds obtained as a
result of the offenses.

### Substitute Assets Provision

102. If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

> a) cannot be located upon the exercise of due
>    diligence;
>
> b) has been transferred or sold to, or
>    deposited with, a third person;
>
> c) has been placed beyond the jurisdiction of
>    the court;
>
> d) has been substantially diminished in value;
>    or
>
> e) has been commingled with other property
>    which cannot be subdivided without
>    difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), to seek forfeiture of any
other property of said defendants up to the value of the above
forfeitable property.

## FORFEITURE ALLEGATION

### (Counts Five and Six)

103. As a result of committing the money laundering offenses alleged in Counts Five and Six of this Indictment, REZA ZARRAB, a/k/a "Riza Sarraf," MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, a/k/a "Abi," SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to, a sum of money representing the amount of property that was involved in the money laundering offenses or is traceable to such property.

### Substitute Assets Provision

104. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

> a) cannot be located upon the exercise of due diligence;
>
> b) has been transferred or sold to, or deposited with, a third person;
>
> c) has been placed beyond the jurisdiction of the court;

  d)  has been substantially diminished in value; or

  e)  has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendants up to the value of the above

forfeitable property.

    (Title 18, United States Code, Sections 981, 982;
     Title 21, United States Code, Section 853;
     Title 28, United States Code, Section 2461.)

Foreperson

JOON H. KIM
Acting United States Attorney

52

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

v.

**REZA ZARRAB, a/k/a "Riza Sarraf,"
MEHMET HAKAN ATILLA,
MEHMET ZAFER CAGLAYAN, a/k/a "Abi,"
SULEYMAN ASLAN,
LEVENT BALKAN,
MOHAMMAD ZARRAB, a/k/a "Can Sarraf,"
a/k/a "Kartalmsd,"
CAMELIA JAMSHIDY, a/k/a "Kamelia
Jamshidy," and
HOSSEIN NAJAFZADEH,**

**Defendants.**

---

### SUPERSEDING INDICTMENT

S4 15 Cr. 867 (RMB)

(18 U.S.C. § 371; 50 U.S.C. § 1705; 31
C.F.R. §§ 560.203, 560.205, 561.203,
561.204, 561.205; 18 U.S.C. §§ 1349,
1956, & 2.)

JOON H. KIM
Acting United States Attorney.

**A TRUE BILL**

*David R. Gullow*

Foreperson.

9/6/17    Filed Indictment
Arrest Warrants ordered          USMJ Parker          RMC