UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                     :

UNITED STATES OF AMERICA

                                     :

                v.                     :          S4 15 Cr. 867 (RMB)

                                     :

REZA ZARRAB, et al.,

                                     :

              Defendants.

                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT MEHMET HAKAN ATILLA'S MOTIONS *IN LIMINE*

HERRICK, FEINSTEIN LLP
Victor J. Rocco
Thomas E. Thornhill
David M. Rosenfield
2 Park Avenue
New York, NY  10016

FLEMING RUVOLDT PLLC
Cathy Fleming
Robert Fettweis, *pro hac vice*
Jonathan Stern
1700 Broadway, 28th Floor
New York, NY  10019

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ..................................................................................................... 1

POINT I        THE RECORDINGS FROM THE TURKISH
INVESTIGATION (AND FRUITS) SHOULD BE PRECLUDED ...................... 1

    A.      Background ....................................................................................... 1

    B.      Because the Government Cannot Satisfy the Standard for Admissibility of
the Recordings, They Should be Precluded from Use as Evidence at Trial. .......... 3

POINT II      THE GOVERNMENT'S PROPOSED EXPERT TESTIMONY SHOULD
BE PRECLUDED AS OVERLY PREJUDICIAL, INFLAMMATORY
AND IRRELEVANT ...................................................................................... 7

    A.      The Government's Proposed Expert Witnesses and their Proffered
Testimony ....................................................................................... 7

    B.      The Government's Proposed Expert Testimony Should Be Precluded
Pursuant to Federal Rules of Evidence 401, 402, 403 and 702 ..................... 9

        1.      Legal Standard ...................................................................... 9

        2.      Mr. Atilla's Proposed Stipulation ........................................... 10

        3.      The Proposed Testimony of Mark Dubowitz Should Be Precluded .......... 11

        4.      The Proposed Testimony of Dr. Jonathan Schanzer Should Be
Precluded ............................................................................ 14

        5.      The Government's OFAC Expert's Proposed Testimony Should
Be Precluded In Part or In Whole ............................................ 17

        6.      The Government's Banking Industry Expert or Experts' Proposed
Testimony Could Be the Subject of a Stipulation ........................... 18

        7.      *Daubert* Hearing ............................................................... 18

POINT III     THE ZARRAB LETTER REFERENCING "ECONOMIC JIHAD,"
AND DRAFTS OF A SIMILAR LETTER, SHOULD BE PRECLUDED
FROM USE AT TRIAL AS OVERLY PREJUDICIAL AND
INFLAMMATORY .......................................................................... 19

POINT IV     MR. ATILLA RESERVES THE RIGHT TO FILE ADDITIONAL
MOTIONS IN LIMINE FOLLOWING RECEIPT OF
THE GOVERNMENT'S EVIDENCE AND JENCKS MATERIAL ...................22

CONCLUSION....................................................................................................................22

# TABLE OF AUTHORITIES

Page

## Federal Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)..................................................................9

*Eid v. Saint-Gobain Abrasives, Inc.*,
   No. 16-12392, 2008 WL 2221977 (E.D. Mich. May 28, 2008) ............................6

*Kennedy v. Lockyer*,
   379 F.3d 1041 (9th Cir. 2004) ..............................................................21

*Old Chief v. United States*,
   519 U.S. 174 (1997)...................................................................20, 21

*Stern v. Shammas*,
   No. 12-CV-5210 (NGG) (RER), 2015 WL 4530473 (E.D.N.Y. July 27, 2015) ..................10

*U.S. v. Love*,
   534 F.2d 87 (6th Cir. 1976) ................................................................21

*U.S. v. Mohamed*,
   410 F. Supp. 2d 913 (S.D. Cal. 2005).......................................................20

*United States v. Al-Moayad*,
   545 F.3d 139 (2d Cir. 2008)...........................................................12, 20

*United States v. Almonte*,
   956 F.2d 27 (2d Cir. 1992)..................................................................4

*United States v. Cabrera*,
   222 F.3d 590 (9th Cir. 2000) .........................................................15, 16

*United States v. Elfgeeh*,
   515 F.3d 100 (2d Cir. 2008)...........................................................12, 20

*United States v. Gelzer*,
   50 F.3d 1133 (2d Cir. 1995)................................................................9

*United States v. Gonzales-Flores*,
   418 F.3d 1093 (9th Cir. 2005)..............................................................21

*United States v. Hassan*,
   742 F.3d 104 (4th Cir. 2014) ..............................................................12

*United States v. Knohl,*
   379 F.2d 427 (2d Cir. 1967)........................................................................3, 4

*United States v. Mostafa,*
   16 F. Supp. 3d 236 (S.D.N.Y. 2014)................................................................12

*United States v. Salameh,*
   152 F.3d 88 (2d Cir. 1998)..............................................................................20

*United States v. Vaghari,*
   735 F. Supp. 2d 197 (E.D. Pa. 2010) ..............................................................14

*United States v. Yevakpor,*
   419 F. Supp. 2d 242 (N.D.N.Y. 2006)..........................................................5, 6

## Statutes, Rules and Regulations

FRE 106 .......................................................................................................5, 6

FRE 401 .................................................................................................. passim

