UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

REZA ZARRAB, et al.,

Defendants.

S4 15-cr-867 (RMB)

**DECLARATION OF CATHY FLEMING, ESQ. IN SUPPORT OF MEHMET HAKAN ATILLA'S MOTION *IN LIMINE* TO PRECLUDE RECORDINGS**

---

I, CATHY FLEMING, do hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am co-counsel of record for Mehmet Hakan Atilla ("Mr. Atilla" or "Atilla"). I respectfully submit this Declaration in support of Mr. Atilla's motion *in limine* to preclude the use of audio recordings (and their fruits) in this case. As set forth below, and as we would expect would be shown at a hearing, the recordings do not meet the standards for admissibility in the United States. As evidence, these recordings do not meet the minimum standards under the rule of completeness or the best evidence rule. In addition, there is significant evidence of untrustworthiness that would also preclude admissibility.

2. Briefly, the recordings proffered to the defense are of questionable provenance and highly suspect. Among other deficiencies: a) they have not been identified as originals, and apparently are not originals; b) the particulars of their origin are unknown; c) no records regarding chain of custody have been produced in discovery; d) the defense has not had the opportunity to test them forensically (and forensic testing on anything other than originals is of little or no value); and, e) there are missing recordings of relevant

conversations involving Mr. Atilla and other defendants, including Reza Zarrab, and critical witnesses.

3. By email dated October 12, 2017, the Government advised us that it "expects to authenticate and introduce digital recordings [produced in this case] through the live testimony of witnesses with knowledge, in the usual course for admitting recordings." The Government further advised us that it is "not prepared to disclose more information than this at this time." (Email dated October 12, 2017 attached with information subject to protective order redacted (Exhibit A).) This email was in response to a series of specific inquiries made by the defense regarding the recordings following our last court appearance. We followed up by email and letter dated October 16, 2017 (Exhibit B). Ten days later, on October 26, 2017, the Government responded that it was "aware of no participation by any U.S. Government agency in making the recordings" and that "the audio files that have been produced in discovery are exact digital duplicates of the audio files in the Government's possession." (October 26, 2017 email, Exhibit C.) The Government's carefully worded, nonresponsive answers to our queries compel the conclusion that: (1) U.S. agencies *may* have participated in some manner in the 2012-2013 Turkish investigation, although *not* in the "making of the recordings," and (2) the Government does *not* have original recordings as we understand original wiretap recordings to be. (The Government's reply also suggests that it does not have all the recordings that were made in Turkey during the investigation.)

4. This is a unique case that raises a number of unusual evidentiary issues, including concerns regarding a trove of wiretaps gathered in Turkey during a widely publicized and highly controversial Turkish criminal investigation in 2012 and 2013. Based on my

2

conversations with Turkish lawyers, Turkish citizens, current and former Halkbank employees, and by reading press accounts in the U.S. and European media, I have learned the following: that the investigation has been repudiated by the Turkish government as an attempted judicial *coup d'etat*; some of the people who conducted it have been transferred, dismissed or even prosecuted by Turkish authorities. Information derived from the investigation, nonetheless, was apparently handed over to American prosecutors by some unknown person or persons: but not in a usual government-to-government handover of evidence that either has been commonly developed or requested pursuant a mutual legal assistance treaty. Instead, we believe the materials were apparently stolen by political partisans and given by someone outside of the Turkish government to the U.S. prosecutors. Their provenance is unknown to both the Defense and the Court and there is reason to be seriously concerned about their reliability. For example, we have not been provided with a description of the chain of custody to show who obtained and has had these recordings and how or where they have been maintained over the past three or more years; certain wiretap recordings are missing, including relevant recordings of conversations that appear to involve Mr. Atilla; and certain Turkish investigators' transcriptions of relevant recordings, which have been produced by the government to the Defense, are inaccurate in that they contain mistranslations or omit as inaudible statements which are in fact audible -- all of which are strong indicia of unreliability. The government has offered no explanation for these anomalies and we are compelled to move to preclude the recordings, or alternatively, to seek the Court's help.

