UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                                    :

UNITED STATES OF AMERICA

                                                    :

        - v. -                                      S4 15 Cr. 867 (RMB)

                                                    :

REZA ZARRAB,
   a/k/a "Riza Sarraf,"                             :
MEHMET HAKAN ATILLA,
MEHMET ZAFER CAGLAYAN,                              :
   a/k/a "Abi,"
SULEYMAN ASLAN,                                     :
LEVENT BALKAN,
ABDULLAH HAPPANI,                                   :
MOHAMMAD ZARRAB,
   a/k/a "Can Sarraf,"                              :
   a/k/a "Kartalmsd,"
CAMELIA JAMSHIDY,                                   :
   a/k/a "Kamelia Jamshidy," and
HOSSEIN NAJAFZADEH,                                 :

                        Defendants.                 :

                                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


### MEMORANDUM OF LAW IN SUPPORT OF
### GOVERNMENT'S MOTIONS *IN LIMINE*


                                    JOON H. KIM
                                    Acting United States Attorney for the
                                    Southern District of New York


Michael D. Lockard
Sidhardha Kamaraju
David W. Denton, Jr.
   Assistant United States Attorneys
Dean Sovolos
   Special Assistant United States Attorney
        *Of Counsel*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

    A.    The Offenses .......................................................................................... 2

    B.    The Indictment ..................................................................................... 10

DISCUSSION ...................................................................................................... 11

I.    Co-Conspirator Statements In Furtherance Of The Charged Conspiracies Should Be Admitted ............................................................................................ 11

    A.    Applicable Law ..................................................................................... 12

    B.    Application ............................................................................................ 15

II.    Proposed Expert Legal Opinions And Testimony Concerning Purported Cultural Norms Should Be Excluded ............................................................... 21

    A.    Applicable Regulations Bar the Defendant From Calling Brummond as a Witness. ......................................................................... 22

    B.    Brummond's Proposed Subjects of Testimony Should Be Precluded .................. 24

    C.    Özçelik's Proposed Testimony Should Be Precluded. ......................................... 28

III.    Evidence, Cross-Examination, Or Argument That The Defendants Were Acting Under The Public Authority Of A Foreign Government Should Be Precluded ........................................................................................ 35

IV.    Evidence, Cross-Examination, Or Argument That The Defendants Did Not Commit The Charged Bank Fraud Offenses Because Of Purported Victim Fault Should Be Precluded .............................................................. 38

V.    Evidence, Cross-Examination, Or Argument Based On The Fact That Atilla Was Not Arrested Or Charged In A Corruption Investigation In Turkey Should Be Precluded ................................................................... 41

VI.    Evidence, Cross-Examination, Or Argument Regarding The JCPOA Should Be Precluded ........................................................................................ 44

VII.    Cross-Examination Of Current And Former Officials Of The U.S. Department Of The Treasury Concerning Matters Beyond The Scope Of Their Testimony Should Be Precluded .............................................................................. 46

A.     The Court Should Preclude Questions about Factual Matters Outside the Scope of Direct Examination ........................................................................... 47

B.     The Court Should Preclude Cross-Examination As To the Treasury Witnesses' Legal Opinions .................................................................................. 50

VIII.   Cross-Examination Of Expert Witnesses Affiliated With A Non-Profit Policy Institute Concerning The Institute's Donors Should Be Precluded...................... 51

CONCLUSION ....................................................................................................................... 53

## INTRODUCTION

The Government respectfully submits this memorandum of law in support of its motions *in limine* in connection with the trial scheduled to begin in this matter on November 27, 2017.

The Government moves to admit the following evidence:

1.      Co-conspirator statements in the form of recorded telephone calls, transcripts of telephone calls, emails, electronic messages, and documents made in furtherance of the charged conspiracies.

The Government moves to preclude the defendants from introducing the following evidence and argument and pursuing the following lines of cross-examination:

2.      Irrelevant and inadmissible expert testimony by the defendants, including legal opinion about the meaning of the statutes and regulations and issue and testimony concerning purported cultural norms;

3.      Evidence, cross-examination, or argument to the effect that the defendants did not commit the charged offenses because the defendants were acting under the public authority of a foreign government;

4.      Evidence, cross-examination, or argument to the effect that the defendants did not commit the charged bank fraud offenses because the victim banks were careless, negligent, reckless, or were otherwise at fault;

5.      Evidence, cross-examination, or argument to the effect that defendant Mehmet Hakan Atilla is not guilty of the charged offenses because he was not among the individuals arrested or charged in 2013 as part of a corruption investigation in Turkey;

6.      Evidence, cross-examination, or argument to the effect that the defendants did not commit the charged offenses of conspiring to defraud the United States and to violate the

International Emergency Economic Powers Act ("IEEPA") because of the adoption and implementation of the Joint Comprehensive Plan of Action among the United States, China, France, Germany, Russia, the United Kingdom, the European Union ("EU"), and Iran ("JCPOA");

7.    Cross-examination of current and former officials of the U.S. Department of the Treasury concerning matters beyond the scope of their testimony; and

8.    Cross-examination of expert witnesses affiliated with a non-profit, private foundation, non-partisan policy institute focusing on foreign policy and national security, concerning the institute's donors;

To date, defense counsel has not produced any discovery, pursuant to the reciprocal obligations of Fed. R. Crim. P. 16(b).  Should any evidence be produced, the Government reserves the right to make any appropriate motions *in limine* as to its use at trial.

## BACKGROUND

### A.    The Offenses

The charges and trial arise out of an investigation of large-scale sanctions evasion, bank fraud, and money laundering by individuals and entities in Turkey, Iran, the United Arab Emirates ("UAE"), and elsewhere.  In the early 2010s, U.S. and international economic sanctions against Iran grew increasingly restrictive in an effort to (a) cut off funding for Iran's nuclear weapons program, support for international terrorism and foreign terrorist organizations, and aggressive military and ballistic missiles programs; and (b) induce Iran to engage in diplomatic resolutions to these peace- and stability-threatening activities.  These sanctions in particular targeted Iran's petroleum industry, which had become tied to the Islamic Revolutionary Guard Corps and was Iran's principal source of trade and national income, and its Central Bank and

financial sector.  Iran, in turn, pursued increasingly aggressive and deceptive measures to evade and violate these sanctions.  Iran used agents and front companies in other countries, including Turkey and the UAE, to conduct transactions on behalf of the Government of Iran and Iranian businesses, as well as forged and fraudulent documents to falsify transactions to make them appear legitimate or exempt from the application of the sanctions.

Reza Zarrab and Mehmet Hakan Atilla, the two defendants who have been arrested in this prosecution, were key players in just such a scheme.  Zarrab, a Turkish national who also has citizenship in Iran and Macedonia, owned and operated a network of money exchange businesses and trading companies in Turkey, Iran, and the UAE, among other places.  Beginning in at least 2010, Zarrab offered Iranian banks and businesses an illicit pathway to the U.S. and international financial systems and to U.S. and international currencies, using his companies and businesses as intermediaries to conceal the fact that the transactions he and his associates conducted were on behalf of and for the benefit of the Government of Iran and Iranian entities.  For example, in late 2011, Zarrab and his business associates procured more than $1 billion in U.S. currency and more than €400 million in Euro currency that he couriered from Dubai to Tehran for the benefit of Bank Mellat, an Iranian government-owned bank sanctioned by the U.S. Department of the Treasury in October 2007 for its financial support for entities involved in Iran's nuclear program. Zarrab and his network also conducted international wire transfers for Mellat Exchange, Bank Mellat's subsidiary, and Sarmayeh Exchange, a subsidiary of the Government of Iran-owned Bank Sarmayeh, including millions of dollars' worth of transactions that were conducted by U.S. banks through correspondent banking accounts[1] held for foreign banks.

---

[1] A correspondent banking account is an account held for another bank that the customer bank typically uses for transactions denominated in foreign currencies.  So, for example, many foreign

A major focus of the scheme was to give the Government of Iran access to billions of dollars' worth of restricted funds held at Türkiye Halk Bankasi A.Ş. ("Halk Bank"), a Turkish bank majority-owned by the Government of Turkey and the bank where the Central Bank of Iran and the National Iranian Oil Company ("NIOC") received payment for sales of Iranian petroleum products to Turkey.  The Government of Iran's oil proceeds held at foreign banks came under increasingly restrictive sanctions regulations in 2012 and 2013 that imposed strict constraints on how the funds could be used, and which exposed the foreign banks to economic penalties, including the loss of their correspondent banking accounts in the United States, for violating those constraints.  The evidence at trial will show that Zarrab and Atilla conspired with senior bank and oil officials from the Government of Iran, senior officials from the Government of Turkey, and other personnel at Halk Bank to circumvent and violate these constraints to give Iran unfettered access to billions of dollars' worth of oil proceeds while concealing their conduct from U.S. government officials in order to avoid the risk of Halk Bank being blacklisted from the U.S. financial system.

In July 2012, Executive Order 13622, 77 Fed. Reg. 45897 (Jul. 30, 2012), authorized sanctions against any person that materially assisted the purchase or acquisition of U.S. bank notes or precious metals by the Government of Iran, including banks and businesses owned by the Government of Iran.  At that time, Zarrab was giving NIOC and Iranian banks access to Iranian oil proceeds at Halk Bank by using the funds to buy gold and export it from Turkey to Dubai, from where it could be converted back into currency or further transported to Iran. Zarrab and Halk Bank continued this gold export scheme even after it was subject to sanctions to

---

banks hold correspondent accounts at U.S. banks in order to conduct U.S.-dollar transactions for the foreign banks' customers.

provide gold to the Government of Iran, despite the fact that Iranian government-owned banks were the principal beneficiaries of the gold exports. In discussions with U.S. Treasury officials about this conduct, however, Atilla and other Halk Bank officials claimed that the tons of gold being exported were bought by private Iranian gold dealers and jewelry customers.

Beginning on February 6, 2013, the Iran Threat Reduction and Syria Human Rights Act of 2012, codified at 22 U.S.C. §§ 8711 et seq. (the "Iran Threat Reduction Act" or "ITRA"), extended the sanctions against Iranian oil sales by requiring that foreign banks conducting financial transactions with respect to the purchase of Iranian oil were required to, among other things, (a) hold the payments to Iran in an escrow account at the foreign bank and (b) allow the oil proceeds to be used only for Iran's import of permissible commodities from the foreign country buying the oil, or for humanitarian items like food and medicine. In other words, the proceeds of Iranian oil sales to Turkey had to be deposited into accounts in Turkey and could only be used for trade between Turkey and Iran; otherwise, any foreign financial institution facilitating these transactions faced U.S. sanctions. Near this same time, the Iranian Freedom and Counterproliferation Act (the "IFCA") broadened the precious metals ban by requiring sanctions to be imposed on any person involved in the sale, supply, or transfer of precious metals, directly or indirectly, to the country of Iran—including non-Government entities. This ban was announced in January 2013 and went into effect on July 1, 2013.

Zarrab, Atilla, and their co-conspirators responded to these increased sanctions in two ways. First, working with senior officials from the Central Bank of Iran, the Iranian Ministry of Oil, and NIOC, as well as senior officials from the Government of Turkey—including then-Minister of the Economy Zafer Çağlayan—and other officials at Halk Bank—including its then-General Manager, Suleyman Aslan—the defendants devised a scheme to transfer Iranian oil

proceeds out of Halk Bank to front companies in Dubai by disguising the transfers as being part

of fake food sales to Iran.  Second, and as discussed more fully below, after the gold ban went

into effect the Government of Turkey instructed Zarrab and Halk Bank to resume gold exports in

order to manipulate Turkey's economic statistics in advance of upcoming elections.  Both

aspects of the scheme—gold exports and fraudulent food trade—were promoted and protected by

massive bribes to Turkish government officials, including then-Minister of the Economy Zafer

Çağlayan, and to bank officials, including Aslan.  For example, in a March and April 2013 email

exchange between Zarrab and co-conspirator Abdullah Happani attempting to reconcile how

much had been paid to Çağlayan and Aslan in bribes, spreadsheets prepared by Happani showed

tens of millions of dollars' worth of payments to Çağlayan in U.S. dollars, Euro, Turkish lira,

and precious stones and jewelry.

