UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                        :

UNITED STATES OF AMERICA

                        :

     - v. -                       S4 15 Cr. 867 (RMB)

                        :

REZA ZARRAB,
  a/k/a "Riza Sarraf,"           :
MEHMET HAKAN ATILLA,
MEHMET ZAFER CAGLAYAN,    :
  a/k/a "Abi,"
SULEYMAN ASLAN,           :
LEVENT BALKAN,
ABDULLAH HAPPANI,        :
MOHAMMAD ZARRAB,
  a/k/a "Can Sarraf,"          :
  a/k/a "Kartalmsd,"
CAMELIA JAMSHIDY,         :
  a/k/a "Kamelia Jamshidy," and
HOSSEIN NAJAFZADEH,       :

                Defendants.    :

                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN OPPOSITION TO
## MEHMET HAKAN ATILLA'S MOTIONS *IN LIMINE*

JOON H. KIM
Acting United States Attorney for the
Southern District of New York

Michael D. Lockard
Sidhardha Kamaraju
David W. Denton, Jr.
  Assistant United States Attorneys
Dean C. Sovolos
  Special Assistant United States Attorney
      *Of Counsel*

# TABLE OF CONTENTS

Page

DISCUSSION ......................................................................................................... 2

I.      The Co-Conspirators' References to "Economic Jihad" and Other
        Evidence of the Nature and Purpose of the Conspiracy is Admissible............................ 2

II.     The Recordings are Admissible ...................................................................... 5

        A.      Applicable Law .................................................................................. 6

        B.      Application ........................................................................................ 7

III.    The Proposed Expert Testimony is Relevant and Admissible ......................................... 12

        A.      Applicable Law .................................................................................. 12

        B.      Application ........................................................................................ 14

                1.      The Expert Testimony of Mr. Dubowitz and Dr. Schanzer
                        is Admissible ............................................................................ 14

                2.      The Expert Testimony of Ms. Palluconi is Admissible ........................... 19

                3.      The Testimony of Bank Witnesses is Admissible and
                        Cannot be Precluded By a Purported Willingness to Stipulate.................. 22

        CONCLUSION ....................................................................................... 23

The Government respectfully submits this memorandum of law in opposition to the motions *in limine* submitted by the defendant Mehmet Hakan Atilla.  In his motions, Atilla seeks orders precluding evidence of the co-conspirators describing the purpose of their actions as "Economic Jihad," precluding the admission of certain recordings of telephone conversations, and precluding certain expert witness testimony.  In support of preclusion, Atilla argues that: (1) evidence that members of the conspiracy used the term "Economic Jihad" to describe the purpose of their actions is unduly prejudicial; (2) the recordings cannot be sufficiently authenticated; (3) expert testimony concerning the Government of Iran and the Iranian economy, the Government of Turkey and the Turkish economy, and the relationships among certain designated entities and individuals and entities involved in the charged conspiracies, is irrelevant, prejudicial, and not the proper subjects of expert opinion; (4) expert testimony from a representative of the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), the office responsible for the administration and enforcement of the Iran sanctions regulations, concerning the relevant sanctions provisions and designations and identifications of relevant individuals and entities pursuant to OFAC's regulatory authority is prejudicial; and (5) testimony from bank officials concerning sanctions compliance and anti-money laundering procedures and policies is unnecessary in light of Atilla's purported willingness to enter into a stipulation, the terms or contours of which are completely unidentified.  Atilla also asks, in the alternative, for a *Daubert* hearing, though his motion does not challenge the qualifications or expertise of any of the proposed witnesses, but only whether their proposed testimony would be relevant or unduly prejudicial.

For the reasons set forth below, Atilla's motions should be denied.

### DISCUSSION[1]

I.   **The Co-Conspirators' References to "Economic Jihad" and Other Evidence of the Nature and Purpose of the Conspiracy is Admissible**

Atilla moves to preclude the admission of two letters – one a letter signed by Zarrab to Mahmoud Ahmadinejad (the "Ahmadinejad Letter") and the other, a draft letter to the general manager of the Central Bank of Iran (the "Central Bank Letter," and together with the Ahmadinejad Letter, the "Letters"). In both Letters, Zarrab pledges his support to the "Economic Jihad" declared by Iran's Supreme Leader, Ayatollah Ali Khamenei and, in the Ahmadinejad Letter, further expresses his commitment to resist "world-devouring imperialism [that] has been using the weapon of economic blockade and negative propaganda to isolate our beloved homeland, the Islamic Iran, and tightens the grip of sanctions further day-by-day."[2] Atilla argues that the Letters should be excluded because they "will not only suffuse Mr. Zarrab with terroristic inclinations, but also, by implication and spillover effect, Mr. Atilla as well" and that there is no evidence linking Atilla to these letters. (*See* Atilla Mem. at 20). Atilla's motion misunderstands both the relevance of the Letters and the applicable case law, and thus should be denied.

Pursuant to Federal Rule of Evidence 401, the first question for the Court to consider is whether the Letters are relevant to the crimes charged in the Indictment. Even though the Letters are not directly connected to Atilla, they are nonetheless relevant and admissible against him at trial for three reasons.

