# The Law Firm
# Fleming . Ruvoldt PLLC

**Cathy Fleming**
**(201) 518-7907 (direct)**
**cfleming@flemingruvoldt.com**

250 Moonachie Road
Suite 501
Moonachie, NJ 07074
(201) 518-7878

1700 Broadway, 28th floor
New York, NY 10019
(212) 706-1850

December 13, 2017

Honorable Richard M. Berman
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 17B
New York, NY 10007-1312

      Re:    <u>United States v. Mehmet Hakan Atilla, et al,</u> S4 15 Cr. 867 (RMB)

Dear Judge Berman:

      Defendant Mehmet Hakan Atilla moves for a mistrial based on the Government's continuous elicitation of inadmissible, confusing and overly prejudicial evidence, despite repeated objections by defense counsel, during the testimony of Huseyin Korkmaz on December 11, 2017 and December 12, 2017, and based as well upon the additional reasons set forth herein. (To meet our filing deadline, we based this motion on the first two days of testimony; we will supplement with the third day of testimony.)

      The Korkmaz testimony related to a 2012-2013 law enforcement investigation in Turkey, in which he participated as a Turkish law-enforcement officer. The investigation initially involved allegations of gold smuggling, money laundering, and conducting of a criminal enterprise. It later included within its scope allegations of bribery. It culminated in December

1

2013 with multiple arrests and the contemporaneous issuance of a 500-page Turkish investigative report.

Defendant Atilla was not charged with any crime in Turkey. There was no evidence that he had either paid or received a bribe. He was not involved in many of the activities investigated or described in Court. But for the better part of two days, Mr. Korkmaz provided testimonial opinions, conclusions, speculation and recitations derived solely and directly from the overwhelming number of hearsay statements and hearsay documents contained or referenced in the Turkish investigative report or otherwise based upon the Turkish investigation that was conducted by many people besides him.

As discussed below, admission of this testimony violates the Confrontation Clause of the United States and defies established evidence rules and case law interpreting these rules. The defendant has been prejudiced to such a degree that the fundamental fairness of the trial has been irreparably undermined. Mistrial is the only appropriate remedy.

A.   <u>Improper Korkmaz Testimony on the First Day</u>.

Mr. Korkmaz is a former Turkish police officer who was involved in an investigation of an organization led by Reza Zarrab. During the course of his December 11, 2017 appearance, the Government repeatedly elicited testimony of his "understanding" of what was about to happen, or what was happening, as well as his "understanding" of purposes of meetings or events. His "understandings" were often based on recorded phone conversations in which he did not participate but subsequently reviewed. (See, for example, Tr. at 1304, 1306-07). Other times, he explained his understanding of the significance of photographs taken by others during physical surveillances in which he was not a participant. (Tr. at 1296, 1300, 1301). He offered his understanding of documents seized during searches where he was not present. (Tr. at 1573,

2

1578, for example). He also improperly testified to his opinion – based on the entirety of the investigation conducted in Turkey – of the respective roles of various members of the alleged criminal organization. (See, for example, tr. at 1282).

Mr. Korkmaz's testimony was improper *ab initio*, when, over objection, he was asked whether he "became familiar with an investigation involving Reza Zarrab, Mehmet Hakan Atilla, and others." (Tr. at 1280). The investigation resulted in some 26 arrests, but <u>not</u> in Mehmet Hakan Atilla's arrest. It was an investigation of criminal activity in Turkey, for Turkish crimes under Turkish law.

Mr. Korkmaz went on to testify as to the roles of various people. He testified about, for example, "the organization that was being led by Reza Zarrab," "Zafer Caglayan and Suleyman Aslan were acting as leaders." (Tr. at 1280). Further, he was asked, "Based on your investigation, did you have an understanding of who number one was" – and responded "Yes," and named the current President of Turkey (Tr. at 1282). The repeated testimony implicating high level officials in Turkey based on hearsay evidence is inappropriate on many levels. It is impermissible under Fed. R. Evid. 702; it is irrelevant under Fed. R. Evid. 401; and it is overly prejudicial to the defendant on trial under Fed. R. Evid. 403.

