ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA             :       **SUPERSEDING INDICTMENT**
                                     :
         - v. -                      :       S6 15 Cr. 867 (RMB)
                                     :
TÜRKİYE HALK BANKASI A.S.,           :
    a/k/a "Halkbank,"                :
                                     :
              Defendant.             :
                                     :
- - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   OCT 1 5 2019

### BACKGROUND

1.    The charges in this Indictment arise out of a
multi-year scheme by TÜRKİYE HALK BANKASI A.S., a/k/a
"Halkbank," the defendant (hereinafter, "HALKBANK"), a Turkish
bank majority-owned by the Government of Turkey, to violate and
evade U.S. national security controls against the Government of
Iran.  HALKBANK and its officers, agents, and co-conspirators
directly and indirectly used money service businesses and front
companies in Iran, Turkey, the United Arab Emirates, and
elsewhere to violate and to evade and avoid prohibitions against
Iran's access to the U.S. financial system, restrictions on the
use of proceeds of Iranian oil and gas sales, and restrictions
on the supply of gold to the Government of Iran and to Iranian
entities and persons.  HALKBANK knowingly facilitated the
scheme, participated in the design of fraudulent transactions

intended to deceive U.S. regulators and foreign banks, and lied to U.S. regulators about HALKBANK's involvement.

2.     High-ranking government officials in Iran and Turkey participated in and protected this scheme.  Some officials received bribes worth tens of millions of dollars paid from the proceeds of the scheme so that they would promote the scheme, protect the participants, and help to shield the scheme from the scrutiny of U.S. regulators.

3.     The proceeds of Iran's sale of oil and gas to Turkey's national oil company and gas company, among others, were deposited at HALKBANK, the defendant, in accounts in the names of the Central Bank of Iran, the National Iranian Oil Company ("NIOC"), and the National Iranian Gas Company.  Because of U.S. sanctions against Iran and the anti-money laundering policies of U.S. banks, it was difficult for Iran to access these funds in order to transfer them back to Iran or to use them for international financial transfers for the benefit of Iranian government agencies and banks.

4.     HALKBANK, the defendant, participated in several types of illicit transactions for the benefit of Iran that, if discovered, would have exposed HALKBANK to sanctions under U.S. law, including (a) allowing the proceeds of sales of Iranian oil and gas deposited at HALKBANK to be used to buy gold for the

benefit of the Government of Iran; (b) allowing the proceeds of sales of Iranian oil and gas deposited at HALKBANK to be used to buy gold that was not exported to Iran, in violation of the so-called "bilateral trade" rule; and (c) facilitating transactions fraudulently designed to appear to be purchases of food and medicine by Iranian customers, in order to appear to fall within the so-called "humanitarian exception" to certain sanctions against the Government of Iran, when in fact no purchases of food or medicine actually occurred.  Through these methods, HALKBANK illicitly transferred approximately $20 billion worth of otherwise restricted Iranian funds.

5.    Senior officers of HALKBANK, the defendant, acting within the scope of their employment and for the benefit of HALKBANK, concealed the true nature of these transactions from officials with the U.S. Department of the Treasury ("Treasury") so that HALKBANK could supply billions of dollars' worth of services to the Government of Iran without risking being sanctioned by the United States and losing its ability to hold correspondent accounts with U.S. financial institutions.

6.    The purpose and effect of the scheme in which HALKBANK, the defendant, participated was to create a pool of Iranian oil funds in Turkey and the United Arab Emirates held in the names of front companies, which concealed the funds' Iranian

3

nexus.  From there, the funds were used to make international payments on behalf of the Government of Iran and Iranian banks, including transfers in U.S. dollars that passed through the U.S. financial system in violation of U.S. sanctions laws.

**The Defendant**

7.  At all times relevant to this Indictment, HALKBANK, the defendant, was a foreign financial institution organized under the laws of and headquartered in Turkey.  The majority of HALKBANK's shares are owned by the Government of Turkey.  From approximately 2011 until 2014, Suleyman Aslan, a co-conspirator not charged as a defendant herein, was HALKBANK's General Manager (i.e., the chief executive).  From approximately 2011 until 2017, Mehmet Hakan Atilla, a co-conspirator not charged as a defendant herein, was HALKBANK's Deputy General Manager for International Banking, and was responsible for maintaining the bank's correspondent banking relationships, including its U.S. correspondent accounts, and for the bank's relationships with Iranian banks, including the Central Bank of Iran.  During their tenures, Aslan and Atilla were the executives principally responsible for communicating with Treasury's Under Secretary for Terrorism and Financial Intelligence and its Director of the Office of Foreign Assets Control ("OFAC") about HALKBANK's compliance with U.S. sanctions

4

against Iran.  From approximately 2011 until 2013, Levent
Balkan, a co-conspirator not charged as a defendant herein,
headed HALKBANK's Foreign Operations Department, which was
responsible for processing international banking transactions.
In undertaking the actions and agreements described below,
Aslan, Atilla, Balkan, and other officers and employees of
HALKBANK were acting within the scope of their employment and
for the benefit of HALKBANK.

        8.    At all times relevant to this Indictment,
HALKBANK, the defendant, was the sole repository of proceeds
from the sale of Iranian oil by NIOC to Turkey.  Principally as
a result of U.S. sanctions restricting the use of Iranian oil
proceeds, as of in or about 2012, billions of dollars' worth of
funds had accumulated in NIOC's and the Central Bank of Iran's
accounts at HALKBANK.

**The International Emergency Economic Powers Act**

        9.    The International Emergency Economic Powers Act
("IEEPA"), codified at Title 50, United States Code, Sections
1701 to 1706, confers upon the President authority to deal with
unusual and extraordinary threats to the national security and
foreign policy of the United States.  Section 1705 provides, in
part, that "[i]t shall be unlawful for a person to violate,
attempt to violate, conspire to violate, or cause a violation of

any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

10.  Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States" and declared "a national emergency to deal with that threat."

