UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                          :
UNITED STATES OF AMERICA                  :
                                          :
   - v. –                   :          S6 15 Cr. 867 (RMB)
                                          :
TURKIYE HALK BANKASI, A.S.,               :
  a/k/a "Halkbank,"                  :
                                          :
       Defendant.    :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


### CORRECTED MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S REQUEST FOR CIVIL CONTEMPT SANCTIONS FOR HALKBANK'S FAILURE TO APPEAR


GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

Michael D. Lockard, Sidhardha Kamaraju,
David W. Denton, Jr., Jonathan Rebold,
Kiersten A. Fletcher,
Assistant United States Attorneys,
    *Of Counsel*

**TABLE OF CONTENTS**

Page

PROCEDURAL HISTORY ................................................................................................... 2

   A. Related Proceedings ............................................................................................. 2

   B. The Indictment of Halkbank and the First Summons .................................................. 2

   C. Halkbank's Failure to Appear and Issuance of the Second Summons ......................... 3

   D. Halkbank's Request for a Special Appearance and Petition for Mandamus ............... 4

FACTUAL BACKGROUND ............................................................................................... 7

   A. Halkbank ............................................................................................................. 7

   B. Halkbank's Offense Conduct ................................................................................ 8

   C. Halkbank's Role in a Cover-up in 2014 in Response to the Disclosure of
      the Bank's Role in Large-Scale Iranian Sanctions Evasion and Corruption ............. 10

   D. Halkbank and the Turkish Government's Response to the U.S. Arrests of
      Reza Zarrab and Mehmet Hakan Atilla .................................................................. 12

   E. Response to Atilla's Conviction and Sentencing .................................................... 15

   F. Response to Halkbank's Indictment ...................................................................... 17

   G. Halkbank's U.S. Financial Activities and Financial Resources ............................... 17

DISCUSSION .................................................................................................................. 18

   I. Relevant Law ....................................................................................................... 19

   II. The Court Should Impose a Substantial Per Diem Fine, Increasing Over Time ........ 20

CONCLUSION ................................................................................................................. 24

The Government respectfully submits this memorandum of law[1] in support of its request that the Court find the defendant, Turkiye Halk Bankasi, A.S. ("Halkbank" or "the defendant") in civil contempt for knowingly and intentionally failing to appear, despite having been served two summonses, and that the Court further impose an appropriate coercive sanction to induce the defendant to appear and end its fugitive status.

As detailed below, Halkbank has consistently sought to avoid responsibility for its role in a massive sanctions-evasion and money laundering scheme that gave the Government of Iran access to billions of dollars' worth of restricted oil proceeds. Halkbank's illicit financial support occurred precisely at the time when the United States and the international community were relying on sanctions to force the Government of Iran to abandon its illicit nuclear and ballistic missiles programs, state sponsorship of terrorism, and actions undermining regional stability. Halkbank has sought to cover up its crimes by lying to U.S. Treasury officials and conducting whitewash internal audits; has protected culpable individuals; and has sought to benefit from efforts by officials of its own government and majority shareholder to politically interfere in criminal investigative and prosecutive actions.

These years-long efforts to avoid facing responsibility have continued following Halkbank's indictment. Halkbank ignored the first summons, intentionally frustrated efforts to deliver the summons and indictment, attacked the indictment in a press statement, and intentionally failed to appear for arraignment. On the eve of a second scheduled arraignment, Halkbank sought to delay the proceedings by requesting a special appearance that would permit the bank to attack the criminal proceedings without being bound by adverse rulings. Halkbank's

---

[1] This memorandum corrects a typographical error in the concluding paragraph on page 24.

efforts to delay and avoid are at an end, and it should be compelled to appear through the imposition of civil contempt sanctions.

## PROCEDURAL HISTORY

### A.    Related Proceedings

Halkbank's former Deputy General Manager for International Banking, Mehmet Hakan Atilla, was convicted following a jury trial of offenses charged in an underlying indictment, S4 15 Cr. 867 (RMB), arising out of his role in the same scheme underlying the charges against Halkbank. (D.E. 293, 486, 518).[2] Halkbank's former General Manager (its chief executive), Suleyman Aslan, and its former Head of Foreign Operations, Levent Balkan, are also charged and remain unapprehended. (Dkt. 293). Additional charged co-conspirators include Mehmet Zafer Caglayan, the former Turkish Minister of the Economy.

Halkbank client and co-conspirator Reza Zarrab pleaded guilty to an information, S5 15 Cr. 867 (RMB), charging him with crimes arising out of his participation in the scheme. (Dkt. 364, 365, Oct. 26, 2017 minute entry).

### B.    The Indictment of Halkbank and the First Summons

On October 15, 2019, a superseding indictment, S6 15 Cr. 867 (RMB) (the "Indictment") was returned by a grand jury sitting in this district. The Indictment charges Halkbank in six counts: (1) conspiring to defraud the United States by obstructing, impairing, and impeding the lawful functions of the U.S. Department of the Treasury ("Treasury"), 18 U.S.C. § 371; (2) conspiring to violate the International Emergency Economic Powers Act

---

[2] "D.E." refers to entries in the docket in this matter. "[Date] Tr." Refers to the transcript of proceedings on the identified date. "Tr." refers to the transcript of the trial of Mehmet Hakan Atilla. "2d Cir. D.E." refers to entries in Second Circuit Court of Appeals docket number 19-4203, relating to Halkbank's petition for mandamus.

("IEEPA"), 50 U.S.C. §§ 1701-1706, and executive orders and regulations issued thereunder, 50 U.S.C. § 1705; (3) bank fraud, 18 U.S.C. §§ 1344 & 2; (4) conspiring to commit bank fraud, 18 U.S.C. § 1349; (5) money laundering, 18 U.S.C. §§ 1956(a)(2)(A) & 2; and (6) conspiring to commit money laundering, 18 U.S.C. § 1956(h). (D.E. 562).

