18-1589
*United States v. Atilla*

1:15-cr-00867-RMB-5

# United States Court of Appeals
# For the Second Circuit

August Term 2019

Argued: December 16, 2019
Decided: July 20, 2020

No. 18-1589

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/16/2020

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

MEHMET HAKAN ATILLA,

*Defendant-Appellant.**

Appeal from the United States District Court
for the Southern District of New York
No. 15-cr-867, Richard M. Berman, *Judge.*

Before: POOLER, HALL, AND SULLIVAN, *Circuit Judges.*

Defendant-Appellant Mehmet Hakan Atilla appeals his conviction after trial on charges including conspiracy to defraud the United States, conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), bank fraud, and money laundering in connection with a scheme to evade U.S. economic sanctions against Iran. Atilla argues that the district court (Richard M. Berman, *J.*)

---

* The Clerk of Court is respectfully requested to amend the caption as set forth above.

erred in instructing the jury, that the evidence was insufficient to support his convictions, that the statute prohibiting defrauding the United States did not reach his conduct, and that the district court abused its discretion in excluding evidence at trial. Although we agree that the district court provided a partially erroneous jury instruction on the IEEPA statute, the error was harmless. In all other respects, Atilla's contentions are unavailing. We therefore affirm the district court's judgment.

AFFIRMED.

> JOHN P. ELWOOD, Arnold & Porter Kaye Scholer LLP, Washington, District of Columbia (Joshua S. Johnson, Vinson & Elkins LLP, Washington, District of Columbia, Victor J. Rocco, Herrick, Feinstein LLP, New York, New York, *on the brief*), *for Defendant-Appellant* Mehmet Hakan Atilla.

> MICHAEL D. LOCKARD, Assistant United States Attorney (Sidhardha Kamaraju, David W. Denton, Jr., Won S. Shin, Assistant United States Attorneys, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, New York, *for Appellee* United States of America.

RICHARD J. SULLIVAN, *Circuit Judge*:

Mehmet Hakan Atilla, a Turkish national and former Deputy General Manager of Turkey's state-owned bank, Türkiye Halk Bankaşi, A.S. ("Halkbank"), appeals his conviction on charges relating to an alleged multibillion-dollar scheme to evade U.S. economic sanctions against Iran. On appeal, Atilla challenges his convictions on four grounds, maintaining that the district court erred in

instructing the jury on the International Emergency Economic Powers Act

("IEEPA"), that the evidence was insufficient to support his convictions, that the

statute prohibiting defrauding the United States did not reach his conduct, and

that the district court abused its discretion in excluding a recording and transcript

of a jailhouse phone call that he sought to introduce at trial.

Although we agree that the district court provided a partially erroneous jury

instruction on the IEEPA statute, we conclude that any error in the instruction was

harmless given that the jury was properly instructed on an alternative theory of

liability for which the evidence was overwhelming.  We further find that the trial

evidence was sufficient to support the remaining convictions, that 18 U.S.C. § 371

– the statute that prohibits defrauding the United States – reaches Atilla's

conspiracy to obstruct the United States' enforcement of its economic sanctions

laws, and that even assuming that the district court abused its discretion by

excluding the phone call recording and transcript, that error was harmless.  We

therefore affirm the district court's judgment.

## I.  BACKGROUND

The evidence at trial established that Atilla agreed with others to evade U.S.

economic sanctions against Iran by laundering billions of dollars' worth of Iranian

oil proceeds out of Halkbank.  As Deputy General Manager of Halkbank, Atilla oversaw the bank's international corporate finance efforts and was responsible for the bank's relationships with U.S. correspondent banks, Iranian banks, and the Central Bank of Iran ("CBI").  At that time, Halkbank held accounts for the CBI and Iran's government-owned petroleum company, the National Iranian Oil Company ("NIOC").  As part of the scheme, Atilla worked with others to help Halkbank's customers steer billions of dollars in financing to the Government of Iran by disguising NIOC's oil funds as permissible private trade and humanitarian assistance.  Atilla also repeatedly lied to senior U.S. Treasury Department officials to hide the scheme and to protect Halkbank from the imposition of U.S. sanctions.

