1:15-cr-00867-RMB-10

20-3499-cr
*United States v. Zarrab (Turkiye Halk Bankasi)*

# United States Court of Appeals
## for the Second Circuit
_____

August Term 2023

(Argued: February 28, 2024    Decided: October 22, 2024)

No. 20-3499

_____

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: ___10/22/2024___ |

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

TURKIYE HALK BANKASI A.S., A/K/A HALKBANK,

*Defendant-Appellant,*

REZA ZARRAB, A/K/A RIZA SARRAF, CAMELIA JAMSHIDY, A/K/A KAMELIA JAMSHIDY, HOSSEIN NAJAFZADEH, MOHAMMAD ZARRAB, A/K/A CAN SARRAF, A/K/A KARTALMSD, MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, ABI, SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI,

*Defendants.* *

_____

_____

* The Clerk of the Court is respectfully directed to amend the caption on this Court's docket to be consistent with the caption on this opinion.

CERTIFIED COPY ISSUED ON 10/22/2024

Before:　　　　　KEARSE, CABRANES, and BIANCO, *Circuit Judges*.

Defendant-Appellant Turkiye Halk Bankasi A.S. ("Halkbank") appeals from the decision and order of the United States District Court for the Southern District of New York (Richard M. Berman, *Judge*), entered on October 1, 2020, denying Halkbank's motion to dismiss the indictment against it on foreign sovereign immunity grounds.  This appeal returns to us on remand from the United States Supreme Court.

In 2019, the United States indicted Halkbank, a commercial bank owned by the Republic of Turkey, for conspiring to evade U.S. economic sanctions against Iran.  The district court denied Halkbank's motion to dismiss on foreign sovereign immunity grounds under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, and the common law, and this Court affirmed.  *See United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021) ("*Halkbank I*").  The Supreme Court affirmed in part, vacated in part, and remanded the case for further proceedings.  *See Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023) ("*Halkbank II*").  In particular, the Supreme Court held that the district court had subject matter jurisdiction over Halkbank's criminal prosecution under 18 U.S.C. § 3231 and that the FSIA does not provide foreign sovereign immunity in criminal cases, but vacated and remanded for full consideration of the common-law immunity arguments raised by the parties.

After careful consideration of the arguments, we hold that common-law foreign sovereign immunity does not protect Halkbank from criminal prosecution based on the charges in this indictment.  Under the common law, as interpreted by the Supreme Court and this Court, we defer to the Executive Branch's determination as to whether a party should be afforded common-law foreign sovereign immunity, and that deference applies regardless of whether the Executive seeks to grant or, as in this case, deny immunity, and also applies equally to criminal and civil cases.  We need not decide whether such deference extends to the Executive Branch's determination to deny immunity if that determination is in derogation of the common law because that is not the situation here.  More specifically, we find no basis in the common law to conclude that a foreign state-owned corporation is absolutely immune from prosecution by a separate sovereign for alleged criminal conduct related to its commercial activities,

2

and not to governmental functions.  Thus, because Halkbank is being prosecuted in the United States for its alleged criminal activity related to its commercial activities as charged in the indictment, we defer to the Executive Branch's determination, through the U.S. Department of Justice, that Halkbank should not be afforded immunity in this case.

Accordingly, we **AFFIRM** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

> FOR APPELLEE: MICHAEL D. LOCKARD, Assistant United States Attorney (David W. Denton Jr., Jonathan Rebold, George D. Turner, and Hagan Scotten, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, New York.

> FOR APPELLANT: JOHN S. WILLIAMS (Robert M. Cary, Simon A. Latcovich, and Eden Schiffmann, *on the brief*), Williams & Connolly LLP, Washington, District of Columbia.

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-Appellant Turkiye Halk Bankasi A.S. ("Halkbank") appeals from the decision and order of the United States District Court for the Southern District of New York (Richard M. Berman, *Judge*), entered on October 1, 2020, denying Halkbank's motion to dismiss the indictment against it on foreign sovereign immunity grounds.  This appeal returns to us on remand from the United States Supreme Court.

In 2019, the United States indicted Halkbank, a commercial bank owned by the Republic of Turkey, for conspiring to evade U.S. economic sanctions against Iran.  The district court denied Halkbank's motion to dismiss on foreign sovereign immunity grounds under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, and the common law, and this Court affirmed.  *See United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021) ("*Halkbank I*"). The Supreme Court affirmed in part, vacated in part, and remanded the case for further proceedings.  *See Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023) ("*Halkbank II*").  In particular, the Supreme Court held that the district court had subject matter jurisdiction over Halkbank's criminal prosecution under 18 U.S.C. § 3231 and that the FSIA does not provide foreign sovereign immunity in

criminal cases, but vacated and remanded for full consideration of the common-law immunity arguments raised by the parties.

After careful consideration of the arguments, we hold that common-law foreign sovereign immunity does not protect Halkbank from criminal prosecution based on the charges in this indictment. Under the common law, as interpreted by the Supreme Court and this Court, we defer to the Executive Branch's determination as to whether a party should be afforded common-law foreign sovereign immunity, and that deference applies regardless of whether the Executive seeks to grant or, as in this case, deny immunity, and also applies equally to criminal and civil cases. We need not decide whether such deference extends to the Executive Branch's determination to deny immunity if that determination is in derogation of the common law because that is not the situation here. More specifically, we find no basis in the common law to conclude that a foreign state-owned corporation is absolutely immune from prosecution by a separate sovereign for alleged criminal conduct related to its commercial activities, and not to governmental functions. Thus, because Halkbank is being prosecuted in the United States for its alleged criminal activity related to its commercial activities as charged in the indictment, we defer to the Executive Branch's

determination, through the U.S. Department of Justice, that Halkbank should not be afforded immunity in this case.

Accordingly, we **AFFIRM** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

## I.   BACKGROUND

Between 2011 and 2013, the United States increased economic sanctions on Iran, targeting proceeds from the sale of Iranian oil and gas and the supply of gold to Iran.  *See, e.g.*, National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1245, 125 Stat. 1298, 1647–50 (2011) (codified as amended at 22 U.S.C. § 8513a); Iran Threat Reduction and Syria Human Rights Act of 2012, 22 U.S.C. §§ 8711 *et seq.*; Iran Freedom and Counter-Proliferation Act of 2012, 22 U.S.C. §§ 8801 *et seq.*  The sanctions regime subjects foreign financial institutions like Halkbank to penalties for conducting or facilitating significant financial transactions with designated Iranian financial institutions,[1] unless those transactions relate to the provision of humanitarian assistance or to bilateral trade between an exempted

---

[1] Designated financial institutions include the Central Bank of Iran and the National Iranian Oil Company.  22 U.S.C. § 8513a(d)(1); Exec. Order No. 13622, 77 Fed. Reg. 45897 (July 30, 2012).

foreign country and Iran.[2]  *See* 22 U.S.C. § 8513a(d)(1), (2), (4)(D).  Any funds owed to Iran as a result of such bilateral trade must be held in an account within that foreign country and may not be repatriated to Iran.  *See* 22 U.S.C. § 8513a(d)(4)(D)(ii)(II).  Therefore, as relevant here, the proceeds from Iran's sale of oil and gas to Turkey were restricted—they had to be deposited into accounts in Turkey and could only be used for further trade between Iran and Turkey.

