UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,     )

      - v. -     )

REZA ZARRAB,     )

      Defendants.     )

**TO BE FILED UNDER SEAL**

S5 15 Cr. 867 (RMB)

## SENTENCING SUBMISSION ON BEHALF OF REZA ZARRAB

Dated: July 2, 2026
New York, New York

MORVILLO, ABRAMOWITZ
GRAND, IASON & ANELLO, P.C.

Robert J. Anello
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
(212) 856-9494 (facsimile)

*Attorneys for Defendant Reza Zarrab*

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ............................................................................................ 1

    A.    The Court Should Impose a Sentence of Time Served ....................................... 3

    B.    No Financial Penalty is Warranted ..................................................................... 6

DISCUSSION ...................................................................................................................... 7

I.    FACTUAL BACKGROUND .................................................................................... 7

    A.    Reza's Childhood in Turkey and Dubai ............................................................ 7

    B.    Reza's Early Business Ventures ......................................................................... 8

    C.    Reza Enters the Iranian Exchange Market ......................................................... 9

    D.    Reza's Altruistic Generosity ........................................................................... 11

    E.    Reza's Arrest in the United States ................................................................... 12

II.    THE OFFENSE CONDUCT .................................................................................. 13

    A.    The Gold Trade ................................................................................................ 13

    B.    The Fake Food Trade ....................................................................................... 14

    C.    Possession of Contraband ................................................................................ 15

III.    REZA'S COOPERATION WITH THE GOVERNMENT ..................................... 15

    A.    The Cooperation Agreement ............................................................................ 15

    B.    The Government's Prosecution of Atilla and Simultaneous Retaliation and Attempted Murder by Turkey ........................................................................... 16

    C.    Reza's Indispensable Testimony at Atilla's Trial ............................................ 18

    D.    Turkey Financially Ruins Reza ▮▮▮▮▮▮ n Retaliation for Reza's Testimony at Atilla's Trial ................................................................................................... 21

    E.    The Halkbank Investigation and Ongoing Abuse by Turkey of Reza ▮▮▮▮ ....... 23

    F.    Reza's Cooperation ▮▮▮▮▮▮▮ ...................................................................... 25

    G.    Turkey's Harassment Led to Oppressive Security Risks That Have Deprived Reza of His Livelihood While on Bail ......................................................................... 27

H.    Reza Seeks Safety and Refuge ███████ ........... 28

███████████████████████████ ........... 29

J.    Reza Finds Solace in Horseback Riding ........................... 30

K.    Ongoing Security Risks Ruin Reza's Budding Horse-Farm Business ........... 30

L.    Halkbank is Handed an Unprecedented DPA and Avoids Penalties ........... 31

███████████████████████████ ........... 33

N.    Reza Marries Dilara Altintop ███████ ........... 34

IV.    THE SENTENCING GUIDELINES ........................................... 35

V.    A TIME-SERVED SENTENCE IS APPROPRIATE ........................... 35

A.    This Court Can and Should Impose a Non-Guidelines Sentence of Time Served ........ 35

B.    The Nature and Circumstances of the Offense Favor a Time-Served Sentence ........... 35

1.    Reza's Cooperation Has Been Extraordinary ................................... 36

2.    The Offense Conduct Was Predominantly Extraterritorial ........................... 36

3.    No Loss Occurred and Any Gain By Reza Was Modest Compared to Others' Gains .. 37

C.    Reza's History and Characteristics Favor a Time-Served Sentence ........................... 37

D.    A Time-Served Sentence Would Provide Just Punishment and Avoid Unwarranted Sentencing Disparities ........................... 39

1.    The Consequences Reza Has Already Suffered Are Just Punishment ........................... 39

2.    A Time-Served Sentence Is Necessary to Avoid Unwarranted Sentencing Disparities 39

3.    A Time-Served Sentence Is Consistent with Other Sentences in Comparable Cases ... 41

E.    A Time-Served Sentence Would Afford Adequate Deterrence ........................... 42

F.    A Custodial Sentence Would Ruin Reza's Mental and Physical Well-Being ........................... 42

VI.    THE COURT SHOULD ORDER FORFEITURE OF THE BOAT VALUED AT $288,690 AND $88,102.59 IN CASH REZA HAS ALREADY PROVIDED TO THE U.S. GOVERNMENT ........................... 43

VII.    THE COURT SHOULD NOT IMPOSE RESTITUTION ........................... 48

VIII.   THE COURT SHOULD NOT IMPOSE A FINE ................................................................. 48

CONCLUSION ................................................................................................................... 49

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Kaley v. United States,*
    571 U.S. 320 (2014)................................................................................................. 44

*Mont v. United States,*
    587 U.S. 514, 523 (2019)......................................................................................... 42

*Rita v. United States,*
    551 U.S. 338 (2007)................................................................................................. 42

*United States v. Atilla,*
    No. 1:15-cr-00867-RMB (S.D.N.Y.)................................................................. 44, 45

*United States v. Bajakajian,*
    524 U.S. 321 (1998)........................................................................................... 45, 46

*United States v. Bryson,*
    229 F.3d 425 (2d Cir. 2000)..................................................................................... 38

*United States v. Elias,*
    154 F.4th 56 (2d Cir. 2025) ..................................................................................... 44

*United States v. Faria,*
    161 F.3d 761 (2d Cir. 1998)..................................................................................... 38

*United States v. Francis,*
    129 F. Supp. 2d 612 (S.D.N.Y. 2001)...................................................................... 39

*United States v. Gassnola,*
    No. 18-cr-252 (LAK) (S.D.N.Y. Oct. 7, 2019)........................................................ 41

*United States v. Kakoullis,*
    150 F. App'x 80 (2d Cir. 2005) ................................................................................ 48

*United States v. Kalish,*
    626 F.3d 165 (2d Cir. 2010)..................................................................................... 44

*United States v. Mateo,*
    299 F. Supp. 2d 201 (S.D.N.Y. 2004)...................................................................... 39

*United States v. Rohr,*
    No. 19-cr-595-RA (S.D.N.Y. May 19, 2023) .......................................................... 41

*United States v. Saidazim,*
  No. 21-cr-564-WFK (E.D.N.Y.) ....................................................................................... 37

*United States v. Stumberger,*
  No. 19-cr-608-RA (S.D.N.Y. Oct. 20, 2023)................................................................... 41

*United States v. Tedeschi,*
  No. 10-cr-235 (S.D.N.Y.) (LAK) .............................................................................. 43, 44

*United States v. Thavaraja,*
  740 F.3d 253 (2d Cir. 2014)............................................................................................ 36

*United States v. Turkiye Halk Bankasi, A.S.,*
  6:15-cr-867-RMB (S.D.N.Y.)................................................................................... 32, 40

*United States v. Viloski,*
  814 F.3d 104 (2d Cir. 2016)............................................................................................ 46

## Statute

18 U.S.C. § 3572(a) .......................................................................................................... 48

18 U.S.C. § 3663A(c)(1)(B) ............................................................................................. 48

18 USCA § 3553................................................................................................... passim

## Rules

U.S.S.G. § 5K1.1 .............................................................................................................. 34

## Other Authorities

Akşener'den Zarrab tepkisi!, Sözcü (Dec. 5, 2017)...................................................... 21

CNN TURK, Reza Zarrab'ın Beyoğlu'ndaki binası evsizlerin mekanı oldu! Tüm eşyalar parça
  parça çalındı (YouTube, Oct. 3, 2021) https://www.youtube.com/watch?v=LU5jicr-Dp4 2, 23

Eric Lipton, Turkish Bank Case Showed Erdogan's Influence with Trump, New York Times
  (Oct. 29, 2020), https://www.nytimes.com/2020/10/29/us/politics/trump-erdogan-
  halkbank.html............................................................................................................... 34

FDD, FDD EVENT | Atilla, Zarrab, and U.S.-Turkish Relations, at 35:45 (YouTube, Jan. 18,
  2018), https://youtube.com/watch?v=pju7rY1vmcY&t=2160s .............................................. 20

Nazif Karaman, Sarraf-FETÖ işbirliğinin kanıtı, Sabah (Dec. 6, 2017) ...................................... 21

Reza Zarrab Case: Turkey Seizes Assets of Trader in US Trial, BBC News ............................. 22

SCF, Iran sanctions-busting Turkish-Iranian gold trader Zarrab seen in New York sushi
    restaurant, Stockholm Center for Freedom (Sept. 12, 2018) https://stockholmcf.org/iran-
    sanctions-busting-turkish-iranian-gold-trader-zarrab-seen-in-new-york-sushi-restaurant/...... 30

Shahir Shahidsaless, Iran petrol protests: Why war could be the only way out of US sanctions
    spiral, Middle East Eye (Nov. 19, 2019) https://www.middleeasteye.net/opinion/will-tehran-
    defeat-trump. ............................................................................................................................... 17

## PRELIMINARY STATEMENT

This memorandum respectfully is submitted on behalf of Reza Zarrab, who will stand before this Court for sentencing on July 14, 2026. The primary charges against Reza arise from his participation while living in Turkey in a business that transmitted proceeds of Iranian oil to bypass U.S. sanctions against Iran. Reza accepts responsibility and is sorry for his role in the business that violated U.S. law. In addition to pleading guilty, for over eight years Reza has engaged in extraordinary and unprecedented cooperation with the U.S. government that has cost him his family, his name, his country, hundreds of millions of dollars of his assets, and hundreds of millions of dollars of his extended family's assets, and that nearly cost him his life.