FRE 402 ..............................................................................9, 15, 16, 17, 18

FRE 403 .................................................................................................. passim

FRE 702 ................................................................................9, 10, 13, 15

FRE 704 ...............................................................................................16, 17

## Miscellaneous

U.S. Department of State, "Diplomacy in Action - Joint Comprehensive Plan of Action,"
   found at www.state.gov/e/eb/tfs/spi/iran/jcpoa/ ....................................................13

## INTRODUCTION

Defendant Mehmet Hakan Atilla ("Mr. Atilla") respectfully submits this memorandum of law in support of the following motions *in limine* to preclude and limit certain evidence:

(a)      To preclude the recordings (and fruits) from the Turkish investigation;

(b)      To preclude the government's proposed expert testimony;

(c)      To preclude the use as evidence at trial of the letter referenced in ¶ 24a of Indictment S4, and the drafts of a similar letter referenced in ¶ 24b; and

(d)      To reserve the right to file additional motions *in limine* following receipt of the government's evidence.

It should be noted that, given that Defendant Reza Zarrab has essentially not participated in the case since the filing of Indictment S4 on September 6, 2017 (for example, he did not file a motion to dismiss Indictment S4), and that all of the other Defendants reside outside the US, it appears likely that Mr. Atilla will be the only Defendant appearing at trial.

## POINT I

## THE RECORDINGS FROM THE TURKISH INVESTIGATION (AND FRUITS) SHOULD BE PRECLUDED

### A.  *Background*

This case is unique. Its genesis lies in audio recordings allegedly derived from wiretaps conducted by Turkish law enforcement authorities in 2012-2013.  But unlike other reported cases where a foreign government provided recordings to the United States Department of Justice as a prelude to a prosecution, here, the government did not obtain these materials from the foreign government, *i.e.*, the Republic of Turkey.  To the contrary, Turkey's government has denounced the 2012-2013 investigation as unlawful and irregular, calling it a judicial *coup d'état*.  (*See* the Declaration of Cathy Fleming in Support of Mehmet Hakan Atilla's Motion *in Limine* to Preclude Recordings dated October 30, 2017 ("Fleming Decl."), ¶¶ 4, 12).

The precise derivation of these recordings is currently unknown to the defense (albeit presumably known to the government). Nevertheless, it is clear that, instead of arriving in the United States via a government-to-government transfer, the recordings were provided to the government, directly or indirectly, by the very individuals -- presumably former Turkish law enforcement officials -- whom the Republic of Turkey has castigated or prosecuted for lawlessness. These individuals, who may currently be targets of or fugitives from Turkish law enforcement, have a distinct interest in embarrassing the Turkish government and establishing the bona fides of their prior efforts.[1] It is likely that one or more of those individuals illegally stole the recordings in question from the custody of the Turkish government, and thereafter delivered them to the Department of Justice ("DOJ"). As noted, the recordings were not provided to the DOJ by the Turkish government. (*Id*. at ¶ 4).

The government has produced in discovery only four recorded conversations in which Mr. Atilla is an alleged participant, even though it appears from the Turkish pen registers that Mr. Atilla may have been intercepted on 12 of the listed calls, (*Id*. at ¶¶ 19-20). Moreover, as Ms. Fleming's Declaration amply demonstrates, the pen register reports for the affected telephones establish the likelihood that thousands of conversations were intercepted during the 2012-2013 Turkish investigation. (*Id*. at ¶ 19). And, we have determined that there are many missing recordings. (*Id*. at ¶¶ 25-26). Under these circumstances, the government has produced in discovery in this case only a fragment of the recordings from the 2012-2013 investigation. What the significance may be of the missing mountains of recordings is impossible to discern.

---

[1] Mr. Atilla was not criminally charged in the 2012-2013 Turkish investigation. Certain telephone conversations attributed to him were intercepted and several were cited in that investigation as a basis for prosecuting others.

2

What is clear, though, is that the unauthorized providers of these recordings had a substantial motive to "cherry-pick," or even alter, the arguably useful ones, and leave behind or destroy any others that might undercut their efforts to vindicate the prior prosecution efforts.  To quote an old cliché, they have an "axe to grind."   The facts show they may have provided incomplete information to the government, which is unreliable and may be false, in an effort to have the latter act as their unwitting agent.

The missing recordings are part of the significant problem surrounding the authenticity of the recordings in this case.  It is also apparent that the recordings are not originals; we do not even know whether they are first generation or tenth generation, or whether they are complete or doctored.  The government has refused to provide any information to the Defense on this topic. (*Id.* at ¶¶ 3, 6, Exhibits A, B and C).  Thus, in a case which reeks of motivation on the part of former Turkish law enforcement officials to tamper with the proffered recordings, the Defense has not had the opportunity to determine through forensic analysis whether the recordings are genuine and unaltered, and given the facts, no such analysis may even be possible.

Accordingly, Mr. Atilla moves for an Order precluding the admission into evidence of the apparently stolen, unverified and inherently suspicious recordings (and fruits) in this case.