5. In the Government's Memorandum of Law in Opposition to Defendant Reza Zarrab's Motion to Suppress Emails filed November 14, 2016 (Doc. 121), the Government

describes obtaining "a 299 page report that appeared to be a law enforcement report of evidence" from a website of a Turkish journalist. (*Id.* at 7.) The Government explained why it concluded that the Report was "genuine," including that "an FBI agent stationed in Istanbul reviewed the Report and confirmed that the Report appeared consistent in format and context with genuine Turkish law enforcement reports." (*Id.* at 8.)

6. I respectfully submit this Declaration in support of Mr. Atilla's Motion *In Limine* to Preclude the Recordings, and similarly tainted evidence from the same Turkish investigation, at trial. We believe that, if the Court does not preclude the use of the recordings at trial based upon Mr. Atilla's motion *in limine* and supporting papers, an evidentiary hearing is necessary to resolve the issues surrounding the competence and admissibility of this evidence. Thus, absent a decision to preclude the recordings, we request a conference at the Court's earliest convenience to address what is a central issue before trial. It will serve judicial economy to do this before trial and before there is a sitting (and waiting jury).

Background

7. Mr. Atilla is a Turkish citizen and a deputy general manager of Turkiye Halk Bankasi A.S. ("Halkbank") in Turkey. He was arrested at JFK Airport on March 27, 2017 on a warrant that was based on a Complaint sworn to March 27, 2017, (Doc. 1). A grand jury subsequently returned two indictments against Mr. Atilla. (Docs. 212 and 293.) The arrest warrant and the indictments rely heavily on the questionable evidence developed in the course of the controversial Turkish investigation.

8. The Atilla defense team has been investigating the factual background of this case since its inception. Lawyers from the Herrick firm first interviewed a group of prospective

Turkish witnesses by telephone as early as May 2017. I (and other lawyers) have made two trips to Turkey (in early August and in late September/early October) to follow up on those earlier interviews in order to investigate the facts and to locate and interview additional potential witnesses and locate pertinent documents. It is a slow, difficult and time-consuming process complicated by the fact that witnesses are scattered, hard to locate and often require interpreters; many of the documents need to be identified and located and also require Turkish translation.

9. The Defense is not done with our factual investigation and we continue to investigate and to seek to interview potential witnesses, some of whom were not available on our first two visits to Turkey. We plan to make another fact-finding trip to Turkey as soon as practicable, when potential witnesses are available. In addition, we have sought and continue to seek information from the United States Government through discovery requests (letters), requests for bills of particulars, and informal requests in order properly to make motions. The following is a summary of pertinent facts based on what I have seen and what I have learned during our investigation to date.

Turkish Investigation

10. Between in or about July 2012 and December 2013, certain groups of then Turkish investigators conducted an investigation into alleged corruption and other related crimes in Turkey. As part of this investigation, those Turkish authorities intercepted thousands of calls and text messages including on a number of devices used by codefendant Reza Zarrab.

11. On or about December 17, 2013, Turkish authorities arrested Reza Zarrab as well as the then general manager of Halkbank (co-defendant Suleyman Aslan) charging both with

bribery and other offenses. According to press reports, approximately 91 people were detained and 26 were arrested as a result of the investigation.

12. The Turkish government (including then Prime Minister Erdogan, now President of Turkey) criticized the 2012-2013 investigation as politically motivated and a "judicial coup," led by Fethullah Gulen, a controversial Turkish cleric and opponent of the Erdogan government who has fled to the United States and whom the U. S. has refused to extradite to Turkey. I understand based on what I have been told by lawyers and citizens in Turkey and based on press reports I have read that many of those prosecutors, investigators and judges involved in the Turkish investigation resigned or were fired; some were reassigned; some fled Turkey; and, some were prosecuted. No one charged in the original corruption investigation was convicted of a crime and their arrests were "reversed."