The scheme was initially hatched by Halk Bank and principally architected by Atilla, a

sanctions expert at Halk Bank.  On March 26, 2013, with the window on gold sales to Iranian

banks and business set to close, Zarrab described to Happani a meeting at Halk Bank with Aslan

where Aslan told Zarrab, "they will stop the gold after one-and-a-half months," and that "[h]e

[Aslan] is insisting that we do food and then he will extend it for about two to three months."

Happani, who was aware (just as Atilla and Aslan were aware) that his and Zarrab's business

was conducting currency exchange and gold transactions and not the food business, asked, "How

are we going to make it food?"  Zarrab relayed that Aslan had instructed, "we can send it from

Dubai to Iran . . . He says that wherever you can provide a document from, do it. . . .  He says,

'It's not that, provide it, it is not a problem; whichever way you provide it, provide it.'"  Zarrab,

Happani, and their business associates thus set themselves to the tasks of obtaining or creating

the documents needed to make transfers out of Halk Bank appear as though they were in

furtherance of food sales to Iran.  Zarrab and Aslan discussed the status of their efforts to switch from gold exports to food sales in an April 22, 2013 exchange of electronic communications, during which Aslan asked: "do you have a problem with the methods proposed by Hakan Atilla? Related to the food sector payments[.]"  Zarrab responded, "No absolutely[, it] is a very correct method."

When the co-conspirators in fact ran into problems with the methods proposed by Atilla, it was Atilla who coached them on correcting their errors.  Transcripts of recorded calls on July 2, 2013 between Zarrab and Atilla show Atilla questioning Zarrab about the patent implausibility of the reported tonnage on the documents ("I'm thinking that it is a little difficult to move one hundred forty to one hundred fifty thousand tons of goods with five tons of things [ships]") and the purported origin of food that was the subject of the fraudulent transactions ("it says there that the origin of the wheat is Dubai, since wheat can't originate from Dubai").  Atilla also reminded Zarrab that the size of the transactions Zarrab was trying to complete were too large and needed to be broken into smaller amounts (Atilla: ". . . the figure is so high."  Zarrab: "Mr. Hakan, we made a technical mistake there, I realize that, so we were going to hit this five million by five million."  Atilla: "Yes.").  In a recorded call on July 9, 2013, Atilla corrected another patent error in the fraudulent documents Halk Bank was receiving from Zarrab, explaining that the documents claimed more food being shipped than the vessels could carry—by quite a lot.  Atilla also warned Zarrab against claiming larger ships, because then Zarrab would have to be able to provide bills of lading from the shipping company, which Zarrab already had indicated he could not provide.  As Zarrab explained to Happani in a later call on July 9, 2013, Atilla was telling Zarrab not to stick it in Halk Bank's eye, be careful and don't sink the ships.

At the same time, in meetings and communications with the U.S. Department of the Treasury, Atilla and Aslan were advised of Iranian efforts to circumvent sanctions using front companies and fraudulent commodities transactions, and they claimed to Treasury officials that Halk Bank had due diligence procedures in place to detect such schemes.

As sanctions reduced the amount of Iranian oil revenues on deposit at Halk Bank, the conspirators encountered another problem:  depleting funds with which to conduct their profitable sanctions-busting business.  Accordingly, in September and October 2013, Zarrab and Aslan discussed restricting major international agricultural companies—companies engaged in the actual shipment of food and medical products to Iran—from being able to access the funds. And, in fact, in October 2014, Halk Bank advised non-Turkish agricultural companies that they would no longer be able to transact business through Halk Bank.

In addition to using fraudulent food transactions to give Iran access to oil money at Halk Bank while avoiding sanctions against the bank, after the gold ban became effective in July 2013 Zarrab and Halk Bank resumed gold exports using Iranian oil funds.  In recorded telephone calls between July 11 and 13, 2013, Zarrab and Çağlayan's assistants scheduled a meeting between Zarrab and Çağlayan to discuss "two matters."  Those matters were so urgent that Zarrab flew his private plane from Istanbul to Ankara to pick up Çağlayan so the two could fly together back to Istanbul and speak on the flight.  Right after this meeting, Zarrab did two things.  First, he called Happani to tell Happani to "hit [send money through] Halk" with "no limit," and to devise a way to "increase the exports of gold and reduce the imports."  Second, Zarrab called the flight attendant for his plane to retrieve a phone number that had been written (along with the name of the then-Prime Minister's son) on a slip of paper during Zarrab's flight with Çağlayan.  The

number was for the manager of a Turkish charitable foundation.  Zarrab then called the manager

on July 16, 2013 to advise that Zarrab would be sending money to the foundation.

On September 12, 2013, Aslan sent Zarrab an electronic communication instructing that

"[e]xports are being wanted Mr. Reza, they are saying let's some money come in let some fund

be created and grow bigger.  So we should come together and talk about these."  Zarrab agreed,

"Of course we have formulas for the situation as you know . . . ."  In response to Zarrab's

question about how Aslan's meeting went, Aslan reported: "Yes no problems it went very well,

we spoke together with Mr. zc [Caglayan]."  On September 16, 2013, Aslan and Zarrab spoke by

phone and Aslan reported: on his meeting:  "That's their request.  Umm, last year they exported

eleven billion dollars in gold."  Zarrab asked, "They are asking for the same to be done again,

aren't they?"  Aslan explained, "Umm, I mean, they're saying, 'do something, whatever the

method is, but help us out, take care of this job,' you know."  In a call three days later with

Happani, Zarrab instructed Happani to find a way to export gold, including the possibility of fake

gold sales.  Happani worried about their ability to make a significant difference, and Zarrab

answered: "even if we do two billion, that is important.  Do you understand?  It is important for

me, in the eye of the Prime Minister, since I will go straight to him. . . . the job has those

aspects."

In July, August, September, and November of 2013, Halk Bank officials emailed

Zarrab's employees spreadsheets tabulating Zarrab's company's gold exports for Iranian buyers

to Dubai and Iran.  According to these spreadsheets, between the July 1, 2013 implementation of

the gold ban and October 2013, Halk Bank facilitated transactions for the export of more than 6.5

tons of gold for Iranian buyers, principally to Credit Institution for Development, an Iranian bank

publicly identified by the Office of Foreign Assets Control ("OFAC") as owned by the

Government of Iran since at least July 2012.  In calls on September 26 and 27, 2013, Atilla reported to Zarrab that a pending transaction had not yet closed, and Zarrab and Happani discussed the fact that it was a gold transaction through Zarrab's company, Royal Denizcilik.

On December 18, 2013, Zarrab, Happani, Aslan, and a number of other individuals—including the sons of certain Ministers—were arrested as part of a Turkish corruption investigation, and millions of dollars of cash was seized from Aslan's residence.  Because the investigation revealed significant, high-level corruption within the Turkish government, retaliation against the law enforcement officers and prosecutors involved in the investigation was swift and harsh.  They were first reassigned, with the investigation taken over by those appointed by the allies of the very targets of the investigation, and then many were arrested and charged with crimes.  As a result, Zarrab and his co-defendants were released from prison in February 2014, and the investigation against them dismissed in September 2014.  This allowed Zarrab and Halk Bank to resume their fraudulent food transactions.  Financial and business records from 2014 and 2015 show that Zarrab's Iranian clients from the 2012 and 2013 food and gold trade continued to transfer huge sums of money to Zarrab's companies at Halk Bank for continued fraudulent food transactions.  In discussions with U.S. Treasury officials in late 2014, however, Atilla continued to conceal the scope and nature of the defendants' business through Halk Bank.

### B.    The Indictment

The Indictment charges Zarrab, Atilla, Aslan, Çağlayan, Happani, and four co-defendants with six counts: (1) conspiracy to defraud the United States, and in particular the U.S. Department of Treasury, in violation of Title 18, United States Code, Section 371 (Count One); (2) conspiracy to violate the IEEPA, Title 50, United States Code, Section 1705 (Count Two); (3) bank fraud, in violation of Title 18, United States Code, Sections 1344 and 2 (Count Three); (4) conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349

(Count Four); (5) money laundering, in violation of Title 18, United States Code, Sections 1956

and 2 (Count Five); and (6) conspiracy to commit money laundering, in violation of Title 18,

United States Code, Section 1956 (Count Six).

## DISCUSSION

**I.      Co-Conspirator Statements In Furtherance Of The Charged Conspiracies Should Be Admitted**

The evidence at trial will include numerous communications between and among the co-

conspirators in furtherance of the charged conspiracies.  The evidence will include, among other

things, email communications recovered from searches of co-conspirators' accounts, electronic

communications recovered from Zarrab's and Atilla's telephones, recordings of telephone calls

and transcripts of telephone calls among the co-conspirators made by Turkish law enforcement,

and photographs of documents recovered from the defendants' phones and from searches of

Zarrab's and Halk Bank's offices conducted by Turkish law enforcement.  Recordings and

transcripts of telephone calls, as well as physical documents and electronic media recovered

during searches of Zarrab's and Aslan's offices, will be authenticated by one or more witnesses

with personal knowledge of how they were obtained.  These documents and communications, in

addition to being admissible for non-hearsay purposes of showing state of mind and relationship

among the conspirators, are also admissible hearsay as co-conspirator statements made in

furtherance of the conspiracies.[2]

---

[2] Many of the communications and records are also admissible as present sense impressions, FED. R. EVID. 803(1); statements of then-existing mental or physical conditions, FED. R. EVID. 803(3); recorded recollections, FED. R. EVID. 803(5); records of regularly conducted activity, FED. R. EVID. 803(6); statements against penal interest, FED. R. EVID. 804(b)(3); and other bases.

### A.       Applicable Law

Statements are admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence

"if . . . the statement is offered against an opposing party and was made by the party's co-

conspirator during and in furtherance of the conspiracy."  To admit a statement pursuant to this

rule, a district court must find, by a preponderance of the evidence, that a conspiracy that

included a defendant and the declarant existed and that the statement was made during the course

and in furtherance of that conspiracy.  *Bourjaily* v. *United States*, 483 U.S. 171, 175 (1987);

*United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

The rule admitting co-conspirator statements permits introduction of any co-conspirator

statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person

to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the

conspiracy."  *United States* v. *Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).  Indeed, the

requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the

statement's objective is "designed to promote or facilitate achievement of the goals of the

conspiracy."  *United States* v. *Rivera*, 22 F.3d 430, 436 (2d Cir. 1994).  In addition,

"[c]oconspirator statements may be 'in furtherance' of the conspiracy if they 'prompt the listener

to respond in a way that facilitates the carrying out of criminal activity.'"  *United States* v.

*Paredes*, 176 F. Supp. 2d 183, 190 (S.D.N.Y. 2001) (quoting *United States* v. *Beech–Nut*

*Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989)).