---

[1] The Government incorporates by reference the background discussion from our moving brief. Those facts will not be restated here except to the extent relevant to particular arguments.

[2] The descriptions of the Letters in this motion are based on draft translations and therefore subject to revision.

First, and most obviously, the Letters are statements made by Atilla's co-conspirator, Zarrab, in furtherance of the conspiracy.  The Government anticipates that the evidence at trial will show that the "Economic Jihad" is a term used to describe Iran's campaign to resist the "world-devouring imperialism" of U.S. sanctions.  The Letters show that Zarrab was attempting to participate in the "Economic Jihad" and that his actions were intended to further its goals.  *See United States v. Maldonado-Rivera*, 922 F.2d 934, 959 (2d Cir. 1990) (statements "in furtherance of the conspiracy include statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy" are admissible as statements in furtherance of the conspiracy).

Those actions in furtherance of the conspiracy include Zarrab's dealings with Türkiye Halk Bankasi A.Ş. ("Halk Bank").  Thus, for example, when, as the proof at trial will show, Zarrab and Atilla, among others, met to discuss how Zarrab could use Iranian oil proceeds at Halk Bank to fund the purported gold and commodities business, the purpose of those meetings was to devise a way around U.S. sanctions intended to restrict the use of Iranian oil proceeds.  In other words, even though there is no evidence showing Atilla's specific link to the Letters, the fact that Zarrab attended meetings or participated in calls with Atilla about this Iranian business, shows that the purpose of these communications was, at least in part, to devise a way to circumvent sanctions.  By way of analogy, the Government would plainly be able to offer evidence that a drug dealer, prior to a drug sale, was seeking out drugs to supply.  And that evidence would similarly be admissible against the purchaser of the drugs because it would show that when the purchaser met with the drug dealer, the purpose of that meeting was to consummate a drug transaction.  In the same way, the Letters show the purpose of meetings between Zarrab and Halk Bank employees, such as Atilla – was to facilitate Iran's "Economic

Jihad."  *Cf. United States* v. *Langella*, 776 F.2d 1078, 1081 (2d Cir. 1985) (background

paragraphs in indictment about prior criminal acts were relevant because they showed that the

purpose of meetings was to discuss criminality); *United States* v. *Friedman*, 139 Fed. App'x.

330, 332-33 (2d Cir. July 20, 2005) (evidence of sexually explicit images on defendant's phone

during a meeting with a minor was probative of the fact that the purpose of the meeting was for

the defendant to induce minor to have sex).

  Second, the Letters constitute direct evidence of the background of the conspiracy and

how the relationship between the co-conspirators developed.  *See United States* v. *Pipola*, 83

F.3d 556, 566 (2d Cir. 1996) (trial court did not abuse its discretion when "it ruled the evidence

was relevant as background information to make the story of the crimes charged complete and to

enable the jury to understand how the illegal relationship between the co-conspirators

developed").  In this case, the scheme described in the Indictment involves coordination

between, among others, Zarrab, Halk Bank employees (including Atilla), and high-ranking

Iranian and Turkish bank and government officials, including officials with the Central Bank of

Iran.  Evidence of efforts by Zarrab to cultivate a relationship with the Iranian government and

the Central Bank of Iran for the express purpose of facilitating Iran's sanctions evasion is

probative of how that international coordination came about.  Thus, even if Atilla himself had no

personal involvement with the Letters, Zarrab's actions to knit together this coalition are

admissible against and relevant to Atilla.  *See United States* v. *Amrep Corp.*, 560 F.2d 539, 545

(2d Cir. 1977) ("So long as a transaction is within the general scope of a scheme on which all

defendants had embarked, a defendant not directly connected with a particular fraudulent act is

nonetheless responsible therefor if it was of the kind as to which all parties had agreed.").

Nor is this evidence unfairly prejudicial, as Atilla claims.  "[E]vidence is unduly prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence."  *United States* v. *Kadir*, 718 F.3d 115, 122 (2d Cir. 2013) (citation omitted).  Atilla argues that the jury will be misled into associating Zarrab, and by extension, Atilla with terrorism if the jury is presented with terms like "Economic Jihad" or "world-devouring imperialism."  But Atilla ignores the fact that the jury will hear testimony about exactly what the "Economic Jihad" is – not a campaign of terrorism, but one of sanctions evasion.  And, as even one of the cases Atilla cites recognizes, any theoretical risk of confusion could be abated by the Court instructing the jury at the appropriate time that Atilla is not charged with a terrorism offense or with participating in terrorism.  *See United States* v. *Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) ("We see no indication that the jury was unable or unwilling to heed the court's repeated instructions that terrorism was not an element in the case, that the case was about alleged banking-law violations, and that the jury must consider only the evidence admitted at trial.").  The Letters should be admitted at trial.

## II.     The Recordings are Admissible

In his motion, Atilla challenges the admissibility of various recordings of telephone conversations, which were captured by Turkish law enforcement, based on a variety of speculations about the authentication and reliability of the recordings.  The recordings will be readily authenticated, however, through the testimony of one or more witnesses with firsthand knowledge sufficient to demonstrate that the recordings are what they purport to be, and the remainder of Atilla's arguments are, at best, grounds on which he can seek to argue the weight that the jury should give to the recordings.