The prosecutor next, over objection, adduced testimony that Mr. Suleyman Aslan was the leader of an organization under investigation in Turkey, and that there were "others at Halkbank whose conduct was within the scope of the investigation," namely "Mr. Hakan Atilla, Levant Balkan, Hakan Aydogan" (none of whom were charged) (Tr. at 1290). The prosecution then elicited hearsay testimony concerning what the investigation showed about people receiving bribes -- three of whom were never even charged in Turkey. The charges against the fourth (Aslan) were thereafter dismissed. (Tr. at 1290-1292).

The prosecution then asked about the "principal investigative techniques" in the investigation. According to Mr. Korkmaz, they were:

> Identification of communications and interception of such communications, surveillance through technical tools, physical surveillance, security camera footage, analysis of emails, documents that were obtained through institutions, auditors and expert reports, pieces of evidence that were seized during the searches within the operation, and also the digital evidence that were seized during the operation.

(Tr. at 1293).

Thereafter, the prosecution had Mr. Korkmaz identify and testify about images obtained during the investigation, including at least one used in a "deposition" of Mr. Aslan's wife in Turkey. (Tr. at 1297).

The witness also testified about certain of his conclusions. For example, he said that some money involved in the investigation was to be given to Bilal Erdogan, the son of the then-Prime Minister. (Tr. at 1323). Korkmaz also opined that a resumption of the gold trade had occurred after July 2013, at a time when the United States sanctions on Iranian gold trading were in full effect. (Tr. at 1323).

At an ensuing break, the defense orally moved for a mistrial. The Court asked the Government to explain the relevance to Mr. Atilla of the testimony to that point. AUSA Lockard said "I think he [*i.e.*, Korkmaz] sort of broadly described how these payments relate to the Iranian oil proceeds. And that's what we're going to focus in throughout the rest of the testimony." (Tr. at 1327). It is, of course, undisputed that Atilla never solicited nor received any bribes, nor is there any evidence that he had any knowledge of bribes. But that is not what happened.

Following the break, Mr. Korkmaz resumed his testimony about the law enforcement "operation" conducted in Turkey on December 17, 2013: "searches … conducted in homes or business places of suspects … capture and detention of suspects," and "individuals who were questioned as part of the operation." (Tr. at 1373).  Thereafter, again over objection, the prosecution elicited that Mr. Korkmaz had been jailed in Turkey, had obtained "some" of the investigative file from an unnamed Turkish prosecutor and others from a Turkish law enforcement lab technician (without explaining Turkish court orders deeming the prosecution improper and null) and – remarkably – eliciting his knowledge of perceived "risks" of his returning to Turkey:

> Q:   How, if at all, did the risks that you perceived from returning to Turkey change as a result of the additional steps you took by leaving Turkey and bringing the evidence with you?
>
> A.   During that time, in the public arena, in the press, there were news published about individuals in custody who were being tortured.  I was aware of the bad treatments that I would be subject to, and I could call that torture, actually.  The high risks that I would face if I were to be extradited, even through official channels, if I were to be extradited, I knew what I would face. But what made me really uneasy in these countries was anything that could be done against me through unofficial means, and for that reason, I was not going out of the house much in these countries.

(Tr. at 1391).  Of course, none of the would-be perpetrators of this "torture," which Mr. Korkmaz learned of through the press, were identified.  Nor were these "risks" in any way connected to Mr. Atilla.

B.   <u>The Second Day of Testimony</u>.

Mr. Korkmaz's direct examination continued on December 12, 2017.  It was characterized once again by conclusory statements riddled with hearsay and opinion and absence of any personal knowledge.