### The Iranian Transactions and Sanctions Regulations

11.  On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders").  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013 the Iranian Transactions and Sanctions Regulations, or "ITSR"), implementing the sanctions imposed by the Executive Orders.

12.   Title 31, Code of Federal Regulations, Section 560.204 of the ITSR prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale, or supply of goods, technology, or services to a third country knowing that such goods, technology, or services are intended for Iran or the Government of Iran, without a license from OFAC.

13.   The ITSR provide that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran.  See 31 C.F.R. § 560.427(a).

14.   The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.  See 31 C.F.R. § 560.203.

### Sanctions Concerning Proceeds of Iranian Oil Sales and the Supply of Gold to Iran

15.   On December 11, 2011, the National Defense Authorization Act for Fiscal Year 2012 was enacted (the "2012 NDAA"), requiring the imposition of sanctions on foreign

financial institutions—including banks and money service business, among others—following a determination by the President that a foreign financial institution violated certain prohibitions with respect to the Central Bank of Iran or another Iranian financial institution designated under the IEEPA.  These prohibitions applied to government-owned foreign financial institutions with respect to transactions for the sale or purchase of petroleum or petroleum products to or from Iran conducted or facilitated on or after 180 days from the enactment of the 2012 NDAA, unless the foreign country significantly reduced its volume of petroleum and petroleum products purchased from Iran.  These prohibitions included an exception for transactions for the sale of food, medicine, or medical devices to Iran.

16.  On July 30, 2012, the President issued Executive Order 13622 to take additional steps with respect to the national emergency declared in Executive Order 12957.  The President, among other things, imposed additional restrictions with respect to the sale of Iranian petroleum and petroleum products, authorizing the Secretary of the Treasury to impose sanctions on a foreign financial institution that knowingly conducted or facilitated any significant financial transaction with NIOC, the Naftiran Intertrade Company Ltd. ("NICO"), or the

Central Bank of Iran, or for the purchase or acquisition of petroleum or petroleum products from Iran, unless the President determined the foreign country had significantly reduced its volume of petroleum and petroleum products purchased from Iran pursuant to the 2012 NDAA.  The available sanctions included prohibitions and conditions on opening or maintaining U.S. correspondent and payable-through accounts of the foreign financial institution.  Exec. Order 13622, 77 Fed. Reg. 45897 (Jul. 30, 2012).

17.  Executive Order 13622 also authorized the Secretary of the Treasury to block property and property interests in the United States of any person who "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, NIOC, NICO, or the Central Bank of Iran, or the purchase or acquisition of U.S. bank notes or precious metals by the Government of Iran."  Exec. Order 13622, 77 Fed. Reg. 45897 (Jul. 30, 2012).  Executive Order 13622 prohibited any transaction that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate any of the prohibitions set forth in that order.

18.  On August 10, 2012, the Iran Threat Reduction and Syria Human Rights Act of 2012, codified at 22 U.S.C. §§ 8711 et

seq. (the "Iran Threat Reduction Act" or "ITRA"), extended the sanctions against Iranian oil sales.  The ITRA amended the 2012 NDAA by imposing a "bilateral trade" restriction on Iranian oil proceeds:  Financial transactions by foreign financial institutions with respect to the sale or purchase of petroleum or petroleum products to or from Iran were permitted only for trade between the foreign country and Iran, with any funds owed to Iran deposited in an account within that foreign country. See 22 U.S.C. § 8513a(d)(4)(D).  In other words, the proceeds of Iranian oil sales to Turkey had to be deposited into accounts in Turkey and could be used only for trade between Turkey and Iran; otherwise, any foreign financial institution facilitating non-compliant transactions faced U.S. sanctions.  These requirements went into effect on or about February 6, 2013.

19.  On January 2, 2013, the Iranian Freedom and Counterproliferation Act (the "IFCA"), imposed additional restrictions on supplying gold to Iran.  The IFCA broadened the prohibition in Executive Order 13622 on supplying precious metals to the Government of Iran to prohibit the sale, supply, or transfer of precious metals, directly or indirectly, to the country of Iran, including non-Government entities.  See 22 U.S.C. § 8804(a)(1)(A).  The available sanctions included prohibitions and conditions on opening or maintaining U.S.

correspondent and payable-through accounts of the foreign financial institution.  The IFCA also extended the ITRA's bilateral trade restriction to the proceeds of Iranian natural gas sales.  The IFCA's restrictions went into effect on or about July 1, 2013.

20.   On June 3, 2013, the President implemented, among other things, the IFCA's prohibition on dealings in precious metals on behalf of Iran pursuant to his authorities under the IFCA, the IEEPA, and other statutes, as well as the ITRA's "bilateral trade" and other restrictions on transactions relating to petroleum and petroleum productions from Iran. Exec. Order 13645, 78 Fed. Reg. 33945 (June 3, 2013).  Executive Order 13645 prohibited any transaction that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate any of the prohibitions set forth in that order.

21.   The Secretary of the Treasury promulgated the Iranian Financial Sanctions Regulations (the "IFSR") implementing the sanctions imposed by the Executive Orders 13622 and 13645, the 2012 NDA, the IFCA, and the ITRA, among others. See 31 C.F.R. §§ 561.203, 204, 205.  The IFSR prohibited, among other things, transactions that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or

attempted to violate any of the provisions of the IFSR.  See 31

C.F.R. § 561.205.

**Designated or Identified Entities and Individuals**

22.  Appendix A to the ITSR contained a list of

persons determined to be the Government of Iran.  At all times

relevant to this Indictment, NIOC was an Iranian Oil Company on

the list in Appendix A.  At all times relevant to this

Indictment, NICO and Naftiran Intertrade Company Sarl ("NICO

Sarl") were on the list in Appendix A.