When the Indictment was filed, a summons was issued (the "First Summons") commanding Halkbank to appear on October 22, 2019 to answer the charges. (D.E. 563). The summons and Indictment were served by delivery to Halkbank's U.S. counsel in compliance with the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 4(c)(3)(D)(ii) (authorizing service on "an organization not within a judicial district of the United States . . . by any other means that gives notice"); Fed. R. Crim. P. 9(c)(1) (providing for summons on an indictment to be served pursuant to Rule 4(c)). (*See* Declaration of Michael DeLuca ("DeLuca Decl.") Exs. 1, 2 & 3; D.E. 566). On October 16, 2019, the day after the Indictment was returned, Halkbank issued a press release attacking the legitimacy of the proceedings before the Court, contending, among other things, that "The indictment is based on illegally obtained, unauthenticated evidence previously presented in the Atilla case, and it relies heavily on unreliable testimony from witnesses who lack the necessary credibility." (DeLuca Decl. Ex. 22). The bank also contended that it "falls outside the Department of Justice's jurisdiction. Therefore the decision to indict is an unprecedented legal overreach," and threatened legal action against "all those who, in an attempt to discredit the Bank and damage its financial composition, try to abuse the situation during the course of the case." (*Id.*).

### C.    Halkbank's Failure to Appear and Issuance of the Second Summons

Halkbank failed to appear on October 22, 2019. On October 23, 2019, the Court issued an order (1) finding that the Indictment and summons had been served pursuant to Rule 4(c)(3)(D)(ii) and Halkbank had knowingly and willfully disobeyed the summons, and

(2) issuing a second summons (the "Second Summons") directing Halkbank to appear on

November 5, 2019, to afford Halkbank an opportunity to cure its noncompliance. (Dkt. 566).

The October 23, 2019 order and Second Summons were served by delivery to

Halkbank's U.S. counsel, to Halkbank in Turkey, and to a representative of Halkbank's majority

shareholder. (DeLuca Decl. Exs. 4, 5, 6 & 7; D.E. 571). Halkbank's Legal Department rejected

an attempted delivery of the Indictment and Second Summons. (DeLuca Decl. Ex. 8; D.E. 572).

### D.    Halkbank's Request for a Special Appearance and Petition for Mandamus

On November 4, 2019, U.S. counsel for Halkbank delivered a letter to the Court

asserting Halkbank's refusal to "accept service" of the summonses and requesting a "limited and

special appearance" for the purpose of moving for recusal and to dismiss the Indictment for lack

of personal jurisdiction under the progeny of *International Shoe Co. v. Washington*, 326 U.S.

310 (1945), based on Halkbank's lack of U.S. offices and operations. (D.E. 570). The

Government opposed, arguing, inter alia, that personal jurisdiction would not be waived by

Halkbank's appearance and that "[c]ivil concepts of personal jurisdiction are inapposite in

criminal prosecutions." (D.E. 571 (citing *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir.

2013), and *United States v. Al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011))).

During a November 5, 2019 conference, U.S. counsel for Halkbank were present

but did not enter an appearance, claiming they had been authorized only to request permission to

make a special appearance, but not to appear or enter a plea. (Nov. 5, 2019 Tr. at 6). Counsel

argued that an appearance could be construed to waive personal jurisdiction, and that Halkbank

intended to argue that "the allegations in the case do not properly make out jurisdiction." (*Id*. at

9). The Government responded that jurisdictional arguments are not waived if promptly asserted

and a special appearance is not necessary to preserve the argument. (*Id*. at 14). The Government

further argued that "it appears that what Halkbank is trying to do is to deny the jurisdiction of the

Court to attempt to move to dismiss the indictment with no commitment whatsoever that it is going to remain in the case and answer the charges if it does not get its preferred ruling." (*Id*.).

The Court asked Halkbank's counsel whether, if the bank were allowed a special appearance and its motion to dismiss were denied, Halkbank would appear and respond to the Indictment. (*Id.* at 15). Counsel refused to concede that Halkbank would appear, calling it a "hypothetical question" (*id*. at 16), and asserting that further consultation with Halkbank would be required to answer it. (*Id*. at 15). At that point, counsel had represented Halkbank in connection with the criminal investigation of the bank for more than two years, the Indictment had been returned three weeks earlier, and Halkbank already had instructed U.S. counsel to request a special appearance in the first instance. Since that time, Halkbank still has never conceded that it would be bound by the Court's adverse rulings even if it were granted a special appearance.

The Court directed further briefing (*id.* at 26) and, following additional submissions from Halkbank and the Government (D.E. 577, 578, 579), denied Halkbank's request for a special appearance on December 5, 2019. (D.E. 581). The Court held that Halkbank would be permitted to challenge the Court's jurisdiction following its appearance and arraignment. (*Id*. at 12 ("Following arraignment and consistent with this Decision & Order, Halkbank may file a motion for the Court's recusal and/or relating to the Court's jurisdiction."), 15 ("Halkbank may seek recusal and/or make its extraterritorial or jurisdictional challenge by motion following arraignment."), 18 ("If Halkbank wishes the district court to decide its jurisdictional motion, this international bank holds the key to unlock its dilemma: travel to New York and answer the charges or have its legal counsel do so."), 22 ("Halkbank faces no prejudice because it is entitled to litigate recusal and jurisdiction following arraignment."), 23 ("Halkbank

is free to argue absence of U.S. contacts or conduct following arraignment."). The Government, similarly, had argued that though Halkbank's personal-jurisdiction arguments were wrong, the bank would not waive those arguments simply by appearing. (D.E. 578 at 9-12). On December 9, 2019, the Court scheduled a hearing on February 10, 2020 for Halkbank to show cause why it should not be held in contempt of the two Summonses, unless counsel for the bank entered an appearance prior to the show-cause hearing. (D.E. 582 at 2-3). The order was served in the same manner as the prior orders and summonses. (DeLuca Decl. Exs. 9, 10, 11, 12).