At the center of the scheme was Atilla's codefendant, Reza Zarrab, a dual citizen of Turkey and Iran and a significant client of Halkbank.  After Zarrab was apprehended by the United States for his role in the scheme, Zarrab pleaded guilty, agreed to cooperate with the government, and was one of the government's principal witnesses against Atilla at Atilla's trial.  During his plea allocution, Zarrab admitted that he had agreed with others, including Atilla, to obstruct Treasury's enforcement of economic sanctions, violate the IEEPA by engaging in commercial transactions designed to evade U.S. sanctions against Iran, mislead

U.S. banks through falsified documents, and move funds from inside the United States to places outside the United States for the purposes of promoting the IEEPA violation and bank fraud.  Zarrab also admitted to paying millions of dollars in bribes to other codefendants.

Following his arrest in March 2017, Atilla was charged with conspiracy to obstruct the lawful functions of Treasury, in violation of 18 U.S.C. § 371 (Count One); conspiracy to violate the IEEPA, in violation of 50 U.S.C. § 1705 (Count Two); bank fraud, in violation of 18 U.S.C. § 1344 and § 2 (Count Three); conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Four); money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) and § 2 (Count Five); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Six).

After the district court denied Atilla's motion to dismiss the indictment, the case proceeded to a three-and-a-half-week jury trial.   At the end of the government's case-in-chief, Atilla moved for a judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure, arguing that the evidence was insufficient to prove that he knew the scheme would involve the use of the U.S. financial system; that willfully avoiding the imposition of sanctions was not a

criminal violation under the IEEPA; and that Counts One, Two, Four, and Six each charged multiple conspiracies.  The district court reserved decision on that motion, which it ultimately denied after trial.  Following the close of the defense's case, the jury deliberated for four days and returned a verdict of guilty on Counts One through Four and Count Six, and a verdict of not guilty on Count Five.  The district court sentenced Atilla to 32 months' imprisonment and imposed a $500 mandatory special assessment.  Atilla completed his term of imprisonment on July 19, 2018 and was deported to Turkey.  Because "a challenge to a criminal conviction itself presents a justiciable case or controversy even after the expiration of the sentence that was imposed as a result of the conviction," *United States v. Probber*, 170 F.3d 345 (2d Cir. 1999), this case is not moot.

## II. DISCUSSION

On appeal, Atilla challenges his convictions on four grounds.  First, he contends that the district court wrongly instructed the jury that it could convict him of conspiring to violate the IEEPA merely if he agreed to evade or avoid the imposition of secondary sanctions.  Second, he asserts that there was insufficient evidence for the jury to convict him of conspiracy to violate the IEEPA, bank fraud, conspiracy to commit bank fraud, and conspiracy to commit money laundering

because the government presented no evidence that he knew the sanctions-avoidance scheme would involve the use of U.S. banks. Third, Atilla maintains that his conviction for conspiring to defraud the United States fails because the statute of conviction, 18 U.S.C. § 371, does not reach agreements to obstruct the United States' enforcement of economic sanctions laws. Fourth, Atilla argues that the district court abused its discretion by excluding a recording and transcript of an Azeri-language phone call involving Zarrab while he was incarcerated. We address each contention in turn.

### A. The District Court Wrongly Instructed the Jury that Atilla Could be Convicted Under the IEEPA for Conspiring to Avoid the Imposition of Secondary Sanctions

Atilla contends that the district court wrongly instructed the jury that it could "convict [him] of conspiring to violate [the] IEEPA based on the theory that he conspired to evade or avoid the imposition of secondary sanctions" – restrictions on accessing the U.S. financial system imposed on foreigners whom the Secretary of the Treasury determines have done business with Iran. Atilla's Br. at 27. According to Atilla, the court's instruction conflicted "with the longstanding position of the agency charged with sanctions administration, the plain language of [the] IEEPA and the regulatory provisions at issue, the

presumption against extraterritoriality, the rule of lenity, and the Due Process Clause." *Id.* His core assertion is that "[t]he relevant provisions only forbid transactions that evade or avoid *existing* 'prohibitions' already imposed on a foreign financial institution's ability to open or maintain U.S. accounts," not "efforts to evade or avoid the *imposition* of secondary sanctions." *Id.* at 27–28. Atilla therefore maintains that, because the instructional error was not harmless, he is entitled to a new trial on Count 2 (and the money laundering conspiracy in Count 6, which "effectively incorporated the erroneous IEEPA charge"). *Id.* at 47.

"We review a claim of error in jury instructions *de novo*, reversing only where, viewing the charge as a whole, there was a prejudicial error." *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003). The object of that review is "to see if the entire charge delivered a correct interpretation of the law." *United States v. Bala*, 236 F.3d 87, 94–95 (2d Cir. 2000) (internal quotation marks omitted). The requirement that any instructional error be prejudicial precludes a defendant from obtaining relief where it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999). Furthermore, prejudice is not present if "the jury would have necessarily found the defendant[] guilty on one of the properly instructed theories

of liability." *United States v. Ferguson*, 676 F.3d 260, 277 (2d Cir. 2011) (citing *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008)).