In 2019, the United States indicted Halkbank for allegedly participating in a multi-year scheme to evade and violate this sanctions regime.  The indictment alleged that Halkbank, a designated repository of proceeds from Iran's sale of oil and gas to Turkey, used gold exports and fraudulent humanitarian assistance transactions to launder billions of dollars through the global financial system, including the U.S. financial system, in order to provide the Government of Iran, the Central Bank of Iran, and the National Iranian Oil Company access to the otherwise-restricted funds held at Halkbank.  The indictment further alleged that, during the course of the conspiracy, senior officers of Halkbank made false

---

[2] To qualify for the bilateral trade exemption, a foreign financial institution must be located within a foreign country that has significantly reduced its volume of crude oil purchased from Iran.  22 U.S.C. § 8513a(d)(4)(D)(i).

statements regarding transactions with Iran to conceal the scheme from the U.S. Department of the Treasury.[3]

Based on the alleged conduct, the indictment charged Halkbank with: (1) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; (2) conspiracy to violate the International Emergency Economic Powers Act, in violation of 50 U.S.C. § 1705; (3) bank fraud, in violation of 18 U.S.C. § 1344; (4) conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; (5) money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A); and (6) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

Halkbank moved to dismiss the indictment, arguing, *inter alia*, that as an instrumentality of Turkey, it was entitled to absolute immunity from criminal prosecution under the FSIA.  Halkbank argued in the alternative that, even if the FSIA did not apply to criminal cases, common-law sovereign immunity barred its prosecution.  The district court denied Halkbank's motion to dismiss, reasoning that the FSIA does not afford immunity in criminal proceedings and that, even if

---

[3] Mehmet Hakan Atilla, Halkbank's former Deputy General Manager for International Banking, was separately charged and convicted, following a jury trial, of offenses arising from this scheme.  *See United States v. Atilla*, 966 F.3d 118 (2d Cir. 2020).  Reza Zarrab, an Iranian-Turkish businessman and alleged co-conspirator of Halkbank, pleaded guilty to charges that also arose from this scheme.  *Halkbank I*, 16 F.4th at 342 n.7.

it did, the exception for commercial activity would apply. *United States v. Halkbank*, No. 15 Cr. 867 (RMB), 2020 WL 5849512, at *4–5 (S.D.N.Y. Oct. 1, 2020). The district court also rejected Halkbank's common-law argument as unsupported by and inconsistent with the historical approach of deferring to the Executive Branch on the question of foreign sovereign immunity. *Id.* at *6.

Halkbank filed an interlocutory appeal, and this Court affirmed. *Halkbank I*, 16 F.4th at 351. We concluded that the district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231 and, assuming *arguendo* that the FSIA conferred immunity in criminal cases, that the commercial activity exception would apply to Halkbank. *Id.* at 347–50. We held that the charged conduct qualified as commercial activity under all three categories of 28 U.S.C. § 1605(a)(2), identifying "the gravamen of the suit" as Halkbank's participation in schemes "intended to deceive U.S. regulators and foreign banks in order to launder approximately $1 billion in Iranian oil and gas proceeds through the U.S. financial system" and its misrepresentations to "Treasury officials regarding the nature of these transactions." *Id.* at 348–49 (internal quotation marks and citations omitted). Finally, we held that Halkbank was not immune under the common law, because:

> even assuming that FSIA did not supersede the pertinent common
> law, any foreign sovereign immunity at common law also had an

> exception for a foreign state's commercial activity, just like FSIA's commercial activity exception . . . . [I]n any event, at common law, sovereign immunity determinations were the prerogative of the Executive Branch; thus, the decision to bring criminal charges would have necessarily manifested the Executive Branch's view that no sovereign immunity existed.

*Id.* at 351 (footnotes omitted).

The Supreme Court granted certiorari and affirmed in part, vacated in part, and remanded. *See Halkbank II*, 598 U.S. at 281. Specifically, after concluding that the district court had subject matter jurisdiction under 18 U.S.C. § 3231, the Supreme Court held that the FSIA does not provide foreign states and their instrumentalities with immunity from criminal proceedings. *Id.* at 272–73. As to immunity under the common law, the Supreme Court noted that this Court "did not fully consider the various arguments regarding common-law immunity that the parties press[ed] in [the Supreme] Court," nor "address whether and to what extent foreign states and their instrumentalities are differently situated for purposes of common-law immunity in the criminal context." *Id.* at 280. The Supreme Court thus vacated this Court's denial of Halkbank's common-law foreign sovereign immunity and remanded for further consideration. *Id.* at 281.

## II.   DISCUSSION

The sole issue on remand is whether common-law foreign sovereign immunity protects Halkbank from criminal prosecution.   We review such questions of law *de novo*.  *See Matar v. Dichter*, 563 F.3d 9, 12 (2d Cir. 2009); *Rukoro v. Federal Republic of Germany*, 976 F.3d 218, 223 (2d Cir. 2020).

Halkbank argues that the common law affords foreign sovereigns and their instrumentalities absolute immunity from criminal prosecution, regardless of the view of the Executive Branch.  On the other hand, the government argues that common-law foreign sovereign immunity does not extend to lawsuits where the Executive determines that such immunity should not be granted.  Therefore, according to the government, this Court should defer to the Executive's determination that Halkbank is not entitled to immunity in this criminal prosecution, and, in doing so, "this Court need not decide the degree of deference warranted to an Executive determination that is at odds with a long-recognized form of common-law immunity, because here the lack of historical support for Halkbank's claim supports the Executive's views."  Appellee's Br. at 17.  More specifically, the government asserts that the common law distinguishes between a foreign state and the corporations it owns, and that state-owned corporations, like

11

Halkbank, do not enjoy absolute immunity from criminal prosecution based on their commercial, non-governmental activities.

As set forth below, we agree with the government and conclude that, under the common law, we defer to the Executive Branch's determination—which may be expressed, as here, by the initiation of a federal criminal prosecution—that a foreign state-owned corporation is not entitled to foreign sovereign immunity for charges arising from its commercial, non-governmental activity because that determination is consistent with the scope of such immunity recognized at common law.  Here, such deference is warranted because the indictment, brought by the Executive through the U.S. Department of Justice, charges Halkbank for alleged criminal activity arising from its commercial activity.  Therefore, we need not decide whether such deference would also apply to the Executive's determination regarding foreign sovereign immunity if that determination in a particular case were in derogation of the common law.