Defense counsel believes that the Turkish government has viewed and continues to view Reza's cooperation with the U.S. government as treason because it has exposed corruption at the highest levels of Turkish government and thwarted Turkey's ability to fraudulently inflate its economy by helping Iran bypass U.S. sanctions.

Reza's decision nevertheless to cooperate with the U.S. government has had a devastating impact on every aspect of his life ▮▮▮▮▮▮▮▮▮▮▮. Because of Reza's cooperation, Reza ▮▮▮▮▮▮▮▮ suffered unthinkable personal and financial retaliation from the Turkish government that has ruined their lives:

- Reza almost lost his life at the MDC when another inmate cornered him and threatened to kill him with a knife after ▮▮▮▮ alerted the inmate to Reza's cooperation.

- Turkey seized over $172,000,000 worth of Reza's assets as retribution for his cooperation.

- Turkey opened an investigation into Reza for espionage, which carries a mandatory life sentence.

1



Because of these relentless threats and retaliatory actions, ██████████

████████████████████████████████████████ Reza ████████

██████ and has been awaiting sentencing for over *eight years* while the government pursued a

criminal case against Halkbank.  After nearly a decade of delay, in March 2026, the U.S.

government entered into a deferred prosecution agreement ("DPA") with Halkbank that imposes

no forfeiture, restitution, or financial penalties on Halkbank and *requires* Halkbank to assist the

government with the enforcement of any criminal judgment against Reza, which defense counsel

believes could further jeopardize Reza's liberty, safety, and financial interests.

---

¹ CNN TURK, *Reza Zarrab'ın Beyoğlu'ndaki binası evsizlerin mekanı oldu! Tüm eşyalar parça parça çalındı* (YouTube, Oct. 3, 2021) https://www.youtube.com/watch?v=LU5jicr-Dp4 (depicting the vandals' destruction).

For all the extraordinary reasons set out below, including Reza's cooperation with the government, the extraordinary retaliation he has faced from Turkey and Iran, the grave threats to his safety, and his complete acceptance of responsibility, counsel respectfully asks the Court to impose a sentence of time served. The Probation Office concurs and recommends a sentence of time served. For the same reasons, and in light of the unprecedented deal brokered by the governments of Turkey and the U.S. to resolve the criminal case against Halkbank, the Court should impose the forfeiture that Reza has already provided to the government—a boat valued at $288,690[2] and $88,102.59 in cash—to reflect the unique circumstances of Reza's cooperation, and in recognition of the substantial seizure of his and his family's assets that already has occurred in Turkey by the government there as a direct response to his truthful cooperation. As discussed below, the law supports such a sentence given the financial consequences already suffered. Finally, as the Probation Office recommends, the Court should not impose restitution or a fine because (1) Reza's crimes did not cause pecuniary harm to any victim and (2) Reza's current net worth is *negative* $50,970,162.50 and █████████████████████████ █████████████ rendering him unable to pay any financial penalties.

### A. The Court Should Impose a Sentence of Time Served

As the Probation Office has recommended, the factors set out in Section 3553(a) of Title 18, United States Code, support a time-served sentence for Reza. Most significantly, Reza's cooperation has been of immense value to the government. He testified for seven days at the trial of Hakan Atilla, providing detailed testimony regarding the mechanics of the sanctions evasion business. This Court repeatedly credited his testimony as detailed, credible, and largely

unrefuted.

The "nature and circumstances" of Reza's offense also support a time-served sentence, including his comparatively limited role in Iran's and Turkey's sanctions evasions. Reza accepts responsibility for his crimes. Those crimes, however, were nonviolent and caused no pecuniary loss to any victim. Only some 10 percent of the currency exchange transactions he facilitated involved electronic U.S. dollar transactions, meaning the offense was predominantly extraterritorial. Moreover, Reza was not the only money exchanger used by Iranian banks. His competitors provided similar services, while others played invaluable roles by facilitating the withdrawal of funds out of Halkbank so that currency could get to Iranians.

Reza also was not the sole or primary financial beneficiary of the sanctions evasion business. Although Reza does not deny that he profited substantially from his role, the chief financial beneficiaries were Halkbank, Turkey, the Iranian government and Iranian banks. Atilla Sentencing Tr. 29. Halkbank profited handsomely from commissions it earned on transactions that benefitted Iran. Zafer Caglayan, the Turkish Minister of Economy, received half of Reza's profits but incurred none of the associated costs. Trial Tr. 302. Reza, on the other hand, bore the costs associated with each transaction that went through his money exchange business.

The other Section 3553(a) factors likewise support a time-served sentence. Reza's "history and characteristics" weigh heavily in favor of leniency. He has been on pretrial release since January 2018 and has been a model defendant, cooperator, and community resident. Prior to that, Reza spent nearly two years in jail, part of which he spent in solitary confinement, and all of which he spent isolated from his family and in a state of chronic stress.

These consequences of Reza's cooperation already have afforded adequate deterrence. In addition to the financial, safety, and familial fallout of Reza's cooperation, his life has been irrevocably altered. Reza never will be able to return to his home country. He has been unable to open a bank account or find work. These difficulties likely will continue for a significant time. Reza could not reoffend even if he wanted to, and he does not. This is Reza's first encounter with the criminal justice system in the United States and, given the immeasurable suffering he already has endured because of his crimes and cooperation, it will be his last.

A time-served sentence also is necessary to avoid unwarranted sentencing disparities. The Deferred Prosecution Agreement ("DPA") between the government and Halkbank includes no penalties whatsoever for the bank, a keystone in the sanctions evasion business that allegedly transferred about $20 billion worth of restricted Iranian funds and sought to obstruct the government at every stage of the investigation and criminal case. The DPA purportedly reflects the role Halkbank and the Turkish government played in securing the release of hostages from Hamas—a miracle of foreign diplomacy that defense counsel believes was made possible by Reza's willingness to testify against Halkbank and his cooperation. Reza's case also compares favorably with the sentences imposed in other IEEPA violation cases in which defendants who did not cooperate or suffer in the way Reza has cooperated or suffered were still sentenced far below the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G") ranges. Even Atilla, who did not cooperate and went to trial, received a 32-month sentence despite having a Guidelines range of 97-121 months, which ultimately resulted in Atilla serving a term of imprisonment comparable to the amount of time Reza himself already has served. Reza's extraordinary cooperation warrants a time-served sentence, as the Probation Office recommends.

Additionally, a time-served sentence would account for the severe mental and physical health issues Reza has experienced throughout this ordeal. The stress of his cooperation and the subsequent fallout have taken an enormous toll on his wellbeing. A time-served sentence would allow Reza to continue treating his conditions while rebuilding his life.

Reza has taken responsibility for his actions, cooperated extensively, revealed corruption on a global scale, and lived with the consequences of his crimes for nearly a decade. He has felt the heavy burden of retaliation █████████████████████████████ ████████████████ He wishes to move on and continue his new life in the United States. The Court should not impose a term of supervised release because Reza already has been supervised on release for over eight years since he was granted pretrial release. Reza has complied with his pretrial release conditions for over 100 months without issue and proved to the community, the Probation Office, and the Court that he has rehabilitated himself and is an upstanding member of society. Imposing a term of supervised release would not advance any governmental or societal interests.

**B. No Financial Penalty is Warranted**

The Court should not impose any financial penalties given the extraordinary circumstances of this case. As a result of his plea and cooperation Reza is destitute and heavily in debt. In addition to outright destruction of their property, Reza's assets and his family's assets have been seized by the Turkish government. Reza's and his family's businesses have lost many tens of millions of dollars in lost rental income because of these seizures. Financial institutions around the world have refused to maintain accounts or transfer funds on behalf of Reza or his family members. The retaliation he has suffered has stripped him of virtually all financial resources and seriously depleted those of family members. In recognition of his crimes, Reza already proactively has forfeited a boat valued at $288,690 and $88,102.59 in cash to the U.S.

6

government. *See* June 18, 2026 Presentence Investigation Report ("PSR") at 30.  Reza is unable to pay any further financial penalties because as a result of Turkish retaliation, his current net worth is *negative* $50,970,162.50 ███████████████████████████████████

███████ PSR at 29, n.13.

Meanwhile, Halkbank faces no financial consequences under the DPA, despite the bank's enormous culpability.  Under these circumstances, the imposition of any significant amount of forfeiture beyond the approximately $400,000 Reza has already forfeited—which courts in this district refuse to impose where unwarranted and unjust, and where defendants such as Reza no longer possess any proceeds of their offenses—would be grossly disproportionate to Reza's culpability, and would violate the Excessive Fines Clause of the Eighth Amendment.

Finally, as the Probation Office recommends, no restitution is warranted because this Court previously found that no victims existed within the meaning of the Mandatory Victims Restitution Act.  Atilla Sentencing Tr. 82.

For all these reasons, the Court should impose a sentence of time served with no financial penalties other than forfeiture Reza has already provided to the government (the boat valued at $288,690 and $88,102.59 in cash), and the mandatory special assessment.  Reza at long last should be allowed to rebuild his life ███████████████████████████████

███████████████████████

## DISCUSSION

### I.    FACTUAL BACKGROUND

#### A.  Reza's Childhood in Turkey and Dubai

Reza was born in Iran in 1983.  Both of Reza's parents are Iranian by birth and were respected manufacturers and merchants.  When Reza was a toddler, his father, a well-known gold manufacturer in Iran, moved the family (including Reza's siblings) to Turkey.