**B.**     ***Because the Government Cannot Satisfy the Standard for Admissibility of the Recordings They Should be Precluded from Use as Evidence at Trial.***

In *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir. 1967), the Second Circuit recognized the uniquely powerful effect that tape recordings can have on a jury, and accordingly imposed requirements to ensure that the presentation of this evidence comports with standards of basic fairness.  The Circuit declared:

> We are not unmindful, however, that tape recordings are
> susceptible to alteration and that they often have a persuasive,

3

sometimes a dramatic, impact on a jury. It is therefore incumbent on the Government to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings, and where the court accepts them as authentic and accurate but the evidence is conflicting on these points, it must caution the jury to scrutinize the evidence with care.

*Knohl* then added:

The question of whether so much of the tape recording is inaudible *or the circumstances surrounding it are so suspicious and make it so untrustworthy that it should not be admitted into evidence in the first place* is addressed to the discretion of the trial judge.

(emphasis added).

The Second Circuit's enunciated standard in *Knohl* for the admissibility and authentication of recordings is critical here. To our knowledge, unlike every other reported case involving the admission into evidence of foreign wiretap recordings, the recordings in this case have not come from a governmental source. Instead, it seems likely that they were stolen from the 2012-2013 Turkish investigation file, which belonged to the Turkish government, and then improperly delivered to the United States as part of an effort to vindicate a denounced prosecution in Turkey.

Given that we *know* there are missing recordings – including some believed to be exculpatory of Mr. Atilla – from the recordings wiretapped during the 2012-2013 Turkish investigation, and given the complete lack of information as to the provenance of the existing recordings, this Court has ample basis to reject the *bona fides* of the wiretap evidence that the government seeks to present here. A party proffering evidence has the burden of proving a rational basis for concluding that the exhibit is what it is claimed to be. *See United States v. Almonte*, 956 F.2d 27, 30 (2d Cir. 1992). The government cannot meet that burden here.

4

Federal Rule of Evidence ("FRE") 106 and the Doctrine of Completeness provide a further basis for rejection of this evidence. FRE 106 provides:

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time.

Here, there are, it would seem, hundreds, if not thousands, of missing recordings that would place a proper factual context around the four recorded conversations in which the government claims that Mr. Atilla participated. There are so many recordings missing that the inculpatory (or exculpatory) impact of the missing recordings on the prosecution of Mr. Atilla cannot be cogently or fairly evaluated. It is worth noting that the defense has and can prove that at least one of the four purported recordings of Mr. Atilla that were used to establish probable cause in the Complaint against Mr. Atilla that led to his arrest does *not* include Mr. Atilla, and his voice was misidentified (as it was in the Turkish investigation). Fleming Decl. ¶ 24.

*United States v. Yevakpor*, 419 F. Supp. 2d 242 (N.D.N.Y. 2006) is instructive. There, the defendant was indicted for the attempted importation of heroin and possession with intent to distribute a controlled substance. At trial, the government sought to introduce three one-minute video segments that were recorded during a border stop and search of the defendant, as the remainder of the recordings had been inadvertently taped-over by the border patrol. The defendant filed a motion *in limine* challenging the government's use of the recordings, arguing that the "surveillance provided to the defendant to date is not complete and only represents a small clip of the entire time the defendant was recorded . . . ." *Id*. at 244.

In granting the defendant's motion, the court noted that

> the three video segments have been preserved to the exclusion of the rest of the video surveillance, and neither the Government nor

5

> Defendant are certain how much else existed on the videotape prior to erasure/re-recording.  From viewing the time stamps on the video segments, however, the Court notes that at least twenty-two (22) minutes of tape are missing from the first to the third segment (eighteen (18) minutes between segments one and two, and four (4) minutes between segments two and three). No one is certain how much tape, if any, existed before segment one or after segment three.

*Id*. at 245.  Citing the "doctrine of completeness," which was partially codified by FRE 106, the court reasoned that while the rule allows a party to require the introduction of the remainder of a recorded statement that "ought in fairness" be considered together with a part introduced by the adverse party, "[i]t is difficult to determine whether 'any other part… ought… be considered contemporaneously with' the proffered part since no other parts of the video exist for review by the Government or the Defense."  *Id*. at 246.

Moreover, the court rejected the government's argument that the defendant was required to "identify specific portions of the missing or excluded evidence that would be relevant to the case" since "the Defendant cannot know what missing portions would be relevant since the Government has not preserved the entire range of video."  *Id*.  Finally, the court declared:

> From this point forward, let all parties - Government and Defense alike - be on notice: if selected segments of a video or audio exhibit will be offered at trial, the entire video or audio exhibit had best be preserved, so that opposing counsel and/or the opposing party(s) may review the evidence and determine if "any other part or any other writing or recorded statement… ought in fairness… be considered contemporaneously with" the proffered segments.  Fed. R. Evid. 106.

*Id*. at 252; *see also Eid v. Saint-Gobain Abrasives, Inc.*, No. 16-12392, 2008 WL 2221977 (E.D. Mich. May 28, 2008) (granting motion *in limine* to exclude incomplete audiotape recording).

The unfairness here leaps out from the underlying suspicious circumstances.  The fact that the government was not complicit in causing the unavailability of the missing recordings, or in any possible alteration of the recordings, does not alleviate the unfairness.  The recordings (and fruits) of the 2012-2013 Turkish investigation should therefore be precluded from use as evidence in this case.