13. There are many published reports concerning Gulen and the Gulenist movement. After many hours of speaking with lawyers and citizens of Turkey, I believe that many Turks have a sincere belief that Gulen has tried, and continues to try, through a large organization, to overthrow the Government of Turkey, and that many Turks sincerely believe that the 2012-2013 investigation was the result of "Gulenists" trying to further the Gulenist cause, and that the investigation was largely run by Gulenists who included false information and used false evidence in the investigation. Its relevance here is the bias and motive of those Turkish sources who provided (apparently) only partial information to the United States Government.

14. The condemnation in Turkey of the investigation as politically motivated and therefore tainted as a result of false evidence apparently is not new. Prior Turkish investigations

which involved wiretapping have been found to have been tainted by false evidence and discredited. *See, e.g.,* as described by the *New York Times*, "The 2013 allegations (the basis of the Turkish Report), and the wiretaps on which they were based, were denounced as fiction – claims that many Turks found credible because of the Gulen movement's problematic history. Gulenist prosecutors had been found to have fabricated evidence in earlier trials of secular army officers." (*New York Times*, International Section, October 15, 2017, p.11 (Exhibit D).) I have no way of verifying the accuracy of this information. I can only report that widespread allegations of irregularities have been swirling about and the *bona fides* of the Turkish investigation has been sharply questioned.

15. A "Report" dated December 18, 2013, "Actions Relating to the Suspects with Political Immunity Within the Scope of the Investigation"[1] was prepared and issued by unknown persons in Turkey ("the Report"). At some point the Report, or portions of it, was posted online. *See* Doc. 121 at 7. The Report concluded that a criminal enterprise led by Reza Zarrab committed four crimes: fraud, gold smuggling, bribery and intermediary Prostitution Crime. (Doc. 121, Exh. 4a, Report at 8.) The Report has excerpts of recordings of calls which allegedly involve Mr. Atilla. Those calls are referenced in the Complaint that led to Mr. Atilla's arrest here in the United States, and in the most recent indictment (S4) in this case; Mr. Atilla was <u>never</u> charged or accused by anyone in Turkey of any crime. (The Government has provided a copy of the Report in (stilted) English in discovery subject to the protective order that was entered in this case.)

16. We do not know who prepared the Report. The Government suggests in its Memorandum (Doc. 121) that it obtained the Report online. (*Id.* at 7.) We do not know if the Government ever received it from any other source, though it appears to have been

---

[1] The English translation of the Report is 397 pages.

7

widely disseminated. It is a fair assumption that the Government had access to the Report before Reza Zarrab, Mr Atilla's co-defendant, was indicted in December 2015.

17. A separate 350-page document (in English) summarizing the 2012-2013 investigation and borrowing heavily from the Report was apparently sent to the former U.S. Attorney for the Southern District of New York, Preet Bharara, on some unknown date, apparently after Zarrab's March 19, 2016 arrest. This lengthy document purports to summarize selected evidence culled from the Turkish investigation and Report. It provides selected quotes from a small number of intercepted conversations (out of thousands of intercepted calls). This document is shrouded in mystery: the author (or authors) is unknown; when and where it was prepared is unknown, and when and how it came into the possession of the Government, and from whom, is also undisclosed.

Mehmet Hakan Atilla

18. Mr. Atilla was never arrested or charged with a crime in Turkey. The Turkish Report (and the report provided to Bharara) includes excerpts from the same recordings allegedly attributable to Atilla as the Government alleges here, but, as noted, the Turkish authorities never charged Atilla with any crime.

Problems with the Recordings

19. Based on our review of what appear to be pen registers, the defense team has identified more than 3000 telephone calls and texts which were apparently intercepted during the Turkish investigation. It appears from the pen registers that Mr. Atilla may have been intercepted on twelve of the listed calls which were intercepted on the Reza Zarrab and Suleyman Aslan targeted phones.

20. Of the twelve calls referenced in the pen registers in which Mr. Atilla is alleged to have been a party, the Government has produced a total of only four (4) audio recordings. The Government has stated that it has no other recordings of any calls that it contends have the voice of Mr. Atilla.