Thus, the Second Circuit has found that co-conspirator statements that "provide

reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and

cohesiveness or inform each other as to the progress or status of the conspiracy" further the ends

of the conspiracy, *United States* v. *Dresna*, 260 F.3d 150, 159 (2d Cir. 2001), as do statements

"that apprise a co conspirator of the progress of the conspiracy," *United States* v. *Rahme*, 813

F.2d 31, 36 (2d Cir. 1987).  *See also United States* v. *Amato,* 15 F.3d 230, 234 (2d Cir. 1994)

(statement apprising co-conspirator in loansharking conspiracy of status of loan was made in

furtherance of the conspiracy); *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989)

(statement among conspirators that defendant was receiving proceeds of extortion was in

furtherance of conspiracy because it informed conspirators of conspiracy's status).

This is also true of statements that describe past events.  *Dresna*, 260 F.3d at 159

(statements made at gang meeting that recounted attempted arson by gang affiliate were

admissible in prosecution of affiliate because statements "could be understood as informing other

co-conspirators about the status of the conflict between two gangs, and perhaps as an exhortation

to avoid ridicule by doing things right," citing *United States* v. *Maldonado-Rivera*, 922 F.2d 934,

958 (2d Cir. 1990)); *see also United States* v. *Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002)

(cooperating witness permitted to testify that co-conspirator had told witness the amount of

money that defendant was making because issue was relevant to operation of enterprise).

Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are

made . . . simply to keep coconspirators abreast of current developments and problems facing the

group."  *United States* v. *Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotations

omitted).  For example, in *United States* v. *Lozano-Reyes*, the Second Circuit affirmed the trial

court's admission of co-conspirator statements relating to past events because the statements

served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's]

familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and

the anticipated profits."  101 F.3d 686 (2d Cir. 1996) (unpublished table opinion).

In fact, the Second Circuit has specifically allowed co-conspirator testimony where a

member of an enterprise informed another member of the enterprise about a crime that had

already taken place.  *United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991).  In *Simmons*, a

cooperating witness was permitted to testify that four separate members of the enterprise

acknowledged their participation in a murder of a debtor to the organization.  *Id.*  Testimony

concerning these conversations was permitted under Rule 801(d)(2)(E) because "discussions of

[the] murder and, the reasons for it, may well have served to promote the criminal activities of

the [enterprise] by enforcing discipline among its members."  *Id.*  "Because these statements may

have promoted cohesiveness among the Crew and helped induce Crew member assistance in the

affairs of the criminal enterprise, the district court did not abuse its discretion in admitting the

disputed testimony."  *Id.*; *see also United States* v. *Salerno*, 868 F.2d 524, 535-37 (2d Cir. 1987)

(finding co-conspirator statements were made to further the goals of the charged conspiracy

where conversations about past events helped to coordinate future criminal activities and brief

co-conspirators, given the cooperation of a high-ranking member); *United States* v. *Ruggiero*,

726 F.2d 913, 923-24 (2d Cir. 1984) (statements made by co-conspirator Ruggiero reporting

defendant Santora's role in a homicide were admissible against Santora where co-conspirator

Ruggiero regularly reported the affairs of the enterprise to the declarant).

Moreover, the exception also specifically encompasses statements made by co-

conspirators relevant to protecting, hiding, or continuing the activities of the conspiracy.  Written

records created by co-conspirators "to act as a record and as a guide to future conduct," *United

States* v. *SKW Metals & Alloys, Inc.*, 195 F.3d 83, 89 (2d Cir. 1999), are admissible co-

conspirator statements, as are statements regarding efforts to neutralize threats that "jeopardize

the continuing viability of the conspiracies," *United States* v. *Arline*, 660 F. App'x 35, 40 (2d

Cir. 2016).

14

### B.      Application

Under these clear standards for the admissibility of co-conspirator statements, communications and records reflecting communications between and among the defendants and their co-conspirators are admissible.  Several examples of such admissible evidence are summarized below.

<u>Documents and communications reflecting meetings and planning with Iranian officials</u>. The evidence will include, among other things, documents and communications reflecting multiple meetings and discussions between and among Zarrab, Atilla, other Halk Bank officials, and Turkish government officials with Iranian government, oil, and banking officials about methods to evade U.S. sanctions to extract Iranian funds from Halk Bank.

Recorded calls between and among Zarrab, Çağlayan's assistant, an official at another Turkish bank, and Happani in October 2012 reflect meetings between Çağlayan, Halk Bank officials, officials from Naftiran Intertrade Company Ltd. ("NICO") (a NIOC company), and the head of the Central Bank of Iran to discuss efforts to transfer Iranian oil proceeds held in other countries to Halk Bank among other topics.  In one call, Zarrab spoke with a police officer to get permission to use the emergency lane in order to drive the NICO delegation to Halk Bank. Similarly, recorded calls among Zarrab, Aslan, and then-Halk Bank official Levent Balkan, a defendant, in November 2012 reflect meetings to discuss a change Turkey's payment mechanism for Iranian oil to benefit Zarrab:  Rather than Turkey's national oil company paying the Central Bank of Iran to buy Iranian oil, it would pay NIOC at an account held by Government-of-Iran-owned Bank Sarmayeh at Halk Bank, with which Zarrab had an existing business relationship.

Recorded calls in April and May 2013 reflect more meetings with Iranian delegations.  In April, Zarrab, Halk Bank, and Çağlayan met with officials from NIOC and NICO to discuss ways to extract oil funds from Halk Bank, including Zarrab buying a bank to act as a conduit for

funds.  It was shortly before these meetings that Aslan instructed Zarrab to begin the food trade. Following these meetings, Zarrab, Atilla, and Aslan discussed problems Turkey's oil company was having making payments directly to Bank Sarmayeh and their efforts to delay the payment until the beneficiary could be changed from the Central Bank of Iran to Bank Sarmayeh.

In May 2013, NICO and NIOC officials and the head of Iran's Oil Ministry returned to Turkey to meet with Zarrab, Halk Bank, Çağlayan, and others.  On May 6, 2013, Zarrab and Aslan spoke on a recorded call, during which Aslan advised Zarrab that he was in Ankara and Zarrab wished Aslan good luck.  Aslan also reported that Atilla had reported that NIOC transferred funds directly to one of Zarrab's companies; Zarrab complained about NIOC's error and promised to fix it.  Approximately two to three weeks after the meetings with the Iranian delegation, Çağlayan told Zarrab in a recorded call that Aslan had called Çağlayan asking to meet; Çağlayan summoned Zarrab and Aslan to a meeting the following morning.  Zarrab then spoke with Aslan, and Aslan advised that he had asked for a meeting to assess the outcome of their recent efforts, related to a meeting Aslan recently had with America.  Zarrab told Aslan that he would speak to the anxiety that Aslan had mentioned to Zarrab recently.

Documents and communications reflecting the payment of bribes.  The evidence includes numerous documents and communications relating to bribes paid as part of the charged offenses, principally to bribes paid to Çağlayan and Aslan.

In an October 6, 2012 recorded call, Zarrab and Happani spoke about a meeting Zarrab recently had with Aslan.  Zarrab reported how well the meeting went and how valuable Aslan would be to Zarrab's business and that Zarrab would begin paying bribes to Aslan in the same way he was paying bribes to Çağlayan; Happani expressed concern that Çağlayan would find out, and Zarrab assured him that Çağlayan already knew and had instructed Zarrab to begin.

Three days later, Zarrab instructed Happani on the phone to send "two" to "Levent's boss"—Aslan.  For the next year, Zarrab and Aslan regularly exchange electronic communications recovered from Zarrab's phone in 2013 in which they discussed deliveries of cash to Aslan, referred to in code as "guests" or "visitors."  For example, on May 18, 2013, Zarrab informed Aslan that "the guest count is a little low, the rest will come on Monday.  But the present party is on its way right now."  Aslan responded, "That's not a problem, we will wait for them on Monday too. We will be available."

The evidence also includes documents and communications concerning bribes paid to Çağlayan.  For example, in a recorded March 29, 2013 call between Zarrab and Happani, the two discussed payments they had made to Çağlayan and Aslan, and spreadsheets that Happani had prepared tracking the payments.  This call corresponds to emails exchanged between Happani and Zarrab in March and April 2013 tabulating U.S. dollar, Euro, and Turkish lira payments totaling tens of millions of dollars' worth of bribes.  By way of further example, a series of recorded calls on August 30, 2013 among Zarrab, Happani, and Zarrab employees trace the delivery of $2 million U.S. dollars, €2 million Euro, and 1.5 million Turkish lira to Çağlayan's relative in Ankara.  As discussed in other calls, the conspirators usually preferred to deliver bribes in shoe boxes, but on this occasion the amount of cash was so large that Zarrab's employees used a suitcase and a carryon bag to carry the money.

The evidence also includes documents and communications concerning Zarrab's efforts to develop a relationship with then Prime Minister Erdogan to garner support and protection for his business.  For example, Zarrab and Erdogan both attended the April 12, 2013 wedding of another Çağlayan relative, where Zarrab spoke with Erdogan.  Zarrab and Aslan exchanged electronic communications discussing this meeting.  Thereafter, in a recorded call on April 16,

2013, Zarrab described more about his discussion with Erdogan.  In response to Aslan's inquiry about the progress of Zarrab's efforts to buy a bank (as discussed with Iranian officials, in order to establish a conduit for transactions for Iran), Zarrab responded, "I thought about it until I begged the twenty-four prophets, but they say to only beg of God.  I went to the Prime Minister. . . I went to him and talked about the thing I was going to do and I explained it that day at the wedding.  I will go back and will say, Mr. Prime Minister, if you approve, give me a license, I will go though BDDK [the Turkish bank regulator] even if I bought the bank anyway."

As described above, the evidence includes communications among Zarrab, Çağlayan's assistants, Happani, and others reflecting discussions between Zarrab and Çağlayan about funneling money to a Turkish foundation affiliated with the Prime Minister's relative, and communications among Zarrab, Aslan, Çağlayan, and Happani reflecting Turkish government officials' instructions for Zarrab and Halk Bank to take steps to increase Turkey's export figures.

Documents and communications reflecting means and methods of the conspiracy to use gold trade to evade and violate sanctions.  The evidence comprises voluminous recorded calls, transcripts of calls, emails and financial records relating to the conspirators' use of gold exports from Turkey to allow Iran access to oil proceeds at Halk Bank in violation and avoidance of sanctions.  Some examples, but by no means a complete catalogue, are summarized below:

- A November 12, 2012 call during which Zarrab and a Halk Bank employee discussed the recent gold regulations from the United States

- A November 15, 2012 call during which Zarrab and Balkan discussed Zarrab opening an account at an intermediary firm for gold trade, and how to record transactions using the intermediary firm

- Calls on December 4, 2012 during which Zarrab and Happani discuss problems in the Dubai gold market and decide to reimport the exported gold back to Turkey

- A February 22, 2013 call during which Happani and a Zarrab employee discussed the fact that Zarrab's companies, Duru Doviz and Tasbasi Doviz, were ranked number 1 and number 2 in the gold markets

18

- A March 29, 2013 call during which Zarrab and Happani discussed the bribe rates paid to Çağlayan and Aslan ("four or five out of a thousand") and what the amount of bribes paid so far reflected about the volume of business they had conducted ("That's not too shabby . . . Wow, we earned quite a bit.")

- An April 18, 2013 call during which Zarrab told Happani that Zarrab was meeting with Halk Bank the next day and intended to put Happani on speaker to explain issues with the gold trade; Zarrab suggested "let's do something special, motivational, for him," meaning sending a payment to Aslan

- A May 28, 2013 call during which Zarrab told Happani to pump up the gold trade so that exports went up, doing fake gold transactions and exporting gold only to have it reimported, even if it caused a loss, because "we need more exports until the elections . . . This is not for the purpose of making money."