## A.     Applicable Law

Rule 901(a) of the Federal Rules of Evidence "requires the proponent of any evidence to submit 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'  This requirement is satisfied 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'"  *United States* v. *Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991) (quoting 5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 901(a) [01], at 901–17 (1990)).  With respect to audio recordings, because "'recorded evidence is likely to have a strong impression upon a jury and is susceptible to alteration, we have adopted a general standard, namely, that the government 'produce clear and convincing evidence of authenticity and accuracy' as a foundation for the admission of such recordings."  *Id.* (quoting *United States* v. *Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977)).  But "this Circuit has never expressly adopted a rigid standard for determining the admissibility of tape recordings," *United States* v. *Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001) (quoting *Fuentes*, 563 F.2d at 532), and "rulings as to authentication [are within] the district court's 'broad discretion.'"  *Ruggiero*, 928 F.2d at 1303 (quoting *United States* v. *Mendel*, 746 F.2d 155, 167 (2d Cir. 1984)).

The Government is not required to "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be."  *Tropeano*, 252 F.3d at 661 (2d Cir, 2003) (quoting *United States* v. *Pluta*, 176 F.3d 43, 49 (2d Cir. 1999)).  Audio recordings can properly be authenticated in numerous ways, including by a participant in the conversations, *see Tropeano*, 252 F.3d at 660-61 (authentication by conversation participants); voice identification by participant, *see United States* v. *Albert*, 595 F.2d 283, 290 (5th Cir. 1979); by a technician who recorded the conversation, *see United States* v. *Barone*, 913 F.2d 46, 49 (2d Cir. 1990); by someone familiar with how the recordings were made, *United States* v. *Bosch*, 399 F. Supp. 2d 521, 522 (S.D.N.Y. 2005) (authentication by

summary witness, an agent "responsible for the wiretaps conducted in the investigation"); or by an individual who recognizes the voices of the participants, *see* FED. R. EVID. 901(b)(5); *United States* v. *Hemmings*, 482 Fed. App'x. 640, 643 (2d Cir. 2012) (unpublished) (voice identification by government agent); *United States* v. *Rizzo*, 492 F.2d 443, 448 (2d Cir. 1974) (voice identification by three detectives sufficient).  Voice recordings can also be admitted for the jury itself to make a voice comparison.  *See United States* v. *Sliker*, 751 F.2d 477, 496-501 (2d Cir. 1985).  As *Sliker* observed, "the rule requires the admission of evidence 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" *Id.*  (quoting 5 Weinstein's Evidence, § 901(a)[01] at 901-17).

### B.    Application

The Government expects that, at trial, the recordings of telephone conversations will be authenticated by one or more witnesses with personal knowledge of, and experience with, how telephone intercepts are recorded and maintained generally by Turkish law enforcement, how these particular recordings were made and maintained, characteristics of the recordings that are consistent with genuine law enforcement intercepts, and with personal knowledge of the voices of some of the participants.  Under the law of this Circuit, such testimony is amply sufficient for the evidence to be considered by the jury.  *See Hemmings*, 482 Fed. App'x. at 643; *Tropeano*, 252 F.3d at 660-61; *Barone*, 913 F.2d at 49; *Albert*, 595 F.2d at 290; *see also* FED. R. EVID. 901(b)(1), (4), (5), (9).  Similar witness testimony will authenticate other evidence obtained through the Turkish investigation, including physical and electronic documents recovered from searches of homes and offices of the co-conspirators.

Challenging the admissibility of the recordings, Atilla launches a series of highly conjectural attacks on the supposed reliability and authenticity of the recordings—claims which are based on the wildest of speculation, rumor, and innuendo.  Atilla argues, for example, that

the recordings might have been tampered with and claims that "the Defense has not had the opportunity to determine through forensic analysis whether the recordings are genuine and unaltered." (Atilla Mem. at 3)  The supposition that the recordings might have been tampered with is rank speculation, unsupported by any articulated facts, and the contention that the defense has not had the opportunity to perform a forensic analysis is false.  Defense counsel has had exact digital copies of the recordings for more than six months, and they can analyze them in any way they wish.  Defense counsel also requested an opportunity to examine the original recordings and the Government, in response, requested the identity of the expert who would perform the examination; defense counsel never responded to that inquiry and never provided expert notice of a forensic examiner.  The fidelity of the recordings is not seriously at issue in this case.  *See, e.g.*, *Ruggiero*, 928 F.2d at 1304 (defendants "do not claim any specific instance of tampering or suspected tampering").  And Atilla's baseless claim that the United States Government is acting as some unidentified individual's or group's "unwitting agent" is categorically false.  This case was brought as part of a long-running, independent, national security investigation conducted by the Federal Bureau of Investigation.  As reflected in earlier filings, the Government expects the evidence at trial will show that the recordings obtained as part of that investigation are strongly corroborated by mountains of other investigative evidence, including financial records, the results of email search warrants, and witness interviews.