Among other problems with the evidence:

5

(a) Mr. Korkmaz did not even attempt to identify a chain of custody for any of the evidence he brought with him without authorization from Turkey;

(b) He offered opinion evidence on suspects' roles and on the significance of various locations (*e.g.*, "Orient Bazaar," tr. at 1569), impermissible under Fed. R. Evid. 702; *see United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005);

(c) He repeatedly testified to hearsay – what he was told by others, in essence -- thereby orally presenting the Turkish police report to the jury. For example, he testified about the fruits of searches at various locations (Tr. 1569, 1573-1575) without indicating any personal involvement in the searches or in the recovery of the materials introduced into evidence through his testimony;

(d) He repeatedly testified to what he had learned from the investigation. (See, for example, tr. at 1576, 1592, 1593).

All of this testimony stemmed from the same Turkish investigation that was dismissed by a Turkish court -- an investigation as to which defendant Atilla was never charged, making the entire Turkish report and investigation irrelevant, but highly prejudicial, to him.

C.    Police Reports Such as the Turkish Investigation Report Are Inadmissible Hearsay.

Rule 803(8) of the Federal Rules of Evidence provides that police reports, when offered by the Government in a criminal case, are inadmissible hearsay. As early as 1977, the Second Circuit found that Congress's purpose in enacting the exclusion in Rule 803(8) was to prevent the Government from proving its case against an accused through out-of-court reports and documents prepared by law enforcement personnel. *See United States v. Oates*, 560 F.2d 45, 72 (2d Cir. 1977) ("We thus think it manifest that it was the clear intention of Congress to make evaluative and law enforcement reports absolutely inadmissible against defendants in criminal

6

cases."). Yet, Mr. Korkmaz repeatedly testified about events, theories, and conclusions evinced in and drawn from the Turkish investigative report.

There is more than a little irony in the fact that Mr. Korkmaz has testified so extensively about Turkish criminal procedures. His production of evidence in this courtroom was made possible by his own violation of Turkish criminal law. He simply stole the Turkish evidence. Without any authorization, he obtained some of the evidence from a Turkish prosecutor and other items from a Turkish digital evidence lab technician. (Tr. 1385-86). Stolen evidence in hand, he fled from Turkey, made his way to the United States and delivered the purloined materials to the U.S. Attorney in the Southern District of New York. The latter office accepted them, apparently without reservation.

Fed. R. Evid. 602 permits the introduction of testimony only where the witness has personal knowledge of the matters underlying the testimony. Mr. Korkmaz had no (or little) personal knowledge of the events to which he was testifying.  He was not present at the searches; he did not monitor the wiretaps; he did not take the photographs; he did not perform the surveillances. His testimony constituted an oral police report. It epitomizes the reasons why the Federal Rules of Evidence prohibit the admission of such a document and such testimony.

Furthermore, the Government's presentation of the Turkish investigation and the underlying report were designed to sensationalize the case.  The report itself is inarguably barred from evidence.  Yet, when the Government elicited testimony from that report, it paraded the 500-page document itself in front of the jury, as if to demonstrate not only its heft but also its seriousness.

7

D. The Testimony of Mr. Korkmaz Is Impermissible Lay Witness, and Law Enforcement Witness, Testimony

In *Garcia*, 413 F.3d at 210-12 (2d Cir. 2005), the Court held that it is erroneous "to allow law enforcement witnesses to express opinions as to defendants' culpability based on the totality of information gathered in the course of their investigations." 413 F.3d at 211. That, however, is precisely what Mr. Korkmaz did in response to Government questioning. He continually relied upon the information contained in the Turkish investigative report to formulate his responses to that questioning. In so doing, he improperly invaded the province of the jury. *See also*, *United States v. Kaplan*, 490 F.3d 110, 118-119 (2d Cir. 2007); *United States v. Yakabov*, 712 F.2d 20, 26 (2d Cir. 1983).