23.  At all times relevant to this Indictment, Bank

Sarmayeh, Bank Parsian, Bank Pasargad, Bank Saman, Credit

Institution for Development, and Eghtesad Novin Bank were

Iranian financial institutions and, beginning on July 12, 2012,

were identified as Iranian financial institutions by OFAC.  At

all times relevant to this Indictment, Sarmayeh Exchange was a

money services business in Iran owned and controlled by Bank

Sarmayeh.  At all times relevant to this Indictment, Bank

Keshavarzi was an Iranian financial institution owned or

controlled by the Government of Iran and listed in Appendix A to

the ITSR.

24.  On or about July 12, 2012, OFAC designated Hong

Kong Intertrade Company ("HKICO") as a "Specially Designated

National" ("SDN") pursuant to the ITSR.  OFAC further identified

NIOC as an agent or affiliate of Iran's Islamic Revolutionary Guard Corp ("IRGC") pursuant to Executive Order 13599 on or about September 24, 2012.  On or about May 23, 2013, OFAC designated Seifollah Jashnsaz, chairman of NICO, NICO Sarl, and HKICO; Ahmad Ghalebani, managing director of NIOC and a director of both Petro Suisse Intertrade Company SA and HKICO; Farzad Bazargan, managing director of HKICO; Hashem Pouransari, NICO official and managing director of Asia Energy General Trading LLC; and Mahmoud Nikousokhan, NIOC finance director and a director of Petro Suisse Intertrade Company SA as SDNs under Executive Order 13382 and the Weapons of Mass Destruction Non-Proliferation Sanctions Regulations, 31 C.F.R. Part 544.  At all times relevant to this Indictment after on or about July 12, 2012, HKICO was an SDN. At all times relevant to this Indictment after May 23, 2013, Jashnsaz, Ghalebani, Bazargan, Pouransari, and Nikousokhan were each an SDN.  At all times relevant to this Indictment after September 24, 2012, NIOC was identified as an agent or affiliate of the IRGC.

### The Gold Export Scheme

25.  As alleged above, in 2012 the U.S. sanctions relating to the sale of Iranian oil and the supply of currency and precious metals to Iran and the Government of Iran grew more restrictive.  In response, HALKBANK, the defendant, and others

devised a scheme to use exports of Turkish gold to allow Iran access to the proceeds of Iranian oil sales to Turkey, to evade those restrictions, and to deceive foreign banks and U.S. regulators.

26.   First, HALKBANK, the defendant, conspired with Reza Zarrab, a co-conspirator not named as a defendant herein, and others to transfer Iranian oil proceeds at HALKBANK to exchange houses and front companies controlled by Zarrab in order for those exchange houses and front companies to buy gold for export from Turkey.  After being exported from Turkey, the gold could be converted into cash or currency and remitted to Iran or used to conduct international financial transfers on behalf of Iranian persons and entities.  Although these gold purchases were made by or on behalf of the Government of Iran -- including NIOC, the Central Bank of Iran, and Iranian banks owned or controlled by the Government of Iran -- in violation of Executive Order 13622, Aslan and Atilla represented to Treasury officials that the gold purchases were permissible transactions by private Iranian companies and individuals.

27.   Second, HALKBANK, the defendant, conspired with Zarrab and others to use false documentation and misrepresentations to make it appear that, after gold had been purchased in Turkey with the proceeds of Iranian oil sales

deposited at HALKBANK, the gold was then exported to Iran when, in fact, the gold was exported to Dubai and sold there, in violation of the ITRA, 22 U.S.C. § 8513a(d)(4)(D), in order to obtain U.S. dollars, Euros, and other currencies that could be used to fund the activities of the Government of Iran and Iranian companies and persons. This continued after the IFCA broadened the gold prohibitions to include supply to private Iranian companies and individuals.

### HALKBANK Agrees with the Government of Iran and Zarrab to Execute the Gold Export Scheme

28. Reza Zarrab, an Iranian-Turkish businessman, operated, among other things, money services businesses and trading companies in the United Arab Emirates and Turkey. Zarrab had a contract with Sarmayeh Exchange, a money services business owned and controlled by Bank Sarmayeh, to conduct currency exchange and wire transfers for that entity. In or about early 2012, Zarrab learned from a representative of Sarmayeh Exchange that NIOC and the Central Bank of Iran held billions of dollars' worth of proceeds of sales of Iranian petroleum in accounts maintained at HALKBANK, the defendant.

29. Accordingly, in or about March 2012, Zarrab approached Aslan about opening business accounts at HALKBANK, the defendant, in order to extract the Iranian oil proceeds to Dubai through gold exports, using Sarmayeh Exchange and Bank

Sarmayeh as intermediaries between Zarrab's companies and the Government of Iran accounts. Aslan, however, was concerned that Zarrab's high public profile in Turkey would draw attention creating a risk that the scheme would be detected.

30. Zarrab then met with Turkey's then-Minister of Economy, Mehmet Zafer Çağlayan, a co-conspirator not charged herein, about Aslan's concern. Zarrab explained the scheme to Çağlayan and enlisted his help. Çağlayan agreed to help Zarrab execute the gold export scheme through HALKBANK, the defendant, but demanded that Zarrab give Çağlayan half of Zarrab's profits. Zarrab agreed. Over the course of 2012 and 2013, Zarrab paid Çağlayan bribes totaling at least approximately $70 million in U.S. dollars, Euro, and Turkish lira, as well as luxury watches and other items, in exchange for Çağlayan's support of the gold export scheme's execution.