       Halkbank filed a petition for mandamus with the Court of Appeals for the Second Circuit on December 17, 2019. Halkbank noted the February 10, 2020 hearing but did not request expedited consideration of its petition. (D.E. 585). Halkbank moved this Court for a stay of proceedings pending the resolution of its mandamus petition (*id.*), which the Court denied on December 26, 2019. (D.E. 588). In its order denying the requested stay, the Court repeated its prior holding that Halkbank would be entitled to seek recusal and to challenge jurisdiction following arraignment, and would not waive its proffered personal-jurisdiction arguments. (*Id.* at 2 ("The Court has also made it crystal clear that it will take up Halkbank's jurisdictional and recusal motions following arraignment."); *see also id.* at 3). The Court rescheduled the show-cause hearing from February 10, 2020 to February 25, 2020 to accommodate any proceedings in the Second Circuit, with advance briefing due on January 21, February 4, and February 6, 2020. (*Id.* at 5).

       On December 26, 2019, Halkbank moved for a stay in the Second Circuit. (2d Cir. D.E. 20). The Government filed its opposition on January 6, 2020, and Halkbank filed its reply on January 13, 2020. (2d Cir. D.E. 21, 22). Halkbank requested that its stay motion be returnable on February 21, 2020—that is, eight weeks after the date on which Halkbank filed its stay

motion in the Circuit, nearly six weeks after the motion was fully submitted, two weeks after the briefing on the Government's request for contempt sanctions will have been completed, and only two business days before the scheduled show-cause hearing before the Court.

As of the filing of this memorandum, the Second Circuit has not directed the Government to respond to Halkbank's petition for mandamus. *See* Fed. R. App. P. 21(b). Halkbank's motion for a stay with the Court of Appeals and is fully briefed and pending.

## FACTUAL BACKGROUND

### A.    Halkbank

Halkbank is a Turkish bank majority-owned by the Government of Turkey, currently controlled by the Turkiye Varlik Fonu, or Turkey Wealth Fund. (DeLuca Decl. Ex. 24 at 9). The Wealth Fund, in turn, is under the authority of the Office of the Presidency. The chairman of the Turkey Wealth Fund is President Recep Tayyip Erdogan; the deputy chairman is President Erdogan's son-in-law and the Minister of Treasury and Finance, Berat Albayrak. *Erdogan appoints himself chairman of Turkey's sovereign wealth fund*, REUTERS (Sep. 12, 2018).[3] Prior to 2017, Halkbank was controlled by the Turkish Privatization Administration, which was under the authority of the Office of the Prime Minister. At that time, the Prime Minister was also Erdogan.

Among other things, Halkbank is and, throughout the time period of the offenses charged in the Indictment, was the principal financial channel for trade between Turkey and Iran. Most significantly, Halkbank held accounts for the Central Bank of Iran and for the National

---

[3] *Available at* https://www.reuters.com/article/turkey-economy-fund/update-1-erdogan-appoints-himself-chairman-of-turkeys-sovereign-wealth-fund-idUSL5N1VY1SW.

Iranian Oil Company ("NIOC"), where Turkey deposited money to pay for billions of dollars' worth of oil and gas purchases from the Iranian government. (Ind. ¶¶ 3, 8, 26-27, 28, 35).

### B.    Halkbank's Offense Conduct

As alleged in the Indictment, from approximately 2012 through 2016, Halkbank knowingly participated in a scheme to violate U.S. criminal laws in order to give the Government of Iran access to billions of dollars' worth of sanctions-restricted funds deposited with Halkbank. These sanctions were in response to the unusual and extraordinary threat the Government of Iran and its actions pose to the United States' national security, economy, and foreign policy: the Government of Iran's sponsorship of international terrorism, pursuit of an illicit nuclear program and ballistic missiles program, and human rights abuses. The sanctions were imposed to deprive the Government of Iran of funding for its deadly and malign activities and to coerce the Government of Iran to engage in diplomatic process to limit or abandon those activities. (Tr. 163-65, 179-85, 195, 1081-82, 1409-12).

Dramatically undermining those efforts, Halkbank conspired to secretly give the Government of Iran access to at least approximately $20 billion-worth of oil revenues that were restricted by U.S. and international sanctions. (Ind. ¶ 4). The purpose of Halkbank's scheme was to move the Government of Iran's money from accounts with Halkbank to intermediary accounts in the United Arab Emirates and Turkey, so the funds could be disbursed throughout the world, including through the U.S. financial system, with the Iranian nexus to the funds concealed. (Ind. ¶¶ 1-6). A sophisticated system of trade-based money laundering, falsified documents, front companies, and payment intermediaries induced U.S. financial institutions to unwittingly export funds and financial services for Iran and the Government of Iran in violation of the banks' compliance and anti-money laundering policies and in violation of sanctions laws. (*Id.* ¶¶ 25-35, 50-62, 64). Halkbank thus knowingly participated in a scheme to defraud U.S. financial

institutions, to launder money through the U.S. financial system, and to cause unlawful exports of money and services from the United States for Iran and the Government of Iran. (*Id.* ¶¶ 69-81).

This sanctions-evasion conspiracy not only benefitted the Government of Iran; it also benefitted Halkbank by boosting its fees and revenues; it benefitted a corrupt Halkbank CEO and corrupt Turkish government officials who received tens of millions of dollars' worth of bribes as part of the scheme; and it benefitted the Turkish administration by falsely inflating Turkish economic statistics. (Ind. ¶¶ 30, 31, 36-38, 47, 59, 60, 62).

Halkbank lied to the Treasury Department to conceal the scheme and to protect Halkbank's access to the U.S. financial system. The transactions Halkbank facilitated for the Government of Iran could trigger sanctions against Halkbank itself under the relevant regulations. These potential sanctions included prohibitions on opening or maintaining U.S. correspondent bank accounts—prohibitions with potentially crippling effects. (Ind. ¶¶ 16-21). In meetings with senior Treasury officials in the United States and in Turkey (*see, e.g., id.* ¶¶ 42, 63), and telephone conversations and email correspondence with Treasury officials directed into the United States (*see, e.g., id.* ¶ 45; *see also* Tr. 1079-80, 1083-84, 1112-13, 1118, 1126, 1128-29, 1131-32, 1141-42, 1143-44, 1147-48, 1253-66, 1412-13, 1418-19. 1420-22, 1434, 1445-46, 1447, 1452-53, 1457, 1459-60), Halkbank lied about its use of Iranian government funds and its sanctions compliance in order to obstruct Treasury's ability to administer the sanctions and to prevent sanctions against Halkbank that would have cut it off from the U.S. financial system. (Ind. ¶¶ 66-71).