The IEEPA makes it unlawful for a person "to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the statute. 50 U.S.C. § 1705(a). A person who "willfully conspires to commit" such an unlawful act is subject to criminal penalties. *Id.* § 1705(c).

The Executive Branch has exercised its authority under the IEEPA and promulgated several provisions and orders relevant here. First, the Iranian Transactions and Sanctions Regulations ("ITSR") generally prohibit the exportation from the United States of goods and services intended for Iran or its government without a license from the Office of Foreign Assets Control ("OFAC"). 31 C.F.R. § 560.204. The execution of bank transactions is a "service" under the ITSR. *See United States v. Banki*, 685 F.3d 99, 108 (2d Cir. 2012) ("[T]he execution of money transfers from the United States to Iran on behalf of another, whether or not performed for a fee, constitutes the exportation of a service."). Second, the Iranian Financial Sanctions Regulations ("IFSR") generally prohibit U.S. correspondent banking transactions with foreign financial institutions determined

9

by Treasury to have engaged in certain sanctionable activity (such as facilitating transactions for the CBI or NIOC). 31 C.F.R. §§ 561.203–.204. Once a foreign financial institution is sanctioned, the IFSR prohibits U.S. correspondent banking transactions with the sanctioned foreign bank. *Id.* Third, Executive Orders 13,622 and 13,645 authorize Treasury to prohibit U.S. correspondent banking transactions with foreign banks that knowingly facilitated purchases of gold for the Government of Iran or for any Iranian citizen. *See* Exec. Order No. 13,645, 78 Fed. Reg. 33,945 (June 3, 2013); Exec. Order No. 13,622, 77 Fed. Reg. 45,897 (July 30, 2012). Executive Order 13,645 further authorizes Treasury to prohibit U.S. correspondent banking transactions with foreign banks that knowingly facilitated financial transactions for the purchase of petroleum from Iran, unless the funds were used only for bilateral trade between the foreign country or the transaction was for the sale of agricultural commodities, medicine, or medical devices to Iran. *See* 78 Fed. Reg. at 33,945–53. Each of these regulations and orders prohibits "[a]ny transaction" that "evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth" in the respective regulation or order. 31 C.F.R. §§ 560.203(a), 561.220(a); Exec. Order No.

10

13,645, 78 Fed. Reg. at 33,950, § 13(a); Exec. Order No. 13,622, 77 Fed. Reg. at 45,900,

§ 9(a).

We agree with Atilla that, based on their plain language, the IEEPA, the

regulations, and the executive orders at issue do not make it unlawful for an

individual to conspire to evade or avoid the prospective imposition of

prohibitions.  The government's theory of liability in this respect rested on the

premise that a person violates a "license, order, regulation, or prohibition issued

under" the IEEPA by evading or avoiding the imposition of secondary sanctions.

*See* 50 U.S.C. § 1705(a).  But the text of the relevant statutes, regulations, and

executive orders does not prohibit conduct merely because it could provide a basis

for prohibitions in the future.  The regulations provide that the Secretary of the

Treasury may "prohibit U.S. financial institutions from opening [or maintaining]

a correspondent account or a payable-through account" for foreign financial

institutions, but only "upon a determination by the Secretary of the Treasury that

[the] foreign financial institution has knowingly conducted or facilitated any

significant financial transaction" with designated Iranian entities or for "the

purchase or acquisition of" petroleum, petroleum products, or petrochemical

products from Iran.  31 C.F.R. §§ 561.203–.204.  The regulations thus make clear

11

that there is no prohibition until the Secretary of the Treasury has made the requisite determination.

Consequently, the government's theory that it is unlawful to conspire to evade or avoid the determinations that might lead to the imposition of "prohibitions on being able to maintain access to the U.S. financial system" has no basis in the text.  App'x at 721.  As written, the relevant statutes, regulations, and executive orders are most naturally read to apply to transactions that evade or avoid existing prohibitions that have already been imposed on a foreign financial institution's ability to open or maintain U.S. accounts; indeed, the text plainly states that conduct that "evades or avoids . . . any of the prohibitions set forth" in the provisions is unlawful.  *See, e.g.*, 31 C.F.R. § 560.203(a).  This conclusion is further supported by the fact that the very same provisions make it illegal to "cause[] a violation of . . . prohibitions," which would be impossible for as-yet-unimposed prohibitions.  *Id.*

The government concedes that "Atilla may well be correct that . . . the language addressed to 'caus[ing] a violation' of a prohibition, 'attempt[ing] to violate' a prohibition, and 'evad[ing]' a prohibition . . . [is] best understood to refer to existing prohibitions that have already been imposed."  Gov't Br. at 38–39.