### A. Common-Law Foreign Sovereign Immunity and Deference to the Executive Branch

Foreign sovereign immunity originally developed as a matter of common law based on principles announced by the Supreme Court in *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812).  *See Samantar v. Yousuf*, 560 U.S. 305, 311

(2010).  In *Schooner Exchange*, the Supreme Court addressed whether an armed

national vessel of France was immune from the jurisdiction of U.S. courts.  *See* 11

U.S. at 135–36.  Writing for the Court, Chief Justice John Marshall established as a

threshold matter that foreign sovereigns have no inherent right to immunity from

the jurisdiction of U.S. courts, explaining:  "The jurisdiction of the nation within

its own territory is necessarily exclusive and absolute.  It is susceptible of no

limitation not imposed by itself."  *Id.* at 136.  He then observed, however, that

international comity had "given rise to a class of cases in which every sovereign is

understood to wa[i]ve the exercise of a part of that complete exclusive territorial

jurisdiction."[4]  *Id.* at 137.  Thus, accepting a suggestion advanced by the Executive

Branch, *see id.* at 134, Chief Justice Marshall held that the French vessel at issue was

immune because the United States had "impliedly consented to wa[i]ve its

jurisdiction" over "national ships of war, entering the port of a friendly power

open for their reception," *id.* at 145–46.  The Chief Justice emphasized, though, that

"[w]ithout a doubt, the sovereign of the place is capable of destroying this

---

[4] This "class of cases," the Court explained, included:  (1) "the exemption of the person of the sovereign from arrest or detention within a foreign territory"; (2) "the immunity which all civilized nations allow to foreign ministers"; and (3) "where [a sovereign] allows the troops of a foreign prince to pass through his dominions."  *Id.* at 137–39.

implication . . . . by employing force, or by subjecting such vessels to the ordinary tribunals." *Id.* at 146.

Subsequent cases applying *Schooner Exchange* stressed that the immunity afforded to foreign sovereigns and their instrumentalities depended on the consent of the Executive. *See, e.g.*, *The Santissima Trinidad*, 20 U.S. (7 Wheat.) 283, 353 (1822) (explaining that the immunity of foreign public ships "is implied only from the general usage of nations, [and] may be withdrawn upon notice at any time"); *The Divina Pastora*, 17 U.S. (4 Wheat.) 52, 71 n.3 (1819) (explaining that the Executive can still "claim and exercise jurisdiction" over foreign sovereigns by "expressly exert[ing]" that power); *see also Coleman v. Tennessee*, 97 U.S. 509, 516 n.1 (1878) (describing foreign sovereign immunity as an "exemption from the civil and criminal jurisdiction of the place [that] is extended . . . by permission of its government"). Recognizing that foreign sovereign immunity was "a matter of grace and comity on the part of the United States," courts "consistently . . . deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480,

486 (1983) (citing *Ex parte Peru*, 318 U.S. 578, 586–90 (1943); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 33–36 (1945)).

For many years, "the Executive Branch followed a policy of requesting immunity in all actions against friendly sovereigns." *Republic of Austria v. Altmann*, 541 U.S. 677, 689 (2004). "Typically, after a plaintiff sought to sue a foreign sovereign in an American court, the Executive Branch, acting through the State Department, filed a suggestion of immunity—case-specific guidance about the foreign sovereign's entitlement to immunity." *Opati v. Republic of Sudan*, 590 U.S. 418, 421 (2020) (internal quotation marks omitted). Courts deferred to the suggestions of the Executive Branch "on the theory that issues of comity and foreign relations 'implicate judgments that the Constitution reserves to the political branches.'" *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 818 (2d Cir. 2021) (alterations adopted) (quoting *Opati*, 590 U.S. at 421). Thus, although "the United States generally granted foreign sovereigns complete immunity from suit," this was a function of the Executive Branch's policy rather than a substantive rule of law. *Verlinden*, 461 U.S. at 486; *cf. Hoffman*, 324 U.S. at 36 ("[I]t is an accepted rule of substantive law governing the

exercise of the jurisdiction of the courts that they accept and follow the executive determination [regarding foreign sovereign immunity].").

This policy changed in 1952 when the State Department announced in the Tate Letter that it would begin "to follow the 'restrictive' theory of foreign sovereign immunity in advising courts whether they should take jurisdiction in any given case." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208 (2018). Under the restrictive theory, "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden*, 461 U.S. at 487. As the Supreme Court recognized, however, this "change in State Department policy . . . had little, if any, impact on federal courts' approach to immunity analyses." *Altmann*, 541 U.S. at 690. The Executive Branch continued to bear the "initial responsibility for deciding questions of sovereign immunity," and courts continued to "abide[] by suggestions of immunity from the State Department." *Verlinden*, 461 U.S. at 487 (internal quotation marks omitted). Where there was "no communication" from the Executive concerning immunity in a particular case, the court would "decide for itself whether it [was] the established policy of the State Department to recognize claims of immunity of this type." *Victory Transp. Inc. v. Comisaria Gen.*

*de Abastecimientos y Transportes*, 336 F.2d 354, 358–59 (2d. Cir. 1964); *see also The Navemar*, 303 U.S. 68, 75 (1938) (concluding that, because the Executive "declined to act," the availability of foreign sovereign immunity was an "appropriate subject[] for judicial inquiry").

In 1976, Congress enacted the FSIA to "endorse and codify the restrictive theory of sovereign immunity." *Samantar*, 560 U.S. at 313. Although the FSIA "transfers primary responsibility for immunity determinations from the Executive to the Judicial Branch," *Altmann*, 541 U.S. at 691, "in the common-law context, we [still] defer to the Executive's determination of the scope of immunity," *Matar*, 563 F.3d at 15.[5]

---

[5] Although Halkbank dismisses as dicta the cases "in which the Supreme Court and this Court broadly describe common-law immunity determinations as Executive prerogative," Reply Br. at 9, "it does not at all follow that we can cavalierly disregard" those descriptions of the deference afforded to the position of the Executive at common law, *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975). We have repeatedly emphasized that, "[e]ven if Supreme Court dicta do not constitute established law, we nonetheless accord deference to such dicta where, as here, no change has occurred in the legal landscape." *Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 100 (2d Cir. 2023); *see also Bell*, 524 F.2d at 206 (noting that Supreme Court dicta "must be given considerable weight"). In any event, this Court held in *Matar* that the defendant was entitled to common-law foreign sovereign immunity "under our traditional rule of deference to such Executive determinations." 563 F.3d at 15. That precedent is binding here. *See Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995) (per curiam) ("A decision of a panel of this Court is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court."); *see also Cox v. Department of Justice*, 111 F.4th 198, 209 (2d Cir. 2024). Similarly, although Justice Gorsuch's partial concurrence in *Halkbank II* noted that "whether customary international