Reza's father soon opened a money exchange business to serve Iranians who needed legally to move money between Iran and Turkey. At first, this was a relatively small operation. Iranian students in Turkey would send Turkish lira home to their parents, and the exchange would handle the exchange of lira to Iranian rial.

Reza attended school in Turkey until the mid-1990s. When Reza was a young teenager, Turkish criminals kidnapped and held his father for ransom. After his father was released, the family moved again, this time to Dubai to escape growing financial and political instability in Turkey. Reza always had struggled in school, but the move to Dubai exacerbated the problem. The school in Dubai taught its lessons in Arabic and English, and Reza lacked skills in either language to keep up with the curriculum. Reza failed out of school in Dubai after one year.

At age sixteen, Reza returned to Turkey on his own to continue his education and enter the workforce. He began working at a branch of his father's exchange company in Turkey, the Al Nafees Exchange. He began as an assistant: he prepared transfer requests, SWIFT documentation, and other paperwork, all while performing general office duties. In time, the head of the Al Nafees branch left, and Reza took over his role.

### B. Reza's Early Business Ventures

A few years after Reza moved back to Turkey, he began having difficulties with his father, including because of his desire to pursue a career in computer coding. To avoid further friction, Reza left his father's company and went into business on his own in Turkey.

Reza opened a small currency-exchange business in Turkey, serving Azerbaijani clients with U.S. dollar transactions. Trial Tr. 272. He soon expanded his exchange services to assist Romanian clients with transactions in China, and later into transactions between Azerbaijani clients and Russia. By the time Reza was nineteen, his exchange operations were generating a combined $30,000 to $40,000 in monthly profits.

Using his entrepreneurial skills, in 2008, Reza leveraged his reputation in the exchange industry to secure a $25 million contract to construct five river yachts for a Russian client, despite having no shipbuilding experience. The project employed 350 workers in Turkey. Also in 2008, Reza reconciled with his father and began assisting him with construction of a steel factory in Iran, but the two encountered cash flow difficulties. Reza had assets but no liquidity and found himself $10 million in debt arising from the need for funds to finance his father's steel factory. During this period of financial pressure, Reza began dealing with Iranian exchanges.

In 2010, Reza married Ebru Gundes, a celebrated Turkish singer and celebrity. In 2011, Reza and Ebru welcomed their daughter ███ into the world. Reza always dreamt of starting a family and grew extremely close with ███ his only child. Reza began spending significant amounts of time caring for and bonding with ███

### C. Reza Enters the Iranian Exchange Market

Around 2010, the U.S. began more aggressively imposing sanctions—fines, asset freezes, and loss of market access—on foreign financial institutions that conducted certain business related to Iran. Although the sanctions did not prohibit all Iran-related transactions, the UAE became averse to having any financial ties to Iran and closed the bank accounts of Iranian nationals and Iranian-owned entities. As a result, Al Nafees Exchange's bank accounts were shut down. Reza set up a new exchange company at the behest of his father. Iranians needed exchange services and the Zarrabs' exchanges provided those services. With the help of Turkish Minister for EU Affairs Egeman Bagis, Reza opened accounts at Aktif Bank, a privately owned investment bank in Turkey, to facilitate these transactions, which at first totaled around 5 to 10 million euros per day. Trial Tr. 273-78. Eventually Reza's business with existing Iranian customers began to slow because all their money that was held in Aktif Bank had been

exchanged. Reza sought out new Iranian customers that needed cash and onboarded two of the biggest banks in Iran. Trial Tr. 278, 286.

In early 2012, Aktif Bank received a warning from the United States that some of its Iranian-related transactions may be in violation of U.S. sanctions. Out of caution, Aktif Bank scrutinized its transactions related to Iran more closely and started working directly with Iranian customers, instead of using middlemen like Reza. As a result, Aktif Bank stopped brokering transactions for Reza. His income declined. Trial Tr. 294-95.

Meanwhile, Iran maintained access to Turkey's currency market through Halkbank, a Turkish state-owned bank that held accounts for Iranian banks and several Iranian oil and gas companies. U.S. sanctions prohibited Halkbank from converting Iranian oil proceeds to cash. A loophole in the law, however, allowed Halkbank to exchange Iranian oil proceeds for gold. This allowed Halkbank to transfer large sums of gold out of Turkey, which would inflate Turkey's exports and make its economy appear stronger.

In 2012, the Turkish Minister of the Economy, Zafer Caglayan, told Reza that he could help him start working with Halkbank to exchange Iranian oil proceeds held at Halkbank for gold. *See* Trial Tr. 301-02. Caglayan offered to broker Halkbank's work with Reza in exchange for 50% of Reza's profits. Trial Tr. 302. Halkbank's CEO, Suleyman Aslan, also required Reza to give him a share of Reza's profits in brokering the gold exchanges. Trial Tr. 408-12. Reza agreed to both Caglayan's and Aslan's requirements and began working with Halkbank to exchange money held in Halkbank accounts for gold.

The U.S. sanctions did not allow Iranian oil proceeds held at Halkbank to be exchanged for U.S. dollars. Over time, Reza learned that some of the transactions that he helped process through Halkbank involved the exchange and shipment of U.S. dollars. Those transactions

comprised only around 10% of Reza's business. Reza was not involved in the actual processing of the problematic transfer requests, which were handled by smaller exchange houses (hawaladars) that would process the requests and send the proof of purchase to Reza for transmission to the original Iranian customer.

### D. Reza's Altruistic Generosity

Reza always has found joy and purpose in helping others. Following his imprisonment in Turkey, he refocused his efforts on supporting those less fortunate. Among other charitable projects, Reza has "support[ed] the construction and development of school[s]," provided financial assistance to an orphanage in Iran that cared for abandoned and seriously ill children, "purchased household necessities for struggling families, helped elderly individuals facing financial hardship, and supported people battling serious illnesses." (███████ Ltr.) He also enlisted friends to coordinate charitable projects, including food drives, financial assistance programs, and donations of wheelchairs. ███ Ltr.) ████████████, emphasized that Reza's "motivation was never recognition, praise, publicity, or personal benefit," and noted that "[m]any of the people who benefited from his assistance never knew the full extent of his involvement because he intentionally chose to remain in the background." ███ Ltr.)

Most notably, during the Syrian refugee crisis in 2015, Reza and his diving instructor ████████ saved countless adults and children from drowning off the coast of Bodrum, Turkey. Between July and September, they undertook twelve high-stakes rescue missions to save survivors from the water and surrounding islets. In ████████ words, "Reza repeatedly put himself in difficult and dangerous situations to help people he had never met. He never did it for recognition or praise. He did it because he could not stand by while people were suffering and losing their lives at sea." (███████ Ltr.)

11

### E. Reza's Arrest in the United States

In March 2016, the FBI arrested Reza in Miami while he was enroute to Disney World with his then-wife and four-year-old daughter. He was charged with conspiring to defraud the U.S., conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), and conspiring to commit bank fraud and money laundering. ECF No. 2. Reza spent nearly two years in jail, partially in solitary confinement, isolated from his family and in a state of chronic stress. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

In 2017, Reza made the momentous decision to enter into a cooperation agreement. Although initially attempting unsuccessfully to have the case otherwise resolved, Reza struggled deeply with the decision to cooperate against Halkbank and Turkey because of the threats of ████████████ retaliation and imprisonment against him ████████ from the Turkish government.[3] Despite his well-founded concerns which later materialized, to an extent beyond what he had imagined, Reza agreed to assist the U.S. government in its investigation and prosecution of other individuals, entities, and nations involved in the business.

On October 26, 2017, in a sealed proceeding, Reza pleaded guilty before your Honor to a seven-count superseding information to conspiring to violate IEEPA; conspiring to violate U.S. sanctions laws; bank fraud and conspiring to commit bank fraud; money laundering and conspiring to commit money laundering; and conspiring to bribe a jail guard.

---

[3] These issues are discussed in Section III.

## II.    THE OFFENSE CONDUCT

The primary charges against Reza arise from his participation in a business that transmitted proceeds of Iranian oil to bypass U.S. sanctions using two primary methods of moving Iranian money out of Halkbank: the "gold trade" and the "fake food trade."

### A.  The Gold Trade

The initial idea for the gold trade originated in 2012 with Ahmet Alacaci, a Turkish jeweler who proposed using gold exports to extract foreign (primarily Iranian) money from Halkbank. Trial Tr. 296-97. Reza discussed the idea with several Turkish politicians and senior executives at Halkbank—first Aslan, then Caglayan and Atilla. Trial Tr. 298-99, 268-69. Because the international sanctions laws are complex and dynamic, Atilla's expertise as "the most knowledgeable person about the sanction rules in the bank" was critical for the gold trade's success. Trial Tr. 269. Atilla stayed apprised of changes in the regulations, identified supposed "loopholes," and devised new ways to make the transactions appear as though they complied with U.S. sanctions. Trial Tr. 604-05.