**POINT II**

**THE GOVERNMENT'S PROPOSED EXPERT TESTIMONY SHOULD
BE PRECLUDED AS OVERLY PREJUDICIAL, INFLAMMATORY AND
IRRELEVANT**

*A.      The Government's Proposed Expert Witnesses and their Proffered Testimony*

By letter dated August 16, 2017, the government informed Defendants that it expects to call at least four expert witnesses to testify at trial.  (*See* Declaration of David M. Rosenfield in Support of Defendant Mehmet Hakan Atilla's Motions *in Limine* dated October 30, 2017 ("Rosenfield Decl."), Ex. A).   First, the government intends to call Mark Dubowitz of The Foundation for Defense of Democracies ("FDD"), to testify regarding: (i) the "repeated imposition of economic sanctions by the United States against the Islamic Republic of Iran," and "the actions by Iran that caused the United States to impose sanctions, and the goals of the United States' sanctions against Iran," including "Iran and its Islamic Revolutionary Guard Corps (the 'IRGC')'s support of terrorism and foreign terrorist groups (including Hezbollah)"; (ii) "Iran's 'Economic Jihad' and adoption of a 'resistance economy,' and the various and evolving methods Iran used to evade U.S. and European sanctions"; (iii) the "role that key players in the Iranian government, economy, and society played in Iran's attempt to evade U.S. sanctions, including the IRGC", and the IRGC's "role in the Iranian government and economy"; and (iv) the "negotiation of and impact of the Joint Comprehensive Plan of Action."  *Id.* at 1-2.

7

Second, the government intends to call Dr. Jonathan Schanzer, also of FDD, to "testify about the relationship between the Republic of Turkey and Iran and Turkey's role in Iran's sanctions evasion efforts," including: (i) the purported economic and political ties between Turkey and Iran; (ii) Turkey's alleged "role in Iran's sanctions evasion activity", including the "so-called 'gas-for-gold' scheme"; (iii) the "role and usage of U.S. dollars as a standard currency for pricing and settlement of transactions involving precious metals and petroleum products"; and (iv) "[p]atterns of financial activity that are consistent with money laundering." *Id*. at 2.

Third, the government expects to call an unspecified representative of the Office of Foreign Assets Control ("OFAC"), United States Department of the Treasury, as a witness to testify regarding: (i) OFAC's authority under certain statutes, executive orders, and implementing regulations; (ii) "OFAC's licensing, designation, and enforcement authority"; (iii) the "identification and/or designation of Iranian banks, companies, and government entities pursuant to various OFAC authorities"; and (iv) the "existence and/or non-existence of licenses relating to certain counterparty entities or classes of transactions involved in this case." *Id*. at 2-3.

Fourth, and finally, the government intends to call another unnamed witness or witnesses, a representative or representatives of one or more major international banks, to testify regarding "standard practices in the banking industry regarding the maintenance of correspondent banking relationships, the operation of wire transfers and the interpretation of wire transfer instructions (*i.e.*, SWIFT messages), the settlement of foreign currency transactions, and policies and procedures designed to combat money laundering and sanctions evasion." *Id*. at 3.

As discussed below, we believe that almost all of the government's proposed expert testimony should be precluded as either irrelevant, unduly prejudicial, or not proper expert testimony because it would not aid the jury.

**B.      The Government's Proposed Expert Testimony Should Be Precluded Pursuant to Federal Rules of Evidence 401, 402, 403 and 702**

**1.      Legal Standard**

FRE 401 permits the introduction at trial of "relevant evidence," and provides that "[e]vidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FRE 402 precludes the introduction of irrelevant evidence.  FRE 403 protects against the adverse effect of otherwise relevant evidence that goes beyond tending to prove a fact or issue that would justify its admission.  *See United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995).  FRE 403 provides as follows:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Unfair prejudice means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  FRE 403 Advisory Committee notes on 1972 proposed rules.

With respect to expert testimony, FRE 702 provides, in pertinent part, that a witness qualified as an expert "may testify in the form of an opinion or otherwise if" it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Like any other evidence, expert testimony must be relevant pursuant to FRE 401 to be admissible.  *See Amorgianos v.*

9

*Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) ("[i]n fulfilling [its] gatekeeping role [under FRE 702], the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'")

Moreover, even where expert testimony meets the requirements of both FRE 401 and 702, "that testimony is subject to FRE 403's balancing test, and can therefore be excluded if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury . . . or needlessly presenting cumulative evidence." *Stern v. Shammas*, No. 12-CV-5210 (NGG) (RER), 2015 WL 4530473, at *2 (E.D.N.Y. July 27, 2015) (internal citations and quotations marks omitted); *see* FRE 403 testimony.