21. With respect to all of the recordings we have been provided, including those purportedly involving Mr. Atilla, we cannot verify that these are recordings of complete calls or that the recordings themselves are complete or whether they been altered in any way. We do not know who, if anyone, has the original recordings. There is no indication of who monitored the calls, when the recordings were made, how or by whom the recordings were made or even what kind of equipment was used – vital questions that go to the admissibility of the recordings. There are no line sheets or logs of intercepted calls as we would see in a U.S. wiretap, or investigative reports, affidavits or court orders that would describe facts relevant to the wire interceptions. There is nothing to indicate when the interceptions began or ended as we would see in a U.S. federal wiretap investigation. In other words, we have no way of knowing whether the calls listed on the pen registers are *all* the pertinent calls, if the calls were recorded in full, or if the conversations ascribed to Atilla are the *only* purported conversations of his that were intercepted. As described below, we have good reason to believe that, at the very least, there were more calls in the relevant time period between Atilla and Zarrab. We also know that the evidence apparently derived from the recordings as serious flaws.

22. For example, the Turkish recordings do not include any identifying header information (*e.g.*, date, time, recording number, phone number being recorded). This header information is included, to varying extents, only in the Turkish investigators' transcripts

of the recordings and in separate listings of intercepted calls which also appear to be of Turkish origin. Each recording is tied to its header information only through a numeric recording identifier which appears in the Turkish investigators' transcripts, the separate listings of intercepted calls, and as part of the file name of audio files produced in discovery. Assuming that those who have prepared English transcripts of the Turkish recordings do not have personal knowledge of the participants in the calls or when the calls took place, any translation that includes, among other things, the identity of the call participants, the participants' phone numbers and/or the date and time of the call, would necessarily have to rely on materials extrinsic to the recordings themselves and of unknown origin.

Misidentified Participants

23. In the Complaint underlying Mr. Atilla's arrest, sworn to March 27, 2017, Special Agent Jennifer A. McReynolds of the FBI swore that particular conversations included the voice of Mr. Atilla. Agent McReynolds purportedly authenticated the recordings by listening to what she believed to be Mr. Atilla's voice on a YouTube video. *See* Doc. 1, ¶18, fn4.

24. We know and have verified extrinsically that Agent McReynolds is wrong in her identification of Mr. Atilla in at least one call. We have verified that fact by speaking to the actual speaker on one particular recording, who told us that the voice attributed to Mr. Atilla in the Turkish Report and the Complaint by Agent McReynolds, is in fact his voice, not Mr. Atilla's.

Missing Recordings

25. In addition to the recorded calls which the Government has provided and presumably intends to attempt to offer at trial, the Government has provided pen registers which show

10

additional conversations during the relevant time period between phones used by Reza Zarrab (and others), including to call Atilla.

26. Our investigation, however, has revealed that the problem of unreliability is even worse than the discovery provided would suggest. We have determined that there were additional calls between Atilla and Zarrab in the relevant time frame – apparently on intercepted phone lines of Zarrab – which are not listed on pen registers nor referenced in either the transcripts or the recordings that have been provided to us by the Government. As such, we are missing recordings of calls.

Exculpatory Calls

27. In addition, I have spoken with several potential witnesses in Turkey who have confirmed that he or she had multiple phone conversations during the relevant time period with Mr. Zarrab (and others) on phones that were intercepted during the Turkish investigation which demonstrate Halkbank's good faith efforts to ensure the *bona fides* of the transactions in which the Bank was involved with Zarrab and his companies. I believe the calls are exculpatory and relevant. None of these recordings have been provided in discovery to the Defense. We do not know whether they have been provided to the Government, or whether the Government is even aware of them or has asked for them or has simply failed to produce them.

Yet Another Wiretap

28. Further, our investigation reveals that during the approximate time frame of 2011-2013 there was another investigation in Turkey (the Selam-Tevhid' case) which included interceptions of some 2280 people, including on the telephones of another Halkbank employee who had multiple conversations with Reza Zarrab in that period. That wiretap

11

application erroneously included Mr. Atilla's cell phone number (as belonging to this other Halkbank employee), and thus Mr. Atilla's phone was also apparently intercepted. I understand from Turkish lawyers and the European press that the Selam-Tehvid' case was dismissed after a three year investigation. I have been told by Turkish counsel that judges and prosecutors were charged with making 1348 irregular wiretapping decisions and extending them 950 times, even though there was no evidence that the alleged terrorist group, Selam-Tevhid', even existed. The targeted Halkbank employee was never charged with any crime. We do not know whether the Government has obtained these recordings.