- A July 2, 2013 call during which Zarrab and Aslan discussed differences in documentation between the gold trade and the food business; during the call, Zarrab complained about documents that were being requested by lower-level Halk Bank staff, and Zarrab and Aslan agreed that the transactions were not getting stuck at Atilla's level, they were getting stuck at a lower level

- A July 2, 2013 call during which Zarrab and Atilla discussed the documents Zarrab could and could not provide for food trade, with references to what was previously done under the "system"—an apparent reference to the gold trade

- Calls and electronic communications in September and October 2013 among Zarrab, Aslan, and Happani and others relating to Zarrab's companies inflating the export figures using gold trade

- Numerous emails exchanged among Zarrab's employees and others containing invoices, shipping records, customs documents, and financial records relating to the purchase, sale, and export of gold

- Electronic documents recovered from a December 2013 search of Zarrab's businesses' premises relating to transactional and financial records for gold transactions

- U.S. banking records showing nearly $1 billion in U.S. correspondent account transactions in approximately 2013 relating to Zarrab's reimport of gold from Dubai to Turkey in order to conduct gold transactions for the benefit of an on behalf of Iran and Iranian banks and businesses

- Emails reflecting spreadsheets sent by Halk Bank employees tabulating Zarrab's company's gold exports for Iranian buyers to Dubai and Iran in 2012 and 2013

Documents and communications reflecting means and methods of the conspiracy to use fraudulent food transactions to evade and violate sanctions.  The evidence similarly comprises voluminous recorded calls, transcripts of calls, emails and financial records relating to the conspirators' use of gold exports from Turkey to allow Iran access to oil proceeds at Halk Bank in violation and avoidance of sanctions.  Some examples, but by no means a complete catalogue, are summarized below:

- Calls in March and April 2013 among Zarrab, Happani, Aslan, and other Halk Bank personnel concerning Halk Bank's instructions to switch from gold trade to food trade,

- Calls in April 2013 among Zarrab, Happani, and Zarrab employees about obtaining and manufacturing transactional records, customs documents, and forged official stamps

- Calls in July 2013 among Zarrab, Happani, Atilla, and Aslan discussing numerous problems in the size of food transactions submitted by Zarrab's companies, discrepancies and implausibilities in the documents concerning the purported transactions, and how to correct the documents

- Electronic communications in July 2013 between Zarrab and Aslan discussing appropriate transaction sizes and what kinds of documentation Zarrab could obtain

   o In one such communication, Zarrab apologized that "Mr. minister [Çağlayan] told me to step on the gas and I think I over did."

   o Aslan responded "Esteemed B. [*bakan* (Minister) or *Basbakan* (Prime Minister)] does not know it's a transit transaction that is not included in our export figures anyway"

   o Zarrab answered, "Yes but I'm supporting it in gold"

   o In another communication, Zarrab warned, "My esteemed general manager I may have some problems related to the bank's new documentation guidelines related to our latest transactions"

   o Aslan answered, "I will solve that subject do not worry Mr. Riza"

- Calls and electronic communications in September and October 2013 between Zarrab and Aslan discussing Halk Bank stopping other companies from using Iranian oil proceeds to conduct real food trade with Iran so that Zarrab's companies would be able to use the entire oil balance

- Documents recovered from a December 2013 search of Aslan's office at Halk Bank relating to Halk Bank's decision to stop other companies from using Iranian oil proceeds to conduct real food trade with Iran

- Documents recovered from a December 2013 search of Aslan's office at Halk Bank showing that Zarrab companies had different and more lenient document requirements than other companies purporting to conduct food transactions to Iran

- Electronic documents recovered from a December 2013 search of Zarrab's businesses' premises relating to transactional and financial records for purported food transactions

- Electronic documents and communications recovered from a 2016 search of Zarrab's smartphone relating to purported food transactions, including inspection certificates and financial records

These various categories are intended to be representative examples, but not an exhaustive catalogue of the communications and documents that are admissible as co-conspirator statements in furtherance of the charged conspiracies, in addition to other exceptions under Rule 803 and 804, and should be admitted at trial.

## II.   Proposed Expert Legal Opinions And Testimony Concerning Purported Cultural Norms Should Be Excluded

By letter dated October 27, 2017 (attached hereto as Exhibit A), Atilla provided notice that he intends to call as expert witnesses David Brummond, an attorney and former OFAC advisor, and Öner Özçelik, an assistant professor at Indiana University.  According to Atilla, Brummond would testify as to "[t]he structure of OFAC's Iranian sanctions," "[h]ow OFAC administered the sanctions framework," "[h]ow and what OFAC communicated about Iranian sanctions to foreign financial institutions," and "[h]ow OFAC gathered information about foreign financial institutions and other entities and individuals dealing with Iran, and the role that such information played in OFAC's analysis and decision making."  As to Özçelik, who is offered as an expert in Turkish linguistics and culture, Atilla proposes to have him testify about issues matters of organizational psychology involving workplace dynamics and to offer linguistic

interpretations of recorded calls.  For the reasons stated below, the proffered expert testimony is

inadmissible because it invades the province of the Court and jury, and because it violates

Federal Rule of Evidence 403.

### A.     Atilla Has Not Complied With *Touhy* Regulations

In *United States ex rel. Touhy* v. *Ragan*, the Supreme Court upheld an order promulgated

by the Attorney General, Order Number 3229, which precluded Department of Justice employees

from producing documents in response to a subpoena absent authorization.  *See* 340 U.S. 462,

468 (1951).  The Court noted that regulations like the one before it were appropriate because

"[w]hen one considers the variety of information contained in the files of any government

department and the possibilities of harm from unrestricted disclosure in court, the usefulness,

indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be

willingly obeyed or challenged is obvious."  *See id.*  The Court gave effect to DOJ's internal

regulations governing the circumstances of disclosure of agency information.  In the wake of the

Supreme Court's decision, federal agencies, including the Department of the Treasury, adopted

so-called *Touhy* regulations governing when current and former federal employees can testify.

*See, e.g.*, 28 C.F.R. § 16.21 et seq.; 31 C.F.R. § 1.11.

Although *Touhy* specifically noted that the case did not involve a request for disclosure

from a federal agency during a prosecution by the United States, *see* 340 U.S. at 467, courts have

held that agency *Touhy* regulations are applicable in federal criminal prosecutions.  *See United*

*States* v. *Soriano-Jarquin*, 492 F.3d 495, 504 (4th Cir. 2007) (applying Department of Homeland

Security *Touhy* regulations in federal criminal prosecution); *United States* v. *Huong Thi Kim Ly*,

798 F. Supp. 2d 467, 476 (E.D.N.Y. 2011) (applying Department of State regulations to limit

agency witness's testimony in federal prosecution).  Thus, courts routinely recognize that *Touhy*

"regulations for subpoenaing witnesses have been held to be valid and mandatory."  *United*

*States* v. *Wallace*, 32 F.3d 921, 929 (5th Cir. 1994).  Accordingly, if a defendant's request for testimony of current or former employees does not comply with the applicable *Touhy* regulations, then the defendant should not be permitted to call the employees as witnesses.

These principles were applied by retired Justice Sandra Day O'Connor for the Fourth Circuit panel in *United States* v. *Guild*, 341 Fed. Appx. 879 (4th Cir. 2009) (unpublished).  The *Guild* court noted that, as a general matter, Government invocation of *Touhy* regulations to limit a government employee's testimony would only violate the defendant's Sixth Amendment right if the excluded testimony was "material and favorable" to the defendant, and if the defendant could establish a need for that testimony.  *Id.* at 886.

Governing regulations from the Department of the Treasury define the specific circumstances in which current or former Treasury employees are or are not allowed to testify.  Section 1.11(f)(1) of Title 31 of the Code of Federal Regulations specifies that "an employee or former employee shall not provide, with or without compensation, opinion or expert testimony concerning official information, subjects, or activities, except on behalf of the United States or a party represented by the Department of Justice, without written approval of agency counsel."[3]  Such approval may only be provided "[u]pon a showing by the requestor of exceptional need or unique circumstances and that the anticipated testimony will not be adverse to the interests of the Department or the United States."  31 C.F.R. § 1.11(f)(2).

Brummond is plainly a former employee of OFAC whose services as an expert witness are governed by these regulations.  As of October 30, 2017, the Government has been advised by the Department of the Treasury that it has not received a request to authorize Brummond's

---

[3] The regulation makes an exception "where the testimony involves only general expertise."  31 C.F.R. § 1.11(f)(3).  Atilla's letter clearly demonstrates that he expects Brummond to testify about official information, subjects, or activities and not "general expertise."

testimony and has not issued any written authorization for him to testify.  Thus, pursuant to *Touhy* and the governing regulations, Brummond may not testify as an expert witness in this matter.

### B.    Brummond's Proposed Subjects of Testimony Should Be Precluded

Even if Atilla were to comply with applicable Touhy regulations, Brummond's proposed testimony would still be inadmissible.  Federal Rule of Evidence 702 provides that expert testimony that "assists the trier of fact to understand the evidence or to determine a fact in issue," may be admitted if "the testimony is based on sufficient facts or data," and "is the product of reliable principles and methods" that have been reliably applied to the facts of the case.  In particular, as the Second Circuit has noted, "[u]nder Rules 701 and 702 [of the Federal Rules of Evidence], opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence that wastes time."  *Hygh*, 961 F.2d at 363 (internal quotation omitted).

It is "the exclusive province" of the trial judge "to instruct the jury on the law."  *Hygh* v. *Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992).  Accordingly, "an expert's testimony on issues of law is inadmissible."  *United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  Indeed, "[t]he rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'"  *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (internal quotation marks omitted).  Because it is the Court's role to instruct the jury on the requirements of the law, the Second Circuit has cautioned that "it would be very confusing to a jury to have opposing opinions of law admitted into evidence as involving a factual question for them to decide."  *United States* v. *Ingredient Tech. Corp.*, 698 F.2d 88, 97 (2d Cir. 1983).

In this regard, the Second Circuit "is in accord with other circuits in requiring the exclusion of expert testimony that expresses a legal conclusion," or "communicat[es] a legal

standard -- explicit or implicit -- to the jury," since it is "the exclusive province" of the trial judge "to instruct the jury on the law."  *Hygh,* 961 F.2d at 363-64 ("experience [of an expert] is hardly a qualification for construing a document for its legal effect"); *see United States* v. *Scop*, 846 F.2d 135, 140 (2d Cir. 1988); *Ingredient Tech. Corp.*, 698 F.2d at 97 ("Questions of law are for the Court.").  The Circuit has also warned of "[t]he danger . . . that the jury may think that the 'expert' in the particular branch of the law knows more than the judge -- surely an inadmissible inference in our system of law."  *Hygh*, 961 F.2d at 364 (quoting *Marx*, 550 F.2d at 512).

Brummond's testimony conflicts with these requirements in multiple ways.  Even aside from the substance of the testimony, it is not clear that Brummond is qualified to opine on these subjects.  Although Atilla's counsel produced a CV for Brummond, his current law firm biography (attached hereto as Exhibit B) makes clear that Brummond's experience is far afield from the issues in this case.  While at OFAC, Brummond served as a "Senior Sanctions Advisor – Insurance" who "specialized in analyzing and advising on U.S. sanctions as applied to the insurance sector."  Brummond only purports to have "insurance subject matter expertise," and his experience was in "the drafting of OFAC licenses for insurance transactions and develop[ing] recommendations for appropriate OFAC enforcement responses to sanctions violations within the insurance sector."  This case, by contrast, concerns the ITSR's prohibitions on the export of goods or services from the United States or by a United States person, directly or indirectly, to Iran or the Government of Iran as well as sanctions specifically applicable to foreign financial institutions and trade in gold and currency.  Brummond's insurance subject matter expertise does not qualify him as an expert on the matters offered, and Atilla's proposal is analogous to offering a doctor specializing in one area to testify as an expert in a different medical specialty.