More importantly, however, Atilla's attacks are at best issues for the jury to consider in determining the weight it should accord the recordings, not the admissibility of the recordings.  *See Tropeano*, 252 F.3d at 661 ("Any doubts raised by such a challenge [to the reliability of recordings] would, however, go to the weight to be given to the tapes by the jury, not to their admissibility."); *Ruggiero*, 928 F.2d at 1304; *Fuentes*, 563 F.2d at 532; *Hemmings*, 482 Fed.

App'x. at 643; *United States* v. *Knohl*, 379 F.2d 427, 440-41 (2d Cir. 1967).  They are no basis to exclude relevant and highly probative evidence.

Atilla complains first that the recordings will not be authenticated under Rule 902(3) as foreign documents signed or attested by a person authorized by a foreign country's law to do so and accompanied by a certification of the genuineness of the signature and official position of the signer or attester.  (Atilla Mem. at 4).  But the bases cited by Atilla are not the exclusive means by which the Government can authenticate the recordings.  Indeed, foreign documents routinely are authenticated under grounds other than Rule 902(3).  As the Second Circuit held in *Pluta*, "[a] document which is of a type that could be self-authenticating but which does not meet all the requirements of Rule 902 may nonetheless be authenticated by any means appropriate under Rule 901."  176 F.2d at 49-50.

In *United States* v. *Prevezon Holdings Ltd.*, Judge Pauley rejected an argument virtually identical to the one Atilla advances concerning criminal investigative records from Russia. Judge Pauley held that:

> The Government can authenticate the Criminal Case File for non-hearsay purposes through the . . . testimony of Mr. Gorokhov who, among other things, will describe the circumstances by which he accessed and copied the Criminal Case File onto SD cards.  A Department of Homeland Security agent will also testify that the hard drive used at trial contains accurate copies of the SD cards and their content.

319 F.R.D. 459, 462-63 (S.D.N.Y. 2015); *see also United States* v. *Gasperini*, 16 Cr. 441 (NGG), 2017 WL 3140366, at *6 (E.D.N.Y. July 21, 2017) (rejecting authenticity objection to foreign evidence where the Government "will authenticate the hard drives through the testimony of an Italian law enforcement officer involved in their seizure").  Indeed, if Atilla's argument were correct, the very government that was the subject of the Turkish corruption investigation would hold an absolute veto over the admissibility of the evidence gathered during that

investigation in a United States court, notwithstanding the availability of one or more witnesses with first-hand knowledge to authenticate the records.

Atilla also characterizes the recordings as "stolen" and "improperly delivered" to the United States.  (Atilla Mem. at 4).  This not only is mere speculation, but also legally irrelevant. Even if it were true, the argument has nothing to do with authenticity.  If the alleged theft were part of state action by the United States, it might be relevant to a motion to suppress made by a person having a protected privacy interest; but Atilla has never moved to suppress the recordings, has no personal privacy interest in most of them, and there was no state action involved here.

Atilla next complains that the recordings are not all of the recordings, and argues that the rule of completeness precludes admission of the recordings that are available.  (Atilla Mem. at 5).  None of Atilla's arguments finds any purchase in the law or facts.  Indeed, the rule of completeness generally is a basis for an adverse party to *admit* evidence, not a basis for exclusion.  *See United States* v. *Watts*, 934 F. Supp. 2d 451, 480 (E.D.N.Y. 2013) ("As a basis on which to *admit* evidence, Rule 106 does not support precluding the government from introducing Serrano's recordings." (emphasis in original)); 1-106 Weinstein's Federal Evidence § 106.02 ("Rule 106 does not prohibit admission of an incomplete document.  Instead, it allows the party against whom the document is introduced to place the remainder in evidence.").  Moreover, Atilla does not challenge the completeness of any particular recording.  Rather, he contends that recordings of hundreds of calls produced in discovery should be excluded because of Atilla's speculative contention that there may have been exculpatory material in other, unspecified calls. (Atilla Mem. at 5-6).  The law is clear, however, that recordings are admissible notwithstanding the absence of additional recordings or, indeed, notwithstanding that portions of the recordings

themselves may be inaudible.  In *Fuentes*, for example, a confidential source had a series of both recorded and unrecorded meetings with the defendants.  563 F.2d at 529-30.  The recorded conversations were properly admitted.  *Id.* at 531.  In *Hemmings*, the Government offered recordings of meetings made by a confidential source, which the district court admitted over defense objection.  The Second Circuit affirmed, despite the fact that portions of the recordings were inaudible.  482 Fed. App'x. at 642-43.