In *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004), the Court remarked upon the insidious result that would arise from permitting law enforcement agents to opine on issues properly within the province of the jury. Rejecting a Government argument that such testimony is permissible as opinion testimony under Fed. R. Evid. 701(b), the Court declared:

> The argument fundamentally misunderstands Rule 701(b). Were it to be accepted, there would be no need for the trial jury to review personally any evidence at all. The jurors could be "helped" by a summary witness for the Government who could not only tell them what was in the evidence but tell them what inferences to draw from it. That is not the point of lay opinion evidence.

*Grinage*, 390 F.3d at 750.

In the present case, Mr. Korkmaz regularly crossed the line established in the above-discussed cases. As a result, the jury has been irrevocably tainted. This Court should therefore grant the mistrial application.

E. The Confrontation Clause of the Constitution Bars This Testimony.

In *Crawford v. Washington*, 541 U.S. 36, 55 (2004), the Supreme Court held that the Confrontation Clause of the Constitution barred the admission of out-of-court testimonial

8

statements where the defendant has no opportunity to cross-examine the witness. Here, the testimony of Mr. Korkmaz is premised upon the statements and observations of others in Turkish law-enforcement who, with personal knowledge, provided information for the Turkish report.

Thus, when Mr. Korkmaz purports to testify about documents recovered in searches conducted by others (*e.g.*, Tr. at 1297-98, 1570) or surveillances he did not personally conduct (Tr. at 1316), he is improperly providing what should have been testimonial statements from others. More generally, whenever he testifies about findings or conclusions or opinions derived from the Turkish report -- and his testimony is replete with such statements -- the Confrontation Clause prohibits the receipt of such testimony into evidence. The jury has now been tainted by the wholesale admission of this improper evidence. Mistrial is the only remedy.

F.   The Absence of any Rule 403 Analysis.

Mr. Korkmaz's speculative testimony about possible torture he might have faced in Turkey, admitted over defense objection, raised images of unlawful and sadistic violence that, he inferred, would have been inflicted upon him by certain of defendant Atilla's alleged co-conspirators in the Turkish government.  Despite a defense objection to this testimony under Fed. R. Evid. 403, the Court admitted it without balancing its probative value against the prejudicial impact.

The prejudicial impact is plain.  Associating the defendant with the specter of mindless and cruel political violence at the hands of his government-based alleged co-conspirators is almost guaranteed to inflame the jury against the defendant.  What's more, the testimony was introduced without any basis for a suggestion that Atilla could ever have foreseen the possibility that his supposed co-conspirators would act in such a reprehensible way.  Neither is there any

9

allegation in the indictment that any co-conspirator engaged or was prepared to engage in violence in order to fulfill the alleged objects of any conspiracy.

The probative value of this testimony, then, is nil. Its prejudicial impact is substantial. The jury cannot be expected to disregard or minimize what it has heard in this regard. Admission of this shocking testimony into evidence constitutes an additional reason why the declaration of a mistrial is now the only reasonable remedy.

G.    A Cautionary Instruction Would Be Insufficient to Undo the Harm.

"Where an inadmissible statement is followed by a curative instruction, the court must assume 'that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant.'" *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008), quoting from *Greer v. Miller*, 483 U.S. 756, 765 n.8 (1987). Here, of course, the presentation of inadmissible evidence was not inadvertent. Nor did it constitute an isolated statement; instead, it continued for the better part of Mr. Korkmaz's testimony. Given the time during which the jury was continuously exposed to this testimony, the likelihood is high that, in the words of the *Greer* Court, "the effect of the evidence would be devastating to the defendant." This is particularly true since, from Day 1 of this trial, the Government has exposed the jury to concepts such as Iranian terrorism and China-based conspiracies involving Reza Zarrab and other such irrelevancies that had no connection whatever to the defendant or to the charges in the indictment.