31. In addition to benefiting the Government of Iran by evading restrictions on the use of oil proceeds, the gold scheme would also benefit the Government of Turkey: By converting the otherwise-restricted Iranian oil proceeds at HALKBANK, the defendant, into gold and exporting that gold, the scheme would artificially inflate Turkey's export statistics, making its economy appear stronger than it in fact was. For example, in 2011, the year before the scheme began, Turkey

reported exporting approximately $55 million in gold to Iran.
In 2012, after, as discussed below, the gold scheme was
implemented, Turkey reported exporting approximately $6.5
billion in gold to Iran.  Similarly, Turkey's reported exports
of gold to the U.A.E. rose from approximately $280 million in
2011 to approximately $4.6 billion in 2012.  The funds laundered
from HALKBANK, the defendant, through Zarrab and his companies
were responsible for the vast majority of this increase.

32.  After obtaining Cağlayan's agreement to use his
influence to help the scheme, Zarrab met again with Aslan.
After Cağlayan conveyed his support of the gold export scheme to
Aslan, Aslan agreed that Zarrab could participate in the gold
scheme through HALKBANK, the defendant.

33.  During the summer of 2012, executives with
HALKBANK, the defendant, discussed the gold scheme and its
operation.  For example, Balkan sent emails to Aslan and other
bank officers tracking Zarrab's and others' gold export volumes
and confirming the bank's understanding of the scheme.  In one
such email, sent on or about June 20, 2012, Balkan summarized
the scheme, writing:

> It is understood that this gold, which is
> left in Dubai, can be used in all kinds of
> foreign payments of Iran, either in gold or
> in foreign currency. The fact that these
> gold deposits are collected in the various
> fiduciary accounts and used for

> international payments of the forbidden
> Iranian banks in Dubai (such as Bank Melli,
> Bank Sedarat) or Bank Mellat in Turkey. The
> gold transaction volume has reached
> remarkable dimensions in terms of
> international Iran sanctions.

34.   In October 2012, Zarrab arranged meetings between, among others, Iranian government officials and Iranian bank executives at the Istanbul offices of HALKBANK, the defendant, to discuss ways to increase the amount of Iranian oil proceeds that could be laundered through the scheme.

35.   In particular, on or about October 4, 2012, Aslan, Atilla, Zarrab, and a representative of Sarmayeh Exchange met with Mahmoud Nikousokhan, then the finance director of NIOC, and other Iranian oil officials.  The participants discussed, among other things, the following:

a.   NIOC sought to transfer its oil revenues held in banks in other countries to HALKBANK, the defendant, so that these funds could also be laundered through the gold system in place at HALKBANK.

b.   NIOC officials also asked that HALKBANK make international financial payments on behalf of NIOC using its oil proceeds directly, rather than laundering them through Zarrab's front companies.  Aslan and Atilla declined the request, telling NIOC that those payments should continue to be made through "the existing system" -- meaning the laundering of Iranian oil funds

through the gold system with Zarrab, which concealed HALKBANK's participation in the scheme.

### HALKBANK's General Manager Accepts Bribes to Support the Gold Export Scheme

36. On October 6, 2012, Aslan and Zarrab met in Alsan's office at HALKBANK, the defendant. At this meeting, Aslan told Zarrab that he was under scrutiny by U.S. officials relating to HALKBANK's Iran-related business, and that while Cağlayan directed that the gold export scheme should be conducted through HALKBANK, it was Aslan who bore the risks.

37. After this meeting, Zarrab sought and obtained Cağlayan's permission to bribe Aslan. Cağlayan agreed. In an intercepted telephone conversation on October 6, 2012, Zarrab told Abdullah Happani, a co-conspirator not named as a defendant herein and an employee of Zarrab, that Cağlayan knew Zarrab would pay bribes to Aslan, and described how Aslan's bribes would be structured using the "same system" as Cağlayan's bribe payments.

38. On October 8, 2012, officers of HALKBANK, the defendant, held another meeting with Iranian and Turkish government officials. In an intercepted telephone call, Aslan described the meeting to Zarrab, stating that the Iranian officials had again asked HALKBANK to allow the government of Iran to conduct transfers of their funds out of the bank. Aslan

told Zarrab that:  "I [Aslan] defended the matter just like we had talked about yesterday," and that he had told the Iranians that HALKBANK would continue to move their money "through the existing system" with Zarrab.  The next day, Reza Zarrab directed Happani to arrange to pay a €2 million bribe to Suleyman Aslan.  A few days later, one of Zarrab's employees delivered the bribe.  Over the course of the following year, Zarrab arranged for regular deliveries of cash, packaged in shoe boxes, to Aslan at Aslan's residence.  These bribes totaled at least approximately $8.5 million in U.S. dollars, Euro, and Turkish lira.

39.  Zarrab arranged additional meetings in Turkey between Caǧlayan, Aslan, others at HALKBANK, the defendant, and Iranian government banking and oil officials. In May 2013, these meetings included the then-Iranian Minister of Oil; Ahmad Ghalebani, the then-managing director of NIOC; Mahmoud Nikousokhan; and Seifollah Jashnsaz, the then-chairman of NICO. At these meetings the participants discussed, among other things, arranging for the Turkish national oil company to make its payments to NIOC for Iranian oil at an account held by Bank Sarmayeh at HALKBANK.  Because of Zarrab's contract with Sarmayeh Exchange, he would have preferential access to these Iranian oil revenues.

### HALKBANK Protects the Gold Export Scheme
### from Detection by OFAC

40.     Throughout the scheme, senior executives from
HALKBANK, the defendant, took steps to prevent U.S. authorities,
particularly OFAC, from detecting the illicit nature of the
transfers being conducted through Zarrab's companies.

41.     On or about October 24, 2012, Zarrab and Balkan
spoke in an intercepted telephone call.  During that
conversation, Zarrab and Balkan discussed a transfer of U.S.
dollars between Zarrab's account at HALKBANK, the defendant, and
another account held by Zarrab's gold trading company, Safir
Altin.  Balkan warned Zarrab about the transfer because it was
conducted by a U.S. financial institution through its
correspondent account in the United States ("U.S. Bank-1").
Balkan expressed his concern about drawing attention to
HALKBANK's involvement in Zarrab's illicit gold-trading business
as a result of the direct transfer from HALKBANK to the United
States, stating:  "I mean I'm talking about, one, an American
Bank.  Two, dollars.  Three, Safir.  I mean, many factors are
all bundled up here."  Zarrab asked if the transfer would cause
an issue, and Balkan replied:  "I just wanted to share it with
you.  When I mentioned strategic thinking, I meant we should
assess this together briefly. . . .  The balance, the balance is
not important.  What's more important is security."