C.    **Halkbank's Role in a Cover-up in 2014 in Response to the Disclosure of the Bank's Role in Large-Scale Iranian Sanctions Evasion and Corruption**

As shown at Atilla's trial, Turkish law enforcement investigated money laundering, public corruption, and other offenses arising out of the scheme between approximately 2012 and 2013, resulting in the December 17, 2013 arrests of Zarrab, Suleyman Aslan, and others. This robust investigation was based on, among other things, judicially authorized wiretaps; physical surveillance; and judicially authorized searches of electronics and of the homes and offices of some of the co-conspirators. (*See, e.g.*, Tr. 1293, 1392-98, 1578-81, 1585-88 (Korkmaz); *see also, e.g.*, Tr. 339, 359, 367, 388, 391, 401, 409, 416, 425, 433, 462-63, 477, 487-88, 496, 500, 503, 509-10, 513, 578, 581, 583, 586, 593, 595, 596, 599, 615, 621-22, 671, 677).

The Turkish law enforcement investigation uncovered millions of dollars' worth of bribes Zarrab paid to Aslan, then Halkbank's General Manager (its chief executive) in connection with the scheme, as well as millions of dollars' worth of bribes paid to Mehmet Zafer Caglayan, then Turkey's Minister of the Economy, and his family members; bribes paid to an organization associated with then-Prime Minister Erdogan and his son; to Mehmet Guler, then Turkey's Minister of the Interior, and his family members; and to Egemen Bagis, then Turkey's Minister for European Union Affairs. (*See, e.g.*, Tr. 1280-81, 1300-05, 1305-09, 1314-16, 1317-19, 1321-23, 1576-78, 1661-62 (Korkmaz); *see also* Tr. 303-09, 462, 1031-32 (Zarrab)). Information about the illicit Iranian finance scheme at Halkbank and about the vast corruption was widely publicized after the December 17, 2013 arrests. (Ind. ¶ 59). *See also, e.g.*, Glen Johnson and Richard Spencer, *Turkey's politicians, gold dealer and the pop star*, THE

TELEGRAPH (Dec. 29, 2013);[4] Humeyra Pamuk et al., *Golden Loophole: How an alleged Turkish crime ring helped Iran*, REUTERS (Apr. 29, 2014).[5]

        Halkbank and the Turkish government took swift steps to limit the damage from these revelations. Supervisors in the Financial Crimes Unit were immediately reassigned (Tr. 1374-75, 1379-80) and their replacements issued instructions to limit questioning of suspects and to withhold reports from the prosecutors. (Tr. 1375-77, 1379). The remaining investigators and prosecutors were soon reassigned, and later prosecuted for participating in a legitimate criminal investigation. (Tr. 1381-83, 1561-64, 1783-84). Halkbank sought to whitewash the conduct by conducting a purported internal audit that focused on tangential questions, such as whether Zarrab was given improper loans or whether the business of Zarrab's competitors was impeded, but that ignored the issues of corruption and illicit Iranian finance. (Tr. 2205-07 (Atilla)). Halkbank issued repeated denials of involvement in Iranian sanctions evasion or money laundering based on its audit practices, and threatened civil or criminal legal action against the press. (*See, e.g.*, DeLuca Decl. Exs. 13 (Disclosure: To the Attention of the General Public (Jan. 13, 2014)) ("All business operations and transactions of our Bank are audited by the relevant auditing authorities on a regular basis."); 14 (Disclosure: Our Bank has filed a criminal complaint (Jan. 30, 2014)) ("[O]ur bank has filed a criminal complaint against the publisher, executives, and the columnist of [a Turkish newspaper] for publishing a news article titled 'Halkbank engages in money laundering'."); 15 (Disclosure: News Reports in the Media (Mar. 11, 2014)) ("Our bank has always complied with local and international laws in all foreign trade

---

[4] *Available at* https://www.telegraph.co.uk/news/worldnews/europe/turkey/10540423/Turkeys-politicians-gold-dealer-and-the-pop-star.html.

[5] *Available at* https://www.reuters.com/article/us-iran-turkey-special-report/special-report-golden-loophole-how-an-alleged-turkish-crime-ring-helped-iran-idUSBREA3S07120140429.

transactions for which it has served as a financial intermediary. . . This has been confirmed

through internal audits and audits performed by the Banking Regulation and Supervision Agency

(BRSA) and independent audit firms."); 23 (Halkbank 2013 Annual Report) at 251 ("The

transactions that might be considered in the scope of the judicial inquiry have been inspected and

audited comprehensively by the Board of Inspectors of the Bank.")).

   Zarrab and the other defendants in the corruption and money laundering

investigation were soon released, and the investigations closed, as a result of bribes. (Tr. 696).

Halkbank resumed the scheme with Zarrab after only a few months had passed. (Tr. 702-05

(Zarrab)). The initial reluctance of Halkbank's new general manager, Aslan's successor, was

overcome by the support of other bank officers (Tr. 1041) and instructions from then-Prime

Minister Erdogan and Berat Albayrak to resume the business. (Tr. 1037-38). Halkbank continued

the scheme for nearly two more years, until Zarrab's arrest in the United States in early 2016.