12

Nevertheless, the government insists that "the provisions also prohibit any transaction that '*avoids* . . . any of the prohibitions.'" *Id.* at 39. The government stresses that the term "avoid" – which it defines as "to prevent the occurrence of" or "to keep from happening" – has a plain and unambiguous meaning independent from "evade" in the provisions. *Id.* (internal quotation marks omitted). Thus, according to the government, "the . . . [p]rovisions prohibit any transaction designed to *prevent* the imposition of a prohibition set forth in the [r]egulations." *Id.* (emphasis added). The government attacks Atilla's position as "fail[ing] to offer any alternative meaning of the word 'avoid'" and as "simply lump[ing] 'evade' and 'avoid' together." *Id.* at 40. The government maintains that this Court must give "evade" and "avoid" independent meanings because Congress used both terms in the provisions, and that to treat the words merely as synonyms would "effectively read[] the word 'avoid' out of the [r]egulations." *Id.*

We reject the government's contentions. Several principles of statutory construction indicate that the words "evade" and "avoid" in the phrase "evade or avoid" should not be given distinct meanings. The words are close synonyms, giving us confidence that we may treat "evade or avoid" as a unitary phrase with a single meaning. *See Evade*, *Oxford English Dictionary* ("[t]o escape . . . from," "to

13

avoid, save oneself from," "to elude"), https://www.oed.com/view/Entry/65173; *Avoid, Oxford English Dictionary* ("[t]o escape, evade," "to keep out of the way of"), https://www.oed.com/view/Entry/13796.  The phrase "evade or avoid," therefore, is naturally read as a redundant doublet, such as "null and void," "arbitrary and capricious," or "aid and abet."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176–77 (2012).[1]  The provisions' punctuation further supports this reading, since verb phrases with different meanings are separated by commas, but no comma appears between "evades" and "avoids."  *E.g.*, 31 C.F.R. § 561.220(a) ("Any transaction . . . that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in [the relevant regulations] is prohibited.").

---

[1] We are mindful that several courts have recognized that "evade" can have a slightly more nefarious connotation than "avoid" in some contexts.  *See, e.g., SUPERVALU, Inc. v. Bd. of Trs.*, 500 F.3d 334, 341 (3d Cir. 2007) (interpreting the ordinary meaning of the clause "evade or avoid liability" in the context of an ERISA claim and explaining that "[t]he verb 'avoid' means 'to stay clear of' or 'to keep from happening' and is synonymous with escape," while "[t]he verb 'evade' means 'to escape or avoid by cleverness or deceit' or 'to fail to make a payment of'" (internal brackets omitted) (quoting *Am. Heritage Dictionary* 128, 634 (3d ed. 1992))); *see also Lopresti v. Pace Press, Inc.*, 868 F. Supp. 2d 188, 201 (S.D.N.Y. 2012) (adopting the Third Circuit's interpretation of "evade or avoid liability" in the ERISA context).  But that distinction, made in connection with a wholly different statute, does not affect our analysis here, since an exact match between the component parts of a phrase is not required for treatment as a unitary phrase.  *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 634–35 (2012).

Similarly, the phrases "evade or avoid," "cause a violation of," and "attempt to violate" all have the same object – the phrase "any of the prohibitions set forth" in the relevant regulations and executive orders.  The government acknowledges that "caus[ing] a violation" of a prohibition, "attempt[ing] to violate" a prohibition, and "evad[ing]" a prohibition are best understood to refer to existing prohibitions, but incongruously contends that *avoiding* a prohibition refers to as-yet-unimposed prohibitions.  Since courts are generally averse to giving the same words different meanings when construing statutes or regulations, *see Bank of Am., N.A. v. Caulkett*, 135 S. Ct. 1995, 2000–01 (2015); *Clark v. Martinez*, 543 U.S. 371, 378 (2005), the logical inference is that "prohibitions" has the same meaning in connection with the word "avoid" that it does with the other verbs that appear in the regulations.