### B.  Federal Criminal Prosecution of Halkbank

The government argues that the federal criminal prosecution of Halkbank reflects the Executive's determination that foreign sovereign immunity is not warranted in this case.  We agree.  A federal grand jury found probable cause to believe that Halkbank violated numerous criminal laws of the United States, and the Executive decided to prosecute those alleged crimes.  The indictment is clear that the Government of Turkey owns the majority of Halkbank's shares.  Under these circumstances, "we may assume that by electing to bring this prosecution, the Executive has assessed this prosecution's impact on this Nation's relationship with" Turkey and concluded that foreign policy concerns should not bar the action.  *Pasquantino v. United States*, 544 U.S. 349, 369 (2005); *see also The Santissima Trinidad*, 20 U.S. at 354 (observing that it would be "strange" if an immunity derived from international comity "should be construed as a license to do wrong to the nation itself").  In other words, the decision to bring federal criminal charges against Halkbank reflects the Executive Branch's determination that Halkbank is

---

law survives as a form of federal common law after *Erie* [*R.R. Co. v. Tompkins*, 304 U.S. 64 (1938),] is a matter of considerable debate among scholars," 598 U.S. at 287 (Gorsuch, J., concurring in part and dissenting in part), we continue to consider such law (*i.e.*, federal common law that may derive in part from customary international law) on this issue based on binding precedent from the Supreme Court in *Schooner Exchange* and subsequent cases of this Court.

not entitled to sovereign immunity for the conduct at issue.[6]  *See United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997) ("[B]y pursuing Noriega's capture and this prosecution, the Executive Branch has manifested its clear sentiment that Noriega should be denied [common-law] head-of-state immunity.").

Having recognized the Executive Branch's position with respect to Halkbank, we now must decide whether that position is entitled to deference in this particular case.  *See Matar*, 563 F.3d at 14 (deferring to Executive's suggestion that civil suit be dismissed on immunity grounds); *accord Doe v. De Leon*, 555 F. App'x 84, 85 (2d Cir. 2014) (summary order) (reasoning that the Executive's "submission is dispositive").  Halkbank argues that deference is inappropriate here because the Executive's position is inconsistent with the forms of foreign sovereign immunity recognized at common law.  In particular, Halkbank contends that courts may not apply deference to deny (as opposed to extend) foreign sovereign immunity, and, in any event, the position of the Executive cannot

---

[6] Although Halkbank briefly suggests that the Executive's position in this case is less authoritative because it was expressed by federal prosecutors rather than the State Department, we have held in this context that the "test should naturally be supplied by the Executive's representations, not the technical nature of its appearance."  *Sullivan v. State of Sao Paulo*, 122 F.2d 355, 357 (2d Cir. 1941).

abrogate the absolute immunity of foreign state instrumentalities from criminal prosecution.

As set forth below, we find Halkbank's arguments unpersuasive. The deference afforded at common law to the Executive's determination regarding foreign sovereign immunity applies regardless of whether the Executive seeks to grant or, as in this case, deny immunity, and also extends to criminal cases. Moreover, we need not determine the outer limits of the deference afforded in this context because the Executive Branch's position here is consistent with the scope of immunity extended to foreign state-owned corporations at common law. Although certain prior cases extended immunity to state-owned corporations based on their *governmental* conduct, the common law places no independent bar on the prosecution of such corporations for their *commercial* activity. Therefore, where, as here, a foreign state-owned corporation is being prosecuted for its commercial, non-governmental activity, we defer to the Executive Branch's determination that immunity is not warranted in that particular case.

### i. Executive Branch's Position that Immunity Should Be Denied in a Criminal Case

As an initial matter, Halkbank's argument that courts may only defer to the Executive's position to apply, rather than deny, foreign sovereign immunity is

inconsistent with the Supreme Court's and this Court's precedents.  In *Hoffman*,

the Supreme Court recognized a "guiding principle" that, in foreign sovereign

immunity cases, "courts should not so act as to embarrass the executive arm in its

conduct of foreign affairs."  324 U.S. at 35.  The Court indicated that this principle

applied regardless of whether the Executive sought to grant or deny immunity:

> It is . . . not for the courts to deny an immunity which our government
> has seen fit to allow, *or to allow an immunity on new grounds* which the
> government has not seen fit to recognize.  The judicial seizure of the
> property of a friendly state may be regarded as such an affront to its
> dignity and may so affect our relations with it, that it is an accepted
> rule of substantive law governing the exercise of the jurisdiction of
> the courts that they accept and follow the executive determination
> that the vessel shall be treated as immune.  But recognition by the
> courts of an immunity upon principles which the political department
> of government has not sanctioned may be *equally embarrassing* to it in
> securing the protection of our national interests and their recognition
> by other nations.

324 U.S. at 35–36 (emphases added) (footnote and citation omitted).  We

subsequently interpreted this language from *Hoffman* to "mean[] at least that the

courts should deny immunity where the State Department has indicated, either

directly or indirectly, that immunity need not be accorded."  *Victory Transp.*, 336

F.2d at 358 (explaining that it "makes no sense . . . to permit the disregard of legal

obligations to avoid embarrassing the State Department if that agency indicates it

will not be embarrassed").

21

Halkbank relies on *Berizzi Brothers Co. v. The Pesaro*, 271 U.S. 562 (1926), for the proposition that courts may apply foreign sovereign immunity over the disagreement of the Executive. In that case, the Supreme Court held that a merchant ship owned and operated by a foreign government was immune from suit by a private party, *id.* at 576, even though the State Department had expressed to the district court its view that "government-owned merchant vessels or vessels under requisition of governments whose flag they fly employed in commerce should not be regarded as entitled to the immunities accorded public vessels of war," *The Pesaro*, 277 F. 473, 479 n.3 (S.D.N.Y. 1921). Because most cases applying deference involve an Executive determination to extend immunity, Halkbank argues that *Berizzi Brothers* shows that courts do not defer to the Executive's determination to *deny* immunity.

We decline to adopt such a broad reading of *Berizzi Brothers*. To start, the Supreme Court did not reference the State Department's position, and thus did not expressly recognize that it was departing from the Executive's view. *See Hoffman*, 324 U.S. at 35 n.1 (noting that "[t]he propriety of . . . extending the immunity where the political branch of the government had refused to act was not considered" in *Berizzi Brothers*). It is thus not clear that *Berizzi Brothers* can be

characterized as a case in which a court declined to defer to the Executive Branch. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). Moreover, the Supreme Court has questioned the ongoing validity of the *Berizzi Brothers* decision. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 699 (1976) (explaining that "the authority of [*Berizzi Brothers*] has been severely diminished by later cases"); *see also Hoffman*, 324 U.S. at 39 (Frankfurter, J., concurring) ("If this be an implied recession from the decision in *Berizzi Bros. Co. v. Pesaro*, I heartily welcome it."). Therefore, we conclude that, under the common law, deference applies to the Executive's determination regarding foreign sovereign immunity, even when it involves a denial of such immunity.