Under the gold trade, Iranian funds held at Halkbank were transferred internally from Iranian accounts to one of Reza's companies, and finally to a gold supplier with an account at Halkbank. Trial Tr. 327-28, 330. The gold supplier would provide Reza's company with gold in Turkey, which would be exported to Dubai and sold for cash. Trial Tr. 331, 361. Halkbank would instruct Reza's employees to prepare customs papers indicating that the gold was intended for Iran (or another country) through Dubai, but the gold would never leave Dubai. Trial Tr. 355-57, 362, 690. In Dubai, cash from the gold sale would be deposited in accounts at Dubai banks and sent around the world to fulfill payment instructions from Iranians. Trial Tr. 267, 333.

## B. The Fake Food Trade

In 2013, a new sanctions law came into effect that limited the use of Iranian oil or gas proceeds in Turkey and prohibited supply of gold to Iran. The gold trade business was no longer a viable mode for moving money. At Aslan's direction, and using Atilla's expertise in U.S. embargos, the business turned to purported sales of food to continue their laundering activities. Trial Tr. 494-98, 549, 559, 603-04.

The purpose of the fake food business was the same as that of the gold business—to convert Iranian funds from Halkbank into cash for international payments—but this time using fake food shipping companies. Trial Tr. 562-63. Just like in the gold trade business, the fake food business relied on a series of transfers conceived by Atilla through accounts at Halkbank to an Iranian account, to a "supplier" company that Reza controlled, and then to Dubai. Trial Tr. 563-69. In Dubai, the money would be used to fulfill Iran's payment orders. Trial Tr. 565-67.

Unlike the gold trade, in which gold was physically exported, no food was shipped. Trial Tr. 568. To conceal the true nature of the transactions, Reza's employees created documents purporting to show that the transactions involved food shipments, including invoices, customs declarations, and shipping documents. *Id.* The employees would also obtain blank customs manifest forms in Dubai, fill them with fictitious information, and get them stamped by customs officers to create "official" documents for shipments that never occurred. Trial Tr. 580-81.

To facilitate the gold and fake food trades and maintain access to the Turkish banking system, Reza shared with Turkish government officials, many of whom became his co-defendants, part of the proceeds. Those officials included Caglayan, Minister of the Economy; Aslan, CEO of Halkbank; and Bagis, Minister for EU Affairs.

14

### C. Possession of Contraband

While incarcerated at the MCC, Reza, along with other inmates, paid a jail guard approximately $45,000 in exchange for the guard providing Reza with alcohol and a cell phone. Reza used the cell phone to call his then-wife, daughter, and other family members who were unable to visit him. The guard allowed Reza to use the guard's personal cell phone and provided him with DayQuil. Trial Tr. 815-17. After Reza began cooperating with the government, he revealed this incident and other instances of corruption in the MCC to the government, leading to the guard's arrest and a crackdown on corruption.

## III.    REZA'S COOPERATION WITH THE GOVERNMENT

Reza's unconditional cooperation with the government over the past eight years has been extraordinary in both scope and impact. The value of the information proffered by Reza to the United States's national security interests was and continues to be of significant value. It has led to conviction, indictment, and considerable value for the United States in ongoing investigations.

### A. The Cooperation Agreement

Reza first proffered almost nine years ago in the summer of 2017. Between July and October 2017, Reza participated in over a dozen proffer sessions with the government. The initial sessions focused on Reza's business, his accounts at the various Turkish banks, and the component transactions used to exchange currency and, ultimately, to launder Iranian oil proceeds. After laying groundwork, Reza provided the government with valuable information about the evasion of U.S. sanctions by foreign financial institutions and others. A high-level Iranian official stated that with the arrest of Reza, the U.S. had "identified [Iran's] respiratory tract."[4] Reza proved this statement true as he painstakingly detailed to the government the

---

[4] Shahir Shahidsaless, *Iran petrol protests: Why war could be the only way out of US sanctions*

methods by which Iran evades U.S. sanctions and the dozens of participants involved

The information from Reza advanced national security interests by helping identify and close sanctions loopholes and debilitating future sanctions evasion by Iran. In recognition of the immense value of Reza's cooperation

Reza's candor with the government also led to the discovery of corruption in the federal pretrial facilities where he was housed and the prosecution of a federal guard. The guard, who accepted bribes from multiple inmates, was charged and pleaded guilty to federal bribery charges. The guard was sentenced to three years in prison.

Reza pleaded guilty in October 2017.

## B. The Government's Prosecution of Atilla and Simultaneous Retaliation and Attempted Murder by Turkey

After Reza's plea, he continued to meet on dozens of occasions with the government to prepare for the trial of Atilla. At that time, Reza was incarcerated at the MDC and the government took extensive precautions to try to keep Reza's cooperation secret.

Rumors of his cooperation nonetheless surfaced and Reza soon faced threats of violence from other inmates. In early November 2017, the threats culminated with a fellow

armed with a knife, cornering Reza and saying that he had been paid by ▓▓ to kill Reza and

*spiral,* Middle East Eye (Nov. 19, 2019) https://www.middleeasteye.net/opinion/will-tehran-defeat-trump.

would do so if Reza was cooperating. The immediate threat ended when Reza's cell mate came looking for him and, along with other inmates, forcefully rescued Reza. This incident led to Reza's immediate transfer to FBI custody, where two FBI agents watched over Reza at all times, because given the extensive reach of those who wanted to harm him, all involved understood that no jail would be sufficiently safe. ████████████

As Atilla's trial neared ████████████████ subjected to relentless threats and intimidatio ██████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████

As further retaliation, about a week before Atilla's trial, three of Reza's employees were arrested in Turkey. Their arrests were held over Reza's head by Turkish authorities as a last-ditch attempt to coerce him not to testify. A day before testifying, the employees were released as a sign of good faith. In November 2017, in the days before Atilla's trial, Turkey raided the home of another of Reza's employees ████████, in the middle of the night while his family watched in terror ██████████████████████████

████████████████████████████



Notwithstanding these escalating threats, Reza continued to participate in frequent and lengthy meetings with the government and to prepare diligently for his testimony. He reviewed hundreds of phone calls and thousands of communications and documents related to the sanctions evasion business. Reza also used his own time to review his communications and business records. Reza prepared diagrams, timelines, and spreadsheets depicting the payment systems for the government to use as demonstratives at Atilla's trial and explained Halkbank's participation in the payment systems that evaded U.S. sanctions against Iran.

### C. Reza's Indispensable Testimony at Atilla's Trial

From November 29 to December 7, 2017, in a courtroom overflowing with press and others from around the world, Reza testified at the trial of Mehmet Hakan Atilla, Halkbank's deputy CEO. Despite threats to his and his family's safety, Reza testified for seven days.

In the Court's words, he "was one of the government's most important witnesses in Mr. Atilla's trial." Sentencing Tr. 27. Reza admitted in open court to the crimes he committed and the reasons for his cooperation. His testimony was essential to obtaining Atilla's conviction. He gave detailed descriptions of the different methods by which the business moved the proceeds of Iranian oil and gas sales, named people and entities involved in the business, and testified about dozens of payments and bribes. He drew color-coded diagrams for the jury depicting different

18

pathways for laundering funds. Reza stayed up all night diagramming the business on poster boards spread across the walls of his hotel room. A former U.S. Treasury Department official described Reza as "tak[ing] on the persona of a Harvard business professor" while testifying, adding that Reza "lay[ed] it all out there" like the movie *A Beautiful Mind*.[5] These efforts helped the prosecutors present the complex business to the jury in a way they could easily understand.

Reza's testimony elicited a cascade of aggressive responses from the Turkish government, which viewed Reza's testimony and cooperation as espionage:

- On the first day of Reza's testimony, the three employees who were previously arrested and released were arrested by Turkish authorities for a second time.

- The next day, Turkey opened a sham investigation into Reza for criminal espionage, which carries a sentence of life imprisonment



- Around the same time, the Turkish government seized Reza's assets, worth over $172,000,000, including his plane, real estate, boats, vehicles, and art collection. Authorities also sought to demolish his home on the Bosporus as further retribution.

- The Turkish government also closed bank accounts and ordered the seizure of the assets of approximately twenty other individuals connected to Reza ▮▮▮▮▮ to pay for any future fines or penalties that the Turkey could face a result of Reza's cooperation



---

[5] FDD, *FDD EVENT | Atilla, Zarrab, and U.S.-Turkish Relations*, at 35:45 (YouTube, Jan. 18, 2018), https://youtube.com/watch?v=pju7rY1vmcY&t=2160s.

- ████████████████████████████████████

- ████████████████████████████████████

- ████████████████████████████████████

- ████████████████████████████████████

- The Turkish press published a steady stream of aggressive, and at times unhinged, criticisms of Reza, painting him as a traitor, a spy, and a fraud.[6]

Despite the threats and backlash, Reza returned to court and testified until he was dismissed. On January 3, 2018, a jury convicted Atilla.

Atilla was sentenced on May 16, 2018, to 32 months in prison. The Court emphasized the importance of Reza's testimony—which it characterized as "credible" and "largely unrefuted"—in securing Atilla's conviction, the thoroughness of Reza's preparation, and the value of his cooperation with the USAO. Sentencing Tr. 18, 27. To Reza's credit, the Court observed, his explanation of Atilla's involvement in the business included Atilla's reluctance to

---

[6] *See, e.g.*, Nazif Karaman, *Sarraf-FETÖ işbirliğinin kanıtı*, SABAH (Dec. 6, 2017) (arguing that Reza's testimony is evidence that he is cooperating with FETO, the group the Turkish government blames for a failed 2013 coup attempt); *Akşener'den Zarrab tepkisi!*, SÖZCÜ (Dec. 5, 2017) (describing the reaction to Reza's testimony, referring to Reza as a traitor).