### 2. *Mr. Atilla's Proposed Stipulation*

Mr. Atilla will stipulate to the existence and provisions of the US sanctions against Iran -- what we have referred to in other briefs as the "Iranian Sanctions Regime." Mr. Atilla will also stipulate as to the maintenance of a Specially Designated Nationals ("SDN") list of sanctioned individuals and entities maintained by OFAC. We will confer with the government to determine if any such stipulations can be entered into. It is the existence of the Iranian Sanctions Regime and the SDN list that is relevant to this case, not the motivation for or background of the Sanctions Regime, or why the sanctions have been maintained over time. This background information, which the government is attempting to introduce into evidence through Mr. Dubowitz and Dr. Schanzer, will be overly prejudicial to Mr. Atilla. These stipulations will obviate the need for the testimony of Mr. Dubowitz and Dr. Schanzer. However, even if the

stipulations cannot be agreed upon, the testimony of Mr. Dubowitz and Dr. Schanzer should still be precluded for the reasons discussed herein.

### 3. *The Proposed Testimony of Mark Dubowitz Should Be Precluded*

The proposed testimony of Mr. Dubowitz is nothing more than a blatant attempt by the government to poison the jury with irrelevant, highly prejudicial testimony.   Thus, Mr. Dubowitz's proposed testimony regarding the United States' sanctions against Iran, which, as noted, would include "the actions by Iran that caused the United States to impose sanctions" -- including IRGC's "support of terrorism and foreign terrorist groups (including Hezbollah)" and Iran's "Economic Jihad" -- should be excluded under FRE 401 and 403.   Describing the background and reasons for the Iranian sanctions has no place in this trial, as the only issues are (a) what were the Iranian sanctions, and (b) did Mr. Atilla (and the other Defendants) criminally violate them.

Without question, the introduction into evidence of subjects such as terrorism, Economic Jihad and Hezbollah, even if tangentially related to the enactment of sanctions against Iran, have no relevance to the specific charges against Mr. Atilla, which involve allegations that he conspired to defraud the United States; conspired to violate the International Emergency Economic Powers Act ("IEEPA"); committed and conspired to commit bank fraud; and committed and conspired to commit money laundering.

Of equal significance, the topics that the government proposes Mr. Dubowitz will testify about will likely include such matters as: the Iranian Revolution; the takeover of the U.S. Embassy in Tehran following the Revolution and the hostage crisis; Iran's state sponsorship of terrorism, and such terrorist groups as Hezbollah, and Hamas; Iran's hostility towards the United States; and issues relating to nuclear energy and weapons of mass destruction.   Such testimony

would inflame the jury and be overly prejudicial to Mr. Atilla.  Jurors would likely have strong negative reactions to the presentation of Iran's policies and actions, and would unfairly and unjustifiably link Mr. Atilla to those actions.  Indeed, the jury is being invited to believe that any conviction of Mr. Atilla will assist the US in its war on terror.

As the Second Circuit has said, "[t]here can be little doubt that…evidence linking a defendant to terrorism in a trial in which he is not charged with terrorism is likely to cause undue prejudice."  *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008); *see United States v. Mostafa*, 16 F. Supp. 3d 236, 262-63 (S.D.N.Y. 2014) (evidence pertaining to foreign terrorist organizations and terrorist attacks "touch on very sensitive issues for Americans" and thus require "careful consideration" before such evidence may be admitted); *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (because evidence of terrorism is "undoubtedly prejudicial," courts ask not whether prejudice would result, but whether the probative value of the evidence is sufficient to outweigh prejudice).

This case is plainly not one in which Mr. Atilla has been charged with terrorism, or even working with terrorist organizations or groups, such as the IRGC or Hezbollah.  The only conceivable purpose of offering expert testimony on topics involving Iran's ties to terrorism, foreign terrorist groups, and "Economic Jihad" is to inflame and prejudice the jury by portraying Mr. Atilla as affiliated with Iran and entities who support terrorism, thereby suggesting that Mr. Atilla is a danger to the US based on hostility and fear directed at Iran itself.  This is not permitted under FRE 403.  *See United States v. Al-Moayad*, 545 F.3d 139, 160-63 (2d Cir. 2008) (evidence of uncharged conduct (an eyewitness description of a terrorist bus bombing) not involving the defendant was found to be more inflammatory than the charged crime (knowledge

of a terrorist group's activities) and was inadmissible under FRE 403 as a blatant appeal to the

jury's emotions and prejudices).

The government also proposes that Mr. Dubowitz will testify about "[t]he negotiation and

impact of the Joint Comprehensive Plan of Action (the 'JCPOA')."  The U.S. State Department's

current website describes the JCPOA as follows:

> On July 14, 2015, the P5+1 (China, France, Germany, Russia, the
> United Kingdom, and the United States), the European Union
> (EU), and Iran reached a Joint Comprehensive Plan of Action
> (JCPOA) to ensure that Iran's nuclear program will be exclusively
> peaceful.  October 18, 2015 marked Adoption Day of the JCPOA,
> the date on which the JCPOA came into effect and participants
> began taking steps necessary to implement their JCPOA
> commitments.  January 16, 2016, marks Implementation Day of
> the JCPOA.  The International Atomic Energy Agency (IAEA) has
> verified that Iran has implemented its key nuclear-related measures
> described in the JCPOA, and the Secretary State has confirmed the
> IAEA's verification.  As a result of Iran verifiably meeting its
> nuclear commitments, the United States and the EU have lifted
> nuclear-related sanctions on Iran, as described in the JCPOA.