<u>Missing Documents</u>

29. The Government has failed to produce (or is itself missing) crucial portions of the Turkish investigation file. We are aware of two conspicuous examples of missing evidence:

    a. During an interview in Turkey in late December 2013, Mr. Atilla was asked by Turkish investigators about a certain phone call at the Bank allegedly involving him and Mr. Zarrab. Following his interview, within days, Mr. Atilla realized he had traveled to Spain and that he was not at the Bank on any such call with Mr. Zarrab. He sent a letter to the Turkish authorities, including copies of pages from his passport and copies of his plane tickets to show he was not in Turkey at the time of the call. Mr. Atilla's letter – clearly exculpatory, as well as being discoverable under Rule 16 – has never been provided to the Defense by the Government. Excerpts from that recording, which we have confirmed does not involve

12

      Mr Atilla, were used to establish probable cause for Mr. Atilla's arrest here in the U.S. (Doc. 2, ¶18(b)).

  b. In addition, we have spoken with a witness in Turkey who advises us that he was interviewed by the Turkish authorities (and provided documents to them) in 2014 and addressed and provided innocent explanations of some of the allegations in the Turkish Report. No such documents or references to this witness have been provided by the Government to the Defense.

30. We are aware, so far, of these two relevant and very significant pieces of evidence which were provided to the Turkish investigators in early 2014, but which the Government has failed to produce or are missing. At a minimum, this illustrates the fact that highly pertinent – and exculpatory – information is missing and that the apparently stolen investigative materials given to the United States government, which form a large part of the core evidence in this case, is selective, incomplete and likely tainted.

<u>Turnover of Selectively Culled Records</u>

31. To date, we have been unable to locate any of the missing recordings – either in the United States or in Turkey – which we know were intercepted during the Turkish investigation (or the other "Selam-Tevhid" wiretap intercepting a Halkbank employee) and which the Government has not provided in discovery. We believe, based on conversations with a number of witnesses, that there is evidence in these recordings which may be exculpatory and is at least helpful, which was apparently deliberately withheld from U.S. prosecutors.

32. We also have been advised by Turkish lawyers and citizens that there is an opposition faction to the current Erdogan government in Turkey and that this opposition faction led

the Turkish investigation. As noted above, we also understand that some of the prosecutors and law enforcement officials who participated in or instigated the Turkish investigation are themselves being (or have been) prosecuted and some have fled Turkey. We have no way of independently verifying this information (although we are trying to do so), but we believe that the Court can take judicial notice of the fact that the Turkish investigation which underlies these recordings is highly controversial and there may be significant motives for former Turkish law enforcement officials to cause United States authorities to bring prosecutions that these individuals believe could be used to discredit their political opponents in the present Turkish government or to vindicate themselves. Most significantly, we also have a good faith basis to believe that the cache of apparently stolen evidence which forms the core of this criminal case is, in fact, material selectively culled by a rival and partisan political faction and is incomplete and missing significant materials, at least some of which we believe are exculpatory.

Conclusion

33. Given the serious questions surrounding the recordings, including their provenance, as well as the fact that relevant recordings of Mr. Atilla have not been produced, the misidentification of Mr. Atilla on at least one recording in the Complaint that led to his arrest, and the other irregularities described above, we believe that the recording evidence is incomplete, untrustworthy, unreliable and inadmissible at trial. Alternatively, we respectfully suggest that an evidentiary hearing be held before trial so that the Court, as gatekeeper, may determine whether the Government can prove that this evidence meets the standards for admissibility under the law.

Dated: New York, New York
       October 30, 2017

                                                _____
                                                Cathy Fleming