More importantly, even if Brummond were qualified to testify on the proposed topics, the testimony nonetheless would be inadmissible.  First, opinion testimony about "how OFAC administered the sanctions framework" and "OFAC's analysis and decision making" is plainly irrelevant.  Nothing about OFAC's internal deliberative processes or how OFAC administered sanctions has any bearing on any element of the charged offenses, whether the crimes charged in the Indictment were committed, or who committed them.  As the Second Circuit has recognized, to prove the defendant's willful violation of the IEEPA, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful."  *United States* v. *Homa Int'l Trading Corp.*, 387 F.3d 144, 147 (2d Cir. 2004).  OFAC's internal deliberative process, including decisions about administrative penalties or sanctions designations, is not relevant to the criminal standard under the IEEPA.  The proposed testimony is no more relevant to a defendant's state of mind, or his guilt, than evidence of how vigorously police enforce speeding laws, or the stringency with which the IRS enforces tax regulations -- it may have a practical effect on the likelihood that a violator will be caught or penalized, but has no bearing on whether the defendant committed the violation or knew that his conduct was proscribed by law.

With respect to Atilla's proposal that Brummond testify concerning "the structure of OFAC's Iranian sanctions," this proposed topic is vague and threatens to invade the Court's role as the finder of law.  The Government, for example, intends to offer expert testimony from a representative of OFAC concerning, *inter alia*, the nature and authorities provided to OFAC by relevant statutes, executive orders, and implementing regulations; this testimony would essentially identify the basis for the enactment of various statutes, orders, and regulations; the date they were adopted; how they are made public; and the basic content of those laws (without offering expert legal opinion as to their meaning and application).  Brummond's proposed

testimony is not on its face so limited.  It is flatly impermissible for any witness, on direct or
cross examination, to suggest to the jury that certain conduct is or is not illegal in any way that
conflicts with the Court's rulings of law.  While expert testimony may be useful to aid the jury in
understanding unfamiliar terms and concepts, it is not permitted where it will "usurp either the
role of the trial judge in instructing the jury as to the applicable law or the role of the jury in
applying that law to the facts before it." *Bilzerian*, 926 F.2d at 1294.  Allowing Atilla's expert to
opine on what the OFAC sanctions prohibit or what would constitute a violation of those creates
a strong risk that the jury would be confused by "opposing opinions of law admitted into
evidence as involving factual questions for them to decide," *Ingredient Tech. Corp.*, 698 F.2d at
97, and misled into believing that the expert, rather than the Court, should be instructing them on
the law, *Hygh*, 961 F.2d at 364.

In another prosecution in this District of IEEPA violations, in which a defendant sought
to call a former OFAC director as an expert regarding the structure of Iranian sanctions, Judge
Keenan emphasized that "absent Defendant's own testimony or other direct evidence that he
believed his conduct to be lawful, there is no basis on which the jury could properly infer
anything about Defendant's state of mind from the opinion of this third party expert witness who
likely has never communicated with the Defendant."  *United States* v. *Banki*, No. S1 10 CR. 08
(JFK), 2010 WL 1875690, at *2 (S.D.N.Y. May 10, 2010).  Regardless of the defendant's
testimony, such a witness absolutely "may not testify about the legal requirements of the ITR or
any other OFAC regulations," or offer an opinion that could "be characterized as [the witness]'s
construal of the law OFAC enforces." *Id.* ("It is not for the jury to decide what the ITR
means . . .; instead, the jury's task is only to determine whether Defendant's alleged conduct
violates the law as laid out by the Court.").

Similarly, the topic of "[h]ow and what OFAC communicated about Iranian sanctions to foreign financial institutions" as a general matter is not relevant to this prosecution; what is relevant is how and what OFAC and the Treasury Department communicated to Atilla and his co-conspirators.  Brummond is not offered as a fact witness with knowledge of the events of this case, and has no ability to offer factual testimony about what <u>in fact</u> was communicated to Atilla, Zarrab, Halk Bank, or other Turkish banking and government officials.  By contrast, as noted below, the Government expects to call current and former employees of the Department of the Treasury who had actual dealings with those individuals and who will testify to what in fact was communicated to and from Atilla and Halk Bank.  Generalized testimony about what OFAC "usually" did or what hypothetically "would have been" communicated only poses the risk of confusing the jury when there are fact witnesses who will discuss that precise subject.  It is the jury's role to make the determinations of fact as to what happened and whether charged violations of U.S. law were willful.  Combining the issues of fact with the generalized opinion testimony of an "expert" would invade the jury's province to assess the facts that actually occurred.

### C.    Özçelik's Proposed Testimony Should Be Precluded.

Atilla has also disclosed that he intends to call Professor Özçelik as an expert witness at trial.  Professor Özçelik is offered as an expert on the following topics: (a) "Turkish linguistics and culture"; (b) "[t]he relationships in Turkey, in general, between businessmen and their clients, including bankers"; (c) "[t]he deferential nature of the relationships between individuals who work at a company and their supervisors"; (d) "the tone of certain relevant recordings, and what the tone suggests about the relationship between the parties participating in the phone calls, e.g., very close, friendly, businesslike, formal"; (e) "the meaning of certain words and phrases based on intonation patterns and context"; (f) "the meaning of certain words and phrases not

generally used by Americans in their conversations, but used routinely by Turks"; and (g) "[t]he battle between the Erdogan government and the Gulenist movement in Turkey as it impacts upon this case, particularly with respect to the 2012-2013 Turkish investigation and its aftermath." (Exhibit C at 2).

Professor Özçelik's proposed testimony should be precluded for similar reasons to those concerning the proposed testimony of Brummond.  First, Atilla proposes to offer expert opinion from Professor Özçelik that is outside of his areas of expertise.  Second, the proposed expert opinion is not grounded in the evidence in this case, risks supplanting the jury's consideration of the evidence concerning the particular individuals and conduct at issue with generalized observations from a putative expert witness, and rely in part on cultural stereotyping rather than individualized consideration of the facts of this case.

The Supreme Court has made it clear that a district court has a "gatekeeping" function in evaluating the admissibility of expert testimony: it is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Amorgianos* v. *AMTRAK*, 303 F.3d 256, 265 (2d Cir. 2002) (observing departure, under Federal Rule, from the *Frye* standard).  As the Second Circuit has held, Rule 702 "did not represent an abdication of the screening function traditionally played by judges," rather it "governs the district court's responsibility to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"  *Nimley* v. *City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (quoting *Daubert*, 509 U.S. at 589).  In *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 152 (1999), the Supreme Court further clarified that whether a proposed expert witness's area of expertise is technical, scientific, or more generally "experience-based," Rule 702 requires the district court to

fulfil the "gatekeeping" function of "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimley*, 414 F.3d at 399 n.13 (noting that a qualified forensic pathologist was not qualified as an expert on human perception or cognitive function); *United States* v. *Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990) ("A witness may be qualified as an expert on certain matters and not others."). The absence of adequate qualifications is a bar to accepting proffered expert testimony. *See*, *e.g.*, *Pan Am. World Airways* v. *Port Authority of N.Y.*, 995 F.2d 5, 10 (2d Cir. 1993) (rejecting proposed testimony because it was beyond witness's expertise).

Here, Professor Özçelik is offered as an expert in linguistics, which is a far cry from the proposed areas of testimony on Turkish history, politics, sociology, or business culture. Professor Özçelik may well have an interest or even insight into such topics, but he does not appear to have specialized expertise in those subjects. Moreover, to the extent that any of the proffered topics do fit into Professor Özçelik's linguistics expertise, Professor Özçelik still should not be permitted to testify as to them because that testimony would be irrelevant, improperly would seek to explain Atilla's state of mind and intent, and would tell the jury what result to reach.

Professor Özçelik is not qualified to testify about "[t]he relationships in Turkey, in general, between businessmen and their clients, including bankers"; "[t]he deferential nature of the relationships between individuals who work at a company and their supervisors"; or "[t]he battle between the Erdogan government and the Gulenist movement in Turkey as it impacts upon

this case, particularly with respect to the 2012-2013 Turkish investigation and its aftermath."

None of these topics concern linguistics, and nothing in Professor Özçelik's background

indicates that he otherwise has expertise in these areas through academic study or practical or

clinical experience.  Professor Özçelik's Turkish family origin in and of itself, is not a sufficient

basis. It is clear that his attempt to offer such testimony goes beyond an area within his

professional and academic ken.  *See United States* v. *Urie*, 183 Fed.Appx. 608, 611 (9th Cir.

2006) (upholding lower court's exclusion of testimony on basis that witness's qualifications as an

expert were based only on the fact that he grew up in Nigeria and claimed to be "intimately

familiar with Nigerian culture") (internal quotation marks and alternations omitted); *see also*

*Jinro Am. Inc.* v. *Secure Investments, Inc.*, 266 F.3d 993, 1005-06 (9th Cir. 2001), *opinion*

*amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) ("[Purported . . . expert on Korean

business culture and practices ... was not a trained sociologist or anthropologist, academic

disciplines that might qualify one to provide reliable information about the cultural traits and

behavior patterns of a particular group of people of a given ethnicity or nationality. Rather, [he]

offered his impressionistic generalizations."); *In re Heparin Prod. Liab. Litig.*, No. 1:08-HC-

600000 (JGC), 2011 WL 1059660, at *10 (N.D. Ohio Mar. 21, 2011) (concluding that purported

expert is not "qualified to offer opinions about Chinese cultural norms, behavior and business

conduct" as he "has no education or training as a cultural expert generally, or as an expert on

Chinese culture specifically").

Even if Professor Özçelik were an expert on generalized relationships between Turkish

bankers or Turkish employers and their supervisors, those issues are not matters that are properly

put before the jury through expert testimony.  Whatever tropes about Turkish culture a proposed

expert may offer to testify about do not speaks to the intentions and conduct of the specific

bankers or employees in this case.  To suggest that just because, according to Professor Özçelik, Turks (as opposed to other nationalities) have a particular culture of deference, Atilla, Aslan, or any other Turkish national acted in a certain way is nothing more than rank stereotyping.  An effort to explain the actions of a narrow group of individuals based on stereotypes about a group should be rejected on principle; it rests on the pernicious and inaccurate assumption that individual behavior conforms to stereotypes about the group of which that individual is part.  *See Calhoun* v. *United States*, 133 S.Ct. 1136 (2013) (Mem) (statement of Sotomayor, J., joined by Breyer, J.) (a prosecutor's comment "was pernicious in its attempt to substitute racial stereotype for evidence"); *United States* v. *Bahena-Cardenas*, 411 F.3d 1067, 1078 (9th Cir. 2005) (upholding trial court's decision "[r]efusing to allow expert testimony that would encourage or require jurors to rely on cultural stereotypes").