The two district court cases upon which Atilla relies, *United States* v. *Yevakpor*, 419 F. Supp. 2d 242 (N.D.N.Y. 2006) and *Eid* v. *Saint-Gobain Abrasives, Inc.*, 16 Civ. 12392, 2008 WL 2221977 (E.D. Mich. May 28, 2008), are neither binding nor applicable.  In *Yevakpor*, the defendant was charged with narcotics offenses after attempting to smuggle heroin from Canada.  During his border crossing, the defendant was recorded on security cameras within the customs facility, and the Government sought to offer three one-minute clips from these recordings, which were part of a larger, unpreserved series of at least 46 additional minutes of recordings.  419 F. Supp. 2d at 243-45.  The district court excluded the preserved three minutes, not because of the rule of completeness, but because of the inference the court drew that Customs had violated a duty to preserve evidence knowing that the video was relevant to impending criminal charges.  419 F. Supp. 2d at 246-49.  In other words, the exclusion was principally a discovery sanction for action by a U.S. federal agency.  Here, there is no contention whatsoever that the Government has selectively preserved or destroyed any evidence.  Indeed, the suppression of evidence on the basis of spoliation generally requires the defendant to show that the Government failed to preserve potentially useful evidence in bad faith.  *See California* v. *Trombetta*, 467 U.S. 479, 489 (1984); *United States* v. *Valenzuela-Bernal*, 458 U.S. 858, 867 (1982); *United States* v. *Morgenstern*, 933 F.2d 1108, 1116 (2d Cir. 1991); *United States* v. *Rastelli*, 870 F.2d 822, 833

11

(2d Cir. 1989).  And in *Eid*, a civil lawsuit, the district court excluded, without substantive

discussion or analysis, a recording of a conversation based on the fact that recording ended

before the conversation concluded and all three participants to the conversation were available as

witnesses.  2008 WL 2221977 at \*3.  Atilla points to no particular recording that incompletely

records the particular conversation at issue, nor any recording for which all participants are

available as witnesses.

Accordingly, Atilla's motion to preclude the recordings should be denied.  His claims, at

best, are jury arguments concerning the weight jurors should accord the evidence.

### III.    The Proposed Expert Testimony is Relevant and Admissible

Atilla also moves to preclude the Government from offering expert testimony on a

variety of subjects, relying almost exclusively on what he asserts to be the prejudicial effect of

such testimony.  His contentions are without merit, and the Government's experts should be

permitted to testify.

#### A.    Applicable Law

Federal Rule of Evidence 702 allows an expert to offer testimony in the form of an

opinion if the individual expert's "specialized knowledge will assist the trier of fact to

understand the evidence or to determine a fact in issue, as long as (1) the testimony is based upon

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and

(3) the witness has applied the principles and methods reliably to the facts of the case." FED. R.

EVID. 702.  An expert's testimony is admissible when (1) expert has "sufficient qualifications to

testify," *Humphrey* v. *Diamant Boart, Inc.*, 556 F.Supp.2d 167, 174 (E.D.N.Y. 2008) and (2) the

proffered testimony has a "sufficiently reliable foundation." *Davis* v. *Carroll*, 937 F.Supp.2d

390, 412 (S.D.N.Y. 2013) (quoting *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256,

265 (2d. Cir. 2002)).  "The Rules of Evidence provide a liberal standard for the admissibility of

expert testimony," *United States* v. *Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003), and the Second

Circuit has held numerous times that expert testimony can be helpful to inform the jury about

concepts involved in the trial that are "beyond the ken of the average juror." *United States* v.

*Lombardozzi*, No. S1 02 Cr. 273 (PKL), 2003 WL 1907965, at *4 (S.D.N.Y. Apr. 17, 2003); *see

also United States* v. *Amuso*, 21 F.3d 1251, 1264 (2d. Cir. 1994).

This standard requires a "common sense inquiry into whether the untrained layman

would be qualified to determine intelligently and to the best possible degree the particular issue

without enlightenment from those having a specialized understanding of the subject involved in

the dispute." *United States* v. *Locascio*, 6 F.3d 924, 936 (2d. Cir. 1993). Undoubtedly, "expert

witnesses are often uniquely qualified [in] guiding the trier of fact through complicated morass

of obscure terms and concepts." *United States* v. *Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

However, as with all evidence, the Court retains the discretion to exclude expert testimony when

its probative value is "substantially outweighed by the danger of unfair prejudice." *Dukagjini*,

326 F.3d at 51-52.

Courts in this District and Circuit repeatedly have "approved the use of expert testimony

to provide juries with background on criminal organizations," *United States* v. *Farhane*, 634

F.3d 127, 159 (2d Cir. 2011), in particular "to help explain the operation, structure, membership,

and terminology" of such organizations. *United States* v. *Mustafa*, 406 F. App'x 526, 528 (2d

Cir. 2011). Consistent with this case law, courts around the country have similarly been

unanimous in admitting similar expert testimony in cases alleging violations of the U.S. embargo

on Iran. *See, e.g.*, *United States* v. *Vaghari*, 735 F. Supp. 2d 197, 203 (E.D. Pa. 2010) (admitting

testimony of expert with "practical and academic experience in the area of Iran sanctions" "to

testify about trans-shipment as a modus operandi in evading such sanctions"); *United States* v.

*Lahiji*, No. 3:10-CR-506-(1, 2)-KI, 2013 WL 5963033, at *5 (D. Or. Nov. 7, 2013) (admitting expert testimony "about the governance of Iran, the role of ayatollahs, the payment of taxes to them, how ayatollahs can divert money"); *United States* v. *Banki*, No. S1 10 CR. 08 (JFK), 2010 WL 2076770, at *2 (S.D.N.Y. May 25, 2010) (in Iranian sanctions prosecution, admitting expert testimony regarding "the operation of the alleged hawala").