The circumstances here are akin to those facing the Court in *United States v. Aly*, 1989 WL 34039 (S.D.N.Y. Apr. 4, 1989). There, the Court dealt with a defendant's *in limine* motion

to exclude anticipated co-conspirator statements.  The Court determined that it would admit those statements provisionally, subject to connection.  If, however, that connection never materialized, the Court said that it would instruct the jury to disregard the hearsay "or, when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility . . . declare a mistrial if the defendant asks for it." At *1, *quoting* from *United States v. Geany* [sic], 417 F.2d 1116, 1120 (2d Cir.), *cert. denied*, 397 U.S. 1026 (1970).

Here, so much inadmissible and highly prejudicial evidence has already come before this jury that, as the *Aly* Court warned, a cautionary instruction would be "of doubtful utility."  The defendant therefore respectfully asks for a mistrial.

H.     The Failure to Authenticate Audio Recordings.

As of this writing, Mr. Korkmaz is still testifying on direct examination.  It is impossible to guess what he will be testifying about on that day. The defendant specifically reserves the right to orally object to any improper testimony, and to utilize any such impropriety as a further basis for this application.

But to date Korkmaz has failed to properly authenticate the audio recordings derived from the Turkish investigation, many of which were admitted into evidence here subject to authentication.  He testified that he had reviewed hundreds of recordings and/or transcripts, without identifying any one in particular that he had so reviewed. (Tr. 1079-1088).

Thus, the audio recordings, instead of being identified, were treated in an amorphous, collective fashion.  These recordings were the subject of defendant's motion *in limine* to preclude, or at a minimum for a hearing (Doc. 319).  The Court's pretrial ruling was that the Government would be permitted to use recordings so long as they could be authenticated.  That

11

has not occurred yet during the Korkmaz testimony. He has thus far failed to lay a proper foundation for the admission of any audio recording or any transcript of a recording.

Mr. Korkmaz never testified to having personal knowledge of the dates of any phone call. He never testified that he had listened to any particular call during the investigation. He has not testified to personal familiarity with the voices heard on the calls thus far. He has not proffered evidence about any chain of custody for the maintenance of any recording or transcript, or, for that matter, any other evidence. He has not addressed whether or how the recordings or their underlying metadata were protected from alteration. The Government, therefore, will either have to attempt to introduce authenticating testimony on his last day at trial or fail in its "subject to connection" obligation.

I.  Massive Amounts of Inadmissible Evidence was Admitted

The defense has periodically advised the Court, and sought relief from it on occasion, concerning the continuing Government proclivity for belated delivery of massive amounts of trial exhibits and 3500 material. The Government has regularly produced thousands of pages of documents, including quantities of untranslated Turkish materials, at the eleventh or twelfth hour. On December 12, 2017, the Government offered into evidence trial exhibits GX 605 through GX 614. They comprise over 7,000 documents, not counting a substantial quantity of emails contained in at least one email archive file. These documents are largely the result of the Turkish investigation.

For all the foregoing reasons, and for any additional reasons that may arise during Mr. Korkmaz's final day of direct examination, the defendant respectfully requests the granting of a mistrial in this matter.

Respectfully submitted,

| | |
|---|---|
| HERRICK FEINSTEIN LLP | FLEMING RUVOLDT PLLC |
| By: /s/ Victor J. Rocco<br>    Victor J. Rocco<br>    Two Park Avenue<br>    New York, New York 10016<br>    (212) 592-1400 | By: /s/ Cathy Fleming<br>    Cathy Fleming<br>    1700 Broadway, 28th floor<br>    New York, New York 10019<br>    (212) 706-1850 |
| McDERMOTT WILL & EMERY LLP | LAW OFFICES OF JOSHUA L. DRATEL |
| By: /s/ Todd Harrison<br>    Todd Harrison<br>    340 Madison Avenue<br>    New York, New York 10173<br>    212-547-5727 | By: /s/ Joshua L. Dratel<br>    Joshua L. Dratel<br>    29 Broadway, Suite 1412<br>    New York, New York 10006<br>    212-571-3792 |

cc:    All Counsel