42.   On or about February 12, 2013, Treasury representatives met in Turkey with Atilla and other officials of HALKBANK, the defendant.  During this meeting, among other things, Treasury representatives, including the then-Director of OFAC, specifically warned Atilla about HALKBANK's involvement in Iranian attempts to evade sanctions.  The OFAC Director specifically cautioned Atilla about (a) the use of false invoices concealing the true purchaser or destination of goods as a means of allowing Iran to launder oil proceeds through phony purchases, and (b) the requirement that trade between Turkey and Iran financed with Iranian oil proceeds be "bilateral," that is, restricted Iranian funds at HALKBANK could be used only to buy Turkish goods for shipment to Iran.  The Director pulled Atilla aside for a private meeting to warn Atilla that HALKBANK was in a "category unto themselves," reflecting OFAC's particular concern about the magnitude of the bank's potential involvement in Iranian sanctions evasion.

43.   Shortly after the meeting with OFAC, Atilla, HALKBANK's Deputy General Manager for International Banking, instructed Zarrab to alter the way the gold transactions were reflected in the customs paperwork submitted to the bank, changing the purported destination of the gold from the United Arab Emirates to Iran.  In August 2012, Atilla had directed

22

Zarrab to change the documents to reflect that the gold was
being exported to Dubai rather than Iran, to reduce the risk
that HALKBANK, the defendant, would be sanctioned under the
regulations against supplying gold to the Government of Iran.
Now, Atilla wanted the documentation to be changed again because
of the tightened restrictions on the use of oil proceeds for
bilateral trade. In an intercepted telephone call between Zarrab
and Happani on February 21, 2013, Zarrab relayed that he "talked
to Mr. Hakan," referring to Atilla.  Zarrab stated that Atilla
had informed him that "there was a problem but it has been
resolved . . . for the exports, write 'transit to Iran through
Dubai' on the declarations again . . . .  That is what the
regulations indicate" -- referring to the requirement described
in the February 12, 2013 meeting between Atilla and OFAC.  The
change directed by Atilla made it appear as if the shipments of
gold purchased with Iranian oil proceeds complied with the
regulations, though the gold in fact continued to be sent to
Dubai in order to make NIOC oil proceeds available for Iran's
international financial payments there.

44.  On or about May 6, 2013, Zarrab and Aslan spoke
in an intercepted telephone call.  During this conversation,
Aslan told Zarrab that Atilla had reported that NIOC transferred
70 million Turkish lira directly to an account controlled by

23

Zarrab at HALKBANK, the defendant.  This transfer contradicted the agreement among HALKBANK, NIOC, and Zarrab that NIOC's oil proceeds would be transferred to Zarrab indirectly through another Iranian bank account held at HALKBANK.  Zarrab complained, "No, not direct.  No.  They made a mistake.  It will go to . . . Bank Shahr.  You stop it, and I will get it corrected.  They are stupid.  They are retarded . . . .  Please process this as a null transaction, as if it never happened."  Aslan agreed to void the transaction, and told Zarrab that HALKBANK would not report the violation.  Because reporting the transaction would have revealed that the money Zarrab and his companies were laundering through the gold scheme belonged to NIOC, Zarrab and Aslan's agreement to nullify and not report this transaction protected the scheme from detection.

### HALKBANK Continued the Gold Export Scheme While Lying to OFAC

45.  On or about July 1, 2013, the day IFCA's restrictions on the supply of precious metals to Iran went into effect, see supra ¶ 19, Atilla sent an email to the then-Director of OFAC, purporting to inform him that HALKBANK, the defendant, had stopped allowing Iranian gold transactions as of June 10, 2013.

46.  In fact, however, HALKBANK, the defendant, continued to allow Zarrab to use proceeds of Iranian oil and gas

sales at HALKBANK to buy gold for export from Turkey in order to give the Government of Iran and Iranian banks access to these funds after July 1, 2013. On or about November 11, 2013, for example, a HALKBANK representative emailed Zarrab's employees spreadsheets of transactions relating to exports of gold from Turkey to the United Arab Emirates and Iran that purported to show tens of millions of Euros' worth of gold being exported by Zarrab's companies, Royal Denizcilik and Safir Altin Ticaret, to Iran as recently as October 2013, including to Iranian financial institutions.

47. On or about September 16, 2013, Zarrab and Aslan spoke in an intercepted telephone conversation. Aslan reported on a meeting that he recently had with the then-Prime Minister of Turkey, Cağlayan, and other Turkish government officials. Aslan was asked to increase Turkey's gold exports. Aslan reported, "That's their request, um, last year they exported $11 billion in gold." Zarrab responded, "They are asking for the same to be done again, aren't they?" Aslan replied, "I mean, they're saying, 'do something, whatever the method is, but help us out, take care of this job,' you know." Aslan also stated, "I said, 'Iran -- it would not be through Iran, but we, um, we will find a way, don't you worry. They said, 'if you can find a

way, do it.'" Zarrab responded in part, "We have a method, we will do it. We need to sit down and talk about that in person."