  **D.**  **Halkbank and the Turkish Government's Response to the U.S. Arrests of Reza Zarrab and Mehmet Hakan Atilla**

   Zarrab was arrested by the FBI in the United States on March 19, 2016. *United*

*States v. Zarrab*, 16 Mag. 2352 (JJO) (S.D. Fla.) (Mar. 21, 2016 Minute Entry). Halkbank

promptly denied any connection between the bank and the investigation against Zarrab. (DeLuca

Decl. Exs. 16 (Disclosure: About News on Media-Transactions of IRAN (Mar. 22, 2016)); 17

(Disclosure: About News Reports (Mar. 28, 2016)). Halkbank had no basis for these

representations about the scope of the investigation.

   After Atilla, Halkbank's then-Deputy General Manager for International Banking,

was arrested in the United States on March 27, 2017, the bank denied any wrongdoing, again

pointing to its whitewash audit efforts. (DeLuca Decl. Ex. 18 (Disclosure: About News on Media

(Mar. 30, 2017)). Halkbank continued to deny that it was a subject of the investigation that led to

the arrests of one of its largest clients and most senior managers, and that "no negative feedback has been received from any regulatory body." (DeLuca Decl. Ex. 19 (Disclosure: About News on Media (May 12, 2017)). This assertion was contrary to Treasury's pointed warnings to the bank during the offense conduct. Halkbank also bizarrely attributed Atilla's U.S. prosecution to the efforts of a Turkish religious and political organization deemed terrorists by the Turkish government. (DeLuca Decl. Ex. 18). During Atilla's trial, counsel chosen and funded by Halkbank (D.E. 581 at 4) advanced a similar theory during cross-examination, despite having "no foundation in the record" and the contention being "unpersuasive and borderline unprofessional." (Tr. 1970). Halkbank continued stridently to deny its involvement in the scheme even as trial commenced, Zarrab pleaded guilty, and the jury found Atilla guilty of five offenses. (DeLuca Decl. Ex. 20 (Disclosure: About News on Media (Nov. 30, 2017)); 21 (Disclosure: About the Case in the USA (Jan. 4, 2018)).

Halkbank sought to benefit from efforts by its majority shareholder, the Government of Turkey, to politically interfere in the ongoing investigation and prosecutions.

According to press reports, in late September 2016 President Erdoğan raised Zarrab's arrest with then Vice President Biden, claiming that Zarrab was innocent of the charges and that the prosecution was based on some unidentified "ulterior motives." *See* Ayla Jean Yackley, *Erdogan sees 'ulterior motives' in U.S. case against gold trader*, REUTERS (Sep. 25, 2016).[6] Erdoğan also reportedly accused members of the Government of having been "wined and dined" by followers of Fetullah Gulen, a former political ally of Erdoğan who in recent years has been labeled a terrorist by the Turkish government. *Id.*; *see also* Fikret Bila, *Erdogan says he*

---

[6] *Available at* http://www.reuters.com/article/us-turkey·us-prosecution-idUSKCN11V0FR.

*asked US VP Biden about arrest of Iranian-Turkish businessman Zarrab*, HÜRRIYET DAILY NEWS (Sep. 25, 2016).[7]

In April 2017, it was reported that the Istanbul prosecutor's office opened a criminal investigation of former U.S. Attorney Preet Bharara, former Under Secretary Cohen (who was, at that time, Deputy Director of the CIA), and other U.S. government and academic figures for alleged involvement in a failed July 2016 military coup attempt in Turkey. *See* Patrick Kingsley, *Turkey Investigating 17, Some Americans, Accused in Failed Coup*, N.Y. TIMES (Apr. 15, 2017).[8]

In September 2017, after the return of the superseding indictment charging former Turkish Minister of the Economy Cağlayan for his role in the offense, Turkish President Erdoğan called the charges an act against the Republic of Turkey. *See* Selcan Hacaoglu and Onur Any, *Erdogan Says U.S. Targeting Turkey With Iran-Linked Prosecutions*, BLOOMBERG NEWS (Sep. 8, 2017);[9] *see also Erdogan says will discuss case of ex-Turkish minister with Trump during visit*, REUTERS (Sep. 15, 2017);[10] Ece Toksabay, *Turkey says U.S. indictment of former minister amounts to 'coup attempt'*, REUTERS (Sep. 20, 2017).[11] In mid-November 2017, Turkey's foreign minister told the press that the prosecutions against Zarrab and Atilla were based on fabricated

---

[7] *Available at* http://www.hurriyetdailynews.com/erdogan-says-he-asked-us-vp-biden-about-arrest-of-iranian-turkish-businessman-zarrab.aspx.

[8] *Available at* https://www.nytimes.com/2017/04/15/world/europe/turkey-failed-coup-investigation-americans.html.

[9] *Available at* https://www.bloomberg.com/news/articles/2017-09-08/erdogan-says-u-s-targeting-turkey-with-iran-linked-prosecutions.

[10] *Available at* https://www.reuters.com/article/us-usa-turkey/erdogan-says-will-discuss-case-of-ex-turkish-minister-with-trump-during-visit-idUSKCN1BQ2GC.

[11] *Available at* https://www.reuters.com/article/us-usa-turkey-spokesman/turkey-says-u-s-indictment-of-former-minister-amounts-to-coup-attempt-idUSKCN1BM2A1.

evidence and were somehow politically motivated.[12] The Deputy Prime Minister called the trial a "conspiracy against Turkey," a "political trial" that was "devoid of legal foundation." *See Bekir Bozdağ: Reza Zarrab being held hostage in the USA*, Cumhuriyet (Nov. 20, 2017).[13] That same month, the Istanbul prosecutor's office announced that it had opened a criminal investigation of then-current and former U.S. Attorneys and others. *See, e.g.*, *Turkey Prosecutors Open Probe of Former, Acting US Attorneys*, N.Y.L.J. (Nov. 20, 2017).[14]

### E.    Response to Atilla's Conviction and Sentencing

Following the jury's guilty verdict against Atilla, the government of Turkey has continued to assert his purported innocence and to attack the trial and conviction. In a May 15, 2018 interview, Turkish President Erdoğan called Atilla "a friend of ours" who was "definitely innocent." Erdoğan said that Halkbank's lawyers were closely following the criminal proceedings. *Erdogan on U.S. Sanctions, Halkbank*, BLOOMBERG NEWS (May 14, 2018).[15]

The Turkish Ministry of Foreign Affairs issued a statement asserting that Atilla was innocent, had been convicted following "an entirely feigned process which is inconsistent with the principle of fair trial," and the prosecution was based on falsified evidence and perjured testimony. *Turkey slams US court's sentencing of former Halkbank manager Hakan Atilla*, HÜRRIYET DAILY NEWS (May 17, 2018).[16] According to press reports, Turkey's Deputy Prime

---

[12] At Atilla's trial, voluminous evidence, including wiretap evidence, emails, and financial records, was authenticated and admitted and there is no legitimate dispute that the evidence is genuine.