Accordingly, we hold that the language prohibiting "[a]ny transaction" that "evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth" in the relevant regulations and orders – *see* 31 C.F.R. §§ 560.203(a), 561.220(a); Exec. Order No. 13,645, 78 Fed. Reg. at 33,950, § 13(a); Exec. Order No. 13,622, 77 Fed. Reg. at 45,900, § 9(a) – extends only to *existing* prohibitions.  And since Treasury never prohibited

15

Halkbank from opening or maintaining U.S. accounts, the district court erred in instructing the jury that it could convict Atilla merely for conspiring to avoid the imposition of future sanctions. *See* Special App'x at 27 ("[I]t is not necessary for the foreign financial institutions to have been sanctioned before the conspirators agreed to engage in the transaction for the purpose of evading or avoiding the prohibitions that could result in the imposition of sanctions. It is sufficient if the conspirators believed that the sanctions could be imposed . . . .").

The mere fact that the district court erred in instructing the jury, however, does not compel us to vacate Atilla's convictions on Counts Two and Six and remand for a new trial. Instead, we must determine whether the instructional error was harmless. *See Neder*, 527 U.S. at 18; *Ferguson*, 676 F.3d at 277. Here, there can be little doubt that the jury necessarily found Atilla guilty on a different, properly instructed theory of liability – namely, that Atilla conspired to violate the IEEPA by exporting services (including the execution of U.S.-dollar transfers) from the United States to Iran in violation of the ITSR. Consequently, any instructional error was harmless.

The district court instructed the jury on this second theory of liability as follows:

16

> [T]he exportation, reexportation, sale or supply, directly or indirectly, from the United States . . . of any . . . services to Iran, or the government of Iran, is prohibited unless the transaction was for the export of agricultural commodities, medicine and medical devices or was authorized by a license from OFAC. . . . I instruct you that the execution of dollar denominated money transfers from the United States on behalf of another, whether or not performed for a fee, constitutes the exportation of a service. Services may be provided indirectly, for example, if funds are transferred to Iran or on behalf of an Iranian person or business through an intermediary, or if they are transferred to a third party for the benefit of, or on behalf of, the government of Iran . . . .

Special App'x at 26.

Atilla's convictions for bank fraud and bank fraud conspiracy demonstrate that the jury necessarily would have found Atilla guilty of Count Two based on the properly instructed ITSR theory. The indictment expressly alleged in the bank fraud count that Atilla "induc[ed] U.S. financial institutions to conduct financial transactions on behalf of and for the benefit of the Government of Iran and Iranian entities and persons using money and property owned by and under the custody and control of such financial institutions." App'x at 242. To find Atilla guilty of bank fraud and bank fraud conspiracy, the jury was required to find that he obtained or agreed to obtain, through deceit, funds in the custody of one of several named federally insured banks located in the United States. Atilla's convictions for bank fraud and bank fraud conspiracy therefore establish that the jury found

17

beyond a reasonable doubt that Atilla agreed to transfer money from the United States to Iran.

Accordingly, although Atilla is correct that the district court erred in instructing the jury that it could convict him if he conspired to evade or avoid the imposition of prohibitions, that instructional error was harmless and we decline to vacate his conviction on Counts Two or Six.

## B.  The Evidence Supports Atilla's Convictions

Atilla next maintains that the district court erred by denying his motion for a judgment of acquittal on the IEEPA conspiracy, bank fraud, bank fraud conspiracy, and money laundering conspiracy charges because "the government presented *no* evidence . . . that [he] knew Zarrab's alleged sanctions-avoidance scheme would involve the use of U.S. banks," an element that neither party disputes was necessary to the convictions.  Atilla's Br. at 47–48.  He argues that "[t]he . . . *only* . . . evidence of [his] knowledge of the use of U.S. banks was Zarrab's testimony that [he] allegedly knew that after funds were removed from Halkbank, they would be used to fulfill 'international money orders' or make 'international payments' for Iran."  *Id.* at 50.  Atilla argues that this testimony was "not sufficient to support a finding beyond a reasonable doubt that [he] knew the

scheme would use *U.S. banks*," since "'international payments' can be . . . completed without any part of the transaction being cleared through the United States." *Id.* Consequently, Atilla contends that he is "entitled to reversal and entry of a judgment of acquittal on the IEEPA-conspiracy, bank-fraud, bank-fraud-conspiracy, and money-laundering-conspiracy charges (Counts 2, 3, 4, and 6)." *Id.* at 56.