Furthermore, contrary to Halkbank's contention, we find nothing in the common law that suggests that the deference afforded to the Executive's determination is limited to civil cases, nor is there any binding or even persuasive case authority supporting such a restriction. Halkbank cites two district court cases for the proposition that courts do not defer to the Executive's position in

criminal cases.[7]  We disagree.  First, in *In re Investigation of World Arrangements*, the district court did not view the issuance of a grand jury subpoena on a corporation controlled by the British government as indicative of the Executive's position that no immunity was warranted; instead, the district court engaged in an independent analysis, recognizing that "[w]here the political branch of the government declines to assert an opinion . . . , the courts may decide for themselves whether all the requisites of immunity exist."  13 F.R.D. 280, 290 (D.D.C. 1952).  Similarly, in *In re Grand Jury Investigation of the Shipping Industry*, the district court declined to rule on whether foreign sovereign immunity required it to quash a grand jury subpoena without additional factfinding to confirm that the Philippine National Lines was engaged in commercial activities, as the State Department had claimed in its statement declining the Philippine Government's request for immunity.  186 F. Supp. 298, 318–20 (D.D.C. 1960).  Neither of these cases determined that it was inappropriate to defer to the Executive's position to decline immunity in a criminal case; thus, neither case lends even persuasive authority to that proposition.

---

[7] Although the two district court cases upon which Halkbank relies relate to the enforcement of grand jury subpoenas rather than criminal prosecution, the Supreme Court has indicated that grand jury cases are relevant to the foreign sovereign immunity analysis in criminal proceedings overall.  *See Halkbank II*, 598 U.S. at 274.

Halkbank argues that deference to the Executive's decision to deny immunity is unprecedented, particularly in the criminal context. To be sure, relatively few cases have expressly deferred to the Executive's position that foreign sovereign immunity is not warranted. *But see, e.g., Renchard v. Humphreys & Harding, Inc.*, 381 F. Supp. 382, 385 (D.D.C. 1974) (holding that "the Department of State's suggestion not to grant immunity should be given conclusive effect"); *Amkor Corp. v. Bank of Korea*, 298 F. Supp. 143, 144 (S.D.N.Y. 1969) ("The Department of State's determination that immunity need not be extended is binding on this Court."); *see also Yousuf v. Samantar*, 699 F.3d 763, 772 (4th Cir. 2012) (deferring to Executive Branch's position that the defendant should be denied head-of-state immunity); *Noriega*, 117 F.3d at 1212 (same); *Hoffman*, 324 U.S. at 38 (describing the Executive's 'fail[ure]' to 'recognize immunity' on the facts at issue in that case as 'controlling'). However, this can be explained by the Executive Branch's overwhelming tendency to request the application of foreign sovereign immunity, *see Verlinden*, 461 U.S. at 486, and Halkbank cannot identify a single case where common-law immunity *was* applied to a foreign state-owned entity facing federal criminal charges.

In any event, as Halkbank acknowledges, we have on numerous occasions recognized that the Executive's "failure or refusal to suggest immunity" is at least "a significant factor to be taken into consideration in determining if the case is one justifying derogation from the normal exercise of the court's jurisdiction." *Heaney v. Gov't of Spain*, 445 F.2d 501, 503 (2d Cir. 1971); *accord Victory Transp.*, 336 F.2d at 360; *see also Yousuf*, 699 F.3d at 773 (holding that the Executive's position on "status-based immunity doctrines such as head-of-state immunity" should be given "absolute deference," while its position on "conduct-based immunity . . . carries substantial weight").[8]  If the Executive's failure to suggest immunity is a significant factor, then its active decision to deny immunity is, *a fortiori*, entitled to equal if not greater weight in our analysis.

---

[8] The Fourth Circuit explained that "head-of-state immunity is tied closely to the sovereign immunity of foreign states," and that both forms of immunity aim "to promote comity among nations."  *Yousuf*, 699 F.3d at 769 (internal quotation marks and citation omitted).  It then concluded that the Executive's "pronouncement as to head-of-state immunity is entitled to absolute deference," given "the Executive's constitutionally delegated powers" to recognize foreign heads of state and "the historical practice of the courts" in deferring to "executive 'suggestions of immunity' for heads of state."  *Id.* at 772 (citation omitted).  The Fourth Circuit concluded that the Executive's position as to official-act immunity is not controlling, by contrast, because "[s]uch cases do not involve any act of recognition for which the Executive Branch is constitutionally empowered; rather, they simply involve matters about the scope of defendant's official duties."  *Id.* at 773.

Thus, having concluded that there is no basis for treating the Executive's decision to deny immunity differently than its position to extend immunity, and that such deference is not restricted to civil cases, we proceed to consider the scope of immunity afforded to foreign state-owned corporations at common law and whether the federal criminal prosecution of Halkbank comports with the substance of that common law.

### ii.  Immunity of State-Owned Corporations

It is undisputed in this case that the United States would not subject Turkey—a state *qua* state—to criminal prosecution; indeed, the government acknowledges that doing so would be "in derogation of the common law." Appellee's Br. at 34 (internal quotation marks omitted); *see also id.* ("When the Government stated [at oral argument before the Supreme Court] that it 'would not endeavor' to indict a 'state qua state,' it was explaining that indicting a state-owned corporation like Halkbank is a different matter." (quoting App'x at 199)). Halkbank argues that the common law extends absolute immunity from prosecution not only to foreign sovereigns, but also to any entity owned and

27

controlled by a foreign state, including state-owned corporations like Halkbank. We disagree.

Courts applying the common law have long distinguished between the immunity afforded to a foreign state and to the entities that it owns.[9]  Most early cases dealt with foreign state-owned ships, and courts consistently declined to extend the immunity of the sovereign unless the ship in question was "in the possession and service of the foreign government."  *Hoffman*, 324 U.S. at 32–36 (compiling cases); *see also* HAZEL FOX & PHILIPPA WEBB, THE LAW OF STATE IMMUNITY 146 (3d ed. 2015) ("Ownership by a State was not seen of itself to impress the property with a public character; it was its employment in carrying on operations of the government . . . which entitled the ship to immunity" in U.S. courts.).  For instance, in *The Navemar*, the Supreme Court denied immunity to a ship owned but not possessed by the Spanish government, reasoning that "actual

---

[9] The parties do not dispute that Halkbank is an "instrumentality of a foreign state" under the FSIA.  *Halkbank I*, 16 F.4th at 342 n.8; *see also* 28 U.S.C. § 1603(b)(2) (defining an "instrumentality of a foreign state" as including "any entity" for which "a majority of [its] shares or other ownership interest is owned by a foreign state or political subdivision thereof").  However, Halkbank's status under the FSIA, which the Supreme Court has determined does not apply here, is not instructive in determining its status under the common law. *See* Chimène I. Keitner, *Prosecuting Foreign States*, 61 VA. J. INT'L L. 221, 268–69 (2021) ("Although the FSIA defines 'foreign state' expansively for purposes of that statute, history and practice support differentiating between state-owned corporations and foreign states for immunity purposes under a common law approach.").