20

be involved. Sentencing Tr. 28. Reza's testimony had also helped uncover falsities in Atilla's testimony, for which the Court added obstruction points. Sentencing Tr. 15-19.

### D. Turkey Financially Ruins Reza ███████████ in Retaliation for Reza's Testimony at Atilla's Trial

On the first day of Reza's testimony at Atilla's trial, Turkey retaliated against Reza by charging him with espionage and seizing over $172,000,000 of his and his family's assets. *See Reza Zarrab Case: Turkey Seizes Assets of Trader in US Trial*, BBC NEWS (Dec. 1, 2017), https://www.bbc.com/news/world-europe-42203274. These assets included real estate, boats, a plane, motorcycles, and religious and other works of art. Turkish Prime Minister Binali Yildirim stated that he hoped that these retaliatory seizures would cause Reza to "turn back from his mistake." *Id.* Because Reza did not turn back and instead continued to testify, cooperate with the government ███████████████████████████ Turkey turned many of Reza's ████████ assets over to trustees affiliated with the Turkish government. ███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████ Rez ██████ also lost countless millions in rental income on property that they could not use because Turkey seized it.

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

21



A chart[7] depicting the rental income, repair and maintenance fees, and value lost to Reza and his family is below:

| Property | Original Value | Lost Rental Income | Repair and Maintenance Fees | Estimated Current Value | Total Loss |
|---|---|---|---|---|---|
| ▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓ | $79,200,000 |
| Beykoz-İstanbul House | $16,000,000 | $6,240,000 | $15,208,253 | $16,000,000 | $21,448,253 |
| Bakırköy, Istanbul Apartment | $2,000,000 | $1,152,000 | $172,794 | Unknown | $1,324,794 |
| Bodrum Home | $2,838,262 | $2,177,280 | $1,262,569 | $1,500,000 | $4,778,111 |
| Metroport Offices | $908,236 | $1,307,871 | $268,601 | $1,000,000 | $1,484,708 |
| Shop at Grand Bazaar | $1,000,000 | $2,052,000 | $184,573 | $1,500,000 | $1,736,573 |
| Kandilli Office | $13,350,000 | $4,800,000 | Unknown | $5,000,000 | $13,150,000 |
| Furniture Factory | $1,500,000 | $3,360,000 | $130,073 | Unknown | $3,490,073 |
| Bella Park Building | $2,500,000 | $1,728,000 | $90,901 | $1,000,000 | $3,318,901 |
| Total | | | | | $129,931,413 |

As reflected in the above chart, Turkey's retaliatory seizures of and damages to and neglect of Reza and his family's real estate have caused some $129,931,413 in total losses.

---

[7] The original value is based on Reza's recollection of the purchase price of the property. Lost rental income represents the income that Reza approximates he would have made if the real estate were fully operational. The repair and maintenance fees include fees that Reza was charged by the trustees and fees he was required to pay to maintain the real estate. The estimated current value represents Reza's approximation of how much the property is worth now. The total loss equals the difference between the original value and the estimated current value, less the lost rental income, and less the repair and maintenance fees.

In addition to this $129,931,413 loss from seized real estate, Reza and his family have incurred substantial losses on additional assets. One of those assets was a business jet seized by the Turkish government. After being forced out of operation by the seizure, the total repair and maintenance costs exceeded $1.5 million. With an estimated 2,000 hours of unutilized flight time since the plane has been out of commission, $9,000,000 in potential revenue has been lost. The jet's repair and maintenance costs of $1,500,000 plus the $9,000,000 in lost potential revenue mean that Turkey's seizure of the jet has caused Reza and his family to lose some $10,500,000.

Reza also suffered substantial losses from the seizure of a sailing boat. Since the seizure, Reza has lost an estimated $4,000,000 in lost rental income. In addition, the vessel has incurred over $6,303,386 in excess maintenance, repairs, and marina fees due to the lack of use after the seizure, which have been paid by Reza's mother. The yacht's $6,303,386 maintenance costs plus the $4,000,000 in lost rental income mean that Turkey's seizure of the yacht has caused Reza and his family to lose $10,303,386.

Therefore, Turkey's seizure of Reza and his family's assets have caused them to lose at least approximately $150,734,799, and damages to and seizure of numerous other assets including vehicles and religious and other works of art are not part of this total.

**E. The Halkbank Investigation and Ongoing Abuse by Turkey of Reza** ▮▮▮▮▮

After he testified in Atilla's trial, Reza continued to work with the U.S. government in its investigation of Halkbank. In the months leading to the Halkbank indictment, Reza met ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Reza appeared before the Court

Although Reza had pleaded guilty in 2017, the government continued to delay his sentencing pending its prosecution of Halkbank.

- Turkish politicians from all parties publicly condemned Reza in the news and in public speeches. Turkish opposition published a stunning and false statement (translated into English) blaming Reza for the war between Turkey and Syria:

  *Because of the Halkbank case, the republic of Turkey was forced to sell its interest that has gained with casualties and blood. Because of the problem that Reza Zarrab has caused today, while tens of thousands of Army officers, sergeants, young soldiers are going to the front to the border, you sent children to their death, and then because of a clown named Reza Zarrab, those children, those hero children, you risked their security*

-

-

-

24



- The October 15, 2019, indictment against Halkbank, which charged Halkbank with helping Iran evade sanctions to access approximately $20 billion worth of restricted Iranian funds,

- At Halkbank's request, the Turkish government seized and eventually allowed to be destroyed an iconic building in Istanbul owned by Reza's family and formerly worth $78 million. The government fired the family's lawyers and inserted their own to prevent the Zarrabs from asserting their rights over the property. Because the building's ownership was well-known, it was vandalized beyond recognition. The community around the building sued the Zarrabs for the loss of business in the neighborhood.

**F. Reza's Cooperation**

Reza has been separated from his family for ten years, since March 2016. While some family members have been able to come to the U.S. to visit him, many others have not, and he may never see them again.

26



Reza also has gone years at a time without seeing his parents, who have suffered their own hardships through these proceedings.

**G. Turkey's Harassment Led to Oppressive Security Risks That Have Deprived Reza of His Livelihood While on Bail**

On January 18, 2018, after spending nearly two years in jail, his plea, testimony at the Atilla trial, and extensive cooperation, Reza filed a motion for bail.

The Court granted Reza's motion on January 21, 2018, and Reza was released shortly afterwards on several conditions including the following:

- Required to hire and pay for a 24-hour guard to protect him

- Home detention with 24/7 electronic and GPS monitoring

- Not permitted to leave residence, except to attend court proceedings; meet with the government, meet with pretrial services; or receive medical services

- Not permitted to be outside of the Southern or Eastern Districts of New York

After his release, Reza had trouble finding a place to live because he had no family in the United States, his ID cards had been cancelled by the Turkish government, and it was not safe to use his real name or be in public because of the threats on his life. To make matters worse, Reza could not open a U.S. bank account or credit card because he did not have an ID. Reza rented a NYC apartment. He had to use an assumed name to maintain anonymity and get a lease. The government supported these efforts, which were necessary to protect his safety.

From January 2018 to July 2018, by necessity, Reza lived under              confined to his apartment under the 24/7 watch of two security guards he hired. He left the apartment

27

only under tight security and only to attend meetings with the government or with the Court's permission. He lived isolated and in constant fear that foreign governments would find him.

Reza's fears became his reality. ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████ Reza was then photographed by both reporters and private citizens, and the photos were posted on the internet.

In July 2018, to allow Reza to establish a more permanent and financially stable lifestyle, the Court modified Reza's bail conditions. The Court removed the home confinement and electronic monitoring requirements and allowed Reza to travel to the Districts of New Jersey and Connecticut, in addition to the Southern and Eastern Districts of New York. Turkish figures continued to track and photograph him throughout NYC. Among other occurrences, on September 18, 2018, Turkish tabloids photographed Reza at a NYC restaurant.[8]

**H. Reza Seeks Safety and Refuge** ███████

Staying in the NYC area appeared no longer to be safe for Reza. With the government's consent and encouragement, he and his counsel began looking at other U.S. cities that might be

---

[8] SCF, *Iran sanctions-busting Turkish-Iranian gold trader Zarrab seen in New York sushi restaurant*, Stockholm Center for Freedom (Sept. 12, 2018) https://stockholmcf.org/iran-sanctions-busting-turkish-iranian-gold-trader-zarrab-seen-in-new-york-sushi-restaurant/.

safer. He eventually asked for permission ████████████████ which he believed would reduce his visibility. The Court granted Reza's request and in December 2018 Reza secretly ████████ ████

Even after ████████████████████████████ for safety reasons and had to be accompanied by a driver and bodyguard everywhere he went. Reza could not get on an airplane because of security concerns and because he did not have an ID. He traveled between ████████ and New York ████████████████ several times to cooperate and meet with the government. ████████████████████

████████████████████████████████

████ Without an identity, valid work authorization, or a bank account in his own name, it was impossible for Reza to transact any meaningful business or find a job.

I. ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████ Reza began charitably working as a volunteer for ████████████

[REDACTED] but ultimately had to stop because of publicity and security concerns [REDACTED]

### J. Reza Finds Solace in Horseback Riding

Fortunately, Reza re-discovered his love for horses and began "endurance riding" to cope with the stress of his circumstances. Endurance riding is an ultra-marathon for horses and riders. Riders cover distances up to 100 miles per day, traversing hills, streams, and rugged terrain. The fitness and stamina necessary for endurance riding requires extreme training from the riders and horses. Reza competed in several cross-country endurance races. This new hobby supported Reza's mental and physical health and provided him with business opportunities. He eventually opened a small horse farm and training center. [REDACTED]

[REDACTED]

Reza built the farm and training center from the ground up. He spent hundreds of hours manually building the facility with his workers. (Negahban Ltr.) He often worked from sunrise to sundown before returning home covered in mud. [REDACTED]

[REDACTED] The intense physical labor required to train horses transformed Reza's health and helped him cope with the stress of his life. [REDACTED]

### K. Ongoing Security Risks Ruin Reza's Budding Horse-Farm Business

[REDACTED]

[REDACTED]

[REDACTED] In late 2021, Reza's whereabouts and [REDACTED] were published on Twitter, which led to a cascade of requests for information from reporters writing follow-on articles. [REDACTED] Reza had to move to [REDACTED]

[REDACTED]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████ Both customers and financial

institutions were not comfortable with the danger that appeared associated with Reza. Halkbank

even used the U.S. legal system to uncover Reza's location. In 2024, the bank filed a complaint

against certain U.S. federal agencies seeking information about Reza.████████████████████

████████████████████████████████████████████ People

within the horse community started rumors about Reza after noticing his security guards and that

ominous individuals often followed and surreptitiously photographed him at the horse farm and

events. The rumors and Reza's inability to bank were major setbacks for his burgeoning horse

farm and he soon had to end his association with the business. ████████████████

The effects of the ████████████ threats haunt Reza to this day. He has well-

founded fears any time he goes out in public. Despite the extraordinary challenges he has faced,

Reza has remained in compliance with his bail conditions and has continued to cooperate with

the government.

### L. Halkbank is Handed an Unprecedented DPA and Avoids Penalties

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[REDACTED] Halkbank fought the charges and obstructed the prosecution. The bank filed endless motions and multiple appeals in the Second Circuit and Supreme Court, leading to the nearly nine-year delay between Reza's guilty plea and his sentencing. [REDACTED]

The nearly nine years Reza spent cooperating and waiting for resolution of his own case recently were rendered largely meaningless. On March 9, 2026, the government filed a letter notifying the Court that it had reached an agreement with Halkbank to enter a DPA pursuant to which the government will drop all charges against Halkbank. *United States v. Turkiye Halk Bankasi, A.S.*, 6:15-cr-867-RMB (S.D.N.Y.), ECF No. 759. The DPA credits Halkbank, vis-à-

32

vis the Turkish government, for its cooperation and assistance in advancing U.S. foreign policy and national security interests, chief among them supposedly "obtain[ing] the release of all then-remaining hostages" held by Hamas. *Id.* Incredibly, under the DPA, Halkbank will not receive financial penalties. Defense counsel believes that it was Reza's cooperation that made this DPA possible—whatever actions Halkbank (and the Turkish government) purportedly took to obtain the release of hostages were taken in the shadow of Reza's cooperation, with the knowledge that unless Halkbank reached a deal with the U.S. government, the trial would proceed with Reza's testimony front and center.

M.





### N. Reza Marries Dilara Altintop

Reza strengthened his family bonds when he married Dilara Altintop in January 2025. Dilara spent the first 18 years of her life living in Turkey, before moving to the United States to pursue her college education. (Altintop Ltr.) She impressively went on to earn a Bachelor of Arts degree in Political Science from Florida Atlantic University, a Paralegal Certificate from Boston University, and a Master of Business Administration degree from Westcliff University. *Id.* She is now pursuing a Doctorate degree in Business Administration. *Id.*

In addition to being highly educated, Dilara is a world champion swimmer. *Id.* She swam for the Turkish National Swimming Team from when she was 12 years old until she was 21, breaking multiple national records and winning numerous medals. *Id.* Dilara competed in numerous international competitions, including the European Youth Olympic Games, the FINA World Championships, and the LEN European Championships. *Id.* In 2011, she won a world championship at the ISF Swim Cup held in Malta. *Id.*

Reza met Dilara in 2023. *Id.* Before they met, Dilara knew only of Reza "from the Turkish media, which depicted him as a traitor to the nation" because of his crimes and cooperation. *Id.* As Dilara got to know Reza, she "came to know a compassionate, caring, and deeply loyal person whose character cannot be fully understood through public perception alone." *Id.* Dilara was drawn to Reza's "kindness [and] generosity" and "the way he treated people around him." *Id.* Dilara watched Reza "reflect on his actions, accept responsibility for

34

them, and live with their consequences every day" while he continued to remain strong and make her feel "supported, loved, and protected." *Id.* The couple married in 2025.



## IV.    THE SENTENCING GUIDELINES

The Court should find that Reza's Offense Level is 30, that his Criminal History Category is I, and that his advisory sentencing range under the Guidelines is 97 to 121 months, which is consistent with the Probation Office's calculation in the Presentence Report.

## V.    A TIME-SERVED SENTENCE IS APPROPRIATE

### A. This Court Can and Should Impose a Non-Guidelines Sentence of Time Served

This Court should impose a sentence of time served, as the Probation Office recommends. Reza already has spent 22 months in jail. He also spent another 5 months in strict home confinement in New York and 95 months under restrictive bail conditions▮▮▮▮▮ The Court should sentence Reza to time served based on the Section 3553(a) factors.

### B. The Nature and Circumstances of the Offense Favor a Time-Served Sentence

Reza's crimes are undeniably serious and, as he stated during his plea, he accepts full responsibility for his actions. The quantum of seriousness, however, is reflected in the 32-month sentence given to Atilla and the DPA given to Halkbank. The particular "nature and circumstances" of Reza's offense weigh in favor of a time-served sentence where he has engaged in extraordinary cooperation, where much of the conduct was extraterritorial, where there was no loss, and where any gain was modest. 18 U.S.C. § 3553(a)(1).

35

### 1. Reza's Cooperation Has Been Extraordinary

Reza's sentence should reflect that he promptly took responsibility for his actions and substantially assisted the government. As described, Reza's cooperation was monumental, involving hundreds of hours of proffers, document review, trial preparation, testimony at trial, and ███████████████████████████ Reza's extensive cooperation has also come at great cost to himself and to his family and he has risked his life countless times. Reza expects the government to file a motion pursuant to U.S.S.G. § 5K1.1 detailing his substantial assistance in the investigation and prosecution of Halkbank, Atilla, and others. Considering that Reza is the only cooperator here, the Court should impose time served. *See* U.S.S.G. § 5K1.1(a)(1)-(4).

### 2. The Offense Conduct Was Predominantly Extraterritorial

The fact that most of the offense conduct was extraterritorial, with no connection to the U.S., weighs in favor of leniency. The fundamental mechanism of the sanctions evasion business involved internal transfers within Halkbank, and thus within Turkey, to move funds from Iranian accounts to Reza's companies' accounts, and then to the accounts of suppliers. *See* Trial Tr. 329-30. In fact, the co-conspirators sought to keep those transactions within Turkey and away from U.S. correspondent banks. Trial Tr. 405. Most of the value generated by the business—which largely came from the extractions of funds from Halkbank and conversion to gold in Dubai—occurred entirely outside of the United States. The fact that most of the conduct had no connection to the United States warrants leniency. *See United States v. Thavaraja*, 740 F.3d 253, 261 (2d Cir. 2014) (district court "did not err in considering the degree of harm that an individual member of [a foreign organization] caused or intended to cause the United States").

### 3. No Loss Occurred and Any Gain By Reza Was Modest Compared to Others' Gains

The offense conduct resulted in no losses. Any gain by Reza was comparatively modest compared to the benefits received by Halkbank and Turkey. His profit represented only a fraction of the proceeds, most of which went to other co-conspirators with much more pecuniary gain. Reza's profits were modest compared to the approximately $20 billion scale of the business. Reza testified that, "[a]fter paying the commission for the bank, and after paying the other bribes, and after deducting all of the expenses, [his profit margin was] approximately 0.4 or 4 per thousand to 5 per thousand" transacted. Trial Tr. 820. In other words, Reza's profit margin was between 0.04% and 0.5% of the overall transaction value, a small portion of the proceeds that flowed through the business. Reza's gross profits also must be viewed in the context of the payments he made to Turkish officials. His commissions were split 50/50 with Caglayan and, at times, Aslan. *See* Trial Tr. 302. Only Reza, however, bore the operational costs and risk associated with the transactions, while the others received a share of the gross profits. Although Reza has suffered immeasurably, Caglayan and others have faced no financial consequences of their actions and remain in positions of power in Turkey. *See, e.g., United States v. Saidazim*, No. 21-cr-564-WFK (E.D.N.Y.) (sentencing defendant who received comparatively low pecuniary gain to time served).