U.S. Department of State, "Diplomacy in Action - Joint Comprehensive Plan of Action," found

at www.state.gov/e/eb/tfs/spi/iran/jcpoa/ (accessed October 26, 2017) (Rosenfield Decl., Ex. B).

Based upon the State Department's own description of the JCPOA, it is evident that this

evidence would be completely irrelevant to this case, and therefore Mr. Dubowitz's proposed

testimony on this subject should not be permitted under FRE 401 - 402.  The only purpose for

introducing the JCPOA testimony would appear to be to prejudice the jury by focusing their

attention on Iran's nuclear program.

Thus, not only does Mr. Dubowitz's intended testimony not "help the trier of fact to

understand the evidence or to determine a fact in issue" (FRE 702), the potential prejudice that

introducing this testimony would cause to Mr. Atilla substantially outweighs any possible

probative value that it may carry.  *See* FRE 403.  As such, Mr. Dubowitz should be precluded

from testifying pursuant to FRE 401 - 403 and 702.

In the alternative, if the Court finds that *some* of Mr. Dubowitz's proposed testimony may

be relevant and admissible -- and we would strongly disagree with such a determination -- the

Court should preclude any mention of terrorism, terrorist organizations or groups, or any other

"actions by Iran that caused the United States to impose sanctions."  *See, e.g., United States v.

Vaghari*, 735 F. Supp. 2d 197, 206 (E.D. Pa. 2010) (finding that Defendants' contention that

testimony related to issues regarding "terrorism and related areas . . . however brief, will be

highly prejudicial to defendants" insofar as "this case is not a terrorism case, and that defendants

are merely charged with shipping products in violation of the Iran embargo," and directing the

government and defense counsel "to minimize such references during the trial").

### 4.    *The Proposed Testimony of Dr. Jonathan Schanzer Should Be Precluded*

The government should also be precluded from introducing at trial the testimony of Dr.

Jonathan Schanzer, which, as noted, is expected to concern the purported economic and political

ties between Turkey and Iran, Turkey's purported role in assisting Iran to avoid U.S. sanctions,

and Turkey's and its financial institutions' alleged involvement in the "gas-for-gold" scheme.

Like Mr. Dubowitz's expected testimony, Dr. Schanzer's testimony -- which is clearly

aimed at painting in broad strokes the Government of Turkey and its banks as being complicit in

Iran's illicit financial activities -- has no relevance as to, and will not aid the jury in determining,

whether Mr. Atilla himself violated IEEPA or committed the other crimes with which he is

charged.  It is the province of the jury to determine if Mr. Atilla violated the laws he is charged

with violating, and nothing in the opinions of an expert witness regarding generalities about the

purported connections between Turkey and its financial institutions and Iran will aid the jury in

reaching its decision as to Mr. Atilla. Therefore such evidence would not assist the jury in assessing the evidence against him or in determining any fact in issue. *See* FRE 401, 402 and 702.

If anything, Dr. Schanzer's testimony would actually mislead and confuse the jury and substantially prejudice Mr. Atilla, as the jury might believe that Mr. Atilla, a citizen of Turkey and employee of Turkish-owned Halkbank, *must* be guilty because of the purported involvement over time of the Government of Turkey and some of its banks in aiding Iran's attempts to evade US sanctions. But any purported historical activity on the part of the Government of Turkey (or some of its financial institutions) in assisting Iran to evade sanctions has nothing to do with the specific charges against Mr. Atilla in this case -- whether he, Zarrab and others, including Halkbank, assisted Iran in evading sanctions between 2010 and 2015. In other words, based on Dr. Schanzer's testimony, it is quite possible that the jurors will hold Mr. Atilla responsible based, not on what *he* did and what *his* mindset was, but rather, based on what his country and its banks purportedly have done.

Thus, any such testimony by Dr. Schanzer would be inadmissible, not only because it is irrelevant to the charges in the case and would thus not assist the trier of fact, but also because it is unduly prejudicial under FRE 403. The government should not be allowed to avoid its heavy burden of proof by trying to tar Mr. Atilla as a bad person out to harm the US based on historical information of ties between Iran and Turkey that have no specific connection to the charges here.

Dr. Schanzer's testimony also appears designed to portray Mr. Atilla as a danger to the US based on his Turkish nationality, given Turkey's purported assistance to Iran in evading US sanctions, and this is also not permissible under FRE 403. *See United States v. Cabrera*, 222 F.3d 590, 596-97 (9th Cir. 2000) (finding that witnesses' testimony regarding the Cuban

community "had the cumulative effect of putting the [city's] Cuban community on trial, rather than sticking to the facts of [the offenses charged]"). Nor is national origin relevant under FRE 401. *See Cabrera*, 222 F.3d at 597 ("People cannot be tried on the basis of their ethnic backgrounds or national origin.").

The government also proposes that Dr. Schanzer would testify about "the role and usage of U.S. Dollars as a standard currency for pricing and settlement of transactions involving precious metals and petroleum products." However, there are no allegations in the Indictment, nor any evidence provided in discovery, which would suggest that the US dollar was the currency used in the Iranian precious metals and petroleum transactions that involved Mr. Atilla and Halkbank. Indeed, the only paragraph in that section of the Indictment concerning the gold scheme that discusses US dollars, ¶ 43, does not even mention Mr. Atilla or Halkbank. Nor does that section of the Indictment, ¶¶ 56-84, concerning the international wire transfer scheme, which also discusses the use of US dollars. Thus, any testimony by Dr. Schanzer on the use of the US dollar as the standard currency for precious metals and oil transactions would be irrelevant as to Mr. Atilla, and thus inadmissible under FRE 401 and 402.