Similarly, testimony from Professor Özçelik about "Turkish linguistics or culture," "the tone of certain relevant recordings, and what the tone suggests about the relationship between the parties participating in the phone calls, e.g., very close, friendly, businesslike, formal," or "the meaning of certain words and phrases based on intonation patterns and context," are matters that appear (a) outside his expertise as a linguistics expert; (b) are properly based on the particular individuals and their particular relationships as demonstrated by the evidence, not by expert opinion based on generalized cultural conclusions; and (c) are squarely matters for the jury to assess.  It is entirely unclear what relevance expert opinions on Turkish linguistics or culture have to the evidence to be introduced at trial.  *See LVL XIII Brands, Inc.* v. *Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 624 (S.D.N.Y. 2006) ("Where a witness's 'expertise is too general or too deficient,' the Court 'may properly conclude that [he is] insufficiently qualified.'") (quoting *Stagl* v. *Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997)). Moreover, a jury is well equipped

to understand the "tone" or "intonations" of recorded conversations and to draw conclusions about them—indeed, juries routinely do so when assessing recorded exchanges in any number of contexts—and thus not need a purported expert to explain it to them.  *See*, *e.g.*, *United States* v. *Paracha*, No. 03 Cr. 1197 (SHS), 2006 WL 12768, at *17 (S.D.N.Y. Jan. 3, 2006) (noting that tone of voice was one of the ways through which a jury could judge a witness's demeanor); *United States* v. *Barroso*, 108 F. Supp. 2d 338, 342 n.4 (S.D.N.Y. 2000) ("The jury may also have drawn inferences of guilt from the tone and manner of Barroso's speaking voice."); *United States* v. *Myers*, 527 F. Supp. 2d 1206, 1230 (E.D.N.Y. 1981) ("Not only was there no question of the actual words used by the participants, but the jury could also perceive the added dimensions of tone of voice, timing of comments, and even the defendants' gestures and mannerisms.").

Courts have routinely precluded the testimony of linguistics experts who purport to be able to divine through expertise some meaning from recordings, even though the jury will itself hear the recordings.  *See*, *e.g.*, *United States* v. *Henderson*, 956 F.2d 270 (6th Cir. 1992) (affirming exclusion of linguistics expert because by "testifying about who raises issues or takes leading roles in the conversations, Dr. Dumas would be testifying directly on a question to be decided by the jury. . .  The testimony offered would invade the province of the jury and may lead to confusion by the jurors on an issue on which their common sense should be sufficient."); *United States* v. *Evans*, 910 F.2d 790, 803 (11th Cir. 1990), *aff'd*, 504 U.S. 255 (1992) (affirming exclusion of linguistics expert testimony about recordings because "questions regarding the defendant's understanding of the illegality of the operation and the extent of government inducement were at the center of the trial. The jury's task was to determine, on the basis of its collective experience and judgment, what Evans's state of mind was[, and] . . . the testimony

33

presented a risk that the jury would allow the judgment of the expert to substitute for its own");
*United States* v. *Kupau*, 781 F.2d 740, 745 (9th Cir. 1986) (affirming exclusion of testimony as to defendant's "intent based on the expert's analysis of . . . linguistics, discourse analysis, conversational analysis, structural analysis, topic recycling, topic clustering, response analysis, referencing analysis, language function analysis, and contrastive analysis").

Nor is there any factual basis or relevance for proposed expert testimony on "[t]he battle between the Erdogan government and the Gulenist movement in Turkey as it impacts upon this case, particularly with respect to the 2012-2013 Turkish investigation and its aftermath."  For one thing, it is entirely unclear what this topic is intended to encompass.  For another, it does not appear to be a topic capable of scientific, technical, or other specialized knowledge, much less by an American linguistics professor.  If anything, internal Turkish politics relating to the Erdogan administration and followers of Gulen appears incapable of reliable conclusions, let alone conclusions that would be relevant to the jury's determination of the facts at issue in this case. The "Gulenist" strawman that Atilla seeks to advance through the improper and unqualified testimony of Professor Özçelik is a farce and has no role in the truth-seeking function of the U.S. criminal justice system.

Finally, to the extent that Professor Özçelik proposes to testify concerning "the meaning of certain words and phrases not generally used by Americans in their conversations, but used routinely by Turks," this appears to be testimony within his linguistics expertise and the type of testimony commonly offered by translators and linguists.  So long as testimony on this topic is confined to that scope and does not invade the province of the Court or jury, or introduce irrelevant and prejudicial matters through improper and unqualified opinion testimony, as discussed above, the Government has no objection.

**III.    Evidence, Cross-Examination, Or Argument That The Defendants Were Acting Under The Public Authority Of A Foreign Government Should Be Precluded**

The Government anticipates that the evidence introduced at trial will show that Turkish government and banking officials were integral to the sanctions evasion scheme charged in the Superseding Indictment.  The scheme alleged involved actions taken by and at the direction of corrupt Turkish officials, such as Mehmet Zafer Çağlayan, who were receiving bribes from Zarrab.  For example, the Superseding Indictment describes how Çağlayan, Zarrab, and Atilla, among others, participated in meetings with Iranian officials at which aspects of the scheme were discussed.  (*See* Ind. ¶¶ 37 & 39).  Similarly, the Superseding Indictment also describes how Çağlayan directed other participants in the scheme to engage in deceptive acts and to protect the scheme through interference with Zarrab's competitors.  (*See id.* ¶ 26).  Indeed, the Superseding Indictment alleges that, as part of the scheme, U.S. regulators were misled by members of the conspiracy, including Atilla.  (*See, e.g., id.* ¶ 55).  The Government also anticipates that, at trial, the evidence will show that, after he was arrested, Atilla stated, in substance and in part, that he had not done anything wrong and that he was simply following instructions.  The Government moves to preclude any argument that the conduct alleged in the Superseding Indictment was not illegal because it was authorized, endorsed, or otherwise directed by Turkish government officials.

Any purported foreign authorization or endorsement of the conduct charged in the Superseding Indictment is irrelevant to whether that conduct constitutes a crime *under U.S. law*.  Initially, there is nothing in the IEEPA, the ITSR, the IFSR, or any relevant executive order that permits a foreign national to engage in actions that violate U.S. sanctions because that foreign national did so with the authority of a foreign government.  Nor would that make any sense, given that, for example, U.S. sanctions specifically target actions taken for the benefit of the

Government of Iran.  Many actions taken for the benefit of the Government of Iran are done at

the behest of that government – Iran's supreme leader, Ayatollah Ali Khamenei has, after all,

declared an "Economic Jihad" intended to circumvent U.S. and international sanctions against

Iran.  Thus, if it was a defense that the Government of Iran had authorized certain sanctions

evasion activity, then that would defeat the whole point of U.S. sanctions on Iran.  Such a self-

defeating construction of the statutory and regulatory scheme is not appropriate.  *See United*

*States* v. *Al Kassar*, 660 F.3d 108, 125 (2d Cir. 2011) (stating that courts must generally

"interpret statutes to give effect to congressional purpose," and rejecting narrow interpretation of

criminal liability as one that would "undermine" statutory purpose to prevent "harm [to] the

national security or foreign relations of the United States").

Nor is there any purchase for such an argument in the public authority defense.  In the

Second Circuit, the public authority defense comprises two distinct defenses.  *See United States*

v. *Giffen*, 473 F.3d 30, 39 (2d Cir. 2006).   First, there is the "actual public authority defense"

which "exists where a defendant has in fact been authorized by the government to engage in

what would otherwise be illegal activity."  *See id*. at 39.  Second, this Circuit also recognizes

"entrapment by estoppel," which "depends on the proposition that the government is estopped

from prosecuting the defendant where the government procured the defendant's commission of

the illegal acts by leading him to reasonably believe he was authorized to commit them."  *See id*.

Finally, in addition to the two forms of the public authority defense, the Second Circuit has

acknowledged that some courts (but not the Second Circuit) have recognized the doctrine of

"negation of intent," which involves "an attempt to rebut the government's proof of the intent

element of a crime by showing that the defendant had a good-faith belief that he was acting with government authorization." *See id*. at 43.[4]

Each of these doctrines is grounded in the self-evident concept that the U.S. government can, through its own action, decriminalize conduct that the U.S. government chose to criminalize in the first place. Thus, whether it is through an actual grant of authority, as in the case of an actual public authority defense, or through a reasonably perceived grant of authority, as in the case of estoppel or negation of intent, the U.S. government can take action that makes it improper to prosecute a defendant for a violation of U.S. law. But a foreign nation has no power to declare that an act made illegal by the United States is no longer illegal under U.S. law simply because the foreign nation has authorized the act. If that were the case, then espionage on behalf of another country, which violates, among other statutes, Title 18, United States Code, Section 794, would not be a crime when such spying is done at the behest of a foreign country. That, of course, would be a laughable result, given that all spying is done at the behest of another country. In that same way, if a foreign actor – whom the Court has already ruled can be prosecuted by the United States for violating the IEEPA – could breach the U.S. embargo on Iran with impunity based solely on direction from his host country, then that would mean that foreign countries could simply invalidate U.S. law. Put more bluntly, there would be no point in the United States

---

[4] While recognizing that some courts—in particular, the Eleventh Circuit—had recognized the "negation of intent" doctrine, the Second Circuit expressed significant doubts about it: "We have great difficulty with this proposition, which would swallow the actual public authority and entrapment-by-estoppel defenses." *See Giffen*, 473 F.3d at 43; *see also id.* (noting that "[s]uch an unwarranted extension of the good faith defense would grant any criminal carte blanche to violate the law should he subjectively decide that he serves the government's interests thereby," rendering "[l]awbreakers . . . their own judges and juries" (quoting *United States* v. *Wilson*, 721 F.2d 967, 975 (4th Cir. 1983))).

imposing sanctions on another country if that country could neuter those sanctions simply by saying it would not comply with them.

To the extent that Atilla wants to argue that the charged conduct was approved of, directed by, and furthered by Turkish government officials; that evidence, however, does not change the fact that the conduct remained illegal under U.S. law.  The Government respectfully submits that the Court should preclude any argument that any authorization or endorsement by the Government of Turkey constitutes a defense or otherwise makes legal the conduct proven at trial.

### IV.   Evidence, Cross-Examination, Or Argument That The Defendants Did Not Commit The Charged Bank Fraud Offenses Because Of Purported Victim Fault Should Be Precluded

The Government anticipates that it will introduce evidence at trial about the harms that can befall U.S. financial institutions that facilitate transactions barred by the U.S. embargo on Iran.  The Government further anticipates that this will include evidence about U.S. financial institutions that have been found by U.S. regulators and law enforcement officials to have enabled Iranian sanctions evasion and the penalties that have been levied against such financial institutions.  The Government moves to preclude any cross-examination or argument at trial by the defense that the fact that certain financial institutions knowingly participated in evading U.S. sanctions against Iran constitutes a defense against the bank fraud charges in the Superseding Indictment.

Neither prong of the bank fraud statute requires that the purpose of the scheme be to victimize a financial institution.  The first prong of the bank fraud statute prohibits "a scheme or artifice to defraud a financial institution."  18 U.S.C. § 1344(1).  In *Shaw* v. *United States*, the Supreme Court considered, among other things, whether this prong required the Government to prove that (a) the bank suffered a loss as a result of the scheme; (b) the defendant knew that the

bank would be harmed by the scheme and (c) the purpose of the scheme was to harm the bank. *See* 137 S.Ct. 462, 467-68 (2016).  The Court rejected each of those arguments.  *See id*.  Thus, under the first prong, while the defendant must intend to obtain property possessed by the bank through a scheme or artifice to defraud, the defendant need not have intended or even known that the bank could be harmed as part of the scheme, *i.e.*, that the bank be the victim of the scheme. *See id*.

The same is true under the second prong of the bank fraud statute.  That prong applies to a "scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1344(2).  In *Loughrin* v. *United States*, the Supreme Court addressed whether this prong required that the defendant intended to deceive a financial institution.  *See* 134 S.Ct. 2384, 2389 (2014).  The Court explicitly rejected the defendant's argument, finding that it was contrary to the language and purpose of the bank fraud statute.  *See id*. at 2389-95.