### B.   Application

#### 1.   The Expert Testimony of Mr. Dubowitz and Dr. Schanzer is Admissible

The Government proposes to offer Mark Dubowitz as an expert in the United States' sanctions on Iran.  In that regard, Mr. Dubowitz will testify about the identities of the designated entities and individuals who are involved in this case, the evolution of U.S. sanctions on Iran, and the Iranian actions both that prompted those evolutions and that came in response.

Mr. Dubowitz's testimony will be directly relevant to the allegations in this case.  First, testimony about the identities of designated individuals and their roles in the Iranian economy and other designated institutions is critical to the jury's understanding of the scheme alleged in the Indictment.  Atilla is not charged with a simple illicit transfer to or from a Specially Designated National ("SDN").  He is charged with participating in a massive fraud designed to launder proceeds of Iranian oil sales through the accounts of Iranian banks, to the accounts of front companies such as those controlled by Zarrab, and on to exchange houses in Turkey and the UAE, where those funds could be directed by Iran without fear of international restriction. Understanding, for example, the relationship between the National Iranian Oil Company ("NIOC"), the Central Bank of Iran, and private Iranian banks will be crucial to the jury's understanding of the significance of meetings and other events charged in the Indictment.  *See, e.g.*, Ind. ¶ 37 (alleging defendants' participation in meetings with the Governor of the Central Bank of Iran and Mahmoud Nikousokhan, the finance director of NIOC); ¶ 39 (alleging

defendants' participation in meetings with the Iranian Minister of Oil, the managing director of NIOC, and others).

The fact that many of these individuals and the entities for which they worked have connections to the Iranian Revolutionary Guard Corps ("IRGC") is simply reflective of the fact that the IRGC plays an outsized role in the Iranian economy, and that it controls a wide range of entities for the express purpose of funding its illicit activities. The Iranian organizers of the scheme included high-ranking government officials, many of whom have or had some role with the IRGC. It is impossible to disaggregate the defendants' actions in support of the Government of Iran from the role of the IRGC in those entities, and the Court need not excise it from the case.

Similarly, Mr. Dubowitz's testimony about the reasons for the imposition of sanctions and their evolution is equally critical to understanding the charged scheme. As described in the Indictment, the defendants' scheme evolved significantly in response to changes in the law applicable to sanctions. *See, e.g.*, Ind. ¶ 44 (describing change in methods of conspiracy "[i]n response to the broadened prohibition against the supply of gold to include private Iranian companies and individuals"). Some of these changes were communicated directly to Atilla in meetings with officials from the U.S. Department of the Treasury. *See, e.g.*, Ind. ¶¶ 47, 55. The Government expects that Mr. Dubowitz will describe how changes in the sanctions laws arose both to target specific sectors of the Iranian economy and to prevent newly discovered Iranian methods of evasion. Thus, understanding the reasons why the sanctions were imposed is both necessary to explain members of the conspiracy's actions in changing the scheme and to help the jury understand why the law was different at different points during the charged timeframe.

Iran's response to the sanctions is equally important. While the defendant protests the use of the term "Economic Jihad," that is the term used by the Iranian government to refer to its

scheme of sanctions evasion.  The Government expects that Mr. Dubowitz will testify that Ayatollah Ali Khamenei declared the "Economic Jihad" in a speech in March of 2011, for the stated purpose of violating, evading, and avoiding sanctions on the Iranian economy.  While the Iranian purpose is relevant in and of itself, for the reasons noted above, *see supra* p. 4, the timing of that declaration bears substantially on the events charged in the Indictment.  As discussed above, the Government will introduce exhibits showing that Zarrab invoked the "Economic Jihad" in describing his scheme later in 2011, and the evidence will prove that the scheme to launder Iranian oil funds out of Halk Bank began soon after.  Placing these actions in context and identifying why terms like "Economic Jihad" would have particular significance to the conduct charged in this case is both highly relevant to the jury's understanding of the defendants' scheme and is rooted in the facts of the case, rather than injecting issues that otherwise would not arise.

Atilla devotes almost his entire opposition to Mr. Dubowitz's testimony to arguing that references to terrorism would be unduly prejudicial.  While Iran's state sponsorship of terrorism is simply a necessary fact in this trial (it provides the legal basis for designations of certain individuals and entities, and it explains the timeline for the adoption of differing sanctions laws and regulations), the Government recognizes the need to avoid undue prejudice, and will limit such references during Mr. Dubowitz's testimony to those that have a direct relationship with particular aspects of U.S. sanctions laws relevant to this case.  In particular, the Government will seek to avoid reference to specific acts of terrorism, except as necessary to identify particular dates as being relevant.  Moreover, as the Government has already noted, any possibility of prejudice can readily be cured by a limiting instruction that Atilla is not charged with a terrorism offense or participating in terrorism.  *See supra* p. 4.