48. Zarrab and others caused gold purchased with the proceeds of Iranian oil and gas sales and exported from Turkey to be sold in Dubai rather than reexported to Iran, and further caused the proceeds to be transferred back to companies owned and controlled by Zarrab in Turkey, where they could be further transferred secretly on behalf of and for the benefit of the Government of Iran and Iranian companies and persons. On other occasions, Zarrab and others would cause the gold to be repurchased by companies owned and controlled by Zarrab in Turkey and imported back to Turkey, where it could be sold. These transactions to sell gold in Dubai or to repurchase and reimport the gold to Turkey on behalf of and for the benefit of the Government of Iran and Iranian companies and persons were often conducted in U.S. dollars. Between at least approximately December 2012 and October 2013, more than $900 million in such transactions were conducted by U.S. financial institutions through correspondent accounts held in the United States.

49. At all times relevant to the gold export scheme, Aslan, Atilla, Balkan, and other officers and employees of HALKBANK, the defendant, were acting within the scope of their employment at HALKBANK and for the benefit of HALKBANK.

## The Fraudulent Food and Medicine Trade Scheme

50.   In response to the broadened prohibition against the supply of gold to include private Iranian companies and individuals and heightened restrictions limiting the use of Iranian oil proceeds for bilateral trade, HALKBANK, the defendant, and others also conspired to transfer Iranian oil revenues held at HALKBANK outside Turkey by falsely pretending that these transfers were in connection with the sale of food and medicine to Iran from Dubai, which would qualify for humanitarian exceptions to the sanctions restrictions.

51.   Aslan, Atilla, and others at HALKBANK, the defendant, designed the fraudulent food and medicine scheme with Zarrab, Happani, and others.   In addition to helping design the scheme, Aslan and Atilla concealed the scheme from Treasury officials in order to avoid potential sanctions against HALKBANK pursuant to the 2012 NDAA, the ITSR, the IFCA, and the IFSR. Cağlayan and other Turkish government officials both approved of and directed that the fraudulent food and medicine scheme be adopted and implemented.

52.   On or about March 26, 2013, Zarrab met with Aslan again.   At this meeting, Aslan told Zarrab that HALKBANK, the defendant, would stop processing the fraudulent gold transactions in the next month-and-a-half, but that Aslan could

27

extend that deadline by another month or two. Aslan instructed Zarrab instead to begin conducting food transactions, even though Zarrab had no history conducting such transactions with HALKBANK. When Zarrab asked how it would be possible for him to start food trade with the bank now, Aslan also told Zarrab during the meeting that Zarrab should provide HALKBANK with whatever documentation Zarrab could for these food transactions, even if that involved submitting fraudulent documents. In other words, as the deadline for IFCA's tightened regulations on gold trade approached, Aslan instructed Zarrab that Zarrab should instead pursue a fraudulent food trade.

53. Zarrab arranged meetings in Turkey between approximately April 9 and 10, 2013, among Cağlayan, Aslan, and others, and Iranian government banking and oil officials, including Mahmoud Nikousokhan and Seifollah Jashnsaz. At these meetings the participants discussed, among other things, designing fraudulent transactions with the proceeds of Iranian oil sales held at HALKBANK, the defendant, to make them appear to be for the purpose of importing food into Iran, when in reality they were a vehicle for further evasion of U.S. sanctions.

54. Aslan and Atilla devised methods to mask the true purpose of the purported food trade so as to avoid detection,

and to create a compliance record to protect HALKBANK, the defendant, while excusing Zarrab from records he could not provide because the transactions were not genuine. For example, in or about April 2013, Zarrab met with Atilla and Aslan in Aslan's office at HALKBANK's headquarters. During that meeting, the participants discussed documentation Zarrab would provide in connection with the fraudulent food transactions. When Zarrab stated that he could provide bills of lading, Atilla informed Zarrab that bills of lading were traceable. Zarrab then retracted his representation, and the participants agreed that Zarrab would not be required to provide such documents. Zarrab later purported to use small, wooden vessels that would not provide traceable bills of lading to cover for this deficiency in his documentation.

55. On or about July 2, 2013, Zarrab and Atilla spoke in an intercepted telephone call. During that conversation, Atilla cautioned Zarrab about errors made by Zarrab's employees in falsifying the documents submitted to HALKBANK, the defendant, that could result in the scheme's detection by regulators. For example, Atilla instructed Zarrab that the quantities of the purported shipments were unrealistic in light of the small size of the vessels Zarrab purported to use because of his inability to provide bills of lading: "I'm thinking that

29

it is a little difficult to move a shipment of 140, 150 thousand tons, on things with five-thousand ton capacity." Zarrab apologized for the error and promised to correct it.

56.   On or about July 9, 2013, Zarrab and Atilla spoke again during an intercepted telephone call. Zarrab and Atilla discussed, among other things, more errors in the false supporting documents submitted in connection with Zarrab's transfers of Iranian oil proceeds at HALKBANK, the defendant. Atilla explained that the falsified documents now either (a) still claimed to load quantities of goods on the vessels larger than the purported capacities of the ships, or (b) purported to use vessels that were large enough to be able to provide the bills of lading that Zarrab could not, in fact, provide. Atilla explained: "Now, these vessels, um, some of them are very large vessels . . . . I mean, there is one that is 50,000 tons. There are those that are 80,000, 90,000 tons . . . . These are not small vessels . . . . I would kindly ask that the guys take a look at compliance between the loads and the tonnages." ZARRAB acceded: "Of course. Do you mean that they should look at the ones involving large vessels?" Atilla warned of the even greater risks of documents identifying smaller ships:

> They should look at the opposite, the small ones, as well. Now, for example, the bill

> of lading may be somewhat doable, you know,
> with the large vessels, since the vessel is
> large.  As for the small ones, the
> relatively smaller ones, such as vessels
> with capacities between 13,000 and 14,000
> tons, when their loads are 20,000, then that
> becomes different and odd.  You get that
> reviewed . . . .  There are those large
> loads on small tonnage [vessels].

Zarrab asked:  "Is there anything I need to do about them?"

Atilla instructed:  "They need to keep an eye on this . . . .
The load should match up."