[13] *Available at* http://www.cumhuriyet.com.tr/haber/english/870096/ Bekir_Bozdag__Reza_Zarrab_being_held_hostage_in_the_USA.html.

[14] *Available at* https://www.law.com/newyorklawjournal/sites/newyorklawjournal/ 2017/11/20/turkey-prosecutors-open-probe-of-former-acting-us-attorneys.

[15] *Available at* https://www.bloomberg.com/news/videos/2018-05-15/erdogan-on-u-s-sanctions-halkbank-video.

[16] *Available at* http://www.hurriyetdailynews.com.turkey-slams-us-courts-sentence-on-

Minister tweeted that the sentence was the result of a conspiracy between the FBI, CIA, and Gulen, and asserted that another country cannot judge Turkey's actions and institutions. *See Turkish deputy PM says CIA, FBI, and Islamist group in plot over banker's sentence*, AHVAL NEWS (May 17, 2018).[17]

When Atilla completed his sentence and returned to Turkey, he reportedly was welcomed at the Istanbul airport by Berat Albayrak, currently Turkey's Minister of Treasury and Finance, and Halkbank's current General Manager. *Halkbank executive returns to Turkey after serving U.S. sentence*, REUTERS (Jul. 24, 2019).[18] Less than a week after the Indictment was returned charging Halkbank, Atilla was named CEO of the Istanbul Stock Exchange, which, like Halkbank, is majority owned by the Turkish government. Ayla Jean Yackley, *Turkey picks former jailed banker to head Istanbul stock exchange*, FINANCIAL TIMES (Oct. 21, 2019).[19] Albarak reportedly stated: "After his unjust conviction, Hakan Atilla was reunited with his family and nation, and his period of rest has now ended." *Id.*

As the Turkish government lobbied against the Zarrab, Atilla, and Halkbank prosecutions, it reportedly also sought to use a U.S. citizen imprisoned in Turkey as a proposed exchange for minimizing or dropping further proceedings involving Halkbank. *See, e.g.*, Nick Wadhams and Jennifer Jacobs, *Turkey Holds Out on Releasing American Pastor*, BLOOMBERG NEWS (Aug. 8, 2018);[20] Steve Holland & Jeff Mason, *U.S. says more sanctions await if Turkey*

---

former-halkbank-manager-hakan-atilla-131939.

[17] *Available at* https://ahvalnews6.com/halkbank/turkish-deputy-pm-says-cia-fbi-and-islamist-group-plot-over-bankers-sentence.

[18] *Available at* https://www.reuters.com/article/us-turkey-usa-banker/halkbank-executive-returns-to-turkey-after-serving-u-s-sentence-idUSKCN1UJ1MO.

[19] *Available at* https://www.ft.com/content/31e25da8-f442-11e9-a79c-bc9acae3b654.

[20] *Available at* https://www.bloomberg.com/news/articles/2018-08-08/turkish-delegation-

*does not free pastor*, REUTERS (Aug. 15, 2019);[21] Demetri Sevastopulo, *Trumps warns of no concessions to Turkey for Pastor's release*, FINANCIAL TIMES (Aug. 20, 2018).[22]

### F.    Response to Halkbank's Indictment

As noted above, immediately after the Indictment was returned, Halkbank issued a release attacking the legitimacy of these proceedings in the press (DeLuca Decl. Ex. 18), but has refused to appear and respond to the charges on the merits. Shortly after Halkbank was charged, a Turkish delegation led by President Erdogan reportedly raised the indictment in an October 17, 2019 meeting with Vice President Michael Pence. *See* Laura Pitel, *Erdogan attacks 'ugly' US decision on Turkey Halkbank*, FINANCIAL TIMES (Oct. 16, 2019);[23] *Remarks by Vice President Pence and Secretary of State Pompeo in Press Conference, Ankara, Turkey* (Oct. 17, 2019).[24] The Turkish Foreign Minister claimed, with no basis, that the charges were politically motivated. Tuvan Gumrukcu, *Turkey says nothing will come of Halkbank case if law in U.S. works*, REUTERS (Oct. 20, 2019).[25]

### G.    Halkbank's U.S. Financial Activities and Financial Resources

According to its 2018 Annual Report, the most recent annual report available, Halkbank had total assets as of December 31, 2018 of TRY 378,422,055,000

---

to-meet-with-state-treasury-amid-u-s-row.

[21] *Available at* https://www.reuters.com/article/us-turkey-currency-sanctions/u-s-says-ready-with-more-sanctions-if-turkey-does-not-free-pastor-idUSKBN1L122C.

[22] *Available at* https://www.ft.com/content/6d790d6e-a4d2-11e8-926a-7342fe5e173f.

[23] *Available at* https://www.ft.com/content/1b2b76fe-f00e-11e9-ad1e-4367d8281195.

[24] *Available at* https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-secretary-state-pompeo-press-conference-ankara-turkey/.

[25] *Available at* https://www.reuters.com/article/us-usa-turkey-halkbank/turkey-says-nothing-will-come-of-halkbank-case-if-law-in-u-s-works-idUSKBN1WZ072.