We review preserved claims of insufficiency of the evidence *de novo*. *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012). Nevertheless, "[a] defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). We must uphold a jury verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks and brackets omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, we must view the evidence in the light most favorable to the government. *United*

*States v. Temple*, 447 F.3d 130, 136–37 (2d Cir. 2006). We must analyze the evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks omitted), and apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008) (internal quotation marks omitted). We must credit "every inference that the jury might have drawn in favor of the government," *Temple*, 447 F.3d at 136–37 (internal quotation marks omitted), because "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

In a conspiracy case, the deference we accord to a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotation marks omitted). As with the other elements of a conspiracy, "a defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence." *United States v. Gordon*, 987 F.2d 902, 906–07 (2d Cir. 1993).

We conclude that sufficient evidence existed to support the jury's verdict. The evidence – which included wiretapped conversations, witness testimony (including that of a cooperating witness and high-ranking U.S. government officials personally involved in the events described at trial), and hundreds of documentary exhibits – establishes that Atilla was a knowing participant in the sanctions evasion scheme that involved routing hundreds of millions of dollars through the U.S. financial system.

First, the evidence demonstrated that the purpose of the scheme was to convert Iranian oil proceeds held at Halkbank into a form that could be used to fund international payments on behalf of the Government of Iran and Iranian entities. For example, Zarrab testified that the goal of the conspiracy was to make international financial payments for NIOC, including in U.S. dollars. Second, the evidence showed that these international payments were likely to pass through the U.S. financial system. Expert testimony demonstrated that NIOC was particularly interested in "get[ting] access to dollars or Euros." App'x at 354. The jury could reasonably infer that Atilla, the Deputy General Manager for International Banking at Halkbank, had sufficient expertise and experience to

know about the importance of U.S. dollars to Iran and the integral role of U.S. correspondent banks in processing U.S.-dollar transactions.

Third, the evidence showed that senior-level executives at Halkbank knew the particulars of the scheme, including the importance of the international payments and of U.S.-dollar transactions.  The jury could reasonably infer that Atilla – a comparably senior executive at Halkbank who was directly involved with Zarrab and Suleyman Aslan, Halkbank's General Manager, in planning and executing the scheme – understood that Iran's international payments would include U.S.-dollar payments.  Fourth, the evidence demonstrated that Atilla knew that the international payments involved in the scheme were payments on behalf of Iranian clients that Halkbank itself refused to process directly.  Atilla had rebuffed Iranian requests to process international payment transactions through Halkbank directly, insisting that the payments continue to go through Zarrab's companies.  At the same time, Atilla emphasized to Treasury officials during a meeting about the United States' Iranian sanctions regime that Halkbank refused to perform U.S.-dollar transfers in matters involving Iran, reflecting his knowledge that the international payments Iran wanted would include dollar transfers and were illegal.  On this record, the jury could reasonably infer that Atilla wanted the

Iranian transactions to remain obscured by Zarrab because Atilla knew that they violated U.S. sanctions on Iran.

Fifth, Atilla repeatedly lied to Treasury officials to conceal the sanctions avoidance scheme, such as when he falsely represented to OFAC Director Adam Szubin that Halkbank was financing gold exports only to private Iranian citizens. Atilla also adjusted the scheme based on what he learned from Treasury, such as when he instructed Zarrab to change his paperwork for gold shipments in order to appear to comply with revised sanctions requirements. The jury could reasonably infer, based on the fact that Atilla lied to and concealed information from U.S. officials charged with sanctions enforcement, that he was aware that the scheme involved international payments through U.S. banks that were violations of U.S. sanctions.

Viewing this evidence in the light most favorable to the government, and drawing all inferences in support of the verdict, we conclude that a rational jury could have found, beyond a reasonable doubt, that Atilla knew the sanctions-avoidance scheme would involve the use of U.S. banks. We therefore reject Atilla's sufficiency of the evidence challenge.

### C.  Conspiracy to Obstruct the Enforcement of Economic Sanctions Laws Properly Falls Under 18 U.S.C. § 371

Atilla also asserts that he "is entitled to a judgment of acquittal on (or, alternatively, dismissal of) the § 371 charge" because "[t]he government's theory is inconsistent with § 371's text."  Atilla's Br. at 57–58.  According to Atilla, § 371 incorporates the common law definition of "to defraud" – "to deprive another of property rights by dishonest means."  *Id.* at 58 (emphasis omitted) (quoting *United States v. Coplan*, 703 F.3d 46, 59 (2d Cir. 2012)).  Since the government "never alleged [that] [he] sought to deprive the United States of any 'property,'" he maintains that he could not have been properly convicted under § 371.  *Id.* at 59.