possession by some act of physical dominion or control in behalf of the Spanish government was needful, or at least some recognition on the part of the ship's officers that they were controlling the vessel and crew in behalf of their government." 303 U.S. at 75–76 (citations omitted); *cf. Berizzi Bros. Co.*, 271 U.S. at 570, 573–74 (extending immunity to a merchant ship owned, possessed, and operated by Italian government). Courts likewise extended immunity to railways that were owned and operated by a foreign government for public purposes because, under those circumstances, the suit was "virtually against the king of a foreign country." *Mason v. Intercolonial Ry. of Can.*, 83 N.E. 876, 876–77 (Mass. 1908); *see also Bradford v. Dir. Gen. of R.Rs. of Mex.*, 278 S.W. 251, 251–52 (Tex. Civ. App. 1925). Indeed, in *Oliver American Trading Co. v. Government of United States of Mexico*, we extended immunity to the National Railways of Mexico, reasoning that a suit against an entity owned and operated by the Mexican government — "just as it operates the Post Office, the Customs Service, or any other branch of the national government" — was "in reality a suit . . . against the Mexican government." 5 F.2d 659, 661 (2d Cir. 1924); *see also id.* at 665 (describing the Mexican government's operation of the railway as "the performance of a fundamental governmental function").

Given the focus on government function, in certain cases involving state-owned corporations, courts declined to extend immunity primarily *because of* the corporations' separate juridical status. *See, e.g.*, *United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199, 202 (S.D.N.Y. 1929) (denying immunity to a mining corporation majority-owned by the French government because the "company [is] an entity distinct from its stockholders" and "[p]rivate corporations in which a government has an interest . . . are not departments of government"); *Coale v. Société Co-op. Suisse des Charbons*, 21 F.2d 180, 181 (S.D.N.Y. 1921) ("If the Swiss government chose to do its business by means of the Société, the latter, as a corporate entity, was liable for its corporate obligations."); *Ulen & Co. v. Bank Gospodarstwa Krajowego (Nat'l Econ. Bank)*, 24 N.Y.S.2d 201 (2d Dep't 1940) (denying immunity to a bank majority-owned by the Polish government because it "has all the characteristics of a corporation"); *see also The Beaton Park*, 65 F. Supp. 211, 212 (W.D. Wash. 1946) (denying immunity to a ship whose "commercial operation was not by the Canadian Government itself, but by a corporation operating agent whose capital stock is owned by the Canadian Government"); *but see F. W. Stone Eng'g Co. v. Petroleos Mexicanos of Mex., D. F.*, 352 Pa. 12, 17 (1945) (finding it insignificant that the defendant was a "separate corporation" because

the State Department's determination that the corporation was immune was binding).

Accordingly, the few courts that did extend immunity to state-owned corporations emphasized those entities' performance of governmental functions. *See, e.g., Dunlap v. Banco Cent. Del Ecuador*, 41 N.Y.S.2d 650, 651–52 (Sup. Ct. N.Y. Cnty. 1943) (concluding that immunity may be available to a corporation partly owned by the Ecuadorean government because "it may have acted solely as a part of the Republic of Ecuador, and as its instrumentality in the performance of its governmental function of minting and circulating its fractional money"). Moreover, once the Executive Branch adopted the restrictive theory, the immunity inquiry focused further on whether "the *activity* in question" was a "strictly public or political act" or "more of the character of a private commercial act."[10]  *Victory Transp.*, 336 F.2d at 360 (emphasis added).

---

[10]  The restrictive theory thus had the effect of collapsing the prior analysis of whether a state-owned entity performed public functions generally into whether the conduct in question was a public act.  *See, e.g.*, Keitner, *supra*, at 252–53 ("Under the restrictive theory, an entity's status as a foreign [state-owned entity] is less important to determining its potential exemption from domestic jurisdiction than the nature of the conduct at issue in the proceeding . . . . As a matter of international law, the fundamental question under the restrictive theory is whether an entity's conduct is sovereign or non-sovereign in nature.").  Although Halkbank argues that the restrictive theory was only incorporated into the common law as to civil cases and "has never applied to criminal cases," Reply Br. at 12–13, the authority upon which it relies for this proposition discusses the "exercise

Few cases address whether, and under what circumstances, foreign state-owned corporations are entitled to common-law immunity in criminal cases; however, those that have addressed the issue have done so in accordance with the principles explained *supra*.  For instance, in *In re Investigation of World Arrangements*, the district court quashed a grand jury subpoena served on the Anglo-Iranian Oil Company, a corporation controlled and partly owned by the British government, concluding that the corporation was immune because its "supplying of oil to insure the maintenance and operation of a naval force" was a "fundamental government function," which rendered it "indistinguishable from the Government of Great Britain."  13 F.R.D. at 282, 290–91.  Moreover, as noted *supra*, in *In re Grand Jury Investigation of the Shipping Industry*, the district court declined to make any ruling on foreign sovereign immunity, pending a showing by the government that the Philippine National Lines' activities were

---

of criminal jurisdiction directly over another State," rather than state-owned entities, FOX & WEBB, *supra*, at 91, and later concludes that "it is to be expected that the application of the restrictive doctrine will permit claims for compensation where a foreign State has committed in the forum State or authorized the commission there of acts of a criminal nature," *id.* at 95.  *See also id.* at 94–95 (explaining that the "immunity of the State from criminal proceedings [was treated] as more a matter of substantive incapacity and the inapplicability of the penal code of one State in respect of the acts of another State, rather than attributable to a procedural defect," and that the restrictive doctrine's treatment of "a State which engages in commercial or private law matters as on the same footing as any other artificial person or corporation" may "point the way, should occasion so require, to the fashioning of an exception to immunity from criminal proceedings").

"substantially, if not entirely, commercial."  186 F. Supp. at 319–20.  Halkbank argues that these two district court cases show that corporations owned and controlled by a foreign state are absolutely immune from prosecution under the common law.  However, in our view, neither of these cases suggests that the state-owned corporation in question is entitled to *absolute* immunity.  Instead, they indicate that state-owned corporations may be immune if engaged in governmental, non-commercial conduct.