### C. Reza's History and Characteristics Favor a Time-Served Sentence

Reza's "history and characteristics" contain extensive mitigating factors. 18 U.S.C. § 3553(a)(1). Reza has been a model cooperator and defendant and complied with all court-ordered conditions of his release despite the enormous threats to his safety and relentless attacks by foreign governments, which tore apart Reza's family in Turkey. Fortunately, since being released on bail in 2018, Reza has built a quiet and simple life in the United States. ▮▮▮▮

███████████████████████████████████████████████████

███

The letters from Reza's family and friends provide the best insight into Reza as a person. Those who know Reza attest to his compassion, generosity, dependability, and selflessness. Richard Armas, Reza's diving partner and a former federal corrections officer, stated Reza "possesses a character defined by kindness and a genuine regard for those around him." (Armas Ltr.) Despite the challenges Reza has faced over the last ten years, he always is quick to offer help to others. ████████████████████████████████████████ Reza went above and beyond to make sure he had access to the best care possible. (████████ Ltr.)

Reza's good works are not limited to members of his family. He has provided emotional and financial support to countless friends and associates with difficult medical issues (███████ ████ Ltr., ████ Ltr.), including by helping an employee undergoing treatment for breast cancer (Saran Ltr.), and by helping his housekeeper build her own cleaning company (Candal Ltr.). (*See also* ████ Ltr.; ████ Ltr.; ████ Ltr.) When Reza's ████████████████, suffered the devastating loss of his child, Reza made every effort he could "to support [him and his family] emotionally, financially, and legally." ████ Ltr.)

A sentence of time served also would allow Reza to care for his mother, to whom he remains close and who has suffered immensely. ████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ Courts have sentenced defendants to time served to avoid harming innocent family members who depend on the defendant. *See, e.g.,* *United States v. Faria*, 161 F.3d 761, 762 (2d Cir. 1998).

Finally, the Second Circuit "consistently held that a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000). Reza is not the same person today as he was when he was arrested in 2016. A time-served sentence would allow Reza to continue the personal progress he has made since these proceedings began ten years ago.

### D. A Time-Served Sentence Would Provide Just Punishment and Avoid Unwarranted Sentencing Disparities

#### 1. The Consequences Reza Has Already Suffered Are Just Punishment

Reza has already suffered severe punishment. His family is broken and he can no longer return to Turkey or Iran to see his living relatives. His money and property are in the hands of a hostile foreign government. After spending 22 months in prison he was released on home confinement, only to find himself the target of stalking, harassment, threats, and retaliation. Reza's life while out on bail has been significantly more onerous than it would be for a normal defendant. The Court can and should depart downward to account for these circumstances. *See United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004); *United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001).

#### 2. A Time-Served Sentence Is Necessary to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Reza already spent 22 months behind bars, from his arrest in March 2016 until he was released on bail in January 2018. Especially when considered in the context of the intense retaliation and suffering Reza endured both in prison and in hiding, the only sentence that would avoid creating an unwarranted sentencing disparity is one of time served.

The total absence of *any* penalty for the non-cooperative Halkbank contrasts starkly with Reza's potential punishment and has the potential to create an unconscionable injustice. The charges against Halkbank, one of Turkey's state-owned banks, are undeniably serious. In 2019, using information provided by Reza, the government charged Halkbank in a 45-page and six-count indictment for helping Iran evade sanctions to access approximately $20 billion worth of otherwise restricted Iranian funds. This Court recognized during Atilla's sentencing that "Halkbank was a significant beneficiary in terms of fees earned and the ability to serve as one of Iran's principal Turkish bankers." Atilla Sentencing Tr. 29. The government justifies its unprecedented agreement with Halkbank with reference to Turkey's assistance "that was instrumental in the ceasefire agreement [between Israel and Hamas] and Hamas's commitment to release all remaining hostages." *United States v. Turkiye Halk Bankasi, A.S.*, No. 6:15-cr-867 (S.D.N.Y.), ECF No. 759. Defense counsel believes that Turkey's assistance in the ceasefire agreement would not likely have occurred without Reza's cooperation, as Reza's information and demonstrated ability to testify provided the government with the leverage it needed to secure Turkey's diplomatic assistance. Reza should receive a comparable benefit for his invaluable role in making the deal possible.

Atilla's sentence of 32 months (with credit for time served), a significant downward variance from his guidelines range of 97-121 months, also counsels in favor of a time-served sentence. Reza recognizes that his participation in the sanctions evasion business was more extensive than Atilla's. Atilla, however, did not cooperate or plead guilty, thus exposing the government and this Court to the costs of trial preparation and trial. Moreover, upon returning to Turkey after completing his sentence, Atilla was heralded as a hero for not cooperating and given a high-profile position as the head of the Istanbul Stock Exchange. In addition, on top of five

40

months of home confinement and 95 months of strict bail, Reza already has served a significant amount of time—some 22 months in BOP and FBI custody—close to what would be served on a 32-month sentence such as Atilla received. A defendant sentenced to 32 months will generally serve less than that because of good time credit and First Step Act credit, and Reza's 22 months in custody is thus already comparable to the sentence Atilla received despite Reza's extensive, risky, and proactive cooperation.

### 3. A Time-Served Sentence Is Consistent with Other Sentences in Comparable Cases

A sentence of time served would also be consistent with other sentences imposed for defendants who are similarly situated to Reza (although Reza's experience has been unique). Cooperators sentenced in large fraud and conspiracy cases often receive time served or other non-custodial sentences, even when they are perpetrators of the fraud because their cooperation "was essential . . . to making [the] case, and [so] served a real public interest." *United States v. Gassnola*, No. 18-cr-252 (LAK) (S.D.N.Y. Oct. 7, 2019) (sentencing fraud cooperator to time served with two months' home detention); *see also United States v. Stumberger*, No. 19-cr-608-RA (S.D.N.Y. Oct. 20, 2023), ECF No. 42 (cooperator sentenced to time served despite Guidelines range of 97 to 121 months in $140 million financial fraud case); *United States v. Rohr*, No. 19-cr-595-RA (S.D.N.Y. May 19, 2023), ECF No. 24 (cooperator sentenced to time served despite Guidelines range of 168 to 210 months in $140 million financial fraud case).

The nature and circumstances here require a more lenient sentence due to the retribution he suffered, the fact that Halkbank faces no penalties, and the fact that Atilla's sentence is comparable to what Reza has already served.

41

### E. A Time-Served Sentence Would Afford Adequate Deterrence

A time-served sentence is sufficient to "protect the public from further crimes of the defendant" and to afford "adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B), (C). The collateral consequences Reza has suffered ██████████████████████████ will have a lasting effect on his life and ensure that he does not reoffend. As a first-time offender with zero history points, Reza is unlikely to recidivate. *See* 2023 Amendments in Brief, U.S.S.C. (2023), https://www.ussc.gov/policymaking/amendments/2023-criminal-history-amendment.

### F. A Custodial Sentence Would Ruin Reza's Mental and Physical Well-Being

A time-served sentence would allow Reza to continue receiving needed medical care ██ ███████████████ 18 U.S.C. § 3553(a)(2)(D). "When determining an appropriate sentence, the district court is permitted to consider the defendant's age, education, mental or emotional condition, [and] medical condition." *Rita v. United States*, 551 U.S. 338, 364 (2007) (Stevens, J., concurring) ████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████████

### G. The Court Should Not Impose Supervised Release

The Court should not impose a term of supervised release because Reza already has been supervised on release for some eight years. Reza has complied with his bail conditions for over eight years without issue and proved to the community, the Probation Office, and the Court that he has learned his lesson, rehabilitated himself, and is an upstanding member of society. Supervised release is unnecessary because "Congress provided for supervised release to facilitate a 'transition to community life,'" *Mont v. United States*, 587 U.S. 514, 523 (2019), and Reza already successfully has integrated himself into community life and then some. Imposing a term

42

of supervised release does not advance any governmental or societal interests. Moreover, imposing supervised release would result in an unwarranted sentencing disparity between Reza and Atilla, his co-defendant, because the Court declined to impose any term of supervised release on Atilla. *See* Atilla Sentencing Tr. at 49.

### VI. THE COURT SHOULD ORDER FORFEITURE OF THE BOAT VALUED AT $288,690 AND $88,102.59 IN CASH REZA HAS ALREADY PROVIDED TO THE U.S. GOVERNMENT

In the plea agreement, Reza agreed to forfeit the proceeds of the crimes to which he pleaded guilty. Reza and his family already have done that and more. As noted, Reza proactively has forfeited a boat valued at $288,690 (*see* Exhibit 3), and $88,102.59 in cash to the U.S. government, and the Court's forfeiture order here should be limited to those items. PSR at 30. No forfeiture beyond those items is warranted because (1) Reza no longer has possession of any other proceeds of the offense conduct, (2) any further forfeiture would be disproportionate to the gravity of the offense and defense counsel believes that it would subject Reza to further retaliation by the Turkish government, and (3) any further forfeiture would impair Reza's livelihood and ability to rebuild his life.

First, because Reza cooperated, the Turkish government seized virtually all his assets and has subjected Reza to unimaginable retaliation and suffering. Given those seizures by the Turkish government, among other things, Reza no longer has any ill-gotten proceeds; as Probation has determined, his net-worth is *negative* $50,970,162.50, *see* PSR at 29, n.13. Reza has had assets worth over $172,000,000 seized as a consequence of his plea and cooperation. Reza and his family have lost at least $150,734,799 from maintenance and repair fees, lost rental opportunities, and lost value in these assets. *See supra* pg. 23. Because Reza already has lost, as a result of his cooperation, more than his share of the proceeds from the crimes charged, this

43

Court should not order forfeiture beyond the items Reza has already surrendered. *See United States v. Tedeschi*, No. 10-cr-235 (S.D.N.Y.) (LAK), ECF No. 27 at 11, 39 (imposing $1 in forfeiture and noting that forfeiture should not extend to proceeds no longer in the defendant's possession).

In general, the goal of forfeiture is to disgorge gains and "ensure that crime does not pay." *United States v. Elias*, 154 F.4th 56, 63 (2d Cir. 2025); *see also Kaley v. United States*, 571 U.S. 320, 323 (2014) ("Forfeitures help to ensure that crime does not pay.") Forfeiture should not be duplicative of other penalties, however, or involve proceeds no longer in the defendant's possession. In *United States v. Tedeschi*, No. 10-cr-235 (S.D.N.Y.) (LAK), ECF No. 27 at 11 (Sentencing Transcript), for example, Judge Kaplan noted that forfeiture should be limited to proceeds that remain in a defendant's possession, explaining that the statutory language referencing "property which constitutes or was derived from proceeds traceable to a violation of a relevant statute" is "expressly limited or implicitly limited to property in the possession, custody or control of the defendant." No. 10-cr-235 (S.D.N.Y.) (LAK), ECF No. 27 (Sentencing Tr. 11). Judge Kaplan expressed his concern that the government should not be able to obtain an order of forfeiture, for example, against a defendant who stole a car requiring the defendant to forfeit the car even if the car is "in the hands of [a] used car dealer." *Id.* at 12. The Second Circuit too has recognized that a forfeiture amount may be reduced when ill-gotten gains are no longer in the possession of the defendant. *See United States v. Kalish*, 626 F.3d 165, 169-70 (2d Cir. 2010).

████████████████, Reza's █████████████ have taken more from Reza and his family than Reza gained from the sanctions evasion business. The amount of proceeds Reza earned through the illegal conduct was between $100 and $150 million dollars. *See* Trial Tr. 820. He

split that profit with Caglayan and Aslan, Trial Tr. 302, 412, leaving approximately $50 to $75 million dollars. Reza and his family have had over $172 million dollars of assets seized and suffered over $150,000,000 in losses from these seizures because of lost rental income, required maintenance and repair fees, and lost value. Many of these assets were only indirect proceeds of the sanctions evasion business. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Reza no longer possesses other specific property that might be subject to a forfeiture order and lacks the means to satisfy a money judgment beyond what he already forfeited.

Accordingly, this Court should impose forfeiture of the boat valued at $288,690 and the $88,102.59 in cash Reza has already forfeited because any other result, just as in Judge Kaplan's example of a stolen car that is no longer in a defendant's hands, would involve property that is no longer in Reza's possession due to the Turkish government's seizures of Reza's assets.

Second, any other result would also be "grossly disproportional to the gravity of [Reza's] offense," and would violate the Eighth Amendment's Excessive Fines Clause. In *United States v. Bajakajian*, the Supreme Court affirmed the judgment of the Court of Appeals for the Ninth Circuit, which concluded that "the reduced forfeiture of $15,000 was proportional to respondent's culpability." 524 U.S. 321, 327 (1998). Although the forfeiture statute authorizes forfeiture of property "involved in" a reporting violation, the Supreme Court held, "[c]omparing the gravity of respondent's crime with the $357,144 forfeiture the Government seeks, we conclude that such a forfeiture would be grossly disproportional to the gravity of his offense."

45

*Id.* at 339-40. Here, imposing further forfeiture on Reza would be disproportionate to the gravity of his offense.

The government's DPA with Halkbank further demonstrates how the imposition of any further money judgment is unwarranted. Reza was not the primary beneficiary of the sanctions evasion business. *See United States v. Atilla*, No. 1:15-cr-00867-RMB (S.D.N.Y.), ECF No. 510; Atilla Sentencing Tr. 29. While he received a share of the proceeds, Halkbank received much more and played an integral role in executing the business. Reza, for his part, split his profits with Halkbank and the Turkish officials, and bore all the out-of-pocket costs himself.

That DPA, however, does not require Halkbank to turn over even a dollar of its immeasurable profits. When viewed in this context, a substantial order of forfeiture against Reza, whose conduct and profits pale in comparison to Halkbank's, would be grossly disproportionate to the severity of his crimes. If no forfeiture is warranted for the obstructive retaliatory Halkbank, which profited in the billions of dollars, then the same should be true for Reza who not only pled guilty but cooperated extensively and suffered financially and otherwise because of that cooperation. Further, to the extent Halkbank already controls proceeds that once belonged to Reza, those proceeds arguably should have been turned over to the U.S. government. Yet Halkbank has now been relieved of *any* obligation to forfeit property in its control.

Although Reza's conduct was serious, the harm that he caused was relatively minor compared to that caused by other actors, which also warrants a proportionally lower forfeiture order. As this Court observed when sentencing Atilla, the crimes constituting the sanctions evasion business lacked the hallmarks of those that "warrant very stiff sentences," such as "crimes of violence, drugs, or terrorism." Atilla Sentencing Tr. 25. Nor did Reza's actions cause any pecuniary harm. *See* Atilla Sentencing Tr. 82 ("[T]here is no restitution because there

46

is no victim"). Accordingly, any further forfeiture would be grossly disproportionate to Reza's offense.

Third and finally, no further forfeiture is warranted because further forfeiture would deprive Reza of his future livelihood. *See Bajakajian*, 524 U.S. at 335; *United States v. Viloski*, 814 F.3d 104, 111 (2d Cir. 2016) ("courts may consider . . . whether the forfeiture would deprive the defendant of his livelihood"). Financial institutions will not allow Reza or many of his family members to maintain accounts or transfer funds. The retaliation he has suffered has stripped him of virtually all financial resources. Because Reza cannot access the U.S. banking system, a money judgment that is enforced against whatever cash *is* in his possession will further deprive Reza of his livelihood.

As noted, the Halkbank DPA provides that Halkbank will assist the U.S. government with respect to any order for the seizure of Reza's assets, funds, or property to satisfy a judgment against him. Defense counsel believes that the DPA's language could be used by Turkey to harass and abuse Reza and his family under the guise of complying with a court order. If the Court imposes a forfeiture order beyond what Reza has already forfeited and Turkey has authority to enforce it, defense counsel believes that Turkey will almost certainly use that authority to punish not only Reza ████████████████████████████████

████████ No criminal act encompassed in the sanctions evasion business is commensurate with that level of punishment. A forfeiture order must account for these extraordinary circumstances.

For all these reasons, the Court should impose forfeiture of the boat valued at $288,690 (*see* Exhibit 3), and $88,102.59 in cash Reza has already provided to the U.S. government.

## VII.    THE COURT SHOULD NOT IMPOSE RESTITUTION

The government stated during Reza's plea hearing, "we do not expect restitution."

Zarrab Plea Tr. 31. Restitution is unwarranted because as the Court already has found, in

declining to impose restitution on Atilla, there is no victim in this case for purposes of restitution.

Atilla Sentencing Tr. at 82:4-6 ("there is no restitution because there is no victim"). That finding

remains true. The Probation Office concurs and does not recommend restitution for Reza

because "the victim in this case is unascertainable." PSR at 41. The government's theory of

bank fraud was that Reza sought to induce U.S. banks to process transactions that were

prohibited under the Iranian sanctions regime. In processing those transactions, the banks earned

money in the form of fees and suffered no pecuniary harm. The absence of pecuniary harm and

identifiable victims precludes the Court from imposing restitution. *See* 18 U.S.C.

§ 3663A(c)(1)(B).

## VIII.    THE COURT SHOULD NOT IMPOSE A FINE

As the Probation Office recommends, the Court should not impose a fine because Reza is

unable to pay a fine. *See* PSR at 53. Reza is unable to pay a fine because his current net worth is

negative $50,970,162.50, he is unemployed, ██████████████████████████████

██████████    *See* PSR at 29, n.13. The Court declined to impose a fine on Atilla "based

largely upon the recommendation of probation" because the Probation Office concluded that

Atilla was unable to pay a fine. Atilla Sentencing Tr. 53. The Court should apply the same

reasoning and reach the same conclusion for Reza. *See United States v. Kakoullis*, 150 F. App'x

80, 82 (2d Cir. 2005) ("Imposing a fine that the defendant is unable to pay is an abuse of

discretion."). Reza has paid more than the price for his crimes and cooperation. The retaliation

to which Reza has been subjected has stripped him of virtually all financial resources. Even the

most basic banking services are unavailable to him because of his connection to this prosecution.

Although Reza suffers financially, his actions have not inflicted any pecuniary loss on others. Given these circumstances, the imposition of a fine is unnecessary and would not further the interests of justice. *See* 18 U.S.C. § 3572(a).

## CONCLUSION

For the foregoing reasons, the Court should sentence Reza to time served, forfeiture of

the boat valued at $288,690 (*see* Exhibit 3), and $88,102.59 in cash Reza has already provided to

the U.S. government, and no fine or restitution.

Dated: July 2, 2026
     New York, New York

MORVILLO, ABRAMOWITZ
GRAND, IASON & ANELLO, P.C.

By: */s/ Robert J. Anello*

*Attorneys for Defendant Reza Zarrab*

50