Finally, because the proposed testimony of Dr. Schanzer concerning "[p]atterns of financial activity that are consistent with money laundering, including trade-based money laundering, and sanctions evasion," could lead the jury to believe that Mr. Atilla had the requisite state of mind to commit money laundering, it is impermissible under FRE 704(b). FRE 704(b) provides that,

> In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

16

Because the minimal probative value, if any, of certain of Dr. Schanzer's proposed testimony would be greatly outweighed by its prejudicial effect, in violation of FRE 403, and because the other portions of Dr. Schanzer's testimony would be irrelevant and thus inadmissible under FRE 401 and 402, or would violate FRE 704(b), the Court should preclude Dr. Schanzer's testimony in its entirety.

### 5. *The Government's OFAC Expert's Proposed Testimony Should Be Precluded In Part or In Whole*

Certain of the proposed testimony of the government's unnamed expert witness, who would supposedly testify regarding OFAC, should be precluded as well.  Specifically, the unnamed OFAC expert, who would testify regarding "the nature of the Iran-related economic sanctions programs administered by OFAC," including "the identification and/or designation of Iranian banks, companies, and government entities pursuant to various OFAC authorities," should be precluded from offering testimony regarding the specific circumstances underlying OFAC's decision to identify and designate any particular Iranian entity as subject to US sanctions.

While the government's letter does not clearly state whether it intends to offer testimony at trial regarding the specific circumstances of any such decisions, permitting an expert to testify regarding OFAC's prior sanctions designations, without limitation, would potentially allow the expert to provide the very same type of prejudicial information that the government is improperly seeking to introduce through Mr. Dubowitz.  In other words, the OFAC expert should be precluded from testifying regarding terrorism, "Economic Jihad" or any other related topic as a way to explain how or why OFAC identified and designated any particular Iranian entity as subject to US sanctions.  Not only would such testimony be irrelevant under FRE 401, and thus

inadmissible under FRE 402, such testimony would also be unduly prejudicial to Mr. Atilla under FRE 403 for the reasons discussed above.

Additionally, to the extent that present or former US Treasury Department or OFAC representatives are called to testify as fact witnesses, the expert's testimony would likely be cumulative, and thus unnecessary.  And given the allegations in ¶¶ 3, 5, 55, 86 and 90 of Indictment S4 regarding Treasury and OFAC, it seems almost certain that such individuals will testify.

### 6.     The Government's Banking Industry Expert or Experts' Proposed Testimony Could Be the Subject of a Stipulation

Finally, as noted, the government's banking industry expert or experts will purportedly testify concerning the maintenance of correspondent banking relationships, the operation of wire transfers, interpretation of SWIFT messages, settlement of foreign currency transactions, and policies designed to combat money laundering and sanctions evasions.  We believe that a stipulation could be entered into that would obviate the need for this testimony, and will confer with the government to determine if such a stipulation can be agreed upon.

### 7.     *Daubert* Hearing

If the Court is not inclined to preclude the government's proposed experts based on the arguments we have raised in this brief, and we strongly believe the Court should preclude the testimony, then we respectfully request a pre-trial *Daubert* hearing concerning the government's experts.

**POINT III**

**THE ZARRAB LETTER REFERENCING "ECONOMIC JIHAD,"
AND DRAFTS OF A SIMILAR LETTER, SHOULD BE PRECLUDED
FROM USE AT TRIAL AS OVERLY PREJUDICIAL AND INFLAMMATORY**

In ¶ 24a of the Indictment, the government references a letter allegedly signed by Mr. Zarrab and written to then-President of Iran Mahmoud Ahmadinejad, with no date provided. The letter allegedly refers to the use of an "'Economic Jihad'" to respond to the "'world-devouring imperialism [that] has been using the weapon of economic blockade and negative propaganda to isolate our beloved homeland, the Islamic Iran, and tightens the grip of sanctions further day-by-day.'"  The letter also purportedly discusses, as paraphrased in ¶ 24a, the Zarrab family's "experience in international finance and their willingness and ability to help the Government of Iran defeat U.S. and international sanctions."

Additionally, ¶ 24b of the Indictment alleges that, "ZARRAB and co-conspirators exchanged and reviewed drafts of a similar letter [to that cited in ¶ 24a] addressed to a senior official of the Central Bank of Iran in December 2011."  The drafts of the "similar letter" noted in ¶ 24b are not quoted in Indictment S4.  However, a draft of this similar letter was referred to and quoted in ¶ 18a of Indictment S3, which alleged that on or about December 3, 2011, Mr. Zarrab and one of his co-conspirators received an email which attached a draft letter in Farsi to the General Manager of the Central Bank of Iran, and was prepared for Mr. Zarrab's signature. A portion of this draft letter was quoted in ¶ 18a as stating, among other things, as follows:

> "since the wise leader of the Islamic Revolution of Iran has announced this to be the year of the Economic Jihad, the Zarrab family, which has had half a century of experience in foreign exchange…considers it to be our national and moral duty to declare our willingness to participate in any kind of cooperation in order to implement monetary and foreign exchange anti-sanction policies…"

The contents of both the signed letter referred to in ¶ 24a of Indictment, and the drafts of a similar letter referred to in ¶ 24b, as well as in ¶ 18a of Indictment S3, by using such phrases as "Economic Jihad" and "world-devouring imperialism," will not only suffuse Mr. Zarrab with terroristic inclinations, but also, by implication and spillover effect, Mr. Atilla as well.  There is no evidence whatsoever linking Mr. Atilla to these letters.