What thus emerges from *Shaw* and *Loughrin* is that it does not matter whether a defendant thought he was ultimately harming the bank or not.  Thus, even if a defendant thought that he was not harming a U.S. bank by having it process prohibited financial transactions on behalf of Iranian beneficiaries because he believed that that U.S. bank secretly wanted to process such transactions, that would not be a defense to bank fraud, assuming the defendant still took deceptive means to have his transactions processed.  Nor would it be a defense if indeed, the defendant was correct, and the U.S. bank saw through the defendant's scheme, but nevertheless processed the transactions anyway.  In proving a scheme to defraud, the Government "is not required to show that the intended victim was actually defrauded."  *United States* v. *Wallach*,

935 F.2d 445, 461 (2d Cir. 1991) (internal citations omitted); *see also Neder* v. *United States*,

527 U.S. 1, 24-25 (1999) (stating that "justifiable reliance" was not an element under wire fraud,

mail fraud, or bank fraud statutes).  Simply put, the fact that a bank may not have been the

intended victim of a bank fraud scheme because the bank was complicit in some way in the

scheme is not a defense to the defendant's own culpability.

Nor does any one specific bank's complicity in the scheme impact the determination as to

the materiality of misrepresentations made as part of the scheme.  In *Neder*, the Supreme Court

held that materiality was an element of the wire, mail, and bank fraud statutes.  *See* 527 U.S. at

25.  The Court noted that "[i]n general, a false statement is material if it has a natural tendency to

influence, or [is] capable of influencing, the decision of the decision-making body to which it

was addressed."  *See id.* at 16.  Citing the Second Restatement of Torts, the Court further

explained that a matter can be material if either "a reasonable man would attach importance to its

existence or nonexistence in determining his choice of action in the transaction in question," or

"the maker of the representation knows or has reason to know that its recipient regards or is

likely to regard the matter as important in determining his choice of action, although a reasonable

man would not so regard it."  *See id.* at 22, n.5.  Thus, applying this standard to a financial

institution that is the target of a scheme to defraud, a misrepresentation would be material if

either a reasonable financial institution would find attach importance to the information (the

"objective standard") or if a defendant knew or had reason to know that the specific financial

institution ascribed importance to the information, even if a reasonable financial institution

would not (the "subjective standard").

Here, the Court has already found that allegations in a preceding superseding indictment

– allegations that the Government expects will be proven at trial – constitute material

misrepresentations.  (Dkt. Entry No. 90 (the "Zarrab Order") at 29).  Under *Neder*, this would be true if the misrepresentations met either the objective standard or the subjective standard of materiality.  *See* 527 U.S. at 22, n.5.  A reasonable financial institution would attach importance to whether a financial transaction that it was asked to process would be for the benefit of an Iranian beneficiary because processing that transaction would be a violation of U.S. law that could subject the bank to loss, as the Court has already found.  (*See* Zarrab Order at 15-16, 29).  To argue to the contrary, that a reasonable financial institution would not care about breaking the law would lead to an absurd reading of the bank fraud statute, which should be avoided.  *See generally United States* v. *Venturella*, 391 F.3d 120, 126 (2d Cir. 2004) ("A statute should be interpreted in a way that avoids absurd results.") (internal citations and quotations omitted).

Thus, because these misrepresentations would be material under the objective standard, there is no need for the Court or the jury to consider the subjective views of the omitted Iranian beneficiary information of any specific bank.  *See* 527 U.S. at 22, n.5 (noting that information is material if it satisfies the objective standard *or* the subjective standard).  Even if a victim bank that was involved in the sanctions evasion scheme described in the Superseding Indictment ascribed no importance to the true beneficiaries of the transactions, that would still not be a defense to the bank fraud charges.

Accordingly, the Government moves to preclude any cross-examination or argument by the defense based on the knowing participation of any of the victim banks in the sanctions evasion activity on behalf of Iranian entities.

## V. Evidence, Cross-Examination, Or Argument Based On The Fact That Atilla Was Not Arrested Or Charged In A Corruption Investigation In Turkey Should Be Precluded

As discussed above, some of the conduct at issue in this case was the subject of an investigation into public corruption of high-ranking officials in Turkey, which resulted in the

arrest and charging of a number of individuals in December of 2013.  Although evidence about

Atilla was collected during that investigation, he was not charged with a crime in Turkey at that

time.  Because the opinion of Turkish authorities as to Atilla's guilt or innocence is irrelevant as

to any issue in this case, which concerns his guilt for violating American laws, the Court should

preclude Atilla from presenting argument based on the fact that he was not charged in connection

with the Turkish investigation.

      Federal Rule of Evidence 401 requires that, to be admissible, evidence must be "of

consequence in determining the action."  Even if evidence is relevant, it must not be

"substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading

the jury."  FED. R. EVID. 403.  It is well established that "[c]riminal charges, and by implication,

the lack of them, are not evidence."  *United States* v. *Dufresne*, 58 F. App'x 890, 897 (3d Cir.

2003).  Accordingly, courts routinely preclude the introduction of evidence regarding the

disposition of other charges pertaining to the conduct at issue in the instant matter.  *United States*

v. *Paul*, 194 F. App'x 792, 795 (11th Cir. 2006) ("[T]he disposition of prior state charges . . .

was irrelevant to Paul's guilt or innocence concerning the charged conduct."); *United States* v.

*Kerley*, 643 F.2d 299, 300–01 (5th Cir. 1981) (precluding evidence of state court acquittal on

charges arising out of same conduct both "because it does not prove innocence but rather merely

indicates that the prior prosecution failed to meet its burden" and "because . . . the elements of

the state battery charge were entirely different from the elements of the federal charges in this

case, the probative value of evidence of Kerley's acquittal on that charge was substantially

outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury");

*Dufresne*, 58 F. App'x 890, 897 ("[T]he reasons for New Jersey's decision to charge or not

charge defendants in a separate prosecution are not part of the record in this case, are unreviewable and are irrelevant to the factual issues at trial.").

The decision of one sovereign whether or not to bring criminal charges against a defendant has no bearing whatsoever on the guilt of that defendant for violating the laws of another. "Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses, and in doing so each is exercising its own sovereignty, not that of the other." *United States* v. *Wheeler*, 435 U.S. 313, 320 (1978).

The fact that Turkish authorities did not charge Atilla with public corruption offenses has no bearing whatsoever on his guilt on the charges he faces here in the United States. Most obviously, Turkey was not investigating violations of U.S. sanctions or money laundering laws, and so its determination as to whether there was sufficient evidence to warrant charging Atilla for other violations of Turkish law simply has no bearing on the questions for the jury in this case. More broadly, however, the decision whether or not to bring criminal charges in any context is not evidence of guilt or innocence, or even of any particular fact. The decision to charge, or not to charge, a particular defendant is a function of not just factual guilt or innocence, but also available law enforcement resources and priorities, rulings on the admissibility of evidence, vagaries of jurisdiction, and a host of other factors not susceptible to judicial disaggregation. *See Newman* v. *United States*, 382 F.2d 479, 480 (D.C. Cir. 1967) (Burger, C.J.) ("Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.").

At bottom, the fact that Atilla was not charged in Turkey represents nothing more than the opinion of Turkish authorities with respect to violations of Turkish law. But evidence of

opinions as to a defendant's guilt or innocence is plainly inadmissible.  See United States v.

Garcia, 413 F.3d 201, 215 (2d Cir. 2005) (precluding testimony by law enforcement agent "that,

in his opinion, based on the totality of the investigation, defendant was a culpable member of the

charged conspiracy").  That, however, is precisely what argument based on Turkish charging

decisions would amount to.  See United States v. Demosthene, 334 F. Supp. 2d 378, 380

(S.D.N.Y. 2004) (holding that a defendant "may not argue before the jury issues relating to the

overall propriety of the Government's investigation" because it is "irrelevant to the central

question of [the defendant's] guilt or innocence") (citing United States v. Regan, 103 F.3d 1072

(2d Cir. 1997); United States v. Reyes, 18 F.3d 65, 71 (2d Cir. 1994)).  Accordingly, Atilla

should be precluded from introducing evidence or offering testimony as to the fact that he was

not charged with crimes by Turkish authorities.

## VI.    Evidence, Cross-Examination, Or Argument Regarding The JCPOA Should Be Precluded

The defendants should be precluded from arguing at trial (or attempting to introduce

related trial evidence) to the effect that the adoption and implementation of the JCPOA is a

defense to the charged offenses.  The JCPOA, implemented on January 16, 2016, is an

international agreement between the U.S., Iran, and other nations relating to the lifting of some

sanctions in exchange for Iranian commitments to curtail their nuclear program.  Any arguments

based on the JCPOA are irrelevant and should be precluded.[5]  See FED. R. EVID. 402.  To the

extent those arguments, or JCPOA agreement provisions, have any probative value, they are

---

[5] In its expert notice, dated August 16, 2017, the Government notified the defendant of the possibility that Mark Dubowitz, the Government's expert as to the history of U.S. sanctions against Iran and the Iranian response to those sanctions, would testify about "[t]he negotiation of and impact of the Joint Comprehensive Plan of Action."  Consistent with this motion, the Government does not intend to offer any testimony on this subject.

substantially outweighed by the danger of confusing the issues and misleading the jury.  *See* FED. R. EVID. 403.

For example, the Government plans on calling a representative of OFAC as an expert witness, who will discuss OFAC license and enforcement authority, and other relevant background information on OFAC sanctions programs.  The fact of the JCPOA will be discussed in this witness's testimony, because the witness's roles in implementing the JCPOA in positions with the National Security Council and OFAC are part of the witness's background and subject matter expertise, but the Government will not offer testimony concerning the terms, meaning, or operation of the JCPOA.  The defendants similarly should be precluded from eliciting testimony from this, or any other witness, that involves the details of the JCPOA, such as the removal of certain Iranian or Iran-related individuals and entities from the SDN List, the categories of lifted sanctions, and other issues, as set out in the JCPOA.

The charged conduct in the indictment arises out of a multi-year scheme, from at least in or about 2010, up to and including in or about 2015, to violate and evade U.S. national security controls against the Government of Iran.  The lifting of some sanctions against Iran under the JCPOA went into effect on "Implementation Day," January 16, 2016.  Any evidence or arguments about the JCPOA would pertain only to conduct outside the charged time period, and thus would be irrelevant.  The terms and provisions of the JCPOA and its implementation do not affect the elements of the crimes charged in this case.  The effect of allowing evidence of the details of those terms and provisions before the jury will be to confuse the issues and mislead the jury.

The provisions of the JCPOA germane to the charges.  Permitting the defendants to introduce evidence of changes effected by the JCPOA would create a trial within a trial, as to

factual matters occurring after the charged conduct, and the irrelevant terms of the agreement would distract the jury from the central issues in this case.

### VII.   Cross-Examination Of Current And Former Officials Of The U.S. Department Of The Treasury Concerning Matters Beyond The Scope Of Their Testimony Should Be Precluded

At trial, the Government anticipates calling as witnesses a number of current and former officials of the United States Department of the Treasury, who will testify as fact witnesses about their interactions with Turkish banking and government officials, including, among others, Atilla, Suleyman Aslan, Levent Balkan, and Zafer Caglayan.  The Government anticipates calling as witnesses former Under Secretary of the Treasury for Terrorism and Financial Intelligence ("TFI") David Cohen and former Director of the Office of Foreign Assets Control ("OFAC") Adam Szubin, as well as a number of other officials of those two departments, including Eytan Fisch, Joshua Kirschenbaum, Michael Liberman, and David Tessler (collectively, the "Treasury Witnesses").  In addition to their personal interactions with several of the charged defendants in this case, during their tenures of public service, these officials have worked on a variety of the U.S. government's most highly sensitive matters, some of which may have also involved U.S. policy towards Iran, Turkey, or both.  The Government intends to limit the scope of direct examination of these witnesses only to their interactions with Turkish banking and government officials, including Atilla, Aslan, Balkan, and Caglayan.  The Treasury Witnesses will describe both information communicated to those individuals by the U.S. Department of the Treasury and the representations made by those individuals in response. Accordingly, the Court should ensure that cross-examination of these witnesses is limited to those interactions only.