Instead, Atilla suggests that he will stipulate to the bare minimum facts in order to avoid any discussion of Iran's actions in this trial.  But the fact that Atilla played a central role in financing Iran's illicit activities through the scheme to launder its funds out of Halk Bank is not unfairly prejudicial—it is central to the case.  As the Court recognized in denying bail for Atilla, "Iran continues to be the world's leading state sponsor of terrorism and plays a significant role in destabilizing the Middle East region."  (Tr. of Aug. 15, 2017 Conf. at 33-34).  Nothing in Rule 403 or applicable case law entitles Atilla to sanitize his conduct by stipulation, thereby concealing from the jury the nature of the entities he helped fund.  "[T]he prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away."  *Old Chief v. United States*, 519 U.S. 172, 189 (1997).  The Government introduces evidence "not just to prove a fact but to establish its human significance, and so to implicate the law's moral underpinnings and a juror's obligation to sit in judgment[,] . . . to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault."  *Id.* at 187-88.

Atilla's motion to preclude the expert testimony of Dr. Jonathan Schanzer should also be denied.  Dr. Schanzer is expected to testify on the relationship between the Republic of Turkey and Iran, Turkey's role in Iran's sanctions evasion efforts, patterns of financial activity that are consistent with sanctions evasion, and the role and usage of U.S. dollars as a standard currency for pricing and settlement of transactions involving precious metals and petroleum products.

Dr. Schanzer's proposed testimony is both "beyond the ken of the average juror" and helpful to the jury to understand other evidence that will be introduced.  As set forth in the indictment and in the Government's memorandum of law in support of its motions *in limine*, the charged offenses took place in the context of geopolitical and macroeconomic events in Turkey,

the UAE, and Iran.  The sanctions-violating transactions at issue themselves took place in international commerce, in the form of international wire transfers and international gold shipments.  The Indictment alleges that the scheme was structured in significant part, not only to violate U.S. sanctions against Iran, but also to manipulate Turkey's own economic figures. Expert testimony concerning the political and economic relationships between Turkey and Iran, the role of various government agencies and officials in those relationships—including, for example, the role of the Turkish Ministry of the Economy—the meaning and relevance of various economic indicators implicated in the transactions (export figures, trade deficits, current accounts, and the like), and how certain economic indicators reflected the charged conduct all contribute to the jury's understanding of the meaning and significance of other evidence at trial. *See, e.g.*, *Mustafa*, 406 F. App'x at 528 (The court "repeatedly has approved the admission of expert testimony in organized crime cases to help explain the operation, structure, membership, and terminology of organized crime families.").

Atilla argues that this testimony nonetheless should be excluded because it does not bear directly on his own role.  (Atilla Mem. at 15).  But that is not required for expert testimony to be admissible.  Atilla concedes, for example, the expert testimony by U.S. banking officials about correspondent banking, sanctions compliance, and anti-money laundering is relevant and admissible (Atilla Mem. at 18), even though such testimony will not speak to Atilla's personal role in the offense conduct.  Atilla also argues that Dr. Schanzer's testimony will be prejudicial because the jury will assume that Atilla himself must be responsible as an employee of a Turkish government-owned bank.  (Atilla Mem. at 15).  But this is like arguing that expert testimony about organized crime or about terrorist organizations will cause the jury to automatically assume that the charged defendants are guilty.  It does not, and Atilla will be free to argue that it

does not, or to request an appropriate limiting instruction from the Court.  *See, e.g.*, *United States* v. *Benkahla*, 530 F.3d 300, 308-310 (4th Cir. 2008) (affirming admission of expert testimony about radical Islam and jihad, including the history of the Taliban government in Afghanistan, in a false statements prosecution).

Atilla also argues that proposed expert testimony about the role of the U.S. dollar in international petroleum transactions is irrelevant because it is not alleged in the Indictment. (Atilla Mem. at 16).  First, the Indictment alleges, and the discovery discloses, U.S. dollar payments made to a Turkmeni government-owned natural gas company.  Such testimony is relevant background for the petroleum-related transactions that underlie and fueled the charged conspiracy and is relevant to what conduct of his co-conspirators was foreseeable to Mr. Atilla. *See United States* v. *Milstein*, 401 F.3d 53, 72 (2d Cir.2005) ("Foreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators.") (citing *United States* v. *Ben Zvi*, 242 F.3d 89, 97 (2d Cir. 2001)).

*Unites States v. Cabrera*, the case upon which Atilla principally relies to argue the contrary (Atilla Mem. at 15-16), does not support his position.  In *Cabrera*, the Ninth Circuit reversed a narcotics conviction based on the investigating officer's repeated references at trial to Cuban drug dealers, on the grounds that "[a]ppeals to racial, ethnic, or religious prejudice during the course of trial violated a defendant's Fifth Amendment right to fair trial."  222 F.3d 590, 594 (9th Cir. 2000)).  Atilla's equating overt appeals to prejudice with expert testimony on Iran, Turkey, and the details of measures taken to evade sanctions by defendants who were geographically located in these countries is without merit.

For the foregoing reasons, the Government respectfully submits that the defendant's motion to preclude the testimony of Dr. Schanzer should be denied.