57.  In electronic communications on or about July 1,
2013, Zarrab explained to Aslan the underlying reason for the
errors in the forged documents:  Zarrab had tried to move too
much Iranian oil money at once through the fake food scheme at
HALKBANK, the defendant, resulting in unrealistic purported food
quantities that made the documents' falsity obvious.  Zarrab
told Aslan, "Mr. minister [Cağlayan] told me to step on the gas
and I think I over did it."  Zarrab and Aslan agreed that Zarrab
would limit the amount of money he would move each time going
forward.

58.  On or about September 16, 2013, Zarrab and Aslan
spoke in a recorded telephone conversation, as described in
paragraph 47 above.  During this conversation, Zarrab and Aslan
discussed, among other things, the fact that HALKBANK, the
defendant, intended to preclude non-Turkish companies, including

two specifically identified American companies, from selling

food to Iran in exchange for the proceeds of Iranian oil and gas

sales held at HALKBANK, in order to increase the amount of funds

available to Zarrab.

### HALKBANK Continues the Scheme After the Arrests of Zarrab and Aslan

59.   In or about December 2013, Zarrab, Aslan, and

others were arrested by Turkish law enforcement officials in

connection with a Turkish public corruption investigation into,

among other things, the bribe payments Zarrab made to Aslan,

Cağlayan, and others in furtherance of the scheme to launder

Iranian funds through HALKBANK, the defendant.  See supra ¶¶ 30,

36-38.  At the time of the arrests, Turkish law enforcement

officers conducted searches of Zarrab's and Aslan's homes and

offices, among other places, during which they recovered, among

other things:

a.   millions of dollars' worth of cash, in

multiple currencies, including U.S. dollars, stored in shoeboxes

in Aslan's home.

b.   documents in Aslan's home and his office at

HALKBANK reflecting exceptions from documentation ordinarily

required by HALKBANK that Zarrab's companies had received in

connection with falsified food trade transactions; and

c.   a diagram of the transactions associated with the food scheme found in Aslan's office at HALKBANK.

60.   Zarrab paid bribes, through his attorney, to secure his release and the release of his co-defendants from prison in February 2014 and, ultimately, the dismissal of the case in October 2014.

61.   In mid-2014, after Zarrab was released from prison but before the case was dismissed as a result of bribe payments, Zarrab approached HALKBANK, the defendant, including its new general manager, a co-conspirator not named as a defendant herein ("Halkbank General Manager-1"), and Atilla, among other HALKBANK employees, to restart the sanctions-evasion scheme.

62.   Though some at HALKBANK, the defendant, supported continuing the scheme, Halkbank General Manager-1 initially was reluctant to do so because of concern that Zarrab's arrest and notoriety would draw unnecessary attention to the scheme.  At Zarrab's request, however, the then-Prime Minister of Turkey and his associates, including a relative of the then-Prime Minister who later held multiple Turkish cabinet positions, instructed HALKBANK to resume the scheme, and HALKBANK agreed.  The only change to the scheme was the addition of one new forged document:  Zarrab would provide forged inspection certificates

33

as part of the fake food scheme.  HALKBANK continued executing
the evasion and money-laundering scheme until at least in or
about March 2016, when Zarrab was arrested in the United States.

63.  After the continuation of the scheme following
Zarrab's arrest, officials at HALKBANK, the defendant, continued
to deceive Treasury officials about the bank's relationship with
Zarrab.  For example, on or about October 10, 2014, Treasury
representatives met with Atilla, Halkbank General Manager-1, and
other HALKBANK officials.  During this meeting, the Treasury
representatives asked about HALKBANK's dealings with Zarrab.
Atilla lied about the scope of Zarrab's business:  he failed to
disclose Zarrab's gold export business for the Government of
Iran or Zarrab's fraudulent food trade for the Government of
Iran, and instead described Zarrab as the recipient of certain
bank loans and someone involved in unspecified foreign trade.

64.  As a result of the gold export and fake food
schemes, at least approximately $1 billion was laundered through
unwitting U.S. financial institutions on behalf of NIOC, the
Central Bank of Iran, and other Iranian entities.

65.  At all times relevant to the fraudulent food and
medicine scheme, Aslan, Halkbank General Manager-1, Atilla,
Balkan, and other officers and employees of HALKBANK, the

defendant, were acting within the scope of their employment at HALKBANK and for the benefit of HALKBANK.

## STATUTORY ALLEGATIONS

### COUNT ONE

### (Conspiracy to Defraud the United States)

The Grand Jury charges:

66.   The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

67.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to defraud the United States and an agency thereof, to wit, to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of the U.S. Department of the Treasury in the enforcement of economic sanctions laws and regulations administered by that agency.

### Overt Acts

68.   In furtherance of the conspiracy and to effect the illegal object thereof, TÜRKİYE HALK BANKASI A.S., a/k/a

"Halkbank," the defendant, and its coconspirators committed the overt acts set forth in paragraphs 25 to 64 of this Indictment, among others, which are fully incorporated by reference herein.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Conspiracy to Violate the
### International Emergency Economic Powers Act)

The Grand Jury further charges:

69.   The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

70.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act.

71.   It was a part and an object of the conspiracy that TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, would and did provide and cause others to provide financial services to Iran and to the

36

Government of Iran prohibited by U.S. law, without first

obtaining the required approval of OFAC, and to evade and avoid

the requirements of U.S. law with respect to the provision of

financial services to Iran and to the Government of Iran, in

violation of Executive Orders 12959, 13059, 13224, 13599, 13622,

and 13645 and Part 31 of the Code of Federal Regulations,

Sections 560.203, 560.204, 560.205, 561.203, 561.204, and

561.205.

> (Title 50, United States Code, Section 1705;
> Executive Orders 12959, 13059, 13224, 13599, 13622, & 13645;
> Title 31, Code of Federal Regulations, Sections 560.203,
> 560.204, 560.205, 561.203, 561.204, & 561.205.)