($64,239,490,053),[26] including TRY 40,097,793,000 ($6,806,848,968) in cash and cash equivalents. (DeLuca Decl. Ex. 24 (Halkbank 2018 Annual Report) at 144). Halkbank's reported reserves include a legal reserve of TRY 1,864,266,000 ($316,470,712) and an extraordinary reserve of TRY 18,563,848,000 ($3,151,328,294). (*Id.* at 146, 274-75). Halkbank reported a net operating income for 2018 of TRY 2,717,818,000 ($461,366,456) and a net profit of TRY 2,521,795,000 ($428,090,336). (*Id.* at 150).

Halkbank reported that it made no financial provision related to the ongoing investigation of the bank. (*Id.* at 131, 292, 295, 469). As of December 31, 2018, the bank had been expressly advised by the Government on several occasions that it was a target of the criminal investigation and that the evidence was sufficient to charge.

## DISCUSSION

Halkbank's contempt of the two summonses is indisputable. Halkbank was served with, and knew of, both summonses and intentionally failed to appear as ordered. (*See, e.g.*, D.E. 566; Nov. 5, 2019 Tr.). The Court has granted Halkbank ample opportunity to cure its contempt, including issuing a second summons and allowing briefing and argument on Halkbank's meritless request for a special appearance. That request has been correctly rejected and Halkbank must appear as ordered. A significant *per diem* penalty, accruing continuously until Halkbank's appearance and increasing over time in proportion to Halkbank's intransigence, is appropriate and necessary to compel Halkbank's compliance with this Court's orders.

---

[26] Equivalent values in U.S. dollars reported here are based on publicly reported exchange rates as of January 18, 2020, of approximately TL 5.89 per dollar.

I.        **Relevant Law**

The Supreme Court has long observed that "[t]here can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). "An adjudication of civil contempt is coercive—to compel obedience to a lawful court order[.]" *In re Grand Jury Witness*, 835 F.2d 437, 440 (2d Cir. 1987); *see also Matter of Dickinson*, 763 F.2d 84, 87 (1985) ("The primary purpose of the imposition of a sanction for civil contempt is to coerce the contemnor into future compliance and to remedy past non-compliance, rather than to punish him.").

Civil contempt sanctions may be imposed on "notice and an opportunity to be heard," and "[n]either a jury trial nor proof beyond a reasonable doubt is required." *United Mine Workers of America v. Bagwell*, 512 U.S. 821, 828 (1994). To impose contempt sanctions, a district court must (1) find that the order that the party allegedly failed to comply with is clear and unambiguous; (2) find that proof of noncompliance is clear and convincing; and (3) find that the contemnor was not reasonably diligent in attempting to comply. *United States v. Local 1804-1 Int'l Longshoremens Ass'n AFL-CIO*, 44 F.3d 1091, 1096 (2d Cir. 1995)

A district court has "wide discretion" in "fashioning a remedy for civil contempt." *Matter of Dickenson*, 763 F.2d at 87. That discretion "clearly permits the imposition of a fine." *Id*. at 88 (citing *Marc Rich & Co. A.G. v. United States*, 707 F.2d 663, 670 (2d Cir. 1983)). A "per diem" fine, "imposed for each day a contemnor fails to comply with an affirmative court order," is a civil contempt sanction that "exert[s] a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged." *Bagwell*, 512 U.S. at 829.

"[W]hen the civil contempt order imposes a fine, the contemnor's financial resources must be weighed in order to decide whether the sanctions appropriately compel obedience to the order." *In re Grand Jury Witness*, 835 F.2d at 443. In order to determine an

19

appropriately coercive contempt sanction, a district court should consider "(1) the character and magnitude of the harm threatened by continued contempt, (2) the probable effectiveness of the proposed sanction, and (3) the financial consequence of that sanction upon the contemnor." *Id.* (citing *United States v. United Mine Workers of America*, 330 U.S. 258, 304 (1947); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982)).

## II.    The Court Should Impose a Substantial Per Diem Fine, Increasing Over Time

Halkbank's contempt is amply demonstrated. The Court's two summonses were "clear and unambiguous," *see Local 1804-1 Int'l Longshoremens Ass'n AFL-CIO*, 44 F.3d at 1096, directing Halkbank to appear in Court at specified dates and times. The "proof of noncompliance is clear and convincing," *id.*; despite having actual knowledge of both summonses, Halkbank twice failed to appear as directed. Indeed, Halkbank even authorized counsel to attend the second appearance date but specifically without authority to enter an appearance on Halkbank's behalf. And Halkbank has "not [been] reasonably diligent in attempting to comply." *Id.* To the contrary, it has diligently sought to *avoid* complying with the summonses and has raised meritless arguments in an effort to evade the Court's authority. Halkbank will have had ample notice and opportunity to be heard, *see Bagwell*, 512 U.S. at 828, in advance of the show-cause hearing: the Court issued the Second Summons specifically to afford Halkbank an opportunity to cure its noncompliance with the First Summons, and has entertained—and correctly rejected—Halkbank's request to avoid complying with the summonses by entering a special appearance. Halkbank will further have an opportunity to argue why sanctions should not be imposed at the hearing.

Upon appearing, Halkbank will have the full panoply of rights that every criminal defendant enjoys under the U.S. system of criminal justice. Those rights do not include the right to ignore lawful orders of the Court. Halkbank must appear as directed and, if the bank does not

appear prior to the date of the show-cause hearing, it should be held in contempt and appropriate sanctions should be imposed. "Federal court orders are to be obeyed unless and until litigants succeed in having them duly overturned by the appropriate court of appeals. Litigants may not defy court orders because their commands are not to the litigants' liking." *United States v. Philip Morris USA Inc.*, 287 F. Supp. 2d 5, 14 (D.D.C. 2003).