Atilla moved to dismiss the indictment and later moved for a judgment of acquittal with respect to the § 371 charge.  We review *de novo* preserved claims regarding "[t]he sufficiency of an indictment and the interpretation of a federal statute," *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012), as well as preserved claims regarding the interpretation of a statute raised in the context of a Rule 29 motion for a judgment of acquittal, *United States v. Ivezaj*, 568 F.3d 88, 91 (2d Cir. 2009).

Section 371 prohibits two types of conspiracies:  The "offense clause" makes it unlawful to conspire "to commit any offense against the United States," while

24

the "defraud clause" prohibits conspiracies "to defraud the United States, or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371. To prove a conspiracy under the "defraud clause," the government must establish "(1) that [the] defendant entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996) (internal quotation marks and brackets omitted).

Atilla's challenge to his § 371 conviction fails because § 371's defraud clause was properly applied to his case. First, although Atilla contends that the defraud clause incorporates the common law meaning of fraud, it has been "well established" that the term "defraud" in § 371 "is not confined to fraud as that term has been defined in the common law." *Coplan*, 703 F.3d at 61 (internal quotation marks omitted). The defraud clause "not only reaches schemes which deprive the government of money or property," but also "embraces 'any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of Government.'" *United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987) (quoting *Dennis v. United States*, 384 U.S. 855, 861 (1966)).

25

Second, Atilla cites *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957), to suggest that most cases applying the defraud clause "involve[] . . . conspiracy to impede and obstruct the Treasury Department in the collection of income taxes." Atilla's Br. at 59 (internal quotation marks and brackets omitted).  But the defraud clause has been applied to conspiracies to obstruct the functions of a variety of government agencies and has not been limited to the IRS.  *See, e.g.*, *Dennis*, 384 U.S. at 857, 861 (National Labor Relations Board); *United States v. Johnson*, 383 U.S. 169, 172 (1966) (Department of Justice); *United States v. Stewart*, 590 F.3d 93, 102, 109–11 (2d Cir. 2009) (Bureau of Prisons); *Ballistrea*, 101 F.3d at 831–33 (Food and Drug Administration).

Third, Atilla contends that the defraud clause should not be applied in this case because it would allow the prosecution to interfere with the executive function of conducting foreign affairs.  This claim, however, ignores the fact that the Department of Justice is an executive branch agency and that Atilla's prosecution is also an executive function.

Fourth, Atilla's narrow interpretation of § 371 – which effectively would reach only conspiracies to impede and obstruct the IRS in the collection of income taxes – is inconsistent with the broad text of the statute.  The defraud clause does

26

not single out any one agency, nor does it exempt OFAC and sanctions enforcement from its coverage.

Atilla's reliance on *Marinello v. United States*, 138 S. Ct. 1101 (2018), and *Skilling v. United States*, 561 U.S. 358 (2010), for the proposition that the defraud clause should be construed narrowly to avoid vagueness concerns is equally misplaced. *Marinello* is inapposite because in that case, the Supreme Court analyzed 26 U.S.C. § 7212(a)'s unique text, context, and history – which are wholly unrelated to § 371's defraud clause. As for *Skilling*, we recently rejected a similar attempt to invoke the vagueness concerns of that case to "pare the body of § 371 precedent down to its core." *Coplan*, 703 F.3d at 62 (internal quotation marks omitted). We held in *Coplan* that we are "bound to follow" both "the law of the Circuit" and "long-lived Supreme Court decisions" that have definitively adopted and reaffirmed the "expansive reading of § 371" given by courts. *Id.* at 61–62.

Accordingly, we reject Atilla's interpretation of § 371 and conclude that the jury properly convicted Atilla for conspiracy to obstruct the United States' enforcement of economic sanctions laws under that statute.

### D. Even Assuming the District Court Abused Its Discretion by Excluding the Phone Call Recording and Transcript, That Error Was Harmless

Atilla last contends that the district court abused its discretion when it excluded a recording and an uncertified, translated transcript of a jailhouse phone call between Zarrab and his uncle. The exclusion of this evidence, Atilla asserts, was not harmless error because "Zarrab's testimony was the foundation of the government's case, and jurors could reasonably interpret his jailhouse statements as expressing an intent to lie about the particular scheme in which Atilla was charged with participating." Atilla's Br. at 68.