This view is consistent with the other criminal cases Halkbank cites, which only support the existence of common-law immunity for sovereigns and their instrumentalities for governmental functions.  For example, in *Coleman*, the Supreme Court found it "well settled that a foreign army permitted to march through a friendly country, or to be stationed in it, by permission of its government or sovereign, is exempt from the civil and criminal jurisdiction of the place," and held that "an army invading an enemy's country [is likewise] exempt."  97 U.S. at 515–16; *see also Dow v. Johnson*, 100 U.S. 158, 165, 169 (1879) (elaborating on the "doctrine of non-liability to the tribunals of the invaded country for acts of warfare").  Halkbank also points to a decision of France's highest criminal court, which it identifies as the "only national supreme court to squarely reach the

criminal immunity of a corporate instrumentality."  Reply Br. at 17.  However, that case extended Malta's immunity from prosecution to the Malta Maritime Authority *because* the charged conduct involved the defendant's exercise of state authority:

> '[T]he rule of customary international law which bars proceedings against States before the criminal courts of a foreign State extends to organs and entities that constitute emanations of the State, as well as to their agents, by reason of acts which, as on the facts of the present case, relate to the sovereignty of the State concerned.'

Brief for Professor Roger O'Keefe as Amicus Curiae Supporting Defendant-Appellant, at 12 (quoting *Agent judiciaire du Trésor v. Malta Mar. Auth. and Carmel X*, Cour de Cassation [Cass.] [supreme court for judicial matters] crim., Nov. 23, 2004, Bull. crim., No. 04-84.265 (Fr.)); *accord* FOX & WEBB, *supra*, at 94 & n.80. Therefore, these cases do not address the issue of common-law immunity for a state-owned corporation for its commercial activity, and Halkbank cites no case holding that immunity exists for such activity.[11]

---

[11]  Although *Berizzi Brothers* extended immunity to a merchant ship owned and operated by a foreign government, *see* 271 U.S. at 574, the Supreme Court has stated that *Berizzi Brothers* "no longer correctly states the law" with respect to immunity "in cases arising out of purely commercial transactions," *Alfred Dunhill*, 425 U.S. at 703.  Nor are we persuaded by Halkbank's assertion that the lack of cases explicitly denying a state-owned corporation's claim of immunity from prosecution bolsters its absolute-immunity argument.  *See In re Grand Jury Subpoena*, 912 F.3d 623, 630 (D.C. Cir. 2019) (rejecting the argument that "[t]he lack of reported cases—before and after the [FSIA]—considering

In sum, we conclude that, under the common law, foreign state-owned corporations are not entitled to absolute immunity in all criminal cases. Although prior cases have extended immunity to sovereigns and their instrumentalities based on their governmental conduct, we find that the common law places no independent bar on the prosecution of state-owned corporations for their commercial activity. Thus, when a foreign state-owned corporation is prosecuted for its commercial, non-governmental activity, we defer to the Executive Branch's determination that immunity is not warranted in that particular case.[12]

### iii. Halkbank's Charged Conduct

As we previously held, the charges in the indictment concern Halkbank's commercial activity. *See Halkbank I*, 16 F.4th at 349–50; *see also Halkbank II*, 598 U.S.

---

criminal process served on sovereign-owned corporations . . . . [implies] that such corporations are universally understood to possess absolute immunity, [because] that notion [is] highly speculative[, and] [a]n equally likely explanation for the absence of cases is that most companies served with subpoenas simply comply without objection").

[12] This is not to foreclose a situation in which the Executive decides that a foreign state-owned corporation *is* entitled to immunity in a criminal case (*e.g.*, one brought by a state or local prosecutor), even if the alleged conduct at issue is arguably commercial in nature. The Executive's position would be entitled to deference in that case. We more narrowly hold here that common-law immunity from criminal prosecution is not afforded to a foreign, state-owned corporation for its commercial activity when the Executive has determined, through its prosecution, that the corporation should not receive such immunity.

at 283 (Gorsuch, J., concurring in part and dissenting in part) (concluding that "the indictment sufficiently alleges that Halkbank has engaged in . . . commercial activities"). On remand, Halkbank urges us to reassess our characterization of the charged conduct, arguing that the common law "rejected a strict governmental/commercial distinction," and that "in certain categories of core sovereign concern, commercial acts taken for a governmental purpose remained immune." Reply Br. at 22 (citing *Victory Transp.*, 336 F.2d at 360, and *Heaney*, 445 F.2d at 503–04). The government contends that the commercial activity exception under the FSIA is coextensive with that under the common law because, as the Supreme Court has recognized, "one of the primary purposes of the FSIA was to codify the restrictive theory of sovereign immunity." *Samantar*, 560 U.S. at 319–20. We need not determine the extent to which the FSIA's and common law's standards differ, however, because we conclude that Halkbank's activity charged in the indictment is commercial even if we consider, as Halkbank urges, the purpose of that activity.

In *Victory Transport*, we concluded that the "strictly political or public acts" entitled to immunity were "generally limited" to: (1) "internal administrative acts, such as expulsion of an alien"; (2) "legislative acts, such as nationalization"; (3)

"acts concerning the armed forces"; (4) "acts concerning diplomatic activity"; and (5) "public loans." 336 F.2d at 360. We then determined that a contract by a Spanish government agency for the transportation of wheat was not a political or public act because, even if the transaction was made "pursuant to the Surplus Agricultural Commodities Agreement to help feed the people of Spain," it was "conducted through private channels of trade" with the agency "act[ing] much like any private purchaser of wheat." *Id.* at 361. In *Heaney*, by contrast, we concluded that a contract by the Spanish government to have an individual "generate adverse publicity" against the British government in order to advance Spanish interests in Gibraltar was an "'act[] concerning diplomatic activity.'" 445 F.2d at 503–04 (quoting *Victory Transp.*, 336 F.2d at 360); *see also Heaney*, 445 F.2d at 503 n.3 (explaining that "the term 'diplomatic' in *Victory Transport* was obviously intended in the broad sense of the word and was not meant to be limited to the activities of diplomatic missions"). We rejected the argument that "all contracts, regardless of their purpose, should be deemed 'private' or 'commercial' acts," and

affirmed that the criteria set forth in *Victory Transport* would govern our inquiry into the purpose of the acts. *Id.* at 504.[13]

Here, Halkbank argues that its alleged conduct constitutes political or public acts under the *Victory Transport* test. In particular, Halkbank argues that the indictment focuses on "internal administrative acts" of the Turkish government because it alleges that Turkey designated Halkbank as the "sole repository of proceeds from the sale of Iranian oil," App'x at 23; that certain government officials "participated in and protected [the alleged] scheme," *id.* at 20; and that the alleged scheme would "benefit the Government of Turkey" by "artificially inflat[ing] Turkey's export statistics, making its economy appear stronger than it in fact was," *id.* at 34. Halkbank further argues that the indictment implicates "acts concerning diplomatic activity" because it includes a charge based on Halkbank's alleged misrepresentations to U.S. Treasury officials regarding its compliance with sanctions against Iran. We disagree.

---

[13] In the FSIA, Congress enacted its own definition of commercial activity, which was expanded to include contracts made for a public purpose. *See Tex. Trading & Mill. Corp. v. Fed. Rep. of Nigeria*, 647 F.2d 300, 310 n.27 (2d Cir. 1981), *overruled on other grounds by Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Rep.*, 582 F.3d 393 (2d Cir. 2009). However, as set forth below, we conclude that Halkbank's alleged conduct is commercial in nature even when the FSIA definition and cases interpreting that definition are disregarded.