Even if the government could articulate how the signed letter and the drafts of a similar letter are somehow relevant in this case, and we submit they cannot, they should still be precluded under FRE 403 because they are overly prejudicial and highly inflammatory. Certainly, any probative value they have is substantially outweighed by the danger of unfair prejudice.  *See* FRE 403.

The probative value of the signed letter and the drafts of a similar letter is low, particularly with respect to Mr. Atilla, as they have nothing to do with him.  It appears that the government has included allegations concerning the signed letter and the drafts of a similar letter for one reason, and one reason only: the inflammatory phrases used therein will conjure up in the minds of American jurors terroristic events and emotionally-charged, negative images of not only Mr. Zarrab, but also of Mr. Atilla.

The potential prejudice of the signed letter and drafts of a similar letter is high.  As the Supreme Court has said, "[t]he term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 174, 180 (1997).  A district court must make a conscientious assessment of whether unfair prejudice substantially outweighs the probative value of proffered evidence.  *See United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998).

The term "Economic Jihad" creates a particular, heightened risk of unfair prejudice because the term is unquestionably associated with terrorism.  *See, e.g.*, *United States v. Elfgeeh*, 515 F.3d at 127;  *U.S. v. Al-Moayad*, 545 F.3d at 162; *U.S. v. Mohamed*, 410 F. Supp. 2d 913, 917 (S.D. Cal. 2005) (excluding evidence under Rule 403 because "distraction and confusion are bound to occur as a result of the public's consumption of matters surrounding national and international post 9/11 war on terrorism objectives").

The government's use of the signed letter referred to in ¶ 24a of the Indictment, or any drafts of a similar letter referred to in ¶ 24b, will have the effect of associating Mr. Zarrab with terrorist activity, and by implication, Mr. Atilla as well, since "Economic Jihad" is discussed. Placing terrorist affiliations in the minds of a jury could cause them to declare guilt on grounds different from the proof specific to the offenses charged and introduced at trial, which, as noted, the Supreme Court has warned against.  *See Old Chief*, 519 U.S. at 180; *United States v. Gonzales-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) ("[U]nfairly prejudicial evidence is that having an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (internal quotation marks and citation omitted).)

Finally, improper use of terrorism evidence to sway a jury is similar to that condemned in organized crime and gang prosecutions.  *See, e.g., U.S. v. Love*, 534 F.2d 87, 88 (6th Cir. 1976) ("[R]eversal is required because the prosecutor intentionally and for no proper purpose injected into the trial the spectre of organized crime and the Mafia."); *Kennedy v. Lockyer*, 379 F.3d 1041, 1055-56 (9th Cir. 2004) (evidence of gang membership cannot be introduced to prove intent or culpability; such evidence creates the impermissible and prejudicial risk of "guilt by association," as well as the risk that the jury will equate gang membership with the charged crimes).

For the foregoing reasons, the Court should preclude from the evidence at trial both the signed letter referred to in ¶ 24a of the Indictment, and the drafts of a similar letter referred to in ¶ 24b.

## POINT IV

### MR. ATILLA RESERVES THE RIGHT TO FILE ADDITIONAL MOTIONS *IN LIMINE* FOLLOWING RECEIPT OF THE GOVERNMENT'S EVIDENCE AND *JENCKS* MATERIAL

Mr. Atilla should be permitted to file any appropriate additional motions *in limine* once we receive notice of the government's evidence in the case in the form of witness and exhibit lists, as well as *Jencks* material and any additional discovery.  Until then, with respect to his motions *in limine*, Mr. Atilla is operating somewhat in a vacuum.  Thus, we reserve the right to file additional motions *in limine*, if necessary.

## CONCLUSION

For the foregoing reasons, Mr. Atilla's motions *in limine* should be granted.

Dated:  New York, New York
           October 30, 2017


Respectfully submitted,

HERRICK, FEINSTEIN LLP                    FLEMING RUVOLDT PLLC

By:   s/Victor J. Rocco                        By:   s/Cathy Fleming
    Victor J. Rocco                                 Cathy Fleming
    Thomas E. Thornhill                          Robert Fettweis, *pro hac vice*
    David M. Rosenfield                          Jonathan Stern
    Two Park Avenue                              1700 Broadway, 28th Floor
    New York, New York  10016               New York, New York  10019
    (212) 592-1400                                (212) 706-1850
    (212) 592-1500 (fax)                         (212) 706-1855 (fax)

*Attorneys for Defendant Mehmet Hakan Atilla*