### A.    The Court Should Preclude Questions about Factual Matters Outside the Scope of Direct Examination

"[Federal] Rule [of Evidence] 611(b) provides that 'cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.'"  *United States* v. *Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989).  Moreover, "'trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Fuller* v. *Gorczyk*, 273 F.3d 212, 219-20 (2d Cir. 2001) (quoting *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679 (1986)).

Even where a witness may have had broad involvement in the general area at issue in the trial, if the witness's direct testimony is limited, cross-examination is similarly limited.  Thus, in *United States* v. *Koskerides*, the Second Circuit affirmed the district court's enforcement of Rule 611(b)'s proscription on cross-examination beyond the scope of direct as to a former law enforcement agent, who testified on direct only about the defendant's "admissions during the course of the investigation and his efforts in following the leads provided by [the defendant]," notwithstanding the fact that the agent had previously played a much broader role in the investigation as a "case agent."  877 F.2d at 1136.  When "[d]efense counsel attempted to cross-examine [the agent] regarding the part of his investigation leading to the net worth computations[, t]he district court determined that this area of inquiry was beyond the scope of direct examination and therefore was foreclosed under Fed.R.Evid. 611(a) and (b)," a conclusion upheld by the Second Circuit.  *Id.*

Following *Koskerides*, enforcement of the Rule's limitations has been routine in this District.  *See, e.g.*, *United States* v. *Adeniyi*, No. 03 Cr. 86 (LTS), 2004 WL 1077963, at *3 (S.D.N.Y. May 12, 2004) (Where agent testified on direct solely as to "his preparation of a photo

array and the circumstances of Defendant's arrest," cross-examination into his conversations

with other Government witnesses or his role in the investigation was precluded.  "The Court

[was] unpersuaded by Defendant's apparent contention that [the agent's] acknowledgment

during direct examination that he had participated in an investigation of Defendant, coupled with

[the agent's] testimony regarding certain specific aspects of that investigation, combined to give

defense counsel carte blanche to inquire into any subject related to the investigation of

Defendant. The Government's direct examination of [the agent] was limited to two very specific

aspects of the investigation, and the Court acted well within the discretion afforded to it under

Fed.R.Evid. 611 and the relevant case law when it prohibited defense counsel from inquiring on

cross-examination into additional aspects of the investigation that were far afield from those

covered during direct examination."); *United States* v. *Santana*, No. 13 Cr. 811 (ALC),

(S.D.N.Y. May 31, 2017) (limiting scope of cross-examination of former FBI case agent where

witness was called only to authenticate recordings of intercepted communications and physical

evidence for which agent was custodian, notwithstanding agent's broader role in investigation).

The limited scope of a witness's direct examination also serves to limit the scope of the

material that must be produced under 18 U.S.C. § 3500, which requires only the production of a

statement by a witness that "relates to the subject matter as to which the witness has testified."

Accordingly, prior statements by a witness that are merely "incidental or collateral" to the

witness's testimony are not subject to disclosure.  *United States* v. *Cardillo*, 316 F.2d 606, 616

(2d Cir. 1963).  If a statement "does not deal with the events and activities testified to on direct

examination, it is not producible under the Act." *United States* v. *Bin Laden*, 397 F. Supp. 2d

465, 492 (S.D.N.Y. 2005), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E.*

*Africa*, 552 F.3d 93 (2d Cir. 2008) (precluding production of 3500 material regarding other

activities of al Qaeda not being testified to by witness).  Moreover, the Court must be mindful

that "Section 3500 is meant to protect FBI and government files 'from the danger of the

disclosure of irrelevant and incompetent matter.'"  *United States* v. *Gallo*, 654 F. Supp. 463,

474–75 (E.D.N.Y. 1987) (quoting Jencks Act Senate Report, No. 981, 85th Cong., 1st Sess.1862,

quoting *Gordon* v. *United States*, 344 U.S. 414, 419 (1953), reprinted in 1957 U.S.Code Cong. &

Ad.News 1861, 1862).

   As noted, the Government intends to inquire of these witnesses from the Department of

the Treasury about specific interactions they had with Turkish banking and government officials,

including where and how the interactions occurred, what led to the interaction taking place, what

information was conveyed by the Treasury Witnesses, what responses the Treasury Witnesses

received, and other factual matters to which the witnesses may testify from personal knowledge.

The Government does not propose to inquire of these witnesses more broadly as to the

deliberative processes of the Department of the Treasury, policy positions with respect to Iran or

Turkey, or other matters in which the witnesses may have been involved that are, at most

"incidental or collateral" to their testimony about the specific interactions as to which they can

offer direct evidence in this case.  Accordingly, the Court should limit cross-examination of

those witnesses solely as to the interactions with Turkish banking and government officials that

will be the subject of their direct testimony.  The Government intends to similarly limit its

production of § 3500 material to statements of these witnesses relating to that subject.

   This is particularly true in the context of these specific witnesses, whose roles in the

United States Government have involved some of the most sensitive matters of foreign policy,

international negotiations, counter-terrorism, and the integrity of financial markets and

institutions, many of which touch on information classified at the highest levels of secrecy.  The

49

Government does not propose to delve into these matters, and so there is no conceivable prejudice from precluding cross-examination as to areas other than the witnesses' interactions that will be the subject of their direct testimony. By contrast, allowing defense counsel to troll through the deliberations and actions of high-ranking Government officials in the name of confrontation would be precisely the sort of "harassment, prejudice, confusion of the issues, . . . or interrogation that is . . . only marginally relevant," *Fuller*, 273 F.3d at 219-20, and the Court should preclude such an irrelevant fishing expedition.

This is particularly true with respect to former Under Secretary David Cohen, who, after leaving the Department of the Treasury, served from 2015 to 2017 as Deputy Director of the Central Intelligence Agency ("CIA"). This time period only minimally overlaps with that of the charged conspiracy, and Mr. Cohen did not have any relevant interactions with the charged defendants or with Halk Bank during his tenure at the CIA. Given the sensitivity of Mr. Cohen's role at the CIA, and the absence of any relevant factual testimony from that time period, the Court should specifically preclude any questioning about Mr. Cohen's work in that capacity.

## B. The Court Should Preclude Cross-Examination As To the Treasury Witnesses' Legal Opinions

As already noted, "an expert's testimony on issues of law is inadmissable." *Bilzerian*, 926 F.2d at 1294. Although the Treasury Witnesses are undoubtedly knowledgeable about the statutes, orders, regulations, and prohibitions at issue in this case, they are not being offered as expert witnesses and the Court should preclude inquiry as to their opinions on the interpretation of the Iranian sanctions regime or on whether certain conduct would or would not have been illegal. Not only would such questions be impermissibly beyond the scope of their direct examination, but because the witnesses are being offered solely as fact witnesses, they may not offer opinions based on "specialized knowledge" pursuant to Federal Rule of Evidence 702.

50

Moreover, as noted, it is flatly impermissible to ask any witness, even an expert, to offer an interpretation of law to the jury.  This prohibition extends beyond mere opinion as to legal matters and similarly precludes questioning witnesses about the application of law to fact in the context of the case.  *See, e.g.*, *Marx & Co.* v. *Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977) (precluding witness testimony "as to the legal standards which he believed to be derived from the contract and which should have governed Diners' conduct").  So too here, it would be inappropriate for witnesses called to testify as to limited issues of fact to be asked to opine on their views as to whether or not the Iranian sanctions regime prohibited certain conduct or whether certain conduct was subject to prosecution under the IEEPA.  The Government does not intend to ask such questions in direct testimony, and the Court should preclude such questioning on cross-examination as well.

## VIII.   Cross-Examination Of Expert Witnesses Affiliated With A Non-Profit Policy Institute Concerning The Institute's Donors Should Be Precluded

The Government expects to call Mark Dubowitz and Dr. Jonathan Schanzer of the Foundation for Defense of Democracy ("FDD"), as expert witnesses at trial. Mr. Dubowitz, the CEO of the FDD, is expected to testify about the history of U.S. sanctions against Iran and the Iranian response to those sanctions. Dr. Schanzer, the Senior Vice President of the FDD, is expected to testify on the relationship between the Republic of Turkey and Iran, and Turkey's role in Iran's sanctions evasion efforts.

Mr. Dubowitz and Dr. Schanzer serve as principals of the FDD, which is a non-profit, non-partisan 501(c)(3) policy institute focusing on foreign policy and national security.  As principals, they exercise and discharge fundraising duties, including managing contributed income and soliciting grants.  Foreign government contributions are not accepted by FDD, and the FDD executive team is not aware of any donors having an interest in the outcome of the

captioned trial.  As a 501(c)(3) non-profit agency, and in compliance with its legal obligations, the FDD files an IRS form 990 on an annual basis, which includes information on the FDD mission, programs, and finances, and is available to the general public. The IRS form 990 filed by the FDD does not require the disclosure of the identities of donors.

The Government seeks a ruling *in limine* precluding cross-examination of these witnesses on any matters pertaining to donations received, the identities of individual or institutional donors, or the general governance of the FDD because these do not have any bearing on the witness' credibility, nor are they relevant to the events at issue at trial.  On the other hand, these matters are subject to legitimate privacy interests of the charitable donors and permitting inquiry into this matter could chill legitimate charitable giving and free association.  *See, e.g.*, *Citizens United* v. *Schneiderman*, F. Supp. 3d 457, 463 (S.D.N.Y. 2015) ("Charitable solicitation most certainly qualifies for First Amendment protection.  Because [the challenged regulation] is a disclosure requirement, it must satisfy exacting scrutiny.") (citations omitted)

Rule 402 of the Federal Rules of Evidence provides, in relevant part, that "[e]vidence which is not relevant is not admissible."  FED. R. EVID. 402.  Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  FED. R. EVID. 401.  Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  FED. R. EVID. 403.  In addition, under Rule 611, it is clear that "cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witnesses."  FED. R. EVID. 611.

It is well-settled that the scope and extent of cross-examination is within the sound discretion of the Court, *see, e.g.*, *United States* v. *Wilkerson*, 361 F.3d 717, 734 (2d Cir. 2004); *United States* v. *Salameh*, 152 F.3d 88, 131 (2d Cir. 1998), and that the Court may properly bar cross-examination which is marginally relevant to the issues before the court. *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 956 (2d Cir. 1990). "[T]he decision to restrict cross-examination will not be reversed absent an abuse of discretion." *United States* v. *Lawes*, 292 F.3d 123, 131 (2d Cir. 2002) (internal citations omitted).

The defendants should be precluded from cross-examining Mr. Dubowitz and Dr. Schanzer about the identities of those who donate to the FDD, or on details on the governance of the FDD. Such information is not relevant to the credibility of these witnesses, is entirely irrelevant to the subject of their testimony, and poses a danger of confusion of the issues.

## CONCLUSION

Accordingly, the Government respectfully requests that the Court grant the Government's motions *in limine* as set forth above.

Dated: New York, New York
       October 30, 2017

> Respectfully submitted,
>
> JOON H. KIM
> Acting United States Attorney
>
> by: _____/s/_____
> Michael D. Lockard/Sidhardha Kamaraju/David W. Denton, Jr., Assistant U.S. Attorneys
> Dean Sovolos, Special Assistant U.S. Attorney
> (212) 637-2193/6523/2744/2213