### 2.     The Expert Testimony of Ms. Palluconi[3] is Admissible

Atilla moves to preclude testimony from a representative of OFAC from offering expert

testimony from testifying about "terrorism, 'Economic Jihad,' or any other related topic as a way

to explain how or why OFAC identified and designated any particular Iranian entity as subject to

US sanctions."

Ms. Palluconi will principally testify concerning (1) when the applicable sanctions laws

were enacted, issued, or adopted and the fact that they were made publicly available; (2) their

general content, in a manner that does not attempt to describe the elements of an offense for

violating such laws but that provides sufficient context for the jury to understand other evidence

that will be introduced at trial; (3) when OFAC designated relevant individuals and entities as

SDNs, under what sanctions regime such designations were made, and the fact that such

designations are publicly available; and (4) when OFAC identified certain individuals or entities

as within the definition of "Government of Iran" under the Iranian Transactions and Sanctions

Regulations, 31 C.F.R. Part 560, and that fact that such identifications are publicly available.

As described in the Government's memorandum of law in support of its motions *in

limine*, the trial evidence is expected to show how the defendants and their co-conspirators

reacted to increasingly restrictive sanctions against the Government of Iran and certain categories

of financial transactions with or involving the Government of Iran and designated Iranian

entities.  Those increasingly restrictive sanctions certainly are "beyond the ken of the average

juror," and establishing for the benefit of the jury which rules and designations became effective,

---

[3] In his motion, Atilla describes an "unnamed expert witness, who would supposedly testify regarding OFAC."  (Atilla Mem. at 17).  Prior to Atilla filing the motion, the Government identified Lisa Palluconi from the U.S. Department of the Treasury, Office of the General Counsel as its proposed expert witness concerning the applicable statutes, executive orders, regulations, identifications, and designations.

when they became effective, and under what sanctions authorities they became effective will greatly assist the jury in understanding evidence about the communications, intentions, and conduct of the defendants and their co-conspirators.  For example, on January 2, 2013, Congress enacted the Iran Freedom and Counter-Proliferation Act ("IFCA"), 112 Pub. L. 239, Title XII, Subtitle D (Jan. 2, 2013) (codified at 22 U.S.C. §§ 8801 *et seq*.), which, among other things, strengthened an existing sanctions provision concerning the sale or supply of U.S. currency or precious metals to the Government of Iran by subjecting foreign banks that knowingly conducted or facilitated a significant transaction for the sale or supply, directly or indirectly, of precious metals to Iran to possible punishment.  *Id*. § 1245(c).  This provision became effective 180 days after enactment, or July 1, 2013.  Expert testimony explaining the timing and general content of this law will greatly assist the jury in understanding evidence concerning the co-conspirators' communications, intentions, and conduct relating to the export of gold from Turkey with respect to these time periods.

Similarly, the expert testimony will illustrate that the basis upon which an Iranian entity was designated or identified had significance, especially for financial institutions under the applicable statutes.  Whether an Iranian bank was designated as an SDN under the Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. Part 544, or was identified as a financial institution owned by the Government of Iran under Executive Order 13599, 77 Fed. Reg. 6659 (Feb. 5, 2012), had different consequences under the applicable regulatory regime, *see, e.g.*, 31 C.F.R. §§ 561.201(a)(5); and is information that was readily ascertainable by, and had sanctions significance to, foreign financial institutions—and in turn informed Atilla and his co-conspirators' actions with respect to the offense conduct.

Accordingly, the motion to preclude Ms. Palluconi's testimony should be denied.

### 3.    The Testimony of Bank Witnesses is Admissible and Cannot Be Precluded By a Purported Willingness to Stipulate

Atilla does not contest that proposed expert testimony by bank officials concerning sanctions compliance, anti-money laundering practices, correspondent banking, and other topics is relevant and admissible.  Rather, he asserts that the substance of such testimony can be the subject of a stipulation.  (Atilla Mem. at 18).  However, there is no basis to limit the Government's ability to present the jury with relevant, admissible, and helpful testimony simply because the defendant is willing to enter into a stipulation concerning all or some part of that testimony.  As discussed above, "the Supreme Court has noted specifically that the government generally has a right to present evidence, rather than accept a stipulation, to establish the 'human significance' of the fact and 'to implicate the law's moral underpinnings.'"  *United States* v. *Polouizzi*, 564 F.3d 142, 152-53 (2d Cir. 2009) (quoting *Old Chief*, 519 U.S. at 187-88. Moreover, Atilla has not yet specifically identified the content of any proposed stipulation and the Government is not in a position to evaluate the sufficiency of any stipulation.  Accordingly, the motion should be denied.

## CONCLUSION

Accordingly, the Government respectfully requests that the Court deny the defendant's

motions *in limine*.

Dated:  New York, New York
        November 6, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

by:    _____/s/_____
       Michael D. Lockard/Sidhardha Kamaraju/
       David W. Denton, Jr.
       Assistant U.S. Attorneys
       Dean C. Sovolos
       Special Assistant U.S. Attorney
       (212) 637-2193/6523/2744/2213