## COUNT THREE

### (Bank Fraud)

The Grand Jury further charges:

72.   The allegations contained in paragraphs 1 through

65 of this Indictment are repeated and realleged as if fully set

forth herein.

73.   From at least in or about 2012, up to and

including in or about 2016, in the Southern District of New

York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE

HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others

known and unknown, did knowingly execute and attempt to execute

a scheme or artifice to defraud a financial institution, the

deposits of which were then insured by the Federal Deposit

37

Insurance Corporation (the "FDIC"), and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of such financial institution, by means of false and fraudulent pretenses, representations, and promises, and aided and abetted the same, to wit, inducing U.S. financial institutions to conduct financial transactions on behalf of and for the benefit of the Government of Iran and Iranian entities and persons using money and property owned by and under the custody and control of such financial institutions, by deceptive means.

(Title 18, United States Code, Sections 1344 & 2.)

## COUNT FOUR

### (Conspiracy to Commit Bank Fraud)

The Grand Jury further charges:

74.   The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

75.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit

bank fraud, in violation of Title 18, United States Code, Section 1344.

76.   It was a part and an object of the conspiracy that TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others known and unknown, would and did knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, the deposits of which were then insured by the FDIC, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

## COUNT FIVE

### (Money Laundering)

The Grand Jury further charges:

77.   The allegations contained in paragraphs 1 through 65 of this Indictment are repeated and realleged as if fully set forth herein.

78.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others

known and unknown, in an offense involving and affecting

interstate and foreign commerce, did knowingly transport,

transmit, and transfer, and attempt to transport, transmit, and

transfer, monetary instruments and funds to places in the United

States from and through places outside the United States, in

amounts exceeding $10,000, and aided and abetted the same, with

the intent to promote the carrying on of specified unlawful

activity, to wit, (i) the illegal export of services to Iran as

charged in Count Two of this Indictment, (ii) bank fraud as

charged in Counts Three and Four of this Indictment, and

(iii) an offense against a foreign nation involving bribery of a

public official.

(Title 18, United States Code, Sections 1956(a)(2)(A) & 2.)

## COUNT SIX

### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

79.   The allegations contained in paragraphs 1 through

65 of this Indictment are repeated and realleged as if fully set

forth herein.

80.   From at least in or about 2012, up to and

including in or about 2016, in the Southern District of New

York, Turkey, the United Arab Emirates, and elsewhere, TÜRKİYE

HALK BANKASI A.S., a/k/a "Halkbank," the defendant, and others

known and unknown, willfully and knowingly combined, conspired,
confederated, and agreed together and with each other to violate
Title 18, United States Code, Section 1956(a)(2)(A).

81.   It was a part and an object of the conspiracy
that TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant,
and others known and unknown, in an offense involving and
affecting interstate and foreign commerce, would and did
transport, transmit, and transfer, and attempt to transport,
transmit, and transfer, monetary instruments and funds to places
in the United States from and through places outside the United
States, in amounts exceeding $10,000, with the intent to promote
the carrying on of specified unlawful activity, to wit, (a) the
illegal export of services to Iran as charged in Count Two of
this Indictment, (ii) bank fraud as charged in Counts Three and
Four of this Indictment, in violation of Title 18, United States
Code, Sections 1344 and 1349, and (iii) an offense against a
foreign nation involving bribery of a public official, in
violation of Title 18, United States Code, Section
1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h).)

41

## FORFEITURE ALLEGATION

### (Counts Two, Three, and Four)

82.   As a result of committing the offenses alleged in
Counts Two, Three, and Four of this Indictment, TÜRKİYE HALK
BANKASI A.S., a/k/a "Halkbank," the defendant, shall forfeit to
the United States, pursuant to Title 18, United States Code,
Section 981(a)(1)(C) and Title 28, United States Code, Section
2461, all property, real and personal, that constitutes or is
derived from proceeds traceable to the commission of the
offenses alleged in Counts Two, Three, and Four of this
Indictment, including but not limited to a sum of money
representing the amount of proceeds obtained as a result of the
offenses.

### Substitute Assets Provision

83.   If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

      a)    cannot be located upon the exercise of due
          diligence;

      b)    has been transferred or sold to, or
          deposited with, a third person;

      c)    has been placed beyond the jurisdiction of
          the court;

      d)    has been substantially diminished in value;
          or

e)    has been commingled with other property
which cannot be subdivided without
difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the above

forfeitable property.

### FORFEITURE ALLEGATION

### (Counts Five and Six)

84.    As a result of committing the money laundering

offenses alleged in Counts Five and Six of this Indictment,

TÜRKİYE HALK BANKASI A.S., a/k/a "Halkbank," the defendant,

shall forfeit to the United States, pursuant to Title 18, United

States Code, Section 982, all property, real and personal,

involved in the money laundering offenses and all property

traceable to such property, including but not limited to, a sum

of money representing the amount of property that was involved

in the money laundering offenses or is traceable to such

property.

### Substitute Assets Provision

85.    If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

a)    cannot be located upon the exercise of due
diligence;

43

b)    has been transferred or sold to, or deposited with, a third person;

c)    has been placed beyond the jurisdiction of the court;

d)    has been substantially diminished in value; or

e)    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

Foreperson

GEOFFREY S. BERMAN
United States Attorney

44

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

**v.**

### TÜRKİYE HALK BANKASI A.S.,
### a/k/a "Halkbank,"

**Defendant.**

### SUPERSEDING INDICTMENT

S6 15 Cr. 867 (RMB)

(18 U.S.C. § 371, 1344, 1349, 1956, &
2; 50 U.S.C. § 1705; 31 C.F.R.
§§ 560.203, 560.204, 560.205, 561.203,
561.204, & 561.205.)

GEOFFREY S. BERMAN
United States Attorney.

A TRUE BILL

Foreperson.

KL
TO 15 19

Filed Superseding Indictment

Stewart D. Aaron
USMJ