 The Government respectfully suggests that a *per diem* fine is an appropriate sanction to "exert a constant coercive pressure" to compel the defendant's appearance. *Bagwell*, 512 U.S. at 829; *see also Int'l Business Machines Corp. v. United States*, 493 F.2d 112, 115-16 (2d Cir. 1973) (civil contempt sanction for failure to comply with discovery order of $150,000 per day properly reflected contemnor's resources and ability to pay); *In re Sealed Case*, 932 F.3d 915 (D.C. Cir. 2019) (affirming civil contempt sanctions for failure to comply with grand jury subpoenas of $50,000 per day); *Walters v. People's Republic of China*, 72 F. Supp. 3d 8, 10 (D.D.C. 2014) (proposed contempt sanctions for failure to comply with discovery order of $246,500 per day); *Chabad v. Russian Fed'n*, 915 F. Supp. 2d 148, 155 (D.D.C. 2013) (contempt sanctions for failure to comply with an injunctive judgment of $50,000 per day); *Philip Morris USA Inc.*, 287 F. Supp. 2d at 14-15 (civil contempt sanctions for failure to comply with discovery order of $25,000 per day).

 The amount of the *per diem* fine should increase over time, so that if the sanction is not initially effective to compel the bank's appearance, the coercive effect of the fine will increase in relation to Halkbank's intransigence. *See, e.g.*, *FG Hemisphere Assocs. LLC v. Democratic Republic of Congo*, 637 F.3d 373, 376 (D.C. Cir. 2011) (affirming civil contempt sanction for refusal to comply with discovery order of $5,000 per week of noncompliance, doubling every week to a maximum of $80,000 per week); *Shell Offshore Inc. v. Greenpeace,*

*Inc.*, 815 F.3d 623, 630 (9th Cir. 2016) (affirming civil contempt sanction for violations of an injunction of $2,500 per hour, increasing after 24 hours to $10,000 per hour).

The Government respectfully proposes a *per diem* fine in the amount of $1,000,000 per day, and that the fine should double at the end of every week that Halkbank fails to cure its noncompliance by appearing and entering a plea. Thus, if Halkbank fails to cure its noncompliance for one week, the total accrued fine will be $7 million. If Halkbank fails to cure its noncompliance for an additional week, the total accrued fine will be $21 million. If Halkbank fails to cure its noncompliance for a third week, the total accrued fine will be $49 million. The Court should also, upon application by the Government, enter interim judgments reflecting the aggregate amount of the fine accrued at that date in order to aid in the enforcement of the Court's orders.

The proposed sanction is appropriately coercive in light of (1) Halkbank's financial resources and ability to pay, (2) the probable effectiveness of the proposed sanction, and (3) the character and magnitude of the harm threatened by continued contempt. *United Mine Workers of America*, 330 U.S. at 304; *In re Grand Jury Witness*, 835 F.2d at 443; *Perfect Fit Indus.*, 673 F.2d at 57. Halkbank had reported total assets, as of the end of 2018, of more than $64 billion, including legal reserves in excess of $316 million and extraordinary reserves exceeding $3.1 billion. The bank's net operating income for 2018 was more than $461 million, averaging over $1.26 million per day. In light of Halkbank's assets, large reserves, and substantial net operating income, a daily fine beginning at $1 million a day is appropriate and necessary in order to have a coercive effect. Compare *Int'l Business Machines Corp.*, 493 F.2d at 115-16.

A large daily fine is especially appropriate in light of the extraordinary lengths to which Halkbank has gone over a number of years to conceal the scheme and to try to cover up or deny its responsibility for it. During the offense, the bank participated in and helped structure transactions that relied on forged documents and falsified export records, and lied repeatedly to senior Treasury officials during the scheme. When the scheme was partially revealed and its former General Manager arrested in late 2013, Halkbank attempted to cover up its participation with a whitewash audit report and repeated, audacious denials, and quickly resumed the scheme with minimal modification. When one of Halkbank's partners in the offense, Zarrab, and its Deputy General Manager for International Banking, Atilla, were arrested, the bank continued its strategy of wagon-circling and relied on the high-level efforts of the Turkish Government to achieve the same result reached in 2014—an attempt to end the investigation and allow Halkbank to escape responsibility for its crimes. Since the Indictment was returned in October 2019, the bank has completely ignored the First Summons, intentionally failed to comply with the Second Summons, and insisted—without merit—that it cannot be required to answer the charges. The bank has attempted to attack the Indictment without demonstrating any intention to honor rulings adverse to its position. A significant coercive sanction is necessary to counter this intransigence.

The character and magnitude of the harm threatened by Halkbank's continued contempt reinforces the need for a substantial coercive sanction. Halkbank was at the center of an illicit Iranian finance and money-laundering scheme of historic proportion, undermining international efforts to denuclearize a state sponsor of terrorism. As shown above, Halkbank has also been at the center of a persistent effort to cover up that crime and protect wrongdoers from

the just consequences of their actions. This significant challenge to national security and to the rule of law requires strong measures.

**CONCLUSION**

Accordingly, the Government respectfully submits that the evidence clearly and convincingly shows that, by failing to appear in this action to answer the charges in the Indictment, Halkbank is in knowing, intentional violation of clear and unambiguous Court orders.  Halkbank's failure to appear is contumacious and part of a long course of conduct by both the defendant itself and the defendant's principal shareholder, the Government of Turkey, aimed at obstructing the investigation that led to the charges in the Indictment and suppressing the public airing of evidence of the bank's central role in a massive sanctions-evasion scheme and of the large-scale bribery as part of this scheme that enriched corrupt participants at the bank and in the Turkish government.

A substantial financial penalty, accruing on a regular basis until the contempt is purged, is an appropriate and necessary sanction to apply a sufficient coercive pressure to cause the defendant to cease its contempt and appear in this matter. The Government respectfully suggests that a doubling fine—a fine amount that doubles for each week that the bank refuses to

appear—beginning at $1,000,000 and doubling over time as necessary to counter the obstinacy

of Halkbank's refusal to comply, is a necessary and appropriate coercive sanction.

Dated:  New York, New York
        January 21, 2020

                            Respectfully submitted,

                            GEOFFREY S. BERMAN
                            United States Attorney

                    by: _____
                            Michael D. Lockard / Sidhardha Kamaraju /
                            David W. Denton, Jr. / Jonathan Rebold /
                            Kiersten A. Fletcher
                            Assistant United States Attorneys

25