District courts have broad discretion to decide evidentiary issues. *See, e.g.*, *United States v. Khalil*, 214 F.3d 111, 122 (2d Cir. 2000). We review a district court's evidentiary rulings for abuse of discretion. *See United States v. Taubman*, 297 F.3d 161, 164 (2d Cir. 2002). "To find such an abuse we must be persuaded that the trial judge ruled in an arbitrary and irrational fashion." *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996).

But even if a district court abused its discretion in making an evidentiary ruling, we will disregard errors in admitting or excluding evidence if the errors are harmless. *See* Fed. R. Crim. P. 52(a); *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946); *United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992). For an error to be

28

deemed harmless, "we are not required to conclude that [the evidence] could not have had any effect whatever; the error is harmless if we can conclude that [the evidence] was unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Rea*, 958 F.2d at 1220 (internal quotation marks omitted).  In determining whether the exclusion of cross-examination material is harmless, we evaluate a "host of factors," including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

On September 15, 2016, Zarrab, while incarcerated, spoke with his uncle Ahad Khabbaz Tamimi on the phone.  According to Atilla's uncertified translation of that call, Zarrab stated that he had "already partially admitted [his] guilt." App'x at 828.  In response to Tamimi's statement that Zarrab "ha[dn't] done anything" wrong, Zarrab stated: "But there is no law here.  There is no rule of law here, look.  Here, you have to admit to something you haven't done.  This is how it works here.  This country is like this.  Look, you have to say you have done

29

something you haven't." *Id.* at 829. Almost two minutes later, after discussing

other topics, Zarrab stated:

> This oppression that exists here, it is only in America. It doesn't
> happen in other countries. When there is no such oppression in the
> country, they can't play around. They can either know before you
> admit guilt. In that case they come and say, for example, take these
> shops and fuck off and give up your shops. But once you admit your
> guilt, you are set free. That's it, getting free. It is like you swallow it.

*Id.* at 830.

During cross-examination of Zarrab, defense counsel turned to this phone

call and transcript:

> Q: You made a call on September 15th, 2016, to your Uncle Ahad,
> correct, from the jail?
>
> A: I don't recall the dates, but it is true that I had made many phone
> calls to my uncle from the jail; that is correct, ma'am.
>
> Q: You told your uncle that, in this country, you have to admit to
> something you haven't done in order to become free; once you admit
> your guilt, you become free; isn't that correct?
>
> A: That is absolutely not correct, ma'am.

*Id.* at 543. Defense counsel then sought to play the jail call and introduce the

transcript "for impeachment purposes," but the district court concluded that it

was extrinsic evidence that could not be admitted for impeachment. *Id.* Returning

to cross-examination, defense counsel asked:

> Q:  You spoke with your uncle about how you get out of jail in the United States, correct?
>
> A:  That is not correct, ma'am.
>
> Q:  You didn't tell him that you have to admit to something you haven't done in order to get free?
>
> A:  That is not correct, ma'am.

*Id.* at 544.  Defense counsel asked no other questions about the jail call.

Even assuming that the district court abused its discretion in excluding the phone call and transcript – a determination we do not make here – such error was clearly harmless.  Defense counsel cross-examined Zarrab for two-and-a-half days, attacking his credibility by inquiring about his participation in the offense conduct, his payment of numerous bribes, his participation in the creation of false and forged documents, his false exculpatory statements to law enforcement, and other examples of his prior untruthfulness.  Defense counsel also crossed Zarrab on whether his cooperation agreement with the government provided an incentive to give false testimony, whether Zarrab viewed cooperation as the fastest way to leave prison, and whether Zarrab was dependent on the government to move for a sentence reduction for substantial assistance.  Consequently, even without the phone call, the jury was well aware that Zarrab hoped to receive a lenient sentence as a result of testifying and wanted the government to view him as having

provided substantial assistance. "[T]he jury was already in possession of sufficient information to make a discriminating appraisal of [Zarrab's] possible motives for testifying falsely in favor of the government." *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980).

Moreover, even if the jail call had been admitted, we are confident that it would not have affected the jury's verdict because Zarrab's testimony was corroborated on critical points by independent evidence, all of which pointed to Atilla's guilt. For example, Zarrab's testimony about Atilla's participation in designing the fake food scheme was corroborated by contemporaneous electronic communications in which Aslan and Zarrab discussed "the method proposed by Hakan Atilla," App'x at 423, 549, as well as by other wiretapped conversations, including ones in which Atilla himself discussed the scheme.

Accordingly, even assuming that the district court abused its discretion in excluding the phone call recording and transcript, we conclude that this error was harmless.

III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.