As we previously determined, the "gravamen" of the indictment is Halkbank's "participation in money laundering and other fraudulent schemes designed to evade U.S. sanctions." *Halkbank I*, 16 F.4th at 350.  The indictment alleges that, in connection with the schemes, Halkbank "used money service businesses and front companies" and "participated in several types of illicit transactions for the benefit of Iran."  App'x at 19–20; *see also id.* at 32 (alleging that Halkbank conspired to "transfer Iranian oil proceeds . . . to exchange houses and front companies . . . in order for those exchange houses and front companies to buy gold for export from Turkey"); *id.* at 33–34 (describing alleged efforts to "open[] business accounts at HALKBANK . . . in order to extract the Iranian oil proceeds to Dubai through gold exports, using Sarmayeh Exchange and Bank Sarmayeh as intermediaries").  These transactions were conducted via private, commercial banking channels and thus are "far more of the character of a private commercial act than a public or political act."  *See Victory Transp.*, 336 F.2d at 360; *see also Halkbank I*, 16 F.4th at 350 ("[B]ecause those core acts [described in the indictment] constitute an activity that could be, and in fact regularly is, performed by private-sector businesses, those acts are commercial, not sovereign, in nature." (internal quotation marks and citation omitted)).

Allegations that the charged schemes arose from Halkbank's designation as the repository of Iranian oil proceeds and benefitted Turkey's government by making its economy appear stronger do not transform Halkbank's commercial activity into "internal administrative acts," even if certain government officials were involved in the schemes. Halkbank emphasizes that it held the Iranian funds at Turkey's direction, consistent with the bilateral trade exemption under applicable U.S. sanctions laws. *See* 22 U.S.C. § 8513a(d)(4)(D). However, we rejected such an argument in *Victory Transport*, reasoning that the "purchase of wheat pursuant to the Surplus Agricultural Commodities Agreement [between the United States and Spain] to help feed the people of Spain" did not move the otherwise commercial transaction to the "political realm." 336 F.2d at 361. Although that Agreement "permitted purchasers authorized by the Government of Spain to buy various amounts of surplus commodities," *id.* at 356 n.1, such authorization—even to a government agency—did not, in our view, imbue the resulting transactions with public purpose, *see id.* at 361.[14] Halkbank's argument that its conduct served a public purpose because the charged schemes allegedly

---

[14] The Surplus Agricultural Commodities Agreement was entered into pursuant to the Agricultural Trade Development and Assistance Act, 7 U.S.C. §§ 1691 *et seq*. *See Victory Transp.*, 336 F.2d at 356 & n.1.

increased Turkey's export statistics is likewise unavailing, as it is well established that a motivation to advance the national economy is insufficient to confer immunity to otherwise commercial conduct.  *See id.*; *see also Ruggiero v. Compania Peruana de Vapores Inca Capac Yupanqui*, 639 F.2d 872, 878 (2d Cir. 1981) (observing that, by the 1940s, "international usage" had shifted away from considering the advancement of economic welfare to be a public purpose justifying immunity).

In addition, the fact that one of the charges against Halkbank relates to its alleged misrepresentations to U.S. Treasury officials does not mean that the indictment implicates "acts concerning diplomatic activity" of Turkey. Discussions between Halkbank and U.S. Treasury officials regarding sanctions compliance are not "diplomatic," even in the "broad sense of the word." *See Heaney*, 445 F.2d at 503 & n.3.  As the indictment alleges, these communications involved Halkbank officials and related to "the bank's potential involvement in Iranian sanctions evasion," App'x at 40, rather than any effort by the sovereign to affect foreign relations, *cf. Heaney*, 445 F.2d at 503.

We therefore conclude that the indictment concerns Halkbank's commercial activity, even if we consider the purpose of the alleged conduct.  Because the indictment concerns Halkbank's commercial activity, the Executive's position that

Halkbank is not immune from prosecution based on that activity is consistent with the scope of foreign sovereign immunity recognized at common law. Because the Executive's position is consistent with the common law, we defer to that position and conclude that Halkbank is not immune from prosecution in this case.

Finally, in reaching this holding, we reject the policy arguments cited by Halkbank in advocating a different result. For example, Halkbank argues that, when it comes to disputes with foreign state-owned corporations, the United States should not be able to wield the tool of federal criminal prosecution because foreign states may react negatively to its use, particularly when the Executive's toolbox otherwise contains a "full arsenal of diplomacy, tariffs, investment blocks, visa limits, export controls, the grant or denial of economic assistance, military aid, and sanctions." Appellant's Br. at 56–57. However, "[t]hroughout history, courts have resolved questions of foreign sovereign immunity by deferring to the decisions of the political branches . . . ." *Altmann*, 541 U.S. at 696 (alteration adopted) (internal quotation marks and citation omitted). This approach reflects our recognition that the political branches are, unlike the judiciary, "well situated to consider sensitive foreign policy issues" and "possess significant diplomatic tools and leverage the judiciary lacks." *Munaf v. Geren*, 553 U.S. 674, 702–03 (2008)

(internal quotation marks and citation omitted).  Indeed, "[t]he determination to grant (or not grant) immunity can have significant implications for this country's relationship with other nations."  *Ye v. Zemin*, 383 F.3d 620, 627 (7th Cir. 2004). Thus, the decision to initiate a federal criminal prosecution against a foreign state-owned corporation rather than, for example, impose tariffs or deny military aid is not one for the judiciary to second guess.  *See Pasquantino*, 544 U.S. at 369 ("The greater danger, in fact, would lie in our judging this prosecution barred based on . . . foreign policy concerns . . . , concerns that we have neither aptitude, facilities nor responsibility to evaluate." (internal quotation marks and citation omitted)); *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) ("In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation.").  "[A]s Chief Justice Marshall explained in the *Schooner Exchange*, 'exemptions from territorial jurisdiction must be derived from the consent of the sovereign of the territory' and are 'rather questions of policy than of law, that they are for diplomatic, rather than legal discussion.'"  *Munaf*, 553 U.S. at 701 (alteration adopted) (quoting *Schooner Exchange*, 11 U.S. at 143, 146).

Notwithstanding this broad deference to the political branches on these matters of immunity, we leave for another day whether deference to the Executive in this context should be cabined if, unlike here, the Executive's denial of immunity to a foreign sovereign derogated from the common law—for instance, if the Executive indicted a state *qua* state. Here, the Executive made the decision to bring federal criminal charges against Halkbank for its commercial activity, and, because common-law foreign sovereign immunity imposes no bar on that prosecution, we defer to the Executive's decision not to afford such immunity in this criminal case.

### III.   CONCLUSION

For the foregoing reasons, we **AFFIRM** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit